No. 21-16756

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

TODD YUKUTAKE, and DAVID KIKUKAWA,
*Plaintiffs-Appellees,*

v.

HOLLY T. SHIKADA, in her Official Capacity
as the Attorney General of the State of Hawaiʻi,
*Defendant-Appellant,*[1]

and

CITY AND COUNTY OF HONOLULU,
*Defendant.*[2]

---

On Appeal from the United States District Court for the District of Hawaiʻi
Honorable J. Michael Seabright, Chief United States District Judge
(Civil No. 1:19-cv-00578 JMS-RT)

---

## EXCERPTS OF RECORD FOR DEFENDANT-APPELLANT
## HOLLY T. SHIKADA (VOLUME 1 OF 3)

---

[1] HOLLY T. SHIKADA succeeded CLARE E. CONNORS as Attorney General of the State of Hawaiʻi on December 10, 2021 and is automatically substituted as a party pursuant to Fed. R. App. P. 43(c)(2).
[2] Defendant CITY AND COUNTY OF HONOLULU was dismissed with prejudice by stipulation in the District Court on June 12, 2020. 3-ER-440-444 (ECF 53).

| HOLLY T. SHIKADA | 4017 |
| Attorney General of the State of Hawaiʻi | |
| KIMBERLY T. GUIDRY | 7813 |
| Solicitor General | |

ROBERT T. NAKATSUJI 6743
First Deputy Solicitor General
CARON M. INAGAKI 3835
KENDALL J. MOSER 6515
Deputy Attorneys General
Dept. of the Attorney General
425 Queen Street
Honolulu, Hawaiʻi 96813
Telephone: (808) 586-1360
E-mail:  Kimberly.T.Guidry@hawaii.gov
Robert.T.Nakatsuji@hawaii.gov
Caron.M.Inagaki@hawaii.gov
Kendall.J.Moser@hawaii.gov

Counsel for Defendant-Appellant HOLLY T. SHIKADA, in her
Official Capacity as the Attorney General of the State of Hawaiʻi

AO 450 (Rev. 5/85) Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

TODD YUKUTAKE; DAVID
KIKUKAWA,

            Plaintiff(s),

            V.

CLARE E. CONNORS,

            Defendant(s).

JUDGMENT IN A CIVIL CASE

Case: CV 19-00578 JMS-RT

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

September 23, 2021

At 3 o'clock and 20 min p.m.
MICHELLE RYNNE, CLERK

[ ] **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[✓] **Decision by Court**. This action came for consideration before the Court. The issues have been considered and a decision has been rendered.

        On August 16, 2021, the Court issued an Order, ECF No. 107: "ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S COUNTER MOTION FOR SUMMARY JUDGMENT" ("August 16, 2021 Order") and on September 23, 2021, the Court issued an Order, ECF No. 116: "ORDER (1) CLARIFYING REMEDIES; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR STAY PENDING APPEAL, ECF NO. 113" ("September 23, 2021 Order").

        IT IS ORDERED AND ADJUDGED that Judgment is entered in favor of Plaintiffs pursuant to and in accordance with the August 16, 2021 and September 23, 2021 Orders.

September 23, 2021
_____
Date



MICHELLE RYNNE
_____
Clerk

/s/ Michelle Rynne by J.O.
_____
(By) Deputy Clerk

**1-ER-003**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TODD YUKUTAKE, ET AL., | CIV. NO. 19-00578 JMS-RT |
| Plaintiffs, | ORDER (1) CLARIFYING REMEDIES; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR STAY PENDING APPEAL, ECF NO. 113 |
| vs. | |
| CLARE E. CONNORS, | |
| Defendant. | |

## ORDER (1) CLARIFYING REMEDIES; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR STAY PENDING APPEAL, ECF NO. 113

### I. INTRODUCTION

In this case, Plaintiffs Todd Yukutake and David Kikukawa ("Plaintiffs") sued State of Hawaii Attorney General Clare E. Connors in her official capacity ("Defendant"), arguing that two State of Hawaii firearm laws violate the Second Amendment. ECF No. 78. The first, Hawaii Revised Statutes ("HRS") § 134-2(e), specifies, in relevant part, that permits to acquire handguns (i.e., a pistol or revolver) expire after 10 days. The second, HRS § 134-3(c), requires, in relevant part, that individuals physically bring their firearm to the police department for in-person inspection and registration.

In a prior order, the court held unconstitutional the two challenged portions of Hawaii's firearm statutes.  ECF No. 107; *Yukutake v. Connors*, 2021 WL 3625307, at *13 (D. Haw. Aug. 16, 2021) (granting summary judgment to Plaintiffs).  But with agreement of the parties, the court delayed entry of judgment until September 22, 2021.  ECF No. 112.  Defendant subsequently filed a motion requesting that the court stay its order pending appeal, ECF No. 113 ("Motion for Stay Pending Appeal").

Because the court's prior order did not specifically address whether the unconstitutional portions of Hawaii's firearm statutes are severable—i.e., whether just those portions are invalid or whether all of §§ 134-2 and 134-3 are invalid—this Order analyzes severability and clarifies the remedies:  Both the 10-day permit use period, and the requirement of in-person inspection and registration, are severed from their respective statutes and stricken.  This Order also grants in part and denies in part Defendant's Motion for Stay Pending Appeal.  A stay is GRANTED for the injunction against the enforcement of the 10-day permit use period.  A stay is DENIED for the injunction against the enforcement of the in-person inspection and registration requirement.

## II. <u>BACKGROUND</u>

Plaintiffs, residents of Honolulu, own multiple firearms and wish to legally acquire additional guns, including handguns.  ECF No. 78 at PageID

1-ER-005

## 557, 567–69. They allege that HRS §§ 134-2(e) and 134-3(c) violate their Second Amendment right to bear arms. *Id.* at PageID # 570; *see also* ECF No. 85. Section 134-2(e) provides, in relevant part, that "[p]ermits issued to acquire any pistol or revolver [i.e., handguns] shall be void unless used within ten days after the date of issue." Section 134-3(c) provides, in relevant part, that firearms "shall be physically inspected by the respective county chief of police or the chief's representative at the time of registration."

To lawfully acquire and possess a firearm in Hawaii, an applicant must complete the following steps: First, in the case of handguns, the applicant must obtain from the seller information identifying the firearm, including its make, model, and serial number.[1] Second, the applicant must visit the police station to apply for a permit to acquire the firearm. *See* https://www.honolulupd.org/ information/firearms/. The applicant must provide personally identifying information and, in the case of handguns, the gun's make, model, and serial number. *See* HRS § 134-2(e). Third, the applicant must wait 14 days while the police department reviews the application, conducts background checks, and issues the permit. *Id.* The police department retains one copy of the permit. *Id.*

---

[1] When "[c]omplet[ing] the permit to acquire application," applicants must provide the "make, model, caliber, type, barrel length, and the serial number of all handguns." https:// www.honolulupd.org/information/firearms/ (click on "Apply For Permit" tab) (last visited September 22, 2021).

3

**1-ER-006**

Fourth, the applicant must return to the seller to present the permit and finalize the purchase of the firearm. *Id.* Applicants must purchase the firearm within 10 days of permit issuance in the case of a handgun and within one year of permit issuance in the case of a long gun. *Id.* Fifth, for handguns, the applicant signs the permit and delivers it to the seller, who verifies the identity of the applicant and the information identifying the handgun. HRS § 134-2(f). The seller signs the permit and delivers it in person or by mail to the police department. *Id.* Sixth, the applicant must register the firearm within 5 days of acquisition. HRS § 134-3(a). Firearm dealers licensed under State of Hawaii law or by the United States Department of Justice can register without an in-person inspection using "forms prescribed by the attorney general." HRS § 134-3(c). All other applicants must bring their firearm to the police station for registration and physical inspection, including to confirm the firearm's make, model, and serial number. *Id.*

The court agreed with Plaintiffs that the 10-day use period for handgun permits, and the requirement of in-person inspection and registration for all firearms, are unconstitutional on their face. *Yukutake*, 2021 WL 3625307, at *13. The court found that the Plaintiffs are burdened by those requirements because the Plaintiffs must take time off work in order to complete their firearm purchases in quick succession. *Id.* at *6, *11. But that burden is not severe, and thus intermediate scrutiny is the appropriate standard of review. *Id.*

4

The court held that the Defendant failed to show that those requirements were reasonably tailored to a substantial government interest. *Id.* at *8, *12. The Defendant asserted that the 10-day permit use period promotes public safety, but the Defendant provided no evidence and gave no meaningful explanation in support of that assertion. *Id.* at *8. Likewise, the Defendant's assertions concerning the in-person inspection and registration requirement lacked supporting evidence; the Defendant relied on "common sense" and hypothetical "conjecture" to support her assertion that the in-person requirement increases public safety. *Id.* at *11–12. After ruling that the challenged statutory provisions were unconstitutional, the court ordered that Defendant and her agents be enjoined from enforcing those provisions. *Id.* at *13. But the court delayed entry of judgment on its holdings until September 15, 2021. *Id.*

Following the court's decision, Defendant indicated her intent to appeal, and the court granted the parties' joint request that the entry of judgment be further delayed until September 22, 2021. ECF Nos. 111, 112. Defendant filed her Motion for Stay Pending Appeal on August 31, 2021, requesting that this court stay the effect of its prior order for the duration of any appeal to the Ninth Circuit or, alternatively, to administratively stay this case until the Ninth Circuit decides whether a stay is warranted. *See* ECF Nos. 113, 113-1. Plaintiffs filed a Response

on September 13, 2021, opposing entry of any stay.  ECF Nos. 114, 114-1.  This

matter is decided without a hearing pursuant to Local Rule 7.1(c).

### III.  <u>STANDARDS OF REVIEW</u>

**A.  Severability**

   If a court holds a portion of a statute unconstitutional, the court should

conduct a severability analysis to see if it should invalidate only the

unconstitutional portion of the legislative enactment, as opposed to the entire

enactment.  *See Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1282–

83 (9th Cir. 2003).  The severability of a state statute is a matter of state law.

*Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996).  "The general rule of law [in Hawaii]

concerning the concept of severability is that if any part of a statute is held invalid,

and if the remainder is complete in itself and is capable of being executed in

accordance with the apparent legislative intent, then the remainder must be upheld

as constitutional."  *State v. Bloss*, 62 Haw. 147, 153, 613 P.2d 354, 358 (1980).  If

the "legislative history of the [statutory scheme] yields the conclusion that 'the

legislature [would] have preferred what is left of its statute to no statute at all,'"

then the court should sever the unconstitutional portions of the statute from the

constitutional portions.  *State v. Pacquing*, 139 Haw. 302, 320, 389 P.3d 897, 915

(2016) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320,

330 (2006)).

"Severability of portions of the HRS is generally authorized by HRS § 1-23." *Id.* at 319, 389 P.3d at 914.  Section 1-23 states that "[i]f any provision of the [HRS], or the application thereof to any person or circumstances, is held invalid, the remainder of the [HRS], or the application of the provision to other persons or circumstances, shall not be affected thereby."  But HRS § 1-23 is not dispositive of the severability analysis.  *See, e.g.*, *Hawaii Pac. Health v. Takamine*, 2013 WL 1858554, *2 (D. Haw. May 1, 2013) (citing § 1-23 but declining to sever); *see also Nelson v. Miwa*, 56 Haw. 601, 611, 546 P.2d 1005, 1013 (1976) (declining to sever, although not citing HRS § 1-23, which was enacted before the date of decision, *see* L. 1955, ch. 57, sec. 1(f)).

The in-person inspection and registration requirement was added to HRS § 134-3 by Act 74, Session Laws of Hawaii 2020 (H.B. 2744, H.D. 1, S.D. 2) ("the 2020 Act").  The 2020 Act contains a more specific severability clause: "If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the invalidity does not affect other provisions or applications of the Act that can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable."  H.B. 2744, pt. III, sec. 7.  The 10-day permit use period was added by 1933 Haw. Sess. Laws, Act 26 (H.B. 70) ("the 1933–34 Act") (codified at Revised Laws of Hawaii §§ 2540–2553 (1935 ed.)).  The 1933–34 Act also contains a more specific severability clause:  "If any section,

7

subsection, sentence, clause or phrase of this Act is, for any reason, held to be unconstitutional or invalid, such decision shall not affect the validity of the remaining portions of this Act. The Legislature hereby declares that it would have approved this Act . . . irrespective of the fact that any one or more other sections, subsections, sentences, clauses or phrases be declared unconstitutional." H.B. 70, sec. 16.

**B.    Stay Pending Appeal**

When a court issues final judgment granting an injunction and an opposing party appeals that judgment, the court may stay the injunction on terms that secure the opposing party's rights. *See* Fed. R. Civ. P. 62(d). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006 (9th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 433–34 (2009)). Courts consider the following factors when deciding whether to issue a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (internal quotation marks omitted).

The first and second factors are most important.  *Id.*  For the first factor, the movant must show that there is a "substantial case for relief on the merits," i.e., that the appeal has a "reasonable probability" of success.  *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (describing various formulations of the standard as interchangeable).  The movant does not have to show that it is more likely than not to succeed on its appeal.  *Id.*  For the second factor, the movant must show that "irreparable injury is likely to occur during the period before the appeal is decided."  *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020); *see also Al Otro Lado*, 952 F.3d at 1007 ("[The movant] must show that an irreparable injury is the more probable or likely outcome.").  A "possibility of irreparable injury" is insufficient.  *Nken*, 556 U.S. at 434–35.  The Ninth Circuit applies a flexible "sliding scale" test to the first two factors; a weak showing of irreparable harm requires a strong showing of likelihood of success, and vice versa.  *Al Otro Lado*, 952 F.3d at 1007, 1010.

The last two factors—balance of the equities, and public interest—are relevant only if the movant satisfies the first two factors.  *Id.* at 1007 (citing *Nken*, 556 U.S. at 434–35).  When assessing the balance of the equities, courts must ask "whether the other parties to the litigation will be substantially injured if the district court's preliminary injunction is stayed pending appeal."  *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 837 (9th Cir.

2020).  When a public program is being challenged, the public interest is often in favor of ensuring the stable administration of that public program.  *See Doe #1*, 957 F.3d at 1068.

Finally, when considering staying an injunction that enjoins a government from enforcing a law, a court may stay the injunction in part, e.g., by permitting enforcement of the law under certain circumstances.  *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (staying, in part, a preliminary injunction against the federal government's enforcement of an executive order, by permitting the government to enforce that immigration order as to "foreign nationals who lacked any bona fide relationship with a person or entity in United States").

## IV.  ANALYSIS

The court begins by clarifying the remedies for the Second Amendment violations:  The 10-day permit use period is severed from HRS § 134-2(e) and is stricken.  The in-person inspection and registration requirement is severed from HRS § 134-3(c) and is also stricken.  The court then analyzes the four factors governing the Defendant's Motion for Stay Pending Appeal.  Those four factors dictate a different result for the two constitutional violations:  The court stays its Order with respect to the 10-day permit use period.  But the court

1-ER-013

does not stay its Order with respect to the in-person inspection and registration requirement.

## A.    Severability and Remedies

### 1.    *The 10-Day Permit Use Period Is Severable from HRS § 134-2.*

The court has held unconstitutional the requirement in HRS § 134-2(e) that "[p]ermits issued to acquire any pistol or revolver shall be void unless used within ten days after the date of issue." *Yukutake*, 2021 WL 3625307, at *5–9. The remaining question is whether, if the 10-day permit use period is severed, the remainder of § 134-2 is complete in itself and is capable of being executed in accordance with the apparent legislative intent. *See Bloss*, 62 Haw. at 153, 613 P.2d at 358.

In addition to the general severability clause in HRS § 1-23, the 1933–34 Act that introduced the 10-day period contains a more specific severability clause. *See* 1933 Haw. Sess. Laws, Act 26, sec. 16 (H.B. 70). The court thus starts with a strong presumption in favor of severability.

As a practical matter, removing the 10-day permit use period from § 134-2(e) creates a void in the statutory scheme. There is no background rule in the HRS, nor any language remaining in chapter 134, that specifies an expiration date for handgun permits. There is a provision in § 134-2(e) that limits handgun permits to a single transaction. But that provision and the remaining language in

11

chapter 134 do not cap the time period in which a permit must be used.  As the Defendant argues, *see* ECF No. 113-1 at PageID # 1034, if the 10-day permit use period is removed, one could read the statute as implicitly authorizing handgun permits that do not expire.  The court finds that possibility—and, more generally, the lack of an expiration date for permits acquired through an otherwise thorough process—to be akin to assigning homework without a due date.  Such as scheme is so unnatural and unexpected that any reasonable person would see a void in that scheme.

The remaining question is whether the Hawaii legislature would have preferred that impractical result over no statute at all.  *See Pacquing*, 139 Haw. at 320, 389 P.3d at 915.  The purpose behind the 1933–34 Act that introduced the 10-day permit use period was to "give the law enforcing agencies of the Territory [of Hawaii] a better means of controlling the sale, transfer and possession of firearms and ammunition."  ECF No. 92-9 at PageID # 774 (Journal of the House of Representatives of the 17th Legislature of the Territory of Hawaii, Special Session 1933).  The purpose behind the 1933–34 Act—increasing public safety by maintaining better control and tracking of firearms—is undoubtedly a purpose underlying many of the subsequent acts by the Hawaii legislature that have modified the firearm statutes and left in place the 10-day permit use period.  *See, e.g.*, ECF No. 92-16 at PageID ## 827–28 (Journal of the Senate of the 15th

1-ER-015

Legislature of the State of Hawaii, Regular Session of 1990) (increasing penalties for firearm offenses and noting that "our entire community should be a safe place to live and learn and that everyone deserves to feel free from the threat of harm wherever they go").

Invalidating all of HRS § 134-2 would leave Hawaii without a permitting process for firearms. That result would likely produce a significant increase in gun violence. For example, the Defendant would have less control over the acquisition of firearms by persons with mental-health issues, *see* HRS § 134-2(b) and (c), and by persons with threatening criminal histories, *see* HRS § 134-2(e). And the Defendant would lose some ability to prevent the acquisition of guns by individuals that have been arrested for a felony or crime of violence. *See id.* Invalidating all of § 134-2 would, therefore, be directly contrary to the intent of the 1933–34 Legislature and to the intent of subsequent legislatures that have maintained the 10-day permit use period.

It is evident that the Hawaii legislature—whether now, in 1933–34, or anytime in between—would have preferred to remove the 10-day permit use period versus invalidating all of HRS § 134-2, even if removing the 10-day period leaves an apparent void in the statutory scheme. The court concludes that the void concerning the duration of handgun permits does not render the statute incapable of being fairly executed by the Defendant. Although the court does not decide

13

what the proper interpretation of HRS § 134-2 will be, the court notes that the void

might be filled through a legislative fix, a patchwork of county regulations, official

guidance issued by the Defendant, subsequent litigation, or some combination of

those options.  In sum, severing the 10-day period from § 134-2 will likely

generate some degree of legal uncertainty, but the Defendant is not incapable of

navigating that uncertainty and enforcing the remainder of § 134-2.

       The intent of the Hawaii legislature, and the strong presumption of

severability provided by HRS § 1-23 and the 1933–34 Act, dictate that the 10-day

permit use period be severed from HRS § 134-2.  Accordingly, the requirement in

§ 134-2(e) that "[p]ermits issued to acquire any pistol or revolver shall be void

unless used within ten days after the date of issue" is severed from the statute and

declared unconstitutional in violation of the Second Amendment.  Defendant's

officers, agents, servants, employees, and all persons in active concert or

participation with Defendant are permanently enjoined from enforcing HRS § 134-

2(e)'s 10-day permit use period for handguns.  To be clear, no other language in

HRS § 134-2 is found unconstitutional.

### 2. *The In-Person Inspection and Registration Requirement Is Severable from HRS § 134-3.*

       The court has held unconstitutional the requirement in HRS § 134-

3(c) that "[a]ll other firearms and firearm receivers registered under this section

[besides those registered by certain dealers] shall be physically inspected by the

respective county chief of police or the chief's representative at the time of registration." *Yukutake*, 2021 WL 3625307, at \*9–12. The remaining question is whether, if the in-person requirement is severed, the remainder of § 134-3 is complete in itself and is capable of being executed in accordance with the apparent legislative intent. *See Bloss*, 62 Haw. at 153, 613 P.2d at 358.

In addition to the general severability clause in HRS § 1-23, the 2020 Act that introduced the in-person inspection and registration requirement contains a more specific severability clause. *See* H.B. 2744, H.D. 1, S.D. 2, Session Laws of Hawaii 2020, pt. III, sec. 7. The court thus starts with a strong presumption in favor of severability.

Unlike with the 10-day permit use period, removing the in-person inspection and registration requirement does not leave a void in the statutory scheme. Removing that requirement leaves in place the background rule that "[e]very person who acquires a firearm pursuant to section 134-2 shall register the firearm in the manner prescribed by this section within five days of acquisition." HRS § 134-3(b). And the rules that registrations be conducted "on forms prescribed by the attorney general" that are "uniform throughout the State" and include certain information, *see id.*, would also remain in place. With those rules in place, and without the more specific in-person requirement, the statute would

15

mandate firearm registration via prescribed forms but without specifying the medium through which those forms can be delivered to the police departments.

That lack of specificity would presumably allow for in-person registration and possibly registration by other mediums, such as by drop box, mail, or over the Internet.[2] Indeed, that would be the most reasonable reading of HRS § 134-3, considering the court's holding that the *mandatory in-person* aspect of the post-acquisition procedures violates the Second Amendment. *See Yukutake*, 2021 WL 3625307, at *9–12. That reading is further reinforced by the fact that remote registrations were not barred by § 134-3 before the 2020 Act.[3] Hence, the absence of a provision specifying the medium through which registration can take place is not so unexpected or unnatural that it constitutes a void in the statutory scheme.

Moreover, relative to invalidating all of § 134-3, severing the in-person requirement is more compatible with the intent of the 2020 Hawaii Legislature. Invalidating all of § 134-3 would erase Hawaii's post-acquisition

---

[2] Of course, the Defendant and the county police departments would choose the appropriate mediums and implement registration by those mediums.

[3] *See* HRS § 134-3 (2019 ed.) (stating, in subsection c, that licensed dealers "shall not be required to have the firearms physically inspected by the chief of police at the time of registration," but not specifying whether in-person inspection is required for non-dealers); ECF No. 60-1 at PageID # 268 n.3 (Defendant's Motion for Summary Judgment) ("[T]he fact that the Legislature felt compelled to amend HRS § 134-3(c) so as to provide for in-person inspection suggests that the statute previously did not require it."); ECF No 70-1 at PageID # 517 n.7 (Plaintiffs' Opposition to Defendant's Motion for Summary Judgment) ("HB2744[, H.D. 1, S.D. 2, Session Laws of Hawaii 2020] . . . clarifies that in-person registration is required.").

16

registration process.  It would eliminate the requirement that citizens of other states register their firearms when moving to Hawaii, *see* HRS § 134-3(a).  And it would eliminate the provisions added by the 2020 Act concerning the regulation of "ghost gun[s]," firearms assembled "from a prepackaged kit requiring only minimal expertise and, thus, bypass background checks, registration, and other legal requirements," such as the permitting requirements in § 134-2.  Quite clearly, the 2020 Hawaii Legislature would have preferred severing the in-person requirement over invalidating all of § 134-3 because the latter would be more likely to hinder "Gun Violence Prevention," the principal purpose of the 2020 Act.  *See* H.B. 2744, H.D. 1, S.D. 2, Session Laws of Hawaii 2020 (titled "A Bill for an Act Relating to Gun Violence Prevention").

In sum, there is a strong presumption of severability, severing does not leave a void in the statutory scheme or otherwise render the statutory scheme incapable of execution, and severing is more consistent with the 2020 Legislature's intent.  Accordingly, the requirement in HRS § 134-3(c) that "[a]ll other firearms and firearm receivers registered under [HRS Chapter 134] shall be physically inspected by the respective county chief of police or the chief's representative at the time of registration" is severed from the statute and declared unconstitutional in violation of the Second Amendment.  Defendant's officers, agents, servants, employees, and all persons in active concert or participation with Defendant are

17

permanently enjoined from enforcing HRS § 134-3(c)'s in-person firearm

inspection and registration requirement.  To be clear, no other language in HRS

§ 134-3 is found unconstitutional.

**B.      Stay Pending Appeal**

*1.      The Injunction Concerning the 10-day Permit Use Period Is Stayed Pending Appeal.*

  *a.      Likelihood of Success on the Merits*

Defendant contends that she is likely to succeed on the merits before

the Ninth Circuit.  ECF No. 113-1 at PageID # 1030.  In support of that contention,

Defendant submits many of the same arguments she submitted in support of her

Counter Motion for Summary Judgment and Opposition to Plaintiffs' Motion for

Summary Judgment.  *Compare id.* at PageID ## 1030–32, *with* ECF No. 91-1 at

PageID ## 712–19.  As for Defendant's arguments concerning the 10-day permit

use period, the court continues to find those arguments unpersuasive.  *See*

*Yukutake*, 2021 WL 3625307, at *5–9.

One fact tending to support the success of Defendant's appeal is that

the Second Amendment is a fledgling area of constitutional law.  *See Dist. of*

*Columbia v. Heller*, 554 U.S. 570, 625–26 (2008) ("It should be unsurprising that

such a significant matter [(interpreting the Second Amendment)] has been for so

long judicially unresolved. . . .  For most of our history the question did not present

itself."); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571 (7th Cir. 2014)

("Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun . . . is an issue that is just beginning to receive judicial attention."); Shawn E. Fields, *Stop and Frisk in A Concealed Carry World*, 93 Wash. L. Rev. 1675, 1691 n.100 (2018) ("Prior to the 1960's, the Second Amendment was rarely litigated and broadly viewed as an archaic military amendment . . . ."). When addressing such an area of the law, the court lacks significant guidance as to the scope and application of the Second Amendment (relative to other constitutional rights), and that lack of guidance increases unpredictability on appeal. As an example, courts have not addressed in any detail when regulations on the commercial sale of firearms qualify for the "longstanding prohibitions on the possession of firearms." *See Heller*, 554 U.S. at 626–27. Moreover, the court is not aware of any decisions from the Ninth Circuit or any other Circuits in factually similar cases that would be highly persuasive to the Ninth Circuit in deciding Defendant's appeal.

The court also recognizes that assessing the constitutionality of the 10-day permit use period involves difficult questions concerning the relationship between a statutory provision and public safety. In holding that requirement unconstitutional, the court ruled against the Defendant principally because she failed to provide any evidence or meaningful explanation as to how the 10-day period promotes public safety. *See Yukutake*, 2021 WL 3625307, at *6–9

19

(describing the Defendant's showing as consisting of an unpersuasive "common-sense argument" and general statements of purpose in the legislative history). Despite those deficiencies, it is not inconceivable that the Ninth Circuit would disagree with this court.

For those reasons, the court finds that the Defendant's appeal has at least a reasonable probability of success with respect to the 10-day permit use period. The first factor weighs in Defendant's favor.

      *b.*    *Irreparable Injury*

For the irreparable-injury factor, the relevant question is whether, assuming the Ninth Circuit reverses this court's invalidation of the 10-day permit use period, the Defendant will suffer an irreparable injury in the meantime. The Defendant first asserts that a "state suffers irreparable injury whenever an enactment of its people or representatives is enjoined." ECF No. 113-1 at PageID ## 1032–33 (quoting *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997)).

As Plaintiffs point out, however, the Ninth Circuit has called into doubt the principle that irreparable harm occurs every time a court enjoins a state statute. *See Indep. Living Ctr. of S. California, Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009), *vacated and remanded on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606 (2012). "To the

extent that [principle] is true, . . . it is not dispositive of the balance of harms analysis.  If it were, then the [injunction] rule requiring 'balance' of 'competing claims of injury,' [*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)], would be eviscerated."  *Maxwell-Jolly*, 572 F.3d at 658.  The court recognizes that enjoining the enforcement of provisions in Hawaii's firearm statutes is a serious matter, but the court does not view that injunctive relief as creating an abstract harm that, by itself, satisfies the showing required of Defendant on the irreparable-injury factor.

The Defendant next asserts that invalidating the 10-day permit use period will "creat[e] chaos for the State of Hawaii and all four counties," and that the consequences of that chaos will be irreversible.  ECF No. 113-1 at PageID ## 1033–34.  More specifically, the Defendant identifies three types of harms associated with that "chaos":  First, there will be legal uncertainty as to how law enforcement should treat handgun permits.  *See id.*  Second, a flood of new applications will drown the county police departments.  *See id.* at PageID # 1033.  And third, "people will be acquiring and registering firearms who would not ordinarily be able to do so under the prior regulations," "result[ing] in an increased threat to public safety."  *Id.* at PageID # 1034.  In other words, there will be an increase in the possession of handguns by unfit individuals, damaging public safety in a way that the Defendant cannot "un-ring."  *Id.*

21

As to the first type of harm, the court agrees that the absence of the 10-day permit use period will cause legal uncertainty.  As stated earlier, removing the 10-day period leaves a void in the statutory scheme.  *See* discussion *supra* Part IV.A.1.  Although that void could potentially be fixed in various ways, the more permanent fix of a legislative amendment is unlikely to occur for at least four months, as the 2021 Regular and Special Sessions of the Hawaii Legislature have ended, and the 2022 Regular Session will not begin until January 2022.  *See* Haw. Const. art. III, § 10 ("The legislature shall convene annually in regular session at 10:00 o'clock a.m. on the third Wednesday in January.").  While not certain, it is possible the void can be fixed through official guidance by the Defendant or through a patchwork of county regulations.  But both of those possible fixes require the Defendant to dedicate significant resources to coordinating permitting standards across the counties.[4]  Moreover, the legality of those fixes is not clear, which could generate further litigation.

As to the second type of harm—the drain on police-department resources—the court agrees with the Defendant that removing the 10-day permit

---

[4] The Defendant would have to decide whether the law permits an expiration date for handgun permits, and, if one is selected, whether the Second Amendment is satisfied.  The Defendant would also have to assess how the court's ruling affects permits issued on a previous date, e.g., permits issued three days before the issuance of this order.  It is also likely that if the Defendant's guidance was not promptly issued, the counties would take divergent approaches, and the Defendant would have the additional burden of handling permits issued before and after the guidance.

use period will more likely than not cause an influx of applications for handgun permits.  Plaintiffs have consistently asserted that the 10-day period is a substantial obstacle to acquiring a handgun.  *See, e.g.*, ECF No. 1 at PageID # 5 ("[T]he applicant has ten days . . . to return to HPD to pick up his or her issued permit to acquire during the aforementioned business hours *and* to pick up the firearm from the store."); ECF No. 78 at PageID # 562 ("The ten-day expiration increases the burden on Plaintiffs and all other law-abiding citizens who wish to exercise their rights to armed self-defense with a handgun inside their home."); *id.* at PageID # 564 ("[Plaintiff] went to the gun shop to complete paperwork, but the shop was closed and the sign on the door stated it would be closed through January 9, 2019. This exceeded the 10-day expiration date on the permit to acquire."); ECF No. 95-1 at PageID # 933 ("The ten-day expiration date of a handgun permit forces Plaintiffs to take an additional day off in quick succession to use it or lose it."). The court thus finds that, if that obstacle were removed, there will likely be a significant increase in the number of applications for handgun permits.  That influx of applications could strain the finite resources of the county police departments, which will already be handling the uncertainty associated with permit expiration.[5]

---

[5] Plaintiffs argue that the police departments, once freed of the burden of administering in-person inspections and registrations, will have plenty of resources to dedicate to the influx of permit applications.  ECF No. 114-1 at PageID # 1065.  Plaintiffs fail to realize that the Defendant and the county police departments may continue to provide in-person registration, and that citizens may choose to register in-person rather than through some other medium.  Also,

(continued . . . )

1-ER-026

As to the third type of harm—increase in the possession of handguns by unfit individuals—the court disagrees with Defendant. The Defendant argues that the court's injunction will "encourage more people to apply for permits and registrations," and that, "[a]s a result, people will be acquiring and registering firearms who would not ordinarily be able to do so under the prior regulations," "result[ing] in an increased threat to public safety." ECF No. 113-1 at PageID ## 1033–34. But, as the Plaintiffs correctly respond, an increase in gun ownership is a Second Amendment right, and any increase would be tied to the removal of an unconstitutional restriction on Second Amendment rights. *See* ECF No. 114-1 at PageID # 1064 ("[Defendant's] statement is shocking because we are dealing with an enumerated fundamental right."); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010) (stating that the Second Amendment is not "a second-class right"). Moreover, it is speculative that gun possession by unfit individuals will increase simply because gun ownership will increase. The police departments will still be conducting thorough investigations of applicants' mental health histories, *see* HRS § 134-2(b) and (c), and applicants' criminal histories, *see* HRS § 134-2(e).

---

regardless of the medium used, police departments still must process registrations, and registrations will logically increase with an influx of applications.

In sum, removing the 10-day permit use period leaves a void in the permitting statute, and there is no clear answer as to how the Defendant can accomplish meaningful, orderly enforcement of the statute within a short period of time.[6] The resulting uncertainty and the drain on Defendant's resources constitute significant, irreparable harms that the court finds are likely to occur during Defendant's appeal. Finally, the court finds that the Defendant is likely to suffer at least a minor degree of irreparable harm due to the strain on law enforcement resources and due to the mere fact that a Hawaii statute is being enjoined. The second factor weighs strongly in Defendant's favor.

    c.    *Balance of the Equities*

As discussed above, the Defendant is likely to suffer irreparable harm absent a stay of the court's order enjoining enforcement of the 10-day permit use period. But if the stay is granted, Plaintiffs will be injured—the deprivation of a constitutional right is itself an irreparable harm. *See Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir.1984) ("An alleged constitutional

---

[6] When analyzing the severability of the 10-day period, *see supra* Part IV.A.1, the court concluded that Defendant is not incapable of fairly enforcing the remainder of HRS § 134-2. The crucial distinction for the stay analysis is that, although Defendant can eventually sort out § 134-2, its very unlikely Defendant can do so in a short period of time. During the intervening period, orderly enforcement is unlikely, and Defendant is likely to suffer irreparable injury as a result.

infringement will often alone constitute irreparable harm." (citing Wright & Miller, 11 *Federal Practice and Procedure* § 2948 at 440 (1973))).

The court finds that the sum of Defendant's harms—legal uncertainty, drain on resources, and restriction of a duly enacted statute—is roughly equal to the sum of Plaintiffs' harms, which includes taking time off work, making multiple visits to the Honolulu Police Department and gun stores, and the deprivation of a fundamental constitutional right. *See Silvester v. Harris*, 2014 WL 6611592, at *4 (E.D. Cal. Nov. 20, 2014) (declining to stay injunction against unconstitutional 10-day waiting-period law because the law "caused additional expense and inconvenience, and . . . caused individuals to forego exercising their Second Amendment rights," and noting that the "deprivation of constitutional rights, for even minimal periods of time, unquestionably constitutes irreparable injury").

Although the court previously held that Plaintiffs' rights were "not severely burden[ed]," the court analyzed the Plaintiffs' burdens for the purposes of selecting a level of scrutiny. *See Yukutake*, 2021 WL 3625307, at *11. But for the balance of the equities, the court cannot focus on the burdens while ignoring that there is persistent deprivation of constitutional rights. *See Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) ("Here, the [district court] judge zeroed in on the occasional expense and inconvenience of having to travel to a firing range in the suburbs, but that's not the relevant constitutional harm. . . . [The firing-range ban]

violates [appellants'] Second Amendment rights every day it remains on the books. These are not application-specific harms calling for individual remedies.").

The court also finds that the likelihood of Defendant's harms is roughly equal to the likelihood of Plaintiffs' harms. Plaintiffs have already experienced the inconveniences associated with 10-day permit use period. And one of the Plaintiffs alleges that he is a "firearms instructor" that "routinely must take time off work to purchase and register handguns." ECF No. 78 at PageID # 567. Moreover, if a stay is granted, Plaintiffs will experience a deprivation of constitutional rights "every day." *See Ezell*, 651 F.3d at 698. The court thus finds it likely that Plaintiffs will suffer substantial injury if a stay is granted.

After weighing the relative degree and likelihood the parties' harms, the court finds that the equities in favor of granting the stay are roughly equal to those in favor of denying the stay. This factor is neutral.

> d.    *Public Interest*

The public interest weighs slightly in favor of granting the stay. If the stay is denied and the 10-day permit use period is not enforced for the duration of Defendant's appeal, Hawaii's citizens will be harmed by the lack of clarity as to the permitting process. *See id.* On the other hand, if the stay is granted and the 10-day permit use period is enforced, Hawaii's citizens will experience continued infringement of their Second Amendment rights. *See Preminger v. Principi*, 422

1-ER-030

F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.").

Importantly, the other harms that are likely to occur to Defendant if the stay is denied—namely, legal uncertainty, drain on resources, and restriction of a duly enacted statute—also affect Hawaii's citizenry, albeit indirectly. Those harms undermine the Defendant's ability to operate the firearm permitting and registration system. The public has a strong interest in the stable administration of a public-safety program, such as a firearm permitting and registration system. *See Doe #1*, 957 F.3d at 1068 ("In this case, the public interest lies with maintaining the status quo while the appeal is pending. For countless decades, a stable immigration system has provided for families to be united through a visa system . . . .").

The public interest thus favors Defendant. Because the first two factors strongly favor the Defendant, the fourth factor also favors Defendant, and the third factor is neutral, the Defendant has satisfied her burden of showing that the circumstances of this case justify a stay of the court's order enjoining enforcement of the 10-day permit use period. Defendant's Motion for Stay Pending Appeal is GRANTED with respect to the court's injunction against enforcement of the 10-day permit use period.

### 2. *The Injunction Concerning the In-Person Inspection and Registration Requirement Is Not Stayed Pending Appeal.*

#### a. *Likelihood of Success on the Merits*

Defendant contends that she is likely to succeed on the merits before the Ninth Circuit. ECF No. 113-1 at PageID # 1030. Again, Defendant submits many of the same arguments she submitted in support of her Counter Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment. *Compare id.* at PageID ## 1030–32, *with* ECF No. 91-1 at PageID ## 712–19. As for the arguments concerning the in-person inspection and registration requirement, the court continues to find those arguments unpersuasive. *See Yukutake*, 2021 WL 3625307, at \*9–12.

The court recognizes that assessing the constitutionality of the in-person inspection and registration requirement involves difficult questions concerning the relationship between a statutory provision and public safety. In holding that requirement unconstitutional, the court ruled against the Defendant principally because she failed to provide any evidence or meaningful explanation as to how the in-person requirement promotes public safety. *See id.* at \*10–12 (describing the Defendant's showing as being grounded on a "bald statement" of purpose in the legislative history and on "common-sense conclusions" based on hypothetical "conjecture"). Despite those deficiencies, it is not inconceivable that the Ninth Circuit would disagree with this court.

29

**1-ER-032**

Ultimately, however, the prospects of Defendant's appeal regarding the in-person requirement are diminished by *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller IV*"), a decision in a factually similar case that provides strong support for this court's ruling. In *Heller IV*, the D.C. Circuit held unconstitutional the District of Columbia's statutory "requirement that the firearm be made available for inspection." 801 F.3d at 277. Like the Defendant in this case, the District "offered no evidence—let alone substantial evidence—from which it can be inferred that verification will promote public safety." *Id.* And, like this court, the D.C. Circuit found that the asserted "common-sense inference" that in-person inspection increases public safety was not so common or sensible: "On the contrary, common sense suggests that bringing firearms to the [police department] would more likely be a threat to public safety; as [appellant] maintains, there is a 'risk that the gun may be stolen en route or that the would-be registrant may be arrested or even shot by a police officer seeing a 'man with a gun' (or a gun case).'" *Id.*

There is thus a highly persuasive decision on the books from a sister Court of Appeals, and that decision supports the court's ruling on the in-person inspection and registration requirement. On balance, and giving consideration to the D.C. Circuit's decision in *Heller IV*, the court finds that the Defendant's appeal does not have a reasonable probability of success with respect to the in-person

30

1-ER-033

inspection and registration requirement. The first factor is not in the Defendant's favor.

> b. *Irreparable Injury*

For the irreparable-injury factor, the Defendant continues to assert that a "state suffers irreparable injury whenever an enactment of its people or representative is enjoined." ECF No. 113-1 at PageID ## 1032–33 (quoting *Wilson*, 122 F.3d at 719). The court recognizes that Defendant is harmed by the injunction against a portion of the Hawaii firearm statute, but the court declines to treat that harm as sufficient, by itself, to satisfy the showing required for the irreparable-injury factor.

Unlike with the 10-day permit use period, invalidating the in-person inspection and registration requirement will not cause legal uncertainty. That is because removing the in-person requirement from HRS § 134-3 does not leave a void in the statute. *See* discussion *supra* Part IV.A.2. Because in-person registrations can still occur, Defendant will not have to dedicate significant resources to reorganizing the registration process. At worst, Defendant and the county police departments will need to decide whether they will implement registration by means other than visiting the police station. That is a negligible harm.

Defendant identifies three other harms that will flow from enjoining the in-person inspection and registration requirement for the duration of the appeal: First, Defendant will be harmed because applicants will be "acquiring firearms even though the information their permits were based on is inaccurate." ECF No. 113-1 at PageID # 1034. Second, Defendant will be harmed because applicants will be "registering firearms with inaccurate serial numbers or other identifying information." *Id.* And third, Defendant will be harmed because applicants will be "registering firearms that violate Hawaii law, such as by having barrel lengths that are too short, that constitute assault pistols, or that have illegal accessories, such as bump fire stocks." *Id.*

Contrary to Defendant's suggestion, those three harms are not likely to occur. As to the first and second types of harm—errors in permit data and gun-tracking data—the court finds those alleged harms to be speculative at best and, in any event, obviated by other requirements in Hawaii's firearm statutes.

When applying for a handgun permit, applicants must provide the police department with the handgun's identifying information—its make, model, and serial number. *See* HRS § 134-2(e). Applicants must also provide personally identifying information. *Id.* After the permit issues, the applicant visits the seller to acquire the handgun, and the applicant surrenders the permit to the seller. HRS § 134-2(f). The seller then verifies the handgun's identifying information, verifies

32

1-ER-035

the applicant's identifying information, writes that information on the permit, signs the permit, and delivers it to the police department. *Id.* Finally, the applicant must register the firearm using "forms prescribed by the attorney general," which must include the handgun's identifying information. HRS § 134-3(b). Presumably, those forms also include the applicant's identifying information. *See id.*

Thus, even without in-person inspection and registration, there are three separate sources of information that police departments can use to verify the identity of an applicant and the identity of that applicant's handgun: the information on the permit application, the information on the permit delivered by the seller, and the information on the applicant's registration form. With those three sources of information in hand, it is very unlikely that police departments will overlook permitting errors and registration errors for handguns. To suggest otherwise is simply speculation.

The permitting and registration process for long guns (i.e., rifles and shotguns) is slightly different, but that process still provides meaningful checks on erroneous permit data and gun-tracking data. The applicant does not have to provide the long gun's identifying information when applying for a permit. *See* HRS § 134-2(b). But whenever the applicant acquires a long gun with that permit, the seller must verify the long gun's identifying information, verify the applicant's identifying information, and send that information, in writing, to the police

33

1-ER-036

department.  HRS § 134-2(f).  As with handguns, an applicant acquiring a long gun must register that long gun using "forms prescribed by the attorney general," which must include the long gun's identifying information.  *See* HRS § 134-3(b).  Presumably, those forms also include the applicant's identifying information.  *See id.*

Thus, even without in-person inspection and registration, there are two sources of information that police departments can use to verify the identity of an applicant and the identity of that applicant's long gun: the information delivered by the seller and the information on the applicant's registration form.  Those two sources of information make it unlikely that permitting errors and registration errors will occur for long guns.

The third alleged harm is the increased registration of illegal firearms.  The court recognizes it is at least possible that two individuals could conspire to give the authorities false information about a firearm being sold or transferred, and that the sale or transfer could be validated when it might otherwise be thwarted by an inspection.  But that is not likely to occur—Hawaii's firearm statutes have legal safeguards against such malfeasance.  First, as described above, for sales of both long guns and handguns, the seller must deliver firearm identifying information to the police department after a sale has occurred.  HRS § 134-2(f).  The seller must also include in that delivery his or her identity.  *Id.*  That transparency and

34

accountability measure puts pressure on the seller to be truthful and to not sell illegal firearms—if the illegal firearm is later discovered, the seller could be within the scope of a criminal investigation.

Second, regarding illegal accessories, such as bump stocks and barrel modifications, the Defendant has the authority to cut off the upstream supply of those accessories. Defendant can vigorously enforce HRS § 134-8.5(a), which makes it a felony to manufacture, import, sell, or offer for sale any "bump fire stock, multiburst trigger activator, or trigger crank." Defendant can also vigorously enforce HRS § 134-8, which makes it a felony to manufacture, sell, or transfer "assault pistols," "automatic firearms," "silencers," and long guns with certain barrel lengths, among other things.

Third, assuming that a substantial portion of firearm sales occur through licensed dealers, *see* HRS § 134-31, the Defendant can reduce sales of illegal firearms by regulating licensed dealers using HRS § 134-32. That statute conditions licensing on the dealer's compliance with all applicable firearm laws, which provides a motivating force against illegal sales. *See* HRS § 134-32(1) and (5). Further, Defendant can supervise the licensed dealers by periodically inspecting their inventory for illegal firearms. *See* HRS § 134-32(4) ("[A]ll firearms in the possession and control of the licensee or registered . . . shall be

1-ER-038

subject to physical inspection by the chief of police of each county during normal business hours at the licensee's place of business.").

In sum, the court finds that the three types of harm identified by Defendant are unlikely to occur during the Defendant's appeal. If the stay is denied as to the in-person requirement, and the Defendant is enjoined from enforcing that requirement, the only injuries that Defendant is likely to suffer are a negligible sink in resources and the abstract harm of enjoining a state statute. The court holds that those harms are insufficient for purposes of the irreparable-injury factor. That factor is not, therefore, in Defendant's favor.

Because the Defendant has made a weak showing on the first two factors, the third and fourth factors are irrelevant. *See Al Otro Lado*, 952 F.3d at 1007. The Defendant has *not* satisfied her burden of showing that the circumstances of this case justify a stay of the court's order enjoining enforcement of the in-person inspection and registration requirement. Defendant's Motion for Stay Pending Appeal is DENIED with respect to the court's injunction against enforcement of the in-person inspection and registration requirement. For the same reasons the court has denied that stay, the court also denies the Defendant's request for an administrative stay. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in

every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

## V. <u>CONCLUSION</u>

The 10-day permit use period and the in-person inspection and registration requirement are severed from their respective statutes and invalidated. The Defendant is enjoined from enforcing those provisions. Defendant's Motion for Stay Pending Appeal is GRANTED with respect to the court's injunction against enforcement of the 10-day permit use period in HRS § 134-2(e). But Defendant's Motion for Stay Pending Appeal is DENIED with respect to the court's injunction against enforcement of the in-person inspection and registration requirement in HRS § 134-3(c). The clerk of court is directed to enter Judgment in favor of Plaintiffs and close the case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 23, 2021.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Yukutake v. Connors*, Civ. No. 19-00578 JMS-RT, Order (1) Clarifying Remedies; and (2) Granting in Part and Denying in Part Defendant's Motion for Stay Pending Appeal, ECF No. 113

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TODD YUKUTAKE, ET AL., | Civ. No. 19-00578 JMS-RT |
| Plaintiffs, | ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S COUNTER MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| CLARE E. CONNERS, | |
| Defendant. | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S COUNTER MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiffs Todd Yukutake and David Kikukawa ("Plaintiffs") are firearm owners living on Oahu. They bring suit against State of Hawaii Attorney General Clare E. Connors in her official capacity ("Defendant" or "the Government") arguing that two State of Hawaii firearm laws violate the Second Amendment. The first, Hawaii Revised Statutes ("HRS") § 134-2(e), requires, in relevant part, that individuals purchase a handgun (i.e., a pistol or revolver) within 10 days of obtaining a permit to acquire. The second, HRS § 134-3(c), requires, in relevant part, that individuals physically bring their firearm to the police department for in-person inspection and registration within five days of acquiring

it.  ECF No. 85.  Currently before the court are Plaintiffs' Motion for Summary

Judgment and Defendant's Counter Motion for Summary Judgment, ECF No. 91.

The challenged provisions in both HRS § 134-2(e) and HRS § 134-

3(c) are not longstanding and impose only a moderate burden on the right to bear

arms.  As such, both provisions are subject to intermediate scrutiny.  And because

the Government has entirely failed to demonstrate how each law effectuates its

asserted interest in public safety, neither law can pass constitutional muster under

this standard of review.  Plaintiffs' Motion for Summary Judgment is GRANTED

and Defendant's Counter Motion for Summary Judgment is DENIED.

To be clear, this Order affects only these two discrete provisions of

the State of Hawaii's firearm scheme; no other aspect of the State's firearm

regulatory scheme is challenged or addressed in this Order.

## II.  <u>BACKGROUND</u>

Plaintiffs are residents of the City and County of Honolulu.  ECF No.

78 at PageID # 557.  Both legally own multiple firearms and wish to legally

acquire additional guns, including handguns.  *Id.* at PageID ## 567-69.  They

allege that certain provisions of two State of Hawaii firearm laws, HRS §§ 134-

2(e) and 134-3(c), violate their Second Amendment right to bear arms.  *Id.* at

PageID # 570.

HRS § 134-2(e) provides, in relevant part, that "[p]ermits issued to acquire any pistol or revolver [i.e., handguns] shall be void unless used within ten days after the date of issue." And HRS § 134-3(c) provides, in relevant part, that firearms "shall be physically inspected by the respective county chief of police or the chief's representative at the time of registration."[1] Plaintiffs allege that both laws infringe on the Second Amendment right to bear arms because "people who wish to own a firearm, including the litigants in this matter, must take time off work to complete the lengthy application process." ECF No. 78 at PageID # 562. To legally possess a firearm, applicants must complete that application process,[2] which consists of the following steps:

(1) In the case of handguns, acquire all necessary identifying information about the firearm from the seller, including its make, model, and serial number;

(2) Physically visit the police station to apply for a permit to acquire the firearm, including by providing personal identifying

---

[1] Firearms dealers licensed under State of Hawaii law or by the United States Department of Justice are exempt from this in-person registration and inspection requirement. *See* HRS § 134-3(c) ("Dealers licensed under section 134-31 or dealers licensed by the United States Department of Justice shall register firearms pursuant to this section on registration forms prescribed by the attorney general and shall not be required to have the firearms physically inspected by the chief of police at the time of registration.").

[2] Before undertaking the listed steps, first-time applicants for a firearm are required to take a safety course. Individuals applying for additional guns need not take the safety course again. HRS § 134-2(g).

3

1-ER-043

information, including name, address, and physical appearance;
and, in the case of handguns, the gun's make, model, and serial
number;

(3) Wait 14 days while the police department reviews the application,
conducts a background check to ensure that the individual is
qualified to possess a gun, and issues the permit;

(4) Return to the seller to present the permit and finalize the purchase
of the firearm. Applicants must purchase the firearm within 10
days of permit issuance in the case of a handgun and within a year
of permit issuance in the case of a long gun. HRS § 134-2(e);[3] and

(5) Within five days of acquiring the firearm, bring the firearm back
to the police station for a physical inspection and registration,
including by providing the firearm's make, model, and serial
number. HRS § 134-3(c).[4]

On October 30, 2020, Plaintiffs filed a First Amended Complaint
against Defendant in her official capacity as State Attorney General, challenging

---

[3] Plaintiffs do not challenge the constitutionality of the one-year permit use period for
long guns.

[4] At the June 28, 2021 hearing, both Plaintiffs' counsel and Defendant's counsel agreed
that these are the steps an applicant must complete to acquire a firearm in the State of Hawaii.
ECF No. 102.

the constitutionality of HRS § 134-2(e)'s 10-day permit use period for handguns and HRS § 134-3(c)'s in-person inspection and registration requirement for firearms.[5]  ECF No. 78.  That same day, the court stayed and administratively closed the case pending issuance of the Ninth Circuit's en banc opinion in *Young v. State of Hawaii*, No. 12-17808.  ECF No. 79.

On March 24, 2021, the Ninth Circuit issued its decision in *Young*. 992 F.3d 765 (9th Cir. 2021).  The next day, March 25, 2021, the court lifted the stay and reopened this case.  ECF No. 80.  On April 28, 2021, Plaintiffs filed a Motion for Summary Judgment, ECF No. 85.  And on May 28, 2021, Defendant filed a Counter Motion for Summary Judgment, ECF No. 91.  Plaintiffs filed a "Reply and Opposition" to Defendant's Counter Motion on June 7, 2021, ECF No. 95, and Defendant filed a Response in support of the Counter Motion and in Opposition to Plaintiff's Motion on June 14, 2021, ECF No. 99.  On June 15, 2021,

---

[5] Plaintiffs' initial Complaint asserted facial and as-applied challenges against both Defendant and the City and County of Honolulu.  ECF No. 1 (filed October 24, 2019).  When Plaintiffs initiated their lawsuit, HRS § 134-3(c) did not expressly require in-person inspection and registration of firearms.  But the Honolulu Police Department ("HPD") had implemented § 134-3 by requiring applicants to register their firearms in person.  *See* ECF No. 1 at PageID # 4.

On June 9, 2020, Plaintiffs and the City and County of Honolulu reached a settlement agreement, with the City and County agreeing to extend the hours of the Firearms Unit and to issue permits via email rather than requiring applicants to come to the station to physically pick up their permits.  ECF No. 52; ECF No. 78 at PageID # 561 (describing conditions of settlement).  On June 12, 2020, the parties stipulated to dismissal with prejudice of all claims against the City and County, ECF No. 53.  Shortly thereafter, on July 10, 2020, the Hawaii State Legislature amended HRS § 134-3(c) to affirmatively require in-person inspection and registration of firearms.  *See* H.B. 2744, H.D. 1 S.D. 2, 30th Leg., Reg. Sess. (enacted Sept. 16, 2020).

5

the court granted Everytown for Gun Safety ("Everytown") leave to file a brief as amicus curiae. ECF No. 100. A hearing was held on June 28, 2021. ECF No. 102.

### III. <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also, e.g.*, *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021). Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

"The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact." *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citing *Celotex*, 477 U.S. at 323). Where the moving party does not have the ultimate burden of persuasion at trial, they bear both the initial burden of production and the ultimate burden of persuasion on their motion for summary judgment. *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016) (citing *Nissan Fire*, 210 F.3d at 1102).

1-ER-046

"'[W]hen the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts,'" but must come forward with specific facts showing that there is a genuine dispute for trial. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "'[A]t least some 'significant probative evidence'" must be produced. *Hexcel Corp. v. Ineos Polymers, Inc.,* 681 F.3d 1055, 1063 (9th Cir. 2012) (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)). "'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 329-30 (9th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."); *see also Friedman*, 833 F.3d at 1185 (citing *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016)).

For purposes of Rule 56(a), a dispute is genuine only if there is a sufficient evidentiary basis on which "a reasonable jury could return a verdict for the nonmoving party," and a dispute of fact is material only if it could affect the outcome of the suit under the governing law. *Momox-Caselis v. Donohue*, 987

7

F.3d 835, 841 (9th Cir. 2021) (citing *Anderson*, 477 U.S. at 248).  When

considering the evidence on a motion for summary judgment, the court must draw

all reasonable inferences in the light most favorable to the nonmoving party.

*Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).

## IV.  <u>ANALYSIS</u>

Plaintiffs challenge the constitutionality of both the State of Hawaii's

10-day use period for permits to acquire handguns under HRS § 134-2(e) and its

requirement that all firearms be inspected and registered in-person under HRS

§ 134-3(c).  Both requirements are subject to intermediate scrutiny, and both fail to

pass constitutional muster under that standard of review.[6]

### A.    Second Amendment Standards

The Second Amendment states: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed."  In *District of Columbia v. Heller*, 554 U.S. 570

---

[6] Plaintiffs assert that they are bringing both facial and as-applied challenges, while Defendant argues that Plaintiffs relinquished their as-applied challenges when they settled their claims against the City and County of Honolulu.  But, as set forth in more detail below, both challenged provisions are facially unconstitutional.  Thus, the court need not consider whether Plaintiffs have preserved their as-applied challenges.  *See Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (explaining that because "'[f]acial and as-applied challenges differ *in the extent* to which the invalidity of a statute need be demonstrated' . . . the substantive legal tests used in the two challenges are 'invariant'" (quoting *Legal Aid Servs. of Oregon v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010))); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (explaining that the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint," with an as-applied challenge offering a "'narrower remedy'" than a facial challenge (quoting *United States v. Treasury Emps.*, 513 U.S. 454, 478 (1995))).

(2008), the Supreme Court engaged in its "first in-depth examination of the Second Amendment." *Id.* at 635. The Court determined that "the right to keep and bear arms is an individual right held by the people, and not limited by the prefatory clause—'a well regulated Militia'—only to 'the right to possess and carry a firearm in connection with militia service.'" *Young*, 992 F.3d at 782 (quoting *Heller*, 554 U.S. at 596, 577, 599). The Court further determined that the right to bear arms was not created by the Constitution, but rather that the Second Amendment codified a pre-existing right "inherited from our English ancestors." *Heller*, 554 U.S. at 599. And the Court identified the "core" of the Second Amendment as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

*Heller* also set forth a framework for determining whether a law impermissibly infringes on Second Amendment rights. First, *Heller* indicated that "'determining the scope of the Second Amendment's protections requires a textual and historical analysis of the amendment.'" *United States v. Chovan*, 735 F.3d 1127, 1133 (9th Cir. 2013) (summarizing *Heller*). And while the Court declined to undertake such an "exhaustive historical analysis" in its opinion, it identified certain "longstanding prohibitions" on the possession of firearms as "presumptively lawful," including "bans on possession by felons and the mentally

9

ill; bans on possession in sensitive places; and regulations on the commercial sale of firearms." *Young*, 992 F.3d at 782 (citing *Heller*, 554 U.S. at 626-27).

Second, *Heller* provided guidance for courts reviewing laws that do not qualify as longstanding and presumptively lawful. The Court explained that an outright ban of firearms in the home violates the Second Amendment under any level of scrutiny. *Heller*, 554 U.S. at 628. And while the Court left discussion of the precise level of scrutiny applicable to Second Amendment challenges to a later day, it expressly "reject[ed] a rational basis standard of review, thus signaling that courts must at least apply intermediate scrutiny." *Silvester v. Harris*, 843 F.3d 816, 820 (9th Cir. 2016) (summarizing *Heller*).

The Ninth Circuit—along with the majority of other circuit courts—has adopted a two-step inquiry to implement the *Heller* framework. At the first step, courts "ask if the challenged law affects conduct that is protected by the Second Amendment." *Young*, 992 F.3d at 783. That is, courts ask whether the law "is one of the presumptively lawful . . . measures identified in *Heller*, or whether the record includes persuasive historical evidence establishing that the [law] at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (internal quotation and citation omitted).

10

If the law is found to burden conduct protected by the Second Amendment at step 1, courts proceed to step 2 to determine what level of scrutiny to apply.  In undertaking this inquiry, courts assess "(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right."  *Id.* at 1221-22.  A law is unconstitutional under any level of scrutiny if it so severely restricts the "core" right of self-defense of the home that it "amounts to a destruction of the Second Amendment right."  *Id.* at 1222.  "Further down the scale," a law that "implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny."  *Id.* "Otherwise, intermediate scrutiny is appropriate."  *Id.*  The Ninth Circuit's "post-Heller decisions generally have applied intermediate scrutiny to firearms regulations."  *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (collecting cases).

## B.    HRS § 134-2(e)'s 10-Day Permit Use Period

### 1.    *The 10-Day Permit Use Period Is Not Longstanding and Presumptively Valid*

Defendant argues that HRS § 134-2(e)'s 10-day permit use period is longstanding and presumptively valid because it is a "condition[] and qualification[] on the commercial sale of arms" that "dates back to 1933-1934."

ECF No. 91-1 at PageID ## 712-13.[7]  In support of this argument, Defendant points to "similar laws" that were passed in four other states—Arkansas, Massachusetts, Missouri, and Michigan—"during that [same] era" (i.e., the 1930s). ECF No. 91-1 at PageID # 713; *see also* ECF Nos. 92-16, 92-17, 92-18, 92-19. But a handful of similar laws from the 1930s, without more, is insufficient to establish that the State of Hawaii's law belongs to a "longstanding" historical tradition of "presumptively lawful" firearm prohibitions.  *Young*, 992 F.3d at 783.

  *Young* clarified the test for whether a law is "longstanding and presumptively lawful," explaining that the *purpose* of conducting the historical analysis is to determine whether the challenged law falls within the scope of the right as it was understood during the founding era.  *Id.*  That is, "[l]aws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis."  *Id.* (quoting *Silvester*, 843 F.3d at 821).  Evidence of similar restrictions found in ancient English law, founding era laws, and early post-ratification laws provide persuasive evidence of the historical understanding of the scope of the

---

[7] To the extent Defendant argues that the 10-day permit use period is presumptively lawful simply because it is a "condition[] and qualification[] on the commercial sale of arms," this argument fails.  The Ninth Circuit has held the phrase "conditions and qualifications on the commercial sale of arms" "'sufficiently opaque'" to prohibit reliance on it alone, instead opting to conduct a "full textual and historical review" of the scope of the Second Amendment. *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 683 (9th Cir. 2017) (en banc).  The court follows that approach here.

right.  *Id.*  By contrast, "twentieth-century developments . . . may be less reliable as evidence of the original meaning of the American right to keep and bear arms."  *Id.* at 811.

Here, Defendant puts forth *only* laws of this less reliable caliber.  And while early Twentieth Century laws "might . . . demonstrate a history of longstanding regulation *if their historical prevalence and significance is properly developed in the record*," *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (emphasis added), Defendant has failed to satisfy these conditions.  The sparse handful of laws Defendant puts forth does not demonstrate the requisite "historical prevalence."  *Young*, 992 F.3d at 783 ("We are looking for 'historical prevalence.'") (quoting *Fyock*, 779 F.3d at 997)).  Moreover, there is no evidence in the record suggesting that these laws are tethered—in any way—to the "original meaning of the American right to keep and bear arms."  *Id.* at 811.  Indeed, Defendant does not provide *any* historical context for these laws.  Instead, Defendant asserts that their mere existence is evidence that the State of Hawaii's 10-day permit expiry period is presumptively valid.  This meager showing is not enough.

Finally, it is worth noting that three of the four laws Defendant relies upon have been repealed.  ECF No. 95-1 at PageID ## 931-32.  And the only law that remains on the books, Michigan's, imposes a 30-day rather than 10-day time

13

limit on permit holders. *Id.* at PageID # 931. Thus, even if these laws *did* provide evidence of founding-era understanding of lawful firearm prohibitions, it is not clear that their existence supports Defendant's argument that the State of Hawaii's law falls within that historical tradition.

Simply put, the court cannot conclude that HRS § 134-2(e)'s 10-day permit use period is longstanding and presumptively valid.

### 2.   *Intermediate Scrutiny Applies*

Having determined that HRS § 134-2(e)'s 10-day permit use period implicates the right to bear arms, the court next considers the appropriate level of scrutiny to apply. As both parties agree, the 10-day permit use period does not "amount to destruction" of the right to bear arms. ECF No. 85-1 at PageID # 603; ECF No. 91-1 at PageID # 715. This leaves a choice between strict and intermediate scrutiny. Strict scrutiny is appropriate only when a law "implicates the core of the Second Amendment right *and* severely burdens that right." *Silvester*, 843 F.3d at 821 (emphasis added). Otherwise, intermediate scrutiny is appropriate. *Id.* Defendant concedes that "the core of the Second Amendment is presumably implicated since Plaintiffs state that they want to purchase handguns." ECF No. 91-1 at PageID # 714. Thus, the appropriate level of scrutiny to apply turns on the severity of the burden imposed by the law.

In weighing the severity of a law's burden on the right to bear arms, courts are "guided by a longstanding distinction between laws that regulate the manner in which individuals may exercise their Second Amendment right, and laws that amount to a total prohibition of the right." *Pena*, 898 F.3d at 977. HRS § 134-2(e)'s 10-day permit use period falls into the former category. It merely regulates when an individual may purchase handguns—requiring them to take possession of the weapon within ten days of acquiring a permit. It does not prohibit individuals from possessing or acquiring handguns. Indeed, the only burden alleged by Plaintiffs is that they "are required to take time off work to make their firearms purchase in quick succession." ECF No. 85-1 at PageID # 605. This is not a severe burden on the right. *See Silvester*, 843 F.3d at 827 ("[L]aws which regulate only the '*manner* in which persons may exercise their Second Amendment rights' are less burdensome than those which bar firearm possession completely" (quoting *Chovan*, 735 F.3d at 1138)); *see also id.* ("The burden of [a] 10-day waiting period . . . is less than the burden imposed by contested regulations in other Ninth Circuit cases applying intermediate scrutiny."). Intermediate scrutiny applies.

///

///

///

15

**1-ER-055**

### 3. *Application of Intermediate Scrutiny*

"In the context of Second Amendment challenges, intermediate scrutiny requires: '(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective.'" *Fyock*, 779 F.3d at 1000 (quoting *Chovan*, 735 F.3d at 1139).[8]  Intermediate scrutiny "does not require the least restrictive means of furthering a given end." *Bauer*, 858 F.3d at 1221.  Rather, the law must merely "promote[] a substantial government interest that would be achieved less effectively absent the regulation." *Fyock*, 779 F.3d at 1000 (quotation and citation omitted).  It is the government's burden to prove that both prongs of the test are satisfied.  *See Chovan*, 735 F.3d at 1140-41.

The nature and quantity of the showing required by the government "will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000); *see also United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) ("[T]he Constitution does not mandate a specific method by which the government must satisfy its burden under

---

[8] This test is "imported . . . from First Amendment cases" and courts rely on First Amendment jurisprudence when applying intermediate scrutiny to Second Amendment challenges.  *Silvester*, 843 F.3d at 821; *see also Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 960 (9th Cir. 2014) ("Both *Heller* and *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010)] suggest that First Amendment analogies are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context" (quoting *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011))).

heightened judicial scrutiny.").  To meet its burden, the government may resort to a wide range of sources, including "legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require."  *Carter*, 669 F.3d at 418; *Jackson*, 746 F.3d at 966 (pointing to case law, empirical studies, and legislative history as appropriate bases for demonstrating the reasonable fit between a government interest and a challenged law); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (recognizing that, in some cases, restrictions on constitutional rights may be justified "based solely on history, consensus, and 'simple common sense'" (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995))).  But "the government must present more than anecdote and supposition."  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000).  Courts owe substantial deference to a legislature's policy judgments; their "sole obligation is to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence."  *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997).

The Government has not met its burden here.  Defendant states that the 10-day permit use period furthers the "important government interest" of public safety "in that such requirements provide more effective supervision and control over the sale, transfer, and possession of firearms."  ECF No. 91-1 at PageID

# 715. It is "self-evident" that public safety is a substantial and important government interest. *Fyock*, 779 F.3d at 1000. But Defendant has failed to demonstrate *how* the 10-day permit use period furthers that interest.

To begin, the Government does not show that the legislature considered *any* evidence—let alone substantial evidence—prior to enacting the law. The Government cites only to legislative history that pronounces the public safety purpose of gun regulation generally, but provides no legislative history addressing why HRS § 134-2(e)'s 10-day permit use period, in particular, was enacted. *See* ECF No. 91-1 at PageID ## 706-09. The Government also fails to provide any legislative history addressing what evidence the legislature considered prior to enacting that requirement.[9] Likewise, the Government provides no empirical evidence or case law suggesting that a 10-day permit use period would enhance public safety. Indeed, as the Government conceded during oral argument, its arguments boil down to simple "common sense."

The Government's primary common-sense argument is that a short expiry period is necessary to ensure that the information provided when an individual applies for a permit to acquire a specific handgun remains accurate

---

[9] Upon independent review, the court was unable to find any legislative history addressing the purpose behind this particular statutory provision.

18

1-ER-058

when that person acquires that gun.[10]  ECF No. 91-1 at PageID ## 718-19.

Specifically, the Government points out that information provided when an

applicant applies for a permit, including the person's name, address, or appearance

could change over time; or an applicant could become disqualified from owning a

gun after the background check has been completed and the permit issued—

including by becoming subject to a civil protective order, committing certain

crimes, or being diagnosed with a significant mental disorder.  *Id.*  Because such

changes are unlikely to occur within a mere 10 days of acquiring a permit, such a

"relatively short expiration date will ensure that the information remains accurate

when the person acquires [their] firearm."  *Id.* at PageID # 719.  Put differently, the

10-day permit use period minimizes the probability that any changes—

---

[10] As a reminder, the handgun permitting process proceeds as follows.  An applicant must:

    (1) Acquire all necessary identifying information about the firearm from the seller, including its make, model, and serial number;

    (2) Physically visit the police station to apply for a permit to acquire the firearm, including by providing the gun's make, model, and serial number, as well as personal identifying information including name, address, and physical appearance;

    (3) Wait 14 days while the police department reviews the application, conducts a background check to ensure that the individual is qualified to possess a gun, and issues the permit;

    (4) Return to the seller to present the permit and purchase the firearm within 10 days of permit issuance; and

    (5) Within five days of acquiring the firearm, bring the firearm back to the police station for a physical inspection and registration.

The Government maintains that by allowing applicants only ten days to acquire a handgun after receiving the permit, the law ensures that the information provided at step 2 and step 3 will be accurate at step 4.  But the Government does not explain *how* this promotes public safety.

19

1-ER-059

disqualifying or otherwise—will occur between the time that the permit issues and the time that the applicant makes use of that permit to purchase a gun.[11]

But the Government makes no effort to explain *how* this promotes public safety—that is, why the law is a reasonable fit to its asserted objective. In absence of an explanation, the court's best guess as to the Government's reasoning is that the law ensures that individuals do not make use of a permit to acquire after they become disqualified from owning a gun. But that this promotes public safety is not a common-sense conclusion. In fact, the opposite could be true. By shortening the permit use period to reduce the likelihood that disqualifying changes occur before the applicant obtains the handgun, the law arguably increases the likelihood that individuals will *already* be in possession of a gun should a disqualifying change occur.[12] This outcome could negatively impact public safety by increasing the probability that unqualified individuals may be in possession of

---

[11] The Government additionally argues that the short permit period "minimizes the risk of an unauthorized person using [the permit] if it is lost or stolen." ECF No. 91-1 at PageID # 716. The Government does not flesh out this argument beyond the quoted sentence—let alone provide evidence suggesting that lost or stolen permits pose a problem. Taken on its face, this argument does not make sense. HRS § 134-2(f) requires the seller to verify the permit holder's identity prior to transferring the gun, and the Government does not explain how an unauthorized individual could make use of a permit in another's name.

[12] And as Plaintiffs point out, virtually all applicants *do* make use of their permits within the 10-day period. For example, in 2020, 95.8% of permits were used to acquire a gun within the 10-day period, while only 1.4% were voided (and 2.8% of permit applicants were denied). ECF No. 86-3 at PageID # 635. The same trend held true in 2017, 2018, and 2019. *See* ECF Nos. 86-4, 86-5, 86-6.

guns.  Of course, in the absence of any *evidence* addressing the effect of the law on public safety, this is mere conjecture.  Nevertheless, this conjecture demonstrates that it is not a simple matter of common sense that the 10-day permit use period promotes public safety.  Finally, it is worth noting that if it really were common sense that a 10-day permit use period promoted public safety, Hawaii likely would not be the *only* state in the nation to maintain such a restrictive requirement.[13]

The Government has failed to show that there is a reasonable fit between their stated objective of promoting public safety and the 10-day permit use period imposed by HRS § 134-2(e).  The 10-day permit use period for handguns does not survive intermediate scrutiny.[14]

---

[13] To be clear, the court is not suggesting that *any* permit use period would violate the Second Amendment.  And, as Plaintiffs' counsel conceded at oral argument, some greater time period could pass constitutional muster.  This Order, however, does not attempt to define the boundaries of a constitutional versus unconstitutional permit use period.

[14] Both parties spill considerable ink discussing "Rap Back"—an FBI service that informs state and local law enforcement officers when an individual subject to a criminal history record check is arrested for a criminal offense anywhere in the country.  ECF No. 85-1 at PageID # 612; ECF No. 91-1 at PageID ## 717-19.  Plaintiffs argue that "if the Defendant's stated interest [in the 10-day permit use requirement] is blocking a person from using a permit after committing a felony, it is unnecessary and an additional unjustifiable burden because Rap Back provides the same 'service.'"  ECF No. 85-1 at PageID # 612.  Defendant responds that Rap Back falls short of providing this service because some criminal offenses can fall through the cracks and because Rap Back does not inform law enforcement of other disqualifying events, including diagnosis with a disqualifying mental condition or entry of a civil protective order or restraining order.  ECF No. 91-1 at PageID ## 717-18.  But these arguments are largely irrelevant.  The law does not pass intermediate scrutiny for the more fundamental reason discussed above—that the state has failed to show how the 10-day permit use period promotes public safety.

**C.** **HRS § 134-3(c)'s In-Person Firearm Inspection and Registration Requirement**

    *1.*     *The In-Person Firearm Inspection and Registration Requirement Is Not Longstanding and Presumptively Valid*

HRS § 134-3(c) was amended in 2020 to require in-person inspection and registration of all firearms within five days of acquiring them. The Government argues that this new in-person inspection and registration requirement is longstanding and presumptively valid because it is "part of the registration process" and "[i]n Hawaii, registration and permitting requirements, *in general*, date back to 1907 and 1919, respectively." ECF No. 91-1 at PageID ## 722-23 (emphasis added). This argument fails. Although certain registration requirements may be longstanding, it does not follow that *all* registration requirements are. And the Government has provided absolutely no evidence suggesting that in-person inspection and registration was historically understood as an appropriate regulation on the right to bear arms.

In its Amicus Brief, Everytown argues that the State's in-person inspection and registration requirement falls outside the scope of the Second Amendment as "part of a longstanding regulatory tradition" because it is of a kind with 18th century militia laws. ECF No. 94-1 at PageID # 866. Those laws required individuals enlisted in state militias—"white men in a specified age range"—to maintain their own arms and "provided for in-person inspection to

22

ensure that militiamen were prepared and properly armed if called up to fight." *Id.* at PageID ## 871, 873. Everytown cites to a variety of state militia laws, as well as federal Militia Acts. *Id.* at PageID ## 872-77. In general, as Everytown explains, these laws required periodic inspections of militiamen's weaponry, with some laws requiring military officials to keep a record of the weapons held by men in their company. *Id.* Everytown concludes that "[t]he ubiquity of these militia inspection laws means that ordinary citizens in the founding era would have understood a requirement to present arms for inspection to be well within the government's power—and thus outside the scope of the Second Amendment." *Id.* at PageID # 877.

But the purpose and scope of these colonial-era militia laws are too dissimilar to the State of Hawaii's current registration requirement to support such a finding. Although a law need not have a "precise founding-era analogue" in order to be deemed presumptively valid, *Fyock*, 779 F.3d at 997 (quotation and citation omitted), the law must be sufficiently similar to historical regulations to demonstrate that the law's restrictions accord with historical understanding of the scope of the Second Amendment right. *Young*, 992 F.3d at 783.

In the 18th century, state militias were a primary part of the United States armed forces. And, as Everytown itself explains, the purpose of the militia laws was to ensure that the armed forces maintained weapon stockpiles suitable for

the nation's defense and warfare needs. ECF No. 94-1 at PageID # 873. Accordingly, many of these laws did not require individuals to register their weapons upon acquiring them, but instead to periodically demonstrate that they maintained weapons of appropriate caliber for military activity. *Id.* at PageID ## 873-75. Moreover, each law that Everytown cites applied *only* to individuals who were enlisted in the militia and to the guns that they possessed for military purposes; Everytown has pointed to no law that required in-person inspection and registration of firearms held by civilians in their personal capacity.

HRS § 134-3(c)'s in-person inspection and registration requirement does not fall within the historical tradition of these 18th century militia laws. Whereas militia laws applied only to militiamen, HRS § 134-3(c)'s requirement applies to all civilians who wish to acquire a handgun for personal use. Likewise, the purpose of the militia inspection laws was to ensure that soldiers had the correct weapons for duty and that those weapons were appropriately maintained for battle. ECF No. 94-1 at PageID ## 872-77. In contrast, HRS § 134-3(c)'s requirement is meant to serve the Government's interest—not in military preparedness—but in protecting public safety through "more effective supervision and control over the sale, transfer, and possession of firearms." ECF No. 91-1 at PageID # 724. And, most significantly, the militia laws did not place a burden on any individual's ability to *acquire* a weapon. Indeed, militiamen were *required* to

24

possess weapons.  In contrast, the State of Hawaii's law places a burden on the right to acquire handguns by requiring compliance with the in-person inspection and registration requirement in order for civilians to legally possess firearms in the first instance.

Given these considerable differences, the State of Hawaii's in-person inspection and registration requirement for civilian firearms cannot be said to fall within the historical tradition of colonial-era laws requiring inspection of what were effectively the military weapon stockpiles of the day.  On the record before the court, HRS § 134-3(c)'s in-person inspection and registration requirement cannot be considered longstanding and presumptively valid at the first step of the analysis. *See, e.g.*, *Bauer*, 858 F.3d at 1221.

## 2. *Intermediate Scrutiny Applies*

Having determined that HRS § 134-3(c)'s in-person inspection and registration requirement implicates the right to bear arms, the court next considers the appropriate level of scrutiny to apply.  As with the 10-day permit use period, the parties agree that the law does not destroy the core of the Second Amendment right, and Defendant concedes that "the core of the Second Amendment is presumably implicated since Plaintiffs state that they want to purchase handguns." ECF No. 91-1 at PageID # 723.  Thus, the choice is again one between strict and intermediate scrutiny.

1-ER-065

Intermediate scrutiny is plainly the appropriate standard to apply because the law does not severely burden the right to bear arms. HRS § 134-3(c) is a gun registration requirement. The Ninth Circuit has consistently held that "gun-registration requirements do not severely burden the Second Amendment because they do not 'prevent an individual from possessing a firearm in his home or elsewhere.'" *Pena*, 898 F.3d at 977 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) ("*Heller II*")). Finally, factually, the only burden alleged by Plaintiffs is, again, that they "are required to take time off work to make their firearms purchase in quick succession." ECF No. 85-1 at PageID # 605. This is not a severe burden. Intermediate scrutiny applies.

### 3. *Application of Intermediate Scrutiny*

To survive intermediate scrutiny, the Government must demonstrate a "significant, substantial, or important" government interest and must show that there is a "reasonable fit between the challenged regulation and the asserted objective." *Fyock*, 779 F.3d at 1000. Here, the Government's asserted interest is once again public safety. "More specifically, the 'significant, substantial, or important' government objective in requiring people to bring the firearm to the registration is that it ensures that the registration information is accurate, it ensures that the firearm complies with Hawaii law, and it confirms the identity of the

26

firearm so as to facilitate tracing by law enforcement." ECF No. 91-1 at PageID ## 724-25.

But, once again, while public safety interests are legitimate, *Fyock*, 779 F.3d at 1000; *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010), the Government wholly fails to demonstrate *how* the in-person inspection and registration requirement furthers these interests. It merely states that "ensuring that the registration information is accurate, ensuring that the firearm complies with Hawaii law, and confirming the identity of the firearm can be easily accomplished simply by bringing the firearm to the registration for inspection." ECF No. 91-1 at PageID # 725.

This bald statement is not enough to meet the Government's burden. "To survive intermediate scrutiny, the defendants must show '*reasonable* inferences based on *substantial* evidence' that the statutes are substantially related to the governmental interest." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015) (quoting *Turner Broad.*, 520 U.S. at 666); *Heller II*, 670 F.3d at 1259 (same). Here, the Government has provided no evidence whatsoever in support of its position. The Government has provided no legislative history speaking to the legislature's reasons for amending the statute.[15] It has not

---

[15] Though not proffered by the Government, the court has reviewed the legislative history related to the 2020 amendment of HRS § 134-3(c). This history reveals that the legislature

(continued . . . )

1-ER-067

shown that inaccurate registration was a problem affecting public safety (or even a problem at all) prior to enactment of the 2020 in-person inspection and registration requirement, nor has it provided any studies, examples from other jurisdictions, or any other type of evidence suggesting that an in-person inspection and registration requirement would ameliorate such a problem.

      In absence of concrete evidence, the only support that the Government offers is conjecture. Defendant asserts that in-person inspection and registration promotes public safety by requiring that the police directly inspect the serial number on the gun itself, rather than the number as reported by the buyer and (separately) by the seller on the permit. *See* HRS § 134-2(f). Specifically, the Government speculates that "[s]ome people might innocently make mistakes in transcribing serial numbers or other identifying information" or may be unaware that their gun's identifying marks or other attributes have been impermissibly

---

amended § 134-3 in 2020 primarily to address concerns around ghost guns—firearms that are assembled "without serial numbers or other identification markings." Stand. Com. Rep. No. 685-20 (Feb. 19, 2020). The legislature was concerned because "individuals who are otherwise prohibited from owning or possessing firearms under state law can assemble these 'ghost guns,' thereby bypassing background checks, registration, and other legal requirements." *Id.* But while the legislature made two amendments specifically related to ghost guns, the amendment to require in-person inspection and registration appears unrelated. It addresses requirements for individuals who register their firearms legally, not the issue of individuals attempting to bypass legal registration with ghost guns. Rather, this amendment appears to fall into a separate, secondary reason for amending the statute: to "[a]mend certain requirements relating to firearms registration." *See* Stand. Com. Rep. No. 3557 (May 19, 2020); Stand. Com. Rep. No. 3729 (June 30, 2020). But this does not reveal the purpose of the in-person inspection and registration requirement, nor could the court locate any additional legislative history—whether from 2020 or previous sessions—addressing the purpose of this requirement.

altered.  ECF No. 91-1 at PageID # 720.  And, the Government hypothesizes, individuals may not be aware of these errors or inconsistencies until they bring their firearm to the police station to have it physically inspected.  *Id.*  But this hypothetical falls short under intermediate scrutiny.  To meet its burden, the Government must "present some meaningful evidence, not mere assertions, to justify its predictive judgments."  *Heller II*, 670 F.3d at 1259 (striking down a gun registration law where the government failed "to present any data or other evidence to substantiate its claim that these requirements can reasonably be expected to promote . . . the important governmental interests it has invoked").[16]

Thus, it once again appears that the Government's only permissible argument is that common sense shows the law is reasonably related to its interest in promoting public safety.  But the notion that in-person inspection and registration promotes public safety is not a matter of common sense.  First, as stated above, in the absence of any evidence to that end, it is not a common-sense conclusion that mistakes in registration were a problem prior to enactment of the

---

[16] The Government also argues that the in-person inspection and registration requirement provides a benefit to new gun owners in that it affords them a presumption of innocence in the event the firearm's identifying marks are discovered to be altered after the registration process is complete.  Again, this argument is based on mere supposition.  *See* ECF No. 91-1 at PageID ## 725-26 (speculating that a "new owner could be accused of the alteration at some point in the distant future when the alteration is finally discovered" and that "in-person inspection at registration sets a 'base line' that protects the new owner").  Moreover, any secondary benefits the law allegedly affords gun owners is irrelevant in the context of this constitutional challenge; the question is only whether the law is reasonably tailored to meet the asserted government interest.

29

in-person inspection and registration requirement. Indeed, there is redundancy built into the registration process even without the in-person requirement—both the firearm seller and buyer must provide the serial number and other identifying information about the firearm. As Plaintiffs point out, "it strains credulity that both a firearms store and a buyer would both fail to properly transcribe numbers or realize" that the gun has been impermissibly altered.[17]  ECF No. 95-1 at PageID # 941.

Second, as the D.C. Circuit pointed out in *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller IV*"), requiring individuals to bring firearms into the police station for in-person inspection and registration may "more likely be a threat to public safety [because] there is a risk that the gun may be stolen en route or that the would-be registrant may be arrested or even shot by a police officer seeing a 'man with a gun.'" *Id.* at 277 (internal citation and quotation omitted). While these possibilities—like the Government's hypothetical about mistaken transcription—are no more than conjecture, they demonstrate that it is not a simple matter of common sense that in-person inspection and registration promotes public safety.

---

[17] This is especially true given that the Second Amendment protects the rights of "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635.

Finally, it is again worth noting that Hawaii is the *only* state in the country to require in-person inspection and registration of firearms. ECF No. 85-1 at PageID # 614. As in the case of the 10-day permit use period, if it were truly a matter of common sense that in-person inspection and registration promoted public safety—or that misidentification in the absence of in-person inspection and registration was a problem—one would expect additional states to maintain similar requirements. The Government has failed to show that the in-person inspection and registration requirement is reasonably tailored to a significant, substantial, or important government interest. HRS § 134-3(c)'s in-person inspection and registration requirement does not survive intermediate scrutiny.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is GRANTED and Defendant's Counter Motion for Summary Judgment is DENIED.

HRS § 134-2(e)'s requirement that "[p]ermits issued to acquire any pistol or revolver shall be void unless used within ten days after the date of issue" is declared unconstitutional in violation of the Second Amendment. Defendant's officers, agents, servants, employees, and all persons in active concert or participation with Defendant are permanently enjoined from enforcing HRS

31

**1-ER-071**

§ 134-2(e)'s 10-day permit use requirement for handguns. To be clear, no other language in HRS § 134-2(e) is found unconstitutional.

HRS § 134-3(c)'s requirement that, with the exception of certain licensed dealers, "[a]ll other firearms and firearm receivers registered under [HRS § 134] shall be physically inspected by the respective county chief of police or the chief's representative at the time of registration" is unconstitutional in violation of the Second Amendment. Defendant's officers, agents, servants, employees, and all persons in active concert or participation with Defendant are permanently enjoined from enforcing HRS § 134-3(c)'s in-person firearm inspection and registration requirement. To be clear, no other language in HRS § 134-3(c) is found unconstitutional.

///

///

///

///

///

///

///

///

///

1-ER-072

Pursuant to the parties' Stipulation, ECF No. 106, and Federal Rule of Civil Procedure 58(b), entry of separate judgment in this action will be delayed until September 15, 2021. The Order shall not take effect and shall not be appealable until the separate judgment is entered. The Clerk's Office shall not close the case file at this time.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 16, 2021.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Yukutake v. Connors*, Civ. No. 19-00578 JMS-RT, Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendant's Counter Motion for Summary Judgment

1

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3
    TODD YUKUTAKE and              ) CIVIL NO. 19-00578JMS-RT
 4  DAVID KIKUKAWA,                )
                                   ) Honolulu, Hawaii
 5            Plaintiffs,          ) June 28, 2021
                                   )
 6       vs.                       )
                                   ) [54] PLAINTIFFS' MOTION FOR
 7  CLARE E. CONNORS, in her       )  SUMMARY JUDGMENT
    Official Capacity as the       ) [60] DEFENDANT CLARE E.
 8  Attorney General of the        )  CONNORS, IN H ER OFFICIAL
    State of Hawaii,               )  CAPACITY AS THE ATTORNEY
 9                                 )  GENERAL OF THE STATE OF
             Defendant.            )  HAWAII'S COUNTER MOTION FOR
10  _____  )  SUMMARY JUDGMENT

11
                       TRANSCRIPT OF PROCEEDINGS
12           BEFORE THE HONORABLE J. MICHAEL SEABRIGHT,
                CHIEF UNITED STATES DISTRICT JUDGE
13
    APPEARANCES:
14
    For the Plaintiffs:      ALAN ALEXANDER BECK, ESQ.
15                           (By video teleconference)
                             Law Office of Alan Beck
16                           2692 Harcourt Drive
                             San Diego, California  92123
17

18  For the Defendant:       KENDALL J. MOSER, ESQ.
                             Department of the Attorney General,
19                            State of Hawaii
                             425 Queen Street
20                           Honolulu, Hawaii   96813

21
    Official Court           Cynthia Fazio, RMR, CRR, CRC
22  Reporter:                United States District Court
                             300 Ala Moana Blvd., C-270
23                           Honolulu, Hawaii  96850

24
    Proceedings recorded by machine shorthand, transcript produced
25  with computer-aided transcription (CAT).
```

2

```
 1   MONDAY, JUNE 28, 2021                      10:02 A.M.
 2           THE COURTROOM MANAGER:  Civil Number 19-00578JMS-RT,
 3   Todd Yukutake and David Kikukawa versus Clare E. Connors, in
 4   her official capacity as the Attorney General of the State of
 5   Hawaii.
 6           This case has been called for a hearing on Plaintiffs'
 7   Motion for Summary Judgment and Defendant's Countermotion for
 8   Summary Judgment.
 9           Counsel, please make your appearances for the record.
10           MR. BECK:  Alan Beck for the plaintiffs.
11           THE COURT:  Yes, good morning, Mr. Beck.
12           MR. BECK:  Morning, Your Honor.
13           MR. MOSER:  Good morning, Your Honor.  Kendall Moser
14   for defendant Clare Connors.
15           THE COURT:  All right.  Thank you.
16           All right.  Well, I think the motion, although we have
17   cross-motions, Mr. Beck filed first.  So I think he should as
18   plaintiff probably argue first as well.
19           So, let me just say a few things.  I'm going to sort
20   of frame a little bit of the argument here.  And certainly I'll
21   let you make your arguments.  But there's one area I think I'm
22   pretty unmovable on given what I've looked at and I really
23   don't think argument will help, and that is if we get past the
24   sort of longstanding history, the historical record and get to
25   a level of scrutiny, I'm convinced this is intermediate
```

1    scrutiny, not strict scrutiny.  And so I really don't want

2    argument on that because it's just not necessary.

3          So I want both sides to limit your comments to

4    application note and intermediate scrutiny test.  I understand

5    you argue otherwise, Mr. Beck, but I just don't see that.  And

6    so I don't need argument on that.

7          Okay.  So with that, Mr. Beck, I'll turn it over to

8    you.

9          MR. BECK:  Yes, thank you, Your Honor.

10         Morning, Your Honor.  Today we're here on behalf of my

11   plaintiffs, my clients' challenge to the HRS 134-2 and HRS

12   134-3's provisions that a long arm -- that a handgun permit

13   expires after ten days.  Whereas, a long arm permit lasts for

14   one year.  And the requirement that a applicant for a firearm

15   take the firearm to the police station.

16         I will begin with the ten-day expiration date, Your

17   Honor.

18         Here the statute is not longstanding.  And we know

19   this because in *Young v. State of Hawaii*, the court recently

20   said very explicitly, as I stated in my briefing, that we're

21   not going to look to 20th century laws to see whether a

22   provision is longstanding because it doesn't give any

23   illumination to the original public meaning of the Second

24   Amendment.  So if you take that snippet from the en banc panel,

25   that what this -- what the current precedent requires in this

4

1    circuit is for this Court to look at what was longstanding,

2    what was prohibited at the time of the ratification of the

3    second amendment.

4         And other precedent supports this.  Here I'll start

5    with the out-of-circuit precedent that's been relied upon by

6    the State.  They've cited to both the Fifth Circuit and the

7    D.C. Circuit.  And a closer examination of both those cases,

8    appeals demonstrate that those opinions actually support a

9    application of looking to colonial law to see whether something

10   is longstanding.

11        In the D.C. court, the -- they found there was a --

12   that here the only reason they would find that the registration

13   laws were longstanding was simply because the laws at issue, as

14   I explain in my briefing, were de minimis.  And in the Fifth

15   Circuit they expressly looked to colonial laws to find that

16   prohibitions on 18 through 20-year-olds were around at the time

17   of the ratification of the Second Amendment.

18        So, the State simply has not cited to any precedent.

19        THE COURT:  What's your -- what's your view on the

20   amicus brief, what's laid out by Everytown in their amicus

21   brief?  Because obviously they do go back to that time period,

22   but you're arguing that should be examined.  So what's your

23   view on that?

24        MR. BECK:  Yes, Your Honor.  The amicus brief about

25   Everytown does not support the proposition that every firearm

1   could be registered or inspected at 1791.  This is -- maybe a
2   closer analogy is the bottom of the military or maybe -- and
3   also the reserve post.  If -- at 1791 there were militia laws
4   in place that required that all able-bodied men go to muster in
5   order to show that they were, you know, able to effectively
6   defend the community.  And all the colonies, I believe, have
7   that.  And so every single statute that's been cited to in the
8   amicus brief of Everytown are statutes that say, look, the
9   firearm that you bring to formation in order to satisfy your
10  duty as a member of the militia, we get a chance to look at it
11  simply because this is a firearm that, you know, we're going to
12  use in this military setting.  And there were no laws, not a
13  single law that Everytown cited to goes to the proposition that
14  you could look at -- that the government could go into your
15  home and look at your additional firearms.
16          THE COURT:  Okay.  Let me interrupt.  I mean I
17  understand that.  So let's move to the intermediate scrutiny
18  now.  Like I say, I don't want you to argue strict scrutiny
19  because I just am not going to find that applies, if I get to
20  this point.
21          MR. BECK:  Yes, Your Honor.
22          THE COURT:  So we have this ten-day period.  You spend
23  a fair amount of time talking about under inclusiveness and
24  comparing it to the ten-day period with handguns to the sort of
25  one-year period for long guns under inclusiveness.  But under

6

1    the intermediate scrutiny test, we don't have to have the least
2    restrictive law possible.  And in the *Pena* case the Ninth
3    Circuit sort of swatted away an argument under inclusiveness.
4          So I guess I'm trying to understand what law would be
5    acceptable in your view?  You know, when is it not a burden?
6    Would a 30-day period be such that it would pass muster, would
7    a 60-day, 90-day?  I mean what's your view on what -- I mean
8    obviously a permit can't last a lifetime.  So there has to be
9    some line that can be drawn that's reasonable, right?
10         MR. BECK:  Just to my application under intermediate
11   scrutiny, Your Honor.
12         THE COURT:  Yes.
13         MR. BECK:  Yes.  I -- look, the core argument that my
14   clients and -- have is they have to take a considerable amount
15   of time off work in a relatively short period of time to the
16   point that it becomes a huge burden for them to repeatedly tell
17   their employers that they need to take time off in -- during
18   that period.
19         I don't -- I'm not -- I can't commit to a exact time
20   frame, but for the purposes of this challenge under
21   intermediate scrutiny it would be enough time where it's -- you
22   know, whether -- where it's -- it would be convenient for them,
23   just somebody, okay, I'm taking one day off today, you know.
24   Say couple months, you know, I take another day off.
25         You know, it's -- here the substantial burden is the

**1-ER-079**

1    fact that, you know, this is really interfering with your

2    day-to-day lives in order to exercise an inalienable right.  So

3    it's -- I mean I don't think that same burden would come into

4    place with the year, you know.  I don't -- I'd be sort of

5    uncomfortable saying 30 to 60.  But certainly the year doesn't

6    have the same impediment on their -- just their ability to take

7    time off so they can --

8              THE COURT:  So you -- you accept that a time period is

9    legitimate, it's just the ten-day period is too short; is that

10   fair?

11             MR. BECK:  What I will say is that the crux of my

12   clients' challenge --

13             THE COURT:  That's not my question though.  No, I want

14   you to answer my question, not what -- I don't want you to say

15   what you want to say, I want you to answer my question.

16             MR. BECK:  I -- I will accept that -- that a certain

17   amount of time for a permit is acceptable under intermediate

18   scrutiny.

19             THE COURT:  All right.  Okay.  That's all.  And you're

20   just saying given the mechanisms by which you go about getting

21   the firearm, you know, you have to first go purchase it, but

22   you don't get it, then you fill out the paperwork, you submit

23   that and then you have only that ten-day period to get back to

24   the station.

25             MR. BECK:  Yes, Your Honor.  I mean taken in total

8

1  together, I mean this is a five-day -- this is a five-step

2  process that has to be done just in a matter of weeks.

3      THE COURT:  Walk me through that five-step process.

4  Let's make sure we're on the same page with that process.  I'll

5  let Mr. Moser comment on this.  But no one lays that out in

6  like a bullet point, so I think it would be useful actually to

7  hear that five-step process.

8      MR. BECK:  Okay.  Let's -- first off let's assume that

9  this is their second gun.  So they've gone through, you know,

10  just all the normal stuff that you have to do for somebody to

11  purchase a gun.  So, we're on the second gun here because both

12  of my clients are --

13      THE COURT:  Well, okay, let me back up.  I mean are

14  you making just an as-applied challenge here?  That's what it

15  sounds like you're saying.

16      MR. BECK:  No, we're making both a facial and

17  as-applied challenge, Your Honor.

18      THE COURT:  All right.  Okay.  Go ahead.  So let's

19  just talk about generically.  I don't want to talk about your

20  clients.  Let's just talk generically if you buy a handgun.

21  What is the process?

22      MR. BECK:  Okay.  First you have to take the state

23  mandated handgun course.  After you've satisfied those

24  requirements, you have to go to the gun store and basically

25  pick out your gun.  After that you go to the station and you

 1  fill out a -- the application.  Then --

 2          THE COURT:  Let me stop you.  And that has to be at

 3  the station?

 4          MR. BECK:  Yes, Your Honor.  And after that, you wait

 5  14 days.  And assuming that everything's okay after the 14-day

 6  waiting period, you come back to pick up the -- the permit and

 7  then you take the permit and go back -- you know, you go to the

 8  gun store.  In the case of a handgun, you get ten days to use

 9  it --

10          THE COURT:  Okay, wait, wait.  Stop, stop, stop.  I

11  thought the permit was being e-mailed now?

12          MR. BECK:  That has not been implemented yet, Your

13  Honor.  We're not sure when that will be.

14          THE COURT:  Okay.  All right.

15          MR. BECK:  And then you pick up the permit, go to the

16  gun store, and then finally you go to the -- back to HPD for

17  the -- for the -- to register the firearm.

18          THE COURT:  And that requires the physical inspection?

19          MR. BECK:  Yes, Your Honor.

20          THE COURT:  Okay.  So, you're saying first you have to

21  have a safety course.  You go to the gun store and purchase or

22  put a downpayment, whatever it is, on a firearm, you don't pick

23  it up, but you get all of the relevant information, the serial

24  number, the make, model, et cetera, the information you need.

25  You then fill out an application for a permit at the police

1    station.  And for handguns each gun is a separate permit, as I

2    understand it, there's not a permit for several firearms, it's

3    individual.

4           Then HPD, or if it's HPD, whatever police department

5    it is, will do the background check, the relevant background

6    check.  There is a 14-day waiting period which allows that to

7    happen, perhaps a cooling off period.  And then you're notified

8    and you get the permit.  Right now it's in person, but you're

9    saying maybe in the future it will be by e-mail, that's still

10   to be worked out.  You then go to the gun store, back to the

11   store, get the firearm.  And then I think it's five days you

12   have to bring it to the police station for physical inspection.

13   Is -- did I get that right, Mr. Beck, from your perspective?

14          MR. BECK:  You did, Your Honor.  Yes, Your Honor.

15          THE COURT:  Let me turn to Mr. Moser just on that and

16   see if he agrees with that general process.

17          MR. MOSER:  We do agree, Your Honor, yes.

18          THE COURT:  All right.  And what's the status of the

19   e-mail?  Just -- I mean it may not be that relevant to me, but

20   that's being worked on right now?

21          MR. MOSER:  Well, Your Honor, that's the City and

22   County's process.  They said, if I recall correctly, and if I

23   do not, perhaps Mr. Beck knows, that they would have that

24   process available by December 31st of this year.

25          THE COURT:  I see.  Okay.  So it's the plan for the

1    future anyways.

2              MR. MOSER:  That is my understanding, yes, Your Honor.

3              THE COURT:  Okay.  All right.  And you agree that you

4    have to fill out the application at the police station?

5              MR. MOSER:  Yes, Your Honor.

6              THE COURT:  Okay.  All right.  Thank you.  That's

7    useful to have that bullet point sort of understanding.

8              All right.

9              MR. BECK:  Should I continue, Your Honor?

10             THE COURT:  Yes, I'm sorry, go ahead, yes.

11             MR. BECK:  So, the bottom line here is under

12   intermediate scrutiny, that requires the State to present

13   evidence that these are -- satisfy important government

14   interests.  And throughout their briefing there's been legal

15   argument, there hasn't actually been a presentation of evidence

16   that demonstrates the ten-day waiting period actually

17   accomplishes anything.

18             It's -- for example, the State reports, which the

19   State has stipulated are true, shows that not a single handgun

20   permit has been voided for malfeasance.  There have been quite

21   a few where people simply weren't able to pick up which -- in

22   the time, and that's cited to in the brief.  But there's not a

23   single cited example of a person either -- of not being able

24   to -- of having it voided in that time period.

25             And this is the -- both laws at issue and they are

 1    sort of prophylactic on prophylactic reasoning that the laws

 2    that the Supreme Court in -- sorry, *McCutcheon* -- I'm sorry, I

 3    cited that in my briefing.  I'm having a problem pronouncing

 4    it -- but had said needs to be looked at even under --

 5    extremely -- with quite a bit of scrutiny, with a heightened

 6    eye.

 7            Here there just -- there hasn't been any presentation

 8    of evidence --

 9            THE COURT:  All right.  Let me do this, Mr. Beck.  I

10    want to break this argument up into the two -- the two

11    provisions that are being challenged.  And I think I've heard

12    enough from you on the first.  So I want to hear from Mr. Moser

13    on that.  I'll give you a little rebuttal time and then we'll

14    go to the in-person --

15            MR. BECK:  Yes, thank you, Your Honor.

16            THE COURT:  -- inspection.  I think it's best we break

17    it up like that.  So I'm going to go ahead and turn to you,

18    Mr. Moser.

19            MR. MOSER:  Okay.  May I remain here, Your Honor?

20            THE COURT:  It's totally up to you.  With COVID time

21    people are free to sort of wherever you're comfortable.

22            MR. MOSER:  Thank you.  I don't want to talk about

23    things that the judge -- Your Honor doesn't really want to

24    hear.  So I think --

25            THE COURT:  Well, let me say this:  I am having

1    trouble with this historical record.

2          MR. MOSER:  Oh.

3          THE COURT:  You know, I do think *Young* suggests it's

4    not that relevant.  It's not saying it's not -- it's not

5    totally irrelevant.  I mean they didn't go that far, but, you

6    know, *Young* did certainly suggest that it's -- it's less

7    reliable evidence of the original meaning.  And what you have

8    is Hawaii laws from the '30s and a handful of other states that

9    have repealed those laws, I'm not sure of the relevance of

10   that, maybe none, but, you know, only a handful of other

11   states.  So I have to say it's not overwhelming.  I think you

12   probably recognize that, Mr. Moser, as far as the quantum of

13   evidence you presented in that regard.

14         MR. MOSER:  Well, I'd like to begin, Your Honor, by

15   saying -- stating a rebuttal, if you call it that, to something

16   that Mr. Beck said about the *Young versus Hawaii* case.  I think

17   he's, with respect, I think Mr. Beck is overstating that

18   portion of the *Young* hearing.  Yeah, they do say that it's not

19   really that -- how shall I put this most succinctly?

20         *Young* primarily relied on the statute of Northampton

21   from England which was enacted in 1328.  So, I can fully

22   understand the Ninth Circuit saying in passing, Well, we don't

23   really need to look at things that happened only a hundred

24   years ago.

25         THE COURT:  Well, but they also say it's less reliable

```
 1    as evidence of the original meaning, right?  So they're going
 2    back to, you know, this after-the-fact evidence has to be
 3    evidence that relates back, right?  So I can accept that it may
 4    be relevant.  The Ninth Circuit didn't say you ignore it.
 5              MR. MOSER:  That's true.
 6              THE COURT:  Right?
 7              MR. MOSER:  Yes.
 8              THE COURT:  I'm just saying I don't think you have
 9    enough here to convince me.
10              MR. MOSER:  All right.  Well, the Everytown did submit
11    their amicus brief.
12              THE COURT:  Right.  Right.
13              MR. MOSER:  One can analogize.  And I understand the
14    difference between a militia and a private citizen owning
15    firearms, but one can analogize to -- somewhat to those militia
16    cases -- or, I'm sorry, to the militia laws that existed around
17    the time of the founding that there were registration
18    requirements.  So the concept at least of a registration
19    requirement did not --
20              THE COURT:  Well, Everytown really deals with the
21    physical inspection, right?  I mean that's really what that
22    brief is about, is the physical inspection.
23              When did Hawaii first pass a law requiring physical
24    inspection?  Not what the practice may have been actually, but
25    actually passed a law?  That is the language in 134-3 --
```

1   there's a subsection here -- (c), as in Charlie, the last

2   paragraph says:  "All other firearms and receivers registered

3   under this section shall be physically inspected by the

4   respective county chief of police or their representative at

5   the time of registration."  Mr. Beck says that's 2020.

6         MR. MOSER:  Yeah, I'm looking, if I might, Your Honor,

7   at the brief we submitted to find out when that law first --

8         THE COURT:  I don't think your brief says it.  I think

9   Mr. Beck's does.  Unless I missed it, Mr. Moser.

10         MR. MOSER:  The statute in 1930 -- during the 1933,

11   1934 special session refers to registration within ten days.  I

12   don't immediately find the inspection --

13         THE COURT:  Right, because that's core of his

14   argument, right, the burden is the having to get whether it be

15   in a car or a bus or whatever it is and get, you know,

16   physically to, in the case of Oahu, HPD.

17         MR. MOSER:  Well --

18         THE COURT:  I mean I can figure that out myself, but

19   he says it's 2020 and -- so the way I looked at it is you were

20   sort of arguing, and tell me if I'm wrong, that the validity of

21   the permit for ten days, that goes back to 1933 and you cited

22   some other courts that had -- I'm sorry, some other states that

23   had similar laws.  You were arguing from that there's a

24   historical record from which I can draw a conclusion.

25         MR. MOSER:  I am and not only --

```
 1          THE COURT:  Let me -- I just want to make sure I
 2   understand your argument.  And then for the physical inspection
 3   requirement, it's really more Everytown's argument, I think,
 4   that takes me back historically.
 5          Now, overlaying all of that you talk about generic
 6   findings of the legislature about safety of the public and so
 7   forth.
 8          MR. MOSER:  Yes.
 9          THE COURT:  So is that fair as far as what your
10   arguments are?
11          MR. MOSER:  It is, Your Honor.
12          THE COURT:  Okay.  All right.  Okay.
13          MR. MOSER:  I would say that in addition to the
14   cases -- I'm sorry, the states that we cited to that had laws
15   dealing with registration and acquisition in our brief, and
16   those specifically are Massachusetts, Missouri, Arkansas and,
17   -- I'm sorry, I'm blanking on the other one.  But there is in
18   the Heller case, which we did cite and I guess we'll call this
19   Heller 2, this is the one from 2011 from the district court,
20   they did cite a number of other states which had registration
21   laws.  So I didn't want the Court to -- to think that we could
22   only find four.  We did find four other ones.
23          THE COURT:  Yeah, but I think saying a registration
24   law is just too broad.  I mean it's the -- it's the ten-day,
25   the validity of a permit being ten days that's in challenge
```

1    here, not the need for a permit is not challenged.

2            MR. MOSER:  Yes, and I will -- I will admit that there

3    are not a plethora of state statutes --

4            THE COURT:  Right.

5            MR. MOSER:  -- from a hundred years ago which talk

6    about -- although we did find one or two, and one was specific

7    and is the same as Hawaii's, you have ten days to acquire.

8            But I have to, I do admit that there are not a lot of

9    other state statutes from that period of time.

10           THE COURT:  Okay.  So let's turn to the intermediate

11   scrutiny then on the ten-day period.

12           MR. MOSER:  Yes.  So --

13           THE COURT:  And help me understand.  First of all,

14   it's true, you present no evidence, right?  You don't present

15   legislative history, you don't present an expert witness,

16   anything, you don't present declaration from a chief of police,

17   you don't present -- I mean it's -- you're asking me to rely on

18   common sense essentially; is that fair?

19           MR. MOSER:  We do cite some statutory history, but,

20   but yes, you're right, we don't have the other categories of

21   evidence.

22           THE COURT:  But again, that's really broad about

23   safety.  There's no legislative history that you cited at least

24   that says this ten-day period is important because here's what

25   can happen outside of ten days, you know, anything of that

1    sort.

2              MR. MOSER:  That's correct.

3              THE COURT:  Right?  It's not your fault, it's just

4    what it is.  Right?

5              MR. MOSER:  Thank you, Your Honor, yes.

6              THE COURT:  And so, the way I read it at least, what

7    you're really arguing is for me to draw sort of common sense

8    reasonable inferences from the law and the overreaching goal of

9    the law to provide safety.

10             MR. MOSER:  Yes.  That -- yes.

11             THE COURT:  Okay.  So let's now bear down on that a

12   little bit and tell me what that common sense -- because I'm

13   not sure I fully understand it, Mr. Moser, the staleness

14   argument that you're making.  So maybe you can help me with

15   that.

16             MR. MOSER:  Well, if we're talking about intermediate

17   scrutiny, Your Honor, I would say this:  HRS 134-2 and -3 do

18   not constitute a ban on the possession of firearms.  Nowhere,

19   speaking of evidence, do the plaintiffs present any evidence or

20   even allege that the provisions at issue prevent them from

21   obtaining firearms.

22             THE COURT:  Right, and that's why I said intermediate

23   scrutiny applies and that's why you argue intermediate scrutiny

24   applies.

25             MR. MOSER:  Because the inconvenience, which they

1  referred to as inconvenient, very convenient, not very easy,

2  depends where you look in the brief, inconvenience is not a

3  substantial burden.  Having to take off -- time off work is not

4  a substantial burden.

5        THE COURT:  Right, and that's why I agree with you

6  intermediate scrutiny applies.  So I'm not sure what your

7  argument is there.  I mean I'm agreeing with you on that.

8        MR. MOSER:  All right.  Then I will move on, Your

9  Honor.

10        Well, going back to the legislative history, in as

11  early as 1919, the -- with regard to permits to acquire, the

12  legislature said that this amendment will enable the police

13  authorities to have a better supervision and check over the

14  sale of firearms.

15        THE COURT:  But again, the ten-day -- that doesn't

16  answer the ten-day period, right?  That's the challenge.

17  There's not a challenge as to registration, as to permit.  It's

18  that it expires in ten days.  You have the 14-day cooling off

19  period, background check period, whatever you want to call it,

20  and then tacked on to that is ten days, after that the permit

21  is invalid and you have to start the process over again.

22        MR. MOSER:  Yes.  Well, the plaintiffs did present to

23  the Court in their moving papers the firearms reports for the

24  last four years, 2020, '19, '18 and '17.  And they said right

25  off the bat that, well, look, last year, for example, 357

1  permits were voided because the people didn't come back to pick
2  them up within the ten days.  And initially that looks kind
3  of -- it looks like a lot.  And then when you look at how many
4  people applied, however, there were 20 -- or how many permits
5  were issued, there were over 26,000.  So when we talk about 357
6  permits being voided for the applicant failing to go back
7  within the ten days to pick up the permit, we're only talking,
8  depending on the year, an average of 2 percent.  The lowest
9  that they cited was 1.4 percent, the highest as I recall off
10  the top of my head was two point --
11          THE COURT:  And what do I do with that evidence?  What
12  does that mean as far as application of intermediate scrutiny?
13          MR. MOSER:  Well, what that means is that it is not a
14  substantial burden.  98 percent of the Hawaii applicants are
15  able to go down to HPD or whichever county they live in and
16  applied to --
17          THE COURT:  Wait a minute, are you arguing that no
18  scrutiny applies at all now?  Are you making a different
19  argument?
20          MR. MOSER:  No, I'm not, and I'm sorry if I'm --
21          THE COURT:  So I don't understand what the substantial
22  burden argument is.  I mean the intermediate scrutiny test is
23  that the statutory objective must be significant, substantial
24  or important, and there's a reasonable fit between the law and
25  that objective.  So I'm just asking where does this 2 percent

21

1 figure, how does that play into this intermediate scrutiny

2 test?

3        MR. MOSER:  Well --

4        THE COURT:  See, here's what I'm having trouble with,

5 let me just lay it out for you, okay, which is -- and I don't

6 have the exact language you had in your brief in front of me

7 here.  Let me see if I can find it.

8        So, the State interest, you say at least in part,

9 right, is to make sure the information is not stale on the

10 permit, right?

11        MR. MOSER:  Yes.

12        THE COURT:  And that somebody could become

13 disqualified, therefore we have a short period that the permit

14 is valid.  Do I have that essentially right?

15        MR. MOSER:  Yes, Your Honor.

16        THE COURT:  But aren't you by having a ten-day -- I

17 mean it just seems to me by having a 10-day period you're just

18 forcing people into getting that gun sooner and then you could

19 have somebody -- so let's say you have a -- normally we have a

20 90-day period in which a permit is valid, right?

21        MR. MOSER:  Yes.

22        THE COURT:  And is one option.  Right now the law says

23 ten.

24        MR. MOSER:  Yes.

25        THE COURT:  And let's say they -- you know, 30,

1    somewhere in between those, somebody becomes disqualified for
2    some reason, whatever that reason is.  It just seems to me more
3    people are going to have guns who are disqualified under the
4    ten-day permit period because you're forcing people to get the
5    guns within ten days and they've become disqualified
6    afterwards, they have the gun.  And that certainly isn't a
7    substantial interest for the State nor a good fit.
8         So I just have trouble understanding the staleness
9    argument other than it's just a statement but without any sort
10   of support in reality.  It sort of seems a little untethered to
11   in real life it seems to me.
12        MR. MOSER:  Well, Your Honor, I'm sorry, I don't know
13   what I can add to what we've submitted in writing.
14        THE COURT:  Okay.  So, is there -- the other thing in
15   my mind I'm kicking around, and this may or may not apply to
16   one or both of these, is if I do grant the motion at all,
17   Mr. Moser, do you have a view on what I should do, if anything,
18   regarding the timing, the effectiveness of that order?  In
19   other words, I don't want to throw a whole system into
20   disarray.  If I were to say, for instance, there is no
21   sufficient fit that has been described for this ten-day period,
22   it would be up to the legislature to fix that, however they see
23   fit, right?
24        MR. MOSER:  And we would hope that they would do so,
25   although as I think Your Honor will recall in some other Second

1    Amendment cases that Mr. Beck and I have worked on, that
2    sometimes we get rulings and then we go to the legislature and
3    submit bills to -- to make the statute in conformity with the
4    Court's rulings and, you know, we can only do what we in the
5    executive branch --
6              THE COURT:  Well, I understand that and I think you're
7    talking about the issue of the, like, green card holders and --
8              MR. MOSER:  And the national -- the U.S. national --
9              THE COURT:  U.S. nationals in American Samoa, right.
10   But I guess I'm just saying in the normal course the way this
11   would work is if I were to strike down the ten-day period,
12   would you be asking for a stay?  I mean what -- how would you
13   see us proceeding?
14             MR. MOSER:  Yes, I -- since Your Honor asked, I
15   believe that is what our office would do is we would ask for a
16   stay and then --
17             THE COURT:  So I mean maybe the conservative course
18   for me, I can hear from you on this, Mr. Beck, maybe the
19   conservative course is I could put out a ruling, not make it
20   effective immediately but ask for briefing on the stay issue is
21   one thing I could do if I grant on this -- on this ten-day
22   period.
23             MR. BECK:  Do you want me to respond, Your Honor?
24             THE COURT:  Yeah, yeah, go ahead.  Go ahead.
25             MR. BECK:  Sorry.  Sorry.  So I'd direct the Court to

1    *Moore v. Madigan*, which is a Seventh Circuit case that -- where

2    there was a complete ban on handgun carrying and the Seventh

3    Circuit struck that as unconstitutional.

4         I believe they -- it was at least six months that the

5    legislature was given.  And I don't remember off the top of my

6    head whether the State filed for a stay or whether that was

7    something the court did sua sponte, but I would direct the

8    Court to the Seventh Circuit's opinion in *Moore v. Madigan* to

9    use as a template for what it could use, assuming that it's

10   amenable to grant this motion.

11        THE COURT:  Okay.  I appreciate that, Mr. Beck.  I'll

12   take a look at that.  And if I need help from you folks in

13   writing on this I'll let you know, if this is where I go.  I

14   can sort of be back in touch with you and ask for more.  And

15   maybe you folks could agree on something, too.  I mean, you

16   know, that's another way to -- to look at this and just see if

17   there's any agreement as to process going forward if I strike

18   down one or both of these provisions.  Okay.

19        MR. BECK:  Yes, Your Honor.  We'd be happy to --

20        THE COURT:  All right.  All right.  What I don't want

21   to do, I'm pretty conservative on this, I don't want to throw a

22   whole registration process into disarray and no one know what

23   to do.  That's what I don't want to have happen if I strike

24   down any of this, Mr. Moser.  And I'm letting you know that,

25   that's not my intent here to do.  Instead -- and I think

1    Mr. Beck probably agrees with this as well, you know, you want

2    an orderly process by which things can be fixed if there's a

3    problem.

4          Now, if the legislature refuses to do it, then that's

5    a whole different matter.  I mean that's sort of on the

6    legislature at that point in time if we get there, but I have

7    no reason to believe they wouldn't do what's appropriate if

8    they understand, you know.  Because the other issue deals with

9    the limited number of people.  This deals with everyone just

10    trying to get a firearm, right, and the registration process.

11    And so you'd think the legislature would want to take a hard

12    look at that and -- and, you know, consult with your office as

13    to what would be constitutional, all those things, right, that

14    should happen.  But I have no interest in throwing a whole

15    system into disarray where no one knows how to then go about a

16    permitting or registration process.

17          MR. MOSER:  I understand, Your Honor.  Thank you.

18          THE COURT:  Okay.  All right.  Let's move on then to

19    the second -- the second part of the challenge, which is the

20    in-person inspection of the firearm.  Mr. Beck, your -- you

21    said that was enacted just in 2020, is that your understanding?

22          MR. BECK:  Yes.  Yes, it is, Your Honor.

23          THE COURT:  And before that the law didn't have

24    that -- the language that I read earlier, it was -- it was --

25    I've not gone back to look as to what the law was before.

26

1    MR. BECK:  That is correct.  That was enacted by the
2  legislature in 2020.  Prior to that it did not mention that.
3    THE COURT:  And is there no legislative history as to
4  the reason for this?
5    MR. BECK:  Not that I'm aware of.  Perhaps Mr. Moser
6  might be able to comment on that, but I'm aware of.
7    THE COURT:  Mr. Moser, are you aware of any
8  legislative history as to this 2020 change, have you looked?
9    MR. MOSER:  I have looked and I'm not aware of the
10  history, any legislative history on that.  It seems, but I
11  don't want to speculate, that this issue came up in connection
12  with ghost guns, as they're called.  And that the legislature
13  seemed to feel that it was necessary to, since the invention,
14  if you will, of ghost guns that those need to be inspected.  So
15  the language did change.  It was amended in 2020.
16    THE COURT:  Okay.  All right.  But you don't think
17  there's legislative history that says, you know, we have a
18  problem with ghost guns?
19    MR. MOSER:  Not that we found, no, Your Honor.
20    THE COURT:  Okay.  All right.  Okay.  Go ahead,
21  Mr. Beck.
22    MR. BECK:  Yes, Your Honor.  In order to purchase a
23  firearm from a FFL in Hawaii, after you purchase it, the FFL
24  will submit the information to the respective county office,
25  police station.  And if you're doing a person to person -- if

1-ER-099

27

1   me and Mr. Moser are exchanging guns, is what a person to

2   person is -- then both parties have to submit the information

3   to HPD. So, in order to sell -- I'm aware that the State takes

4   the position that we need this in-person registration to -- in

5   order to verify that a mistake has been made, but that's just

6   -- again, under intermediate scrutiny there has to be

7   substantial evidence. There's absolutely no evidence of that.

8   And in every state in the union FFL's who are under pretty

9   strenuous requirements by the ATF are able to successfully, you

10   know, do this. And it's something that isn't an issue.

11        And again, you'd have to expect that both people --

12   and person-to-person transfers are the -- I don't know how much

13   that is exactly in Hawaii but just as a general rule is, you

14   know, for a very small portion, you still would have to believe

15   that both parties are given that information. That's just

16   something that isn't the case. I mean -- and if it had been,

17   the State would have been able to produce some type of

18   evidence.

19        And, you know, I don't want to rehash too much what's

20   already in the briefing, but, you know, the D.C. Court of

21   Appeals has already looked at this exact same thing and just

22   found it's not an issue under intermediate scrutiny, which is

23   what the court applied in *Heller*. So --

24        THE COURT: So I think, you know, Mr. Moser is, as he

25   sort of admitted, you know, in part relying on just sort of

1   asking me to draw some common sense conclusions.  And there is

2   some law, I'm not sure in the Ninth Circuit but other circuits,

3   that say intermediate scrutiny you can at some level look at

4   common sense.  And that does ring true.  I mean you could have

5   a very common sense gun law.

6        Let me just give you an example.  Firearms need to

7   have serial numbers, for instance.  And, you know, I don't know

8   if anyone has challenged that or not, I don't remember, but

9   just that basic thing that every firearm has to have a serial

10  number, you know, do you need more than just the common sense,

11  Well, that's how we trace crimes in the United States, gun

12  crimes in the United States, by serial numbers, and therefore

13  it's important every gun have a serial number.  And you don't

14  need actual evidence.  You don't need, whether it be, you know,

15  a legislative history, whether it be, you know, a declaration

16  from the chief of police saying there's a problem, whether it

17  be a, you know, expert report or studies, whatever the case may

18  be.  So -- but is -- first of all, do you disagree with that,

19  Mr. Beck, as a general rule as far as how I look at this?

20       MR. BECK:  I do, Your Honor.  I believe the Supreme

21  Court's precedent just within the context of intermediate

22  scrutiny, it's fairly clear the burden is on the State to

23  produce some evidence.

24       THE COURT:  Right.  And that evidence can be common

25  sense, but it's just here you're saying that's not the case.

29

1    They need to present actual evidence, not just supposition; is
2    that sort of what you're --
3              MR. BECK:  That's correct, Your Honor.
4              THE COURT:  Okay.  All right.  Okay.  I mean that's
5    what I thought your argument was, I just wanted to make sure.
6              All right.  Let me turn to Mr. Moser then on this.
7              MR. MOSER:  Well, I think --
8              THE COURT:  I mean the problem I'm having, Mr. Moser,
9    you know, you didn't present anything from the chief of police,
10   for instance, just even a declaration saying here's the
11   problem.  Right?  You're just asking us, me, to draw sort of a
12   common sense conclusion without actual evidence.
13             MR. MOSER:  Yes, Your Honor, that's correct.  But, you
14   know, I don't think that a declaration -- a declaration could
15   be helpful.  I don't and wouldn't disagree with that, but I
16   think it is certainly common sense.  And we can't -- we can't
17   assume that everyone who wants a firearm is a law-abiding
18   citizen like I understand these two plaintiffs to be.  It sort
19   of ignores reality to think that, oh, someone who gets a gun,
20   so and so is going to provide accurate information to HPD.
21             So I think that the in-person inspection protects
22   public safety by ensuring that, you know, the information is
23   correct.  It's, you know, the right serial number and so forth,
24   that it complies with Hawaii law, that it's not --
25             THE COURT:  Isn't there some case law that says we do

30

1 assume the buyers are law-abiding?  I thought there was some

2 case law like that?

3          MR. MOSER:  I'm sorry, Your Honor, I'm not --

4          THE COURT:  I can take a look and if I need help I'll

5 let you know.  I may be thinking of something else, but it

6 just -- in the back of my mind, Mr. Moser, I think -- and I

7 don't even know if it was the Ninth Circuit, I just remember

8 reading somewhere that you work under the assumption that you

9 have a law-abiding citizen going through this process.

10          MR. MOSER:  And Your Honor has already mentioned about

11 the need to facilitate tracing by law enforcement.  And we --

12          THE COURT:  But what you don't have is, has there ever

13 been a problem with this, right?  In other words, have serial

14 numbers ever gotten transposed.  I have nothing.  I don't know.

15 And if the answer is no, then your whole argument sort of falls

16 apart.  So that's the problem I'm having.

17          But I'm also wondering if you didn't present enough,

18 and I don't know, to deny both Motions for Summary Judgment,

19 say there has to be a trial on this issue.  But I don't know if

20 there's more evidence you could present if the case went to

21 trial or if what you have is sort of all there is, Mr. Moser.

22          MR. MOSER:  I don't know the answer to that, Your

23 Honor, and I'm embarrassed to say that, but I don't know what

24 declaration we might have gotten from, as you say, Your Honor,

25 the chief of police or somebody within the HPD firearms unit.

31

```
 1   It wouldn't have been impossible to approach them and get
 2   something, but of course this is not a as-applied challenge
 3   anymore.  It might be --
 4            THE COURT:  Well, Mr. -- Mr. Beck says it is an
 5   as-applied challenge.  Why don't you address that.
 6            MR. MOSER:  With all due respect to Mr. Beck, he's
 7   wrong.  It is abundantly clear, if nothing else that I've
 8   talked about this morning is clear, one thing that is clear is
 9   these are state statutes which very clearly say that it is the
10   chiefs of police who issue the permits to acquire and to whom
11   you -- with whom you register your firearm and have your
12   firearm inspected.  At one time in this litigation these men,
13   these plaintiffs who are from Oahu, sued not only the State
14   through the Attorney General in her official capacity but the
15   City and County as well and chose for whatever reason to settle
16   with them and to dismiss them with prejudice.
17            THE COURT:  "Them" meaning HPD?
18            MR. MOSER:  I'm sorry?
19            THE COURT:  You say "them," you mean HPD?
20            MR. MOSER:  Yes.  I'm sorry.
21            THE COURT:  Yes.
22            MR. MOSER:  And more specifically the City and County
23   of Honolulu.
24            THE COURT:  Or the City and County.  Okay.
25            MR. MOSER:  Yes, Your Honor.  I apologize.
```

32

1        So again, it's clear that on the face of these

2   statutes that it is the City and County of Honolulu which

3   executes these statutes.  So I don't believe there -- there

4   is -- there can't be an as-applied challenge any longer.  There

5   was a viable one and not one against the State of Hawaii.  It's

6   our statute.  It's a State statute, but it's the City and the

7   County chiefs of police who execute the statutes.

8        THE COURT:  All right.  Well, take your best shot at

9   articulating then the significant, substantial or important

10  objective the government has in the physical inspection and

11  then how that's a reasonable fit.  Go ahead and give me your

12  best shot on that.

13       MR. MOSER:  Okay.  Thank you, Your Honor.

14       Well, the objective which courts have found is --

15  is -- survives a -- an intermediate scrutiny is public safety.

16  And I think the way that it promotes public safety is cited in

17  the legislative history which we have cited in our briefs and

18  as we've discussed a little bit this morning.

19       There was an amendment to HRS 134-2 and -3 in 1990.

20  And the legislative history, which we've attached to our

21  concise statement as Exhibit O, just says in a sentence, this

22  is the Senate Standing Committee Report:  "While your

23  Committee" -- and this was an amendment, proposed amendment to

24  keep firearms away from schools, you know, whatever it was, a

25  hundred yards or 500 feet or whatever it was.

1    And the Senate committee said, quote:  While your

2    Committee strongly agrees that our educational institutions

3    should be places of sanctuary, we believe just as strongly that

4    our entire community should be a safe place to live and learn

5    and that everyone deserves to feel free from the threat of harm

6    wherever they go.

7    And I think we've already discussed and cited in our

8    brief that it's -- it promotes public safety by making sure

9    that the firearm that the person says they have is the firearm

10   that they have, that it's registered to them, that the serial

11   number is correct.  In the unfortunate event that it's used in

12   a crime, then law enforcement can trace it.  And we've cited

13   the case called *U.S. versus Mobley* which talks --

14   THE COURT:  I guess the question I have is, is that

15   enough?  And that's what I'm struggling with on this one.  This

16   is where I'm struggling.  Is that enough without any evidence

17   behind that?  That this is a problem or is it a perceived

18   problem.  And if it's a perceived problem, then I'm not sure

19   you can prevail.

20   MR. MOSER:  And just for clarification, Your Honor,

21   when you say "it" being the problem, what --

22   THE COURT:  The physical inspection.  In other words,

23   the need to match up the firearm with what's on that permit or

24   the registration, right, I guess is what it would be.

25   MR. MOSER:  Well, then I guess that then takes us back

1    to the common sense that we were talking about earlier.

2         THE COURT:  Right.  And then my question becomes, you

3    know, is that enough to get you over the hurdle to get you to

4    trial, just that part of it?  In other words, is there a

5    genuine issue of material fact?  Now, if you say there's no

6    other evidence I would have, then, you know, I don't know why I

7    wouldn't just rule on summary judgment if that's the case.  But

8    if you think there could be other evidence, I'm not sure where

9    I go with that.

10        MR. MOSER:  Well, I -- I think that's all that we can

11   say at this point, Your Honor.

12        THE COURT:  Okay.  All right.

13        MR. MOSER:  What we have is what we've given to the

14   Court.

15        THE COURT:  Okay.  All right.

16        MR. MOSER:  I'm not aware of any other evidence.

17        THE COURT:  And you just don't know if there would be

18   other evidence at this stage?

19        MR. MOSER:  That's correct, Your Honor.

20        THE COURT:  Okay.  All right.  So I'll give you a few

21   minutes for rebuttal, Mr. Beck, and then we'll wrap up here.

22        MR. BECK:  Yes, thank you, Your Honor.  The first

23   thing I would like to rebut is the fact that the -- there could

24   be other people undergoing this process that aren't

25   law-abiding.  You have to go through a 14-day, you know,

    1    background check to undergo this process. We've already
    2    covered that, so I don't want to -- but that's pretty
    3    comprehensive. I mean sort of by definition. By the time you
    4    got to this change you are a law-abiding citizen.
    5            I don't know off the top of my head, off the top of my
    6    head to answer the question that was being asked to Mr. Moser.
    7    I think that might be available in *United States v. Chovan*,
    8    which is the Ninth Circuit's *Lautenberg* case. But -- and
    9    again, that's off the top of my head regarding whether there's
   10    a presumption that people need to be law-abiding.
   11            As to the as-applied issue, I think the most striking
   12    thing with their argument is they didn't cite to any case law
   13    on this that was relevant that I could see. There's -- a
   14    pretty broad law that allows you to sue the -- sue the State
   15    for their laws and you're suing based upon that implementation.
   16    And I wasn't able -- and, you know, we cited to some law to
   17    support our position. They didn't cite to anything. And based
   18    upon that I think that's a failure -- that's a basis to say
   19    that argument has been waived.
   20            THE COURT: Well, you know, I guess I'm -- I'll take a
   21    look at this as to whether I think there's an as-applied
   22    challenge. I mean my instinct right now is there's not,
   23    Mr. Beck, I'll say that, that makes sense to me at least as
   24    opposed to just a facial challenge, but I will take a hard look
   25    at that.

1    MR. BECK:  Yes, thank you, Your Honor.  And as to the

2    inspection, I mean this is the number one problem with the

3    common sense issue.  If it's common sense, there needs to be

4    some indication that this is an issue somewhere.  I mean even

5    if you don't need to do a deep dive into -- I mean it would be

6    a problem somewhere else in the country, whether it be just

7    some indication here this being a problem.  That's why common

8    sense can't be applied here because common sense says

9    otherwise.  I mean it's just simply counterintuitive that just

10   based upon what we know of the firearms industry in, you know,

11   every state of the union.  So I mean beyond anything else,

12   that's why because common sense does not say that this is an

13   issue.

14        THE COURT:  Mr. Moser, let me ask you, how do you

15   address that?  I mean if no other state in the country has

16   this, it does sort of cut against the common sense argument,

17   right?  Because you think at least, even putting aside the, you

18   know, territories, I mean you think at least -- and the

19   District of Columbia, you think at least 49 other states, out

20   of them there would be a handful at least that would have this,

21   but apparently there's not.

22        MR. MOSER:  Well, you know, I think Hawaii and

23   Michigan are the only two left out of that list that we've

24   provided to the Court from, you know, a hundred years ago.

25        THE COURT:  No, I'm talking about the physical

```
 1   inspection though, right?  Are there any other states that
 2   require physical inspection?
 3            MR. MOSER:  Not that I'm aware of, Your Honor.
 4            THE COURT:  Yeah, okay.  All right.  All right.
 5            MR. BECK:  I think Michigan actually repealed that
 6   law, Your Honor.
 7            THE COURT:  Okay.
 8            MR. BECK:  I'm -- outside of -- I'm happy to answer
 9   any other questions that the Court might have.  But if the
10   Court does not, I'm willing to rest at this point, Your Honor.
11            THE COURT:  All right.  Thank you, Mr. Beck.
12            Given there were cross-motions Mr. Moser, I'll let you
13   have the last word here if there's anything further you have.
14            MR. MOSER:  Nothing further.  Thank you.
15            THE COURT:  All right.  Thank you both very much.  I
16   don't know if I'll need anything more from either of you.  If I
17   do, certainly I'll let you know.  And if I do end up at a point
18   where I'm considering granting, I might ask -- reach out to
19   both of you and ask you if you can agree to some language as to
20   maybe how we can make sure if I grant in part or in whole that
21   we don't, you know, disrupt the overall permitting and
22   registration process.  Okay?  And so you can give some thought
23   to that.  Okay?
24            MR. MOSER:  Yes.
25            THE COURT:  All right.  Thank you all very much.
```

38

```
 1              MR. BECK:  Thank you, Your Honor.  Have a good day.
 2              (The proceedings concluded at 10:56 a.m.,
 3    June 28, 2021.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3           I, CYNTHIA FAZIO, Official Court Reporter, United

 4   States District Court, District of Hawaii, do hereby certify

 5   that pursuant to 28 U.S.C. §753 the foregoing pages is a

 6   complete, true, and correct transcript of the stenographically

 7   reported proceedings held in the above-entitled matter and that

 8   the transcript page format is in conformance with the

 9   regulations of the Judicial Conference of the United States.

10
             DATED at Honolulu, Hawaii, September 30, 2021.
11

12

13                    /s/ Cynthia Fazio
                      CYNTHIA FAZIO, RMR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25
```