No. 21-16756

# In the United States Court of Appeals
## for the Ninth Circuit

TODD YUKUTAKE AND DAVID KIKUKAWA
*Plaintiffs-Appellees*,

v.

HOLLY T. SHIKADA, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII,
*Defendant-Appellant*,

And

CITY AND COUNTY OF HONOLULU,[1]
*Defendant*.

**Appeal from a Judgment of United States District Court**
**For the District of Hawaii; Civ. No. 1:19-cv-00578-JMS-RT**
**Honorable Chief District Court Judge J. Michael Seabright**

**BRIEF OF *AMICUS CURIAE* HAWAII RIFLE ASSOCIATION**
**IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

KEVIN O'GRADY
1136 Union Mall, Suite 808
Honolulu, Hawaii 96813
Telephone: (808) 521-3367
Email Kevin@KevinOGradyLaw.Com

*Attorney for Amicus Curiae Hawaii Rifle Association*

---

[1] The City and County of Honolulu was dismissed by stipulation in the lower court.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rules 26.1 and 29(a) of the Federal Rules of Appellate Procedure, Amicus Curiae Hawaii Rifle Association, states that it has no parent corporations, nor has it issued shares or debt securities to the public. The Hawaii Rifle Association is a non-profit corporation, and no publicly held corporation holds ten percent or more of its stock.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST AND IDENTITY OF AMICUS..........................................................1

INTRODUCTION ..........................................................................................2

SUMMARY OF ARGUMENT ..................................................................2

ARGUMENT ....................................................................................... 3

CONCLUSION ..............................................................................................14

CERTIFICATE OF COMPLIANCE.......................................................15

CERTIFICATE OF SERVICE ...............................................................16

# TABLE OF AUTHORITIES

## CASES

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ..........................................................................7, 9

*Friedman v. City of Highland Park,*
784 F.3d 406 (7th Cir. 2015) ..................................................6

*Jackson v. City & Cty of S.F.,*
746 F.3d 953 (9th Cir. 2014) ..................................................4

*Kolbe v. Hogan,*
849 F.3d 114 (4th Cir. 2017) ..................................................4

*McCutcheon v. Federal Election Com'n.,*
572 U.S. 185 (2014) ..................................................9

*United States v. Carter,*
669 F.3d 411 (4th Cir. 2012) ..................................................3

## CONSTITUTIONS AND STATUTES

U.S. Const. amend. II .................................................... *passim*

Hawaii Constitution of 1840 ..................................................8

18 U.S.C. § 923(i) ..................................................10

H.R.S. § 134-2..................................................14

H.R.S. § 134-3..................................................14

## OTHER AUTHORITIES

Annual Firearm Report, available at https://ag.hawaii.gov ......................................5

Joseph G.S. Greenlee, The American Tradition of Self-Made Arms, 2021......12, 13

Gun Violence and Violent Crime Commission, available at
https://ag.hawaii.gov/hcjdc/gun-violence-and-violent-crimes-commission/ ........9

https://trackbill.com/bill/hawaii-house-bill-2744-gun-violence-and-violent-crimes-
commission-firearms-ghost-guns-registration/1863618/ ...................................11

## <u>INTEREST AND IDENTITY OF AMICUS</u>

*Amicus Curiae* Hawaii Rifle Association (HRA), a non-profit, member driven organization incorporated under the laws of the State of Hawaii with its principal place of business in Honolulu, Hawaii, submits this *amicus* brief, in support of Plaintiffs-Appellees Todd Yukutake and David Kikukawa. Hawaii Rifle Association exists to protect the Second Amendment Right to Keep and Bear Arms, and Hawaii's hunting and shooting traditions. HRA does this through the promotion of legislative and legal action, as well as research, advocacy, and training in support of people's civil liberties. HRA litigates arms-regulation cases and supports those cases, and it has consistently advocated for a robust and principled interpretation of the United States Constitution to prevent government from violating the basic civil rights of its citizens. In this case, its interest is in ensuring orderly and lawful development of the right to arms, against an appropriate historical background. Amicus files this brief under the authority of Federal Rules of Appellate Procedure Rule 29.

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person, other than *amicus curiae*, its members or its counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consent to the filing of this brief.

## **INTRODUCTION**

In this case, the District Court correctly invalidated portions of two Hawaii statutes: (1) a provision that established a ten-day expiration date for permits to acquire handguns; and (2) a provision that required the in-person inspection of firearms at the time of registration. *Amicus* supports Plaintiffs-Appellees' request to uphold the District Court decision. The challenged laws are largely redundant parts of a larger statutory scheme of control designed to reduce or eliminate the Second Amendment rights of residents and visitors of the state of Hawaii. The District Court did not stay the "in-person registration" requirement pending appeal. Defendant-Appellant ("Hawaii") failed to produce any evidence to justify its laws.

## **SUMMARY OF THE ARGUMENT**

The ten-day permit lifespan regulation has no connection to any legitimate public safety goal. Hawaii's effort to bootstrap in arguments about so-called "ghost guns" otherwise known as homemade firearms, to save the "in-person inspection" requirement, not only does not add to any legitimate public safety goal, but demonstrates its true goal- the elimination of Second Amendment Rights or the near elimination of Second Amendment Rights in the state of Hawaii.

## **ARGUMENT**

*Amicus* agrees with Plaintiffs-Appellees that strict scrutiny should apply to the review of these laws. *Amicus* understands that the District Court determined that intermediate scrutiny should apply to the laws. *Amicus* notes that the current status of intermediate scrutiny in the Ninth circuit as it pertains to Second Amendment cases has been that it has been applied as a significantly watered-down version of intermediate scrutiny. *Amicus*, however, agrees with Plaintiffs-Appellees that the laws fail under any level of scrutiny.

Hawaii cannot whisper the mantra "public safety" while defending a law and then demand a court apply "common sense" and rule that since it is a firearm law it must deal with "public safety" and that the law also meets the high standard of intermediate scrutiny and the tight fit to accomplish the goal of "public safety". Hawaii produced no evidence to justify the laws at issue in this litigation. As Plaintiffs-Appellees point out, in order to even get to some application of common sense to *add* to the analysis, there must first be data upon which the court can determine if the law is narrowly tailored[2]. Hawaii's approach is that "public safety" must be a "significant governmental interest" and therefore any law serves that goal and if the court didn't agree then it must have not understood the legislative history.

---

[2] *United States v. Carter*, 669 F.3d 411 (4th Cir. 2012).

First, as discussed below, this case is not about "public safety". As will be seen, Hawaii's true colors are showing and their goal is not public safety. With regard to the ten-day permit system, it should be noted that rifles and shotguns can be purchased within a year of the permit and can be used to purchase multiple weapons.

Hawaii pointed to the fact that the ten-day permit requirement, for handguns, dated back to 1933-1934. That means that the law utterly failed and could not be considered long-standing in the tradition analysis currently necessary for Second Amendment cases[3]. It also argued that an applicant's qualification status, which means whether the person is considered a prohibited possessor when they apply for a permit to acquire a firearm[4], along with the person's name, address and appearance, could change, in under ten days, but the State apparently has no such concerns for those that purchase high powered rifles. Hawaii has also argued previously, in contrast, that long guns are more dangerous than pistols and handguns[5]. That means

---

[3] *Jackson v. City & Cty of S.F.*, 746 F.3d 953 (9th Cir. 2014).

[4] That is, when a person seeks to get government permission to exercise an ancient fundamental constitutional right.

[5] See *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) in which Hawaii argued, as *amici*, that rifles are more powerful than handguns. *Amicus* here agrees that common sense informs the layman that rifles with barrels longer than handguns typically shoot projectiles farther. It is believed that the Honolulu Police department's handgun fires 9mm rounds, with an effective range of about 50 yards

that if long guns are more dangerous and they have a one-year permit, such dangerousness would have been noted, observed and provable with decades of statistics. Hawaii failed to not only provide any statistics that would prove that there is a narrowly tailored fit for the law, but there wasn't even anecdotal evidence produced[6]. Hawaii produced no evidence to show that the ten-day permit[7] furthers "public safety". The ten-day permit however does further its real goal- the suffocation and burdening of Second Amendment rights in Hawaii.

---

and the department's rifle, an AR15, owned in the millions by Americans and frequently chambered in 5.56mm, which the U.S. Army has stated has an effective range of better than 500 yards, and that proves that some common sense can be applied in this case. It cuts against Hawaii.

[6] Even the most recent Annual Firearm Report, states "Of the applications processed in 2020, 95.8% were approved and resulted in issued permits; 1.4% were approved but subsequently voided after the applicants failed to return for their permits within the specified time period; and a record high of 2.8% were denied due to one or more disqualifying factors. Figure 1 provides additional information. Denials are described in greater detail throughout this report." Table 2 of the report, available at https://ag.hawaii.gov, last accessed on April 26, 2022, lists eight categories for denials ranging from "mental health related issue" covering 37% of the denials, down to "other e.g. not a U.S. citizen" at 1.5%. Nowhere is there a category of people being denied because their address changed in ten days or even a year or they became alcoholics in less than a fortnight (the time between approval of the application and the person coming in, getting the application and then returning with the weapon for an in-person inspection).

[7] Although it was the in-person inspection and ten-day permit laws that were at stake, Hawaii did not even produce evidence, not even a single biased un-reviewed article, even though it would not have sufficed to show that these laws are "tailored", that even a year-long permit or the concept of a permit to exercise a constitutional right had *any* effect on actual gun violence or "public safety".

With regard to the in-person inspection, Hawaii again pointed to the age of its laws. It also argued that a person with a gun is somehow protected, from the seller's incompetence in writing a serial number down, the buyer's mirrored incompetence, and the possessor's abject ignorance when they bring in a weapon and the paperwork doesn't match or the weapon in question has, for example, a weight of more than fifty ounces and can take a magazine outside the pistol grip[8]. Hawaii argues that requiring in-person inspection of weapons for those reasons furthers "public safety".

Putting aside the enormous insurmountable fact that Hawaii produced not a shred of evidence in support of the laws, other than their age[9], and the fact that they

---

[8] The first issue, a scrivener's error, is only problematic because the error, which can be remedied easily with a phone call, results in either a person being deprived of property, either a purchase or a weapon he *voluntarily* brought to the station now being seized, thus depriving him of his right to self-defense, or in the latter case it definitely results in the seizure of privately owned property and the possibility of criminal charges. The State's nonchalant dismissal of the real danger of criminal prosecution, which is typically handled, not by the State, the party here, but its political subdivision, the County prosecutors, is not reassuring. The State does not propose that if such a nefarious 50 ounce *weapon*, not person, is brought into the police station, that rather than seizing that personal property they would inform the person that he needed to remove it from the state by delivering it to a federally licensed firearm dealer, or perhaps transport it themselves out of the state just like they brought it in. To the State however, it is doing the person seeking permission to exercise his Constitutional rights a benefit by forcing the in-person inspection. The issue of whether or not Hawaii can randomly pick attributes of arms and ban them is another case.

[9] "A law's existence can't be the source of its own constitutional validity". *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015).

exist, the real purpose of the laws is again made clear.  Hawaii's opening brief quietly states out in the open their true goal.

Hawaii argued "…the ten-day expiration date provision had a public safety *purpose*…".  Did the ten-day expiration or in-person inspection, in furtherance of its "purpose", prevent murders? Reduce murders?[10] Or one murder?  Or one armed robbery? Or prevent one crime at all?  No.  The in-person inspection had only been in effect for a short time.  Did that law prove its worth?  Did the ten-day permit prove its worth over the decades?  What do these laws do?  It helps "...law enforcing agencies "***control*** the **sale**, **transfer** and **possession** of firearms".  Not the *illegal* sale, transfer or possession of firearms.  Not the sale or transfer of firearms to violent felons, nor to persons judicially adjudicated as being a danger to themselves or others, not to drug king pins, not to those conspiring or intending to commit any crime.  These measures control merely for control's sake.

Hawaii also argued "…the purpose behind Hawaii's firearm *registration and permitting* statutes it to make the entire community safer by reducing the ***threat*** of

---

[10] *Amicus* notes that even if Hawaii had produced something, verbose partisan legislators and statistics are not enough.  Perhaps channeling Mark Twain, "Lies, damned lies, and statistics", *Heller* itself specifically disavowed legislative attempts to infringe upon the Second Amendment. (certain policy choices are off the table) *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *Amicus* specifically argues against legislators pearl clutching and enacting laws that do nothing to actually affect violent crime but burden, usually severely, law-abiding citizenry.

gun violence." So, *actual* gun violence is not impacted <u>at all</u> by Hawaii's "registration and permitting" statutes, including specifically the two laws that the District Court struck down. Ah, but to the law-abiding Hawaiian, his Second Amendment rights have been *controlled* by the benevolent state, that, as Hawaii itself argued, is merely trying to help the firearm owner save himself from himself and the person he bought his firearm from.

The *control*[11], which means, the elimination or drastic reduction in the exercise of a constitutional right, merely for the purpose of eliminating, crushing or

---

[11] Hawaii's efforts at *control* go back to the Territorial days. See Defendant-Appellant's Opening Brief at page 28. Amicus notes that Hawaii did not attempt to go back further to the days when Hawaii was a kingdom ruled by a king under a constitution that in the Hawaii Constitution of 1840 section "Prerogatives of the King", it is explained "He is the sovereign of all the people and all of the chiefs. The kingdom is his. He shall have the direction of the army and <u>all the implements of war of the kingdom</u>." <u>All</u> arms were thus considered the king's, not belonging to the people. The first laws of the kingdom of 1840 also provided, "…That if any person or persons are hereafter found on -shore with a knife, sword-cane, or any other dangerous weapon in his or their possession, he or they shall be immediately seized and taken to the fort…". Hawaii is thus between Charybdis and Scylla- if an examination ends in the early 20th century, any law is not long-standing and untethered from the text and tradition and ancient history of the American Second Amendment- if an examination goes slightly deeper to the mid 1800's, a newly made chief-king, with no connection to American roots, hordes arms for himself and his armies while not even mentioning a right to bear arms for the people. Hawaii can look no further back since pre-contact Hawaii had zero connection with western civilization.

drastically reducing that right, is not a legitimate government interest[12].  As *Heller* itself indicated-certain policy choices are just off the table.

Hawaii does however truly commit to its effort to control any exercise of the Second Amendment, for what it's worth.  In its brief it argued that the prospect of so called "ghost" guns were the catalyst behind the 2020 law that is the in-person inspection.  This, again, reveals its true intentions- not "public safety" but raw **control.**

First, in front of the District Court, Hawaii stated that there was no legislative history that said that the state had a "problem" with "ghost" guns[13].  On appeal,

---

[12] *McCutcheon v Federal Election Com'n*., 572 U.S. 185 (2014).

[13] The same Act that, in 2020, referenced "ghost" guns, also created the Gun Violence and Violent Crime Commission.  That Commission hasn't done anything.  The complete history of that organization is available at https://ag.hawaii.gov/hcjdc/gun-violence-and-violent-crimes-commission/, last accessed on April 26, 2022.  The Commission has – A Deputy Attorney General, the Director of the Criminal Justice Institute, a member of the administration of the Department of Health, a representative from the Department of Health State Hospital, a representative from the Department of Public Safety, a prosecuting attorney, a public defender, <u>four</u> representatives from police departments, a representative from the University of Hawaii college of social sciences, a representative from the University of Hawaii school of medicine, a representative from a group that advocates for stricter gun *safety* laws, and, finally, a representative from what is called a "firearm advocacy group".  At best, assuming that the Department of health and university representatives are all neutral, five of them, there are, in a state with some of the strictest firearm laws in the country, nine members who seek to *control* the Second Amendment to death and one who

Hawaii has still not added any evidence[14].

Second[15], there is no such thing as a "ghost gun". What the legislature is referring to is homemade weapons or weapons without serial numbers. In front of the District Court, Hawaii could not point to "ghost" guns as having any importance, and refrained from speculating about it and the court couldn't find any relevance either. Yet, Hawaii now attempts to link homemade firearms with in-person inspection, registration, permitting and nearly eighty years of Second Amendment infringement as an American tradition. The Gun Control Act of 1968 at Title 18 United States Code (U.S.C.) 923(i) provides, in part, that licensed manufacturers and licensed importers must identify each firearm manufactured or imported by a serial number in the manner prescribed by regulation. Prior to 1968 many firearms had no serial numbers, and commercial manufacturers were not required to stamp them on firearms. Certainly colonists and early Americans were not stamping numbers on weapons they made themselves. Besides not being something ever done, it would

---

advocates for "firearms"- not Constitutional rights (and apparently, impliedly, advocating for the Second Amendment is not the same as gun *safety.*)

[14] Hawaii even admitted that so called "ghost" guns are new, see Defendant-Appellant Opening Brief page 53, (to those legislators anyway- homemade weapons were not new to the founding fathers).

[15] *Amicus* concurs with Plaintiff-Appellee that the argument regarding "ghost" or homemade firearms was waived below.

have made confiscation by the British much easier. In fact, Representative Greg Takayama, a sponsor of the "ghost" gun legislation[16], was 16 years old and may have been shooting a "ghost gun" himself as a teenager before the first federal law requiring serial numbers was even passed. Hawaii produced no evidence that homemade, or even commercial made weapons, without a serial number, are such a problem that all other hobbyists and second amendment loving persons should have their rights "controlled". There was no problem from 1620 to 1776 to 1865. It wasn't until 1968 that even the federal government thought about it[17].

Hawaii had no need for in-person inspection previously. Once the law was struck down, despite there not being a stay, Honolulu County and Maui County quickly implemented an online permitting system that eliminated, not only multiple trips, within the then short ten-day period, but also physical inspection. Although these systems have only been operational for a short time, there has been no Dodge

---

[16] https://trackbill.com/bill/hawaii-house-bill-2744-gun-violence-and-violent-crimes-commission-firearms-ghost-guns-registration/1863618/

[17] The 1968 GCA also made it a crime, as it is a crime under current Hawaii law, to intentionally deface or remove a serial number. Hawaii also argued that tracing a weapon *after* a crime has been committed, and presumably recovered by law enforcement, is important to public safety. But surely a person intending to commit a crime, or who has recently, will do exactly what is prohibited, remove the serial number, *if* the number could be traced back to him. If the weapon was stolen or bought on the black market the offender wants the weapon traced to whomever registered it.

city firefights nor any news that the lack of either the ten-day permit or in-person inspection has suddenly caused a crime wave[18]. Hawaii's rank speculation never held water and still doesn't.

Despite the newspeak scary name of "ghost gun", homemade weapons are not only an American tradition, they were critically necessary to the American Revolution. Joseph G.S. Greenlee[19] noted that earlier than 1621 colonists had weaponsmiths making weapons.[20] Greenlee also noted "As tensions simmered in the colonies, the British attempted to disarm the Americans by suffocating their supply of gunpowder. The British prevented colonists from accessing their gunpowder reserves stored in central powder houses and in some circumstances, confiscated the powder.[21]" The British also cut off importation of arms, so Americans made them personally.

Greenlee noted "The emphasis on domestic arms production alarmed Pennsylvania's former acting governor, the Tory Richard Penn, who informed the

---

[18] Or more specifically that sellers and buyers are misnumbering applications and people are walking in with weapons Hawaii does not like.

[19] The American Tradition of Self-Made Arms, 2021.

[20] *Id*. at pages 9-10. Not government weaponsmiths nor commercial weaponsmiths, but private persons.

[21] *Id*. at 13.

Duke of Richmond before the House of Commons that Pennsylvanians were building "great numbers" of arms:… Duke: Do they make small arms? Penn: They do, in great numbers and very complete."  Private manufacture of arms was not only ubiquitous but in fact served America greatly.

"Joseph Belton, an inventor from Connecticut, informed the Continental Congress on April 11, 1777, that he had invented "a common small arm" that could "discharge sixteen, or twenty [rounds], in sixteen, ten, or five seconds of time."136 That summer, Belton demonstrated his rifle before leading military officers—including General Horatio Gates and Major General Benedict Arnold— and scientists—including David Rittenhouse—who verified that "[h]e discharged Sixteen Balls loaded at one time[22]." Greenlee discusses how homemade weapons are part of the very foundation of America.  Commercial firearm manufacturers didn't even exist.  Men made their own weapons, arms, firearms, for centuries, and that deeply rooted history is America's history.

*Amicus* recognizes that "ghost" guns and other scary terms were not part of the underlying decision that is on appeal, nor, especially, a part of the District Court's ruling.  *Amicus*' point is to highlight that Hawaii, latched onto "ghost" guns as an effort to further control Hawaiians, in 2020.  The law was nascent.  In

---

[22] It is unknown what alarming adjective-name Hawaii would call this sort of weapon today.

13

front of the District Court Hawaii's counsel did not rely on "ghost" guns as a reason to justify in-person inspection.  Hawaii's efforts, as demonstrated by its "ghost" argument now, proves that when there isn't a shred of evidence to justify baseless laws, Hawaii doubles down, not in the name of "public safety" but to control and to control completely.

## CONCLUSION

This Court should sustain the trial court's opinion and find that H.R.S. § 134-2 and H.R.S. § 134-3 are unconstitutional.

Respectfully submitted,

*/s/ Kevin O'Grady*
KEVIN O'GRADY
1136 Union Mall, Suite 808
Honolulu, Hawaii 96813
Telephone (808) 521-3367
Email Kevin@KevinOGradyLaw.Com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 3,542 words and complies with the word limit of Cir. R. 32-1.

2.      This brief complies with the typeface and type size requirements of Fed. R. App. P.32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

Dated: April 28, 2022.

*/s/ Kevin O'Grady*
Kevin O'Grady

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2022, I filed the foregoing Amicus Curiae's Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Kevin O'Grady*
Kevin O'Grady