No. 21-16756

In the
**United States Court of Appeals for the Ninth Circuit**

TODD YUKUTAKE AND DAVID KIKUKAWA,
*Plaintiffs-Appellees*,

v.

HOLLY T. SHIKADA, in her Official Capacity
as the Attorney General of the State of Hawai'i,
*Defendant-Appellant,*
and
CITY AND COUNTY OF HONOLULU,
*Defendant*.

On Appeal from the
United States District Court for
the District of Hawaii

**Brief *Amicus Curiae* of Gun Owners of America, Inc., Gun Owners
Foundation, Gun Owners of California, Heller Foundation, Oregon
Firearms Federation, Tennessee Firearms Association, Virginia Citizens
Defense League, Grass Roots North Carolina, America's Future, Inc.,
Conservative Legal Defense and Education Fund, and Restoring Liberty
Action Committee in Support of Plaintiffs-Appellees and Affirmance**

RICK BOYER
  INTEGRITY LAW FIRM, PLLC
  Lynchburg, VA 24506
JOHN I. HARRIS
  SCHULMAN, LEROY & BENNETT, P.C.
  Nashville, TN 37203
JOSEPH W. MILLER
  LAW OFFICES OF JOSEPH MILLER, LLC
  Fairbanks, AK 99708

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070
*Attorney of Record
*Attorneys for Amici Curiae*
May 2, 2022

## DISCLOSURE STATEMENT

The *amici curiae* herein, Gun Owners of America, Inc., Gun Owners
Foundation, Gun Owners of California, Heller Foundation, Oregon Firearms
Federation, Tennessee Firearms Association, Virginia Citizens Defense League,
Grass Roots North Carolina, America's Future, Inc., Conservative Legal
Defense and Education Fund, and Restoring Liberty Action Committee, through
their undersigned counsel, submit this Disclosure Statement pursuant to Federal
Rules of Appellate Procedure 26.1 and 29(a)(4)(A). These *amici curiae* are
non-stock, nonprofit corporations, except for Restoring Liberty Action
Committee, which is an educational organization, none of which has any parent
company, and no person or entity owns them or any part of them.

The *amici curiae* are represented herein by Jeremiah L. Morgan, who is
counsel of record; William J. Olson and Robert J. Olson, of William J. Olson,
P.C., 370 Maple Avenue West, Suite 4, Vienna, Virginia 22180-5615. These
*amici* are also represented herein by Rick Boyer of Integrity Law Firm, PLLC,
P.O. Box 10953, Lynchburg, Virginia 24506; John I. Harris of Schulman,
Leroy & Bennett, P.C., 3310 West End Avenue, Suite 460, Nashville,
Tennessee 37203; and Joseph W. Miller of Law Offices of Joseph Miller LLC,

i

P.O. Box 83440, Fairbanks, Alaska  99708.

    s/Jeremiah L. Morgan
Jeremiah L. Morgan

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT

I.   HAWAII'S FIREARMS REGULATIONS VIOLATE THE TEXT AND
     CONTEXT OF THE SECOND AMENDMENT. . . . . . . . . . . . . . . . . . . 4

     A.   The Hawaii Statutory Scheme for Firearms Regulation . . . . . . . 4

     B.   The Text of the Second Amendment . . . . . . . . . . . . . . . . . . 6

     C.   The Immediate History Underlying the Second Amendment . . . . 7

     D.   Early Case Law in the States . . . . . . . . . . . . . . . . . . . . . . . 10

     E.   The Historical Roots of Hawaii's Gun Control Regime Are
          Deeply Disturbing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.  SECOND AMENDMENT RIGHTS CANNOT BE LIMITED BY USE OF
     JUDGE-EMPOWERING INTEREST-BALANCING TESTS . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

iii

# TABLE OF AUTHORITIES

Page

**UNITED STATES CONSTITUTION**
Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

**STATUTES**
Hawaii Revised Statutes 134-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Hawaii Revised Statutes 134-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**CASES**
*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) . . . . . . . . . . . . . . . . . . 11
*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . 4, *passim*
*Jackson v. City and County of San Francisco*, 746 F.3d 953
 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19
*McDonald v. Chicago*, 561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . . . . . 4
*Nunn v. State*, 1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . 10, 11
*State v. Chandler*, 5 La. Ann. 489 (1850) . . . . . . . . . . . . . . . . . . . . . 11
*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) . . . . . . . . . . . . . . . 2, *passim*

**MISCELLANEOUS**
W. Blackstone, <u>Commentaries on the Laws of England</u> (1769) . . . . . . . . . 7
Jonathan Elliot, ed., <u>The Debates in the Several State Conventions on the</u>
 <u>Adoption of the Federal Constitution</u> (1836) . . . . . . . . . . . . . . . . . 9
J. Greenspan, "Hawaii's Monarchy Overthrown with U.S. Support,
 120 Years Ago," *History.com* (Jan. 17, 2013) . . . . . . . . . . . . . . . . . 14
T. Jefferson, <u>Papers of Thomas Jefferson</u> . . . . . . . . . . . . . . . . . . . 9
Kingdom of Hawaii Constitution of 1840 . . . . . . . . . . . . . . . . . . . 13, 14
"Odd Fighting Units: The Honolulu Rifles during the Hawaii
 Rebellions, 1887-1895," *Debor044.blogspot.com* . . . . . . . . . . . . . . 14
P. O'Donnell, "Exclusive–O'Donnell: American Sovereignty: The Battles
 of Lexington and Concord," *Breitbart* (Apr. 20, 2022) . . . . . . . . . . . 9
R. Orrison, "Militia, Minutemen, and Continentals: The American
 Military Force in the American Revolution," *American Battlefield
 Trust* (Apr. 30, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

iv

Michael P. O'Shea, "Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of 'Bearing Arms' for Self-Defense," 61 AM. U.L. REV. 585 (2012) . . . . . . . . . . . . . . . . . 10

J. Story, III <u>Commentaries on the Constitution of the United States</u> (1833) . . . 10

## INTEREST OF *AMICI CURIAE*[1]

Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Heller Foundation, Oregon Firearms Federation, Tennessee Firearms Association, Virginia Citizens Defense League, Grass Roots North Carolina, America's Future, Inc., and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Restoring Liberty Action Committee is an educational organization. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

## STATEMENT OF THE CASE

On October 24, 2019, Plaintiffs Todd Yukutake and David Kikukawa filed suit challenging two Hawaii restrictions on firearm ownership. *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1079 (D. Haw. 2021). In Hawaii, permits to acquire handguns are valid only for one purchase and expire in 10 days. *See* Hawaii Revised Statutes (H.R.S.) 134-2(e). Additionally, Hawaii requires

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

1

owners to personally bring newly acquired firearms to the police station for registration. *See* H.R.S. 134-3(c). Plaintiffs alleged that both restrictions were unconstitutional. Hawaii defended the constitutionality of both provisions, arguing that intermediate scrutiny should be applied by the court.

On June 28, 2021, the district court heard argument on competing motions for summary judgment and, on August 16, 2021, the court granted summary judgment for Plaintiffs, while denying summary judgment to Defendants. *Yukutake* at 1079, 1090-91.

Drawing from this Court's test in *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021), the district court determined that the 10-day permit use period was not "longstanding," and thus not "presumptively valid." *Yukutake* at 1083. The court determined that intermediate scrutiny applied, because the imposition on the Second Amendment was "not a severe burden." *Id.* The court then found the provision failed to survive intermediate scrutiny. *Id.* at 1084.

The Court also struck down the in-person registration requirement, holding that Hawaii failed to provide "'*reasonable* inferences based on *substantial* evidence' that the statute[] [was] substantially related to the governmental

2

interest" of public safety. *Id*. at 1088 (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015)).

The next month, on September 23, 2021, the Court granted Hawaii's request for a stay pending appeal of the order striking down the 10-day permit use provision, but denied a stay of the order striking down the in-person registration requirement. *See* Opening Brief of Defendant-Appellant Holly T. Shikada ("Appellant's Br.") at 5.

## SUMMARY OF ARGUMENT

The two challenged Hawaii statutes must be viewed and analyzed individually, but also need to be viewed in the context of Hawaii's entire firearms regulatory scheme. That scheme has both the apparent intent and clear effect of "infringing" on the God-given, pre-existing, natural right of resistance and self-preservation embodied in the Second Amendment's right to keep and bear arms. The text and history of the Second Amendment protect citizens' personal and collective rights to self-defense against both lawless citizens and lawless governments.

Although in this case the district court judge reached the correct result applying the Ninth Circuit's decision in *Young v. Hawaii*, the Second

3

Amendment should not be subjected to this Court's convoluted balancing test. As Justice Scalia has explained, "the people" did the balancing when they ratified the Second Amendment, which bars all government infringements. *See District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008).

Accordingly, these *amici* urge this Court to discard its flawed, multi-tiered balancing approach and faithfully apply the Supreme Court's *Heller* and *McDonald v. Chicago*, 561 U.S. 742 (2010) decisions, under which Hawaii's uniquely restrictive firearms regime must fail.

## ARGUMENT

### I. HAWAII'S FIREARMS REGULATIONS VIOLATE THE TEXT AND CONTEXT OF THE SECOND AMENDMENT.

#### A. The Hawaii Statutory Scheme for Firearms Regulation.

Before analyzing the specifics of the two firearms laws that were struck down by the district court, it should be noted that Hawaii has perhaps the nation's most onerous firearms regulation regime. As one judge of this Court has explained, Hawaii's firearms statutes:

> generally require that gun owners keep their firearms at their "place of business, residence, or sojourn." H.R.S. §§ 134-23 to -27…. For concealed carry, section 134-9 provides that "[i]n an exceptional case, **when an applicant shows reason to fear injury** to the applicant's person or property, the chief of police of the appropriate

4

county **may** grant a license to an applicant … to carry a pistol or revolver and ammunition therefor concealed on the person." *Id.* For open carry, the chief of police **may** grant a license **only** "[w]here the urgency or the need has been sufficiently indicated" **and** the applicant "is engaged in the protection of life and property." [*Young v. Hawaii*, 992 F.3d 765, 829 (O'Scannlain, J., dissenting) (emphasis added).]

Additionally, each county in the state has discretion to impose even tighter restrictions. For example, Hawaii County created an open-carry licensing regime that is available only to "'private detectives and security guards.'" *Id.*

In contrast, the Second Amendment protects against any "infringement," not just "total destruction," as this Court's *Young* decision assumed. *Young* at 855 (O'Scannlain, J., dissenting). However, even applying that test, Judge O'Scannlain persuasively argued in *Young* that "Hawaii's severe deprivation of the core right to carry a firearm in public … amount[s] to a total destruction of such right." *Id.*[2] The law provides only that police **may issue**, not **must issue**, licenses, leaving the exercise of the federal constitutional right subject to police

---

[2] Judge O'Scannlain explained: "Counsel for [Hawaii] County acknowledged as much at oral argument … stating that, to his knowledge*, no one other than a security guard — or someone similarly employed — had ever been issued* an open-carry license. Hawaii's Attorney General … likewise failed to provide evidence that any of Hawaii's counties had ever issued an open-carry permit *to even a single person not employed in the security profession*…." *Young* at 856 (O'Scannlain, J., dissenting) (emphasis added).

5

discretion. A simple rewording of Hawaii's statute illustrates its unconstitutionality. The statute could just as accurately say, "police **may refuse** to grant any licenses to bear arms." To most, the latter rendering would be plainly unconstitutional — but the effect is the same. Police are not required to grant firearms licenses, can refuse at their discretion, and have uniformly done so. Thus, even applying the erroneous "total destruction" standard, it is reasonable to conclude that the Hawaii statutory scheme "amount[s] to a total destruction of such right."

**B.     The Text of the Second Amendment.**

The Second Amendment declares: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

The prefatory clause of the Second Amendment — to ensure the ability of citizens to organize themselves into a self-regulated citizens militia — was overlooked by the district court. Likewise, the district court did not address the stated objective of the Second Amendment — to preserve "the security of a free State." However, the text "the right of the people to keep and bear Arms, shall

not be infringed," could not be more clear and should be dispositive of the case. As the *Heller* decision instructs:

> The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed".... "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." [*Heller* at 592 (internal citation omitted).]

Thus, the right to keep and bear arms did not originate with the Second Amendment. Rather, it was based on what Blackstone called "the natural right of resistance and self-preservation," and "the right of having and using arms for self-preservation and defence." W. Blackstone, IV <u>Commentaries on the Laws of England</u> at 139-40 (1769). The Amendment recognizes and protects that natural right — but does not limit or diminish it. Hawaii's progressively onerous regulatory regime stands in diametrical opposition to the Amendment's text and the God-given right it reflects and protects.

**C.   The Immediate History Underlying the Second Amendment.**

The historical context of the adoption of the Second Amendment is instructive. As the *Heller* decision explains, the purpose of the Second Amendment is fundamentally "the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*

7

at 584 (internal citation omitted). That right of self-defense reflects a right against unlawful acts both of other citizens and of government itself. "[T]he right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id*. at 599. Indeed, the most obvious recent use of the militia that no doubt was in the minds of the Framers was the use of state militias against the duly constituted, but oppressive and lawless, government of King George III. Indeed, state militias were a crucial weapon in the fight for independence:

> Militias were the main colonial military organization for defense, but they were only part-time and very nonstandardized or professional….
>
> At the Battle of Bunker Hill, outside Boston, militia dealt a deadly blow to the British. [A]t battles such as Bennington, Vermont, King's Mountain, Cowpens, both in South Carolina and Guilford Courthouse, in North Carolina, the militia was crucial to American victories. [R. Orrison, "Militia, Minutemen, and Continentals: The American Military Force in the American Revolution," *American Battlefield Trust* (Apr. 30, 2021).]

Moreover, the precipitating event of the "shot heard around the world" that launched the Revolution involved gun control. The first battles at Lexington and Concord were occasioned by an attempt by British general Thomas Gage to seize American powder and arms stored in Concord in an attempt to disarm the

colonists so they could not resist exercises of arbitrary power.[3]  Pennsylvania's royal governor urged King George "to disarm the people," as "the most effectual way to enslave them."[4]

During Virginia's ratification convention, Patrick Henry noted:  "The great object is, that every man be armed….  Every one who is able may have a gun."[5]  In his first draft of the Constitution of Virginia, Thomas Jefferson put it this way:  "No freeman shall be debarred the use of arms."[6]

The Framers equated ubiquitous firearm ownership with enhanced public safety, but Hawaii's Senate Judiciary Committee concludes the opposite — that Hawaii's severe restrictions serve the purpose of "*everyone* deserv[ing] to feel free from the *threat of harm wherever they go*."  Defendant's Memorandum in Support of Summary Judgment at 7.

---

[3]  P. O'Donnell, "American Sovereignty: The Battles of Lexington and Concord," *Breitbart* (Apr. 20, 2022).

[4]  Speech by George Mason to Virginia Ratification Convention (1788) in 3 Jonathan Elliot, ed., The Debates in the Several State Conventions on the Adoption of the Federal Constitution at 380 (1836).

[5]  Speech by Patrick Henry in The Debates at 386.

[6]  The Virginia Constitution of 1776, First Draft by Jefferson [before June 13, 1776], in Papers of Thomas Jefferson, 1:344.

In his <u>Commentaries on the Constitution</u>, Supreme Court Justice Joseph Story explained:

> The right of the citizens to keep and bear arms has justly been considered, as **the palladium of the liberties of a republic**; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, **enable the people to resist and triumph over them**. [J. Story, III <u>Commentaries on the Constitution of the United States</u>, p. 708 (Hilliard, Gray & Co.: 1833) (emphasis added).]

After having successfully rebuffed attempts by the English king at disarmament, the Framers had just won the nation's independence through force of arms. They allowed no ambiguity in the scope of the right when they chose the words: "shall not be infringed." The Second Amendment was intended both for individual and collective defense, against both lawless citizens and lawless governments. Hawaii's draconian firearms regulations reject the view of the Framers of the Constitution.

**D.    Early Case Law in the States.**

One of the earliest state cases interpreting the Second Amendment is *Nunn v. State*. "No case, historic or recent, is discussed more prominently or positively in Heller."[7] In *Nunn*, the court made clear:

---

[7]  Michael P. O'Shea, "Modeling the Second Amendment Right to Carry Arms (I):  Judicial Tradition and the Scope of 'Bearing Arms' for Self-Defense,"

The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree. [*Nunn v. State*, 1 Ga. 243, 251 (1846).]

Other early state courts cited in *Heller* are in accord. "Interpreting Kentucky's Second Amendment analogue … the state's highest court had no doubt that any law restricting the public carry of firearms would 'import a restraint on the right of the citizens to bear arms.'" *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 at 90, 92 (1822) (Cited in *Young* at 834 (O'Scannlain, J., dissenting)). Louisiana's Supreme Court agreed in 1850, asserting that the Second Amendment protects the "right to carry arms … 'in full open view,' which places men upon an equality. This is the right guaranteed by the Constitution of the United States…." *State v. Chandler*, 5 La. Ann. 489, 490 (1850).

Rejecting the Supreme Court's view about the text, context, history, and tradition of the Second Amendment, Appellant Hawaii badly mischaracterizes *Heller* as being a narrow holding, allowing almost any purported "longstanding" restriction on gun purchases. *See* Appellees' Answering Brief at 4-15. In

---

61 Am. U.L. Rev. 585, 627 (2012).

11

essence, Hawaii treats the phrase "presumptively lawful" as though it meant "conclusively lawful" — ignoring the fact that all laws are "presumptively lawful."

It is telling that Hawaii appears to assert that any "government interest" in "public safety" supported by "common sense" is sufficient to infringe the right to keep and bear arms. Appellant's Br. at 30-41. Hawaii would have this Court treat the Second Amendment as merely a parchment barrier allowing legislative "predictive" discretion[8] to infringe enumerated rights at will, up to the point of "bar[ring] firearm possession completely." *Yukutake v. Conners*, Civil No. 19-00578, Plaintiffs' Memo in Support of Summary Judgment, ECF 91-1, p. 14; Appellant's Br. at 30-41. It would be shocking if Hawaii argued that the First Amendment's promise of free speech allows any longstanding regulation that simply falls short of "barring speech completely." Yet that is Hawaii's position with regard to rights recognized by the Second Amendment.

Hawaii's "severe deprivation of the core right to carry a firearm in public" is so extreme in practice as to "amount[] to a total destruction of such right." *Young* at 855 (O'Scannlain, J., dissenting). In such a case, the admonition in

---

[8] Appellant's Br. at 27.

*Heller* should be observed: "[I]t is not the role of this Court to pronounce the Second Amendment extinct." *Heller* at 636.

### E. The Historical Roots of Hawaii's Gun Control Regime Are Deeply Disturbing.

The district court traced the history of the two statutes in question before finding they were not longstanding. *Yukutake* at 1082-83. Despite the clear findings of the district court, on appeal, Hawaii continues to maintain that both challenged firearms statutes are longstanding, and thus should be upheld. Appellants' Brief at 22-25, 41-43. It should not be overlooked that these two statutes are part of a repressive set of Hawaiian gun control laws with a historical background that should give this Court pause in upholding them as urged by Hawaii.

In *Young*, this Court notes that "Hawai'i law began limiting public carriage of … firearms, more than 150 years ago… in 1852." *Young* at 773. However, when the 1852 law was implemented, Hawaii was an independent monarchy, not subject to the Second Amendment. Hawaii's position on firearms was the polar opposite of that of the United States. Whereas the Second Amendment recognizes and protects "the right of the people" to keep and bear arms, the 1840 Hawaii Constitution vests all rights to arms in the government alone: the "four

13

Governors over these Hawaiian Islands … shall have charge of … the arms and all the implements of war." Kingdom of Hawaii Constitution of 1840, "Governors." Where the United States Constitution declares itself as speaking for the sovereign "People of the United States," the 1840 Hawaii Constitution states that the king "is the sovereign of all the people and all the chiefs." *Id.*, "Prerogatives of the King."

Native Hawaiians had no firearms until their first interaction with white traders and explorers. Then, firearms from white traders and settlers were used to forcibly "unite[] Hawaii's eight main islands into a single kingdom [under] Kamehameha I…."[9] American settlers, with the aid of their firearms, continued to increase their power, while Hawaii's gun control laws limited the ability of native islanders to resist.[10] Americans were later able to seize substantial control over the Hawaiian Islands through the "Bayonet Constitution" of 1887, imposed on Hawaii's King Kalakaua at gunpoint[11]:

---

[9] J. Greenspan, "Hawaii's Monarchy Overthrown with U.S. Support, 120 Years Ago," *History.com* (Jan. 17, 2013).

[10] *See, e.g.*, "Odd Fighting Units: The Honolulu Rifles during the Hawaii Rebellions, 1887-1895," *Debor044.blogspot.com* ("The downfall of both the Kingdom of Hawaii and the independent Hawaiian republic … were both directly linked to actions of the Honolulu Rifles brigade.").

[11] "July 6, 1887: Bayonet Constitution," *NationalGeographic.org*.

14

> The guns surrounding Kalakaua … belonged to members of a militia nicknamed the Honolulu Rifles, made up largely of white settlers … [and] affiliated with a group called the Hawaiian League, which drafted the new constitution to transfer power from the monarchy to the more settler-friendly legislature. [*Id.*]

For these reasons, Hawaiian gun control laws have a troubling pedigree. They originated when the elites ruled over the people. In our nation where the People are the ultimate sovereigns, their right to keep and bear arms cannot be infringed by government.

## II. SECOND AMENDMENT RIGHTS CANNOT BE LIMITED BY USE OF JUDGE-EMPOWERING INTEREST-BALANCING TESTS.

In *Young v. Hawaii*, this Court subjected the clear command that "the right … to keep and bear Arms, shall not be infringed" to a convoluted, multi-tiered "balancing test." This balancing tangle is alien to the text and history of the Amendment discussed *supra*, as well as the Supreme Court's decisions in *Heller* and *McDonald*, and "reduces the right to 'bear Arms' to a mere inkblot." *Young* at 829 (O'Scannlain, J., dissenting). The current flawed "balancing tests" provide almost no real check on that control but, even under the *Young* test, the district court struck down the two challenged statutes. In *Heller*, the Supreme Court observed in passing:

15

> Although we do not undertake an exhaustive historical analysis today
> of the full scope of the Second Amendment, nothing in our opinion
> should be taken to cast doubt on **longstanding prohibitions** on the
> possession of firearms by felons and the mentally ill, or laws
> forbidding the carrying of firearms in sensitive places such as
> schools and government buildings, or laws imposing conditions and
> qualifications on the commercial sale of arms. [*Heller* at 626-27
> (emphasis added).]

Since *Heller*, federal courts have latched onto this language as offering

them carte blanche to uphold all manner of infringements. Yet, from a reading

of the entire *Heller* decision, clearly the Supreme Court was not stating that all

"longstanding prohibitions" were automatically validated — but that was the view

of the district court, and that is the view of Hawaii. *Yukutake* at 1081;

Appellant's Br. at 7-8. Rather, the Court left evaluation of other restrictions to

another day, whether they be "longstanding" or not.

In most instances, the "two-step analysis" is a long and winding road that

leads to the conclusion that a pre-existing right that "shall not be infringed" may

be essentially as regulated or unregulated as a given state or municipality wishes

in its "predictive" discretion. However, here, the district court determined the

restrictions were not longstanding, and therefore could not be sustained even

under *Young*.

16

On appeal, there is now risk that this Court could reject the entire district court analysis and determine that the statutory provisions at issue are longstanding, even if of recent origin. If so, these *amici* would urge this Court to re-examine its convoluted interest-balancing test, as announced in *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), which proceeds as follows:

> In the first step, we ask "whether the challenged law burdens conduct protected by the Second Amendment," *Chovan*, 735 F.3d at 1136, based on a "historical understanding of the scope of the [Second Amendment] right," *Heller*, 554 U.S. at 625, or whether the challenged law falls within a "well-defined and narrowly limited" category of prohibitions "that have been historically unprotected." To determine whether a challenged law falls outside the historical scope of the Second Amendment, we ask whether the regulation is one of the "presumptively lawful regulatory measures" identified in *Heller,* … or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment. [*Id*. at 960 (internal citations omitted).]

Although this test is grounded in prior decisions of this Court, it has no roots in the text, context, history, or tradition of the Second Amendment and is not permitted by *Heller* and *McDonald*.

17

Under this test, only if the Court believes that the statute being challenged for infringing the Second Amendment actually "burdens" the right to keep and bear arms does it proceed to the second step. There:

> [i]f a prohibition falls within the historical scope of the Second Amendment, we must then proceed to the second step … to determine the appropriate level of scrutiny. When ascertaining the appropriate level of scrutiny, "just as in the First Amendment context," we consider: "(1) 'how close the law comes to the core of the Second Amendment right' and (2) 'the severity of the law's burden on the right.'" [*Jackson* at 960-961.]

It is not difficult to comprehend the language "the right of the people to keep and bear Arms, *shall not be infringed*." But the convoluted *Young* framework first requires a determination as to whether the infringement goes to the "core" of the right, and then how "severe" is the infringement of the right that "shall not be infringed." Both of those determinations give the reviewing court great discretion to introduce its own subjective judgment about the reasonableness of the restriction.

Then, only if the law both "implicates the core" of the right and imposes a "severe" burden, is strict scrutiny applied. If the law fails to meet either of these tests, intermediate scrutiny applies. That threshold determination generally determines the outcome of the case. Thus, by redefining the atextual terms

18

"core" and "severe," the reviewing court reserves to itself the ability to choose which test to apply. In practice, courts generally use intermediate scrutiny, which allows most statutes to be upheld.

Under intermediate scrutiny, still another atextual, judge-empowering two-step test is employed. If the government objective is "'significant, substantial or important,'" *and* a "'reasonable fit between the challenged regulation and the asserted objective,'" all proposed infringements pass muster. *Jackson* at 965. Rarely does a court find an asserted government interest "unimportant," but tellingly, here the district court found there to be no real public safety justification. The district court properly rejected Hawaii's view that firearms are "unsafe," and that "public safety" requires that "**everyone** deserves to feel free from the **threat of harm wherever they go**...." Appellant's Br. at 20. Accordingly, Hawaii has enacted a regulatory labyrinth that effectively "amount[s] to a total destruction of [the] right" of self-defense. *Young* at 855 (O'Scannlain, J., dissenting). The Second Amendment has become effectively "extinct" in Hawaii. *See Heller* at 636.

Yet, the Second Amendment allows no balancing test between "legitimate government interests" in "public safety," versus the inalienable right of self-

defense. The Second Amendment **is** the test; the People already did the balancing, as Justice Scalia explained:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right **takes out of the hands of government** — even the Third Branch of Government — **the power to decide on a case-by-case basis whether the right is** *really worth* **insisting upon.** A constitutional guarantee subject to future judges' assessments … is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march… The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong headed views. The Second Amendment … is the very *product* of an **interest balancing by the people**. [*Heller* at 634-635 (emphasis added).]

Should this Court find that the Hawaii statutes are actually longstanding, under *Young*, it could believe itself free to use intermediate scrutiny to uphold the statutes, even though they utterly fail the Second Amendment test announced by the Court in *Heller*. If this Court believes the statutes are longstanding, it should revisit its two-step test and conform its jurisprudence to the Constitution.

20

## CONCLUSION

For the reasons stated, and based on a somewhat different analysis from that of the district court, the ruling of the district court should be affirmed.

Respectfully submitted,

  /s/ Jeremiah L. Morgan

RICK BOYER
  INTEGRITY LAW FIRM, PLLC
  P.O. Box 10953
  Lynchburg, VA 24506

JOHN I. HARRIS
  SCHULMAN, LEROY & BENNETT, P.C.
  3310 West End Avenue
  Suite 460
  Nashville, TN 37203

JOSEPH W. MILLER
  LAW OFFICES of JOSEPH MILLER, LLC
  P.O. Box 83440
  Fairbanks, AK 99708

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070

*Attorney of Record

*Attorneys for Amici Curiae*
May 2, 2022

21

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of America, *et al.*, in Support of Plaintiffs-Appellees and Affirmance, was made, this 2nd day of May 2022, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

   /s/Jeremiah L. Morgan
Jeremiah L. Morgan
Attorney for *Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-16756

I am the attorney or self-represented party.

**This brief contains** | 4,296 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

  ○ it is a joint brief submitted by separately represented parties;

  ○ a party or parties are filing a single brief in response to multiple briefs; or

  ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [              ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Jeremiah L. Morgan | **Date** | May 2, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/2018*