No. 21-16756

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

TODD YUKUTAKE, and DAVID KIKUKAWA,
*Plaintiffs-Appellees,*

v.

HOLLY T. SHIKADA, in her Official Capacity
as the Attorney General of the State of Hawai'i,
*Defendant-Appellant,*[1]

and

CITY AND COUNTY OF HONOLULU,
*Defendant.*[2]

_____

On Appeal from the United States District Court for the District of Hawai'i
Honorable J. Michael Seabright, Chief United States District Judge
(Civil No. 1:19-cv-00578 JMS-RT)

_____

## REPLY BRIEF OF DEFENDANT-APPELLANT
## HOLLY T. SHIKADA

_____

[1] HOLLY T. SHIKADA succeeded CLARE E. CONNORS as Attorney General of the State of Hawai'i on December 10, 2021 and is automatically substituted as a party pursuant to Fed. R. App. P. 43(c)(2).

[2] Defendant CITY AND COUNTY OF HONOLULU was dismissed with prejudice by stipulation in the District Court on June 12, 2020. 3-ER-440-444 (ECF 53).

HOLLY T. SHIKADA          4017
  Attorney General of the State of
  Hawaiʻi

KIMBERLY T. GUIDRY        7813
  Solicitor General

ROBERT T. NAKATSUJI       6743
  First Deputy Solicitor General
CARON M. INAGAKI          3835
KENDALL J. MOSER          6515
  Deputy Attorneys General
Dept. of the Attorney General
425 Queen Street
Honolulu, Hawaiʻi 96813
Telephone: (808) 586-1360
E-mail:  Kimberly.T.Guidry@hawaii.gov
        Robert.T.Nakatsuji@hawaii.gov
        Caron.M.Inagaki@hawaii.gov
        Kendall.J.Moser@hawaii.gov

Counsel for Defendant-Appellant HOLLY T. SHIKADA, in her
Official Capacity as the Attorney General of the State of Hawaiʻi

# **TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................1

II. STATEMENT OF AUTHORITIES ................................................1

III. ARGUMENT........................................................................................1

A.  Longstanding Prohibitions Are Not Limited to the Founding Era ......1

B.  Hawaii's Statutes Were Supported by Sufficient Evidence.................4

C.  Strict Scrutiny Does Not Apply, the Least Restrictive Alternative Is Not Required, and the Challenged Laws Are a Reasonable Fit........9

1.  Whether the City and County of Honolulu Is Accepting Registration Forms Online Is Distinct From and Irrelevant to the In-Person Inspection Issue ...............................................10

2.  The One-Year Expiration Date for Permits to Acquire for Long Guns Is Not a Less Restrictive Alternative ....................11

3.  The Challenged Statutes Represent a Reasonable Fit...............12

D.  Hawaii's Use of Ten-Day Permits for Handguns and One-Year Permits for Long Guns Is Not Underinclusive or Inconsistent..........12

E.  Hawaii's Statutes Do Not Impose "Prophylaxis-Upon-Prophylaxis" ........................................................................................14

1.  The "Prophylaxis-Upon-Prophylaxis" Theory Does Not Address the In-Person Inspection Requirement ......................15

2.  The Rap Back Program Also Is Not a "Prophylaxis-Upon Prophylaxis" Issue....................................................................16

F.  The Location of the In-Person Inspection Requirement Supports Its Interpretation ................................................................................19

G.  Even if Plaintiffs Are Allowed to Rebut the Presumption in Favor of Presumptively Lawful Regulations, the Effects are De Minimis ...22

H.  Plaintiffs' Photograph Is Misleading But Also Supports Defendant's Argument .......................................................................23

i

I.      Plaintiffs' Correction of Their Interpretation of Massachusetts
        Law Is Still Deceptive and Highlights the District Court's Error.......25

J.      *Jones v. Bonta* Does Not Affect the Above Analysis .........................28

IV.   CONCLUSION................................................................................................30

ADDENDUM

CERTIFICATE OF COMPLIANCE FOR BRIEFS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Burson v. Freeman*,
  504 U.S. 191 (1992)................................................................7

*Crowley Cutlery Co. v. United States*,
  849 F.2d 273 (7th Cir. 1988) ........................................ 11, 13

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ("*Heller I*") ............................... 2, 11, 13

*Dolan v. U.S. Postal Service*,
  546 U.S. 481 (2006)..............................................................19

*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013) ...............................................4, 7

*Duncan v. Bonta*,
  19 F.4th 1087 (9th Cir. 2021) (en banc) ...............................4

*Free and Fair Election Fund v. Mo. Ethics Comm'n*,
  903 F.3d 759 (8th Cir. 2018) ...............................................14

*Fyock v. Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015) ................................................2

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ....................... 2, 4, 22, 23

*Heller v. District of Columbia*,
  801 F.3d 264 (D.C. Cir. 2015) ("*Heller IV*")................. 24, 25

*Imaginary Images, Inc. v. Evans*,
  612 F.2d 736 (4th Cir. 2010) ................................... 5, 6, 7, 8

*Jackson v. City & County of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ................................................9

*Jones v. Bonta*,
  No. 20-56174, 2022 WL 1485187 (9th Cir. May 11, 2022)......... 28, 29

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ................................................................14

*Mai v. United States*,
   952 F.3d 1106 (9th Cir. 2020) ...............................................................5

*Mance v. Sessions*,
   896 F.3d 699 (5th Cir. 2018) ..............................................................2, 3

*McCutcheon v. Fed. Elec. Comm'n*,
   572 U.S. 185 (2014) .............................................................................14

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) .............................................................................19

*Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms,
   and Explosives*,
   700 F.3d 185 (5th Cir. 2012) ........................................................ 2, 3, 4

*Pena v. Lindley*,
   898 F.3d 969 (9th Cir. 2018) ....................................................... passim

*Schwab v. Ariyoshi*,
   58 Haw. 25, 564 P.2d 135 (1977) .........................................................21

*Turner Broadcasting System, Inc. v. F.C.C.*,
   512 U.S. 622 (1994) ...............................................................................5

*United States v. Booker*,
   644 F.3d 12 (1st Cir. 2011) ....................................................................2

*United States v. Carter*,
   669 F.3d 411 (4th Cir. 2012) ..................................................................4

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) .....................................................................8

*United States v. Mobley*,
   956 F.2d 450 (3d Cir. 1992) ...................................................................8

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ...............................................................2, 4

iv

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019) ...................................................................14

*Young v. Hawaiʻi*,
  992 F.2d 765 (9th Cir. 2021) (en banc) ................................................3

**Hawaiʻi Constitutional Provisions**

Haw. Const. art. III, § 14 ..........................................................................21

**Hawaiʻi Statutes and Legislative History**

Haw. Rev. Stat. § 134-1 ...........................................................................14

Haw. Rev. Stat. § 134-2 .............................................................................3

Haw. Rev. Stat. § 134-2(e) .......................................................... 11, 12, 13, 26

Haw. Rev. Stat. § 134-3(c) .......................................................................15

Haw. Rev. Stat. § 134-7(c)(1) ...................................................................17

Haw. Rev. Stat. § 134-7(c)(3) ...................................................................17

Haw. Rev. Stat. § 134-7(f) ........................................................................18

Haw. Rev. Stat. § 134-8(a) ........................................................................14

Haw. Rev. Stat. § 846-2.7(a) .....................................................................16

Haw. Rev. Stat. §§ 134-2(a) and 134-3(b) ................................................16

Haw. Rev. Stat. §§ 134-2(a), 134-3(a), 134-3(b), 134-8, 134-8.5 ...........15

Haw. Rev. Stat. §§ 134-23(a)(6), 134-24(a)(6), and 134-25(a)(6) ...........25

Haw. Rev. Stat. §§ 134-23(a)(6), 134-24(a)(6), and 134-25(a)(6) (2011) .............24

1927 Haw. Sess. Laws Act 206, § 5 ..........................................................24

1933 Haw. Sess. Laws (Special Sess.) Act 26, § 4.....................................5

2020 Haw. Sess. Laws Act 74, § 5 ............................................................20

2020 Haw. Sess. Laws Act 74, §§ 2-5 ........................................................5

2021 Haw. Sess. Laws Act 149, § 3 ...........................................................21

H. Stand. Comm. Rep. No. 89, in 1933 House Journal ..............................5

**Statutes from Other States**

430 Ill. Comp. Stat. 65/2, 65/7 ...............................................................28

Cal. Penal Code §§ 26840, 31615, 31655................................................28

Conn. Gen. Stat. §§ 29-33, 29-36f, 29-36h, 29-37a, 29-37p, 29-37r ......27

Conn. Gen. Stat. §§ 29-33, 29-36f, 29-37a, 29-37p ................................13

D.C. Code §§ 7-2502.01, 7-2502.06.......................................................28

Mass. Gen. Laws § 131A ........................................................................26

Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E .......13

Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131A, 131E ...............27

Mass. Gen. Laws ch. 140, §§ 121, 131 ..................................................28

Mass. Gen. Laws ch. 140, §§ 131A, 131E..............................................26

Md. Code Pub. Safety § 5-117.1.............................................................27

Md. Code Pub. Safety §§ 5-101(r), 5-117, 5-117.1, 5-123, 5-124 .........28

Mich. Comp. Laws §§ 28.422, 28.422a...................................................27

N.C. Gen. Stat. §§ 14-402 ......................................................................28

N.J. Stat. § 2C:58-3 ........................................................................ 13, 27

N.Y. Penal Law § 400.00 ........................................................................28

Neb. Rev. Stat. §§ 69-2404, 69-2407, 69-2409 ......................................27

R.I. Gen. Laws §§ 11-47-35....................................................................28

Rev. Code Wash. § 9.41.090....................................................................28

**Rules**

Fed. R. App. P. 43 ..................................................................................1

**Other Authorities**

Alexander D. McCourt, et al., *Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States, 1985-2017*, 110 (no. 10) Am. J. of Pub. Health 1546, 1549 (Oct. 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7483089/pdf/ AJPH.2020.305822.pdf ............................................................8

Alexander Pope, *An Essay on Criticism* (1711) ...................................15

Federal Bureau of Investigation, *Next Generation Identification (NGI): Rap Back*, https://www.fbi.gov/services/cjis/fingerprints-and-other- biometrics/ngi ...........................................................................17

*Licensing*, Giffords Law Center, https://giffords.org/lawcenter/gun-laws/ policy-areas/owner-responsibilities/licensing/ ....................................27

*Testimony of Hawaiʻi County Police Department*, Hawaiʻi State Legislature, https://www.capitol.hawaii.gov/Session2020/Testimony/ HB2744_HD1_TESTIMONY_PSM_03-12-20_.PDF...........................8

# I.     INTRODUCTION

In their Answering Brief, Plaintiffs-Appellees TODD YUKUTAKE and DAVID KIKUKAWA ("Plaintiffs") make incorrect, misleading, and ultimately unconvincing arguments against the constitutionality of Hawaii's firearms laws and in support of a flawed District Court decision.  Defendant-Appellant HOLLY T. SHIKADA,[3] in her official capacity as the Attorney General of the State of Hawaiʻi ("Defendant"), respectfully requests that this Court reverse the District Court's decision and direct the District Court to grant summary judgment in favor of Defendant.

# II.     STATEMENT OF AUTHORITIES

Defendant sets forth the pertinent constitutional provisions, statutes, and rules in the Addendum attached to Defendant's Opening Brief or in the Addendum attached below.

# III.     ARGUMENT

## A.     Longstanding Prohibitions Are Not Limited to the Founding Era.

Plaintiffs' main argument is that the "longstanding prohibitions" that are exempt from the protection of the Second Amendment under *District of Columbia*

---

[3] HOLLY T. SHIKADA succeeded CLARE E. CONNORS as Attorney General of the State of Hawaiʻi on December 10, 2021 and is automatically substituted as a party pursuant to Fed. R. App. P. 43(c)(2).

1

*v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"), must be traced back to the Founding

Era. Answering Brief ("A.B.") at 5-10. Plaintiffs' assertion is simply wrong.

Numerous Courts of Appeals have held that "*Heller* demonstrates that a

regulation can be deemed 'longstanding' even if it cannot boast a precise founding-

era analogue." *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms,*

*and Explosives*, 700 F.3d 185, 196 (5th Cir. 2012). *See also United States v.*

*Skoien,* 614 F.3d 638, 640-41 (7th Cir. 2010) ("[W]e do take from *Heller* the

message that exclusions need not mirror limits that were on the books in 1791.");

*Heller v. District of Columbia,* 670 F.3d 1244, 1253-55 (D.C. Cir. 2011) ("*Heller*

*II*") (relying on early 20th-century state statutes to show that D.C. handgun

registration requirement was "longstanding" and did not "impinge upon the right

protected by the Second Amendment"); *United States v. Booker*, 644 F.3d 12, 23-

24 (1st Cir. 2011) (stating that the statute in question "is firmly rooted in the

twentieth century" and "bears little resemblance to laws in effect at the time the

Second Amendment was ratified"); *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th

Cir. 2015) (mentioning "early twentieth century regulations" that were "not from

the founding era" and citing *Nat'l Rifle Ass'n of Am.*).

Nevertheless, Plaintiffs insist that "longstanding prohibitions" must be

traced back to the Founding Era. Plaintiff relies on a concurring opinion by Judge

Owen in *Mance v. Sessions*, 896 F.3d 699, 712-19 (5th Cir. 2018) (Owen, J.,

concurring).  *See* A.B. at 7, 8, 11, 14.  Judge Owen clearly believes that "longstanding prohibitions" must be traced back to the Founding Era.  *See id.* at 714 ("the Government has offered no evidence that an in-state sales requirement has a founding-era analogue").  However, that position is not the law of the Fifth Circuit.  The Fifth Circuit has instead held that "a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."  *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 196.

Plaintiffs, and Judge Owen, appear to be confused because even though numerous courts have held that "longstanding prohibitions" are not limited to Founding Era laws, they often consider the Founding Era as part of their analysis anyway.  But just because something is allowed does not mean that it is required. Courts are entitled to take a "belt-and-suspenders" approach.  And since Founding Era analogues are preferable if you have them, *see Young v. Hawai'i*, 992 F.2d 765, 811 (9th Cir. 2021) (en banc), it is understandable that courts will still look at the Founding Era.  But the fact remains that, under the prevailing standard, Founding Era analogues are not required.

Plaintiffs further argue that since the ten-day expiration date in Section 134-2 of the Hawai'i Revised Statutes can be traced back only to 1934, it is "too new to be longstanding on its own."  A.B. at 10.  However, this argument conflicts with the numerous cases that have traced firearm laws back to the 1920s or 1930s.  *See*

3

*Nat'l Rifle Ass'n of Am.*, 700 F.3d at 202 ("By 1923, therefore, twenty-two States and the District of Columbia had made 21 the minimum age for the purchase or use of particular firearms."); *Heller II,* 670 F.3d at 1253-54 (reviewing laws through the 1910s, 1920s, and 1930s); *Skoien,* 614 F.3d 638, 640 ("The first federal statute disqualifying felons from possessing firearms was not enacted until 1938[.]"); *Duncan v. Bonta*, 19 F.4th 1087, 1102 (9th Cir. 2021) (en banc) (tracing "firing-capacity restrictions" to 1932 and 1933).

**B.     Hawaii's Statutes Were Supported by Sufficient Evidence.**

Plaintiffs argue that there is no evidence supporting the challenged statutes. A.B. at 20-25, 53-56.  However, Plaintiffs distort the standard required.

> [O]ur analysis of whether there is a "reasonable fit between the government's stated objective and the regulation" considers "the legislative history of the enactment as well as studies in the record or cited in pertinent case law.
>     It is important to note that we are weighing a legislative judgment, not evidence in a criminal trial.  Because legislatures are "not obligated, when enacting [their] statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review," we should not conflate legislative findings with "evidence" in the technical sense.

*Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018) (citations omitted).  Instead, the government "may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require."  *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012).  *See also Drake v. Filko*, 724 F.3d 426, 438 (3d Cir. 2013) (noting that under

4

intermediate scrutiny, states are allowed to justify restrictions by reference to studies and anecdotes, and also by reference to history, consensus, and simple common sense).

The legislative history of the challenged statutes, which the District Court disregarded or misinterpreted, supports their constitutionality. *See* 1933 Haw. Sess. Laws (Special Sess.) Act 26, § 4; H. Stand. Comm. Rep. No. 89, in 1933 House Journal, at 427; 2020 Haw. Sess. Laws Act 74, §§ 2-5, 480-83. While Plaintiffs may complain that there are no studies addressing the precise statutes at issue in this case, empirical studies are not in fact required. "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 665 (1994); *Mai v. United States*, 952 F.3d 1106, 1118 (9th Cir. 2020).

In *Imaginary Images, Inc. v. Evans*, 612 F.2d 736 (4th Cir. 2010), the Fourth Circuit upheld the constitutionality of a policy that prohibited mixed drinks but not beer and wine in nude dancing establishments. In a First Amendment challenge applying intermediate scrutiny, the plaintiffs argued that the government agency did not produce empirical studies showing that a ban on only mixed drinks at sexually-oriented businesses will reduce secondary effects, such as higher crime

rates, lower property values, public sexual conduct, sexual assault, and prostitution.

*Id.* at 744.

> The Fourth Circuit held:

> But while the government must "fairly support" its policy, it need not settle the matter beyond debate or produce an exhaustive evidentiary demonstration. Moreover, its policy expertise is entitled to "deference," and **it may demonstrate the efficacy of its method of reducing secondary effects "by appeal to common sense," rather than "empirical data."** It may also rely on the experiences of other jurisdictions and on findings expressed in other cases.

*Id.* at 742 (citations omitted) (emphasis added). Ultimately, the court went on to

hold:

> The notion that the decisions of democratically accountable bodies must be set aside because of an absence of some unspecified quantum of social science support or the presence of a conflicting study commissioned by a litigant is one we must approach with skepticism. "As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments" made by lawmakers. A local policymaking body "knows the streets … better than we do. It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion."

>     [Plaintiff] insists, however, that there is no evidence in the record showing that people drinking liquor at strip clubs cause more problems than people drinking beer or wine. We agree with [Plaintiff] that no empirical study has been presented that correlates criminal activity to the particular alcoholic beverage consumed, but **we disagree that empirical support is needed for the perfectly sensible legislative proposition that someone drinking liquor at a strip club will get more intoxicated than someone drinking beer or wine over the same amount of time and hence be more likely to cross permissible lines.**

*Id.* at 748 (citations omitted) (emphasis added). This principle has been applied in Second Amendment cases as well. In *Drake*, the Third Circuit stated: "[W]e refuse to hold that the fit here is not reasonable merely because New Jersey cannot identify a study or tables of crime statistics upon which it based its predictive judgment." *Drake*, 724 F.3d at 438. The court noted that "New Jersey's inability to muster legislative history indicating what reports, statistical information, and other studies its legislature pondered" was unsurprising. *Id.* at 437. The court noted that "the legislature could not have foreseen" that its laws might run afoul of the Second Amendment "given that the teachings of *Heller* were not available until that landmark case was decided in 2008." *Id.* at 438.

The approach in *Drake* is similar to the approach in *Burson v. Freeman*, 504 U.S. 191 (1992), where the Supreme Court plurality recognized that the majority of campaign free zone laws were originally adopted in the 1890s, which was "long before States engaged in extensive legislative hearings on election regulations." *Id.* at 208.

Just like in *Imaginary Images*, *Drake*, and *Burson*, the challenged Hawaiʻi laws reflect simple logical ideas that are supported by common sense, extensive legislative findings cannot be expected because the *Heller* interpretation of the Second Amendment is relatively new, and empirical studies should not be required.

7

It should also be noted that studies do exists that support the challenged laws generally, although they do not specifically address the length of time permits are valid. Studies support the efficacy of strong permitting or licensing regulations in reducing gun violence. *See* Alexander D. McCourt, et al., *Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States, 1985-2017*, 110 (no. 10) Am. J. of Pub. Health 1546 (Oct. 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7483089/pdf/AJPH.2020.305822.pdf (and other studies cited therein). In addition, testimony in support of Act 74 attests to the importance of tracing firearms, which the in-person inspection requirement addresses. *Testimony of Hawaiʻi County Police Department*, Hawaiʻi State Legislature, https://www.capitol.hawaii.gov/Session2020/Testimony/HB2744_HD1_TESTIMONY_PSM_03-12-20_.PDF (at pdf 2). There are also findings in case law supporting the importance of serial numbers in tracing firearms. *See Pena*, 898 F.3d at 982; *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010); *United States v. Mobley,* 956 F.2d 450, 454 (3d Cir. 1992). *See also Imaginary Images*, 612 F.2d at 742 (relying on the experiences of other jurisdictions and on findings expressed in other cases).

Thus, there is sufficient evidence supporting the challenged statutes, as long as an improperly strict standard is not imposed.

**C.  Strict Scrutiny Does Not Apply, the Least Restrictive Alternative Is Not Required, and the Challenged Laws Are a Reasonable Fit.**

Plaintiffs argue that strict scrutiny should be applied to this case.  A.B. at 29-30.  However, strict scrutiny is clearly inappropriate because Plaintiffs do not suffer a substantial burden by the challenged statutes.  *See Jackson v. City & County of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014).  The only burden alleged by Plaintiffs was that they had to take time off from work to complete the purchase of their firearms.  1-ER-055; 1-ER-066; 3-ER-403.  Therefore, as the District Court determined, only intermediate scrutiny applies.

Plaintiffs nevertheless argue that the ten-day expiration date for permits to acquire and the in-person inspection requirement are unconstitutional because they are not the least restrictive alternatives.  A.B. at 26-27.  They also argue that the challenged laws are not a "reasonable fit."  A.B. at 30-31, 43, 45, 46, 50, 51.  Plaintiffs are wrong regarding both issues.

Ninth Circuit law is clear that "intermediate scrutiny does not require the least restrictive means of furthering a given end."  *See Jackson,* 746 F.3d at 969.  Even if there are "less burdensome means," a law can survive intermediate scrutiny.  *Id.*  Therefore, the least restrictive alternative is not required in the first place.  With respect to the "reasonable fit," the statute only has to "promote[] a 'substantial government interest that would be achieved less effectively absent the regulation.'"  *Pena*, 898 F.3d at 979.  The challenged statutes satisfy this standard.

9

1.  **Whether the City and County of Honolulu Is Accepting Registration Forms Online Is Distinct From and Irrelevant to the In-Person Inspection Issue.**

Plaintiffs argue that the fact that the Honolulu Police Department is currently accepting registration forms online means that there is a less restrictive alternative. A.B. at 3, 27, 33. Initially, it should be noted that there is no properly admitted evidence in the record supporting the claim that Honolulu is in fact accepting registration forms online. But more importantly, whether Honolulu is accepting online registration forms is distinct from and irrelevant to the in-person inspection issue.

Doing something online is certainly less restrictive than having to do it in-person, but because the conduct being considered is so different, they are not real "alternatives." Submitting registration forms is simply not the same thing as the physical inspection of a firearm. Therefore, even if Honolulu is indeed accepting registration forms online, it is no substitute for in-person inspection of the firearm. In-person inspection verifies the accuracy of the serial number, ensures that the firearm otherwise complies with Hawaiʻi law, and confirms the identity of the firearm to facilitate tracing by law enforcement. *See* Opening Brief ("O.B.") at 45, 53. Merely submitting registration forms online cannot do these things. In-person inspection of the firearm provides the verification that avoids human error and ensures that people do not inadvertently violate Hawaiʻi law.

10

Therefore, not only is the least restrictive alternative not required in the first place, but submission of online registration forms is not a valid alternative to in-person inspection.

### 2. The One-Year Expiration Date for Permits to Acquire for Long Guns Is Not a Less Restrictive Alternative.

Plaintiffs argue that the fact that long guns (i.e., rifles and shotguns) have a one-year expiration date for permits to acquire means that the ten-day expiration date for handguns is not the least restrictive alternative. A.B. at 26-27.

Again, one year may be less restrictive than ten days, but because of the differences between handguns and long guns, it is not a viable alternative. Handguns are more dangerous than long guns because they are more easily concealed. *See, e.g., Heller I*, 554 U.S. at 625 (sawed-off shotguns as dangerous and unusual weapons); *Crowley Cutlery Co. v. United States*, 849 F.2d 273, 278 (7th Cir. 1988) (switchblades more dangerous due to concealability). A shorter expiration date for a more dangerous weapon is justified; therefore, handguns can have a shorter expiration date. Furthermore, permits for rifles and shotguns are valid for multiple purchases. *See* Haw. Rev. Stat. § 134-2(e). Since it takes more time to make multiple purchases, a longer expiration date is appropriate for long guns. However, permits for handguns are valid only for single transactions. *See id.* Since a single purchase should take a relatively short amount of time, a shorter expiration date is appropriate for handguns.

11

Consequently, the least restrictive alternative is not required in the first place, but even if it was required, simply replacing one expiration date with the other is not an appropriate alternative in light of the differences between handguns, long guns, and their permits.

### 3. The Challenged Statutes Represent a Reasonable Fit.

For the reasons discussed above, the challenged statutes represent the required reasonable fit. A ten-day expiration date is appropriate for handguns because they are more concealable, and therefore more dangerous, than long guns, and handgun permits are valid only for a single transaction, rather than multiple transactions. Therefore, the restrictiveness of the regulation matches the characteristics of the firearm and its permit, thus making it more effective in promoting public safety. In-person inspections are appropriate because they provide the verification that avoids human error and they ensure that people do not inadvertently violate Hawai'i law. Without in-person inspection, public safety is left dependent on blind faith, which would be less effective than a simple inspection.

### D. Hawaii's Use of Ten-Day Permits for Handguns and One-Year Permits for Long Guns Is Not Underinclusive or Inconsistent.

Plaintiffs argue that Section 134-2(e) is unconstitutionally underinclusive because permits to acquire for handguns are valid only for ten days while permits

12

to acquire for long guns (i.e., rifles and shotguns) are valid for one year.  A.B. at 51.

The Ninth Circuit has held that "underinclusiveness does not doom [a statute] under intermediate scrutiny." *Pena*, 898 F.3d at 981.  Moreover, permits for long guns are valid for multiple purchases rather than single transactions; therefore, it makes sense for them to be valid for a longer period.  *See* Haw. Rev. Stat. § 134-2(e).

It is also not unusual for states to treat handguns differently than long guns. Many states do so.  *See, e.g.*, Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E; Conn. Gen. Stat. §§ 29-33, 29-36f, 29-37a, 29-37p; N.J. Stat. § 2C:58-3.  Handguns are more dangerous than long guns because they are more easily concealed.  *See, e.g., Heller I*, 554 U.S. at 625; *Crowley Cutlery Co.*, 849 F.2d at 278.  Consequently, it should not be a surprise if the standard for handguns is stricter than the standard for long guns.  In fact, it demonstrates a deliberate attempt to achieve a "reasonable fit" through more careful tailoring by the states that make this distinction.

Plaintiff argues that Hawai'i is being inconsistent by supporting bans on assault weapons but at the same time treating long guns more leniently than handguns.  A.B. at 49-50.  Plaintiffs' argument confuses ordinary long guns with assault weapons.  Long guns that are used for ordinary purposes, such as hunting

and target shooting, are not the same as assault weapons. Assault weapons are specifically designed for killing human beings, *see Kolbe v. Hogan*, 849 F.3d 114, 124-26 (4th Cir. 2017), while other rifles and shotguns are generally designed for lawful uses such as hunting and target shooting. Assault weapons also tend to be extremely powerful, *see Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019); *Kolbe*, 849 F.3d at 127, and are capable of carrying large numbers of rounds, *see Kolbe*, 849 F.3d at 125. Consequently, it is not inconsistent for Hawaiʻi to support banning assault weapons,[4] but also treat handguns strictly and ordinary long guns more leniently.

### E. Hawaii's Statutes Do Not Impose "Prophylaxis-Upon-Prophylaxis."

Plaintiffs argue that the challenged laws represent "prophylaxis-upon-prophylaxis" restrictions that require courts to be "particularly diligent in scrutinizing the law's fit." A.B. at 27-28. However, Plaintiffs rely on two election law cases, *McCutcheon v. Fed. Elec. Comm'n*, 572 U.S. 185 (2014), and *Free and Fair Election Fund v. Mo. Ethics Comm'n*, 903 F.3d 759 (8th Cir. 2018), and they cite no authority for applying this theory outside of the election law context.

---

[4] It should be noted that the assault weapon that Hawaiʻi law currently bans is described as an "assault pistol." *See* Haw. Rev. Stat. § 134-8(a). "Assault pistols" are smaller, and therefore more concealable, weapons with barrel lengths less than 16 inches. *See* Haw. Rev. Stat. § 134-1. Again, there is no inconsistency.

14

Consequently, the "prophylaxis-upon-prophylaxis" theory is inapposite to this case.

### 1. The "Prophylaxis-Upon-Prophylaxis" Theory Does Not Address the In-Person Inspection Requirement.

Even if this theory can be applied to Second Amendment cases, it does not apply to the circumstances of this particular case. Plaintiffs argue that "[b]oth the seller and the buyer are required to send the firearms information to the police department." A.B. at 27. Therefore, they argue, "Hawaii law already has prophylactic measures to register handguns[.]" *Id.* However, sending firearms information to the police does not solve the problem sought to be protected against by the in-person inspection requirement.

The problem addressed by the in-person inspection requirement in Section 134-3(c) is that people make mistakes.[5] It also addresses the problem of people from out of state or in private transactions not realizing that they have a feature or modification on their firearm that is illegal under Hawai'i law. *See* Haw. Rev. Stat. §§ 134-2(a), 134-3(a), 134-3(b), 134-8, 134-8.5. Because of the nature of these problems, merely sending firearms information to the police will not protect against the problem. People are not aware that they are making mistakes (otherwise, they would not make them), and they are not aware that their firearm

---

[5] "**To err is human**; to forgive, divine." Alexander Pope, *An Essay on Criticism* (1711) (emphasis added).

has something illegal on it.  Only an in-person inspection by a third party will catch these particular problems.  Therefore, sending firearm information to the police and in-person inspection do not address the same problems and are not duplicative.

Similarly, Plaintiffs rely heavily on the idea that federal firearms licensees ("FLLs") will prevent errors from occurring.  A.B. at 32, 41, 42, 49.  However, not all transfers are going to be with FLLs.  Under Hawai'i law, permitting and registration requirements also apply to private party sales and transfers.  *See* Haw. Rev. Stat. §§ 134-2(a) and 134-3(b).  Therefore, even if you assume the FLLs are going to be perfect themselves (which is a big assumption), not all errors are going to be caught by FLLs because they are not involved in many transactions.

### 2.     The Rap Back Program Also Is Not a "Prophylaxis-Upon Prophylaxis" Issue.

Plaintiffs also argue that Hawaii's use of the Rap Back program, pursuant to Section 846-2.7(a) of the Hawai'i Revised Statutes, constitutes "prophylaxis-upon-prophylaxis" because it exists on top of the ten-day expiration date for permits to acquire.  A.B. at 28, 29.  They argue that if Hawai'i is worried that the information a permit is based on will go out of date, the Rap Back program "already covers that." *Id.* at 53.

The Rap Back Service is a service operated by the Federal Bureau of Investigation ("FBI"):

16

> The Rap Back service allows authorized agencies to receive notification of activity on individuals who hold positions of trust (e.g. school teachers, daycare workers) or who are under criminal justice supervision or investigation, thus eliminating the need for repeated background checks on a person from the same applicant agency. Prior to the deployment of Rap Back, the national criminal history background check system provided a one-time snapshot view of an individual's criminal history status. With Rap Back, authorized agencies can receive on-going status notifications of any criminal history reported to the FBI after the initial processing and retention of criminal or civil transactions. By using fingerprint identification to identify persons arrested and prosecuted for crimes, Rap Back provides a nationwide notice to both criminal justice and noncriminal justice authorities regarding subsequent actions.

Federal Bureau of Investigation, *Next Generation Identification (NGI): Rap Back*,

https://www.fbi.gov/services/cjis/fingerprints-and-other-biometrics/ngi (last visited

April 29, 2022).

However, what Plaintiffs fail to understand is that Hawaiʻi authorities will

receive notifications only of further "criminal history," such as arrests and

prosecutions. There are people other than criminals who are also prohibited from

owning or possessing a firearm, such as those "under treatment or counseling for

addiction to, abuse of, or dependence upon any dangerous, harmful, or detrimental

drug, intoxicating compound … or intoxicating liquor" and those "diagnosed as

having a significant behavioral, emotional, or mental disorders as defined by the

most current diagnostic manual of the American Psychiatric Association or for

treatment for organic brain syndromes[.]" *See* Haw. Rev. Stat. § 134-7(c)(1) &

(3). The Rap Back Service will not provide notifications regarding such persons.

17

Persons subject to civil protective orders or temporary restraining orders are also disqualified from owning or possessing firearms, but they will not be subject to the Rap Back Service since the initial granting of those orders is civil rather than criminal in nature. *See* Haw. Rev. Stat. § 134-7(f). They would only be subject to the Rap Back Service if they subsequently violated those orders, which would then constitute crimes. Furthermore, even regarding persons who commit crimes, the Rap Back Service is not infallible.

Therefore, the Rap Back Service does not provide complete protection and is not "prophylaxis-upon-prophylaxis." Significantly, however, what Hawaii's use of the Rap Back Service does demonstrate is that Hawai'i has been concerned about the accuracy of the information that underlies its firearm permits and registrations in other contexts. Because Hawai'i has tried to address this problem in other ways, the explanation of the purpose of the ten-day expiration date is not the "post-hoc rationalization[]" that Plaintiffs claim it is. *See* A.B. at 25.[6]

---

[6] The District Court failed to understand the relevance of the Rap Back issue, relegating it a footnote and complaining that the parties "spill considerable ink" on it. 1-ER-061 n.14. Plaintiffs do at least understand the significance of the issue, which addresses the fact that information a permit to acquire is based on will go out of date. However, Plaintiffs fail to understand that the Rap Back Service still does not completely solve the problem.

**F.    The Location of the In-Person Inspection Requirement Supports Its Interpretation.**

Plaintiffs complain that "Hawaii's only argument is that the issue [i.e., the in-person inspection provision] was 'physically located adjacent to' other legislation dealing with 'ghost guns.'  Opening Brief at 47.  This is not a serious argument.…This is balderdash and Hawaii has cited no authority suggesting otherwise."  A.B. at 35.  Plaintiffs apparently do not understand context or statutory interpretation.

It is well-settled that "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.… It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007).  "[A] word is known by the company it keeps[.]"  *Dolan v. U.S. Postal Service*, 546 U.S. 481, 486 (2006).  Therefore, the rules of statutory construction direct courts to consider the context of statutory provisions, which clearly includes the other provisions surrounding the provision being construed.

In the present case, the in-person inspection provision is located right next to the other provisions amending the registration requirements so as to address ghost guns.  Among other things, these provisions required firearms dealers to register unfinished receivers and engrave or embed the registration numbers on the

19

receivers to serve as serial numbers. *See* 2020 Haw. Sess. Laws Act 74, § 5 at 482-83. Reading the in-person inspection provision in context with these other provisions means that it must be interpreted as applying to ghost guns too. Therefore, its primary purpose should be interpreted as requiring the inspection of the newly engraved or embedded serial numbers on ghost guns.

Plaintiffs use an absurd analogy in an attempt to oppose this conclusion. They argue: "By that [Defendant's] logic, an agricultural bill is related to a defense bill if it is physically located adjacent to the defense bill. And the State can use the justification for the defense bill to justify agricultural issues." A.B. at 35. Obviously, this is ridiculous. But if you change the facts a little, Defendant's point is made clear. Take Plaintiffs' hypothetical agricultural bill. Imagine it has three provisions, one that deals with "apple" matters, one that deals with "orange" matters, and one that deals with "banana" matters. Imagine further that there is a dispute over whether the "orange" provision should be interpreted as dealing with "orange" **the fruit** or "orange" **the color**. The answer should be clear. The purpose of the bill is agriculture. The context is that the provision in question is located between two other provisions, both of which deal with fruit. Therefore the "orange" in the statute clearly refers to the fruit.[7] However, in the present case, the

---

[7] Plaintiffs' hypothetical defense bill is irrelevant to all of this. It has a different purpose and is not part of the relevant context. Moreover, Article III, Section 14 of

District Court ignored the purpose of the bill and the context and essentially concluded that the provision at issue addressed the color rather than the fruit.

Plaintiffs criticize Defendant for not providing evidence to the District Court as to the Legislature's intent to address the ghost guns problem. A.B. at 38. However, it must be remembered that at the time of the District Court hearing, Act 74 had only recently been enacted. Prior to Act 74, the statutes did not expressly require in-person inspection, although it appears that the counties did require it in practice. 1-ER-045 n.5. Therefore, it is not surprising that the attorneys and the court were not familiar with the meaning and the history of Act 74.[8] Nevertheless, Defendant argued to the District Court that the Legislature changed the language of the statute and that the Legislature seemed to feel that ghost guns needed to be inspected. 1-ER-099. Admittedly, the legislative history was sparse. *Id.* The legislative committee reports, for example, were not helpful. But even so, the purpose and context of the bill itself, as well as the preamble and some testimony,

---

the Hawaiʻi Constitution provides that "[e]ach law shall embrace but one subject[.]" Haw. Const. art. III, § 14. *See also Schwab v. Ariyoshi*, 58 Haw. 25, 564 P.2d 135 (1977) (construing the single subject matter requirement). Therefore, in Hawaiʻi, it is unlikely that two such disparate measures would be included within the same bill.

[8] The present lawsuit was, in fact, filed before Act 74 was enacted. However, pursuant to 2021 Haw. Sess. Laws Act 149, § 3 at 564, Act 74 applies to proceedings that were begun before its effective date.

supported in-person inspection.  Consequently, there was indeed support for the in-person inspection requirement, and the District Court should not have ignored it.

**G.    Even if Plaintiffs Are Allowed to Rebut the Presumption in Favor of Presumptively Lawful Regulations, the Effects are De Minimis.**

Plaintiffs argue that even if the challenged laws are found to be "longstanding prohibitions" that are presumptively lawful exceptions to the Second Amendment, "[a] plaintiff may rebut this presumption by showing the regulation does have more than a de minimis effect upon his right."  A.B. at 18.  Plaintiffs rely on *Heller II*, 670 F.3d at 1253, and the concurring and dissenting opinion of Judge Bybee in *Pena*, 898 F.3d at 1010 (Bybee, J., concurring in part and dissenting in part).

It is not clear at present whether rebuttal is allowed in this situation in the Ninth Circuit.  Judge Bybee himself noted that, regarding this issue, "the answer has proven elusive, as the circuits have splintered over the question."  *Id.* at 1004.  But even if it is allowed, Plaintiffs would not be successful.  Rebutting the presumption would require showing that "the regulation does have more than a de minimis effect upon his right."  *Heller II*, 670 F.3d at 1253.  In the present case, it is undisputed that the only harm Plaintiffs alleged was that they had to take time off from work to complete the purchase of their firearms.  1-ER-055; 1-ER-066; 3-ER-403.  Therefore, the challenged statutes did not have more than a de minimis affect on Plaintiffs and their attempt at rebuttal should fail.

22

*Heller II*, which Plaintiffs rely on for their rebuttal argument, held that basic firearms registration requirements were de minimis because, among other things, they are similar to driver's license schemes. *See Heller II*, 670 F.3d at 1254-55 ("they are similar to other common registration or licensing schemes, such as those for voting or for driving a car"). Undoubtedly, some people have to take time off from work to apply for or renew their driver's licenses; therefore, taking time off from work, which is Plaintiffs' only harm, should be considered de minimis for firearms as well. *See id.* at 1254-55.

Furthermore, the fact that *Heller II* concluded, based on the analogy to driver's licenses, that the regulation was "self-evidently" de minimis is significant. *See id.* It is within common experience that driver's licenses generally expire after a certain amount of time. Otherwise, people would not have to renew them. The example of driver's licenses expiring supports the idea that having an expiration date on a permit or license, to ensure that it remains accurate, is supported by common sense. *See* O.B. at 30-41. If extensive empirical studies were required, *Heller II*'s analogy to driver's licenses would not be "self-evident." *See Heller II*, 670 F.3d at 1254-55.

## H.    Plaintiffs' Photograph Is Misleading But Also Supports Defendant's Argument.

Plaintiffs include a photograph in their Answering Brief showing a line of people in front of a Honolulu police station waiting to register their firearms. A.B.

23

at 37. The photograph is misleading because it was taken during the pandemic and reflects conditions that existed then which do not necessarily exist otherwise. *See* ECF 114-3. Furthermore, any practical problems that Honolulu may have had in applying the firearms statutes during the pandemic are irrelevant to a facial challenge. It does, however, demonstrate the difficulty that Plaintiffs appear to have in distinguishing between facial and as-applied challenges. *See* O.B. at 55-56.

Nevertheless, the photograph also demonstrates Defendant's argument that the District Court's reliance on *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller IV*"), was improper. *Heller IV* rejected a requirement that an applicant bring the firearm to registration in part because "the would-be registrant may be arrested or even shot by a police officer seeing a 'man with a gun' (or a gun case)." *Id.* at 277 (brackets omitted). Clearly, if people are lining up at a police station, the risk of police officers shooting them is non-existent. People would not line up in this way if they feared that police officers would shoot them.

This conclusion is supported by Hawai'i law. Hawaii's place to keep laws specifically authorize people to bring guns to police stations. *See* Haw. Rev. Stat. §§ 134-23(a)(6), 134-24(a)(6), and 134-25(a)(6) (2011). Place to keep requirements have existed since 1927. *See* 1927 Haw. Sess. Laws Act 206, § 5 at 209-10. Therefore, it is clear that the police expect people with firearms to come

24

to police stations, they do in fact permit people with firearms to line up at police stations, and the police officers are not going to shoot the people in line.

Plaintiffs argue that an even larger concern is the risk that would-be registrants will have their firearms stolen while waiting in line. A.B. at 36. However, similarly, the police know that people will be bringing their firearms to police stations due to the place to keep laws. *See* Haw. Rev. Stat. §§ 134-23(a)(6), 134-24(a)(6), and 134-25(a)(6). Therefore, the police will be more vigilant in protecting people who line up with gun cases. Even if it is still possible for crimes to occur near police stations, and this may happen anecdotally, the chance of this happening for firearms applicants is lessened due to the circumstances of Hawaiʻi law.

For these reasons, the *Heller IV* hypothetical does not apply to Hawaii's circumstances.

## I.    Plaintiffs' Correction of Their Interpretation of Massachusetts Law Is Still Deceptive and Highlights the District Court's Error.

Plaintiffs now appear to acknowledge that, in Massachusetts, the holder of a firearm identification card ("FID") who wants to purchase a handgun must obtain a permit to purchase, which is valid for ten days. A.B. at 12-13. Plaintiffs previously argued to the District Court that "Massachusetts has a firearm identification card required for purchasing firearms, but it is good for six years and can be issued to those persons as young as fifteen. *See* Mass. Ann. Laws ch. 140, §

129B (9)." 2-ER-145-146. Based on Plaintiffs' argument, the District Court believed that the Massachusetts permit to purchase statute had been repealed by the FID statute. 1-ER-053 ("three of the four laws Defendant relies on have been repealed"). The District Court later concluded that Hawai'i is "the *only* state in the nation to maintain such a restrictive requirement." 1-ER-061 (emphasis in original).

Plaintiffs' position in the District Court was clearly incorrect. Instead of repealing the permit to purchase requirement, the FID is a prerequisite for the permit to purchase requirement. Therefore, in Massachusetts, FID holders who want to purchase handguns have to obtain a permit to purchase. Mass. Gen. Laws ch. 140, §§ 131A, 131E. The permit is valid for ten days. *Id.* § 131A. Its origins date back to the 1920s. 2-ER-265-268. Consequently, Massachusetts has a permit to purchase requirement that is similar to Hawaii's in many ways. Hawai'i is not the only state with a permit to purchase/acquire that is valid for ten days. Unfortunately, based on Plaintiffs' incorrect assertion, the District Court committed error, which it compounded by relying on that error in striking down Section 134-2(e).

Plaintiffs try to rationalize their error by arguing that Hawaii's permit to acquire is different because it is mandatory while the Massachusetts permit to purchase is not. A.B. at 13, 39 n.20. Plaintiffs argue that because a person in

Massachusetts can obtain a license to carry rather than an FID, the permit to purchase is not mandatory. A.B. at 39 n.20. However, Plaintiffs never made this distinction to the District Court; indeed, they did not mention the license to carry at all. Plaintiffs are now simply playing a game of semantics to try to hide the fact that they misled the District Court into committing error.

The truth is that Hawaii's permit to acquire is not an outlier. Thirteen states and the District of Columbia have some form of permitting or licensing requirement for the purchase or acquisition of certain firearms. *See Licensing*, Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/owner-responsibilities/licensing/ (last visited April 30, 2022).

For handguns, Hawaiʻi is part of a group of states that require single use, short expiration permits that have deadlines that range from 10 to 90 days. *See* Mich. Comp. Laws §§ 28.422, 28.422a; N.J. Stat. § 2C:58-3; Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131A, 131E (for FID holders). A second group requires multiple use, longer expiration permits that are valid for several years.[9] *See* Conn. Gen. Stat. §§ 29-33, 29-36f, 29-36h, 29-37a, 29-37p, 29-37r; Neb. Rev. Stat. §§ 69-2404, 69-2407, 69-2409; Md. Code Pub. Safety § 5-117.1.[10] A third group

---

[9] For long guns (i.e., rifles and shotguns), Hawaiʻi takes this approach and applies a multiple use permit that is valid for one year.

[10] Maryland might also fall within the first category because, in addition to requiring a longer expiration handgun qualification license, Maryland law also

requires a license to possess or carry firearms, which is also good for a longer period.  *See* N.Y. Penal Law § 400.00; 430 Ill. Comp. Stat. 65/2, 65/7; Mass. Gen. Laws ch. 140, §§ 121, 131 (for license to carry holders).  Another group requires completion of firearm safety training and receipt of a certificate before purchasing firearms.  *See* Cal. Penal Code §§ 26840, 31615, 31655; Rev. Code Wash. § 9.41.090.  And the District of Columbia has a registration requirement that effectively functions as a permit to purchase.  *See* D.C. Code §§ 7-2502.01, 7-2502.06.[11]

**J.      *Jones v. Bonta* Does Not Affect the Above Analysis.**

Just before this Reply Brief was filed, a panel of the Ninth Circuit issued a decision in *Jones v. Bonta*, No. 20-56174, 2022 WL 1485187 (9th Cir. May 11, 2022).  The ultimate validity of *Jones* is unclear at the present time because it is a divided decision, made at the preliminary injunction stage, and it may also be subject to a petition for rehearing en banc.  In any event, *Jones* does not affect the above analysis.

---

requires anyone who purchases, rents, or transfers a firearm to submit a "firearm application" and complete the transaction within 90 days.  *See* Md. Code Pub. Safety §§ 5-101(r), 5-117, 5-117.1, 5-123, 5-124.

[11] Two other states have permit or licensing requirements but do not fall neatly into these categories.  *See* R.I. Gen. Laws § 11-47-35; N.C. Gen. Stat. § 14-402.

For the most part, the *Jones* decision is distinguishable from the present case. The *Jones* majority struck down California's ban on sales of semi-automatic rifles to 18-20 year olds. *See id.* at *2-*3, *14-*15. However, the challenged laws in the present case merely regulate the manner in which guns are transferred and do not impose a ban. Regarding "longstanding prohibitions," the *Jones* majority relied on their assertion that authority from the Founding Era contradicted the more recent legislation. *Id.* at *12. However, in the present case, no such contrary Founding Era authority exits.

Much of the *Jones* majority's analysis criticized the requirement of a "reasonable fit." *Id.* at *17-*20. They advocated a stricter standard requiring that the regulation "does-not-burden-more-conduct-than-necessary." *Id.* at *18. However, the challenged laws in the present case satisfy this standard. There are no viable "alternatives" to the challenged laws because they address problems that the proposed substitutes cannot address, such as the risk of human error and the imperfect knowledge of newcomers and private parties. *See supra* Part III.C.1., C.2. & E.1. By treating handguns and long guns differently, they also attempt to match the restrictiveness of the regulation to the characteristics of the firearm and its permit, which actually demonstrates careful tailoring rather than violating it. *See supra* Part III.C.3 & D. Therefore, even under the *Jones* majority's more onerous standard, the challenged laws reflect a "reasonable fit."

## IV.    CONCLUSION

For the abovementioned reasons, Defendant respectfully requests that this Court reject Plaintiffs' arguments, reverse the District Court's decision, and direct the District Court to grant summary judgment in favor of Defendant.

DATED:  Honolulu, Hawai'i, May 13, 2022.

s/ Robert T. Nakatsuji
_____
KIMBERLY T. GUIDRY
  Solicitor General
ROBERT T. NAKATSUJI
  First Deputy Solicitor General
CARON M. INAGAKI
KENDALL J. MOSER
  Deputy Attorneys General

Attorneys for Defendant-Appellant HOLLY
T. SHIKADA, in her Official Capacity as
the Attorney General of the State of Hawai'i

30

# ADDENDUM

## **Index to Addendum**

Haw. Const. art. III, § 14 ................................................................ 1

Haw. Rev. Stat. § 134-1 ................................................................ 1

Haw. Rev. Stat. § 134-7 ............................................................. 1-2

Haw. Rev. Stat. § 846-2.7 ............................................................ 3

2021 Haw. Sess. Laws Act 149 .................................................... 3

Fed. R. App. P. 43 ........................................................................ 4

## CONSTITUTIONAL PROVISIONS

**Haw. Const. art. III, § 14**
No law shall be passed except by bill. Each law shall embrace but one subject, which shall be expressed in its title. The enacting clause of each law shall be, "Be it enacted by the legislature of the State of Hawaii."

## HAWAI'I STATUTES AND ACTS

**Haw. Rev. Stat. § 134-1**
**§ 134-1. Definitions**
As used in this chapter, unless the context indicates otherwise:
. . .
"Assault pistol" means a semiautomatic pistol that accepts a detachable magazine and has two or more of the following characteristics:

> (1) An ammunition magazine that attaches to the pistol outside of the pistol grip;
> (2) A threaded barrel capable of accepting a barrel extender, flash suppressor, forward hand grip, or silencer;
> (3) A shroud that is attached to or partially or completely encircles the barrel and permits the shooter to hold the firearm with the second hand without being burned;
> (4) A manufactured weight of fifty ounces or more when the pistol is unloaded;
> (5) A centerfire pistol with an overall length of twelve inches or more; or
> (6) It is a semiautomatic version of an automatic firearm;

but does not include a firearm with a barrel sixteen or more inches in length, an antique pistol as defined in this section, or a curio or relic as those terms are used in 18 United States Code section 921(a)(13) or 27 Code of Federal Regulations section 478.11.

**Haw. Rev. Stat. § 134-7**
**§ 134-7. Ownership or possession prohibited, when; penalty**
> . . .
> (c) No person who:
> (1) Is or has been under treatment or counseling for addiction to, abuse of, or dependence upon any dangerous, harmful, or detrimental drug, intoxicating compound as defined in section 712-1240, or intoxicating liquor;

1

    (2) Has been acquitted of a crime on the grounds of mental disease, disorder, or defect pursuant to section 704-411; or

    (3) Is or has been diagnosed as having a significant behavioral, emotional, or mental disorders as defined by the most current diagnostic manual of the American Psychiatric Association or for treatment for organic brain syndromes;

shall own, possess, or control any firearm or ammunition therefor, unless the person has been medically documented to be no longer adversely affected by the addiction, abuse, dependence, mental disease, disorder, or defect.

    . . .

    (f) No person who has been restrained pursuant to an order of any court, including a gun violence protective order issued pursuant to part IV, from contacting, threatening, or physically abusing any person, shall possess, control, or transfer ownership of any firearm or ammunition therefor, so long as the protective order, restraining order, or any extension is in effect, unless the order, for good cause shown, specifically permits the possession of a firearm and ammunition. The protective order or restraining order shall specifically include a statement that possession, control, or transfer of ownership of a firearm or ammunition by the person named in the order is prohibited. The person shall relinquish possession and control of any firearm and ammunition owned by that person to the police department of the appropriate county for safekeeping for the duration of the order or extension thereof. At the time of service of a protective order or restraining order involving firearms and ammunition issued by any court, a police officer may take custody of any and all firearms and ammunition in plain sight, those discovered pursuant to a consensual search, and those firearms surrendered by the person restrained. If the person restrained is the registered owner of a firearm and knows the location of the firearm, but refuses to surrender the firearm or refuses to disclose the location of the firearm, the person restrained shall be guilty of a misdemeanor. In any case, when a police officer is unable to locate the firearms and ammunition either registered under this chapter or known to the person granted protection by the court, the police officer shall apply to the court for a search warrant pursuant to chapter 803 for the limited purpose of seizing the firearm and ammunition.

    For the purposes of this subsection, good cause shall not be based solely upon the consideration that the person subject to restraint pursuant to an order of any court is required to possess or carry firearms or ammunition during the course of the person's employment. Good cause consideration may include but not be limited to the protection and safety of the person to whom a restraining order is granted.

**Haw. Rev. Stat. § 846-2.7**
**§ 846-2.7. Criminal history record checks**
     (a) The agencies and other entities named in subsections (b) and (c) may conduct state and national criminal history record checks on the personnel identified in subsections (b) and (c), and participate in the rap back program, for the purpose of determining suitability or fitness for a permit, license, employment, or volunteer service; provided that the Hawaii criminal justice data center may charge a reasonable fee for the criminal history record checks performed. The agencies and other entities named in subsections (b) and (c) shall notify applicants, employees, and volunteers subject to a criminal history record check pursuant to this section that their fingerprints shall be retained by the Hawaii criminal justice data center and the Federal Bureau of Investigation for all purposes and uses authorized for fingerprint submissions. Notification shall also be given to the applicants, employees, and volunteers subject to the rap back program. The criminal history record check shall include the submission of fingerprints to:
     (1) The Federal Bureau of Investigation for a national criminal history record check; and
     (2) The Hawaii criminal justice data center for a state criminal history record check that shall include nonconviction data.
Except as otherwise provided in this section, criminal history record information shall be used exclusively for the stated purpose for which it was obtained in accordance with section 378-2.5.
     . . .


**2021 Haw. Sess. Laws Act 149**
     . . .
     SECTION 3.  Act 74, Session Laws of Hawaii 2020, is amended by repealing section 6.
     ["~~SECTION 6.  This Act does not affect the rights and duties that matured, penalties that were incurred, and proceedings that were begun before its effective date.~~"]
     . . .

**RULES**

**Fed. R. App. P. 43**

. . .

**(c) Public Officer: Identification; Substitution.**

　. . .

　　**(2) Automatic Substitution of Officeholder.** When a public officer who is a party to an appeal or other proceeding in an official capacity dies, resigns, or otherwise ceases to hold office, the action does not abate. The public officer's successor is automatically substituted as a party. Proceedings following the substitution are to be in the name of the substituted party, but any misnomer that does not affect the substantial rights of the parties may be disregarded. An order of substitution may be entered at any time, but failure to enter an order does not affect the substitution.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  No. 21-16756

I am the attorney or self-represented party.

**This brief contains   6,993   words,** excluding the items exempted by Fed.

R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [  ] it is a joint brief submitted by separately represented parties;
   [  ] a party or parties are filing a single brief in response to multiple briefs; or
   [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**  s/ Robert T. Nakatsuji               **Date**  May 13, 2022
*(use "s/[typed name]" to sign electronically-filed documents)*

1

## **CERTIFICATE OF SERVICE**

I hereby certify that Reply Brief of Defendant-Appellant HOLLY T. SHIKADA was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 13, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED:  Honolulu, Hawaiʻi, May 13, 2022.

s/ Robert T. Nakatsuji
KIMBERLY T. GUIDRY
 Solicitor General
ROBERT T. NAKATSUJI
 First Deputy Solicitor General
CARON M. INAGAKI
KENDALL J. MOSER
 Deputy Attorneys General

Attorneys for Defendant-Appellant HOLLY
T. SHIKADA, in her Official Capacity as
the Attorney General of the State of Hawaiʻi