Neutral
As of: June 28, 2022 4:44 PM Z

# *N.Y. State Rifle & Pistol Ass'n v. Bruen*

Supreme Court of the United States

November 3, 2021, Argued; June 23, 2022, Decided

No. 20-843.

**Reporter**

2022 U.S. LEXIS 3055 *

NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS v. KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

**Notice:** The Lexis pagination of this document is subject to change pending release of the final published version.

**Prior History: [*1]** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

*N.Y. State Rifle & Pistol Ass'n v. Beach, 818 Fed. Appx. 99, 2020 U.S. App. LEXIS 27455, 2020 WL 5032995 (2d Cir. N.Y., Aug. 26, 2020)*

**Disposition:** Reversed and remanded.

## Core Terms

firearms, licensing, gun, arms, regulation, handguns, self-defense, weapons, carriage, restrictions, carrying, pistols, courts, bear arms, concealed, violence, colonial, surety, Amici, cases, ban, means-end, places, Territories, rates, homicide, terror, proper cause, circumstances, law-abiding

## Case Summary

### Overview

HOLDINGS: [1]-Where the State of New York issued public-carry licenses only when an applicant demonstrated a special need for self-defense, the State's licensing regime violated the Constitution because the Second and *Fourteenth Amendments* protected an individual's right to carry a handgun for self-defense outside the home. A State could not prevent law-abiding citizens from publicly carrying handguns because they had not demonstrated a special need for self-defense.

### Outcome

Judgment reversed ; case remanded. 6-3 decision; 3 concurrences; 1 dissent.

## LexisNexis® Headnotes

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN1*[ ] **Fundamental Rights, Right to Bear Arms**

Judicial precedent recognizes that the Second and *Fourteenth Amendments* protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. Consistent with that precedent, the Second and *Fourteenth Amendments* protect an individual's right to carry a handgun for self-defense outside the home.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

Governments > State & Territorial Governments > Licenses

*HN2*[ ] **Fundamental Rights, Right to Bear Arms**

Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, the State's licensing regime violates the Constitution.

Criminal Law & Procedure > ... > Firearms Licenses > Holders > Carrying & Concealed Permits

Governments > State & Territorial Governments > Licenses

*HN3*[↓] **Holders, Carrying & Concealed Permits**

It is a crime in New York to possess any firearm without a license, whether inside or outside the home, punishable by up to four years in prison or a $5,000 fine for a felony offense, and one year in prison or a $1,000 fine for a misdemeanor. *N.Y. Penal Law §§ 265.01-b* (2017), 261.01(1) (Cum. Supp. 2022), *70.00(2)(e)* and *(3)(b)*, *80.00(1)(a)* (2021), *70.15(1)*, *80.05(1)*. Meanwhile, possessing a loaded firearm outside one's home or place of business without a license is a felony punishable by up to 15 years in prison. *N.Y. Penal Law §§ 265.03(3)* (2017), *70.00(2)(c)* and *(3)(b)*, *80.00(1)(a)*.

Criminal Law & Procedure > ... > Firearms Licenses > Holders > Applications

Evidence > Burdens of Proof > Allocation

*HN4*[↓] **Holders, Applications**

A license applicant who wants to possess a firearm at home (or in his place of business) must convince a licensing officer, usually a judge or law enforcement officer, that, among other things, he is of good moral character, has no history of crime or mental illness, and that no good cause exists for the denial of the license. *N.Y. Penal Law § 400.00(1)(a)-(n)* (Cum. Supp. 2022). If he wants to carry a firearm outside his home or place of business for self-defense, the applicant must obtain an unrestricted license to have and carry a concealed pistol or revolver. *N.Y. Penal Law § 400.00(2)(f )*. To secure that license, the applicant must prove that proper cause exists to issue it. If an applicant cannot make that showing, he can receive only a "restricted" license for public carry, which allows him to carry a firearm for a limited purpose, such as hunting, target shooting, or employment. No New York statute defines proper cause. But New York courts have held that an applicant shows proper cause only if he can demonstrate a special need for self-protection distinguishable from that of the general community. For example, living or working in an area noted for criminal activity does not suffice. Rather, New York courts generally require evidence of particular threats, attacks or other extraordinary danger to personal safety.

Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Standard of Review

Criminal Law & Procedure > ... > Firearms Licenses > Holders > Applications

*HN5*[↓] **Standards of Review, Arbitrary & Capricious Standard of Review**

When a licensing officer denies an application, judicial review is limited. New York courts defer to an officer's application of the proper-cause standard unless it is arbitrary and capricious. In other words, the decision must be upheld if the record shows a rational basis for it. The rule leaves applicants little recourse if their local licensing officer denies a permit.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN6*[↓] **Fundamental Rights, Right to Bear Arms**

The Second and *Fourteenth Amendments* protect an individual right to keep and bear arms for self-defense.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN7*[↓] **Fundamental Rights, Right to Bear Arms**

When the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with the Nation's historical tradition may a court conclude that the individual's conduct falls outside the *Second Amendment's* unqualified command.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN8*[↓] **Fundamental Rights, Right to Bear Arms**

Like most rights, the right secured by the *Second Amendment* is not unlimited. The right is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, it is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the *Second Amendment* protects the possession and use of weapons that are in common use at the time.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN9*[⤓] **Fundamental Rights, Right to Bear Arms**

The Heller methodology centers on constitutional text and history. Whether it comes to defining the character of the right (individual or militia dependent), suggesting the outer limits of the *Second Amendment* right, or assessing the constitutionality of a particular regulation, the Heller methodology relies on text and history. It does not invoke any means-end test such as strict or intermediate scrutiny.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN10*[⤓] **Fundamental Rights, Right to Bear Arms**

*Second Amendment* judicial precedent expressly rejects the application of any judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN11*[⤓] **Fundamental Rights, Right to Bear Arms**

The standard for applying the *Second Amendment* is as follows: When the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the *Second Amendment's* unqualified command.

Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN12*[⤓] **Case or Controversy, Constitutionality of Legislation**

To be sure, historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it. But reliance on history to inform the meaning of constitutional text, especially text meant to codify a pre-existing right, is more legitimate, and more administrable, than asking judges to make difficult empirical judgments about the costs and benefits of firearms restrictions, especially given their lack of expertise in the field.

Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation

*HN13*[⤓] **Case or Controversy, Constitutionality of Legislation**

The job of judges is not to resolve historical questions in the abstract; it is to resolve legal questions presented in particular cases or controversies. That legal inquiry is a refined subset of a broader historical inquiry, and it relies on various evidentiary principles and default rules to resolve uncertainties. For example, in the adversarial system of adjudication, courts follow the principle of party presentation. Courts are thus entitled to decide a case based on the historical record compiled by the parties.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN14*[⤓] **Fundamental Rights, Right to Bear Arms**

The *Second Amendment* is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense. It is this balance, struck by the traditions of the American people, that demands unqualified judicial deference.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN15*[⬇] **Fundamental Rights, Right to Bear Arms**

The Heller test requires courts to assess whether modern firearms regulations are consistent with the *Second Amendment's* text and historical understanding. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the *Second Amendment*. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

Constitutional Law > The Judiciary > Case or Controversy > Constitutional Questions

*HN16*[⬇] **Case or Controversy, Constitutional Questions**

Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN17*[⬇] **Fundamental Rights, Right to Bear Arms**

Just as the *First Amendment* protects modern forms of communications, and the *Fourth Amendment* applies to modern forms of search, the *Second Amendment* extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. Thus, even though the *Second Amendment's* definition of arms is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN18*[⬇] **Fundamental Rights, Right to Bear Arms**

Much like judicial precedent uses history to determine which modern arms are protected by the *Second Amendment*, so too does history guide consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy, a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar. And because everything is similar in infinite ways to everything else, one needs some metric enabling the analogizer to assess which similarities are important and which are not,. For instance, a green truck and a green hat are relevantly similar if one's metric is things that are green. They are not relevantly similar if the applicable metric is things you can wear.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN19*[⬇] **Fundamental Rights, Right to Bear Arms**

The Heller and McDonald analyses point toward at least two metrics that render regulations relevantly similar under the *Second Amendment*: how and why the regulations burden a law-abiding citizen's right to armed self-defense. Individual self-defense is the central component of the *Second Amendment* right. Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN20*[⬇] **Fundamental Rights, Right to Bear Arms**

The *Second Amendment* is the product of an interest

balancing by the people, not the evolving product of federal judges. Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, and there is nothing ironic about that undertaking. It is not an invitation to revise that balance through means-end scrutiny.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN21*[⤓] **Fundamental Rights, Right to Bear Arms**

To be clear, analogical reasoning under the *Second Amendment* is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that the Nation's ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN22*[⤓] **Fundamental Rights, Right to Bear Arms**

Nothing in the *Second Amendment's* text draws a home/public distinction with respect to the right to keep and bear arms. The textual elements of the Second Amendment's operative clause, the right of the people to keep and bear arms shall not be infringed, guarantee the individual right to possess and carry weapons in case of confrontation. The right to bear arms refers to the right to wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN23*[⤓] **Fundamental Rights, Right to Bear Arms**

The *Second Amendment* guarantees an individual right to possess and carry weapons in case of confrontation, and confrontation can surely take place outside the home.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN24*[⤓] **Fundamental Rights, Right to Bear Arms**

In light of the text of the *Second Amendment*, along with the Nation's history of firearm regulation, a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense.

Constitutional Law > The Judiciary > Case or Controversy > Constitutional Questions

Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation

*HN25*[⤓] **Case or Controversy, Constitutional Questions**

Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.

Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation

*HN26*[⤓] **Case or Controversy, Constitutionality of Legislation**

As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law rights when determining which historical sources are helpful in illuminating the scope of a constitutional right.

Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation

*HN27*[⤓] **Case or Controversy, Constitutionality of Legislation**

Where a governmental practice has been open,

widespread, and unchallenged since the early days of the Republic, the practice should guide the interpretation of an ambiguous constitutional provision. But to the extent later history contradicts what the text says, the text controls. Liquidating indeterminacies in written laws is far removed from expanding or altering them. Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.

Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation

**[HN28][⬇]** **Case or Controversy, Constitutionality of Legislation**

To the extent later history contradicts what the Constitution's text says, the text controls. Liquidating indeterminacies in written laws is far removed from expanding or altering them. Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

Constitutional Law > Bill of Rights > State Application

**[HN29][⬇]** **Fundamental Rights, Right to Bear Arms**

Strictly speaking, New York is bound to respect the right to keep and bear arms because of the *Fourteenth Amendment*, not the Second. Nonetheless, judicial precedent makes clear that individual rights enumerated in the *Bill of Rights* and made applicable against the States through the *Fourteenth Amendment* have the same scope as against the Federal Government. And it is generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the *Bill of Rights* was adopted in 1791.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

Criminal Law & Procedure > ... > Firearms

Licenses > Holders > Carrying & Concealed Permits

**[HN30][⬇]** **Fundamental Rights, Right to Bear Arms**

Nothing in the *Second Amendment* analysis should be interpreted to suggest the unconstitutionality of the 43 States' shall-issue licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit. Because these licensing regimes shall-issue licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent law-abiding, responsible citizens from exercising their *Second Amendment* right to public carry. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens. And they likewise appear to contain only narrow, objective, and definite standards guiding licensing officials, rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion. That said, because any permitting scheme can be put toward abusive ends, constitutional challenges to shall-issue regimes are not ruled out where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation

Governments > Courts > Common Law

**[HN31][⬇]** **Case or Controversy, Constitutionality of Legislation**

The English common law is not to be taken in all respects to be that of America. Thus, the language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted, not as they existed in the Middle Ages.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

**[HN32][⬇]** **Fundamental Rights, Right to Bear Arms**

Interpretation of the *Second Amendment* is not staked

upon a single law, in effect in a single State, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense in public.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN33*[⤓] **Fundamental Rights, Right to Bear Arms**

The *Second Amendment* guaranteed to all Americans the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN34*[⤓] **Fundamental Rights, Right to Bear Arms**

The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other *Bill of Rights* guarantees.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN35*[⤓] **Fundamental Rights, Right to Bear Arms**

New York's proper-cause requirement violates the *Fourteenth Amendment* in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.

## Syllabus

The State of New York makes it a crime to possess a firearm without a license, whether inside or outside the home. An individual who wants to carry a firearm outside his home may obtain an unrestricted license to "have and carry" a concealed "pistol or revolver" if he can prove that "proper cause exists" for doing so. *N. Y. Penal Law Ann. §400.00(2)(f )*. An applicant satisfies the "proper cause" requirement only if he can "demonstrate a special need for self-protection distinguishable from that of the general community." *E.g., In re Klenosky, 75 App. Div. 2d 793, 428 N. Y. S. 2d 256, 257*.

Petitioners Brandon Koch and Robert Nash are adult, law-abiding New York residents who both applied for unrestricted licenses to carry a handgun in public based on their generalized interest in self-defense. The State denied both of their applications for unrestricted licenses, allegedly because Koch and Nash failed to satisfy the "proper cause" requirement. Petitioners then sued respondents—state officials who oversee the processing of licensing applications—for declaratory and injunctive relief, alleging that respondents violated their *Second* and *Fourteenth Amendment* rights by denying their unrestricted-license applications **[\*2]** for failure to demonstrate a unique need for self-defense. The District Court dismissed petitioners' complaint and the Court of Appeals affirmed. Both courts relied on the Second Circuit's prior decision in *Kachalsky v. County of Westchester, 701 F. 3d 81*, which had sustained New York's proper-cause standard, holding that the requirement was "substantially related to the achievement of an important governmental interest." *Id., at 96*.

*Held*: New York's proper-cause requirement violates the *Fourteenth Amendment* by preventing law-abiding citizens with ordinary self-defense needs from exercising their *Second Amendment* right to keep and bear arms in public for self-defense. Pp. 8-63.

(a) In *District of Columbia v. Heller, 554 U. S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637*, and *McDonald v. Chicago, 561 U. S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894*, the Court held that the *Second* and *Fourteenth Amendments* protect an individual right to keep and bear arms for self-defense. Under *Heller*, when the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and to justify a firearm regulation the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation. Pp. 8-22.

(1) Since *Heller* and *McDonald*, the Courts of Appeals have developed a "two-step" framework for analyzing *Second Amendment* challenges that combines history with means-end scrutiny. The Court rejects that two-part approach as having one step **[\*3]** too many. Step one is broadly consistent with *Heller*, which demands a test rooted in the *Second Amendment's* text, as informed by history. But *Heller* and *McDonald* do not support a second step that applies means-end scrutiny in the *Second Amendment* context. *Heller*'s methodology centered on constitutional text and history. It did not invoke any means-end test such as strict or

intermediate scrutiny, and it expressly rejected any interest-balancing inquiry akin to intermediate scrutiny. Pp. 9-15.

(2) Historical analysis can sometimes be difficult and nuanced, but reliance on history to inform the meaning of constitutional text is more legitimate, and more administrable, than asking judges to "make difficult empirical judgments" about "the costs and benefits of firearms restrictions," especially given their "lack [of] expertise" in the field. *McDonald, 561 U. S., at 790-791, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (plurality opinion). Federal courts tasked with making difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. While judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The *Second Amendment* "is the very product of an interest **[\*4]** balancing by the people," and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller, 554 U. S., at 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Pp. 15-17.

(3) The test that the Court set forth in *Heller* and applies today requires courts to assess whether modern firearms regulations are consistent with the *Second Amendment's* text and historical understanding. Of course, the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. But the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated, even though its meaning is fixed according to the understandings of those who ratified it. See, *e.g.*, *United States v. Jones, 565 U. S. 400, 404-405, 132 S. Ct. 945, 181 L. Ed. 2d 911*. Indeed, the Court recognized in *Heller* at least one way in which the *Second Amendment's* historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." *554 U. S., at 582, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

To determine whether a firearm regulation is consistent with the *Second Amendment*, *Heller* and *McDonald* point toward at least two relevant metrics: first, whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and second, whether **[\*5]** that regulatory burden is comparably justified. Because "individual self-defense is 'the *central component*' of the *Second Amendment* right," these two metrics are "'*central*'" considerations when engaging in an analogical inquiry. *McDonald, 561 U. S., at 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (quoting *Heller, 554 U. S., at 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637*).

To be clear, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster. For example, courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible. *id., at 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. That said, respondents' attempt to characterize New York's proper-cause requirement as a "sensitive-place" law lacks merit because there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department. Pp. 17-22.

(b) Having made the constitutional standard endorsed in *Heller* more explicit, the Court applies that standard to New York's proper-cause requirement. Pp. 23-62.

(1) It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult **[\*6]** citizens—are part of "the people" whom the *Second Amendment* protects. See *Heller, 554 U. S., at 580, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. And no party disputes that handguns are weapons "in common use" today for self-defense. See *id., at 627, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. The Court has little difficulty concluding also that the plain text of the *Second Amendment* protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense. Nothing in the *Second Amendment's* text draws a home/public distinction with respect to the right to keep and bear arms, and the definition of "bear" naturally encompasses public carry. Moreover, the *Second Amendment* guarantees an "individual right to possess and carry weapons in case of confrontation," *id., at 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637*, and confrontation can surely take place outside the home. Pp. 23-24.

(2) The burden then falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. To do so, respondents appeal to a variety of historical sources from the late 1200s to the early 1900s. But when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have

when the people adopted them." *Heller, 554 U. S., at 634-635, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. The *Second Amendment* was adopted in 1791; the Fourteenth in 1868. Historical **[*7]** evidence that long predates or postdates either time may not illuminate the scope of the right. With these principles in mind, the Court concludes that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement. Pp. 24-62.

(i) Respondents' substantial reliance on English history and custom before the founding makes some sense given *Heller*'s statement that the *Second Amendment* "codified a right 'inherited from our English ancestors.'" *554 U. S., at 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. But the Court finds that history ambiguous at best and sees little reason to think that the Framers would have thought it applicable in the New World. The Court cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection. Pp. 30-37.

(ii) Respondents next direct the Court to the history of the Colonies and early Republic, but they identify only three restrictions on public carry from that time. While the Court doubts that just three colonial regulations could suffice to show a tradition of public-carry regulation, even looking **[*8]** at these laws on their own terms, the Court is not convinced that they regulated public carry akin to the New York law at issue. The statutes essentially prohibited bearing arms in a way that spread "fear" or "terror" among the people, including by carrying of "dangerous and unusual weapons." See *554 U. S., at 627, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are today "the quintessential self-defense weapon." *Id., at 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Thus, these colonial laws provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today. Pp. 37-42.

(iii) Only after the ratification of the *Second Amendment* in 1791 did public-carry restrictions proliferate. Respondents rely heavily on these restrictions, which generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes. None of these restrictions imposed a substantial burden on public carry analogous to that imposed by New York's restrictive licensing regime.

*Common-Law Offenses.* As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm **[*9]** carry in the antebellum period. But there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.

*Statutory Prohibitions.* In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. But the antebellum state-court decisions upholding them evince a consensus view that States could not altogether prohibit the public carry of arms protected by the *Second Amendment* or state analogues.

*Surety Statutes.* In the mid-19th century, many jurisdictions began adopting laws that required certain individuals to post bond before carrying weapons in public. Contrary to respondents' position, these surety statutes in no way represented direct precursors to New York's proper-cause requirement. While New York presumes that individuals have no public carry right without a showing of heightened need, the surety statutes presumed that individuals had a right to public carry that could be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836). Thus, unlike New York's regime, a showing of special need **[*10]** was required only *after* an individual was reasonably accused of intending to injure another or breach the peace. And, even then, proving special need simply avoided a fee.

In sum, the historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation, but none of these limitations on the right to bear arms operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose. Pp. 42-51.

(iv) Evidence from around the adoption of the *Fourteenth Amendment* also does not support respondents' position. The "discussion of the [right to keep and bear arms] in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves," *Heller, 554 U. S., at 614, 128 S. Ct. 2783, 171 L. Ed. 2d 637*, generally demonstrates that during Reconstruction the right to keep and bear arms had limits that were consistent with a right of the public to peaceably carry handguns for self-defense. The Court acknowledges two Texas cases—*English v. State, 35 Tex. 473* and

2022 U.S. LEXIS 3055, *10

*State v. Duke, 42 Tex. 455*—that approved a statutory "reasonable grounds" standard for public carry analogous to New York's proper-cause requirement. But these decisions were outliers and therefore provide little insight **[*11]** into how postbellum courts viewed the right to carry protected arms in public. See *Heller, 554 U. S., at 632, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Pp. 52-58.

(v) Finally, respondents point to the slight uptick in gun regulation during the late-19th century. As the Court suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the *Second Amendment* when it contradicts earlier evidence. In addition, the vast majority of the statutes that respondents invoke come from the Western Territories. The bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry. See *Heller, 554 U. S., at 614, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Moreover, these territorial laws were rarely subject to judicial scrutiny, and absent any evidence explaining why these unprecedented prohibitions on all public carry were understood to comport with the *Second Amendment*, they do little to inform "the origins and continuing significance of the Amendment." *Ibid.*; see also The Federalist No. 37, p. 229. Finally, these territorial restrictions deserve little weight because they were, consistent with the transitory nature of territorial government, short lived. Some were held unconstitutional shortly after passage, and others did not survive **[*12]** a Territory's admission to the Union as a State. Pp. 58-62.

(vi) After reviewing the Anglo-American history of public carry, the Court concludes that respondents have not met their burden to identify an American tradition justifying New York's proper-cause requirement. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor have they generally required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general community" to carry arms in public. *Klenosky, 75 App. Div. 2d, at 793, 428 N. Y. S. 2d, at 257*. P. 62.

(c) The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other *Bill of Rights* guarantees." *McDonald, 561 U. S., at 780, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (plurality opinion). The exercise of other constitutional rights does not require individuals to demonstrate to government officers some special need. The *Second Amendment* right to carry arms in public for self-defense is no different. New York's proper-cause requirement violates the *Fourteenth Amendment* by preventing law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear **[*13]** arms in public. Pp. 62-63.

*818 Fed. Appx. 99*, reversed and remanded.

**Counsel: Paul D. Clement** argued the cause for petitioners.

**Barbara D. Underwood** argued the cause for respondents.

**Judges:** Thomas, J., delivered the opinion of the Court, in which Roberts, C. J., and Alito, Gorsuch, Kavanaugh, and Barrett, JJ., joined. Alito, J., filed a concurring opinion. Kavanaugh, J., filed a concurring opinion, in which Roberts, C. J., joined. Barrett, J., filed a concurring opinion. Breyer, J., filed a dissenting opinion, in which Sotomayor and Kagan, JJ., joined.

**Opinion by:** THOMAS

## Opinion

JUSTICE THOMAS delivered the opinion of the Court.

**HN1**[↑] ] In *District of Columbia v. Heller, 554 U. S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*, and *McDonald v. Chicago, 561 U. S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*, we recognized that the *Second* and *Fourteenth Amendments* protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with *Heller* and *McDonald*, that the *Second* and *Fourteenth Amendments* protect an individual's right to carry a handgun for self-defense outside the home.

The parties nevertheless dispute whether New York's licensing regime respects the constitutional right to carry handguns publicly for self-defense. In 43 States, the government issues licenses to carry based on objective

2022 U.S. LEXIS 3055, *13

criteria. But in six States, including New York, the government **[\*14]** further conditions issuance of a license to carry on a citizen's showing of some additional special need. *HN2*[⬆] Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution.

I

A

New York State has regulated the public carry of handguns at least since the early 20th century. In 1905, New York made it a misdemeanor for anyone over the age of 16 to "have or carry concealed upon his person in any city or village of [New York], any pistol, revolver or other firearm without a written license . . . issued to him by a police magistrate." 1905 N. Y. Laws ch. 92, §2, pp. 129-130; see also 1908 N. Y. Laws ch. 93, §1, pp. 242-243 (allowing justices of the peace to issue licenses). In 1911, New York's "Sullivan Law" expanded the State's criminal prohibition to the possession of all handguns—concealed or otherwise—without a government-issued license. See 1911 N. Y. Laws ch. 195, §1, p. 443. New York later amended the Sullivan Law to clarify the licensing standard: Magistrates could "issue to [a] person a license to have and carry concealed a pistol or revolver without regard to employment or place of possessing such weapon" only if that person proved "good moral character" **[\*15]** and "proper cause." 1913 N. Y. Laws ch. 608, §1, p. 1629.

Today's licensing scheme largely tracks that of the early 1900s. *HN3*[⬆] It is a crime in New York to possess "any firearm" without a license, whether inside or outside the home, punishable by up to four years in prison or a $5,000 fine for a felony offense, and one year in prison or a $1,000 fine for a misdemeanor. See *N. Y. Penal Law Ann. §§265.01-b* (West 2017), 261.01(1) (West Cum. Supp. 2022), *70.00(2)(e)* and *(3)(b)*, *80.00(1)(a)* (West 2021), *70.15(1)*, *80.05(1)*. Meanwhile, possessing a loaded firearm outside one's home or place of business without a license is a felony punishable by up to 15 years in prison. *§§265.03(3)* (West 2017), *70.00(2)(c)* and *(3)(b)*, *80.00(1)(a)*.

*HN4*[⬆] ] A license applicant who wants to possess a firearm *at home* (or in his place of business) must convince a "licensing officer"—usually a judge or law enforcement officer—that, among other things, he is of good moral character, has no history of crime or mental illness, and that "no good cause exists for the denial of

the license." *§§400.00(1)(a)-(n)* (West Cum. Supp. 2022). If he wants to carry a firearm *outside* his home or place of business for self-defense, the applicant must obtain an unrestricted license to "have and carry" a concealed "pistol or revolver." *§400.00(2)(f )*. To secure that license, the applicant must prove that "proper cause exists" to issue **[\*16]** it. *Ibid.* If an applicant cannot make that showing, he can receive only a "restricted" license for public carry, which allows him to carry a firearm for a limited purpose, such as hunting, target shooting, or employment. See, *e.g.*, *In re O'Brien, 87 N. Y. 2d 436, 438-439, 663 N. E. 2d 316, 316-317, 639 N.Y.S.2d 1004 (1996)*; *Babernitz v. Police Dept. of City of New York, 65 App. Div. 2d 320, 324, 411 N. Y. S. 2d 309, 311 (1978)*; *In re O'Connor, 154 Misc. 2d 694, 696-698, 585 N. Y. S. 2d 1000, 1003 (Westchester Cty. 1992)*.

No New York statute defines "proper cause." But New York courts have held that an applicant shows proper cause only if he can "demonstrate a special need for self-protection distinguishable from that of the general community." *E.g.*, *In re Klenosky, 75 App. Div. 2d 793, 428 N. Y. S. 2d 256, 257 (1980)*. This "special need" standard is demanding. For example, living or working in an area "'noted for criminal activity'" does not suffice. *In re Bernstein, 85 App. Div. 2d 574, 445 N. Y. S. 2d 716, 717 (1981)*. Rather, New York courts generally require evidence "of particular threats, attacks or other extraordinary danger to personal safety." *In re Martinek, 294 App. Div. 2d 221, 222, 743 N. Y. S. 2d 80, 81 (2002)*; see also *In re Kaplan, 249 App. Div. 2d 199, 201, 673 N. Y. S. 2d 66, 68 (1998)* (approving the New York City Police Department's requirement of "'extraordinary personal danger, documented by proof of recurrent threats to life or safety'" (quoting *38 N. Y. C. R. R. §5-03(b)*)).

*HN5*[⬆] ] When a licensing officer denies an application, judicial review is limited. New York courts defer to an officer's application of the proper-cause standard unless it is "arbitrary and capricious." *In re Bando, 290 App. Div. 2d 691, 692, 735 N. Y. S. 2d 660, 661 (2002)*. In other words, the decision "must be upheld if the record shows a rational basis **[\*17]** for it." *Kaplan, 249 App. Div. 2d, at 201, 673 N. Y. S. 2d, at 68*. The rule leaves applicants little recourse if their local licensing officer denies a permit.

New York is not alone in requiring a permit to carry a handgun in public. But the vast majority of States—43 by our count—are "shall issue" jurisdictions, where authorities must issue concealed-carry licenses

whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability.[1] Meanwhile, only six States and the

District of Columbia have "may issue" licensing laws, under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license. Aside from New York, then, only California, the District of Columbia, Hawaii, Maryland, Massachusetts, and New Jersey have analogues to the "proper cause" standard.[2] All of these "proper cause" analogues have been upheld by the Courts of Appeals, save for the District of Columbia's, which has been permanently enjoined since 2017. Compare *Gould v. Morgan, 907 F. 3d 659, 677 (CA1 2018)*; *Kachalsky v. County of Westchester, 701 F. 3d 81, 101 (CA2 2012)*; *Drake v. Filko, 724 F. 3d 426, 440 (CA3 2013)*; *United States v. Masciandaro, 638 F. 3d 458, 460 (CA4 2011)*; *Young v. Hawaii, 992 F. 3d 765, 773 (CA9 2021)* (en banc), with *Wrenn v. District of Columbia, 864 F. 3d 650, 668, 431 U.S. App. D.C. 62 (CADC 2017)*.

B

As set forth in the **[*18]** pleadings below, petitioners Brandon Koch and Robert Nash are law-abiding, adult citizens of Rensselaer County, New York. Koch lives in Troy, while Nash lives in Averill Park. Petitioner New York State Rifle & Pistol Association, Inc., is a public-interest group organized to defend the *Second Amendment* rights of New Yorkers. Both Koch and Nash

---

[1] See *Ala. Code §13A-11-75* (Cum. Supp. 2021); *Alaska Stat. §18.65.700* (2020); *Ariz. Rev. Stat. Ann. §13-3112* (Cum. Supp. 2021); *Ark. Code Ann. §5-73-309* (2021); *Colo. Rev. Stat. §18-12-206* (2021); **Fla. Stat. §790.06** (2021); *Ga. Code Ann. §16-11-129* (Supp. 2021); *Idaho Code Ann. §18-3302K* (Cum. Supp. 2021); *Ill. Comp. Stat., ch. 430, §66/10* (West Cum. Supp. 2021); **Ind. Code §35-47-2-3** (2021); *Iowa Code §724.7* (2022); *Kan. Stat. Ann. §75-7c03* (2021); *Ky. Rev. Stat. Ann. §237.110* (Lexis Cum. Supp. 2021); *La. Rev. Stat. Ann. §40:1379.3* (West Cum. Supp. 2022); *Me. Rev. Stat. Ann., Tit. 25, §2003* (Cum. Supp. 2022); *Mich. Comp. Laws §28.425b* (2020); *Minn. Stat. §624.714* (2020); *Miss. Code Ann. §45-9-101* (2022); *Mo. Rev. Stat. §571.101* (2016); *Mont. Code Ann. §45-8-321* (2021); *Neb. Rev. Stat. §69-2430* (2019); *Nev. Rev. Stat. §202.3657* (2021); *N. H. Rev. Stat. Ann. §159:6* (Cum. Supp. 2021); *N. M. Stat. Ann. §29-19-4* (2018); *N. C. Gen. Stat. Ann. §14-415.11* (2021); **N. D. Cent. Code Ann. §62.1-04-03** (Supp. 2021); *Ohio Rev. Code Ann. §2923.125* (2020); **Okla. Stat., Tit. 21, §1290.12** (2021); **Ore. Rev. Stat. §166.291** (2021); *18 Pa. Cons. Stat. §6109* (Cum. Supp. 2016); *S. C. Code Ann. §23-31-215(A)* (Cum. Supp. 2021); **S. D. Codified Laws §23-7-7** (Cum. Supp. 2021); *Tenn. Code Ann. §39-17-1366* (Supp. 2021); *Tex. Govt. Code Ann. §411.177* (West Cum. Supp. 2021); *Utah Code §53-5-704.5* (2022); *Va. Code Ann. §18.2-308.04* (2021); **Wash. Rev. Code §9.41.070** (2021); *W. Va. Code Ann. §61-7-4* (2021); *Wis. Stat. §175.60* (2021); *Wyo. Stat. Ann. §6-8-104* (2021). Vermont has no permitting system for the concealed carry of handguns. Three States—Connecticut, Delaware, and Rhode Island—have discretionary criteria but appear to operate like "shall issue" jurisdictions. See **Conn. Gen. Stat. §29-28(b)** (2021); *Del. Code, Tit. 11, §1441* (2022); *R. I. Gen. Laws §11-47-11* (2002). Although Connecticut officials have discretion to deny a concealed-carry permit to anyone who is not a "suitable person," see **Conn. Gen. Stat. §29-28(b)**, the "suitable person" standard precludes permits only to those "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Dwyer v. Farrell, 193 Conn. 7, 12, 475 A. 2d 257, 260 (1984)* (internal quotation marks omitted). As for Delaware, the State has thus far processed 5,680 license applications and renewals in fiscal year 2022 and has denied only 112. See Del. Courts, Super. Ct., Carrying Concealed Deadly Weapon (June 9, 2022), https://courts.delaware.gov/forms/download.aspx?ID=125408. Moreover, Delaware appears to have no licensing requirement for open carry. Finally, Rhode Island has a suitability requirement, see *R. I. Gen. Laws §11-47-11*, but the Rhode Island Supreme Court has flatly denied that the "[d]emonstration of a proper showing of need" is a component of that requirement. *Gadomski v. Tavares, 113 A. 3d 387, 392*

*(2015)*. Additionally, some "shall issue" jurisdictions have so-called "constitutional carry" protections that allow certain individuals to carry handguns in public within the State without *any* permit whatsoever. See, *e.g.*, A. Sherman, More States Remove Permit Requirement To Carry a Concealed Gun, PolitiFact (Apr. 12, 2022), https://www.politifact.com/article/2022/apr/12/more-states-remove-permit-requirement-carry-concea/ ("Twenty-five states now have permitless concealed carry laws . . . The states that have approved permitless carry laws are: Alabama, Alaska, Arizona, Arkansas, Idaho, Indiana, Iowa, Georgia, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, New Hampshire, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming").

[2] See *Cal. Penal Code Ann. §26150* (West 2021) ("Good cause"); *D. C. Code §§7-2509.11(1)* (2018), *22-4506(a)* (Cum. Supp. 2021) ("proper reason," *i.e.*, "special need for self-protection"); *Haw. Rev. Stat. §§134-2* (Cum. Supp. 2018), *134-9(a)* (2011) ("exceptional case"); *Md. Pub. Saf. Code Ann. §5-306(a)(6)(ii)* (2018) ("good and substantial reason"); *Mass. Gen. Laws, ch. 140, §131(d)* (2020) ("good reason"); *N. J. Stat. Ann. §2C:58-4(c)* (West Cum. Supp. 2021) ("justifiable need").

are members.

In 2014, Nash applied for an unrestricted license to carry a handgun in public. Nash did not claim any unique danger to his personal safety; he simply wanted to carry a handgun for self-defense. In early 2015, the State denied Nash's application for an unrestricted license but granted him a restricted license for hunting and target shooting only. In late 2016, Nash asked a licensing officer to remove the restrictions, citing a string of recent robberies in his neighborhood. After an informal hearing, the licensing officer denied the request. The officer reiterated that Nash's existing license permitted him "to carry concealed for purposes of off road back country, outdoor activities similar to hunting," such as "fishing, hiking & camping etc." App. 41. But, at the same time, the officer emphasized that the restrictions were "intended to *prohibit* [*19] [Nash] from carrying concealed in ANY LOCATION typically open to and frequented by the general public." *Ibid.*

Between 2008 and 2017, Koch was in the same position as Nash: He faced no special dangers, wanted a handgun for general self-defense, and had only a restricted license permitting him to carry a handgun outside the home for hunting and target shooting. In late 2017, Koch applied to a licensing officer to remove the restrictions on his license, citing his extensive experience in safely handling firearms. Like Nash's application, Koch's was denied, except that the officer permitted Koch to "carry to and from work." *Id.*, at 114.

C

Respondents are the superintendent of the New York State Police, who oversees the enforcement of the State's licensing laws, and a New York Supreme Court justice, who oversees the processing of licensing applications in Rensselaer County. Petitioners sued respondents for declaratory and injunctive relief under Rev. Stat. 1979, *42 U. S. C. §1983*, alleging that respondents violated their *Second* and *Fourteenth Amendment* rights by denying their unrestricted-license applications on the basis that they had failed to show "proper cause," *i.e.*, had failed to demonstrate a unique need for self-defense.

The **[*20]** District Court dismissed petitioners' complaint and the Court of Appeals affirmed. See *818 Fed. Appx. 99, 100 (CA2 2020)*. Both courts relied on the Court of Appeals' prior decision in *Kachalsky, 701 F. 3d 81*, which had sustained New York's proper-cause standard, holding that the requirement was "substantially related to the achievement of an important

governmental interest." *Id., at 96*.

We granted certiorari to decide whether New York's denial of petitioners' license applications violated the Constitution. *593 U. S. ___, 141 S. Ct. 2566, 209 L. Ed. 2d 590 (2021)*.

II

*HN6*[⬆] ] In *Heller* and *McDonald*, we held that the *Second* and *Fourteenth Amendments* protect an individual right to keep and bear arms for self-defense. In doing so, we held unconstitutional two laws that prohibited the possession and use of handguns in the home. In the years since, the Courts of Appeals have coalesced around a "two-step" framework for analyzing *Second Amendment* challenges that combines history with means-end scrutiny.

Today, we decline to adopt that two-part approach. *HN7*[⬆] ] In keeping with *Heller*, we hold that when the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent **[*21]** with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the *Second Amendment's* "unqualified command." *Konigsberg v. State Bar of Cal., 366 U. S. 36, 50, n. 10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961)*.[3]

A

Since *Heller* and *McDonald*, the two-step test that Courts of Appeals have developed to assess *Second Amendment* claims proceeds as follows. At the first step, the government may justify its regulation by "establish[ing] that the challenged law regulates activity

---

[3] Rather than begin with its view of the governing legal framework, the dissent chronicles, in painstaking detail, evidence of crimes committed by individuals with firearms. See *post*, at 1-9 (opinion of Breyer, J.). The dissent invokes all of these statistics presumably to justify granting States greater leeway in restricting firearm ownership and use. But, as Members of the Court have already explained, "[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications." *McDonald v. Chicago, 561 U. S. 742, 783, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)* (plurality opinion).

2022 U.S. LEXIS 3055, *21

falling outside the scope of the right as originally understood." *E.g.*, *Kanter v. Barr, 919 F. 3d 437, 441 (CA7 2019)* (internal quotation marks omitted). But see *United States v. Boyd, 999 F. 3d 171, 185 (CA3 2021)* (requiring claimant to show "'a burden on conduct falling within the scope of the *Second Amendment's* guarantee'"). The Courts of Appeals then ascertain the original scope of the right based on its historical meaning. *E.g.*, *United States v. Focia, 869 F. 3d 1269, 1285 (CA11 2017)*. If the government can prove that the regulated conduct falls beyond the Amendment's original scope, "then the analysis can stop there; the regulated activity is categorically unprotected." *United States v. Greeno, 679 F. 3d 510, 518 (CA6 2012)* (internal quotation marks omitted). But if the historical evidence at this step is "inconclusive or suggests that the regulated activity is *not* categorically unprotected," the courts generally proceed **[\*22]** to step two. *Kanter, 919 F. 3d, at 441* (internal quotation marks omitted).

At the second step, courts often analyze "how close the law comes to the core of the *Second Amendment* right and the severity of the law's burden on that right." *Ibid.* (internal quotation marks omitted). The Courts of Appeals generally maintain "that the core *Second Amendment* right is limited to self-defense *in the home.*" *Gould, 907 F. 3d, at 671* (emphasis added). But see *Wrenn, 864 F. 3d, at 659* ("[T]he Amendment's core generally covers carrying in public for self defense"). If a "core" *Second Amendment* right is burdened, courts apply "strict scrutiny" and ask whether the Government can prove that the law is "narrowly tailored to achieve a compelling governmental interest." *Kolbe v. Hogan, 849 F. 3d 114, 133 (CA4 2017)* (internal quotation marks omitted). Otherwise, they apply intermediate scrutiny and consider whether the Government can show that the regulation is "substantially related to the achievement of an important governmental interest." *Kachalsky, 701 F. 3d, at 96*.[4] Both respondents and the

United States largely agree with this consensus, arguing that intermediate scrutiny is appropriate when text and history are unclear in attempting to delineate the scope of the right. See Brief for Respondents 37; Brief for United States as *Amicus Curiae* 4.

B

Despite the popularity of this two-step approach, **[\*23]** it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the *Second Amendment's* text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the *Second Amendment* context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

1

To show why *Heller* does not support applying means-end scrutiny, we first summarize *Heller*'s methodological approach to the *Second Amendment*.

In *Heller*, we began with a "textual analysis" focused on the "'normal and ordinary'" meaning of the *Second Amendment's* language. *554 U. S., at 576-577, 578, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. That analysis suggested that the Amendment's operative clause—"the right of the people to keep and bear Arms shall not be infringed"—"guarantee[s] the individual right to possess and carry weapons in case of confrontation" that does not depend on service in the militia. *Id., at 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

From there, we assessed whether our initial conclusion was "confirmed by the historical background of the *Second Amendment*." *Ibid.* We looked to history because "it has always been widely understood that the *Second Amendment* . . . codified a *pre-existing* right." *Ibid.* The Amendment "was not intended to lay down a novel principle but **[\*24]** rather codified a right inherited from our English ancestors." *Id., at 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (alterations and internal quotation marks omitted). After surveying English history dating from the late 1600s, along with American colonial views leading up to the founding, we found "no doubt, on the basis of both text and history, that the *Second Amendment* conferred an individual right to keep and bear arms." *Id., at 595, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

---

[4] See *Association of N. J. Rifle & Pistol Clubs, Inc. v. Attorney General N. J., 910 F. 3d 106, 117 (CA3 2018)*; accord, *Worman v. Healey, 922 F. 3d 26, 33, 36-39 (CA1 2019)*; *Libertarian Party of Erie Cty. v. Cuomo, 970 F. 3d 106, 127-128 (CA2 2020)*; *Harley v. Wilkinson, 988 F. 3d 766, 769 (CA4 2021)*; *National Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 700 F. 3d 185, 194-195 (CA5 2012)*; *United States v. Greeno, 679 F. 3d 510, 518 (CA6 2012)*; *Kanter v. Barr, 919 F. 3d 437, 442 (CA7 2019)*; *Young v. Hawaii, 992 F. 3d 765, 783 (CA9 2021)* (en banc); *United States v. Reese, 627 F. 3d 792, 800-801 (CA10 2010)*; *GeorgiaCarry.Org, Inc. v. Georgia, 687 F. 3d 1244, 1260, n. 34 (CA11 2012)*; *United States v. Class, 930 F. 3d 460, 463,*

---

*442 U.S. App. D.C. 257 (CADC 2019)*.

We then canvassed the historical record and found yet further confirmation. That history included the "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the *Second Amendment*," *id., at 600-601, 128 S. Ct. 2783, 171 L. Ed. 2d 637*, and "how the *Second Amendment* was interpreted from immediately after its ratification through the end of the 19th century," *id., at 605, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. When the principal dissent charged that the latter category of sources was illegitimate "postenactment legislative history," *id., at 662, n. 28, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (opinion of Stevens, J.), we clarified that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification" was "a critical tool of constitutional interpretation," *id., at 605, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (majority opinion).

In assessing the postratification history, we looked to four different types of sources. First, we reviewed [*25] "[t]hree important founding-era legal scholars [who] interpreted the *Second Amendment* in published writings." *Ibid.* Second, we looked to "19th-century cases that interpreted the *Second Amendment*" and found that they "universally support an individual right" to keep and bear arms. *Id., at 610, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Third, we examined the "discussion of the *Second Amendment* in Congress and in public discourse" after the Civil War, "as people debated whether and how to secure constitutional rights for newly freed slaves." *Id., at 614, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Fourth, we considered how post-Civil War commentators understood the right. See *id., at 616-619, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

After holding that the *Second Amendment* protected an individual right to armed self-defense, we also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right. **HN8**[⬆] We noted that, "[l]ike most rights, the right secured by the *Second Amendment* is not unlimited." *Id., at 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Ibid.* For example, we found it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that the *Second Amendment* protects the possession and use [*26] of weapons that are "'in common use at the time.'" *Id., at 627, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (first citing 4 W. Blackstone,

Commentaries on the Laws of England 148-149 (1769); then quoting *United States v. Miller, 307 U. S. 174, 179, 59 S. Ct. 816, 83 L. Ed. 1206, 1939-1 C.B. 373 (1939)*). That said, we cautioned that we were not "undertak[ing] an exhaustive historical analysis today of the full scope of the *Second Amendment*" and moved on to considering the constitutionality of the District of Columbia's handgun ban. *554 U. S., at 627, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

We assessed the lawfulness of that handgun ban by scrutinizing whether it comported with history and tradition. Although we noted that the ban "would fail constitutional muster" "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," *id., at 628-629, 128 S. Ct. 2783, 171 L. Ed. 2d 637*, we did not engage in means-end scrutiny when resolving the constitutional question. Instead, we focused on the historically unprecedented nature of the District's ban, observing that "[f]ew laws in the history of our Nation have come close to [that] severe restriction." *Id., at 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Likewise, when one of the dissents attempted to justify the District's prohibition with "founding-era historical precedent," including "various restrictive laws in the colonial period," we addressed each purported analogue and concluded that they were either irrelevant or "d[id] [*27] not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id., at 631-632, 128 S. Ct. 2783, 171 L. Ed. 2d 637*; see *id., at 631-634, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Thus, our earlier historical analysis sufficed to show that the *Second Amendment* did not countenance a "complete prohibition" on the use of "the most popular weapon chosen by Americans for self-defense in the home." *Id., at 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

2

As the foregoing shows, **HN9**[⬆] *Heller*'s methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny.

Moreover, **HN10**[⬆] *Heller* and *McDonald* expressly rejected the application of any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects

upon other important governmental interests.'" *Heller, 554 U. S., at 634, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (quoting *id., at 689-690, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (BREYER, J., dissenting)); see also *McDonald, 561 U. S., at 790-791, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (plurality opinion) (the *Second Amendment* does not permit—let alone require—"judges to assess the costs and benefits of firearms restrictions" under means-end scrutiny). We declined to engage **[*28]** in means-end scrutiny because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller, 554 U. S., at 634, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. We then concluded: "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Ibid.*

Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that respondents and the United States now urge us to adopt. Dissenting in *Heller*, JUSTICE BREYER's proposed standard—"ask[ing] whether [a] statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests," *id., at 689-690, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (dissenting opinion)—simply expressed a classic formulation of intermediate scrutiny in a slightly different way, see *Clark v. Jeter, 486 U. S. 456, 461, 108 S. Ct. 1910, 100 L. Ed. 2d 465 (1988)* (asking whether the challenged law is "substantially related to an important government objective"). In fact, JUSTICE BREYER all but admitted that his *Heller* dissent advocated for intermediate scrutiny by repeatedly invoking a quintessential intermediate scrutiny precedent. **[*29]** See *Heller, 554 U. S., at 690, 696, 704-705, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (citing *Turner Broadcasting System, Inc. v. FCC, 520 U. S. 180, 117 S. Ct. 1174, 137 L. Ed. 2d 369 (1997)*). Thus, when *Heller* expressly rejected that dissent's "interest-balancing inquiry," *554 U. S., at 634, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (internal quotation marks omitted), it necessarily rejected intermediate scrutiny.[5]

In sum, the Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny. *HN11*[↑] We reiterate that the standard for applying the *Second Amendment* is as follows: When the *Second Amendment*'s plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the *Second Amendment*'s "unqualified command." *Konigsberg, 366 U. S., at 50, n. 10, 81 S. Ct. 997, 6 L. Ed. 2d 105*.

C

This *Second Amendment* standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the *First Amendment*, to which *Heller* repeatedly compared the right to keep and bear arms. *554 U. S., at 582, 595, 606, 618, 634-635, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. In that context, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entertainment Group, Inc., 529 U. S. 803, 816, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000)*; see also *Philadelphia Newspapers, Inc. v. Hepps, 475 U. S. 767, 777, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986)*. In some cases, that burden includes showing whether the expressive conduct falls outside of the category of protected **[*30]** speech. See *Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U. S. 600, 620, n. 9, 123 S. Ct. 1829, 155 L. Ed. 2d 793 (2003)*. And to carry that burden, the government must generally point to *historical* evidence about the reach of the *First Amendment*'s protections. See, *e.g.*, *United States v. Stevens, 559 U. S. 460, 468-471, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010)* (placing the burden on the government to show that a type of speech belongs to a "historic and traditional categor[y]" of constitutionally unprotected speech "long familiar to the bar" (internal quotation marks omitted)).

And beyond the freedom of speech, our focus on history also comports with how we assess many other constitutional claims. If a litigant asserts the right in

---

[5] The dissent asserts that we misread *Heller* to eschew means-end scrutiny because *Heller* mentioned that the District of Columbia's handgun ban "would fail constitutional muster" "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Heller, 554 U. S., at 628-629, 128 S. Ct. 2783, 171 L. Ed. 2d 637*; see *post*, at 23 (opinion of BREYER, J.). But *Heller*'s passing observation that the District's ban would fail under any heightened "standar[d] of scrutiny" did not supplant *Heller*'s focus on constitutional text and history. Rather, *Heller*'s comment "was more of a gilding-the-lily observation about the extreme nature of D.C.'s law," *Heller v. District of Columbia, 670 F. 3d 1244, 1277, 399 U.S. App. D.C. 314 (CADC 2011)* (Kavanaugh, J., dissenting), than a reflection of *Heller*'s methodology or holding.

2022 U.S. LEXIS 3055, *30

court to "be confronted with the witnesses against him," *U. S. Const., Amdt. 6*, we require courts to consult history to determine the scope of that right. See, *e.g.*, *Giles v. California, 554 U. S. 353, 358, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008)* ("admitting only those exceptions [to the *Confrontation Clause*] established at the time of the founding" (internal quotation marks omitted)). Similarly, when a litigant claims a violation of his rights under the *Establishment Clause*, Members of this Court "loo[k] to history for guidance." *American Legion v. American Humanist Assn., 588 U. S. ___, ___, 139 S. Ct. 2067, 2087, 204 L. Ed. 2d 452 (2019)* (plurality opinion). We adopt a similar approach here.

*HN12*[↑] To be sure, "[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *McDonald, 561 U. S., at 803-804, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (Scalia, J., [*31] concurring). But reliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to "make difficult empirical judgments" about "the costs and benefits of firearms restrictions," especially given their "lack [of] expertise" in the field. *Id., at 790-791, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (plurality opinion).[6]

If the last decade of *Second Amendment* litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. But while that judicial deference to

---

[6] The dissent claims that *Heller*'s text-and-history test will prove unworkable compared to means-end scrutiny in part because judges are relatively ill equipped to "resolv[e] difficult historical questions" or engage in "searching historical surveys." *Post*, at 26, 30. We are unpersuaded. *HN13*[↑] The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That "legal inquiry is a refined subset" of a broader "historical inquiry," and it relies on "various evidentiary principles and default rules" to resolve uncertainties. W. Baude & S. Sachs, Originalism and the Law of the Past, 37 L. & Hist. Rev. 809, 810-811 (2019). For example, "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith, 590 U. S. ___, ___, 140 S. Ct. 1575, 1579, 206 L. Ed. 2d 866 (2020)*. Courts are thus entitled to decide a case based on the historical record compiled by the parties.

legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. *HN14*[↑] The *Second Amendment* "is the very *product* of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller, 554 U. S., at 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.

## D

*HN15*[↑] The test that we set forth in *Heller* and apply today requires courts [*32] to assess whether modern firearms regulations are consistent with the *Second Amendment's* text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the *Second Amendment*. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Heller* itself exemplifies this kind of straightforward historical inquiry. One of the District's regulations challenged in *Heller* "totally ban[ned] handgun possession in the home." *Id., at 628, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. The District in *Heller* addressed a perceived societal problem—firearm violence in densely populated communities—and it employed a regulation—a flat ban on the [*33] possession of handguns in the home—that the Founders themselves could have adopted to confront that problem. Accordingly, after considering "founding-era historical precedent," including "various restrictive laws in the colonial period," and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional. *Id., at 631, 128 S. Ct. 2783, 171 L. Ed. 2d 637*; see also *id., at 634, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (describing the claim that "there were somewhat similar restrictions in the founding period" a "false proposition").

New York's proper-cause requirement concerns the same alleged societal problem addressed in *Heller*: "handgun violence," primarily in "urban area[s]." *Ibid.* Following the course charted by *Heller*, we will consider whether "historical precedent" from before, during, and even after the founding evinces a comparable tradition of regulation. *Id., at 631, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. And, as we explain below, we find no such tradition in the historical materials that respondents and their *amici* have brought to bear on that question. See Part III-B, *infra*.

While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges **[*34]** posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a *Second Amendment*—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland, 17 U.S. 316, 4 Wheat. 316, 415, 4 L. Ed. 579 (1819)* (emphasis deleted). **HN16**[⬆] Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated. See, *e.g.*, *United States v. Jones, 565 U. S. 400, 404-405, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012)* (holding that installation of a tracking device was "a physical intrusion [that] would have been considered a 'search' within the meaning of the *Fourth Amendment* when it was adopted").

We have already recognized in *Heller* at least one way in which the *Second Amendment's* historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." *554 U. S., at 582, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. "**HN17**[⬆] Just as the *First Amendment* protects modern forms of communications, and the *Fourth Amendment* applies to modern forms of search, the *Second Amendment* extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Ibid.* (citations omitted). Thus, even though **[*35]** the *Second Amendment's* definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. Cf. *Caetano v. Massachusetts, 577 U. S. 411, 411-412, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016)* (*per curiam*) (stun guns).

**HN18**[⬆] Much like we use history to determine which modern "arms" are protected by the *Second Amendment*, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." C. Sunstein, On Analogical Reasoning, *106 Harv. L. Rev. 741, 773 (1993)*. And because "[e]verything is similar in infinite ways to everything else," *id., at 774*, one needs "some metric enabling the analogizer to assess which similarities are important and which are not," F. Schauer & B. Spellman, Analogy, Expertise, and Experience, *84 U. Chi. L. Rev. 249, 254 (2017)*. For instance, a green truck and a green hat are relevantly similar if one's metric is "things that are green." See *ibid.* **[*36]** They are not relevantly similar if the applicable metric is "things you can wear."

**HN19**[⬆] While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the *Second Amendment*, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component'* of the *Second Amendment* right." *McDonald, 561 U. S., at 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (quoting *Heller, 554 U. S., at 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637*); see also *id., at 628, 128 S. Ct. 2783, 171 L. Ed. 2d 637* ("the inherent right of self-defense has been central to the *Second Amendment* right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central'*" considerations when engaging in an analogical inquiry. *McDonald, 561 U. S., at 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (quoting *Heller, 554 U. S., at 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637*).[7]

---

[7] This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry. Again, **HN20**[⬆] the *Second Amendment* is the "product of an interest balancing *by the people*," not the evolving product of federal judges. *Heller, 554 U. S., at 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (emphasis altered). Analogical reasoning

HN21[↑] To be clear, analogical reasoning under the *Second Amendment* is neither a regulatory straightjacket nor a regulatory blank check. On one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson, 9 F. 4th 217, 226 (CA3 2021)*. On the other hand, analogical reasoning requires only that the government identify **[*37]** a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *554 U. S., at 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, *13 Charleston L. Rev. 205, 229-236, 244-247 (2018)*; see also Brief for Independent Institute as *Amicus Curiae* 11-17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the *Second Amendment*. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

Although we have no occasion to comprehensively **[*38]** define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is

likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the *Second Amendment* and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. See Part III-B, *infra*. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York **[*39]** City Police Department.

Like *Heller*, we "do not undertake an exhaustive historical analysis . . . of the full scope of the *Second Amendment*." *554 U. S., at 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. And we acknowledge that "applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins." *Heller v. District of Columbia, 670 F. 3d 1244, 1275, 399 U.S. App. D.C. 314 (CADC 2011)* (Kavanaugh, J., dissenting). "But that is hardly unique to the *Second Amendment*. It is an essential component of judicial decisionmaking under our enduring Constitution." *Ibid.* We see no reason why judges frequently tasked with answering these kinds of historical, analogical questions cannot do the same for *Second Amendment* claims.

III

Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement.

A

It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of "the people" whom the *Second Amendment* protects. See *Heller, 554 U. S., at 580, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Nor does any party dispute that handguns are weapons "in common use" today for self-defense. See *id., at 627, 128 S. Ct. 2783, 171 L. Ed. 2d 637*; see also *Caetano, 577 U. S., at 411-412, 136 S. Ct. 1027, 194 L. Ed. 2d 99*. We therefore turn to whether the plain text of the *Second Amendment* protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense.

We have little difficulty concluding that it does. Respondents do not dispute this. See Brief **[*40]** for Respondents 19. Nor could they. HN22[↑] Nothing in

---

requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, and contrary to the dissent's assertion, there is nothing "[i]roni[c]" about that undertaking. *Post*, at 30. It is not an invitation to revise that balance through means-end scrutiny.

2022 U.S. LEXIS 3055, *40

the *Second Amendment's* text draws a home/public distinction with respect to the right to keep and bear arms. As we explained in *Heller*, the "textual elements" of the *Second Amendment's* operative clause— "the right of the people to keep and bear Arms, shall not be infringed"—"guarantee the individual right to possess and carry weapons in case of confrontation." *554 U. S., at 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637. Heller* further confirmed that the right to "bear arms" refers to the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id., at 584, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (quoting *Muscarello v. United States, 524 U. S. 125, 143, 118 S. Ct. 1911, 141 L. Ed. 2d 111 (1998)* (Ginsburg, J., dissenting); internal quotation marks omitted).

This definition of "bear" naturally encompasses public carry. Most gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. Although individuals often "keep" firearms in their home, at the ready for self-defense, most do not "bear" (*i.e.*, carry) them in the home beyond moments of actual confrontation. To confine the right to "bear" arms to the home would nullify half of the *Second Amendment's* operative protections.

Moreover, confining the right **[*41]** to "bear" arms to the home would make little sense given that self-defense is "the *central component* of the [*Second Amendment*] right itself." *Heller, 554 U. S., at 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637;* see also *McDonald, 561 U. S., at 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894. HN23*[🔼] After all, the *Second Amendment* guarantees an "individual right to possess and carry weapons in case of confrontation," *Heller, 554 U. S., at 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637*, and confrontation can surely take place outside the home.

Although we remarked in *Heller* that the need for armed self-defense is perhaps "most acute" in the home, *id., at 628, 128 S. Ct. 2783, 171 L. Ed. 2d 637*, we did not suggest that the need was insignificant elsewhere. Many Americans hazard greater danger outside the home than in it. See *Moore v. Madigan, 702 F. 3d 933, 937 (CA7 2012)* ("[A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower"). The text of the *Second Amendment* reflects that reality.

The *Second Amendment's* plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense.

B

Conceding that the *Second Amendment* guarantees a general right to public carry, contra, *Young, 992 F. 3d, at 813*, respondents instead claim that the Amendment "permits a State to condition handgun carrying in areas 'frequented by the general public' on a showing of a non-speculative need for armed self-defense in those areas," Brief for Respondents 19 (citation omitted).[8] To support **[*42]** that claim, the burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the *Second Amendment*, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct.

Respondents appeal to a variety of historical sources from the late 1200s to the early 1900s. We categorize these periods as follows: (1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries.

---

[8] The dissent claims that we cannot answer the question presented without giving respondents the opportunity to develop an evidentiary record fleshing out "how New York's law is administered in practice, how much discretion licensing officers in New York possess, or whether the proper cause standard differs across counties." *Post*, at 20. We disagree. The dissent does not dispute that any applicant for an unrestricted concealed-carry license in New York can satisfy the proper-cause standard only if he has "' "a special need for self-protection distinguishable from that of the general community." '" *Post*, at 13 (quoting *Kachalsky v. County of Westchester, 701 F. 3d 81, 86 (CA2 2012)*). *HN24*[🔼] And in light of the text of the *Second Amendment*, along with the Nation's history of firearm regulation, we conclude below that a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense. See *infra*, at 62. That conclusion does not depend upon any of the factual questions raised by the dissent. Nash and Koch allege that they were denied unrestricted licenses because they had not "demonstrate[d] a special need for self-defense that distinguished [them] from the general public." App. 123, 125. If those allegations are proven true, then it simply does not matter whether licensing officers have applied the proper-cause standard differently to other concealed-carry license applicants; Nash's and Koch's constitutional rights to bear arms in public for self-defense were still violated.

2022 U.S. LEXIS 3055, *42

We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal. "*HN25*[↑]] Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Heller, 554 U. S., at 634-635, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (emphasis added). The *Second Amendment* was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for **[\*43]** courts to "reac[h] back to the 14th century" for English practices that "prevailed up to the 'period immediately before and after the framing of the Constitution.'" *Sprint Communications Co. v. APCC Services, Inc., 554 U. S. 269, 311, 128 S. Ct. 2531, 171 L. Ed. 2d 424 (2008)* (ROBERTS, C. J., dissenting). It is quite another to rely on an "ancient" practice that had become "obsolete in England at the time of the adoption of the Constitution" and never "was acted upon or accepted in the colonies." *Dimick v. Schiedt, 293 U. S. 474, 477, 55 S. Ct. 296, 79 L. Ed. 603 (1935)*.

*HN26*[↑]] As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law rights. The common law, of course, developed over time. *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U. S. 519, 533, n. 28, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*; see also *Rogers v. Tennessee, 532 U. S. 451, 461, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001)*. And English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution. Even "the words of *Magna Charta*"—foundational as they were to the rights of America's forefathers—"stood for very different things at the time of the separation of the American Colonies from what they represented originally" in 1215. *Hurtado v. California, 110 U. S. 516, 529, 4 S. Ct. 111, 28 L. Ed. 232 (1884)*. Sometimes, in interpreting our own Constitution, "it [is] better not to go too far back into antiquity for the best securities of our liberties," *Funk v. United States, 290 U. S. 371, 382, 54 S. Ct. 212, 78 L. Ed. 369 (1933)*, unless evidence shows that medieval law survived to become our Founders' law. A **[\*44]** long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice.

Similarly, we must also guard against giving postenactment history more weight than it can rightly bear. It is true that in *Heller* we reiterated that evidence

of "how the *Second Amendment* was interpreted from immediately after its ratification through the end of the 19th century" represented a "critical tool of constitutional interpretation." *554 U. S., at 605, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. We therefore examined "a variety of legal and other sources to determine *the public understanding* of [the *Second Amendment*] after its . . . ratification." *Ibid*. And, in other contexts, we have explained that "'a regular course of practice' can 'liquidate & settle the meaning of ' disputed or indeterminate 'terms & phrases'" in the Constitution. *Chiafalo v. Washington, 591 U. S. ___, ___, 140 S. Ct. 2316, 2326, 207 L. Ed. 2d 761 (2020)* (quoting Letter from J. Madison to S. Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908)); see also, *e.g.*, *Houston Community College System v. Wilson, 595 U. S. ___, ___, 142 S. Ct. 1253, 212 L. Ed. 2d 303 (2022)* (slip op., at 5) (same); The Federalist No. 37, p. 229 (C. Rossiter ed. 1961) (J. Madison); see generally C. Nelson, *Stare Decisis* and Demonstrably Erroneous Precedents, *87 Va. L. Rev. 1, 10-21 (2001)*; W. Baude, Constitutional Liquidation, *71 Stan. L. Rev. 1 (2019)*. *HN27*[↑]] In other **[\*45]** words, we recognize that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *NLRB v. Noel Canning, 573 U. S. 513, 572, 134 S. Ct. 2550, 189 L. Ed. 2d 538 (2014)* (Scalia, J., concurring in judgment); see also *Myers v. United States, 272 U. S. 52, 174, 47 S. Ct. 21, 71 L. Ed. 160 (1926)*; *Printz v. United States, 521 U. S. 898, 905, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997)*.

But *HN28*[↑]] to the extent later history contradicts what the text says, the text controls. "'[L]iquidating' indeterminacies in written laws is far removed from expanding or altering them." *Gamble v. United States, 587 U. S. ___, ___, 139 S. Ct. 1960, 1987, 204 L. Ed. 2d 322 (2019)* (THOMAS, J., concurring); see also Letter from J. Madison to N. Trist (Dec. 1831), in 9 Writings of James Madison 477 (G. Hunt ed. 1910). Thus, "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Heller, 670 F. 3d, at 1274, n. 6* (Kavanaugh, J., dissenting); see also *Espinoza v. Montana Dept. of Revenue, 591 U. S. ___, ___, 140 S. Ct. 2246, 207 L. Ed. 2d 679 (2020)* (slip op., at 15).

As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms "took place 75 years after the ratification of the *Second*

*Amendment*, they do not provide as much insight into its original meaning as earlier sources." *554 U. S., at 614, 128 S. Ct. 2783, 171 L. Ed. 2d 637*; cf. *Sprint Communications Co., 554 U. S., at 312, 128 S. Ct. 2531, 171 L. Ed. 2d 424* (ROBERTS, C. J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late **[*46]** to provide insight into the meaning of [the Constitution in 1787]"). And we made clear in *Gamble* that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the *Second Amendment* and state constitutions." *Gamble, 587 U. S., at ___, 139 S. Ct. 1960, 1976, 204 L. Ed. 2d 322* (majority opinion) (slip op., at 23). In other words, this 19th-century evidence was "treated as mere confirmation of what the Court thought had already been established." *Ibid.*

**HN29**[⬆] A final word on historical method: Strictly speaking, New York is bound to respect the right to keep and bear arms because of the *Fourteenth Amendment*, not the Second. See, *e.g.*, *Barron ex rel. Tiernan v. Mayor of Baltimore, 32 U. S. 243, 7 Pet. 243, 250-251, 8 L. Ed. 672 (1833)* (*Bill of Rights* applies only to the Federal Government). Nonetheless, we have made clear that individual rights enumerated in the *Bill of Rights* and made applicable against the States through the *Fourteenth Amendment* have the same scope as against the Federal Government. See, *e.g.*, *Ramos v. Louisiana, 590 U. S. ___, ___, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020)* (slip op., at 7); *Timbs v. Indiana, 586 U. S. ___, ___ - ___, 139 S. Ct. 682, 203 L. Ed. 2d 11 (2019)* (slip op., at 2-3); *Malloy v. Hogan, 378 U. S. 1, 10-11, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)*. And we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the *Bill of Rights* was adopted in 1791. See, *e.g.*, *Crawford v. Washington, 541 U. S. 36, 42-50, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)* (*Sixth Amendment*); *Virginia v. Moore, 553 U. S. 164, 168-169, 128 S. Ct. 1598, 170 L. Ed. 2d 559 (2008)* (*Fourth Amendment*); *Nevada Comm'n on Ethics v. Carrigan, 564 U. S. 117, 122-125, 131 S. Ct. 2343, 180 L. Ed. 2d 150 (2011)* (*First Amendment*).

We also acknowledge that there is an ongoing **[*47]** scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the *Fourteenth Amendment* was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). See, *e.g.*, A.

Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the *Bill of Rights*: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=37 66917 ("When the people adopted the *Fourteenth Amendment* into existence, they readopted the original *Bill of Rights*, and did so in a manner that invested those original 1791 texts with new 1868 meanings"). We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry.

\*\*\*

With these principles in mind, we turn to respondents' historical evidence. Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under **[*48]** which one could not carry arms. But apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense. Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense.[9] We conclude that

_____

[9] To be clear, **HN30**[⬆] nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake v. Filko, 724 F. 3d 426, 442 (CA3 2013)* (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their *Second Amendment* right to public carry. *District of Columbia v. Heller, 554 U. S. 570, 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." *Ibid.* And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth v. Birmingham, 394 U. S. 147, 151, 89 S. Ct. 935, 22 L. Ed. 2d 162 (1969)*, rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut, 310 U. S. 296, 305, 60 S. Ct. 900, 84 L. Ed. 1213 (1940)*—features that typify proper-cause standards like New York's. That said, because any

respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement. Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional.

1

Respondents' substantial reliance on English history and custom before the founding makes some sense given our statement in *Heller* that the *Second Amendment* "codified a right 'inherited from our English ancestors.'" *554 U. S., at 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (quoting *Robertson v. Baldwin, 165 U. S. 275, 281, 17 S. Ct. 326, 41 L. Ed. 715 (1897)*); see also *Smith v. Alabama, 124 U. S. 465, 478, 8 S. Ct. 564, 31 L. Ed. 508 (1888)*. *HN31*[↑] But this Court has long cautioned that the English common law "is not to be taken in all respects to be that of America." *Van Ness v. Pacard, 27 U.S. 137, 2 Pet. 137, 144, 7 L. Ed. 374 (1829)* (Story, J., for the Court); see also *Wheaton v. Peters, 33 U.S. 591, 8 Pet. 591, 659, 8 L. Ed. 1055 (1834)*; *Funk, 290 U. S., at 384, 54 S. Ct. 212, 78 L. Ed. 369*. Thus, "[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument [*49] was framed and adopted*," not as they existed in the Middle Ages. *Ex parte Grossman, 267 U. S. 87, 108-109, 45 S. Ct. 332, 69 L. Ed. 527 (1925)* (emphasis added); see also *United States v. Reid, 53 U.S. 361, 12 How. 361, 363, 13 L. Ed. 1023 (1852)*.

We interpret the English history that respondents and the United States muster in light of these interpretive principles. We find that history ambiguous at best and see little reason to think that the Framers would have thought it applicable in the New World. It is not sufficiently probative to defend New York's proper-cause requirement.

To begin, respondents and their *amici* point to several medieval English regulations from as early as 1285 that they say indicate a longstanding tradition of restricting the public carry of firearms. See 13 Edw. 1, 102. The most prominent is the 1328 Statute of Northampton (or Statute), passed shortly after Edward II was deposed by force of arms and his son, Edward III, took the throne of a kingdom where "tendency to turmoil and rebellion was

everywhere apparent throughout the realm." N. Trenholme, The Risings in the English Monastic Towns in 1327, 6 Am. Hist. Rev. 650, 651 (1901). At the time, "[b]ands of malefactors, knights as well as those of lesser degree, harried the country, committing assaults and murders," prompted by a more general "spirit of insubordination" that led to a "decay [*50] in English national life." K. Vickers, England in the Later Middle Ages 107 (1926).

The Statute of Northampton was, in part, "a product of . . . the acute disorder that still plagued England." A. Verduyn, The Politics of Law and Order During the Early Years of Edward III, 108 Eng. Hist. Rev. 842, 850 (1993). It provided that, with some exceptions, Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." 2 Edw. 3 c. 3 (1328).

Respondents argue that the prohibition on "rid[ing]" or "go[ing] . . . armed" was a sweeping restriction on public carry of self-defense weapons that would ultimately be adopted in Colonial America and justify onerous public-carry regulations. Notwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the *Second Amendment* adopted in 1791. The Statute of Northampton [*51] was enacted nearly 20 years before the Black Death, more than 200 years before the birth of Shakespeare, more than 350 years before the Salem Witch Trials, more than 450 years before the ratification of the Constitution, and nearly 550 years before the adoption of the *Fourteenth Amendment*.

The Statute's prohibition on going or riding "armed" obviously did not contemplate handguns, given they did not appear in Europe until about the mid-1500s. See K. Chase, Firearms: A Global History to 1700, p. 61 (2003). Rather, it appears to have been centrally concerned with the wearing of armor. See, *e.g.*, Calendar of the Close Rolls, Edward III, 1330-1333, p. 131 (Apr. 3, 1330) (H. Maxwell-Lyte ed. 1898); *id.*, at 243 (May 28, 1331); *id.*, Edward III, 1327-1330, at 314 (Aug. 29, 1328) (1896). If it did apply beyond armor, it applied to such weapons as the "launcegay," a 10- to 12-foot-long lightweight lance. See 7 Rich. 2 c. 13 (1383); 20 Rich. 2 c. 1 (1396).

---

permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

2022 U.S. LEXIS 3055, *51

The Statute's apparent focus on armor and, perhaps, weapons like launcegays makes sense given that armor and lances were generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace. [*52] See, *e.g.*, Calendar of the Close Rolls, Edward III, 1327-1330, at 402 (July 7, 1328); *id.*, Edward III, 1333-1337, at 695 (Aug. 18, 1336) (1898). Contrast these arms with daggers. In the medieval period, "[a]lmost everyone carried a knife or a dagger in his belt." H. Peterson, Daggers and Fighting Knives of the Western World 12 (2001). While these knives were used by knights in warfare, "[c]ivilians wore them for self-protection," among other things. *Ibid.* Respondents point to no evidence suggesting the Statute applied to the smaller medieval weapons that strike us as most analogous to modern handguns.

When handguns were introduced in England during the Tudor and early Stuart eras, they did prompt royal efforts at suppression. For example, Henry VIII issued several proclamations decrying the proliferation of handguns, and Parliament passed several statutes restricting their possession. See, *e.g.*, 6 Hen. 8 c. 13, §1 (1514); 25 Hen. 8 c. 17, §1 (1533); 33 Hen. 8 c. 6 (1541); Prohibiting Use of Handguns and Crossbows (Jan. 1537), in 1 Tudor Royal Proclamations 249 (P. Hughes & J. Larkin eds. 1964). But Henry VIII's displeasure with handguns arose not primarily from concerns about their safety but rather their inefficacy. Henry VIII worried [*53] that handguns threatened Englishmen's proficiency with the longbow—a weapon many believed was crucial to English military victories in the 1300s and 1400s, including the legendary English victories at Crécy and Agincourt. See R. Payne-Gallwey, The Crossbow 32, 34 (1903); L. Schwoerer, Gun Culture in Early Modern England 54 (2016) (Schwoerer).

Similarly, James I considered small handguns—called dags—"utterly unserviceable for defence, Militarie practise, or other lawful use." A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols (R. Barker printer 1616). But, in any event, James I's proclamation in 1616 "was the last one regarding civilians carrying dags," Schwoerer 63. "After this the question faded without explanation." *Ibid.* So, by the time Englishmen began to arrive in America in the early 1600s, the public carry of handguns was no longer widely proscribed.

When we look to the latter half of the 17th century, respondents' case only weakens. As in *Heller*, we

consider this history "[b]etween the [Stuart] Restoration [in 1660] and the Glorious Revolution [in 1688]" to be particularly instructive. *554 U. S., at 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. During that time, the Stuart Kings Charles II and James II ramped up efforts [*54] to disarm their political opponents, an experience that "caused Englishmen . . . to be jealous of their arms." *Id., at 593, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

In one notable example, the government charged Sir John Knight, a prominent detractor of James II, with violating the Statute of Northampton because he allegedly "did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects." *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686). Chief Justice Holt explained that the Statute of Northampton had "almost gone in *desuetudinem*," *Rex* v. *Sir John Knight*, 1 Comb. 38, 38-39, 90 Eng. Rep. 330 (K. B. 1686), meaning that the Statute had largely become obsolete through disuse.[10] And the Chief Justice further

---

[10] Another medieval firearm restriction—a 1541 statute enacted under Henry VIII that limited the ownership and use of handguns (which could not be shorter than a yard) to those subjects with annual property values of at least £100, see 33 Hen. 8 c. 6, §§1-2—fell into a similar obsolescence. As far as we can discern, the last recorded prosecutions under the 1541 statute occurred in 1693, neither of which appears to have been successful. See *King and Queen* v. *Bullock*, 4 Mod. 147, 87 Eng. Rep. 315 (K. B. 1693); *King* v. *Litten*, 1 Shower, K. B. 367, 89 Eng. Rep. 644 (K. B. 1693). It seems that other prosecutions under the 1541 statute during the late 1600s were similarly unsuccessful. See *King* v. *Silcot*, 3 Mod. 280, 280-281, 87 Eng. Rep. 186 (K. B. 1690); *King* v. *Lewellin*, 1 Shower, K. B. 48, 89 Eng. Rep. 440 (K. B. 1689); cf. *King and Queen* v. *Alsop*, 4 Mod. 49, 50-51, 87 Eng. Rep. 256, 256-257 (K. B. 1691). By the late 1700s, it was widely recognized that the 1541 statute was "obsolete." 2 R. Burn, The Justice of the Peace, and Parish Officer 243, n. (11th ed. 1769); see also, *e.g.*, The Farmer's Lawyer 143 (1774) ("entirely obsolete"); 1 G. Jacob, Game-Laws II, Law-Dictionary (T. Tomlins ed. 1797); 2 R. Burn, The Justice of the Peace, and Parish Officer 409 (18th ed. 1797) (calling the 1541 statute "a matter more of curiosity than use").

In any event, lest one be tempted to put much evidentiary weight on the 1541 statute, it impeded not only public carry, but further made it unlawful for those without sufficient means to "kepe in his or their houses" any "handgun." 33 Hen. 8 c. 6, §1. Of course, this kind of limitation is inconsistent with *Heller*'s historical analysis regarding the *Second Amendment's* meaning at the founding and thereafter. So, even if a severe

explained that the act of "go[ing] armed *to terrify* the King's subjects" was "a great offence at the *common law*" and that the Statute of Northampton "is but an affirmance of that law." 3 Mod., at 118, 87 Eng. Rep., at 76 (first emphasis added). Thus, one's conduct "will come within the Act,"—*i.e.*, would terrify the King's subjects—only "where the crime shall appear to be malo animo," 1 Comb., at 39, 90 Eng. Rep., at 330, with evil intent or malice. Knight was ultimately acquitted **[\*55]** by the jury.[11]

Just three years later, Parliament responded by writing the "predecessor to our *Second Amendment*" into the 1689 English *Bill of Rights*, *Heller, 554 U. S., at 593, 128 S. Ct. 2783, 171 L. Ed. 2d 637*, guaranteeing that "Protestants . . . may have Arms for their Defence suitable to their Conditions, and as allowed by Law," 1 Wm. & Mary c. 2, §7, in 3 Eng. Stat. at Large 417 (1689). Although this right was initially limited—it was restricted to Protestants and held only against the Crown, but not Parliament—it represented a watershed in English history. Englishmen had "never before claimed . . . the right of the individual to arms." Schwoerer 156.[12] And as that individual right matured,

---

restriction on keeping firearms in the home may have seemed appropriate in the mid-1500s, it was not incorporated into the *Second Amendment's* scope. We see little reason why the parts of the 1541 statute that address public carry should not be understood similarly.

We note also that even this otherwise restrictive 1541 statute, which generally prohibited shooting firearms in any city, exempted discharges "for the defence of [one's] p[er]son or house." §4. Apparently, the paramount need for self-defense trumped the Crown's interest in firearm suppression even during the 16th century.

[11] The dissent discounts *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, because it only "arguably" supports the view that an evil-intent requirement attached to the Statute of Northampton by the late 1600s and early 1700s. See *post*, at 37. But again, because the *Second Amendment's* bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the *Second Amendment's* text and historical scope. See *supra*, at 15. To the extent there are multiple plausible interpretations of *Sir John Knight's Case*, we will favor the one that is more consistent with the *Second Amendment's* command.

[12] Even Catholics, who fell beyond the protection of the right to have arms, and who were stripped of all "Arms, Weapons, Gunpowder, [and] Ammunition," were at least allowed to keep "such necessary Weapons as shall be allowed . . . by Order of the Justices of the Peace . . . for the Defence of his House or

---

"by the time of the founding," the right to keep and bear arms was "understood to be an individual right protecting against both public and private violence." *Heller, 554 U. S., at 594, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

To be sure, the Statute of Northampton survived both *Sir John Knight's Case* and the English Bill of Rights, but it was no obstacle to public carry for self-defense in the decades leading to the founding. Serjeant William Hawkins, in his widely read 1716 treatise, confirmed that "no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People." 1 Pleas of the Crown **[\*56]** 136. To illustrate that proposition, Hawkins noted as an example that "Persons of Quality" were "in no Danger of Offending against this Statute by wearing common Weapons" because, in those circumstances, it would be clear that they had no "Intention to commit any Act of Violence or Disturbance of the Peace." *Ibid.*; see also T. Barlow, The Justice of Peace 12 (1745). Respondents do not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people. In fact, the opposite seems to have been true. As time went on, "domestic gun culture [in England] softened" any "terror" that firearms might once have conveyed. Schwoerer 4. Thus, whatever place handguns had in English society during the Tudor and Stuart reigns, by the time we reach the 18th century—and near the founding—they had gained a fairly secure footing in English culture.

At the very least, we cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection.

2

Respondents next point us to **[\*57]** the history of the Colonies and early Republic, but there is little evidence of an early American practice of regulating public carry by the general public. This should come as no surprise—English subjects founded the Colonies at about the time England had itself begun to eliminate restrictions on the ownership and use of handguns.

In the colonial era, respondents point to only three restrictions on public carry. For starters, we doubt that

---

Person." 1 Wm. & Mary c. 15, §4, in 3 Eng. Stat. at Large 399 (1688).

*three* colonial regulations could suffice to show a tradition of public-carry regulation. In any event, even looking at these laws on their own terms, we are not convinced that they regulated public carry akin to the New York law before us.

Two of the statutes were substantively identical. Colonial Massachusetts and New Hampshire both authorized justices of the peace to arrest "all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively . . . by Night or by Day, in Fear or Affray of Their Majesties Liege People." 1692 Mass. Acts and Laws no. 6, pp. 11-12; see 1699 N. H. Acts and Laws ch. 1. Respondents and their *amici* contend that being "armed offensively" meant bearing any offensive weapons, including [*58] firearms. See Brief for Respondents 33. In particular, respondents' *amici* argue that "'offensive'" arms in the 1600s and 1700s were what Blackstone and others referred to as "'dangerous or unusual weapons,'" Brief for Professors of History and Law as *Amici Curiae* 7 (quoting 4 Blackstone, Commentaries, at 148-149), a category that they say included firearms, see also *post*, at 40-42 (BREYER, J., dissenting).

Respondents, their *amici*, and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself. See *supra*, at 34-37. For instance, the Massachusetts statute proscribed "go[ing] armed Offensively . . . in Fear or Affray" of the people, indicating that these laws were modeled after the Statute of Northampton to the extent that the statute would have been understood to limit public carry *in the late 1600s*. Moreover, it makes very little sense to read these statutes as banning the public carry of all firearms just a few years after Chief Justice Holt in *Sir John Knight's Case* indicated that the English common law did not do so.

Regardless, [*59] even if respondents' reading of these colonial statutes were correct, it would still do little to support restrictions on the public carry of handguns *today*. At most, respondents can show that colonial legislatures sometimes prohibited the carrying of "dangerous and unusual weapons"—a fact we already acknowledged in *Heller*. See *554 U. S., at 627, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Drawing from this historical tradition, we explained there that the *Second Amendment* protects only the carrying of weapons that are those "in common use at the time," as opposed to

those that "are highly unusual in society at large." *Ibid.* (internal quotation marks omitted). Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." *Id., at 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

The third statute invoked by respondents was enacted in East New Jersey in 1686. It prohibited the concealed carry [*60] of "pocket pistol[s]" or other "unusual or unlawful weapons," and it further prohibited "planter[s]" from carrying all pistols unless in military service or, if "strangers," when traveling through the Province. An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881) (Grants and Concessions). These restrictions do not meaningfully support respondents. The law restricted only concealed carry, not all public carry, and its restrictions applied only to certain "unusual or unlawful weapons," including "pocket pistol[s]." *Ibid.* It also did not apply to all pistols, let alone all firearms. "Pocket pistols" had barrel lengths of perhaps 3 or 4 inches, far smaller than the 6-inch to 14-inch barrels found on the other belt and hip pistols that were commonly used for lawful purposes in the 1600s. J. George, English Pistols and Revolvers 16 (1938); see also, *e.g.*, 14 Car. 2 c. 3, §20 (1662); H. Peterson, Arms and Armor in Colonial America, 1526-1783, p. 208 (1956) (Peterson). Moreover, the law prohibited only the *concealed* carry of pocket pistols; it presumably did not by its terms touch the open carry of larger, presumably more [*61] common pistols, except as to "planters."[13] In colonial times, a "planter" was simply a farmer or plantation owner who settled new territory. R. Lederer, Colonial American English 175 (1985); New Jersey State Archives, J. Klett, Using the Records of the East and West Jersey Proprietors 31

---

[13] Even assuming that pocket pistols were, as East Jersey in 1686 deemed them, "unusual or unlawful," it appears that they were commonly used at least by the founding. See, *e.g.*, G. Neumann, The History of Weapons of the American Revolution 150-151 (1967); see also H. Hendrick, P. Paradis, & R. Hornick, Human Factors Issues in Handgun Safety and Forensics 44 (2008).

(rev. ed. 2014), https://www.nj.gov/state/archives/pdf/proprietors.pdf. While the reason behind this singular restriction is not entirely clear, planters may have been targeted because colonial-era East New Jersey was riven with "strife and excitement" between planters and the Colony's proprietors "respecting titles to the soil." See W. Whitehead, East Jersey Under the Proprietary Governments 150-151 (rev. 2d ed. 1875); see also T. Gordon, The History of New Jersey 49 (1834).

In any event, we cannot put meaningful weight on this solitary statute. First, although the "planter" restriction may have prohibited the public carry of pistols, it did not prohibit planters from carrying long guns for self-defense—including the popular musket and carbine. See Peterson 41. Second, it does not appear that the statute survived for very long. By 1694, East New Jersey provided that no slave "be permitted to carry **[*62]** any gun or pistol . . . into the woods, or plantations" unless their owner accompanied them. Grants and Concessions 341. If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence. Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey. See 1 Nevill, Acts of the General Assembly of the Province of New-Jersey (1752). At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the *Second Amendment*.

Respondents next direct our attention to three late-18th-century and early-19th-century statutes, but each parallels the colonial statutes already discussed. One 1786 Virginia statute provided that "no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country." Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794).[14] A Massachusetts statute from 1795 commanded justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or **[*63]** go armed offensively, to the fear or terror of the good citizens of this Commonwealth." 1795 Mass. Acts and Laws ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts. And an 1801 Tennessee statute

likewise required any person who would "publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person" to post a surety; otherwise, his continued violation of the law would be "punished as for a breach of the peace, or riot at common law." 1801 Tenn. Acts pp. 260-261.

A by-now-familiar thread runs through these three statutes: They prohibit bearing arms in a way that spreads "fear" or "terror" among the people. As we have already explained, Chief Justice Holt in *Sir John Knight's Case* interpreted this *in Terrorem Populi* element to require something more than merely carrying a firearm in public. See *supra*, at 34-35. Respondents give us no reason to think that the founding generation held a different view. Thus, all told, in the century leading up to the *Second Amendment* and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the *Second Amendment* permitted broad prohibitions on all forms **[*64]** of public carry.

3

Only after the ratification of the *Second Amendment* in 1791 did public-carry restrictions proliferate. Respondents rely heavily on these restrictions, which generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes. None of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime.

*Common-Law Offenses.* As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But as with the earlier periods, there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.

For example, the Tennessee attorney general once charged a defendant with the common-law offense of affray, arguing that the man committed the crime when he "'arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people.'" *Simpson v. State, 13 Tenn. 356, 358 (1833)*. More specifically, the indictment charged that Simpson "with force and arms being arrayed in a warlike manner . . . unlawfully, **[*65]** and to the great terror and disturbance of divers good citizens, did make an affray." *Id., at 361*. The Tennessee Supreme Court quashed the

---

[14] The Virginia statute all but codified the existing common law in this regard. See G. Webb, The Office and Authority of a Justice of Peace 92 (1736) (explaining how a constable "may take away Arms from such who ride, or go, offensively armed, in Terror of the People").

indictment, holding that the Statute of Northampton was never part of Tennessee law. *Id., at 359*. But even assuming that Tennesseans' ancestors brought with them the common law associated with the Statute, the *Simpson* court found that if the Statute had made, as an "independent ground of affray," the mere arming of oneself with firearms, the Tennessee Constitution's *Second Amendment* analogue had "completely abrogated it." *Id., at 360*. At least in light of that constitutional guarantee, the court did not think that it could attribute to the mere carrying of arms "a necessarily consequent operation as terror to the people." *Ibid.*

Perhaps more telling was the North Carolina Supreme Court's decision in *State v. Huntly, 25 N. C. 418 (1843)* (per curiam). Unlike the Tennessee Supreme Court in *Simpson*, the *Huntly* court held that the common-law offense codified by the Statute of Northampton was part of the State's law. See *25 N. C., at 421-422*. However, consistent with the Statute's long-settled interpretation, the North Carolina Supreme Court acknowledged "that the carrying of a gun" for a lawful purpose "*per se* constitutes no offence." *Id., at 422-423*. Only carrying for a "wicked purpose" with **[*66]** a "mischievous result . . . constitute[d a] crime." *Id., at 423*; see also J. Haywood, The Duty and Office of Justices of Peace 10 (1800); H. Potter, The Office and Duties of a Justice of the Peace 39 (1816).[15] Other state courts likewise recognized that the common law did not punish the carrying of deadly weapons *per se*, but only the carrying of such weapons "for the purpose of an affray, and in such manner as to strike terror to the people." *O'Neill v. State, 16 Ala. 65, 67 (1849)*. Therefore, those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so.

---

[15] The dissent concedes that *Huntly, 25 N. C. 418*, recognized that citizens were "'at perfect liberty' to carry for 'lawful purpose[s].'" *Post*, at 42 (quoting *Huntly, 25 N. C., at 423*). But the dissent disputes that such "lawful purpose[s]" included self-defense, because *Huntly* goes on to speak more specifically of carrying arms for "business or amusement." *Id., at 422-423*. This is an unduly stingy interpretation of *Huntly*. In particular, *Huntly* stated that "the citizen is at perfect liberty to carry his gun" "[f]or *any* lawful purpose," of which "business" and "amusement" were then mentioned. *Ibid.* (emphasis added). *Huntly* then contrasted these "lawful purpose[s]" with the "wicked purpose . . . to terrify and alarm." *Ibid.* Because there is no evidence that *Huntly* considered self-defense a "wicked purpose," we think the best reading of *Huntly* would sanction public carry for self-defense, so long as it was not "in such [a] manner as naturally will terrify and alarm." *Id., at 423*.

*Statutory Prohibitions.* In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. As we recognized in *Heller*, "the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the *Second Amendment* or state analogues." *554 U. S., at 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Respondents unsurprisingly cite these statutes[16]—and decisions upholding them[17]—as evidence that States were historically free to ban public carry.

In fact, however, the history reveals a consensus that States could *not* ban public carry altogether. Respondents' cited opinions **[*67]** agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry. That was true in Alabama. See *State v. Reid, 1 Ala. 612, 616, 619-621 (1840)*.[18] It was also true in Louisiana. See *State v. Chandler, 5 La. 489, 490 (1850)*.[19] Kentucky,

---

[16] Beginning in 1813 with Kentucky, six States (five of which were in the South) enacted laws prohibiting the concealed carry of pistols by 1846. See 1813 Ky. Acts §1, p. 100; 1813 La. Acts p. 172; 1820 Ind. Acts p. 39; Ark. Rev. Stat. §13, p. 280 (1838); 1838 Va. Acts ch. 101, §1, p. 76; 1839 Ala. Acts no. 77, §1. During this period, Georgia enacted a law that appeared to prohibit both concealed and open carry, see 1837 Ga. Acts §§1, 4, p. 90, but the Georgia Supreme Court later held that the prohibition could not extend to open carry consistent with the *Second Amendment*. See *infra*, at 45-46. Between 1846 and 1859, only one other State, Ohio, joined this group. 1859 Ohio Laws §1, p. 56. Tennessee, meanwhile, enacted in 1821 a broader law that prohibited carrying, among other things, "belt or pocket pistols, either public or private," except while traveling. 1821 Tenn. Acts ch. 13, §1, p. 15. And the Territory of Florida prohibited concealed carry during this same timeframe. See 1835 Terr. of Fla. Laws p. 423.

[17] See **State v. Mitchell, 3 Blackf. 229 (Ind. 1833)**; *State v. Reid, 1 Ala. 612, 616 (1840)*; *State v. Buzzard, 4 Ark. 18 (1842)*; *Nunn v. State, 1 Ga. 243 (1846)*; *State v. Chandler, 5 La. 489 (1850)*; *State v. Smith, 11 La. 633 (1856)*; *State v. Jumel, 13 La. 399 (1858)*. But see *Bliss v. Commonwealth, 12 Ky. 90 (1822)*. See generally 2 J. Kent, Commentaries on American Law *340, n. *b.*

[18] See *Reid, 1 Ala., at 619* (holding that "the Legislature cannot inhibit the citizen from bearing arms openly"); *id., at 621* (noting that there was no evidence "tending to show that the defendant could not have defended himself as successfully, by carrying the pistol openly, as by secreting it about his person").

[19] See, *e.g.*, *Chandler, 5 La., at 490* (Louisiana concealed-

2022 U.S. LEXIS 3055, *67

meanwhile, went one step further—the State Supreme Court *invalidated* a concealed-carry prohibition. See *Bliss v. Commonwealth, 12 Ky. 90 (1822)*.[20]

The Georgia Supreme Court's decision in *Nunn v. State, 1 Ga. 243 (1846)*, is particularly instructive. Georgia's 1837 statute broadly prohibited "wearing" or "carrying" pistols "as arms of offence or defence," without distinguishing between concealed and open carry. 1837 Ga. Acts 90, §1. To the extent the 1837 Act prohibited "carrying certain weapons *secretly*," the court explained, it was "valid." *Nunn, 1 Ga., at 251*. But to the extent the Act also prohibited "bearing arms *openly*," the court went on, it was "in conflict with the Constitutio[n] and *void*." *Ibid.*; see also *Heller, 554 U. S., at 612, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. The Georgia Supreme Court's treatment of the State's general prohibition on the public carriage of handguns indicates that it was considered beyond the constitutional pale in antebellum America to altogether prohibit public carry.

Finally, we agree that Tennessee's prohibition on carrying "publicly or privately" any "belt or pocket pisto[l]," 1821 Tenn. Acts [*68] ch. 13, p. 15, was, on its face, uniquely severe, see *Heller, 554 U. S., at 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. That said, when the Tennessee Supreme Court addressed the constitutionality of a substantively identical successor provision, see 1870 Tenn. Acts ch. 13, §1, p. 28, the court read this language to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would "violat[e] the constitutional right to keep arms." *Andrews v. State, 50*

---

carry prohibition "interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality"); *Smith, 11 La., at 633* (The "arms" described in the *Second Amendment* "are such as are borne by a people in war, or at least carried openly"); *Jumel, 13 La., at 399-400* ("The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only *a particular mode* of bearing arms which is found dangerous to the peace of society").

[20] With respect to Indiana's concealed-carry prohibition, the Indiana Supreme Court's reasons for upholding it are unknown because the court issued a one-sentence *per curiam* order holding the law "not unconstitutional." **Mitchell, 3 Blackf., at 229**. Similarly, the Arkansas Supreme Court upheld Arkansas' prohibition, but without reaching a majority rationale. See *Buzzard, 4 Ark. 18*. The Arkansas Supreme Court would later adopt Tennessee's approach, which tolerated the prohibition of all public carry of handguns except for military-style revolvers. See, *e.g.*, *Fife v. State, 31 Ark. 455 (1876)*.

---

*Tenn. 165, 187 (1871)*; see also *Heller, 554 U. S., at 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (discussing *Andrews*).[21]

All told, these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of "arms" protected by the *Second Amendment* or state analogues.[22]

*Surety Statutes.* In the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public. Although respondents seize on these laws to justify the proper-cause restriction, their reliance on them is misplaced. These laws were not *bans* on public carry, and they typically targeted only those threatening to do harm.

As discussed earlier, Massachusetts had prohibited riding or going "armed offensively, to the fear or terror of the good citizens of this Commonwealth" since 1795. 1795 Mass. Acts and Laws ch. 2, at 436, **[*69]** in Laws of the Commonwealth of Massachusetts. In 1836, Massachusetts enacted a new law providing:

> "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an

---

[21] Shortly after *Andrews, 50 Tenn. 165*, Tennessee codified an exception to the State's handgun ban for "an[y] army pistol, or such as are commonly carried and used in the United States Army" so long as they were carried "openly in [one's] hands." 1871 Tenn. Pub. Acts ch. 90, §1; see also *State v. Wilburn, 66 Tenn. 57, 61-63 (1872)*; *Porter v. State, 66 Tenn. 106, 107-108 (1874)*.

[22] The Territory of New Mexico made it a crime in 1860 to carry "any class of pistols whatever" "concealed or otherwise." 1860 Terr. of N. M. Laws §§1-2, p. 94. This extreme restriction is an outlier statute enacted by a territorial government nearly 70 years after the ratification of the *Bill of Rights*, and its constitutionality was never tested in court. Its value in discerning the original meaning of the *Second Amendment* is insubstantial. Moreover, like many other stringent carry restrictions that were localized in the Western Territories, New Mexico's prohibition ended when the Territory entered the Union as a State in 1911 and guaranteed in its State Constitution that "[t]he people have the right to bear arms for their security and defense, but nothing herein shall be held to permit the carrying of concealed weapons." *N. M. Const., Art. II, §6* (1911); see *infra*, at 61.

injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided." Mass. Rev. Stat., ch. 134, §16.

In short, the Commonwealth required any person who was reasonably likely to "breach the peace," and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm. Between 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law.[23]

Contrary to respondents' position, these "reasonable-cause laws" in no way represented the "direct precursor" to the proper-cause requirement. Brief for Respondents 27. While New York presumes that individuals have *no* public carry right without a showing of heightened need, the surety statutes *presumed* that individuals had **[*70]** a right to public carry that could be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836).[24] As William Rawle explained in an influential treatise, an individual's carrying of arms was "sufficient cause to require him to give surety of the peace" only when "attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them." A View of the Constitution of the United States of America 126 (2d ed. 1829). Then, even on such a showing, the surety laws did not *prohibit* public carry in locations frequented by the general community. Rather, an accused arms-bearer "could go on carrying without criminal penalty" so long as he "post[ed] money that would be forfeited if he breached the peace or injured others—a requirement from which he was exempt if *he* needed self-defense." *Wrenn, 864 F. 3d, at 661.*

Thus, unlike New York's regime, a showing of special need was required only *after* an individual was reasonably accused of intending to injure another or breach the peace. And, even then, proving special need simply avoided a fee rather than a ban. All told,

therefore, "[u]nder surety laws . . . everyone started **[*71]** out with robust carrying rights" and only those reasonably accused were required to show a special need in order to avoid posting a bond. *Ibid.* These antebellum special-need requirements "did not expand carrying for the responsible; it shrank burdens on carrying by the (allegedly) reckless." *Ibid.*

One Court of Appeals has nonetheless remarked that these surety laws were "a severe constraint on anyone thinking of carrying a weapon in public." *Young, 992 F. 3d, at 820.* That contention has little support in the historical record. Respondents cite no evidence showing the average size of surety postings. And given that surety laws were "intended merely for prevention" and were "not meant as any degree of punishment," 4 Blackstone, Commentaries, at 249, the burden these surety statutes may have had on the right to public carry was likely too insignificant to shed light on New York's proper-cause standard—a violation of which can carry a 4-year prison term or a $5,000 fine. In *Heller*, we noted that founding-era laws punishing unlawful discharge "with a small fine and forfeiture of the weapon . . ., not with significant criminal penalties," likely did not "preven[t] a person in the founding era from using a gun to protect **[*72]** himself or his family from violence, or that if he did so the law would be enforced against him." *554 U. S., at 633-634, 128 S. Ct. 2783, 171 L. Ed. 2d 637.* Similarly, we have little reason to think that the hypothetical possibility of posting a bond would have prevented anyone from carrying a firearm for self-defense in the 19th century.

Besides, respondents offer little evidence that authorities ever enforced surety laws. The only recorded case that we know of involved a justice of the peace *declining* to require a surety, even when the complainant alleged that the arms-bearer "'did threaten to beat, wou[n]d, mai[m], and kill'" him. Brief for Professor Robert Leider et al. as *Amici Curiae* 31 (quoting *Grover* v. *Bullock*, No. 185 (Worcester Cty., Aug. 13, 1853)); see E. Ruben & S. Cornell, Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L. J. Forum 121, 130, n. 53 (2015). And one scholar who canvassed 19th-century newspapers—which routinely reported on local judicial matters—found only a handful of other examples in Massachusetts and the District of Columbia, all involving black defendants who may have been targeted for selective or pretextual enforcement. See R. Leider, Constitutional Liquidation, Surety Laws, and the Right To Bear Arms **[*73]** 15-17, in New Histories of Gun Rights and Regulation (J. Blocher, J.

---

[23] See 1838 Terr. of Wis. Stat. §16, p. 381; Me. Rev. Stat., ch. 169, §16 (1840); Mich. Rev. Stat., ch. 162, §16 (1846); 1847 Va. Acts ch. 14, §16; Terr. of Minn. Rev. Stat., ch. 112, §18 (1851); 1854 Ore. Stat. ch. 16, §17, p. 220; D. C. Rev. Code ch. 141, §16 (1857); 1860 Pa. Laws p. 432, §6; W. Va. Code, ch. 153, §8 (1868).

[24] It is true that two of the antebellum surety laws were unusually broad in that they did not expressly require a citizen complaint to trigger the posting of a surety. See 1847 Va. Acts ch. 14, §16; W. Va. Code, ch. 153, §8 (1868).

Charles, & D. Miller eds.) (forthcoming); see also Brief for Professor Robert Leider et al. as *Amici Curiae* 31-32. That is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry. [25]

Respondents also argue that surety statutes were severe restrictions on firearms because the "reasonable cause to fear" standard was essentially *pro forma*, given that "merely carrying firearms in populous areas breached the peace" *per se*. Brief for Respondents 27. But that is a counterintuitive reading of the language that the surety statutes actually used. If the mere carrying of handguns breached the peace, it would be odd to draft a surety statute requiring a complainant to demonstrate "reasonable cause to fear an injury, or breach of the peace," Mass. Rev. Stat., ch. 134, §16, rather than a reasonable likelihood that the arms-bearer carried a covered weapon. After all, if it was the nature of the weapon rather than the manner of carry that was dispositive, then the "reasonable fear" requirement would be redundant.

Moreover, the overlapping scope of surety statutes and criminal statutes suggests that the former **[*74]** were not viewed as substantial restrictions on public carry. For example, when Massachusetts enacted its surety statute in 1836, it reaffirmed its 1794 criminal prohibition on "go[ing] armed offensively, to the terror of the people." Mass. Rev. Stat., ch. 85, §24. And Massachusetts continued to criminalize the carrying of various "dangerous weapons" well after passing the 1836 surety statute. See, *e.g.*, 1850 Mass. Acts ch. 194, §1, p. 401; Mass. Gen. Stat., ch. 164, §10 (1860). Similarly, Virginia had criminalized the concealed carry of pistols since 1838, see 1838 Va. Acts ch. 101, §1, nearly a decade before it enacted its surety statute, see 1847 Va. Acts ch. 14, §16. It is unlikely that these surety statutes constituted a "severe" restraint on public carry, let alone a restriction tantamount to a ban, when they were supplemented by direct criminal prohibitions on specific weapons and methods of carry.

_____

[25] The dissent speculates that the absence of recorded cases involving surety laws may simply "show that these laws were normally followed." *Post*, at 45. Perhaps. But again, the burden rests with the government to establish the relevant tradition of regulation, see *supra*, at 15, and, given all of the other features of surety laws that make them poor analogues to New York's proper-cause standard, we consider the barren record of enforcement to be simply one additional reason to discount their relevance.

To summarize: The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully **[*75]** eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.

None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose.

4

Evidence from around the adoption of the *Fourteenth Amendment* also fails to support respondents' position. For the most part, respondents and the United States ignore the "outpouring of discussion of the [right to keep and bear arms] in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves" after the Civil War. *Heller, 554 U. S., at 614, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden. Nevertheless, we think a short review of the public discourse surrounding Reconstruction is useful in demonstrating how public carry for self-defense remained a central component of the protection that the *Fourteenth Amendment* secured for all citizens.

A short prologue is in order. Even before the Civil War commenced in 1861, this Court indirectly affirmed the importance of **[*76]** the right to keep and bear arms in public. Writing for the Court in *Dred Scott v. Sandford, 60 U.S. 393, 19 How. 393, 15 L. Ed. 691 (1857)*, Chief Justice Taney offered what he thought was a parade of horribles that would result from recognizing that free blacks were citizens of the United States. If blacks were citizens, Taney fretted, they would be entitled to the privileges and immunities of citizens, including the right "to keep and carry arms *wherever they went*." *Id., at 417, 19 How. 393, 15 L. Ed. 691* (emphasis added). Thus, even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks were often denied in antebellum

America.

After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted. This Court has already recounted some of the Southern abuses violating blacks' right to keep and bear arms. See *McDonald, 561 U. S., at 771, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (noting the "systematic efforts" made to disarm blacks); *id., at 845-847, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (THOMAS, J., concurring in part and concurring in judgment); see also S. Exec. Doc. No. 43, 39th Cong., 1st Sess., 8 (1866) ("Pistols, old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of lunatics").

In the years **[*77]** before the 39th Congress proposed the *Fourteenth Amendment*, the Freedmen's Bureau regularly kept it abreast of the dangers to blacks and Union men in the postbellum South. The reports described how blacks used publicly carried weapons to defend themselves and their communities. For example, the Bureau reported that a teacher from a Freedmen's school in Maryland had written to say that, because of attacks on the school, "[b]oth the mayor and sheriff have warned the colored people to go armed to school, (which they do,)" and that the "[t]he superintendent of schools came down and brought [the teacher] a revolver" for his protection. Cong. Globe, 39th Cong., 1st Sess., 658 (1866); see also H. R. Exec. Doc. No. 68, 39th Cong., 2d Sess., 91 (1867) (noting how, during the New Orleans riots, blacks under attack "defended themselves . . . with such pistols as they had").

Witnesses before the Joint Committee on Reconstruction also described the depredations visited on Southern blacks, and the efforts they made to defend themselves. One Virginia music professor related that when "[t]wo Union men were attacked . . . they drew their revolvers and held their assailants at bay." H. R. Rep. No. 30, 39th Cong., 1st Sess., **[*78]** pt. 2, p. 110 (1866). An assistant commissioner to the Bureau from Alabama similarly reported that men were "robbing and disarming negroes upon the highway," H. R. Exec. Doc. No. 70, 39th Cong., 1st Sess., 297 (1866), indicating that blacks indeed carried arms publicly for their self-protection, even if not always with success. See also H. R. Exec. Doc. No. 329, 40th Cong., 2d Sess., 41 (1868) (describing a Ku Klux Klan outfit that rode "through the country . . . robbing every one they come across of money, pistols, papers, &c."); *id.*, at 36 (noting how a black man in Tennessee had been murdered on his way to get book subscriptions, with the murderer taking,

among other things, the man's pistol).

Blacks had "procured great numbers of old army muskets and revolvers, particularly in Texas," and "employed them to protect themselves" with "vigor and audacity." S. Exec. Doc. No. 43, 39th Cong., 1st Sess., at 8. Seeing that government was inadequately protecting them, "there [was] the strongest desire on the part of the freedmen to secure arms, revolvers particularly." H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 3, at 102.

On July 6, 1868, Congress extended the 1866 Freedmen's Bureau Act, **[*79]** see *15 Stat. 83*, and reaffirmed that freedmen were entitled to the "full and equal benefit of all laws and proceedings concerning personal liberty [and] personal security . . . *including the constitutional right to keep and bear arms.*" §14, 14 Stat. 176 (1866) (emphasis added). That same day, a Bureau official reported that freedmen in Kentucky and Tennessee were still constantly under threat: "No Union man or negro who attempts to take any active part in politics, or the improvement of his race, is safe a single day; and nearly all sleep upon their arms at night, and carry concealed weapons during the day." H. R. Exec. Doc. No. 329, 40th Cong., 2d Sess., at 40.

Of course, even during Reconstruction the right to keep and bear arms had limits. But those limits were consistent with a right of the public to peaceably carry handguns for self-defense. For instance, when General D. E. Sickles issued a decree in 1866 pre-empting South Carolina's Black Codes—which prohibited firearm possession by blacks—he stated: "The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons. . **[*80]** . . And no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess., at 908-909; see also *McDonald, 561 U. S., at 847-848, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (opinion of THOMAS, J.).[26] Around the same time, the editors of The

_____

[26] Respondents invoke General Orders No. 10, which covered the Second Military District (North and South Carolina), and provided that "[t]he practice of carrying deadly weapons, except by officers and soldiers in the military service of the United States, is prohibited." Headquarters Second Military Dist., Gen. Orders No. 10 (Charleston, S. C., Apr. 11, 1867), in S. Exec. Doc. No. 14, 40th Cong., 1st Sess., 64 (1867). We put little weight on this categorical restriction given that the order also specified that a violation of this prohibition would

Loyal Georgian, a prominent black-owned newspaper, were asked by "A Colored Citizen" whether "colored persons [have] a right to own and carry fire arms." The editors responded that blacks had "the *same* right to own and carry fire arms that *other* citizens have." The Loyal Georgian, Feb. 3, 1866, p. 3, col. 4. And, borrowing language from a Freedmen's Bureau circular, the editors maintained that "[a]ny person, white or black, may be disarmed if convicted of making an improper or dangerous use of weapons," even though "no military or civil officer has the right or authority to disarm any class of people, thereby placing them at the mercy of others." *Ibid.* (quoting Circular No. 5, Freedmen's Bureau, Dec. 22, 1865); see also *McDonald, 561 U. S., at 848-849, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (opinion of THOMAS, J.).[27]

As for Reconstruction-era state regulations, there was little innovation over the kinds of public-carry restrictions that had been commonplace in the early 19th century. For instance, South Carolina in 1870 authorized [*81] the arrest of "all who go armed offensively, to the terror of the people," 1870 S. C. Acts p. 403, no. 288, §4, parroting earlier statutes that codified the common-law offense. That same year, after it cleaved from Virginia, West Virginia enacted a surety statute nearly identical to the one it inherited from Virginia. See W. Va. Code, ch. 153, §8. Also in 1870, Tennessee essentially reenacted its 1821 prohibition on the public carry of handguns but, as explained above, Tennessee courts interpreted that statute to exempt large pistols suitable for military use. See *supra*, at 46.

Respondents and the United States, however, direct our attention primarily to two late-19th-century cases in Texas. In 1871, Texas law forbade anyone from

---

"render the offender amenable to trial and punishment by military commission," *ibid.*, rather than a jury otherwise guaranteed by the Constitution. There is thus little indication that these military dictates were designed to align with the Constitution's usual application during times of peace.

[27] That said, Southern prohibitions on concealed carry were not always applied equally, even when under federal scrutiny. One lieutenant posted in Saint Augustine, Florida, remarked how local enforcement of concealed-carry laws discriminated against blacks: "To sentence a negro to several dollars' fine for carrying a revolver concealed upon his person, is in accordance with an ordinance of the town; but still the question naturally arises in my mind, 'Why is this poor fellow fined for an offence which is committed hourly by every other white man I meet in the streets?'" H. R. Exec. Doc. No. 57, 40th Cong., 2d Sess., 83 (1867); see also H. R. Rep. No. 16, 39th Cong., 2d Sess., 427 (1867).

"carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person." 1871 Tex. Gen. Laws §1. The Texas Supreme Court upheld that restriction in *English v. State, 35 Tex. 473 (1871)*. The Court reasoned that the *Second Amendment*, and the State's constitutional analogue, protected only those arms "as are useful and proper to an armed militia," including holster pistols, but not other kinds of handguns. *Id., at 474-475*. Beyond that constitutional holding, the *English* court further opined that the law was not "contrary to public policy," *id., at 479*, given that [*82] it "ma[de] all necessary exceptions" allowing deadly weapons to "be carried as means of self-defense," and therefore "fully cover[ed] all wants of society," *id., at 477*.

Four years later, in *State v. Duke, 42 Tex. 455 (1875)*, the Texas Supreme Court modified its analysis. The court reinterpreted Texas' State Constitution to protect not only military-style weapons but rather all arms "as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense." *Id., at 458*. On that understanding, the court recognized that, in addition to "holster pistol[s]," the right to bear arms covered the carry of "such pistols at least as are not adapted to being carried concealed." *Id., at 458-459*. Nonetheless, after expanding the scope of firearms that warranted state constitutional protection, *Duke* held that requiring any pistol-bearer to have "'reasonable grounds fearing an unlawful attack on [one's] person'" was a "legitimate and highly proper" regulation of handgun carriage. *Id., at 456, 459-460*. *Duke* thus concluded that the 1871 statute "appear[ed] to have respected the right to carry a pistol openly when needed for self-defense." *Id., at 459*.

We acknowledge that the Texas cases support New York's proper-cause requirement, which one can analogize to Texas' [*83] "reasonable grounds" standard. But the Texas statute, and the rationales set forth in *English* and *Duke*, are outliers. In fact, only one other State, West Virginia, adopted a similar public-carry statute before 1900. See W. Va. Code, ch. 148, §7 (1887). The West Virginia Supreme Court upheld that prohibition, reasoning that *no* handguns of any kind were protected by the *Second Amendment*, a rationale endorsed by no other court during this period. See *State v. Workman, 35 W. Va. 367, 371-374, 14 S. E. 9, 11 (1891)*. The Texas decisions therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public.

In the end, while we recognize the support that

postbellum Texas provides for respondents' view, we will not give disproportionate weight to a single state statute and a pair of state-court decisions. *HN32*[🔼] As in *Heller*, we will not "stake our interpretation of the *Second Amendment* upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense" in public. *554 U. S., at 632, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

5

Finally, respondents point to the slight uptick in gun regulation during the late-19th century—principally in the Western Territories. As we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning **[*84]** of the *Second Amendment* when it contradicts earlier evidence. See *id., at 614, 128 S. Ct. 2783, 171 L. Ed. 2d 637; supra, at 28*.[28] Here, moreover, respondents' reliance on late-19th-century laws has several serious flaws even beyond their temporal distance from the founding.

The vast majority of the statutes that respondents invoke come from the Western Territories. Two Territories prohibited the carry of pistols in towns, cities, and villages, but seemingly permitted the carry of rifles and other long guns everywhere. See 1889 Ariz. Terr. Sess. Laws no. 13, §1, p. 16; 1869 N. M. Laws ch. 32, §§1-2, p. 72.[29] Two others prohibited the carry of *all* firearms in towns, cities, and villages, including long guns. See 1875 Wyo. Terr. Sess. Laws ch. 52, §1; 1889 Idaho Terr. Gen. Laws §1, p. 23. And one Territory completely prohibited public carry of pistols *everywhere*, but allowed the carry of "shot-guns or rifles" for certain purposes. See 1890 Okla. Terr. Stats., Art. 47, §§1-2, 5, p. 495.

These territorial restrictions fail to justify New York's

proper-cause requirement for several reasons. First, the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry. For starters, "[t]he very transitional and temporary character of the American [territorial] **[*85]** system" often "permitted legislative improvisations which might not have been tolerated in a permanent setup." E. Pomeroy, The Territories and the United States 1861-1890, p. 4 (1947). These territorial "legislative improvisations," which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect "the origins and continuing significance of the *Second Amendment*" and we do not consider them "instructive." *Heller, 554 U. S., at 614, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

The exceptional nature of these western restrictions is all the more apparent when one considers the miniscule territorial populations who would have lived under them. To put that point into perspective, one need not look further than the 1890 census. Roughly 62 million people lived in the United States at that time. Arizona, Idaho, New Mexico, Oklahoma, and Wyoming combined to account for only 420,000 of those inhabitants—about two-thirds of 1% of the population. See Dept. of Interior, Compendium of the Eleventh Census: 1890, Part I.-Population 2 (1892). Put simply, these western restrictions were irrelevant to more than 99% of the American population. We have already explained that we will not stake our interpretation of the *Second Amendment* upon a law in effect in a single **[*86]** State, or a single city, "that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms" in public for self-defense. *Heller, 554 U. S., at 632, 128 S. Ct. 2783, 171 L. Ed. 2d 637*; see *supra*, at 57-58. Similarly, we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the *Second Amendment's* adoption, governed less than 1% of the American population, and also "contradic[t] the overwhelming weight" of other, more contemporaneous historical evidence. *Heller, 554 U. S., at 632, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

Second, because these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality. When States generally prohibited both open and concealed carry of handguns in the late-19th century, state courts usually upheld the restrictions when they exempted army revolvers, or read the laws to exempt at least that category of weapons. See, *e.g.*, *Haile v. State, 38 Ark. 564, 567 (1882)*;

---

[28] We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the *Second Amendment* when it contradicts earlier evidence.

[29] The New Mexico restriction allowed an exception for individuals carrying for "the lawful defence of themselves, their families or their property, and the same being then and there threatened with danger." 1869 Terr. of N. M. Laws ch. 32, §1, p. 72. The Arizona law similarly exempted those who have "reasonable ground for fearing an unlawful attack upon his person." 1889 Ariz. Terr. Sess. Laws no. 13, §2, p. 17.

*Wilson v. State, 33 Ark. 557, 560 (1878)*; *Fife v. State, 31 Ark. 455, 461 (1876)*; *State v. Wilburn, 66 Tenn. 57, 60 (1872)*; *Andrews, 50 Tenn., at 187*.[30] Those state courts that upheld broader prohibitions without qualification generally operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*. For example, the Kansas Supreme Court upheld a complete ban on public carry enacted by the city of Salina in 1901 based on the rationale that the *Second Amendment* protects **[\*87]** only "the right to bear arms as a member of the state militia, or some other military organization provided for by law." *Salina v. Blaksley, 72 Kan. 230, 232, 83 P. 619, 620 (1905)*. That was clearly erroneous. See *Heller, 554 U. S., at *592, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

Absent any evidence explaining *why* these unprecedented prohibitions on *all* public carry were understood to comport with the *Second Amendment*, we fail to see how they inform "the origins and continuing significance of the Amendment." *Id., at 614, 128 S. Ct. 2783, 171 L. Ed. 2d 637*; see also The Federalist No. 37, at 229 (explaining that the meaning of ambiguous constitutional provisions can be "liquidated and ascertained *by a series of particular discussions and adjudications*" (emphasis added)).

Finally, these territorial restrictions deserve little weight because they were—consistent with the transitory nature of territorial government—short lived. Some were held unconstitutional shortly after passage. See *In re Brickey, 8 Idaho 597, 70 P. 609 (1902)*. Others did not survive a Territory's admission to the Union as a State. See Wyo. Rev. Stat., ch. 3, §5051 (1899) (1890 law enacted upon statehood prohibiting public carry only when combined with "intent, or avowed purpose, of injuring [one's] fellow-man"). Thus, they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition **[\*88]** of state regulation.

Beyond these Territories, respondents identify one

Western State—Kansas—that instructed cities with more than 15,000 inhabitants to pass ordinances prohibiting the public carry of firearms. See 1881 Kan. Sess. Laws §§1, 23, pp. 79, 92.[31] By 1890, the only cities meeting the population threshold were Kansas City, Topeka, and Wichita. See Compendium of the Eleventh Census: 1890, at 442-452. Even if each of these three cities enacted prohibitions by 1890, their combined population (93,000) accounted for only 6.5% of Kansas' total population. *Ibid.* Although other Kansas cities may also have restricted public carry unilaterally,[32] the lone late-19th-century state law respondents identify does not prove that Kansas meaningfully restricted public carry, let alone demonstrate a broad tradition of States doing so.

\*\*\*

At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement. **HN33[↑]** The *Second Amendment* guaranteed to "all Americans" the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. *Heller, 554 U. S., at 581, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Those restrictions, for example, **[\*89]** limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general

---

[30] Many other state courts during this period continued the antebellum tradition of upholding concealed carry regimes that seemingly provided for open carry. See, *e.g.*, *State v. Speller, 86 N. C. 697 (1882)*; *Chatteaux v. State, 52 Ala. 388 (1875)*; *Eslava v. State, 49 Ala. 355 (1873)*; *State v. Shelby, 90 Mo. 302, 2 S. W. 468 (1886)*; *Carroll v. State, 28 Ark. 99 (1872)*; cf. *Robertson v. Baldwin, 165 U. S. 275, 281-282, 17 S. Ct. 326, 41 L. Ed. 715 (1897)* (remarking in dicta that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons").

[31] In 1875, Arkansas prohibited the public carry of all pistols. See 1875 Ark. Acts p. 156, §1. But this categorical prohibition was also short lived. About six years later, Arkansas exempted "pistols as are used in the army or navy of the United States," so long as they were carried "uncovered, and in [the] hand." 1881 Ark. Acts p. 191, no. 96, §§1, 2.

[32] In 1879, Salina, Kansas, prohibited the carry of pistols but broadly exempted "cases when any person carrying [a pistol] is engaged in the pursuit of any lawful business, calling or employment" and the circumstances were "such as to justify a prudent man in carrying such weapon, for the defense of his person, property or family." Salina, Kan., Rev. Ordinance No. 268, §2.

community" in order to carry arms in public. *Klenosky, 75 App. Div., at 793, 428 N. Y. S. 2d, at 257*.

IV

*HN34*[↑] The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other *Bill of Rights* guarantees." *McDonald, 561 U. S., at 780, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (plurality opinion). We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the *First Amendment* works when it comes to unpopular speech or the free exercise of religion. It is not how the *Sixth Amendment* works when it comes to a defendant's right to confront the witnesses against him. And it is **[*90]** not how the *Second Amendment* works when it comes to public carry for self-defense.

*HN35*[↑] New York's proper-cause requirement violates the *Fourteenth Amendment* in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

**Concur by:** ALITO; KAVANAUGH; BARRETT

# Concur

JUSTICE ALITO, concurring.

I join the opinion of the Court in full but add the following comments in response to the dissent.

I

Much of the dissent seems designed to obscure the specific question that the Court has decided, and therefore it may be helpful to provide a succinct summary of what we have actually held. In *District of Columbia v. Heller, 554 U. S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*, the Court concluded that the *Second Amendment* protects the right to keep a handgun in the home for self-defense. *Heller* found that the Amendment codified a preexisting right and that this right was regarded at the time of the Amendment's adoption as rooted in "'the natural right of resistance and self-preservation.'" *Id., at 594, 128 S. Ct. 2783, 171*

*L. Ed. 2d 637*. "[T]he inherent right of self-defense," *Heller* explained, is "central to the *Second Amendment* right." *Id., at 628, 128 S. Ct. 2783, 171 L. Ed. 2d 637*.

Although *Heller* concerned the possession of a handgun in the home, the key point that we decided **[*91]** was that "the people," not just members of the "militia," have the right to use a firearm to defend themselves. And because many people face a serious risk of lethal violence when they venture outside their homes, the *Second Amendment* was understood at the time of adoption to apply under those circumstances. The Court's exhaustive historical survey establishes that point very clearly, and today's decision therefore holds that a State may not enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents from carrying a gun for this purpose.

That is all we decide. Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago, 561 U. S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*, about restrictions that may be imposed on the possession or carrying of guns.

In light of what we have actually held, it is hard to see what legitimate purpose can possibly be served by most of the dissent's lengthy introductory section. See *post*, at 1-8 (opinion of BREYER, J.). Why, for example, does the dissent think it is relevant to recount the mass shootings **[*92]** that have occurred in recent years? *Post*, at 4-5. Does the dissent think that laws like New York's prevent or deter such atrocities? Will a person bent on carrying out a mass shooting be stopped if he knows that it is illegal to carry a handgun outside the home? And how does the dissent account for the fact that one of the mass shootings near the top of its list took place in Buffalo? The New York law at issue in this case obviously did not stop that perpetrator.

What is the relevance of statistics about the use of guns to commit suicide? See *post*, at 5-6. Does the dissent think that a lot of people who possess guns in their homes will be stopped or deterred from shooting themselves if they cannot lawfully take them outside?

The dissent cites statistics about the use of guns in domestic disputes, see *post*, at 5, but it does not explain why these statistics are relevant to the question presented in this case. How many of the cases involving

2022 U.S. LEXIS 3055, *92

the use of a gun in a domestic dispute occur outside the home, and how many are prevented by laws like New York's?

The dissent cites statistics on children and adolescents killed by guns, see *post*, at 1, 4, but what does this have to do with the question **[*93]** whether an adult who is licensed to possess a handgun may be prohibited from carrying it outside the home? Our decision, as noted, does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18, *18 U. S. C. §§922(x)(2)-(5)*, and bars the sale of a handgun to anyone under the age of 21, *§§922(b)(1)*, *(c)(1)*.[1]

The dissent cites the large number of guns in private hands—nearly 400 million—but it does not explain what this statistic has to do with the question whether a person who already has the right to keep a gun in the home for self-defense is likely to be deterred from acquiring a gun by the knowledge that the gun cannot be carried outside the home. See *post*, at 3. And while the dissent seemingly thinks that the ubiquity of guns and our country's high level of gun violence provide reasons for sustaining the New York law, the dissent appears not to understand that it is these very facts that

cause law-abiding citizens to feel the need to carry a gun for self-defense.

No one apparently knows how many of the 400 million privately held guns are in the hands of criminals, but **[*94]** there can be little doubt that many muggers and rapists are armed and are undeterred by the Sullivan Law. Each year, the New York City Police Department (NYPD) confiscates thousands of guns,[2] and it is fair to assume that the number of guns seized is a fraction of the total number held unlawfully. The police cannot disarm every person who acquires a gun for use in criminal activity; nor can they provide bodyguard protection for the State's nearly 20 million residents or the 8.8 million people who live in New York City. Some of these people live in high-crime neighborhoods. Some must traverse dark and dangerous streets in order to reach their homes after work or other evening activities. Some are members of groups whose members feel especially vulnerable. And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury.

Ordinary citizens frequently use firearms to protect themselves from criminal attack. According to survey data, defensive firearm use occurs up to 2.5 million times per year. Brief for Law Enforcement Groups et al. as *Amici Curiae* 5. A Centers **[*95]** for Disease Control and Prevention report commissioned by former President Barack Obama reviewed the literature surrounding firearms use and noted that "[s]tudies that directly assessed the effect of actual defensive uses of guns . . . have found consistently lower injury rates among gun-using crime victims compared with victims who used other self-protective strategies." Institute of Medicine and National Research Council, Priorities for Research To Reduce the Threat of Firearm-Related Violence 15-16 (2013) (referenced in Brief for Independent Women's Law Center as *Amicus Curiae*

---

[1] The dissent makes no effort to explain the relevance of most of the incidents and statistics cited in its introductory section (*post*, at 1-8) (opinion of Breyer, J.). Instead, it points to studies (summarized later in its opinion) regarding the effects of "shall issue" licensing regimes on rates of homicide and other violent crimes. I note only that the dissent's presentation of such studies is one-sided. See RAND Corporation, Effects of Concealed-Carry Laws on Violent Crime (Apr. 22, 2022), https://www.rand.org/research/gun-policy/analysis/concealed-carry/violent-crime-html; see also Brief for William English et al. as *Amici Curiae* 3 ("The overwhelming weight of statistical analysis on the effects of [right-to-carry] laws on violent crime concludes that RTC laws do not result in any statistically significant increase in violent crime rates"); Brief for Arizona et al. as *Amici Curiae* 12 ("[P]opulation-level data on licensed carry is extensive, and the weight of the evidence confirms that objective, non-discriminatory licensed-carry laws have two results: (1) statistically significant reductions in some types of violent crime, or (2) no statistically significant effect on overall violent crime"); Brief for Law Enforcement Groups et al. as *Amici Curiae* 12 ("[O]ver the period 1991-2019 the inventory of firearms more than doubled; the number of concealed carry permits increased by at least sevenfold," but "murder rates fell by almost half, from 9.8 per 100,000 people in 1991 to 5.0 per 100,000 in 2019" and "[v]iolent crimes plummeted by over half ").

---

[2] NYPD statistics show approximately 6,000 illegal guns were seized in 2021. A. Southall, This Police Captain's Plan To Stop Gun Violence Uses More Than Handcuffs, N. Y. Times, Feb. 4, 2022. According to recent remarks by New York City Mayor Eric Adams, the NYPD has confiscated 3,000 firearms in 2022 so far. City of New York, Transcript: Mayor Eric Adams Makes Announcement About NYPD Gun Violence Suppression Division (June 6, 2022), https://www1.nyc.gov/office-of-the-mayor/news/369-22/trascript-mayor-eric-adams-makes-announcement-nypd-gun-violence-suppression-division.

2022 U.S. LEXIS 3055, *95

19-20).

Many of the *amicus* briefs filed in this case tell the story of such people. Some recount incidents in which a potential victim escaped death or serious injury only because carrying a gun for self-defense was allowed in the jurisdiction where the incident occurred. Here are two examples. One night in 1987, Austin Fulk, a gay man from Arkansas, "was chatting with another man in a parking lot when four gay bashers charged them with baseball bats and tire irons. Fulk's companion drew his pistol from under the seat of his car, brandished it at the attackers, and fired a single shot over their heads, causing **[*96]** them to flee and saving the would-be victims from serious harm." Brief for DC Project Foundation et al. as *Amici Curiae* 31 (footnote omitted).

On July 7, 2020, a woman was brutally assaulted in the parking lot of a fast food restaurant in Jefferson City, Tennessee. Her assailant slammed her to the ground and began to drag her around while strangling her. She was saved when a bystander who was lawfully carrying a pistol pointed his gun at the assailant, who then stopped the assault and the assailant was arrested. *Ibid.* (citing C. Wethington, Jefferson City Police: Legally Armed Good Samaritan Stops Assault, ABC News 6, WATE.com (July 9, 2020), https://www.wate.com/news/local-news/jefferson-city-police-legally-armed-good-samaritan-stops-assault/).

In other incidents, a law-abiding person was driven to violate the Sullivan Law because of fear of victimization and as a result was arrested, prosecuted, and incarcerated. See Brief for Black Attorneys of Legal Aid et al. as *Amici Curiae* 22-25.

Some briefs were filed by members of groups whose members feel that they have special reasons to fear attacks. See Brief for Asian Pacific American Gun Owners Association as *Amicus Curiae*; Brief for DC **[*97]** Project Foundation et al. as *Amici Curiae*; Brief for Black Guns Matter et al. as *Amicus Curiae*; Brief for Independent Women's Law Center as *Amicus Curiae*; Brief for National African American Gun Association, Inc., as *Amicus Curiae*.

I reiterate: All that we decide in this case is that the *Second Amendment* protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional.

II

This brings me to Part II-B of the dissent, *post*, at 11-21, which chastises the Court for deciding this case without a trial and factual findings about just how hard it is for a law-abiding New Yorker to get a carry permit. The record before us, however, tells us everything we need on this score. At argument, New York's solicitor general was asked about an ordinary person who works at night and must walk through dark and crime-infested streets to get home. Tr. of Oral Arg. 66-67. The solicitor general was asked whether such a person would be issued a carry permit if she pleaded: "[T]here have been a lot of muggings in this area, and I am scared to death." *Id.*, at 67. The solicitor general's candid answer **[*98]** was "in general," no. *Ibid.* To get a permit, the applicant would have to show more—for example, that she had been singled out for attack. *Id.*, at 65; see also *id.*, at 58. A law that dictates that answer violates the *Second Amendment*.

III

My final point concerns the dissent's complaint that the Court relies too heavily on history and should instead approve the sort of "means-end" analysis employed in this case by the Second Circuit. Under that approach, a court, in most cases, assesses a law's burden on the *Second Amendment* right and the strength of the State's interest in imposing the challenged restriction. See *post*, at 20. This mode of analysis places no firm limits on the ability of judges to sustain any law restricting the possession or use of a gun. Two examples illustrate the point.

The first is the Second Circuit's decision in a case the Court decided two Terms ago, *New York State Rifle & Pistol Assn., Inc.* v. *City of New York*, 590 U. S. ___ (2020). The law in that case affected New York City residents who had been issued permits to keep a gun in the home for self-defense. The city recommended that these permit holders practice at a range to ensure that they are able to handle their guns safely, but the law prohibited them from taking their guns to any range other than the seven that were spread **[*99]** around the city's five boroughs. Even if such a person unloaded the gun, locked it in the trunk of a car, and drove to the nearest range, that person would violate the law if the nearest range happened to be outside city limits. The Second Circuit held that the law was constitutional, concluding, among other things, that the restriction was substantially related to the city's interests in public safety and crime prevention. See *New York State Rifle & Pistol Assn., Inc. v. New York, 883 F. 3d 45, 62-64 (2018)*. But after we agreed to review that decision, the city repealed the law and admitted that it did not actually

2022 U.S. LEXIS 3055, *99

have any beneficial effect on public safety. See *N. Y. Penal Law Ann. §400.00(6)* (West Cum. Supp. 2022); Suggestion of Mootness in *New York State Rifle & Pistol Assn., Inc.* v. *City of New York*, O. T. 2019, No. 18-280, pp. 5-7.

Exhibit two is the dissent filed in *Heller* by JUSTICE BREYER, the author of today's dissent. At issue in *Heller* was an ordinance that made it impossible for any District of Columbia resident to keep a handgun in the home for self-defense. See *554 U. S., at 574-575, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Even the respondent, who carried a gun on the job while protecting federal facilities, did not qualify. *Id., at 575-576*. The District of Columbia law was an extreme outlier; only a few other jurisdictions in the entire country had similar laws. Nevertheless, JUSTICE BREYER's dissent, **[*100]** while accepting for the sake of argument that the *Second Amendment* protects the right to keep a handgun in the home, concluded, based on essentially the same test that today's dissent defends, that the District's complete ban was constitutional. See *id., at 689, 722, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (under "an interest-balancing inquiry. . ." the dissent would "conclude that the District's measure is a proportionate, not a disproportionate, response to the compelling concerns that led the District to adopt it").

Like that dissent in *Heller*, the real thrust of today's dissent is that guns are bad and that States and local jurisdictions should be free to restrict them essentially as they see fit.[3] That argument was rejected in *Heller*, and while the dissent protests that it is not rearguing *Heller*, it proceeds to do just that. See *post*, at 25-28.

*Heller* correctly recognized that the *Second Amendment* codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun. In 1791, when the *Second Amendment* was adopted, there were no police departments, and many families lived alone on isolated farms or on the frontiers. If these people were attacked, they were on their own. It is hard to imagine the furor

that **[*101]** would have erupted if the Federal Government and the States had tried to take away the guns that these people needed for protection.

Today, unfortunately, many Americans have good reason to fear that they will be victimized if they are unable to protect themselves. And today, no less than in 1791, the *Second Amendment* guarantees their right to do so.

JUSTICE KAVANAUGH, with whom THE CHIEF JUSTICE joins, concurring.

The Court employs and elaborates on the text, history, and tradition test that *Heller* and *McDonald* require for evaluating whether a government regulation infringes on the *Second Amendment* right to possess and carry guns for self-defense. See *District of Columbia v. Heller, 554 U. S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*; *McDonald v. Chicago, 561 U. S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*. Applying that test, the Court correctly holds that New York's outlier "may-issue" licensing regime for carrying handguns for self-defense violates the *Second Amendment*.

I join the Court's opinion, and I write separately to underscore two important points about the limits of the Court's decision.

*First*, the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense. In particular, the Court's decision does not affect the existing licensing regimes—known as "shall-issue" regimes—that are employed in 43 States.

The Court's decision addresses **[*102]** only the unusual discretionary licensing regimes, known as "may-issue" regimes, that are employed by 6 States including New York. As the Court explains, New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense. Those features of New York's regime—the unchanneled discretion for licensing officials and the special-need requirement—in effect deny the right to carry handguns for self-defense to many "ordinary, law-abiding citizens." *Ante*, at 1; see also *Heller, 554 U. S., at 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. The Court has held that "individual self-defense is 'the *central component*' of the *Second Amendment* right." *McDonald, 561 U. S., at 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (quoting *Heller, 554 U. S., at 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637*).

---

[3] If we put together the dissent in this case and JUSTICE BREYER's *Heller* dissent, States and local governments would essentially be free to ban the possession of all handguns, and it is unclear whether its approach would impose any significant restrictions on laws regulating long guns. The dissent would extend a very large measure of deference to legislation implicating *Second Amendment* rights, but it does not claim that such deference is appropriate when any other constitutional right is at issue.

New York's law is inconsistent with the *Second Amendment* right to possess and carry handguns for self-defense.

By contrast, 43 States employ objective shall-issue licensing regimes. Those shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements. Brief for Arizona et al. as *Amici Curiae* 7. Unlike **[*103]** New York's may-issue regime, those shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense. As petitioners acknowledge, shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice. Tr. of Oral Arg. 50-51.

Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so. Likewise, the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States.

*Second*, as *Heller* and *McDonald* established and the Court today again explains, the *Second Amendment* "is neither a regulatory straightjacket nor a regulatory blank check." *Ante*, at 21. Properly interpreted, the *Second Amendment* allows a "variety" of gun regulations. *Heller, 554 U. S., at 636, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. As Justice Scalia wrote in his opinion for the Court in *Heller*, and JUSTICE ALITO reiterated in relevant part in the principal opinion in *McDonald* **[*104]** :

> "Like most rights, the right secured by the *Second Amendment* is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . . [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively

lawful regulatory measures only as examples; our list does not purport to be exhaustive.]

> "We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those in common use at the time. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller, 554 U. S., at 626-627, 128 S. Ct. 2783, 171 L. Ed. 2d 637*, and n. 26 (citations and quotation marks omitted); see also *McDonald, 561 U. S., at 786, 130 S. Ct. 3020, 177 L. Ed. 2d 894* (plurality opinion).

\*\*\*

With those additional comments, I join **[*105]** the opinion of the Court.

JUSTICE BARRETT, concurring.

I join the Court's opinion in full. I write separately to highlight two methodological points that the Court does not resolve. First, the Court does not conclusively determine the manner and circumstances in which postratification practice may bear on the original meaning of the Constitution. See *ante*, at 24-29. Scholars have proposed competing and potentially conflicting frameworks for this analysis, including liquidation, tradition, and precedent. See, *e.g.*, Nelson, Originalism and Interpretive Conventions, *70 U. Chi. L. Rev. 519 (2003)*; McConnell, Time, Institutions, and Interpretation, *95 B. U. L. Rev. 1745 (2015)*. The limits on the permissible use of history may vary between these frameworks (and between different articulations of each one). To name just a few unsettled questions: How long after ratification may subsequent practice illuminate original public meaning? Cf. *McCulloch v. Maryland, 17 U.S. 316, 4 Wheat. 316, 401, 4 L. Ed. 579 (1819)* (citing practice "introduced at a very early period of our history"). What form must practice take to carry weight in constitutional analysis? See *Myers v. United States, 272 U. S. 52, 175, 47 S. Ct. 21, 71 L. Ed. 160 (1926)* (citing a "legislative exposition of the Constitution . . . acquiesced in for a long term of years"). And may practice settle the meaning of individual rights as well **[*106]** as structural provisions? See Baude, Constitutional Liquidation, *71 Stan. L. Rev. 1, 49-51 (2019)* (canvassing arguments). The historical inquiry presented in this case does not require us to answer such questions, which might make a difference in another case. See *ante*, at 17-19.

Second and relatedly, the Court avoids another "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the *Fourteenth Amendment* was ratified in 1868" or when the *Bill of Rights* was ratified in 1791. *Ante*, at 29. Here, the lack of support for New York's law in either period makes it unnecessary to choose between them. But if 1791 is the benchmark, then New York's appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little). Cf. *Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. ___, ___-___ (2020) (slip op., at 15-16) (a practice that "arose in the second half of the 19th century . . . cannot by itself establish an early American tradition" informing our understanding of the *First Amendment*). So today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the *Bill of Rights*. On the contrary, the Court is careful to **[\*107]** caution "against giving postenactment history more weight than it can rightly bear." *Ante*, at 26.

**Dissent by:** BREYER

# Dissent

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

In 2020, 45,222 Americans were killed by firearms. See Centers for Disease Control and Prevention, Fast Facts: Firearm Violence Prevention (last updated May 4, 2022) (CDC, Fast Facts), https://www.cdc.gov/violenceprevention/firearms/fastfact .html. Since the start of this year (2022), there have been 277 reported mass shootings—an average of more than one per day. See Gun Violence Archive (last visited June 20, 2022), https://www.gunviolencearchive.org. Gun violence has now surpassed motor vehicle crashes as the leading cause of death among children and adolescents. J. Goldstick, R. Cunningham, & P. Carter, Current Causes of Death in Children and Adolescents in the United States, 386 New England J. Med. 1955 (May 19, 2022) (Goldstick).

Many States have tried to address some of the dangers of gun violence just described by passing laws that limit, in various ways, who may purchase, carry, or use firearms of different kinds. The Court today severely burdens States' efforts to do so. It invokes the *Second Amendment* to strike **[\*108]** down a New York law regulating the public carriage of concealed handguns. In my view, that decision rests upon several serious mistakes.

First, the Court decides this case on the basis of the pleadings, without the benefit of discovery or an evidentiary record. As a result, it may well rest its decision on a mistaken understanding of how New York's law operates in practice. Second, the Court wrongly limits its analysis to focus nearly exclusively on history. It refuses to consider the government interests that justify a challenged gun regulation, regardless of how compelling those interests may be. The Constitution contains no such limitation, and neither do our precedents. Third, the Court itself demonstrates the practical problems with its history-only approach. In applying that approach to New York's law, the Court fails to correctly identify and analyze the relevant historical facts. Only by ignoring an abundance of historical evidence supporting regulations restricting the public carriage of firearms can the Court conclude that New York's law is not "consistent with the Nation's historical tradition of firearm regulation." See *ante*, at 15.

In my view, when courts interpret the *Second Amendment* **[\*109]** , it is constitutionally proper, indeed often necessary, for them to consider the serious dangers and consequences of gun violence that lead States to regulate firearms. The Second Circuit has done so and has held that New York's law does not violate the *Second Amendment*. See *Kachalsky v. County of Westchester, 701 F. 3d 81, 97-99, 101 (2012)*. I would affirm that holding. At a minimum, I would not strike down the law based only on the pleadings, as the Court does today—without first allowing for the development of an evidentiary record and without considering the State's compelling interest in preventing gun violence. I respectfully dissent.

I

The question before us concerns the extent to which the *Second Amendment* prevents democratically elected officials from enacting laws to address the serious problem of gun violence. And yet the Court today purports to answer that question without discussing the nature or severity of that problem.

In 2017, there were an estimated 393.3 million civilian-held firearms in the United States, or about 120 firearms per 100 people. A. Karp, Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey 4 (June 2018),

https://www.smallarmssurvey.org/sites/default/files/reso urces/SAS-BP-Civilian-Firearms-Numbers.pdf. That is more guns per capita than in [*110] any other country in the world. Ibid. (By comparison, Yemen is second with about 52.8 firearms per 100 people—less than half the per capita rate in the United States—and some countries, like Indonesia and Japan, have fewer than one firearm per 100 people. Id., at 3-4.)

Unsurprisingly, the United States also suffers a disproportionately high rate of firearm-related deaths and injuries. Cf. Brief for Educational Fund To Stop Gun Violence et al. as Amici Curiae 17-18 (Brief for Educational Fund) (citing studies showing that, within the United States, "states that rank among the highest in gun ownership also rank among the highest in gun deaths" while "states with lower rates of gun ownership have lower rates of gun deaths"). In 2015, approximately 36,000 people were killed by firearms nationwide. M. Siegel et al., Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States, 107 Am. J. Pub. Health 1923 (2017). Of those deaths, 22,018 (or about 61%) were suicides, 13,463 (37%) were homicides, and 489 (1%) were unintentional injuries. Ibid. On top of that, firearms caused an average of 85,694 emergency room visits for nonfatal injuries each year between 2009 [*111] and 2017. E. Kaufman et al., Epidemiological Trends in Fatal and Nonfatal Firearm Injuries in the US, 2009-2017, 181 JAMA Internal Medicine 237 (2021) (Kaufman).

Worse yet, gun violence appears to be on the rise. By 2020, the number of firearm-related deaths had risen to 45,222, CDC, Fast Facts, or by about 25% since 2015. That means that, in 2020, an average of about 124 people died from gun violence every day. Ibid. As I mentioned above, gun violence has now become the leading cause of death in children and adolescents, surpassing car crashes, which had previously been the leading cause of death in that age group for over 60 years. Goldstick 1955; J. Bates, Guns Became the Leading Cause of Death for American Children and Teens in 2020, Time, Apr. 27, 2022, https://www.time.com/6170864/cause-of-death-children-guns/. And the consequences of gun violence are borne disproportionately by communities of color, and Black communities in particular. See CDC, Age-Adjusted Rates of Firearm-Related Homicide, by Race, Hispanic Origin, and Sex—National Vital Statistics System, United States, 2019, at 1491 (Oct. 22, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/mm7042 a6-H.pdf (documenting 34.9 [*112] firearm-related homicides per 100,000 population for non-Hispanic

Black men in 2019, compared to 7.7 such homicides per 100,000 population for men of all races); S. Kegler et al., CDC, Vital Signs: Changes in Firearm Homicide and Suicide Rates—United States, 2019-2020, at 656-658 (May 13, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7119 e1-H.pdf.

The dangers posed by firearms can take many forms. Newspapers report mass shootings occurring at an entertainment district in Philadelphia, Pennsylvania (3 dead and 11 injured); an elementary school in Uvalde, Texas (21 dead); a supermarket in Buffalo, New York (10 dead and 3 injured); a series of spas in Atlanta, Georgia (8 dead); a busy street in an entertainment district of Dayton, Ohio (9 dead and 17 injured); a nightclub in Orlando, Florida (50 dead and 53 injured); a church in Charleston, South Carolina (9 dead); a movie theater in Aurora, Colorado (12 dead and 50 injured); an elementary school in Newtown, Connecticut (26 dead); and many, many more. See, e.g., R. Todt, 3 Dead, 11 Wounded in Philadelphia Shooting on Busy Street, Washington Post, June 5, 2022; A. Hernández, J. Slater, D. Barrett, & S. Foster-Frau, At Least 19 Children, [*113] 2 Teachers Killed at Texas Elementary School, Washington Post, May 25, 2022; A. Joly, J. Slater, D. Barrett, & A. Hernandez, 10 Killed in Racially Motivated Shooting at Buffalo Grocery Store, Washington Post, May 14, 2022; C. McWhirter & V. Bauerlein, Atlanta-Area Shootings at Spas Leave Eight Dead, Wall Street Journal, Mar. 17, 2021; A. Hassan, Dayton Gunman Shot 26 People in 32 Seconds, Police Timeline Reveals, N. Y. Times, Aug. 13, 2019; L. Alvarez & R. Pérez-Peña, Orlando Gunman Attacks Gay Nightclub, Leaving 50 Dead, N. Y. Times, June 12, 2016; J. Horowitz, N. Corasaniti, & A. Southall, Nine Killed in Shooting at Black Church in Charleston, N. Y. Times, June 17, 2015; R. Lin, Gunman Kills 12 at 'Dark Knight Rises' Screening in Colorado, L. A. Times, July 20, 2012; J. Barron, Nation Reels After Gunman Massacres 20 Children at School in Connecticut, N. Y. Times, Dec. 14, 2012. Since the start of this year alone (2022), there have already been 277 reported mass shootings—an average of more than one per day. Gun Violence Archive; see also Gun Violence Archive, General Methodology, https://www.gunviolencearchive.org/methodology (defining mass shootings to include incidents in which [*114] at least four victims are shot, not including the shooter).

And mass shootings are just one part of the problem. Easy access to firearms can also make many other

aspects of American life more dangerous. Consider, for example, the effect of guns on road rage. In 2021, an average of 44 people each month were shot and either killed or wounded in road rage incidents, double the annual average between 2016 and 2019. S. Burd-Sharps & K. Bistline, Everytown for Gun Safety, Reports of Road Rage Shootings Are on the Rise (Apr. 4, 2022), https://www.everytownresearch.org/reports-of-road-rage-shootings-are-on-the-rise/; see also J. Donohue, A. Aneja, & K. Weber, Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis, 16 J. Empirical Legal Studies 198, 204 (2019). Some of those deaths might have been avoided if there had not been a loaded gun in the car. See *ibid.*; Brief for American Bar Association as *Amicus Curiae* 17-18; Brief for Educational Fund 20-23 (citing studies showing that the presence of a firearm is likely to increase aggression in both the person carrying the gun and others who see it).

The same could be said **[*115]** of protests: A study of 30,000 protests between January 2020 and June 2021 found that armed protests were nearly six times more likely to become violent or destructive than unarmed protests. Everytown for Gun Safety, Armed Assembly: Guns, Demonstrations, and Political Violence in America (Aug. 23, 2021), https://www.everytownresearch.org/report/armed-assembly-guns-demonstrations-and-political-violence-in-america/ (finding that 16% of armed protests turned violent, compared to less than 3% of unarmed protests). Or domestic disputes: Another study found that a woman is five times more likely to be killed by an abusive partner if that partner has access to a gun. Brief for Educational Fund 8 (citing A. Zeoli, R. Malinski, & B. Turchan, Risks and Targeted Interventions: Firearms in Intimate Partner Violence, 38 Epidemiologic Revs. 125 (2016); J. Campbell et al., Risk Factors for Femicide in Abusive Relationships: Results From a Multisite Case Control Study, 93 Am. J. Pub. Health 1089, 1092 (2003)). Or suicides: A study found that men who own handguns are three times as likely to commit suicide than men who do not and women who own handguns are seven times as likely to commit suicide than **[*116]** women who do not. D. Studdert et al., Handgun Ownership and Suicide in California, 382 New England J. Med. 2220, 2224 (June 4, 2020).

Consider, too, interactions with police officers. The presence of a gun in the hands of a civilian poses a risk to both officers and civilians. *Amici* prosecutors and police chiefs tell us that most officers who are killed in the line of duty are killed by firearms; they explain that officers in States with high rates of gun ownership are three times as likely to be killed in the line of duty as officers in States with low rates of gun ownership. Brief for Prosecutors Against Gun Violence as *Amicus Curiae* 23-24; Brief for Former Major City Police Chiefs as *Amici Curiae* 13-14, and n. 21, (citing D. Swedler, M. Simmons, F. Dominici, & D. Hemenway, Firearm Prevalence and Homicides of Law Enforcement Officers in the United States, 105 Am. J. Pub. Health 2042, 2045 (2015)). They also say that States with the highest rates of gun ownership report four times as many fatal shootings of civilians by police officers compared to States with the lowest rates of gun ownership. Brief for Former Major City Police Chiefs as *Amici Curiae* 16 (citing D. Hemenway, D. Azrael, **[*117]** A. Connor, & M. Miller, Variation in Rates of Fatal Police Shootings Across US States: The Role of Firearm Availability, 96 J. Urb. Health 63, 67 (2018)).

These are just some examples of the dangers that firearms pose. There is, of course, another side to the story. I am not simply saying that "guns are bad." See *ante*, at 8 (Alito, J., concurring). Some Americans use guns for legitimate purposes, such as sport (*e.g.*, hunting or target shooting), certain types of employment (*e.g.*, as a private security guard), or self-defense. Cf. *ante*, at 4-6 (Alito, J., concurring). Balancing these lawful uses against the dangers of firearms is primarily the responsibility of elected bodies, such as legislatures. It requires consideration of facts, statistics, expert opinions, predictive judgments, relevant values, and a host of other circumstances, which together make decisions about how, when, and where to regulate guns more appropriately legislative work. That consideration counsels modesty and restraint on the part of judges when they interpret and apply the *Second Amendment*.

Consider, for one thing, that different types of firearms may pose different risks and serve different purposes. The Court has previously **[*118]** observed that handguns, the type of firearm at issue here, "are the most popular weapon chosen by Americans for self-defense in the home." *District of Columbia v. Heller, 554 U. S. 570, 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).* But handguns are also the most popular weapon chosen by perpetrators of violent crimes. In 2018, 64.4% of firearm homicides and 91.8% of nonfatal firearm assaults were committed with a handgun. Dept. of Justice, Bureau of Justice Statistics, G. Kena & J. Truman, Trends and Patterns in Firearm Violence, 1993-2018, pp. 5-6 (Apr. 2022). Handguns are also the most commonly stolen type of firearm—63% of burglaries resulting in gun theft between 2005 and 2010

involved the theft of at least one handgun. Dept. of Justice, Bureau of Justice Statistics, L. Langton, Firearms Stolen During Household Burglaries and Other Property Crimes, 2005-2010, p. 3 (Nov. 2012).

Or consider, for another thing, that the dangers and benefits posed by firearms may differ between urban and rural areas. See generally Brief for City of Chicago et al. as *Amici Curiae* (detailing particular concerns about gun violence in large cities). Firearm-related homicides and assaults are significantly more common in urban areas than rural ones. For example, from 1999 to 2016, 89.8% of the **[*119]** 213,175 firearm-related homicides in the United States occurred in "metropolitan" areas. M. Siegel et al., The Impact of State Firearm Laws on Homicide Rates in Suburban and Rural Areas Compared to Large Cities in the United States, 1991-2016, 36 J. Rural Health 255 (2020); see also Brief for Partnership for New York City as *Amicus Curiae* 10; Kaufman 237 (finding higher rates of fatal assault injuries from firearms in urban areas compared to rural areas); C. Branas, M. Nance, M. Elliott, T. Richmond, & C. Schwab, Urban-Rural Shifts in Intentional Firearm Death: Different Causes, Same Results, 94 Am. J. Pub. Health 1750, 1752 (2004) (finding higher rates of firearm homicide in urban counties compared to rural counties).

Justice Alito asks why I have begun my opinion by reviewing some of the dangers and challenges posed by gun violence and what relevance that has to today's case. *Ante,* at 2-4 (concurring opinion). All of the above considerations illustrate that the question of firearm regulation presents a complex problem—one that should be solved by legislatures rather than courts. What kinds of firearm regulations should a State adopt? Different States might choose to answer that question **[*120]** differently. They may face different challenges because of their different geographic and demographic compositions. A State like New York, which must account for the roughly 8.5 million people living in the 303 square miles of New York City, might choose to adopt different (and stricter) firearms regulations than States like Montana or Wyoming, which do not contain any city remotely comparable in terms of population or density. See U. S. Census Bureau, Quick Facts: New York City (last updated July 1, 2021) (Quick Facts: New York City), https://www.census.gov/quickfacts/newyorkcitynewyork/ ; Brief for City of New York as *Amicus Curiae* 8, 22. For a variety of reasons, States may also be willing to tolerate different degrees of risk and therefore choose to balance the competing benefits and dangers of firearms differently.

The question presented in this case concerns the extent to which the *Second Amendment* restricts different States (and the Federal Government) from working out solutions to these problems through democratic processes. The primary difference between the Court's view and mine is that I believe the Amendment allows States to take account of the serious problems posed by gun violence that **[*121]** I have just described. I fear that the Court's interpretation ignores these significant dangers and leaves States without the ability to address them.

II

A

New York State requires individuals to obtain a license in order to carry a concealed handgun in public. *N. Y. Penal Law Ann. §400.00(2)* (West Cum. Supp. 2022). I address the specifics of that licensing regime in greater detail in Part II-B below. Because, at this stage in the proceedings, the parties have not had an opportunity to develop the evidentiary record, I refer to facts and representations made in petitioners' complaint and in *amicus* briefs filed before us.

Under New York's regime, petitioners Brandon Koch and Robert Nash have obtained restricted licenses that permit them to carry a concealed handgun for certain purposes and at certain times and places. They wish to expand the scope of their licenses so that they can carry a concealed handgun without restriction.

Koch and Nash are residents of Rensselaer County, New York. Koch lives in Troy, a town of about 50,000, located eight miles from New York's capital city of Albany, which has a population of about 98,000. See App. 100; U. S. Census Bureau, Quick Facts: Troy City, New York (last updated July 1, 2021), **[*122]** https://www.census.gov/quickfacts/troycitynewyork; *id.,* Albany City, New York, https://www.census.gov/quickfacts/albanycitynewyork. Nash lives in Averill Park, a small town 12.5 miles from Albany. App. 100.

Koch and Nash each applied for a license to carry a concealed handgun. Both were issued restricted licenses that allowed them to carry handguns only for purposes of hunting and target shooting. *Id.,* at 104, 106. But they wanted "unrestricted" licenses that would allow them to carry concealed handguns "for personal protection and all lawful purposes." *Id.,* at 112; see also *id.,* at 40. They wrote to the licensing officer in

Rensselaer County—Justice Richard McNally, a justice of the New York Supreme Court—requesting that the hunting and target shooting restrictions on their licenses be removed. *Id.*, at 40, 111-113. After holding individual hearings for each petitioner, Justice McNally denied their requests. *Id.*, at 31, 41, 105, 107, 114. He clarified that, in addition to hunting and target shooting, Koch and Nash could "carry concealed for purposes of off road back country, outdoor activities similar to hunting, for example fishing, hiking & camping." *Id.*, at 41, 114. He also permitted **[*123]** Koch, who was employed by the New York Court System's Division of Technology, to "carry to and from work." *Id.*, at 111, 114. But he reaffirmed that Nash was prohibited from carrying a concealed handgun in locations "typically open to and frequented by the general public." *Id.*, at 41. Neither Koch nor Nash alleges that he appealed Justice McNally's decision. Brief for Respondents 13; see App. 122-126.

Instead, petitioners Koch and Nash, along with the New York State Rifle & Pistol Association, Inc., brought this lawsuit in federal court against Justice McNally and other State representatives responsible for enforcing New York's firearms laws. Petitioners claimed that the State's refusal to modify Koch's and Nash's licenses violated the *Second Amendment*. The District Court dismissed their complaint. It followed Second Circuit precedent holding that New York's licensing regime was constitutional. See *Kachalsky, 701 F. 3d, at 101*. The Court of Appeals for the Second Circuit affirmed. We granted certiorari to review the constitutionality of "New York's denial of petitioners' license applications." *Ante*, at 8 (majority opinion).

B

As the Court recognizes, New York's licensing regime traces its origins to 1911, when New York enacted the **[*124]** "Sullivan Law," which prohibited public carriage of handguns without a license. See 1911 N. Y. Laws ch. 195, §1, p. 443. Two years later in 1913, New York amended the law to establish substantive standards for the issuance of a license. See 1913 N. Y. Laws ch. 608, §1, pp. 1627-1629. Those standards have remained the foundation of New York's licensing regime ever since—a regime that the Court now, more than a century later, strikes down as unconstitutional.

As it did over 100 years ago, New York's law today continues to require individuals to obtain a license before carrying a concealed handgun in public. *N. Y. Penal Law Ann. §400.00(2)*; *Kachalsky, 701 F. 3d, at 85-86*. Because the State does not allow the open

carriage of handguns at all, a concealed-carry license is the only way to legally carry a handgun in public. *Id., at 86*. This licensing requirement applies only to handguns (*i.e.*, "pistols and revolvers") and short-barreled rifles and shotguns, not to all types of firearms. *Id., at 85*. For instance, the State does not require a license to carry a long gun (*i.e.*, a rifle or a shotgun over a certain length) in public. *Ibid.*; *§265.00(3)* (West 2022).

To obtain a concealed-carry license for a handgun, an applicant must satisfy certain eligibility criteria. Among other things, he must generally be at least 21 years old and of **[*125]** "good moral character." *§400.00(1)*. And he cannot have been convicted of a felony, dishonorably discharged from the military, or involuntarily committed to a mental hygiene facility. *Ibid.* If these and other eligibility criteria are satisfied, New York law provides that a concealed-carry license "shall be issued" to individuals working in certain professions, such as judges, corrections officers, or messengers of a "banking institution or express company." *§400.00(2)*. Individuals who satisfy the eligibility criteria but do not work in one of these professions may still obtain a concealed-carry license, but they must additionally show that "proper cause exists for the issuance thereof." *§400.00(2)(f)*.

The words "proper cause" may appear on their face to be broad, but there is "a substantial body of law instructing licensing officials on the application of this standard." *Id., at 86*. New York courts have interpreted proper cause "to include carrying a handgun for target practice, hunting, or self-defense." *Ibid.* When an applicant seeks a license for target practice or hunting, he must show "'a sincere desire to participate in target shooting and hunting.'" *Ibid.* (quoting *In re O'Connor, 154 Misc. 2d 694, 697, 585 N. Y. S. 2d 1000, 1003 (Westchester Cty. 1992)*). When an applicant seeks a license for self-defense, he **[*126]** must show "'a special need for self-protection distinguishable from that of the general community.'" *701 F. 3d, at 86* (quoting *In re Klenosky, 75 App. Div. 2d 793, 793, 428 N. Y. S. 2d 256, 257 (1980)*). Whether an applicant meets these proper cause standards is determined in the first instance by a "licensing officer in the city or county . . . where the applicant resides." *§400.00(3)*. In most counties, the licensing officer is a local judge. *Kachalsky, 701 F. 3d, at 87, n. 6*. For example, in Rensselaer County, the licensing officer who denied petitioners' requests to remove the restrictions on their licenses was a justice of the New York Supreme Court. App. 31. If the officer denies an application, the applicant can obtain judicial review under Article 78 of

New York's Civil Practice Law and Rules. *Kachalsky, 701 F. 3d, at 87.* New York courts will then review whether the denial was arbitrary and capricious. *Ibid.*

In describing New York's law, the Court recites the above facts but adds its own gloss. It suggests that New York's licensing regime gives licensing officers too much discretion and provides too "limited" judicial review of their decisions, *ante,* at 4; that the proper cause standard is too "demanding," *ante,* at 3; and that these features make New York an outlier compared to the "vast majority of States," *ante,* at 4. But on what evidence does the Court base these characterizations? **[\*127]** Recall that this case comes to us at the pleading stage. The parties have not had an opportunity to conduct discovery, and no evidentiary hearings have been held to develop the record. See App. 15-26. Thus, at this point, there is no record to support the Court's negative characterizations, as we know very little about how the law has actually been applied on the ground.

Consider each of the Court's criticisms in turn. First, the Court says that New York gives licensing officers too much discretion and "leaves applicants little recourse if their local licensing officer denies a permit." *Ante,* at 4. But there is nothing unusual about broad statutory language that can be given more specific content by judicial interpretation. Nor is there anything unusual or inadequate about subjecting licensing officers' decisions to arbitrary-and-capricious review. Judges routinely apply that standard, for example, to determine whether an agency action is lawful under both New York law and the *Administrative Procedure Act.* See, *e.g., N. Y. Civ. Prac. Law Ann. §7803(3)* (2021); *5 U. S. C. §706(2)(A).* The arbitrary-and-capricious standard has thus been used to review important policies concerning health, safety, and immigration, to name just a few examples. **[\*128]** See, *e.g., Biden* v. *Missouri,* 595 U. S. ___, ___ (2022) (*per curiam*) (slip op., at 8); *Department of Homeland Security* v. *Regents of Univ. of Cal.,* 591 U. S. ___, ___, ___ (2020) (slip op., at 9, 17); *Department of Commerce* v. *New York,* 588 U. S. ___, ___ (2019) (slip op., at 16); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U. S. 29, 41, 46, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).*

Without an evidentiary record, there is no reason to assume that New York courts applying this standard fail to provide license applicants with meaningful review. And there is no evidentiary record to support the Court's assumption here. Based on the pleadings alone, we cannot know how often New York courts find the denial

of a concealed-carry license to be arbitrary and capricious or on what basis. We do not even know how a court would have reviewed the licensing officer's decisions in Koch's and Nash's cases because they do not appear to have sought judicial review at all. See Brief for Respondents 13; App. 122-126.

Second, the Court characterizes New York's proper cause standard as substantively "demanding." *Ante,* at 3. But, again, the Court has before it no evidentiary record to demonstrate how the standard has actually been applied. How "demanding" is the proper cause standard in practice? Does that answer differ from county to county? How many license applications are granted and denied each year? At the pleading stage, we do not know the answers to these and other important questions, so the **[\*129]** Court's characterization of New York's law may very well be wrong.

In support of its assertion that the law is "demanding," the Court cites only to cases originating in New York City. *Ibid.* (citing *In re Martinek, 294 App. Div. 2d 221, 743 N. Y. S. 2d 80 (2002)* (New York County, *i.e.,* Manhattan); *In re Kaplan, 249 App. Div. 2d 199, 673 N. Y. S. 2d 66 (1998)* (same); *In re Klenosky, 75 App. Div. 2d 793, 428 N. Y. S. 2d 256* (same); *In re Bernstein, 85 App. Div. 2d 574, 445 N. Y. S. 2d 716 (1981)* (Bronx County)). But cases from New York City may not accurately represent how the proper cause standard is applied in other parts of the State, including in Rensselaer County where petitioners reside.

To the contrary, *amici* tell us that New York's licensing regime is purposefully flexible: It allows counties and cities to respond to the particular needs and challenges of each area. See Brief for American Bar Association as *Amicus Curiae* 12; Brief for City of New York as *Amicus Curiae* 20-29. *Amici* suggest that some areas may interpret words such as "proper cause" or "special need" more or less strictly, depending upon each area's unique circumstances. See *ibid.* New York City, for example, reports that it "has applied the [proper cause] requirement relatively rigorously" because its densely populated urban areas pose a heightened risk of gun violence. Brief for City of New York as *Amicus Curiae* 20. In comparison, other (perhaps more rural) **[\*130]** counties "have tailored the requirement to their own circumstances, often issuing concealed-carry licenses more freely than the City." *Ibid.*; see also *In re O'Connor, 154 Misc. 2d, at 698, 585 N. Y. S. 2d, at 1004* ("The circumstances which exist in New York City are significantly different than those which exist in

Oswego or Putnam Counties. . . . The licensing officers in each county are in the best position to determine whether any interest of the population of their county is furthered by the use of restrictions on pistol licenses"); Brief for Citizens Crime Commission of New York City as *Amicus Curiae* 18-19. Given the geographic variation across the State, it is too sweeping for the Court to suggest, without an evidentiary record, that the proper cause standard is "demanding" in Rensselaer County merely because it may be so in New York City.

Finally, the Court compares New York's licensing regime to that of other States. *Ante*, at 4-6. It says that New York's law is a "may issue" licensing regime, which the Court describes as a law that provides licensing officers greater discretion to grant or deny licenses than a "shall issue" licensing regime. *Ante*, at 4-5. Because the Court counts 43 "shall issue" jurisdictions and only 7 "may issue" jurisdictions, **[*131]** it suggests that New York's law is an outlier. *Ibid.*; see also *ante*, at 1-2 (KAVANAUGH, J., concurring). Implicitly, the Court appears to ask, if so many other States have adopted the more generous "shall issue" approach, why can New York not be required to do the same?

But the Court's tabulation, and its implicit question, overlook important context. In drawing a line between "may issue" and "shall issue" licensing regimes, the Court ignores the degree of variation within and across these categories. Not all "may issue" regimes are necessarily alike, nor are all "shall issue" regimes. Conversely, not all "may issue" regimes are as different from the "shall issue" regimes as the Court assumes. For instance, the Court recognizes in a footnote that three States (Connecticut, Delaware, and Rhode Island) have statutes with discretionary criteria, like so-called "may issue" regimes do. *Ante*, at 5, n. 1. But the Court nonetheless counts them among the 43 "shall issue" jurisdictions because, it says, these three States' laws operate in practice more like "shall issue" regimes. *Ibid.*; see also Brief for American Bar Association as *Amicus Curiae* 10 (recognizing, conversely, that some "shall **[*132]** issue" States, *e.g.*, Alabama, Colorado, Georgia, Oregon, and Virginia, still grant some degree of discretion to licensing authorities).

As these three States demonstrate, the line between "may issue" and "shall issue" regimes is not as clear cut as the Court suggests, and that line depends at least in part on how statutory discretion is applied in practice. Here, because the Court strikes down New York's law without affording the State an opportunity to develop an evidentiary record, we do not know how much discretion

licensing officers in New York have in practice or how that discretion is exercised, let alone how the licensing regimes in the other six "may issue" jurisdictions operate.

Even accepting the Court's line between "may issue" and "shall issue" regimes and assuming that its tally (7 "may issue" and 43 "shall issue" jurisdictions) is correct, that count does not support the Court's implicit suggestion that the seven "may issue" jurisdictions are somehow outliers or anomalies. The Court's count captures only a snapshot in time. It forgets that "shall issue" licensing regimes are a relatively recent development. Until the 1980s, "may issue" regimes predominated. See *id.*, at **[*133]** 9; R. Grossman & S. Lee, May Issue Versus Shall Issue: Explaining the Pattern of Concealed-Carry Handgun Laws, 1960-2001, 26 Contemp. Econ. Pol'y 198, 200 (2008) (Grossman). As of 1987, 16 States and the District of Columbia prohibited concealed carriage outright, 26 States had "may issue" licensing regimes, 7 States had "shall issue" regimes, and 1 State (Vermont) allowed concealed carriage without a permit. Congressional Research Service, Gun Control: Concealed Carry Legislation in the 115th Congress 1 (Jan. 30, 2018). Thus, it has only been in the last few decades that States have shifted toward "shall issue" licensing laws. Prior to that, most States operated "may issue" licensing regimes without legal or practical problem.

Moreover, even considering, as the Court does, only the present state of play, its tally provides an incomplete picture because it accounts for only the number of States with "may issue" regimes, not the number of people governed by those regimes. By the Court's count, the seven "may issue" jurisdictions are New York, California, Hawaii, Maryland, Massachusetts, New Jersey, and the District of Columbia. *Ante*, at 5-6. Together, these seven jurisdictions comprise **[*134]** about 84.4 million people and account for over a quarter of the country's population. U. S. Census Bureau, 2020 Population and Housing State Data (Aug. 12, 2021) (2020 Population), https://www.census.gov/library/visualizations/interactive/2020-population-and-housing-state-data.html. Thus, "may issue" laws can hardly be described as a marginal or outdated regime.

And there are good reasons why these seven jurisdictions may have chosen not to follow other States in shifting toward "shall issue" regimes. The seven remaining "may issue" jurisdictions are among the most densely populated in the United States: the District of

Columbia (with an average of 11,280.0 people/square mile in 2020), New Jersey (1,263.0), Massachusetts (901.2), Maryland (636.1), New York (428.7), California (253.7), and Hawaii (226.6). U. S. Census Bureau, Historical Population Density (1910-2020) (Apr. 26, 2001), https://www.census.gov/data/tables/time-series/dec/density-data-text.html. In comparison, the average population density of the United States as a whole is 93.8 people/square mile, and some States have population densities as low as 1.3 (Alaska), 5.9 (Wyoming), and 7.4 (Montana) people/square mile. *Ibid.* **[*135]** These numbers reflect in part the fact that these "may issue" jurisdictions contain some of the country's densest and most populous urban areas, *e.g.*, New York City, Los Angeles, San Francisco, the District of Columbia, Honolulu, and Boston. U. S. Census Bureau, Urban Area Facts (Oct. 8, 2021), https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/ua-facts.html. New York City, for example, has a population of about 8.5 million people, making it more populous than 38 States, and it squeezes that population into just over 300 square miles. Quick Facts: New York City; 2020 Population; Brief for City of New York as *Amicus Curiae* 8, 22.

As I explained above, *supra*, at 8-9, densely populated urban areas face different kinds and degrees of dangers from gun violence than rural areas. It is thus easy to see why the seven "may issue" jurisdictions might choose to regulate firearm carriage more strictly than other States. See Grossman 199 ("We find strong evidence that more urban states are less likely to shift to 'shall issue' than rural states").

New York and its *amici* present substantial data justifying the State's decision to retain a "may issue" licensing regime. **[*136]** The data show that stricter gun regulations are associated with lower rates of firearm-related death and injury. See, *e.g.*, Brief for Citizens Crime Commission of New York City as *Amicus Curiae* 9-11; Brief for Former Major City Police Chiefs as *Amici Curiae* 9-12; Brief for Educational Fund 25-28; Brief for Social Scientists et al. as *Amici Curiae* 9-19. In particular, studies have shown that "may issue" licensing regimes, like New York's, are associated with lower homicide rates and lower violent crime rates than "shall issue" licensing regimes. For example, one study compared homicide rates across all 50 States during the 25-year period from 1991 to 2015 and found that "shall issue" laws were associated with 6.5% higher total homicide rates, 8.6% higher firearm homicide rates, and 10.6% higher handgun homicide rates. Siegel, 107 Am.

J. Pub. Health, at 1924-1925, 1927. Another study longitudinally followed 33 States that had adopted "shall-issue" laws between 1981 and 2007 and found that the adoption of those laws was associated with a 13%-15% increase in rates of violent crime after 10 years. Donohue, 16 J. Empirical Legal Studies, at 200, 240. Numerous other studies show similar results. See, *e.g.*, Siegel, 36 J. Rural Health, at 261 (finding that "may issue" laws are associated with 17% lower firearm homicide rates **[*137]** in large cities); C. Crifasi et al., Association Between Firearm Laws and Homicide in Urban Counties, 95 J. Urb. Health 383, 387 (2018) (finding that "shall issue" laws are associated with a 4% increase in firearm homicide rates in urban counties); M. Doucette, C. Crifasi, & S. Frattaroli, Right-to-Carry Laws and Firearm Workplace Homicides: A Longitudinal Analysis (1992-2017), 109 Am. J. Pub. Health 1747, 1751 (Dec. 2019) (finding that States with "shall issue" laws between 1992 and 2017 experienced 29% higher rates of firearm-related workplace homicides); Brief for Social Scientists et al. as *Amici Curiae* 15-16, and nn. 17-20 (citing "thirteen . . . empirical papers from just the last few years linking ['shall issue'] laws to higher violent crime").

JUSTICE ALITO points to competing empirical evidence that arrives at a different conclusion. *Ante*, at 3, n. 1 (concurring opinion). But these types of disagreements are exactly the sort that are better addressed by legislatures than courts. The Court today restricts the ability of legislatures to fulfill that role. It does so without knowing how New York's law is administered in practice, how much discretion licensing officers in New York possess, or whether the proper **[*138]** cause standard differs across counties. And it does so without giving the State an opportunity to develop the evidentiary record to answer those questions. Yet it strikes down New York's licensing regime as a violation of the *Second Amendment*.

III

A

How does the Court justify striking down New York's law without first considering how it actually works on the ground and what purposes it serves? The Court does so by purporting to rely nearly exclusively on history. It requires "the government [to] affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of 'the right to keep and bear arms.'" *Ante*, at 10. Beyond this historical inquiry, the Court refuses to employ what it calls "means-end scrutiny." *Ibid.* That is, it refuses to consider whether

New York has a compelling interest in regulating the concealed carriage of handguns or whether New York's law is narrowly tailored to achieve that interest. Although I agree that history can often be a useful tool in determining the meaning and scope of constitutional provisions, I believe the Court's near-exclusive reliance on that single tool today goes much too far.

The Court concedes that no Court of Appeals [*139] has adopted its rigid history-only approach. See *ante*, at 8. To the contrary, every Court of Appeals to have addressed the question has agreed on a two-step framework for evaluating whether a firearm regulation is consistent with the *Second Amendment*. *Ibid.*; *ante*, at 10, n. 4 (majority opinion) (listing cases from the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and D. C. Circuits). At the first step, the Courts of Appeals use text and history to determine "whether the regulated activity falls within the scope of the *Second Amendment*." *Ezell v. Chicago, 846 F. 3d 888, 892 (CA7 2017)*. If it does, they go on to the second step and consider "'the strength of the government's justification for restricting or regulating'" the *Second Amendment* right. *Ibid.* In doing so, they apply a level of "means-ends" scrutiny "that is proportionate to the severity of the burden that the law imposes on the right": strict scrutiny if the burden is severe, and intermediate scrutiny if it is not. *National Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 700 F. 3d 185, 195, 198, 205 (CA5 2012)*.

The Court today replaces the Courts of Appeals' consensus framework with its own history-only approach. That is unusual. We do not normally disrupt settled consensus among the Courts of Appeals, especially not when that consensus approach has been applied without issue for [*140] over a decade. See Brief for *Second Amendment* Law Professors as *Amici Curiae* 4, 13-15; see also this Court's *Rule 10*. The Court attempts to justify its deviation from our normal practice by claiming that the Courts of Appeals' approach is inconsistent with *Heller*. See *ante*, at 10. In doing so, the Court implies that all 11 Courts of Appeals that have considered this question misread *Heller*.

To the contrary, it is this Court that misreads *Heller*. The opinion in *Heller* did focus primarily on "constitutional text and history," *ante*, at 13 (majority opinion), but it did *not* "rejec[t] . . . means-end scrutiny," as the Court claims, *ante*, at 15. Consider what the *Heller* Court actually said. True, the Court spent many pages in *Heller* discussing the text and historical context of the

*Second Amendment*. *554 U. S., at 579-619, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. But that is not surprising because the *Heller* Court was asked to answer the preliminary question whether the *Second Amendment* right to "bear Arms" encompasses an individual right to possess a firearm in the home for self-defense. *Id., at 577, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. The *Heller* Court concluded that the *Second Amendment's* text and history were sufficiently clear to resolve that question: The *Second Amendment*, it said, does include such an individual right. *Id., at 579-619, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. There was thus no need for the Court to go further—to look beyond text and history, or to suggest what analysis [*141] would be appropriate in other cases where the text and history are not clear.

But the *Heller* Court did not end its opinion with that preliminary question. After concluding that the *Second Amendment* protects an individual right to possess a firearm for self-defense, the *Heller* Court added that right is "not unlimited." *Id., at 626*. It thus had to determine whether the District of Columbia's law, which banned handgun possession in the home, was a permissible regulation of that right. *Id., at 628-630, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. In answering that second question, it said: "Under *any of the standards of scrutiny that we have applied to enumerated constitutional rights*, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family' would fail constitutional muster." *Id., at 628-629, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (emphasis added; footnote and citation omitted). That language makes clear that the *Heller* Court understood some form of means-end scrutiny to apply. It did not need to specify whether that scrutiny should be intermediate or strict because, in its view, the District's handgun ban was so "severe" that it would have failed either level of scrutiny. *Id., at 628-629, 128 S. Ct. 2783, 171 L. Ed. 2d 637*; see also *id., at 628, n. 27, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (clarifying that rational-basis review was not the proper level of scrutiny).

Despite *Heller's* express [*142] invocation of means-end scrutiny, the Court today claims that the majority in *Heller* rejected means-end scrutiny because it rejected my dissent in that case. But that argument misreads both my dissent and the majority opinion. My dissent in *Heller* proposed directly weighing "the interests protected by the *Second Amendment* on one side and the governmental public-safety concerns on the other." *Id., at 689, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. I would have asked "whether the statute burdens a protected

interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id., at 689-690, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. The majority rejected my dissent, not because I proposed using means-end scrutiny, but because, in its view, I had done the opposite. In its own words, the majority faulted my dissent for proposing "a *freestanding* 'interest-balancing' approach" that accorded with "*none of the traditionally expressed levels* [of scrutiny] (strict scrutiny, intermediate scrutiny, rational basis)." *Id., at 634, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (emphasis added).

The majority further made clear that its rejection of freestanding interest balancing did *not* extend to traditional forms of means-end scrutiny. It said: "We know of no other enumerated constitutional right [**143] whose core protection has been subjected to a freestanding 'interest-balancing' approach." *Ibid.* To illustrate this point, it cited as an example the *First Amendment* right to free speech. *Id., at 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Judges, of course, regularly use means-end scrutiny, including both strict and intermediate scrutiny, when they interpret or apply the *First Amendment*. See, *e.g.*, *United States v. Playboy Entertainment Group, Inc., 529 U. S. 803, 813, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000)* (applying strict scrutiny); *Turner Broadcasting System, Inc. v. FCC, 520 U. S. 180, 186, 189-190, 117 S. Ct. 1174, 137 L. Ed. 2d 369 (1997)* (applying intermediate scrutiny). The majority therefore cannot have intended its opinion, consistent with our *First Amendment* jurisprudence, to be read as rejecting all traditional forms of means-end scrutiny.

As *Heller*'s *First Amendment* example illustrates, the Court today is wrong when it says that its rejection of means-end scrutiny and near-exclusive focus on history "accords with how we protect other constitutional rights." *Ante*, at 15. As the Court points out, we do look to history in the *First Amendment* context to determine "whether the expressive conduct falls outside of the category of protected speech." *Ibid.* But, if conduct falls within a category of protected speech, we then use means-end scrutiny to determine whether a challenged regulation unconstitutionally burdens that speech. And the degree of scrutiny we apply often depends on the type of speech burdened and the severity [**144] of the burden. See, *e.g.*, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 564 U. S. 721, 734, 131 S. Ct. 2806, 180 L. Ed. 2d 664 (2011)* (applying strict scrutiny to laws that burden political speech); *Ward v. Rock Against Racism, 491 U. S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)* (applying intermediate scrutiny to time, place, and manner restrictions); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y., 447 U. S. 557, 564-566, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)* (applying intermediate scrutiny to laws that burden commercial speech).

Additionally, beyond the right to freedom of speech, we regularly use means-end scrutiny in cases involving other constitutional provisions. See, *e.g.*, *Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U. S. 520, 546, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)* (applying strict scrutiny under the *First Amendment* to laws that restrict free exercise of religion in a way that is not neutral and generally applicable); *Adarand Constructors v. Pena, 515 U.S. 200, 227, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995)* (applying strict scrutiny under the *Equal Protection Clause* to race-based classifications); *Clark v. Jeter, 486 U. S. 456, 461, 108 S. Ct. 1910, 100 L. Ed. 2d 465 (1988)* (applying intermediate scrutiny under the *Equal Protection Clause* to sex-based classifications); see also *Virginia v. Moore, 553 U. S. 164, 171, 128 S. Ct. 1598, 170 L. Ed. 2d 559 (2008)* ("When history has not provided a conclusive answer, we have analyzed a search or seizure in light of traditional standards of reasonableness").

The upshot is that applying means-end scrutiny to laws that regulate the *Second Amendment* right to bear arms would not create a constitutional anomaly. Rather, it is the Court's rejection of means-end scrutiny and adoption of a rigid history-only approach that is anomalous.

B

The Court's near-exclusive reliance on history is not only unnecessary, it is deeply impractical. It imposes [**145] a task on the lower courts that judges cannot easily accomplish. Judges understand well how to weigh a law's objectives (its "ends") against the methods used to achieve those objectives (its "means"). Judges are far less accustomed to resolving difficult historical questions. Courts are, after all, staffed by lawyers, not historians. Legal experts typically have little experience answering contested historical questions or applying those answers to resolve contemporary problems.

The Court's insistence that judges and lawyers rely nearly exclusively on history to interpret the *Second Amendment* thus raises a host of troubling questions. Consider, for example, the following. Do lower courts have the research resources necessary to conduct

exhaustive historical analyses in every *Second Amendment* case? What historical regulations and decisions qualify as representative analogues to modern laws? How will judges determine which historians have the better view of close historical questions? Will the meaning of the *Second Amendment* change if or when new historical evidence becomes available? And, most importantly, will the Court's approach permit judges to reach the outcomes they prefer and then cloak those outcomes in the language of history? **[*146]** See S. Cornell, *Heller*, New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss," *56 UCLA L. Rev. 1095, 1098 (2009)* (describing "law office history" as "a results oriented methodology in which evidence is selectively gathered and interpreted to produce a preordained conclusion").

Consider *Heller* itself. That case, fraught with difficult historical questions, illustrates the practical problems with expecting courts to decide important constitutional questions based solely on history. The majority in *Heller* undertook 40 pages of textual and historical analysis and concluded that the *Second Amendment's* protection of the right to "keep and bear Arms" historically encompassed an "individual right to possess and carry weapons in case of confrontation"—that is, for self-defense. *554 U. S., at 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637*; see also *id., at 579-619, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Justice Stevens' dissent conducted an equally searching textual and historical inquiry and concluded, to the contrary, that the term "bear Arms" was an idiom that protected only the right "to use and possess arms in conjunction with service in a well-regulated militia." *Id., at 651, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. I do not intend to relitigate *Heller* here. I accept its holding as a matter of *stare decisis*. I refer to its historical analysis only to show the difficulties inherent in answering **[*147]** historical questions and to suggest that judges do not have the expertise needed to answer those questions accurately.

For example, the *Heller* majority relied heavily on its interpretation of the English *Bill of Rights*. Citing Blackstone, the majority claimed that the English *Bill of Rights* protected a "'right of having and using arms for self-preservation and defence.'" *Id., at 594, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (quoting 1 Commentaries on the Laws of England 140 (1765)). The majority interpreted that language to mean a private right to bear arms for self-defense, "having nothing whatever to do with service in a militia." *554 U. S., at 593, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Two years later, however, 21 English and early American historians (including experts

at top universities) told us in *McDonald v. Chicago, 561 U. S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*, that the *Heller* Court had gotten the history wrong: The English Bill of Rights "did not . . . protect an individual's right to possess, own, or use arms for private purposes such as to defend a home against burglars." Brief for English/Early American Historians as *Amici Curiae* in *McDonald* v. *Chicago*, O. T. 2009, No. 08-1521, p. 2. Rather, these *amici* historians explained, the English right to "have arms" ensured that the Crown could not deny Parliament (which represented the people) the power to arm the landed gentry and raise a militia—or **[*148]** the right of the people to possess arms to take part in that militia—"should the sovereign usurp the laws, liberties, estates, and Protestant religion of the nation." *Id.*, at 2-3. Thus, the English right did protect a right of "self-preservation and defence," as Blackstone said, but that right "was to be exercised not by individuals acting privately or independently, but as a militia organized by their elected representatives," *i.e.*, Parliament. *Id., at 7-8*. The Court, not an expert in history, had misread Blackstone and other sources explaining the English *Bill of Rights*.

And that was not the *Heller* Court's only questionable judgment. The majority rejected Justice Stevens' argument that the *Second Amendment's* use of the words "bear Arms" drew on an idiomatic meaning that, at the time of the founding, commonly referred to military service. *554 U. S., at 586, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. Linguistics experts now tell us that the majority was wrong to do so. See, *e.g.*, Brief for Corpus Linguistics Professors and Experts as *Amici Curiae* (Brief for Linguistics Professors); Brief for Neal Goldfarb as *Amicus Curiae*; Brief for Americans Against Gun Violence as *Amicus Curiae* 13-15. Since *Heller* was decided, experts have searched over 120,000 founding-era texts from between 1760 and 1799, as **[*149]** well as 40,000 texts from sources dating as far back as 1475, for historical uses of the phrase "bear arms," and they concluded that the phrase was overwhelmingly used to refer to "'war, soldiering, or other forms of armed action by a group rather than an individual.'" Brief for Linguistics Professors 11, 14; see also D. Baron, Corpus Evidence Illuminates the Meaning of Bear Arms, *46 Hastings Const. L. Q. 509, 510 (2019)* ("Non-military uses of *bear arms* in reference to hunting or personal self-defense are not just rare, they are almost nonexistent"); *id., at 510-511* (reporting 900 instances in which "bear arms" was used to refer to military or collective use of firearms and only 7 instances that were either ambiguous or without a military connotation).

2022 U.S. LEXIS 3055, *149

These are just two examples. Other scholars have continued to write books and articles arguing that the Court's decision in *Heller* misread the text and history of the *Second Amendment*. See generally, *e.g.*, M. Waldman, The *Second Amendment* (2014); S. Cornell, The Changing Meaning of the Right To Keep and Bear Arms: 1688-1788, in Guns in Law 20-27 (A. Sarat, L. Douglas, & M. Umphrey eds. 2019); P. Finkelman, The Living Constitution and the *Second Amendment*: Poor History, False Originalism, and a Very Confused Court, *37 Cardozo L. Rev. 623 (2015)*; D. Walker, **[*150]** Necessary to the Security of Free States: The *Second Amendment* as the Auxiliary Right of Federalism, *56 Am. J. Legal Hist. 365 (2016)*; W. Merkel, *Heller* as Hubris, and How *McDonald* v. *City of Chicago* May Well Change the Constitutional World as We Know It, *50 Santa Clara L. Rev. 1221 (2010)*.

I repeat that I do not cite these arguments in order to relitigate *Heller*. I wish only to illustrate the difficulties that may befall lawyers and judges when they attempt to rely *solely* on history to interpret the Constitution. In *Heller*, we attempted to determine the scope of the *Second Amendment* right to bear arms by conducting a historical analysis, and some of us arrived at very different conclusions based on the same historical sources. Many experts now tell us that the Court got it wrong in a number of ways. That is understandable given the difficulty of the inquiry that the Court attempted to undertake. The Court's past experience with historical analysis should serve as a warning against relying exclusively, or nearly exclusively, on this mode of analysis in the future.

Failing to heed that warning, the Court today does just that. Its near-exclusive reliance on history will pose a number of practical problems. First, the difficulties attendant to extensive historical analysis will be especially acute in the lower **[*151]** courts. The Court's historical analysis in this case is over 30 pages long and reviews numerous original sources from over 600 years of English and American history. *Ante*, at 30-62. Lower courts—especially district courts—typically have fewer research resources, less assistance from *amici* historians, and higher caseloads than we do. They are therefore ill equipped to conduct the type of searching historical surveys that the Court's approach requires. Tellingly, even the Courts of Appeals that have addressed the question presented here (namely, the constitutionality of public carriage restrictions like New York's) "have, in large part, avoided extensive historical analysis." *Young v. Hawaii, 992 F. 3d 765, 784-785 (CA9 2021)* (collecting cases). In contrast, lawyers and

courts are well equipped to administer means-end scrutiny, which is regularly applied in a variety of constitutional contexts, see *supra*, at 24-25.

Second, the Court's opinion today compounds these problems, for it gives the lower courts precious little guidance regarding how to resolve modern constitutional questions based almost solely on history. See, *e.g.*, *ante*, at 1 (BARRETT, J., concurring) ("highlight[ing] two methodological points that the Court does not resolve"). **[*152]** The Court declines to "provide an exhaustive survey of the features that render regulations relevantly similar under the *Second Amendment*." *Ante*, at 20. Other than noting that its history-only analysis is "neither a . . . straightjacket nor a . . . blank check," the Court offers little explanation of how stringently its test should be applied. *Ante*, at 21. Ironically, the only two "relevan[t]" metrics that the Court does identify are "how and why" a gun control regulation "burden[s the] right to armed self-defense." *Ante*, at 20. In other words, the Court believes that the most relevant metrics of comparison are a regulation's means (how) and ends (why)—even as it rejects the utility of means-end scrutiny.

What the Court offers instead is a laundry list of reasons to discount seemingly relevant historical evidence. The Court believes that some historical laws and decisions cannot justify upholding modern regulations because, it says, they were outliers. It explains that just two court decisions or three colonial laws are not enough to satisfy its test. *Ante*, at 37, 57. But the Court does not say how many cases or laws would suffice "to show a tradition of public-carry regulation." *Ante*, at 37. Other **[*153]** laws are irrelevant, the Court claims, because they are too dissimilar from New York's concealed-carry licensing regime. See, *e.g.*, *ante*, at 48-49. But the Court does not say what "representative historical analogue," short of a "twin" or a "dead ringer," would suffice. See *ante*, at 21 (emphasis deleted). Indeed, the Court offers many and varied reasons to reject potential representative analogues, but very few reasons to accept them. At best, the numerous justifications that the Court finds for rejecting historical evidence give judges ample tools to pick their friends out of history's crowd. At worst, they create a one-way ratchet that will disqualify virtually any "representative historical analogue" and make it nearly impossible to sustain common-sense regulations necessary to our Nation's safety and security.

Third, even under ideal conditions, historical evidence will often fail to provide clear answers to difficult

questions. As an initial matter, many aspects of the history of firearms and their regulation are ambiguous, contradictory, or disputed. Unsurprisingly, the extent to which colonial statutes enacted over 200 years ago were actually enforced, the basis for an acquittal [*154] in a 17th-century decision, and the interpretation of English laws from the Middle Ages (to name just a few examples) are often less than clear. And even historical experts may reach conflicting conclusions based on the same sources. Compare, *e.g.*, P. Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, *60 Clev. St. L. Rev. 1, 14 (2012)*, with J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 104 (1994). As a result, history, as much as any other interpretive method, leaves ample discretion to "loo[k] over the heads of the [crowd] for one's friends." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 377 (2012).

Fourth, I fear that history will be an especially inadequate tool when it comes to modern cases presenting modern problems. Consider the Court's apparent preference for founding-era regulation. See *ante*, at 25-28. Our country confronted profoundly different problems during that time period than it does today. Society at the founding was "predominantly rural." C. McKirdy, Misreading the Past: The Faulty Historical Basis Behind the Supreme Court's Decision in District of Columbia v. Heller, *45 Capital U. L. Rev. 107, 151 (2017)*. In 1790, most of America's [*155] relatively small population of just four million people lived on farms or in small towns. *Ibid.* Even New York City, the largest American city then, as it is now, had a population of just 33,000 people. *Ibid.* Small founding-era towns are unlikely to have faced the same degrees and types of risks from gun violence as major metropolitan areas do today, so the types of regulations they adopted are unlikely to address modern needs. *Id., at 152* ("For the most part, a population living on farms and in very small towns did not create conditions in which firearms created a significant danger to the public welfare"); see also *supra*, at 8-9.

This problem is all the more acute when it comes to "modern-day circumstances that [the Framers] could not have anticipated." *Heller, 554 U. S., at 721-722, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (BREYER, J., dissenting). How can we expect laws and cases that are over a century old to dictate the legality of regulations targeting "ghost guns" constructed with the aid of a three-dimensional printer? See, *e.g.*, White House Briefing Room, FACT SHEET: The Biden Administration Cracks Down on Ghost Guns, Ensures That ATF Has the Leadership It Needs To Enforce Our Gun Laws (Apr. 11, 2022), https://whitehouse.gov/briefing-room/statements-releases/2022/ [*156] 04/11 /fact-sheet-the-biden-administration-cracks-down-on-ghost-guns-ensures-that-atf-has-the-leadership-it-needs-to-enforce-our-gun-laws/. Or modern laws requiring all gun shops to offer smart guns, which can only be fired by authorized users? See, *e.g.*, *N. J. Stat. Ann. §2C:58-2.10(a)* (West Cum. Supp. 2022). Or laws imposing additional criminal penalties for the use of bullets capable of piercing body armor? See, *e.g.*, *18 U. S. C. §§921(a)(17)(B)*, *929(a)*.

The Court's answer is that judges will simply have to employ "analogical reasoning." *Ante*, at 19-20. But, as I explained above, the Court does not provide clear guidance on how to apply such reasoning. Even seemingly straightforward historical restrictions on firearm use may prove surprisingly difficult to apply to modern circumstances. The Court affirms *Heller*'s recognition that States may forbid public carriage in "sensitive places." *Ante*, at 21-22. But what, in 21st-century New York City, may properly be considered a sensitive place? Presumably "legislative assemblies, polling places, and courthouses," which the Court tells us were among the "relatively few" places "where weapons were altogether prohibited" in the 18th and 19th centuries. *Ante*, at 21. On the other hand, the Court also tells us that [*157] "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines th[at] category . . . far too broadly." *Ante*, at 22. So where does that leave the many locations in a modern city with no obvious 18th- or 19th-century analogue? What about subways, nightclubs, movie theaters, and sports stadiums? The Court does not say.

Although I hope—fervently—that future courts will be able to identify historical analogues supporting the validity of regulations that address new technologies, I fear that it will often prove difficult to identify analogous technological and social problems from Medieval England, the founding era, or the time period in which the *Fourteenth Amendment* was ratified. Laws addressing repeating crossbows, launcegays, dirks, dagges, skeines, stilladers, and other ancient weapons will be of little help to courts confronting modern problems. And as technological progress pushes our society ever further beyond the bounds of the Framers' imaginations, attempts at "analogical reasoning" will become increasingly tortured. In short, a standard that relies solely on history is unjustifiable and unworkable.

IV

Indeed, the Court's **[*158]** application of its history-only test in this case demonstrates the very pitfalls described above. The historical evidence reveals a 700-year Anglo-American tradition of regulating the public carriage of firearms in general, and concealed or concealable firearms in particular. The Court spends more than half of its opinion trying to discredit this tradition. But, in my view, the robust evidence of such a tradition cannot be so easily explained away. Laws regulating the public carriage of weapons existed in England as early as the 13th century and on this Continent since before the founding. Similar laws remained on the books through the ratifications of the *Second* and *Fourteenth Amendments* through to the present day. Many of those historical regulations imposed significantly stricter restrictions on public carriage than New York's licensing requirements do today. Thus, even applying the Court's history-only analysis, New York's law must be upheld because "historical precedent from before, during, and . . . after the founding evinces a comparable tradition of regulation." *Ante*, at 18 (majority opinion) (internal quotation marks omitted).

A. England.

The right codified by the *Second Amendment* was "'inherited from our English ancestors.'" **[*159]** *Heller, 554 U. S., at 599, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (quoting *Robertson v. Baldwin, 165 U. S. 275, 281, 17 S. Ct. 326, 41 L. Ed. 715 (1897)*); see also *ante*, at 30 (majority opinion). And some of England's earliest laws regulating the public carriage of weapons were precursors of similar American laws enacted roughly contemporaneously with the ratification of the *Second Amendment*. See *infra*, at 40-42. I therefore begin, as the Court does, *ante*, at 30-31, with the English ancestors of New York's laws regulating public carriage of firearms.

The relevant English history begins in the late-13th and early-14th centuries, when Edward I and Edward II issued a series of orders to local sheriffs that prohibited any person from "going armed." See 4 Calendar of the Close Rolls, Edward I, 1296-1302, p. 318 (Sept. 15, 1299) (1906); *id.*, at 588 (July 16, 1302); 5 *id.*, Edward I, 1302-1307, at 210 (June 10, 1304) (1908); *id.*, Edward II, 1307-1313, at 52 (Feb. 9, 1308) (1892); *id.*, at 257 (Apr. 9, 1310); *id.*, at 553 (Oct. 12, 1312); *id.*, Edward II, 1323-1327, at 560 (Apr. 28, 1326) (1898); 1 Calendar of Plea and Memoranda Rolls of the City of London, 1323-1364, p. 15 (Nov. 1326) (A. Thomas ed. 1926). Violators

were subject to punishment, including "forfeiture of life and limb." See, 4 Calendar of the Close Rolls, Edward I, 1296-1302, at **[*160]** 318 (Sept. 15, 1299) (1906). Many of these royal edicts contained exemptions for persons who had obtained "the king's special licence." See *ibid.*; 5 *id.*, Edward I, 1302-1307, at 210 (June 10, 1304); *id.*, Edward II, 1307-1313, at 553 (Oct. 12, 1312); *id.*, Edward II, 1323-1327, at 560 (Apr. 28, 1326). Like New York's law, these early edicts prohibited public carriage absent special governmental permission and enforced that prohibition on pain of punishment.

The Court seems to suggest that these early regulations are irrelevant because they were enacted during a time of "turmoil" when "malefactors . . . harried the country, committing assaults and murders." *Ante*, at 31 (internal quotation marks omitted). But it would seem to me that what the Court characterizes as a "right of armed self-defense" would be more, rather than less, necessary during a time of "turmoil." *Ante*, at 20. The Court also suggests that laws that were enacted before firearms arrived in England, like these early edicts and the subsequent Statute of Northampton, are irrelevant. *Ante*, at 32. But why should that be? Pregun regulations prohibiting "going armed" in public illustrate an entrenched tradition of restricting **[*161]** public carriage of weapons. That tradition seems as likely to apply to firearms as to any other lethal weapons—particularly if we follow the Court's instruction to use analogical reasoning. See *ante*, at 19-20. And indeed, as we shall shortly see, the most significant prefirearm regulation of public carriage—the Statute of Northampton—was in fact applied to guns once they appeared in England. See *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)

The Statute of Northampton was enacted in 1328. 2 Edw. 3, 258, c. 3. By its terms, the statute made it a criminal offense to carry arms without the King's authorization. It provided that, without such authorization, "no Man great nor small, of what Condition soever he be," could "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." *Ibid.* For more than a century following its enactment, England's sheriffs were routinely reminded to strictly enforce the Statute of Northampton against those going armed without the King's permission. See Calendar of the Close Rolls, Edward III, 1330-1333, at 131 (Apr. 3, 1330) (1898); **[*162]** 1 Calendar of the Close Rolls,

Richard II, 1377-1381, at 34 (Dec. 1, 1377) (1914); 2 *id.*, Richard II, 1381-1385, at 3 (Aug. 7, 1381) (1920); 3 *id.*, Richard II, 1385-1389, at 128 (Feb. 6, 1386) (1921); *id*, at 399-400 (May 16, 1388); 4 *id.*, Henry VI, 1441-1447, at 224 (May 12, 1444) (1937); see also 11 Tudor Royal Proclamations, The Later Tudors: 1553-1587, pp. 442-445 (Proclamation 641, 21 Elizabeth I, July 26, 1579) (P. Hughes & J. Larkin eds. 1969).

The Court thinks that the Statute of Northampton "has little bearing on the *Second Amendment*," in part because it was "enacted . . . more than 450 years before the ratification of the Constitution." *Ante*, at 32. The statute, however, remained in force for hundreds of years, well into the 18th century. See 4 W. Blackstone, Commentaries 148-149 (1769) ("The offence of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; *and is particularly prohibited by the Statute of Northampton*" (first emphasis in original, second emphasis added)). It was discussed in the writings of Blackstone, Coke, and others. See *ibid.*; W. Hawkins, 1 Pleas of the Crown 135 (1716) (Hawkins); E. Coke, [*163] The Third Part of the Institutes of the Laws of England 160 (1797). And several American Colonies and States enacted restrictions modeled on the statute. See *infra*, at 40-42. There is thus every reason to believe that the Framers of the *Second Amendment* would have considered the Statute of Northampton a significant chapter in the Anglo-American tradition of firearms regulation.

The Court also believes that, by the end of the 17th century, the Statute of Northampton was understood to contain an extratextual intent element: the intent to cause terror in others. *Ante*, at 34-38, 41. The Court relies on two sources that arguably suggest that view: a 1686 decision, *Sir John Knight's Case*, and a 1716 treatise written by Serjeant William Hawkins. *Ante*, at 34-37. But other sources suggest that carrying arms in public was prohibited *because* it naturally tended to terrify the people. See, *e.g.*, M. Dalton, The Country Justice 282-283 (1690) ("[T]o wear Armor, or Weapons not usually worn, . . . seems also be a breach, or means of breach of the Peace . . . ; *for* they strike a fear and terror in the People" (emphasis added)). According to these sources, terror was the natural consequence—not an additional element—of the crime.

I find this [*164] view more persuasive in large part because it is not entirely clear that the two sources the Court relies on actually support the existence of an intent-to-terrify requirement. Start with *Sir John Knight's*

*Case*, which, according to the Court, considered Knight's arrest for walking "'about the streets'" and into a church "'armed with guns.'" *Ante*, at 34 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep., at 76). The Court thinks that Knight's acquittal by a jury demonstrates that the Statute of Northampton only prohibited public carriage of firearms with an intent to terrify. *Ante*, at 34-35. But by now the legal significance of Knight's acquittal is impossible to reconstruct. Brief for Patrick J. Charles as *Amicus Curiae* 23, n. 9. The primary source describing the case (the English Reports) was notoriously incomplete at the time *Sir John Knight's Case* was decided. *Id.*, at 24-25. And the facts that historians can reconstruct do not uniformly support the Court's interpretation. The King's Bench required Knight to pay a surety to guarantee his future good behavior, so it may be more accurate to think of the case as having ended in "a conditional pardon" than acquittal. *Young, 992 F. 3d, at 791*; see also *Rex* v. *Sir John Knight*, 1 Comb. 40, 90 Eng. Rep. 331 (K. B. 1686). And, notably, it appears that Knight based his defense on his loyalty to the Crown, not a lack [*165] of intent to terrify. 3 The Entring Book of Roger Morrice 1677-1691: The Reign of James II, 1685-1687, pp. 307-308 (T. Harris ed. 2007).

Similarly, the passage from the Hawkins treatise on which the Court relies states that the Statute of Northampton's prohibition on the public carriage of weapons did not apply to the "wearing of Arms . . . unless it be accompanied with such Circumstances as are apt to terrify the People." Hawkins 136. But Hawkins goes on to enumerate relatively narrow circumstances where this exception applied: when "Persons of Quality . . . wea[r] common Weapons, or hav[e] their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them," or to persons merely wearing "privy Coats of Mail." *Ibid.* It would make little sense if a narrow exception for nobility, see Oxford English Dictionary (3d ed., Dec. 2012), https://www.oed.com/view/Entry/155878 (defining "quality," A.I.5.a), and "privy coats of mail" were allowed to swallow the broad rule that Hawkins (and other commentators of his time) described elsewhere. That rule provided that "there may be an Affray where [*166] there is no actual Violence; as where a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People, which is . . . strictly prohibited by [the Statute of Northampton]." Hawkins 135. And it provided no exception for those who attempted to "excuse the wearing such Armour in Publick, by alleging

that . . . he wears it for the Safety of his Person from . . . Assault." *Id.*, at 136. In my view, that rule announces the better reading of the Statute of Northampton—as a broad prohibition on the public carriage of firearms and other weapons, without an intent-to-terrify requirement or exception for self-defense.

Although the Statute of Northampton is particularly significant because of its breadth, longevity, and impact on American law, it was far from the only English restriction on firearms or their carriage. See, *e.g.*, 6 Hen. 8 c. 13, §1 (1514) (restricting the use and ownership of handguns); 25 Hen. 8 c. 17, §1 (1533) (same); 33 Hen. 8 c. 6, §§1-2 (1541) (same); 25 Edw. 3, st. 5, c. 2 (1350) (making it a "Felony or Trespass" to "ride armed covertly or secretly with Men of Arms against any other, to slay him, or rob him, or take him, or retain him till he hath made Fine or Ransom for to have **[*167]** his Deliverance") (brackets and footnote omitted). Whatever right to bear arms we inherited from our English forebears, it was qualified by a robust tradition of public carriage regulations.

As I have made clear, I am not a historian. But if the foregoing facts, which historians and other scholars have presented to us, are even roughly correct, it is difficult to see how the Court can believe that English history fails to support legal restrictions on the public carriage of firearms.

B. The Colonies.

The American Colonies continued the English tradition of regulating public carriage on this side of the Atlantic. In 1686, the colony of East New Jersey passed a law providing that "no person or persons . . . shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province." An Act against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881). East New Jersey also specifically prohibited "planter[s]" from "rid[ing] or go[ing] armed with sword, pistol, or dagger." *Ibid.* Massachusetts Bay and New Hampshire followed suit in 1692 and 1771, **[*168]** respectively, enacting laws that, like the Statute of Northampton, provided that those who went "armed Offensively" could be punished. An Act for the Punishing of Criminal Offenders, 1692 Mass. Acts and Laws no. 6, pp. 11-12; An Act for the Punishing of Criminal Offenders, 1771 N. H. Acts and Laws ch. 6, §5, p. 17.

It is true, as the Court points out, that these laws were only enacted in three colonies. *Ante*, at 37. But that

does not mean that they may be dismissed as outliers. They were successors to centuries of comparable laws in England, see *supra*, at 34-40, and predecessors to numerous similar (in some cases, materially identical) laws enacted by the States after the founding, see *infra*, at 41-42. And while it may be true that these laws applied only to "dangerous and unusual weapons," see *ante*, at 38 (majority opinion), that category almost certainly included guns, see Charles, *60 Clev. St. L. Rev., at 34, n. 181* (listing 18th century sources defining "'offensive weapons'" to include "'Fire Arms'" and "'Guns'"); *State v. Huntly, 25 N. C. 418, 422 (1843)* (*per curiam*) ("A gun is an 'unusual weapon,' wherewith to be armed and clad"). Finally, the Court points out that New Jersey's ban on public carriage applied only to certain people or to the concealed **[*169]** carriage of certain smaller firearms. *Ante*, at 39-40. But the Court's refusal to credit the relevance of East New Jersey's law on this basis raises a serious question about what, short of a "twin" or a "dead ringer," qualifies as a relevant historical analogue. See *ante*, at 21 (majority opinion) (emphasis deleted).

C. The Founding Era.

The tradition of regulations restricting public carriage of firearms, inherited from England and adopted by the Colonies, continued into the founding era. Virginia, for example, enacted a law in 1786 that, like the Statute of Northampton, prohibited any person from "go[ing] nor rid[ing] armed by night nor by day, in fairs or markets, or in other places, in terror of the Country." 1786 Va. Acts, ch. 21. And, as the Court acknowledges, "public-carry restrictions proliferate[d]" after the *Second Amendment's* ratification five years later in 1791. *Ante*, at 42. Just a year after that, North Carolina enacted a law whose language was lifted from the Statute of Northampton virtually verbatim (vestigial references to the King included). Collection of Statutes, pp. 60-61, ch. 3 (F. Martin ed. 1792). Other States passed similar laws in the late-18th and 19th centuries. See, *e.g.*, 1795 Mass. Acts and Laws ch. 2, p. 436 **[*170]** ; 1801 Tenn. Acts pp. 260-261; 1821 Me. Laws p. 285; see also Charles, *60 Clev. St. L. Rev., at 40, n. 213* (collecting sources).

The Court discounts these laws primarily because they were modeled on the Statute of Northampton, which it believes prohibited only public carriage with the intent to terrify. *Ante*, at 41. I have previously explained why I believe that preventing public terror was one *reason* that the Statute of Northampton prohibited public carriage, but not an *element* of the crime. See *supra*, at 37-39.

And, consistent with that understanding, American regulations modeled on the Statute of Northampton appear to have been understood to set forth a broad prohibition on public carriage of firearms without any intent-to-terrify requirement. See Charles, *60 Clev. St. L. Rev., at 35, 37-41*; J. Haywood, A Manual of the Laws of North-Carolina, pt. 2, p. 40 (3d ed.1814); J. Ewing, The Office and Duty of a Justice of the Peace 546 (1805).

The Court cites three cases considering common-law offenses, *ante*, at 42-44, but those cases do not support the view that only public carriage in a manner likely to terrify violated American successors to the Statute of Northampton. If anything, they suggest that public carriage of firearms was not common practice. At least one of **[*171]** the cases the Court cites, *State* v. *Huntly*, wrote that the Statute of Northampton codified a pre-existing common-law offense, which provided that "riding or going armed with dangerous or unusual weapons, is a crime against the public peace, *by* terrifying the good people of the land." *25 N. C., at 420-421* (quoting 4 Blackstone, Commentaries, at 149; emphasis added). *Huntly* added that "[a] gun is an 'unusual weapon'" and that "[n]o man amongst us carries it about with him, as one of his every-day accoutrements—as a part of his dress—and never, we trust, will the day come when any deadly weapon will be worn or wielded in our peace-loving and law-abiding State, as an appendage of manly equipment." *25 N. C., at 422*. True, *Huntly* recognized that citizens were nonetheless "at perfect liberty" to carry for "lawful purpose[s]"—but it specified that those purposes were "business or amusement." *Id., at 422-423*. New York's law similarly recognizes that hunting, target shooting, and certain professional activities are proper causes justifying lawful carriage of a firearm. See *supra*, at 12-13. The other two cases the Court cites for this point similarly offer it only limited support—either because the atextual intent element the Court advocates was irrelevant to **[*172]** the decision's result, see *O'Neill v. State, 16 Ala. 65 (1849)*, or because the decision adopted an outlier position not reflected in the other cases cited by the Court, see *Simpson v. State, 13 Tenn. 356, 360 (1833)*; see also *ante*, at 42-43, 57 (majority opinion) (refusing to give "a pair of state-court decisions" "disproportionate weight"). The founding-era regulations—like the colonial and English laws on which they were modeled—thus demonstrate a longstanding tradition of broad restrictions on public carriage of firearms.

D. The 19th Century.

Beginning in the 19th century, States began to innovate on the Statute of Northampton in at least two ways. First, many States and Territories passed bans on concealed carriage or on any carriage, concealed or otherwise, of certain concealable weapons. For example, Georgia made it unlawful to carry, "unless in an open manner and fully exposed to view, any pistol, (except horseman's pistols,) dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence." Ga. Code §4413 (1861). Other States and Territories enacted similar prohibitions. See, *e.g.*, Ala. Code §3274 (1852) (banning, with limited exceptions, concealed carriage of "a pistol, or any other description of fire arms"); see **[*173]** also *ante*, at 44, n. 16 (majority opinion) (collecting sources). And the Territory of New Mexico appears to have banned all carriage whatsoever of "any class of pistols whatever," as well as "bowie kni[ves,] . . . Arkansas toothpick[s], Spanish dagger[s], slung-shot[s], or any other deadly weapon." 1860 Terr. of N. M. Laws §§1-2, p. 94. These 19th-century bans on concealed carriage were stricter than New York's law, for they prohibited concealed carriage with at most limited exceptions, while New York permits concealed carriage with a lawfully obtained license. See *supra*, at 12. Moreover, as *Heller* recognized, and the Court acknowledges, "the majority of the 19th-century courts to consider the question held that [these types of] prohibitions on carrying concealed weapons *were lawful* under the *Second Amendment* or state analogues." *554 U. S., at 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637* (emphasis added); see also *ante*, at 44.

The Court discounts this history because, it says, courts in four Southern States suggested or held that a ban on concealed carriage was only lawful if open carriage or carriage of military pistols was allowed. *Ante*, at 44-46. (The Court also cites *Bliss v. Commonwealth, 12 Ky. 90 (1822)*, which invalidated Kentucky's concealed-carry prohibition as contrary to that State's *Second Amendment* analogue. *Id., at 90-93*. *Bliss* was later overturned **[*174]** by constitutional amendment and was, as the Court appears to concede, an outlier. See *Peruta v. County of San Diego, 824 F. 3d 919, 935-936 (CA9 2016)*; *ante*, at 45.) Several of these decisions, however, emphasized States' leeway to regulate firearms carriage as necessary "to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence." *State v. Smith, 11 La. Ann. 633 (1856)*; see also *Andrews v. State, 50 Tenn. 165, 179-180 (1871)* (stating that "the right to *keep*" rifles, shotguns, muskets, and repeaters could not be "*infringed* or *forbidden*," but

2022 U.S. LEXIS 3055, *174

"[t]heir *use* [may] be subordinated to such regulations and limitations as are or may be authorized by the law of the land, passed to subserve the general good, so as not to infringe the right secured and the necessary incidents to the exercise of such right"); *State v. Reid, 1 Ala. 612, 616 (1840)* (recognizing that the constitutional right to bear arms "necessarily . . . leave[s] with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals"). And other courts upheld concealed-carry restrictions without any reference to an exception allowing open carriage, so it is far from clear that the cases the Court cites represent a consensus view. See *State v. Mitchell, 3 Blackf. 229 (Ind. 1833)*; *State v. Buzzard, 4 Ark. 18 (1842)*. And, of course, **[*175]** the Court does not say whether the result in this case would be different if New York allowed open carriage by law-abiding citizens as a matter of course.

The second 19th-century innovation, adopted in a number of States, was surety laws. Massachusetts' surety law, which served as a model for laws adopted by many other States, provided that any person who went "armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon," and who lacked "reasonable cause to fear an assault [*sic*]," could be made to pay a surety upon the "complaint of any person having reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836). Other States and Territories enacted identical or substantially similar laws. See, *e.g.*, Me. Rev. Stat., ch. 169, §16 (1840); Mich. Rev. Stat., ch. 162, §16 (1846); Terr. of Minn. Rev. Stat., ch. 112, §18 (1851); 1854 Ore. Stat., ch. 16, §17; W. Va. Code, ch. 153, §8 (1868); 1862 Pa. Laws p. 250, §6. These laws resemble New York's licensing regime in many, though admittedly not all, relevant respects. Most notably, like New York's proper cause requirement, the surety laws conditioned public carriage in at least some circumstances on a special showing of need. Compare *supra*, at 13, with Mass. Rev. Stat., ch. 134, §16.

The Court believes that the absence of recorded cases involving surety laws means that they were rarely enforced. *Ante*, at 49-50. Of **[*176]** course, this may just as well show that these laws were normally followed. In any case, scholars cited by the Court tell us that "traditional case law research is not especially probative of the application of these restrictions" because "in many cases those records did not survive the passage of time" or "are not well indexed or digitally searchable." E. Ruben & S. Cornell, Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L. J. Forum 121, 130-131, n. 53 (2015). On the contrary, "the fact that restrictions on public carry were well accepted in places like Massachusetts and were included in the relevant manuals for justices of the peace" suggests "that violations were enforced at the justice of peace level, but did not result in expensive appeals that would have produced searchable case law." *Id., at 131, n. 53* (citation omitted). The surety laws and broader bans on concealed carriage enacted in the 19th century demonstrate that even relatively stringent restrictions on public carriage have long been understood to be consistent with the *Second Amendment* and its state equivalents.

E. Postbellum Regulation.

After the Civil War, public carriage of firearms remained subject to extensive regulation. See, *e.g.*, Cong. Globe, **[*177]** 39th Cong., 1st Sess., 908 (1866) ("The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons"). Of course, during this period, Congress provided (and commentators recognized) that firearm regulations could not be designed or enforced in a discriminatory manner. See *ibid.*; Act of July 16, 1866, §14, 14 Stat. 176-177 (ensuring that all citizens were entitled to the "full and equal benefit of all laws . . . including the constitutional right to keep and bear arms . . . without respect to race or color, or previous condition of slavery"); see also The Loyal Georgian, Feb. 3, 1866, p. 3, col. 4. But that by-now uncontroversial proposition says little about the validity of nondiscriminatory restrictions on public carriage, like New York's.

What is more relevant for our purposes is the fact that, in the postbellum period, States continued to enact generally applicable restrictions on public carriage, many of which were even more restrictive than their predecessors. See S. Cornell & J. Florence, The Right to Bear Arms in the Era of the *Fourteenth Amendment*: Gun Rights or Gun Regulation? **[*178]** *50 Santa Clara L. Rev. 1043, 1066 (2010)*. Most notably, many States and Western Territories enacted stringent regulations that prohibited *any* public carriage of firearms, with only limited exceptions. For example, Texas made it a misdemeanor to carry in public "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense" absent "reasonable grounds for fearing an [immediate and pressing]

unlawful attack." 1871 Tex. Gen. Laws ch. 34, §1. Similarly, New Mexico made it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory." 1869 Terr. of N. M. Laws ch. 32, §1. New Mexico's prohibition contained only narrow exceptions for carriage on a person's own property, for self-defense in the face of immediate danger, or with official authorization. *Ibid.* Other States and Territories adopted similar laws. See, *e.g.*, 1875 Wyo. Terr. Sess. Laws ch. 52, §1; 1889 Idaho Terr. Gen. Laws §1, p. 23; 1881 Kan. Sess. Laws §23, p. 92; 1889 Ariz. Terr. Sess. Laws no. 13, §1, p. 16.

When they were challenged, these laws were generally upheld. P. Charles, The Faces of the *Second Amendment* Outside the Home, Take Two: How We Got Here and Why It Matters, *64 Clev. St. L. Rev. 373, 414 (2016)*; see also *ante,* at 56-57 (majority opinion) (recognizing that postbellum **[\*179]** Texas law and court decisions support the validity of New York's licensing regime); *Andrews, 50 Tenn., at 182* (recognizing that "a man may well be prohibited from carrying his arms to church, or other public assemblage," and that the carriage of arms other than rifles, shot guns, muskets, and repeaters "may be prohibited if the Legislature deems proper, absolutely, at all times, and under all circumstances").

The Court's principal answer to these broad prohibitions on public carriage is to discount gun control laws passed in the American West. *Ante,* at 58-61. It notes that laws enacted in the Western Territories were "rarely subject to judicial scrutiny." *Ante,* at 60. But, of course, that may well mean that "[w]e . . . can assume it settled that these" regulations were "consistent with the *Second Amendment*." See *ante,* at 21 (majority opinion). The Court also reasons that laws enacted in the Western Territories applied to a relatively small portion of the population and were comparatively short lived. See *ante,* 59-61. But even assuming that is true, it does not mean that these laws were historical aberrations. To the contrary, bans on public carriage in the American West and elsewhere constitute just one chapter of the centuries-old **[\*180]** tradition of comparable firearms regulations described above.

F. The 20th Century.

The Court disregards "20th-century historical evidence." *Ante,* at 58, n. 28. But it is worth noting that the law the Court strikes down today is well over 100 years old, having been enacted in 1911 and amended to substantially its present form in 1913. See *supra,* at 12.

That alone gives it a longer historical pedigree than at least three of the four types of firearms regulations that *Heller* identified as "presumptively lawful." *554 U. S., at 626-627, 128 S. Ct. 2783, 171 L. Ed. 2d 637*, and n. 26; see C. Larson, Four Exceptions in Search of a Theory: *District of Columbia* v. *Heller* and Judicial *Ipse Dixit, 60 Hastings L. J. 1371, 1374-1379 (2009)* (concluding that "'prohibitions on the possession of firearms by felons and the mentally ill [and] laws imposing conditions and qualifications on the commercial sale of arms'" have their origins in the 20th century); *Kanter v. Barr, 919 F. 3d 437, 451 (CA7 2019)* (Barrett, J., dissenting) ("Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons"). Like JUSTICE KAVANAUGH, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding. *Ante,* at 3 (concurring opinion). But unlike JUSTICE KAVANAUGH, I find the disconnect between *Heller*'s treatment of laws prohibiting, **[\*181]** for example, firearms possession by felons or the mentally ill, and the Court's treatment of New York's licensing regime, hard to square. The inconsistency suggests that the Court today takes either an unnecessarily cramped view of the relevant historical record or a needlessly rigid approach to analogical reasoning.

***

The historical examples of regulations similar to New York's licensing regime are legion. Closely analogous English laws were enacted beginning in the 13th century, and similar American regulations were passed during the colonial period, the founding era, the 19th century, and the 20th century. Not all of these laws were identical to New York's, but that is inevitable in an analysis that demands examination of seven centuries of history. At a minimum, the laws I have recounted *resembled* New York's law, similarly restricting the right to publicly carry weapons and serving roughly similar purposes. That is all that the Court's test, which allows and even encourages "analogical reasoning," purports to require. See *ante,* at 21 (disclaiming the necessity of a "historical *twin*").

In each instance, the Court finds a reason to discount the historical evidence's persuasive force. **[\*182]** Some of the laws New York has identified are too old. But others are too recent. Still others did not last long enough. Some applied to too few people. Some were enacted for the wrong reasons. Some may have been based on a constitutional rationale that is now impossible to identify. Some arose in historically unique circumstances. And some are not sufficiently analogous

to the licensing regime at issue here. But if the examples discussed above, taken together, do not show a tradition and history of regulation that supports the validity of New York's law, what could? Sadly, I do not know the answer to that question. What is worse, the Court appears to have no answer either.

V

We are bound by *Heller* insofar as *Heller* interpreted the *Second Amendment* to protect an individual right to possess a firearm for self-defense. But *Heller* recognized that that right was not without limits and could appropriately be subject to government regulation. *554 U. S. at 626-627, 128 S. Ct. 2783, 171 L. Ed. 2d 637*. *Heller* therefore does not require holding that New York's law violates the *Second Amendment*. In so holding, the Court goes beyond *Heller*.

It bases its decision to strike down New York's law almost exclusively on its application of what it calls historical "analogical reasoning." *Ante*, at 19-20. As I have admitted **[\*183]** above, I am not a historian, and neither is the Court. But the history, as it appears to me, seems to establish a robust tradition of regulations restricting the public carriage of concealed firearms. To the extent that any uncertainty remains between the Court's view of the history and mine, that uncertainty counsels against relying on history alone. In my view, it is appropriate in such circumstances to look beyond the history and engage in what the Court calls means-end scrutiny. Courts must be permitted to consider the State's interest in preventing gun violence, the effectiveness of the contested law in achieving that interest, the degree to which the law burdens the *Second Amendment* right, and, if appropriate, any less restrictive alternatives.

The Second Circuit has previously done just that, and it held that New York's law does not violate the *Second Amendment*. See *Kachalsky, 701 F. 3d, at 101*. It first evaluated the degree to which the law burdens the *Second Amendment* right to bear arms. *Id., at 93-94*. It concluded that the law "places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public," but does not burden the right to possess a firearm in the home, where *Heller* said "'the need for defense of self, family, and property **[\*184]** is most acute.'" *Kachalsky, 701 F. 3d, at 93-94* (quoting *Heller, 554 U. S., at 628*). The Second Circuit therefore determined that the law should be subject to heightened scrutiny, but not to strict scrutiny and its attendant presumption of unconstitutionality. *701 F. 3d, at 93-94*.

In applying such heightened scrutiny, the Second Circuit recognized that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention." *Id., at 97*. I agree. As I have demonstrated above, see *supra*, at 3-9, firearms in public present a number of dangers, ranging from mass shootings to road rage killings, and are responsible for many deaths and injuries in the United States. The Second Circuit then evaluated New York's law and concluded that it is "substantially related" to New York's compelling interests. *Kachalsky, 701 F. 3d, at 98-99*. To support that conclusion, the Second Circuit pointed to "studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces." *Id., at 99*. We have before us additional studies confirming that conclusion. See, *e.g.*, *supra* at 19-20 (summarizing studies finding that "may issue" licensing regimes are associated with lower **[\*185]** rates of violent crime than "shall issue" regimes). And we have been made aware of no less restrictive, but equally effective, alternative. After considering all of these factors, the Second Circuit held that New York's law does not unconstitutionally burden the right to bear arms under the *Second Amendment*. I would affirm that holding.

New York's Legislature considered the empirical evidence about gun violence and adopted a reasonable licensing law to regulate the concealed carriage of handguns in order to keep the people of New York safe. The Court today strikes down that law based only on the pleadings. It gives the State no opportunity to present evidence justifying its reasons for adopting the law or showing how the law actually operates in practice, and it does not so much as acknowledge these important considerations. Because I cannot agree with the Court's decision to strike New York's law down without allowing for discovery or the development of any evidentiary record, without considering the State's compelling interest in preventing gun violence and protecting the safety of its citizens, and without considering the potentially deadly consequences of its decision, I respectfully dissent.