No. 21-16756

# In the United States Court of Appeals
## for the Ninth Circuit

TODD YUKUTAKE AND DAVID KIKUKAWA
*Plaintiffs-Appellees,*

v.

HOLLY T. SHIKADA, IN HER OFFICIAL CAPACITY AS THE
ATTORNEY GENERAL OF THE STATE OF HAWAI'I,
*Defendant-Appellant,*

AND

CITY AND COUNTY OF HONOLULU[1]
*Defendant*

---

**Appeal from a Judgment of United States District Court
For the District of Hawaii; Civ. No. 1:19-cv-00578-JMS-RT
Honorable Chief District Court Judge J. Michael Seabright**

---

## Appellees' Supplemental Brief

ALAN ALEXANDER BECK
2692 Harcourt Drive
San Diego, CA 92123
Telephone: (619) 905-9105
alan.alexander.beck@gmail.com

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

*Attorneys for Appellees Todd Yukutake and David Kikukawa*

---

[1] The City and County of Honolulu was dismissed by stipulation in the lower court.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................... 1

SUMMARY OF THE ARGUMENT ....................................................................... 2

ARGUMENT ........................................................................................................... 3

I.      Hawaii Has Temporarily Amended H.R.S. §134-3(c) .......................... 3

      A.     The Hawaii Laws at Issue Are Not Longstanding Under *Bruen* ............... 6

      B.     Both Hawaii Laws Are Within The Scope of The Second Amendment ...................................................................................... 7

      C.     H.R.S. §134-3 Lacks A Historical Tradition ............................... 9

      D.     *Heller IV* Is Still Persuasive Post-*Bruen* ....................................... 17

      E.     There is No Historical Tradition For the Ten Day Expiration for a Permit to Acquire .................................................................... 18

      F.     Even if Permits to Acquire Are Constitutional, Hawaii Cannot Show a Historical Tradition for the Ten-Day Expiration Period .................... 26

CONCLUSION ....................................................................................................... 28

CERTIFICATE OF COMPLIANCE ...................................................................... 29

CERTIFICATE OF SERVICE ............................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*City of Mesquite v. Aladdin's Castle, Inc.,*
  455 U.S. 283 (1982) ................................................................ 4

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................... 2, 5, 6, 10, 11

*Drummond v. Robinson Twp.,*
  9 F.4th 217 (3d Cir. 2021) ................................... 8, 12, 19, 24

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ................................................. 8

*Firearms Policy Coal., Inc. v. McCraw,*
  No. 4:21-cv-1245-P, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022) ...... 6

*Florida Bar v. Went For It, Inc.,*
  515 U. S. 618, 115 S. Ct. 2371, 132 L. Ed. 2d 541 (1995) ............................. 1

*Fyock v. City of Sunnyvale,*
  779 F.3d 991, 997 (9th Cir. 2015) ....................................... 14

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ................................... 13, 14, 18

*Heller v. District of Columbia,*
  801 F.3d 264 (D.C. Cir. 2015) ..................................... 14, 17, 18

*Jackson v. City & Cty. of San Francisco,*
  746 F.3d 953 (9th Cir. 2014) ...................................... 6, 8, 24, 25

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) ............................................... 19

*Kennedy v. Louisiana,*
  554 U.S. 407 (2008) ............................................................ 27

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) .................................................................................... 19

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol*,
   700 F.3d 185 (5th Cir. 2012) ................................................................ 18, 19

*New York State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ......................................................................... *passim*

*Rocky Mountain Gun Owners, et al. v. The Town of Superior*
   (Civil Action No. 22-cv-01685-RM, July 22, 2022) ................................... 6

*Silvester v. Becerra*,
   138 S. Ct. 945 (2018) ................................................................................... 1

*Sprint Comm'ns Co., L.P. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008) .................................................................................... 10

*Teixeira v. Cty. of Alameda*,
   822 F.3d 1047 (9th Cir. 2016) ...................................................................... 8

*Teixeira v. Cty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ................................................................... 8, 19

*United States v. W.T. Grant Co.*,
   345 U.S. 629 (1953) ...................................................................................... 4

*Young v. Hawaii*,
   No. 12-17808, 2022 U.S. App. LEXIS 23140 (9th Cir. Aug. 19, 2022) ................. 8, 9

*Yukutake v. Conners*,
   554 F. Supp. 3d 1074 (D. Haw. 2021) ......................................................... 9

**Statutes**

Act of May 8, 1792, Second Congress, Sess. 1, ch. 33, § 1, 1 Stat. 271 ........................ 13

1778 N.J. Sess. Laws 21, at 42, 46 §§ 14-15 .................................................................. 13

1782 Del. Sess. Laws, at 3 § 6 ........................................................................................ 13

D.C. Code §7-2502.04(c) ................................................................. 17

H.R.S. §134-2 ........................................................................... 2, 7

H.R.S. §134-2(e) ....................................................................... 1, 7

H.R.S. §134-3 ............................................................................... 9

H.R.S. §134-3(c) ............................................................... 1, 3, 7, 12

HB2075 (Act 030) ..................................................................... 3, 4

1786 N.C. Sess. Laws, at § VI, at 409 ............................................. 13

1791 S.C. Sess. Laws, at 17 .......................................................... 13

**Other Authorities**

1 America's Founding Charters: Primary Documents of Colonial and Revolutionary Era Governance (Jon Wakelyn ed., 2006) (Concessions and Agreements, Jan. 11, 1664) ............................................ 22

1 Hening, The Statutes at Large ................................................... 21

1 The Colonial Laws of New York from the Year 1664 to the Revolution, vol. 1 (1896) ........................................................... 22

2 Laws of New Hampshire: First Constitutional Period, 1784–1792, vol. 5 (1916) ............................................................................. 22

3 Hening, The Statutes at Large ................................................... 22

3 Proceedings of the Council of Maryland, 1636–1667 (1965 Reprint) .......... 21

4 Laws of New Hampshire: Revolutionary Period, 1776–1784, vol. 4 (1916) . 22, 23

5 Laws of New Hampshire: First Constitutional Period, 1784–1792 (1916) .. 24

Clayton E. Cramer, Lock, Stock, and Barrel: The Origins of American Gun Culture (2018) ................................................................... 17

Cramer, Clayton E. and Olson, Joseph Edward, Lack of Historical Restrictions on the Commercial and Private Transfer of Firearms in the United States (April 1, 2015), SRN: https://ssrn.com/abstract=2610905 ...................................................... 13

Greenlee, Joseph, The American Tradition of Self-Made Arms (November 10, 2021). forthcoming Volume 54 of the St. Mary's Law Journal in 2022, SSRN: https://ssrn.com/abstract=3960566 ........................................................... 25

Stephen P. Halbrook, The Founders' Second Amendment: Origins of the Right to Bear Arms (2008) .................................................................................... 17

David Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy* ("Kopel"), 53 Harv. J. on Legis. 303, 336 (2016) ....................................... 26

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495 (2019) ............................................................... 19

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) .............................................................................................. 25

Joyce Lee Malcom, To Keep and Bear Arms: The Origins of an Anglo-American Right (1994) ....................................................................................... 13

PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8—SEPTEMBER 1664 (William Hand Browne ed, 1883) ............................ 20, 21

George H. Ryden, DELAWARE–THE FIRST STATE IN THE UNION (1938) ................... 23

C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741 (1993) ............................... 15

THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH (William Brigham ed., 1836) ...................................................... 21

VERMONT STATE PAPERS: BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT (William Slade ed., 1823) ................................................. 23

# INTRODUCTION

Todd Yukutake and David Kikukawa (Plaintiffs) challenged H.R.S. §134-2(e)'s ten-day expiration period for a handgun purchase permit and H.R.S. §134-3(c)'s requirement that firearms must be brought to the station in order to be registered. Plaintiffs contended that both laws violated their Second Amendment rights. Throughout the course of the trial court proceedings, Defendant Shikada ("Hawaii"), failed to produce any evidence to justify the laws at issue. The trial court agreed with Plaintiffs and found both laws to be unconstitutional.

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) has strengthened Plaintiffs' claims and made it even clearer that the challenged laws are unconstitutional. In *Bruen*, the Supreme Court streamlined the existing process for evaluating Second Amendment claims. It removed the second step of the two-step analysis that this and other courts previously used to evaluate Second Amendment claims and provided guidance on how to evaluate Second Amendment claims going forward. *Bruen*, 142 S. Ct. at 2127. Even under the prior framework employed by this Circuit, the trial court correctly found that both laws at issue in this litigation violated the Second Amendment despite applying intermediate scrutiny. This is because Hawaii failed to produce any evidence to justify its laws. "Needless to say, a State that offers 'no evidence or anecdotes in support of [a] restriction' should not prevail under intermediate scrutiny. (*Silvester v. Becerra,* 138 S. Ct. 945, 949 (2018) (quoting *Florida Bar v. Went For It, Inc.*, 515 U. S. 618, 628, 115 S. Ct. 2371, 132 L. Ed. 2d 541 (1995))"

(Thomas, J., dissenting from denial of certiorari). Post-*Bruen*, that result is now glaringly obvious. Both H.R.S. §134-2 and H.R.S. §134-3 violate the Second Amendment as held by the trial court.

## SUMMARY OF THE ARGUMENT

The Supreme Court's decision in *Bruen* strengthens Plaintiffs' Second Amendment challenges and fully places the burden on defendant to justify its laws. In *Bruen*, the Supreme Court rejected the two-step analysis employed by this and other courts to evaluate Second Amendment claims. The Supreme Court clarified that *District of Columbia v. Heller*, 554 U.S. 570, 128 (2008) requires courts to evaluate claims via the use of a text history and tradition inquiry. The *Bruen* Court found that the first step of the two-step test is consistent with this inquiry. "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, at 2127. The trial court's finding that the challenged Hawaii laws are unconstitutional remains the correct outcome post-*Bruen*. That is because the trial court conducted the required text, history and tradition analysis in order to reach its holding that both the challenged laws failed intermediate scrutiny. While the heightened scrutiny is no longer part of the analysis, the trial court's analysis is on point and demonstrates the This Court should similarly find that both the challenged laws encompass conduct protected by the Second Amendment and find that both laws are unconstitutional pursuant to the test, history and tradition of our nation.

## ARGUMENT

I.    <u>Hawaii Has Temporarily Amended H.R.S. §134-3(c)</u>

As an initial matter, on June 3, 2022, Governor Ige signed HB2075 (Act 030).[2] This new law temporarily revised H.R.S. §134-3(c) as a response to the trial court's ruling. For the time being, H.R.S. §134-3(c) requires inspection of all firearms that are not purchased from a Hawaii based federally licensed firearms dealer.[3] These include

- Guns that do not have serial numbers (also known as ghost guns)
- Guns brought to Hawaiʻi from out of state
- Guns transferred between private individuals[4]

This bill was expressly passed for the purposes of this appeal and has a sunset clause.[5] "In this Act, the legislature is requiring physical inspection of certain firearms over a three-year period while the *Yukutake* appeal proceeds." *Id.* "The purpose of this Act is to enact a three-year physical inspection requirement at the time of registration for firearms that were not manufactured with serial numbers, or ghost guns, firearms transported into the State from another jurisdiction, and firearms obtained in private sales and transfers." *Id.* "This Act shall take effect upon its approval; provided that on June 30, 2025, section 2 of this Act shall be repealed and section 134-3, Hawaii Revised

---

[2] https://bit.ly/3Q71uFX.
[3] https://bit.ly/3CQ9QyL. (text of the new law)
[4] https://bit.ly/3AJZ7TR.
[5] https://bit.ly/3CvMlL7.

Statutes, *shall be reenacted in the form in which it read on the day before the effective date of this Act.*" *Id.* (emphasis added).

Plaintiffs do not believe that the passage of HB2075 (Act 030) impacts this litigation. Plaintiffs wish to purchase firearms that are required to be inspected in-person, and thus even during the pendency of this litigation, they will be subject to the in-person inspection requirement. Moreover, the law at issue is very clearly capable of repetition which is an exception to any potential mootness argument. It is well-established that the defendant's voluntary cessation of conduct does not moot a case. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). *See also United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) (allowing a voluntary cessation to moot a case would impermissibly mean that "[t]he defendant is free to return to his old ways" and "a public interest in having the legality of the practices settled, militates against a mootness conclusion"). This is because the new "temporary" law expires in three years. This Court should proceed with this appeal as if the prior law is still in effect. In either event, both the current and prior law are unconstitutional for the same reasons the trial court found below.[6,7]

_____

[6] Because this is a Supplemental Brief "addressing the United States Supreme Court's decision in [*Bruen*,]" (Order, DktEntry 49) Plaintiffs will presume the Court is familiar with the procedural posture and background already briefed in their Answering Brief.

[7] As briefed in the Plaintiffs' Answering Brief, both Honolulu and Maui County removed in person registration. *See* Answering Brief, pp. 33, and 34 n.9. Since the filing of the Answering Brief, Kauai County has also put in place online registration. https://www.kauai.gov/Government/Departments-Agencies/Police-Department/Firearms-Section ("Use the link below for Online submissions for notice

II.    *Bruen* Rejected Means End Scrutiny For Text History and Tradition Analysis

The Supreme Court expressly rejected applying means-end scrutiny generally, and intermediate scrutiny specifically: "Today, we decline to adopt that two-part approach. . . . Despite the popularity of this two-step approach, it is one step too many." *Bruen*, at 2126–27. Means-end scrutiny is inappropriate because it allows courts to "defer to the determinations of legislatures." *Id.* at 2131. "[W]hile that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here." *Id. Bruen* reiterated *Heller*'s refusal "to engage in means-end scrutiny generally" and expressly rejected "the intermediate-scrutiny test that respondents and the United States now urge us to adopt." *Id.* at 2129.

Instead, the *Bruen* Court endorsed a test centered around text, history and tradition.  "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129-30 (2022).  "The test that we set forth in *Heller* and apply today requires courts to assess

_____

of transfer of a firearm. Newly acquired firearms need to be registered within 5 days of acquisition. Individuals who transfer a firearm to another needs to deliver the Notice of Transfer within 2 days to the Firearms Section."). *See also* https://kauaigov.seamlessdocs.com/f/noticeoftransfer (Kauai's in-state registration form).

whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. Therefore, *Bruen* overturned the two-step test this Court had adopted. *See Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (describing two step test). "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, at 2127. A recent case in the Northern District of Texas, applying *Bruen*, held that 18-20 year olds have a right to carry firearms outside the home. *See Firearms Policy Coal., Inc. v. McCraw*, No. 4:21-cv-1245-P, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022). *See also Rocky Mountain Gun Owners, et al. v. The Town of Superior* (Civil Action No. 22-cv-01685-RM, July 22, 2022) (applying *Bruen*, granting TRO, and holding that the burden is on government to justify ban on assault weapons and large capacity magazines). Hawaii argued that both laws were longstanding and thus, constitutional. As the trial court did, this Court is able to quickly dismiss this argument.

A. The Hawaii Laws at Issue Are Not Longstanding Under *Bruen*

*Bruen* clarified that 20th century historical evidence may not be considered if that evidence contradicts earlier evidence from around the time of ratification. "We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, at 2154 n.28. In

6

the trial court, Hawaii argued that H.R.S. §134-2(e) and H.R.S. §134-3(c) were presumptively constitutional because they were longstanding. "Defendant argues that HRS § 134-2(e)'s 10-day permit use period is longstanding and presumptively valid because it is a 'condition[] and qualification[] on the commercial sale of arms' that 'dates back to 1933-1934.'" 1-ER-051. "HRS § 134-3(c) was amended in 2020 to require in-person inspection and registration of all firearms within five days of acquiring them. The Government argues that this new in-person inspection and registration requirement is longstanding and presumptively valid because it is 'part of the registration process' and '[i]n Hawaii, registration and permitting requirements, *in general*, date back to 1907 and 1919, respectively.'" 1-ER-062. The trial court rejected that argument. "The challenged provisions in both HRS § 134-2(e) and HRS § 134-3(c) are not longstanding." 1-ER-042. On appeal, Hawaii raised that argument again. *See* Opening Brief at 22-25 (H.R.S. 134-2) & Opening Brief at 41-43 (H.R.S. 134-3). While Hawaii's position was already foreclosed prior to *Bruen*, *Bruen* has made it explicitly clear that twentieth century laws are not longstanding.

### B. Both Hawaii Laws Are Within The Scope of The Second Amendment

Both challenged Hawaii laws are within the scope of the Second Amendment. "As the Supreme Court just instructed us, the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with

the Nation's historical tradition of firearm regulation." *Young v. Hawaii*, No. 12-17808, 2022 U.S. App. LEXIS 23140, at *8-9 (9th Cir. Aug. 19, 2022) (O'Scannlain, J., dissenting) (punctuation omitted).

Here, "[a]s with the petitioners in *Bruen*," both Plaintiffs are "ordinary, law-abiding, adult citizen[][s]," and are "therefore unequivocally 'part of the people whom the Second Amendment protects.'" *Id.* at *10. Plaintiffs wish to acquire handguns and other firearms. "As the Court observed in *Bruen*, handguns are weapons in common use today for self-defense." *Id.* at *10 (punctuation omitted). "And the plain text of the Second Amendment contemplates 'keeping' of arms in the home." *Id.* In order to be able to own arms in one's home, you must be able to acquire them. The ability to acquire guns and ammunition is "indispensable to the enjoyment" of the fundamental right to bear arms as much as access to a shooting range. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). This Court has expressly found that the right to keep arms includes a right to acquire them. "[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017) (quoting *Jackson v. San Francisco*, 746 F.3d at 967). Judge O'Scannlain's scholarly opinion for the panel opinion in *Teixeira* explores in-depth the history which supports this finding. *See Teixeira v. Cty. of Alameda*, 822 F.3d 1047, 1053-1056 (9th Cir. 2016). This is also in accord with the Third Circuit. See *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 (3d Cir. 2021).

Both laws at issue in this litigation burden the right to acquire arms which this Court has found to be part of the Second Amendment right. "[T]he Second Amendment's plain text thus presumptively guarantees" Plaintiffs' conduct in this matter. *Young*, at *10. Therefore, as the Supreme Court held in *Bruen,* "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms. *Bruen,* at 2123. Hawaii has not and cannot do that. As the trial court found that "there is no evidence in the record suggesting that these laws are tethered—in any way—to the original meaning of the American right to keep and bear arms." *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1082 (D. Haw. 2021) (punctuation omitted). This is because there is no such tradition for either law as will be shown below.

C. <u>H.R.S. §134-3 Lacks A Historical Tradition</u>

In the trial court, the State and its amici made two arguments that H.R.S. §134-3 had a historical tradition. The in person registration is "part of the registration process and [i]n Hawaii, registration and permitting requirements, *in general*, date back to 1907 and 1919, respectively." 1-ER-062 (punctuation omitted). This argument must be rejected, because as discussed above, *Bruen* rejects the use of twentieth century laws to create a historical tradition.

On the first point, *Bruen* made clear that laws first appearing in the 20th century are "late-in-time" and are not part of the relevant historical record. *Bruen*, at 2154, n.28 ("We will not address any of the 20th-century historical evidence brought to bear by

respondents or their amici."). These laws provide even less insight than laws enacted "75 years after the ratification of the Second Amendment," which themselves "do not provide as much insight into its original meaning as earlier sources." *Id.* at 2137 (quoting *Heller*, 554 U.S. at 614 (citing *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C. J., dissenting)) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]")). This is especially true where these late-in-time laws "contradict[] earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28.

The historical analysis required by the Supreme Court often proves "fairly straightforward" and "simple." *Bruen*, at 2131–32. The historical analysis is straightforward when, for instance, "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. The historical analysis is also straightforward when "the Founders themselves could have adopted [a 'distinctly similar' historical regulation to the challenged law] to confront that problem" but did not. *Id.* "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

*Heller* and *Bruen* "exemplifie[d] this kind of straightforward historical inquiry." *Bruen*, at 2131. Both examined laws enacted to remedy centuries-old problems. Both

found that those laws lacked a historical analogue. Both, accordingly, struck those laws as unconstitutional. In *Heller,* the District of Columbia law at issue "addressed a perceived societal problem—firearm violence in densely populated communities" by banning handgun possession in the home. *Bruen*, at 2131. Although "the Founders themselves could have adopted [a similar law] to confront that problem," they did not. *Id*. In striking down the District of Columbia's ban, the Supreme Court found it dispositive that no "Founding-era historical precedent" banned handgun possession in the home. *Id. Bruen* examined New York's proper cause requirement for obtaining a carry permit, which "concern[ed] the same alleged societal problem addressed in *Heller*: handgun violence, primarily in urban area[s]." *Bruen*, at 2131. (quotation omitted). In striking down New York's proper cause requirement, the Supreme Court deemed it controlling that the law lacked an analogue from "before, during, and even after the Founding." *Id*. at 2131–32.

The constitutionality of in-person registration presents a similarly straightforward historical analysis. It concerns the same alleged centuries-old societal problem at issue in both *Heller* and *Bruen*: violence involving the use of firearms. And it also must be rejected because, as the trial court held, "the Government has provided absolutely no evidence suggesting that in-person inspection and registration was historically understood as an appropriate regulation on the right to bear arms." 1-ER-062. "[T]he principle that emerges from First Amendment cases—*Heller*'s favored constitutional analogy—is that the presence of ordinary restrictions in some places

cannot excuse extraordinary restrictions in others." *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 (3d Cir. 2021).

The second attempt to justify Hawaii law as part of a historical tradition was provided by Hawaii's amici.

> In its Amicus Brief, Everytown argues that the State's in-person inspection and registration requirement falls outside the scope of the Second Amendment as "part of a longstanding regulatory tradition" because it is of a kind with 18th century militia laws. ECF No. 94-1 at PageID # 866. Those laws required individuals enlisted in state militias-"white men in a specified age range"—to maintain their own arms and "provided for in-person inspection to ensure that militiamen were prepared and properly armed if called up to fight." *Id.* at PageID ## 871, 873.

1-ER-062 to 1-ER-063.

The trial court correctly rejected this argument. "Whereas militia laws applied only to militiamen, HRS § 134-3(c)'s requirement applies to all civilians who wish to acquire a handgun for personal use." *Id.* "And, most significantly, the militia laws did not place a burden on any individual's ability to acquire a weapon." *Id.* "Given these considerable differences, the State of Hawaii's in-person inspection and registration requirement for civilian firearms cannot be said to fall within the historical tradition of colonial-era laws requiring inspection of what were effectively the military weapon stockpiles of the day." 1-ER-065.

At the time of the Founding, no training was required to acquire a handgun or other firearm. The private transfer of firearms was common and unregulated during the

relevant historical period.[8] Unlike in person inspection, militia training was not a prerequisite to firearm ownership. Instead, these militia laws required firearm ownership *prior* to militia training. For instance, the Militia Act of 1792 (enacted one year after the Bill of Rights was adopted) required a militiaman to "*provide himself* with a good musket or firelock" and that he "shall appear *so armed, accoutered, and provided* when called out to exercise." Act of May 8, 1792, Second Congress, Sess. 1, ch. 33, §1, 1 Stat. 271 (emphases added). The states' requirements were no different. New Jersey, for instance, required its militiamen to "assemble, properly armed and accoutered." 1778 N.J. Sess. Laws 21, at 42, 46 §§14-15. Delaware, too, required its militiamen to "at his own expense, provide himself . . . with a Musket or Firelock with a bayonet" before showing up for militia training. 1782 Del. Sess. Laws, at 3 §6; *see also* 1786 N.C. Sess. Laws, at §VI, at 409 (same); 1791 S.C. Sess. Laws, at 17 (same). No state required militia training *before* it permitted its citizens to acquire a firearm. *See Heller II*, 670 F.3d at 1253, 1255 & n.* (firearms training—as well as classroom orientations and fingerprinting— "are . . . novel," not "deeply . . . rooted in our history," and "not longstanding"). t "[t]he emphasis of colonial governments was on ensuring that the populace was well armed….". Joyce Lee Malcom, To Keep and Bear Arms: The Origins of an Anglo-American Right at 140 (1994).

---

[8] Cramer, Clayton E. and Olson, Joseph Edward, Lack of Historical Restrictions on the Commercial and Private Transfer of Firearms in the United States (April 1, 2015). Available at SRN: https://ssrn.com/abstract=2610905.

It is true that the *Bruen* Court stated the government may rely on analogies to laws enacted around the time of ratification in defending modern firearms regulations. *Bruen,* at 2126, 2135. However, this was the law in this Circuit prior to *Bruen* and the trial court correctly held there is no historical analog to Hawaii's law. "Although a law need not have a 'precise founding-era analogue' in order to be deemed presumptively valid, [*Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015)] (quotation and citation omitted), the law must be sufficiently similar to historical regulations to demonstrate that the law's restrictions accord with historical understanding of the scope of the Second Amendment right." 1-ER-063.

On appeal, Hawaii made the same arguments in its opening brief. It primarily relied on *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") for the proposition that basic registration is longstanding and thus, in person registration is as well. However, in-person registration was expressly and subsequently found to be unconstitutional by the same court in *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015). And whatever persuasive value *Heller II* may once have had, has been called into question by *Bruen's* precedent. As *Bruen* held, laws from the early 20th century are outside of the Nation's historical tradition and, second, these permit-to-purchase laws enacted in the early- to mid-20th century are not "distinctly similar" to in-person registration. *Bruen*, at 2131.

Establishing a "historical tradition of firearm regulation" is a difficult task which Hawaii has failed to do. *Bruen* held that "the historical record compiled by respondents

does not demonstrate a tradition," *id.* at 2138, where the respondents produced three colonial statutes (1686 East New Jersey, 1692 Massachusetts, 1699 New Hampshire), *id.* at 2142–44, three late-18th-century and early-19th-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee), *id.* at 2144–45, three additional 19th-century state laws (1821 Tennessee, 1871 Texas, 1887 West Virginia), *id.* at 2147, 2153, five late-19th-century regulations from the Western Territories (1869 New Mexico, 1875 Wyoming, 1889 Idaho, 1889 Arizona, 1890 Oklahoma), *id.* at 2154–55, and one late-19th-century Western State law (1881 Kansas), *id.* at 2155–56.[9]

*Bruen* noted that when a challenged law addresses an "unprecedented societal concern[]" or involves "dramatic technological changes," the historical analysis may be less straightforward. *Bruen*, at 2132. In these instances, "th[e] historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* (quoting C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)). The controlling "metric" remains "whether modern and historical regulations

---

[9] The Supreme Court did not necessarily agree with the government's reading of the colonial laws or the early state laws, but the it stated that "even if" the government's reading were correct, the record would not justify the challenged regulation. *Bruen*, at 2144.

impose a comparable burden on the right of armed self-defense, and second, whether that regulatory burden is comparably justified." *Id.* at 2133. This inquiry "does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 2133 n.7. Neither handguns nor their acquisition by responsible, law-biding citizens present an unprecedented societal concern or dramatic technological change.

"[H]andguns were introduced in England during the Tudor and early Stuart eras" and have been in commerce ever since. *Bruen*, at 2140 (noting that "Henry VIII issued several proclamations decrying the proliferation of handguns" because they "threatened Englishmen's proficiency with the longbow"). Nor does either law regulate some new technological change in handgun transfers, if such a thing even exists; it instead comprehensively regulates all handgun sales, receipts, rentals and transfers—online or otherwise. But even if the acquisition of handguns did present some unprecedented societal concern or dramatic technological change, the State cannot meet its burden to demonstrate a historical regulation that is a proper analogue to either law. Both challenged laws burden conduct that is protected by the Second Amendment. They have no support in the historical tradition of the Second Amendment. Indeed, it contradicts that historical tradition and is therefore unconstitutional.

The in-person registration requirement at issue here was passed in 2020. During either the Founding or Reconstruction Era there were no laws which required a person bring their firearms to a police station for inspection in order to own them. Other than

the Hawaii law at issue here, there are no comparable laws today. In its Opening Brief, Hawaii argues that in person registration was passed to regulate ghost guns. Opening Brief at 46. And argues it was to deal with the "recent problem of ghost guns". Opening Brief at 51. Firearm crime and accidents were certainly well-known problems in 18th- and 19th-century America. *See* Clayton E. Cramer, Lock, Stock, and Barrel: The Origins of American Gun Culture 111–18 (2018) (discussing crime); Stephen P. Halbrook, The Founders' Second Amendment: Origins of the Right to Bear Arms 19 (2008) (discussing accidents). However, historically there were no comparable laws. There are no analogous laws either. This Court should find that pursuant to *Bruen,* that in-person registration is unconstitutional.

D. *Heller IV* Is Still Persuasive Post-*Bruen*

The District of Columbia also offered no real justification for the in-person requirement, which created the "risk that the gun may be stolen en route or that the person may be arrested or even shot by a police officer seeing a man with a gun (or a gun case)." *Heller v. Dist. of Columbia*, 801 F.3d 264, 277 (D.C. Cir. 2015) (*Heller III*). In the District of Columbia's former code, it stated that "[t]he Metropolitan Police Department (MPD) can require a potential registrant to present his firearm for inspection. D.C. Code § 7-2502.04(c)." *Heller III*, at 285. The MPD wanted to conduct a physical inspection to "verify that the application information is correct and that the firearm has not been altered." *Id.* The D.C. Circuit struck this requirement as violative of the Second Amendment.

Post-*Bruen, Heller III* still is persuasive authority that Hawaii law is unconstitutional. The D.C. Circuit applied intermediate scrutiny in order to strike the District of Colombia's in-person inspection law. Prior to *Bruen,* the D.C. Circuit employed the same two-step test as this Court did. *See Heller v. District of Columbia*, 670 F.3d 1244, 1256-58 (D.C. Cir. 2011) "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, at 2127. Therefore, to get to intermediate scrutiny, the D.C. Circuit found that the District's in-person inspection requirement was within the scope of the Second Amendment and that there was no historical tradition justifying it. Post-*Bruen*, that is all that is needed to find that the in-person requirement is unconstitutional. There is similarly no historical tradition that justified the ten-day expiration period for a permit to acquire.

E. There is No Historical Tradition For the Ten Day Expiration for a Permit to Acquire

No law prior to the Fourteenth Amendment's ratification—including the colonial, founding, and early republic periods, required any form of permit to acquire. The only regulations comparable to Hawaii's laws were racist laws that applied to persons without recognized rights, primarily African Americans and American Indians. These laws required licenses from either local government officials or slave masters. "Some Colonial and Reconstruction Era governments made it illegal to sell guns to enslaved or formerly enslaved people and members of Native American tribes. *See Nat'l*

18

*Rifle Ass'n of Am., Inc. v. Bureau of Alcohol*, 700 F.3d 185, 200 (5th Cir. 2012) (collecting examples); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (same)." *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 (3d Cir. 2021) (footnote omitted). "As then-Judge Barrett once observed, '[i]t should go without saying that such race-based exclusions would be unconstitutional today.'" *Id.* n. 8. (quoting *Kanter v. Barr*, 919 F.3d 437, 458 n.7 (7th Cir. 2019) (Barrett, J., dissenting).[10] Therefore, they are not valid statutes to use in order to demonstrate a historical tradition.

In fact, some statutes expressly exempted firearm owners from militia training. Throughout the colonial and founding eras, statutes in every state mandated gun ownership for ordinary Americans. Cumulatively, there were hundreds of legislative revisions of militia statutes. The many statutes created or retained a requirement that militiamen—typically, all able-bodied men of suitable age—keep firearms, ammunition, and edged weapons at home. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533–89 (2019) (covering the militia laws of the 13 original States and their colonial predecessors, plus Vermont, New Haven Colony, and Plymouth Colony).

---

[10] In *McDonald v. City of Chicago*, the Supreme Court pointed to licensing laws from Florida and Mississippi as examples of the "systematic efforts" of "the States of the old Confederacy" to "disarm . . . blacks." 561 U.S. 742, 771 (2010); *see also Bruen*, 142 S. Ct. at 2151 ("After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted.").

At the time of the Second Amendment's ratification, every state required ordinary citizens to own firearms. *Id.* at 537–38 (New Jersey), 542–43 (Maryland), 547–48 (North Carolina), 550 (South Carolina), 554–55 (New Hampshire), 557–58 (Delaware), 562–63 (Pennsylvania), 567 (New York), 569 (Rhode Island), 573 (Vermont), 583 (Virginia), 585 (Massachusetts), 587 (Georgia), 589 (Connecticut). These 1791 state arms mandates were continuations of mandates that had existed in the colonies since their early days—the exception being Pennsylvania, which had no arms mandate until 1777. Many statutes also mandated firearm ownership by women and non-militiamen. These often applied to everyone old enough to conduct particular activities, such as keeping house.

A 1638/9 Maryland act provided "that every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes one Serviceable fixed gunne." PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8—SEPTEMBER 1664, at 77 (William Hand Browne ed, 1883).[11] If a household lacked the mandated arms, the government provided them. *Id.* Yet only households with three or more men had to

---

[11] The dual years for some colonial statutes (e.g., 1638/9) are used to account for the change from the Old Style calendar to the New Style. Under the New Style, the new year begins on January 1. Under Old Style, the new year began on March 25. So what we today would call "February 1639" was considered by Marylanders of the time to be "February 1638." The English and their colonies adopted the New Style in 1752.

send anyone for militia service. *Id.* at 78. A female "house keeper" had to keep a gun in "her" house, but she did not participate in militia training or service. The same requirements were included in a 1658 law. 3 PROCEEDINGS OF THE COUNCIL OF MARYLAND, 1636–1667, at 345 (1965 Reprint).

Virginia required arms to travel, attend church, work in the fields, and attend court. 1 Hening, THE STATUTES AT LARGE, at 127 (1623 law requiring arms to travel); *id.* (1624, requiring arms to work in the field); *id.* (1624, requiring farmers to possess arms); *id.* at 173 (1632, travel); *id.* (1632, working in the field); *id.* (1632, men to carry arms to church); *id.* at 263 (1643, "masters of every family" to carry arms to church); 2 *id.* at 333 (1676, attending church or court). More broadly, a 1639 law mandated that "ALL persons except negroes to be provided with arms and ammunition or be fined." 1 *id.* at 226. Laws in 1659 and 1662 required all men capable of bearing arms to own a firearm. *Id.* at 525; 2 *id.* at 126. And a 1762 law required persons exempt from militia training to keep at home the same arms as militiamen. 4 *id.* at 534, 537. To the extent that women of any age farmed, traveled, or engaged in other listed activities, the arms mandates applied to them.

A 1632 Plymouth law required that "every freeman or other inhabitant of this colony provide for himselfe and each under him able to beare armes a sufficient musket and other serviceable peece." THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 31 (William Brigham ed., 1836). At the time, the colony had no militia law.

To promote immigration, North Carolina issued land grants starting in 1664—but only to settlers who were "armed with a good firelock or matchlock."[12] 1 AMERICA'S FOUNDING CHARTERS: PRIMARY DOCUMENTS OF COLONIAL AND REVOLUTIONARY ERA GOVERNANCE 210–11 (Jon Wakelyn ed., 2006) (Concessions and Agreements, Jan. 11, 1664). Additional land was provided for each person over 14 who kept the same arms. *Id.* In 1701, Virginia required recipients of land grants to keep someone who possessed arms on the land. 3 Hening, THE STATUTES AT LARGE, at 205.

New York in 1684 mandated that "all persons though freed from [militia] Training by the Law . . . be obliged to Keep Convenient armes and ammunition in Their houses as the Law directs to others." 1 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 161 (1896). Like other colonies, New York exempted certain persons from militia training based on occupational status (e.g., clergy, physicians), but exempted persons still had to keep arms. *Id.* at 49.

Starting in 1718, New Hampshire obliged every head of household to own firearms. 2 LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD, 1702–1745, at 285 (1913). In 1776, New Hampshire required all males between 16 and 50 not in the militia to own firearms. 4 LAWS OF NEW HAMPSHIRE: REVOLUTIONARY PERIOD, 1776–1784, at 46 (1916). Then in 1780, New Hampshire ordered males under 70 who were exempt from

---

[12] The "matchlock" and "firelock" were the most common types of firearms in that era. The firelock was more advanced and is what we today call a "flintlock."

militia training to keep militia arms at home, so that they could defend the community if attacked. *Id.* at 276.

Delaware required "every Freeholder and taxable Person" starting in 1741 to "provide himself with . . . One well fixed Musket or Firelock," and "to keep such Arms and Ammunition by him, during the Continuance of this Act." George H. Ryden, DELAWARE–THE FIRST STATE IN THE UNION 117 (1938). So, all female freeholders or taxable persons, as well as males over fifty, had to possess arms, but they did not participate in militia training.

Beginning in 1779, "every listed soldier and other householder" in Vermont had to "always be provided with, and have in constant readiness, a well fixed firelock . . . or other good fire-arms." VERMONT STATE PAPERS: BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT 307 (William Slade ed., 1823) (emphasis added). Although being a "householder" and not a "soldier" implied no duty of militia training, arms ownership was still mandatory.

Under a 1780 New Hampshire law, males exempt from "Common and ordinary Trainings" for the militia were nevertheless required to "be in all respects Equipped with [the] Arms & Accoutrements" of militiamen. 4 LAWS OF NEW HAMPSHIRE: REVOLUTIONARY PERIOD, at 276. When New Hampshire ratified the Second Amendment on January 25, 1790, the alarm list—which did not have to train— consisted of "all Male persons from forty to sixty . . . exempted . . . from common and

ordinary Training." Again, the alarm list had to keep the same arms as the militia. 5 LAWS OF NEW HAMPSHIRE: FIRST CONSTITUTIONAL PERIOD, 1784–1792, at 178–179 (1916).

Additional considerations from *Bruen* further demonstrate the lack of a historical tradition of relevant regulations. First, *Bruen*'s metrics of "how and why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense" weigh against the training requirement. *Bruen*, at 2133. Like the licensing requirement, the extensive training requirement effectively serves as a handgun prohibition until considerable time, money, and resources are spent by the person desiring to exercise his fundamental right to keep arms. No historical regulation imposed a "comparable burden." No historical law required a permit to acquire before purchase. Therefore, no comparable historical justification existed either.

Firearm accidents were a known problem in the 18th and 19th centuries, but no "distinctly similar historical regulation addressing that problem" was ever enacted— which "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131.

While Plaintiffs are solely challenging the ten-day expiration period and in-person inspection laws, permits to acquire themselves do not have a historical foundation. Despite conducting an extensive historical research to find restrictions on arms sales, the Third Circuit was only able to find restrictions on selling "large amounts of gunpowder[.]" *Drummond,* 9 F.4th at 227. This is in line with *Jackson* which found

24

"states historically imposed modest restrictions on the storage of gunpowder, a dangerous and highly flammable substance" but that did not preclude storage laws from the scope of the Second Amendment. *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 963 (9th Cir. 2014) Even then, "[m]ost gunpowder during the early colonial days was homemade."[13] "Like gunpowder manufacturing, casting bullets was a common household enterprise. *Id.* "Despite their common imperfections, some of the most popular and important firearms in American history were produced by [] solo gunsmiths. *Id.* The American Tradition of Self-Made Arms is the most detailed discussion of home-built firearms in American history. Despite conducting an extensive historical survey of colonial laws, this law review article was unable to identify any colonial laws restricting the creation of homebuilt firearms. *Id.* As there is no historical basis for permits to acquire, it should come as no surprise that Hawaii has been unable to produce any evidence justifying the two laws at issue in this litigation.

At the time of the Founding, the preferred means of addressing the threat of violence was to require law-abiding individuals to be armed. States "typically required that arms be brought to churches or to all public meetings," and "statutes required arms carrying when traveling or away from home." *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 232 (2018) (cited with approval in *Bruen*, 142

---

[13] Greenlee, Joseph, The American Tradition of Self-Made Arms (November 10, 2021). This forthcoming article will be published in Volume 54 of the St. Mary's Law Journal in 2022., Available at SSRN: https://ssrn.com/abstract=3960566 at * 12.

S. Ct. at 2133). Yet, "[u]ntil the early twentieth century, there were no laws that required that individuals receive government permission before purchasing or borrowing a firearm." David Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy* ("Kopel"), 53 Harv. J. on Legis. 303, 336 (2016). As there is no tradition for permits to acquire in general. It follows that neither law at issue here can have a historical analog.

F. Even if Permits to Acquire Are Constitutional, Hawaii Cannot Show a Historical Tradition for the Ten-Day Expiration Period

Hawaii's ten-day expiration period for a permit to acquire for a handgun lacks a historical tradition. As the trial court found, "there is no evidence in the record suggesting that these laws are tethered—in any way—to the 'original meaning of the American right to keep and bear arms.' [] Indeed, Defendant does not provide *any* historical context for these laws." 1-ER-053.

On appeal, Hawaii again did not produce any evidence of a historical tradition requiring individuals to obtain permits to acquire which expire in ten days. "The ten-day expiration date for Hawaii's permit to acquire dates back to 1933-1934. *See* 1933 Haw. Sess. Laws (Special Sess.) Act 26, § 4 at 37." *See* Opening Brief at 23. Hawaii's only argument on this issue was to tie Hawaii's law into twentieth century permit to acquire laws with expiration dates. By dint of their recent vintage, these laws are not evidence of a historical tradition. However "it is worth noting that three of the four laws Defendant relies upon have been repealed. ECF No. 95-1 at PageID ## 931-32.

26

And the only law that remains on the books, Michigan's, imposes a 30-day rather than 10-day time limit on permit holders." 1-ER-053. Even if these laws were old enough to create a historical tradition, four states is insufficient to do so.

The *Bruen* Court rejected the proposition that three colonies out of thirteen was sufficient to create a tradition. "In the colonial era, respondents point to only three restrictions on public carry. For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation." *Bruen*, at 2142. Thus, four states, at a time when there were forty-eight states, is even more insufficient to create a historical tradition pursuant to *Bruen*. Even if modern laws alone could demonstrate a broad *tradition* of a regulation, there must at least be a strong showing that such laws are common in the states, *i.e.*, many more than six states. *See Kennedy v. Louisiana*, 554 U.S. 407, 423 26 (2008) (only six states permitting death penalty for child rapists shows national consensus against it). Hawaii states in their reply brief that "[t]hirteen states and the District of Columbia have some form of permitting or licensing requirement for the purchase or acquisition of certain firearms." This is a red herring. Most of those states have permits to acquire which last several years. *See* Reply Brief at 27. What is at issue here is a ten-day expiration period on permits to acquire.

To justify Hawaii's law post-*Bruen*, it must point to a *historical tradition* or at least some analogs to a ten-day expiration period on a permit to acquire. That Hawaii has not and cannot do. Nor does the law deal with a distinctly modern problem. As argued above, there has always been handgun violence. There are no laws which are "distinctly

similar" to the ten-day expiration for a permit to acquire. *Bruen*, at 2131. Therefore, the law is unconstitutional.

## CONCLUSION

The U.S. Supreme Court's opinion in *Bruen* strengthens Plaintiffs' claims. There is no reason to deviate from the trial court's well-reasoned outcome. This Court should similarly find that both challenged provisions of Hawaii law violate the Second Amendment.

Respectfully submitted,

*s/ Alan Alexander Beck*
ALAN ALEXANDER BECK
2692 Harcourt Drive
San Diego, CA 92123
Telephone: (619) 905-9105
Email: alan.alexander.beck@gmail.com

*s/ Stephen D. Stamboulieh*
STEPHEN D. STAMBOULIEH
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
Email: stephen@sdslaw.us

## **CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(f) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 7,143 words and complies with the word limit of Cir. R. 32-1.

2. This brief complies with the typeface and type size requirements of Fed. R. App. P.32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Garamond.

Dated: September 16, 2022.

*/s/ Alan Alexander Beck*
Alan Alexander Beck

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2022, I filed the foregoing Supplemental Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Alan Alexander Beck*
Alan Alexander Beck