No. 21-16756

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

TODD YUKUTAKE, and DAVID KIKUKAWA,
*Plaintiffs-Appellees,*

v.

HOLLY T. SHIKADA, in her Official Capacity
as the Attorney General of the State of Hawaiʻi,
*Defendant-Appellant,*[1]

and

CITY AND COUNTY OF HONOLULU,
*Defendant.*[2]

On Appeal from the United States District Court for the District of Hawaiʻi
Honorable J. Michael Seabright, Chief United States District Judge
(Civil No. 1:19-cv-00578 JMS-RT)

## SUPPLEMENTAL BRIEF OF DEFENDANT-APPELLANT

## CERTIFICATE OF COMPLIANCE

## CERTIFICATE OF SERVICE

---

[1] HOLLY T. SHIKADA succeeded CLARE E. CONNORS as Attorney General of the State of Hawaiʻi on December 10, 2021 and is automatically substituted as a party pursuant to Fed. R. App. P. 43(c)(2).
[2] Defendant CITY AND COUNTY OF HONOLULU was dismissed with prejudice by stipulation in the District Court on June 12, 2020. 3-ER-440-444 (ECF 53).

HOLLY T. SHIKADA          4017
  Attorney General of the State of
  Hawaiʻi
KIMBERLY T. GUIDRY          7813
  Solicitor General

ROBERT T. NAKATSUJI          6743
  First Deputy Solicitor General
CARON M. INAGAKI          3835
KENDALL J. MOSER          6515
  Deputy Attorneys General
Dept. of the Attorney General
425 Queen Street
Honolulu, Hawaiʻi 96813
Telephone: (808) 586-1360
E-mail:  Kimberly.T.Guidry@hawaii.gov
        Robert.T.Nakatsuji@hawaii.gov
        Caron.M.Inagaki@hawaii.gov
        Kendall.J.Moser@hawaii.gov

Counsel for Defendant-Appellant HOLLY T. SHIKADA, in her
Official Capacity as the Attorney General of the State of Hawaiʻi

# TABLE OF CONTENTS

I.     BACKGROUND ...................................................................1

II.    STATEMENT OF AUTHORITIES..............................................1

III.   SUMMARY OF THE ARGUMENT .........................................2

IV.   ARGUMENT.......................................................................5

      A.    The Second Amendment Analysis Following *Bruen*............................6

      B.    Hawaii's Statutes Are Supported by Several Historical Analogues to the Founding Era.................................8

            1.    Militia Laws .................................................8

            2.    Loyalty Oaths................................................20

            3.    Pardons........................................................22

            4.    Secondary Implementing Procedures .......................26

            5.    The District Court's Initial Rejection of Militia Laws as a Historical Analogue Should be Reversed ...............28

      C.    Hawaii's Statutes Are Valid Because They Are Designed to Ensure that Law-Abiding, Responsible Citizens Can Possess Firearms.................................................30

            1.    *Bruen*'s Support for Regulations Protecting Law-Abiding, Responsible Citizens.................................30

            2.    Historical Analogues Restricting Guns to Law-Abiding, Responsible Citizens.................................39

      D.    Other Possible Arguments by Plaintiffs............................41

V.    CONCLUSION.............................................................41

i

# TABLE OF AUTHORITIES

## Cases

*Binderup v. Attorney General*,
  836 F.3d 336 (3d Cir. 2016) ...................................................................39

*Board of Trustees of Glazing Health and Welfare Trust v. Chambers*,
  941 F.3d 1195 (2019) ...........................................................................32

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ("*Heller I*") ........................................................8, 40

*Franks v. City and County of Honolulu*,
  74 Haw. 328, 843 P.2d 668 (1993) ......................................................33

*Fyock v. Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015) ...............................................................41

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ...........................28, 34, 41

*Heller v. District of Columbia*,
  801 F.3d 264 (D.C. Cir. 2015) ("*Heller IV*") ...............................28, 34

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) .......................................................15, 39-40

*Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and
  Explosives*,
  700 F.3d 185 (5th Cir. 2012) ...............................................................41

*New York State Rifle and Pistol Association, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) .....................................................................*passim*

*Pacific Int'l Servs. Corp. v. Hurip*,
  76 Hawai'i 209, 873 P.2d 88 (1994) ....................................................33

*United States v. Mobley*,
  956 F.2d 450 (3d Cir. 1992) .................................................................31

*United States v. Vongxay*,
  594 F.3d 1111 (9th Cir. 2010) .................................................................39

*United States v. Yancey*,
  621 F.3d 681 (7th Cir. 2010) ...................................................................39

*Wang v. Chinese Daily News, Inc.*,
  737 F.3d 538 (2013) .................................................................................41

**Federal Constitutional and Congressional Material**

U.S. Const. art. II, § 2 ..................................................................................23

U.S. Const. amend. II .....................................................................................6

U.S. Const. amend. XIX ...............................................................................15

4 Journals of the Continental Congress, 1774-1789, at 205
  (Washington Chauncy Ford ed., 1906), available at
  https://memory.loc.gov/ammem/amlaw/lwjc.html............................20

**Hawaii Constitutions, Statutes, and Legislative History**

Haw. Rev. Stat. § 134-2 ....................................................................5, 38, 39

Haw. Rev. Stat. § 134-2(e)..........................................................26, 28, 35

Haw. Rev. Stat. § 134-3 ....................................................................5, 38, 39

Haw. Rev. Stat. § 134-7 ...............................................................................35

Haw. Rev. Stat. § 134-8 (2011) ..............................................................35, 36

Haw. Rev. Stat. § 134-8.5 (Supp. 2019) ................................................35, 36

Haw. Rev. Stat. §134-9 ................................................................................38

Haw. Rev. Stat. §134-9(a).......................................................................5, 38

1933 Haw. Sess. Laws (Special Sess.) Act 26, § 4...................................30

2020 Haw. Sess. Laws Act 74, §§ 2, 5, at 480-83 ...................................32

Act 30, Session Laws of Hawaiʻi 2022, § 1 at 6,
  https://www.capitol.hawaii.gov/session2022/bills/GM1130_.PDF .........32, 33, 35

H. Stand. Comm. Rep. No. 89, in 1933 House Journal, at 427 ...............................30

*Testimony of the Department of the Attorney General*, at pdf 3-4
    (Mar. 29, 2022),
    https://www.capitol.hawaii.gov/Session2022/Testimony/HB2075_H
    D1_TESTIMONY_JDC_03-29-22_.PDF .........................................................37-38

*Testimony of Chief Paul K. Ferreira*, Hawaii County Police
    Department, at pdf 57-58 (Mar. 24, 2022),
    https://www.capitol.hawaii.gov
    /Session2022/Testimony/HB2075_HD1_TESTIMONY_JDC_03-
    29-22_.PDF..........................................................................................................37

*Testimony of Maj. Joseph A. Trinidad*, Honolulu Police Department,
    at pdf 5-6 (Mar. 29, 2022),
    https://www.capitol.hawaii.gov/Session2022/Testimony/
    HB2075_HD1_TESTIMONY_JDC_03-29-22_.PDF .........................................37

**Militia Laws**

United States Selective Service System, *Military Obligation: The
    American Tradition*, vol. 2 (1947)..................................................................*passim*

An Act for Establishing a Militia (Del. June 4, 1785) (part 3, at 27) ....................9

An Act for Revising and Amending the Several Militia Laws of this
    State (Ga. Feb. 26, 1784) (part 4, at 144)...................................................9

An Act to Regulate and Establish a Militia in this State
    (N.C. April 14, 1778-Jan. 19, 1779) (part 10, at 68)................................9

An Act for Regulating the Militia of the State of New York
    (N.Y. April 3, 1778) (part 9, at 271, 274) ...................................9, 11, 12

An Act for the Regulation of the Militia of the Commonwealth of
    Pennsylvania (Pa. Mar. 20, 1780) (part 1, at 77)...................................9-10

An Act for the Regulation of the Militia of this State; and for
    Repealing Such Laws as Have Hitherto Been Enacted for the
    Government of the Militia (S.C. Mar. 28, 1778) (part 13, at 67)...................10, 11

An Act for Forming, Regulating, and Conducting the Military Force
    of this State (Conn. 1784) (part 2, at 256)...............................................11

An Act for Forming and Regulating the Militia Within the Colony of the Massachusetts Bay, in New England, and for Repealing All the Laws Heretofore Made for that Purpose (Mass. Jan. 22, 1776) (part 6, at 223) ...................................................................11, 14

An Act in Further Addition to an Act Entitled An Act for the Forming and Regulating the Militia and for the Encouragement of Military Skill for the Better Defence of this Colony (Conn. Oct. 11-25, 1775) (part 2, at 201-02) .................................................. 11-12

An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for that Purpose (Mass. 1789) (part 6, at 264) ........................12

An Act for Forming and Regulating the Militia Within the State of New Hampshire in New England, and for Repealing All the [] Laws Heretofore Made for that Purpose (N.H. Sept. 19, 1776) (part 7, at 83) ...................................................................12, 14

An Act to Organize the Militia of this State (R.I. Jan. 1798) (part 12, at 222) ..................................................................12, 15

An Ordinance for Raising and Embodying a Sufficient Force, for the Defence and Protection of this Colony (Va. July 17, 1775) (part 14, at 274) ..............................................................................12

An Act for Regulating the Militia in the Province of Maryland (Md. May 22, 1756) (part 5, at 85).........................................................13

An Act for the Regulating, Training, and Arraying of the Militia, and for Providing More Effectually for the Defence and Security of the State (N.J. Jan. 8, 1781) (part 8, at 70, 71)...............................................13, 14

An Act Further to Amend an Act Entitled an Act for Regulating the Militia of the State of New York, and Other Purposes Therein Mentioned (N.Y. Oct. 9, 1779) (part 9, at 283)......................................15

An Act for Amending the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions and Insurrections (Va. Oct. 18, 1784) (part 14, at 427) ..............................................15

Federal Militia Act of 1792, 1 Stat. 271 (May 8, 1792) ........................10, 11, 13, 14

**State Constitutional Provisions (Pardon Provisions)**

Del. Const. of 1792, § 9 ....................................................................22

Ga. Const. of 1798, art. II, § 7 .......................................................23

Mass. Const. of 1780, part II, ch. II, § I, art. VIII....................23

Md. Const. of 1776, § XXXIII ......................................................23

N.C. Const. of 1776, § XIX ..........................................................23

N.H. Const. of 1783-1784..............................................................23

N.J. Const. of 1776, § IX ..............................................................23

N.Y. Const. of 1777, § XVIII ......................................................23

Pa. Const. of 1790, art. II, § 9 ...................................................23

S.C. Const. of 1790, art. II, § 7 .................................................23

Va. Const. of 1776, § 9 ................................................................23

Vt. Const. of 1793, ch. II, § XI ..................................................23

**Rules**

Cir. R. 28-2.7....................................................................................2

Fed. R. App. P. 43(c)(2)..................................................................1

**Other Authorities**

1 William Blackstone, *Commentaries* ....................................................16

*About NICS*, Federal Bureau of Investigation,
    https://www.fbi.gov/services/
    cjis/nics/about-nics (last visited July 25, 2022)..................27

Adam Winkler, *Gunfight--The Battle over the Right to Bear
    Arms in America* (2013) ..........................................................13, 15, 17

Aliza B. Kaplan, *The Governor's Clemency Power:  An Underused Tool to Mitigate the Impact of Measure 11 in Oregon*, 23 Lewis & Clark L. Rev. 1285 (2020) ........................................................24, 25

Black's Law Dictionary (11th ed. 2019) ...........................................16, 38

Daniel J. Hulsebosch, *Exile, Choice, and Loyalism:  Taking and Restoring Dignity in the American Revolution*, 41 Law & Soc. Inquiry 841 (Fall 2016) ................................................21

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (Nov. 1983) .............19, 25, 35, 39

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (Winter 1986) ...........................................35, 39

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L. J. 1339 (June 2009) .........................................................................................25

*Firearm Registrations in Hawaii, 2020*, Department of the Attorney General, Crime Prevention & Justice Assistance Division, at 1, https://ag.hawaii.gov/cpja /files/2021/03/Firearm-Registrations-in-Hawaii-2020.pdf ..................................36

Francine Uenuma, *The First Criminal Trial that Used Fingerprints as Evidence*, Smithsonian (Dec. 5, 2018), https://www.smithsonianmag.com/history/ first-case-where-fingerprints-were-used-evidence-180970883/ ..........................27

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 481 (1995) ................................................35, 39

John Indermaur, *Principles of the Common Law* 195 (Edmund H. Bennett ed., 1st Am. ed. 1878) ......................................................16

*Life expectancy at birth by sex, United States, 1790 to 2014*, Our World in Data, https://ourworldindata.org/grapher/life-expectation- at-birth-by-sex?country=~USA (last visited July 13, 2022) ................................16

Mona Chalebi, *What Percentage of Americans Have Served in the Military*, FiveThirtyEight (Mar. 19, 2015), https://fivethirtyeight.com/features/ what-percentage-of-americans-have-served-in-the-military/..............................29

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America:  The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 156 (Spring 2007) ....................15, 20, 21

Saul Cornell & Nathan DeDino, *A Well Regulated Right:  The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (Nov. 2004) ......................................................17, 21, 39

Saul Cornell, *"Don't Know Much About History"--The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 663 (2002)..............................................................13, 39

William F. Duker, *The President's Power to Pardon:  A Constitutional History*, 18 Wm. & Mary L. Rev. 475 (Spring 1977)............22, 24

Contrary to the District Court's decision, neither of the two challenged provisions in this case violates the Second Amendment to the U.S. Constitution, even after the U.S. Supreme Court's decision in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Defendant-Appellant HOLLY T. SHIKADA, in her official capacity as the Attorney General of the State of Hawai'i ("Defendant"), respectfully requests that this Court reverse the District Court's decision and direct the District Court to grant summary judgment in favor of Defendant.

## I. BACKGROUND

Briefing was completed in the Ninth Circuit in this case. However, on June 23, 2022, the U.S. Supreme Court issued its decision in *Bruen*. On July 1, 2022, Defendants filed their Motion for Remand or, in the Alternative, for Supplemental Briefing. DktEntry 45. Plaintiffs filed an Opposition and Defendants filed a Reply. DktEntry 47, 48. On August 18, 2022, the Ninth Circuit issued its Order denying remand and ordering the parties to submit supplemental briefs addressing *Bruen*, not to exceed 10,000 words and within 30 days. DktEntry 49.

## II. STATEMENT OF AUTHORITIES

Except for provisions previously included in the Addenda filed with Defendant's Opening and Reply Briefs, Defendant sets forth the pertinent

constitutional provisions, statutes, and rules in a separately filed Addendum, pursuant to Circuit Rule 28-2.7.

## III.    SUMMARY OF THE ARGUMENT

Even following the fundamental change to Second Amendment law effected by *Bruen*, Hawaii's firearm statutes are constitutional.  Hawaii's permit to acquire and inspection requirements are supported by historical analogues such as state and federal militia laws, loyalty oaths, and pardons from the Founding Era.  Militia laws mandated (and therefore authorized) certain persons—able-bodied, white males from age 16 (or 18) to age 50 (or 60)— to obtain firearms, required militia members and their equipment to be inspected, and required the information to be recorded in official reports.  Therefore, they were an early form of firearm permitting, inspection, and registration.  At the time of the Revolution, suspected British Loyalists were required to take loyalty oaths or be deprived of their civil rights, including the right to bear arms.  By taking a loyalty oath, a person officially requested permission to own a firearm (and have their other rights restored as well).  Pardons were an integral part of the criminal justice system that were used to ameliorate the harsh effects of a system that was still developing procedurally.  A felony conviction under the common law often resulted in confiscation of property, loss of civil rights, and execution.  Felons did not fall within the benefits of the common law right to possess arms.  However, a full

2

pardon nullified the conviction and allowed the person to regain their civil rights, including the right to own firearms.

A large proportion of the population was covered by these laws. Although only adult, white males of a certain age were subject to militia laws, this constituted the vast majority of the persons who possessed full civil rights at that time. Loyalists also made up as many as one-third of the population during the Revolution. And pardons were frequently granted until relatively recent times.

In addition, whether the focus is on protecting external security or internal security, the security of the community is the ultimate goal. Furthermore, the militia was also used to apprehend criminals, since modern police forces did not exist then.

*Bruen* also indicates that secondary implementing procedures, such as fingerprinting, background checks, mental health records checks, safety courses, and firearms training are also valid. But fingerprinting and background checks do not have historical analogues, and the Court made no effort to present historical analogues for mental health records checks, safety courses, and training programs. Consequently, this means that although the underlying regulatory regime must have a historical basis, secondary procedures intended to implement that regime do not necessarily have to be traced back to the Founding Era. Hawaii's ten-day expiration date is merely an incidental corollary to a permit to acquire requirement

that has historical analogues. Because the permit to acquire itself is supported by historical analogues in the form of militia laws, loyalty oaths, and pardons, the incidental secondary procedures, such as the ten-day expiration date, are valid too.

Hawaii's statues are also valid under the approach taken in footnote 9 of *Bruen*. In footnote 9, the Court noted that regulations that are "designed to ensure" that "law-abiding, responsible citizens" can exercise their Second Amendment rights are valid, as long as they "contain only 'narrow, objective, and definite standards'" and are not "put toward abusive ends[.]" Here, Hawaii's permit to acquire (and its associated deadline) and inspection requirements both serve to ensure that law-abiding, responsible citizens own firearms rather than criminals. The point of a permit to acquire is to prevent those who are disqualified from owning a firearm from acquiring it in the first place. The inspection requirement verifies that serial numbers are engraved or embedded on the firearm legibly, permanently, and accurately. This in turn supports the ability to trace firearms, so as to ensure that firearms are held by their lawful owners rather than criminals. It also serves to ensure that newcomers do not bring illegal firearms from out-of-state and private parties do not transfer illegal firearms. Permit to acquire and inspection requirements apply narrow, objective, and definite standards in that only those persons disqualified from owning firearms by law or whose weapons are objectively illegal under Hawaii law would have trouble meeting the standards.

4

These requirements are also not being "put toward abusive ends" because applicants can easily complete their purchases within the ten-day deadline, at worst they miss some work, and there are good reasons to apply the ten-day deadline and inspection requirements. There have been incidents where people have become ineligible to own firearms due to recent events in their lives, where discrepancies in serial numbers have been discovered, and where newcomers to Hawaii and private parties were not aware that their firearms had something illegal.

In many ways, Hawaii's permit to acquire and inspection at registration requirements can be regarded as a type of "shall-issue" licensing regime that was upheld in *Bruen*. A "permit" and a "license" are essentially interchangeable. Sections 134-2 and 134-3 do not contain the same kind of discretionary language that exists in Section 134-9(a) (requiring "an exceptional case," "reason to fear injury to the applicant's person or property," and "the urgency or the need[.]").

Permit to acquire and inspection requirements can also be considered secondary implementing procedures that merely enforce the underlying purpose of limiting firearms to "law-abiding, responsible citizens." The limitation to law-abiding, responsible citizens itself has historical analogues in the form of restrictions on persons lacking "civic vitu" (such as felons, children, and the insane) or on persons who are "dangerous" because they threaten public safety.

## IV.   ARGUMENT

A.     **The Second Amendment Analysis Following *Bruen*.**

*Bruen* has effected a fundamental change in Second Amendment law.  *Bruen* rejected the two-part analysis that virtually all the U.S. Courts of Appeals had adopted.  *Id.* at 2127.  The decision eliminated means-ends scrutiny and replaced it with what *Bruen* calls a "methodology centered on constitutional text and history." *Id.* at 2128-29.  Under that approach, courts must initially assess whether the "Second Amendment's plain text covers" the regulated conduct, *id.* at 2126—*i.e.*, whether the regulation at issue prevents "the people" from "keep[ing]" or "bear[ing]" "Arms," U.S. Const. amend. II.  If the answer to that question is yes, then the government can justify its regulation by showing that the challenged law is "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2129-30.  "[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.* at 2127.  "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 2132.  The Court pointed to two metrics:  "how and why the regulations burden a law-abiding citizen's right to armed self-defense…. whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*'

6

considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original).

The Court further explained:

> On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue,".... On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Bruen*, 142 S. Ct. at 2133. The Court also focused on both 1791 and 1868 as the relevant timeframe and declined to select between them. *Id.* at 2136-38.

The Court also noted that regulations can be upheld if "they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* at 2138 n.9. Such regulations are permissible if they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* They must "contain only 'narrow, objective, and definite standards'" and they cannot be "abusive[.]" *Id.* But they may include other subsidiary requirements, such as "fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, Jr., concurring).

7

The categorial exceptions originally recognized in *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008) ("*Heller I*"), for "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms[,]" as well as "the historical tradition of prohibiting the carrying of dangerous and unusual weapons[,]" also appear to remain valid. *See Bruen*, 142 S. Ct. at 2161-62 (Kavanaugh, J., concurring).

**B.     Hawaii's Statutes Are Supported by Several Historical Analogues to the Founding Era.**

Under *Bruen*, one could argue that as a purely textual matter, "the people" protected by the Second Amendment simply does not include criminals and other disqualified persons, and since permitting and inspection requirements are intended to keep guns out of the hands of disqualified persons and in the hands of lawful owners, Hawaii's laws are valid. *See Bruen*, 142 S. Ct. at 2134 ("the people" includes "ordinary, law-abiding, adult citizens").  But assuming that this Court does not want to end the analysis at that point, the next step is to consider Founding Era analogues.  There are several historical analogues to Hawaii's statutes that provide ample support pursuant to *Bruen*.

**1.     Militia Laws**

States in the Founding Era had militia laws that regulated firearms in ways that are "relevantly similar" to modern regulations.[3]  States generally required every able-bodied white male, from between the ages of 16 (sometimes 18) and 50 (sometimes 60), to serve in the militia.  *See* United States Selective Service System, *Military Obligation:  The American Tradition*, vol. 2, part 3, at 27 (1947) (reprinting An Act for Establishing a Militia (Del. June 4, 1785) ("every able-bodied effective white male inhabitant between the ages of eighteen and fifty years"))[4]; *id.* part 4, at 144 (reprinting An Act for Revising and Amending the Several Militia Laws of this State (Ga. Feb. 26, 1784) ("all the Male free Inhabitants of this State, from the Age of Sixteen to fifty Years")); *id.* at part 10, at 68 (reprinting An Act to Regulate and Establish a Militia in this State (N.C. April 14, 1778-Jan. 19, 1779) ("Militia of every County shall consist of all the effective men from Sixteen to fifty years of Age inclusive")); *id.* part 9, at 271 (reprinting An Act for Regulating the Militia of the State of New York (N.Y. April 3, 1778) ("every able bodied male person Indians and slaves excepted residing within this State from sixteen years of age to fifty")); *id.* part 1, at 77 (reprinting An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (Pa. Mar. 20,

---

[3] The militia laws cited herein are compiled in the Addendum, part "A".

[4] All citations to *Military Obligation:  The American Tradition* are also available from the HathiTrust Digital Library, at https://catalog.hathitrust.org/Record/100889778/Home.

1780) ("each and every male white person … between the ages of eighteen and fifty-three")); *id.* part 13, at 67 (reprinting An Act for the Regulation of the Militia of this State; and for Repealing Such Laws as Have Hitherto Been Enacted for the Government of the Militia (S.C. Mar. 28, 1778) ("all male free inhabitants within the districts … from the age of sixteen to sixty years")).

These persons were required to obtain their own equipment, including firearms and other weapons. The requirements were often quite specific. The Federal Militia Act of 1792, 1 Stat. 271 (May 8, 1792), required each militia member to

> provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder[.]

*Id.* §1, 1 Stat. 271. State militia laws were similarly specific. For example, a Connecticut law from 1784 required militia members to

> be furnished at their own Expence, with a well fixed Musket, the Barrel not less than three Feet and a Half long, and a Bayonet fitted thereto, with a Sheath and Belt or Strap for the frame, with a Ram rod, Worm, Priming-wire and Brush, one Cartouch-box carrying sixteen rounds of Cartridges, made with good Musket Powder and Ball, fitting his Gun, six good flints, and each Militia Man one Canteen holding no less than three Pints.

*See* United States Selective Service System, vol. 2, part 2, at 256 (reprinting An Act for Forming, Regulating, and Conducting the Military Force of this State (Conn. 1784)). *See also id.* part 6, at 223 (reprinting An Act for Forming and Regulating the Militia Within the Colony of the Massachusetts Bay, in New England, and for Repealing All the Laws Heretofore Made for that Purpose (Mass. Jan. 22, 1776)); *id.* part 9, at 271 (reprinting An Act for Regulating the Militia of the State of New York (N.Y. April 3, 1778)); *id.* part 13, at 67-68 (reprinting An Act for the Regulation of the Militia of this State; and for Repealing Such Laws as Have Hitherto Been Enacted for the Government of the Militia (S.C. Mar. 28, 1778)).

Militia members were required to assemble periodically, where they and their equipment would be inspected by their superiors. The Federal Militia Act required the brigade inspector "to attend the regimental and battalion meetings of the militia composing their several brigades, during the time of their being under arms, to inspect their arms, ammunition, and accoutrements[.]" Federal Militia Act of 1792, §10, 1 Stat. 271, 273 (May 8, 1792). A 1775 Connecticut law required each commanding officer to "cause the arms and ammunition of all under his command … to be reviewed … by requiring such persons to bring forth their arms and ammunition at a certain time and place[.]" *See* United States Selective Service System, vol. 2, part 2, at 201-02 (reprinting An Act in Further Addition to an Act

Entitled An Act for the Forming and Regulating the Militia and for the Encouragement of Military Skill for the Better Defence of this Colony (Conn. Oct. 11-25, 1775)). A 1789 Massachusetts law required each commanding officer to call the train-band (younger members) of his company together four days a year "for the purpose of examining their arms and equipments, and instructing them in military exercises" and to call the alarm-lift (older members) once a year "for the purpose of examining their arms and equipments." *Id.* part 6, at 264 (reprinting An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for that Purpose (Mass. 1789)). *See also id.* part 7, at 83 (reprinting An Act for Forming and Regulating the Militia Within the State of New Hampshire in New England, and for Repealing All the [] Laws Heretofore Made for that Purpose (N.H. Sept. 19, 1776)); *id.* part 9, at 274 (reprinting An Act for Regulating the Militia of the State of New York (N.Y. April 3, 1778)); *id.* at part 12, at 222 (reprinting An Act to Organize the Militia of this State (R.I. Jan. 1798)); *id.* part 14, at 274 (reprinting An Ordinance for Raising and Embodying a Sufficient Force, for the Defence and Protection of this Colony (Va. July 17, 1775)).

The laws in some states, such as Maryland and New Jersey, went even further than inspecting equipment at regular musters and actually authorized searches of homes in order to determine who was in possession of arms,

12

ammunition, and accoutrements. *See id.* part 5, at 85 (reprinting An Act for Regulating the Militia in the Province of Maryland (Md. May 22, 1756)); *id.* part 8, at 70 (reprinting An Act for the Regulating, Training, and Arraying of the Militia, and for Providing More Effectually for the Defence and Security of the State (N.J. Jan. 8, 1781)). *See also* Saul Cornell, *"Don't Know Much About History"--The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 663 (2002) ("Government had a right to inspect weapons in one's home or alternatively to require individuals to turn in their privately owned weapons for inspection at government arsenals."); Adam Winkler, *Gunfight--The Battle over the Right to Bear Arms in America,* at 115-16 (2013) ("In some states, like New Hampshire and Rhode Island, government officials conducted door-to-door surveys of gun ownership in the community. In case of an attack, the government needed to know where the guns necessary to mount a defense were.").

The information about the militia members and their equipment revealed by inspection was then written in "returns," which were then passed up the chain of command. Under the Federal Militia Act, brigade inspectors were required "to make returns to the adjutant-general of the state, at least once in every year, of the militia of the brigade to which he belongs, reporting therein the actual situation of the arms, accoutrements, and ammunition of the several corps[.]" Federal Militia Act of 1792, §10, 1 Stat. 271, 273 (May 8, 1792). The adjutant-general was then

13

to make a return to the commander-in-chief of the state, with a duplicate to the president. *Id.* at 274. A 1776 Massachusetts law provided that "the clerk of each and every company of said militia shall, once every six months after the time of his choice or appointment, take an exact list of his company, and of each man's equipments, respectively, and present the same to the captain or commanding officer thereof[.]" From there, further returns were to be made to the colonel, the brigadier, the first major general, and the Council. United States Selective Service System, vol. 2, part 6, at 224 (reprinting An Act for Forming and Regulating the Militia Within the Colony of the Massachusetts Bay, in New England, and for Repealing All the Laws Heretofore Made for that Purpose (Mass. Jan. 22, 1776)). A 1776 New Hampshire law similarly required the clerk of each company to, every six months, "take an exact List of his Company, and of each Man's Equipments respectively, and present the same to the Captain or commanding Officer thereof[.]" The captain would then have to make returns to the colonel, then to the major general, then to the Council. *Id.*, part 7, at 83 (reprinting An Act for Forming and Regulating the Militia Within the State of New Hampshire in New England, and for Repealing All the [] Laws Heretofore Made for that Purpose (N.H. Sept. 19, 1776)). *See also id.* part 8, at 71 (reprinting An Act for the Regulating, Training, and Arraying of the Militia, and for Providing More Effectually for the Defence and Security of the State (N.J. Jan. 8, 1781)); *id.* at part

14

9, at 283 (reprinting An Act Further to Amend an Act Entitled an Act for Regulating the Militia of the State of New York, and Other Purposes Therein Mentioned (N.Y. Oct. 9, 1779)); *id.* part 12, at 222 (reprinting An Act to Organize the Militia of this State (R.I. 1798)); *id.* part 14, at 427 (reprinting An Act for Amending the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions and Insurrections (Va. Oct. 18, 1784)).

It is important to remember that the persons subject to these militia laws constituted the vast majority of the persons who possessed full civil rights at that time. In the Founding Era, women, Native Americans, slaves, and free Blacks were categorically excluded from full participation in civic life. *See, e.g.*, Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 156 (Spring 2007) ("white Virginians excluded African-Americans, Indians, and indentured servants from the body politic and denied them the most fundamental of rights"); Winkler, *Gunfight,* at 115-16 (noting the forcible disarmament of "slaves, free blacks, and people of mixed race"); *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting) (noting that "[s]laves and Native Americans … were disarmed as a matter of course"); U.S. Const. amend. XIX (granting women the right to vote only in 1920). But of those who possessed

full civil rights—adult, white males—the vast majority of them were required to serve in the militia.

At common law and during the Founding Era, the age of majority was 21. *See* 1 William Blackstone, *Commentaries* ("So that full age in male or female, is twenty one years … , who till that time is an infant, and so styled in law."); *Infant*, Black's Law Dictionary 847 (11th ed. 2019) ("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period … he or she is said to attain majority ….") (quoting John Indermaur, *Principles of the Common Law* 195 (Edmund H. Bennett ed., 1st Am. ed. 1878)).   In addition, in 1790, the average life expectancy at birth for white males was 44.1 years old.  *See Life expectancy at birth by sex, United States, 1790 to 2014*, Our World in Data, https://ourworldindata.org/grapher/life-expectation-at-birth-by-sex?country=~USA (last visited July 13, 2022).  Therefore, if militia service applied to white males between 16 (or 18) and 50 (or 60), this would cover individuals from before they reached majority to after they were expected to die.  Militia service was pervasive among those who possessed full civil rights during the Founding Era and should not be casually dismissed.[5]

---

[5] Although the age limits in militia laws are cited here to show that militia service was widespread, those provisions may not be directly applicable in all cases.

Prominent Second Amendment scholars have also frequently cited militia laws as being an early version of gun registration or an early form of gun control. *See* Winkler, *Gunfight*, at 113 ("Every man of age was legally mandated to acquire a militarily useful gun. This mandate was enforced at 'musters,' public gatherings held several times a year where every person eligible for militia service was required to attend, military gun in hand. At the musters, government officials would inspect people's guns and account for the firearms on public rolls–**an early version of gun registration**."); *id.* at 117 ("The founding fathers had numerous **gun control** laws that responded to the public safety needs of their era."); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 505 (Nov. 2004) ("A variety of laws regulating firearms were already in place during the Founding Era. Militia regulations were the most common form of laws pertaining to firearms. Such laws could be quite intrusive, allowing government not only to keep track of who had firearms, but requiring them to report for a muster or face stiff penalties.").

Furthermore, *Bruen* itself requires courts to consider the "plain text" of the Second Amendment. *See Bruen*, 142 S. Ct. at 2129-30, 2135. The Second Amendment expressly refers to a "well regulated Militia[.]" Therefore, in order to be true to *Bruen*'s emphasis on "text and history," courts cannot simply ignore militia laws. *See id.* at 2118, 2127-31.

17

With respect to permitting, registration, and inspection requirements, militia laws are consistent with the "how and why" of Hawaii's statutes. Regarding the "how" part of the analysis, Hawaii's permit to acquire provision burdens the Second Amendment by requiring official approval before someone can obtain a firearm. This is analogous to the requirement in militia laws that militia members obtain a firearm at their own expense. Although the militia requirement was a **mandate** to affirmatively obtain a firearm, implicit within such a requirement is official **approval** that the person may obtain a firearm for that purpose in the first place. Militia laws are also well-recognized as an early form of gun registration in that the details of militia members' equipment were recorded in official reports. Part of the registration process in Hawai'i includes the inspection of the firearm. Inspection too was required by militia laws in that militia members were required to present their equipment for inspection at periodic assemblies. In fact, some states even authorized people's homes to be searched for firearms and equipment needed by the militia. Therefore, militia laws represent an early form of firearm permitting, registration, and inspection. The "how" part of the *Bruen* analysis is satisfied.

The "why" of the *Bruen* analysis is also satisfied. Although the focus of militia laws was on protecting the community against external threats (e.g., foreign invasion), and modern gun regulations focus on protecting the community against

internal threats (e.g., criminals), they both ultimately protect the security of the community. In other words, the difference between external security and internal security is not significant because they both ultimately address the security of the community. Moreover, even if militia were **primarily** focused on external security, that was not exclusively so. In an age when modern professional police forces did not exist, militia were also called upon to apprehend violators of the law. As one prominent Second Amendment scholar noted:

> In the pre-colonial English tradition there had been no police and no standing army in peacetime. From time immemorial every free Englishman had been both permitted and required to keep such arms as a person of his class could afford both for law enforcement and for military service. With arms readily available in their homes, Englishmen were theoretically prepared at all times to chase down felons in response to the hue and cry, or to assemble together as an impromptu army in case of foreign invasion of their shire.

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 214-15 (Nov. 1983) (footnotes and page numbers omitted). The same tradition applied to the American colonies:

> As in England, the requirement of keeping arms was as much directed toward prevention of crime and apprehension of criminals as the repelling of foreign enemies. Militiamen (apparently selected by rotation) staffed the night watch which both patrolled the city and watched out over i[t] from stationary positions to raise the hue and cry in case of felony and the alarm in case of foreign attack.

*Id.* at 215 n.47.

Therefore, militia laws provide a historical analogue for Hawaii's statutes.

## 2. Loyalty Oaths

Another historical analogue for Hawaii's permit to acquire requirement is the loyalty oath. During the Revolution, several states passed laws that deprived persons loyal to the British Crown of their civil rights, including ownership of firearms. In March 1776, the Continental Congress recommended that local authorities "cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies, against the hostile attempts of the British fleets and armies." 4 Journals of the Continental Congress, 1774-1789, at 205 (Washington Chauncy Ford ed., 1906), available at https://memory.loc.gov/ammem/amlaw/lwjc.html.

Pennsylvania's Test Act of 1777 "required all white men over eighteen to swear an oath declaring allegiance to the commonwealth, abjuring all allegiance to the British monarchy, and promising to do nothing injurious to the freedom and independence of the state. The act prohibited those refusing the test from voting, holding office, serving on juries, suing, and transferring land. It also ordered them disarmed." Churchill, *Gun Regulation*, at 159. Maryland instituted a test oath in 1777 and barred those refusing to take it from voting, holding office, serving on juries, suing, and keeping arms. *Id.* at 160. The Massachusetts Act of 1776 required "every Male Person above sixteen Years of Age" to subscribe to a "test"

20

of allegiance to the "United American Colonies." Those who refused to take the test were "disarmed … [of] all such Arms, Ammunition and Warlike Implements, as by the strictest Search can be found in his Possession or belonging to him." Cornell & DeDino, *A Well Regulated Right*, at 507. However, by taking a loyalty oath to the new state governments, people could regain their civil rights, including the right to own firearms. *See* Churchill, *Gun Regulation*, at 160 (citing North Carolina's law that barred non-testors from basic liberties, including the keeping of arms, but promising that any who relented would be "held and deemed a good subject of this state, and shall enjoy the privileges thereof.").

A large proportion of the population during the Revolution consisted of British Loyalists. John Adams famously estimated that "on the eve of Revolution, about two-thirds of the colonies' 3 million residents were in favor of revolution, while the remaining third opposed it[,]" which would amount to as many as 1 million Loyalists. Daniel J. Hulsebosch, *Exile, Choice, and Loyalism: Taking and Restoring Dignity in the American Revolution*, 41 Law & Soc. Inquiry 841, 841-42 (Fall 2016). More modern estimates put the number of Loyalists at 500,000, which is still significant. *Id.* at 842.

Loyalty oaths also satisfy the "how and why" requirements of *Bruen*. As for "how," a loyalty oath constitutes a request by a suspected Loyalist for official permission to own a firearm (as well as regain all other civil rights). Therefore, it

21

is a burden similar to a permit to acquire, which officially grants permission to own a firearm. Regarding "why," Loyalists were deemed potentially dangerous to the new revolutionary societies because they were suspected of maintaining loyalty to Great Britain. That suspicion had to be dispelled by taking a loyalty oath. Hawaii's permit to acquire serves a similar purpose. A permit to acquire helps to dispel potential dangerousness by requiring people to submit information and secure a permit before acquiring a firearm.

### 3.    Pardons

The practice of awarding pardons to convicted felons is yet another historical analogue for Hawaii's permit to acquire requirement. Pardons have a long history stretching back to the royal prerogatives of English monarchs. *See generally* William F. Duker, *The President's Power to Pardon:  A Constitutional History*, 18 Wm. & Mary L. Rev. 475 (Spring 1977).  The Crown delegated the pardoning power to the royal governors of the American colonies, with few limitations. *Id.* at 497.

During and after the Revolution, states continued to exercise the pardoning power, with some variations.[6]  The Delaware Constitution of 1792 granted the governor the power "to grant reprieves and pardons, except in cases of impeachment." Del. Const. of 1792, § 9.  The Georgia Constitution of 1798 gave

---

[6] The pardon provisions cited herein are compiled in the Addendum, part "B".

the governor the "power to grant reprieves for offences against the State, except in cases of impeachment, and to grant pardons, in all cases after conviction, except for treason or murder, in which cases he may respite the execution, and make a report thereof to the next general assembly, by whom a pardon may be granted." Ga. Const. of 1798, art. II, § 7. The Massachusetts Constitution of 1780 granted the governor, with the advice of the governor's council, "[t]he power of pardoning offences," except for impeachment cases and before a conviction. Mass. Const. of 1780, part II, ch. II, § I, art. VIII. *See also* Md. Const. of 1776, § XXXIII; N.C. Const. of 1776, § XIX; N.H. Const. of 1783-1784; N.J. Const. of 1776, § IX; N.Y. Const. of 1777, § XVIII; Pa. Const. of 1790, art. II, § 9; S.C. Const. of 1790, art. II, § 7; Va. Const. of 1776, § 9; Vt. Const. of 1793, ch. II, § XI. And of course, the U.S. Constitution provides that the president "shall have Power to grant Reprieves and Pardons, for Offences against the United States, except in Cases of Impeachment." U.S. Const. art. II, § 2.

It should be noted that pardons have long been an integral part of the criminal justice system and the modern disapproval of them is very recent. Under the common law, criminal procedures and punishment were notoriously harsh. For example:

> Prior to the sixteenth century, the common law treated all homicides as felonies. In a society with no other means of flexibility, the pardon served as the sole instrument of justice for those who should not be punished. In 1249, for instance, four year old Katherine Passcavant

23

was imprisoned in the abbot of St. Alban's gaol because, in opening a
door, she accidentally pushed a younger child into a vessel of hot
water, killing the child. Because of the inexorable system, subjects
like Katherine could not be acquitted by the courts; they required the
king's grace. Therefore subjects filed petitions of pardon immediately
after accidents or sudden death from natural causes.

Duker, *The President's Power to Pardon*, at 479. Therefore, pardons were
frequently used to ameliorate the harsh effects of a criminal justice system that was
still developing. Aliza B. Kaplan, *The Governor's Clemency Power: An
Underused Tool to Mitigate the Impact of Measure 11 in Oregon*, 23 Lewis &
Clark L. Rev. 1285, 1300 (2020) ("Thus, clemency served as a vital correction on
the justice system that produced unfair and unnecessarily harsh outcomes.").

Pardons were freely granted by presidents and governors throughout history.
*Id.* at 1292, 1295-99. For example, during the 45-year period from 1885 to 1930,
attorney general annual reports reveal that presidents issued over 10,000 grants of
clemency, sometimes upwards of 300 per year. *Id.* at 1292. Mass pardons in the
form of amnesties were granted after the Civil War to former Confederates by
Presidents Lincoln and Andrew Johnson. Duker, *The President's Pardoning
Power*, at 509-15. President Truman granted 1,913 pardons, Eisenhower granted
1,110, Lyndon Johnson granted 960, and Nixon granted nearly 1,000. Kaplan, at
1292. President Carter granted general amnesty to Vietnam-era draft evaders, and
President Ford granted conditional clemency to approximately 20,000 draft
evaders. *Id.* It was not until the 1980s that the use of pardons began to be

24

disfavored. *Id.* at 1306, 1307-12. This coincided with the "tough on crime era" and developments in the criminal justice system. The right to appeal, assistance of counsel, professionalization of law enforcement, developments in criminal procedure, the use of parole, and the use of plea bargaining, all contributed to reducing the need for pardons. *Id.* at 1299-1306. Consequently, for most of American history, pardons were an integral part of the criminal justice system.

Pardons satisfy the "how and why" requirements of *Bruen*. A felony conviction under the common law often resulted in confiscation of property, loss of civil rights, and execution. Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L. J. 1339, 1360-61 (June 2009) ("At common law, felons were essentially stripped of property and other rights: 'A felon who had broken the social contract no longer had any right to social advantages, including transfer of property ....' A felon 'could not own any property himself, nor could [his heirs] claim through him.'"); Kates, *Handgun Prohibition*, at 266 (The common law "punished felons with automatic forfeiture of all goods, usually accompanied by death."). Thus, "felons simply did not fall within the benefits of the common law right to possess arms." Kates, *Handgun Prohibition*, at 266. A full pardon, however, nullified the conviction and allowed the person to regain their civil rights, including the right to own firearms. Regarding the "how" requirement, a pardon is similar to Hawaii's

permit to acquire because a pardon application is a request for official approval of the ability to own a firearm (along with restoration of other civil rights). Regarding the "why" requirement, a pardon clearly relates to the safety of the community. Even if militia laws might primarily focus on external security, pardons primarily focus on internal security. They involve convicted felons seeking to dispel the presumption that they are a danger to the community. A permit to acquire helps to dispel the potential danger by requiring people to submit information and secure a permit before acquiring a firearm.

### 4. Secondary Implementing Procedures

It should be noted that Plaintiffs in the present case specifically challenge the ten-day expiration date in Section 134-2(e) rather than the permit to acquire requirement itself. However, under *Bruen*, the historical basis for the permit to acquire should also validate the ten-day expiration date.

In *Bruen*, the Supreme Court upheld "shall-issue" licensing regimes, but in doing so, the Court also held that secondary procedures such as fingerprinting, background checks, mental health records checks, safety courses, and firearms training were also valid. *See Bruen*, 142 S. Ct. at 2138 n.9 (endorsing requirements "to undergo a background check or pass a firearms safety course"); *id.* at 2162 (Kavanaugh, J. concurring) (endorsing requirements to "undergo fingerprinting, a background check, a mental health records check, and training in

firearms handling and in laws regarding the use of force, among other possible requirements"). However, fingerprinting and background checks do not have historical analogues. Modern fingerprinting analysis was not invented until the late 19th century and was not accepted in the United States until the early 20th century. Francine Uenuma, *The First Criminal Trial that Used Fingerprints as Evidence*, Smithsonian (Dec. 5, 2018), https://www.smithsonianmag.com/history/ first-case-where-fingerprints-were-used-evidence-180970883/. The national background check system used for firearm purchases—the National Instant Criminal Background Check System ("NICS")— did not exist until the passage of the Brady Handgun Violence Prevention Act of 1993, 107 Stat. 1536 (Nov. 30, 1993). *About NICS*, Federal Bureau of Investigation, https://www.fbi.gov/services/ cjis/nics/about-nics (last visited July 25, 2022). And no effort was made by the Court in *Bruen* to provide a historical analysis for mental health records checks, safety courses, and training programs.

Consequently, this means that although the underlying regulatory regime must have a historical basis, secondary procedures intended to implement that regime do not necessarily have to be traced back to the Founding Era. Fingerprinting and background checks (as well as mental health records checks, safety courses, and training programs) do not have to be traced back to the

Founding Era because they merely implement and enforce restrictions that do have a historical basis.

A similar approach was taken in *Heller v. District of Columbia*, 670 F.3d 1244, 1249 n.* (D.C. Cir. 2011) ("*Heller II*"), and *Heller v. District of Columbia*, 801 F.3d 264, 277 (D.C. Cir. 2015) ("*Heller IV*"). The D.C. Circuit ruled that incidental administrative and enforcement provisions, such as registration fees, ballistics testing, fingerprinting, fines, notification requirements, and photographing, can be upheld as corollaries to an underlying regime if that underlying regime is itself lawful and enforceable.

In the present case, the ten-day expiration date in Section 134-2(e) is merely an incidental corollary to a permit to acquire requirement that has historical analogues. Because the permit to acquire itself is supported by historical analogues in the form of militia laws, loyalty oaths, and pardons, the incidental secondary procedures, such as the ten-day expiration date in Section 134-2(e), are valid too.

Therefore, Hawaii's ten-day expiration date for the permit to acquire is validated by the historical analogues for the permit to acquire itself, and an exact analogue for the ten-day deadline is not required.

### 5.    The District Court's Initial Rejection of Militia Laws as a Historical Analogue Should be Reversed.

The District Court's initial decision in this case rejected militia laws as a historical analogue. 1-ER-065. However, because of the changes made to Second Amendment law by *Bruen*, the District Court's decision should be reversed.

One reason the District Court rejected militia laws was that it felt that militia laws were too dissimilar to Hawaii's current regulations. 1-ER-063. However, this decision was made without the benefit of *Bruen*'s explanation that "how and why" are now the central considerations. *See Bruen*, 142 S. Ct. at 2133. As argued above, militia laws satisfy the "how and why" because they are "relevantly similar." Furthermore, the District Court noted that militia laws applied only to those enlisted in the militia and their guns were possessed for military purposes, while Hawaii's laws apply to civilians and guns held in their personal capacity. 1-ER-063. However, the District Court overlooked the fact that militia service was pervasive and militia members constituted the vast majority of the persons possessing full civil rights at the time. The District Court made a distinction between military service and the core of the citizenry that did not exist in the Founding Era. Today, military service is rare, amounting to only 0.4 percent of the population. Mona Chalebi, *What Percentage of Americans Have Served in the Military*, FiveThirtyEight (Mar. 19, 2015), https://fivethirtyeight.com/features/what-percentage-of-americans-have-served-in-the-military/. But it was very different in the Founding Era. The District Court also looked at Hawaii's laws and

concluded that they were for the purpose of protecting public safety rather than military preparedness. 1-ER-064. However, as argued above, whether the focus is on protecting external security or internal security, the security of the community is the ultimate goal. Furthermore, the militia was in fact also used to apprehend criminals, since modern police forces did not exist then. The District Court made the mistake of looking at history through modern eyes, and its decision should be reversed.

## C. Hawaii's Statutes Are Valid Because They Are Designed to Ensure that Law-Abiding, Responsible Citizens Can Possess Firearms.

### 1. *Bruen*'s Support for Regulations Protecting Law-Abiding, Responsible Citizens

Hawaii's statues are also valid under the approach taken in footnote 9 of *Bruen*. In footnote 9, the Court noted that regulations that are "designed to ensure" that "law-abiding, responsible citizens" can exercise their Second Amendment rights are valid, as long as they "contain only 'narrow, objective, and definite standards'" and are not "put toward abusive ends[.]" *Bruen*, 142 S. Ct. at 2138 n.9.

Hawaii's permit to acquire (and its associated deadline) and inspection requirements both serve to ensure that law-abiding, responsible citizens own firearms rather than criminals. The permit to acquire directly serves this purpose. *See* 1933 Haw. Sess. Laws (Special Sess.) Act 26, § 4, at 37-38; H. Stand. Comm. Rep. No. 89, in 1933 House Journal, at 427 ("The purpose of the Bill is to give the

law enforcing agencies of the Territory a better means of controlling the sale, transfer and possession of firearms and ammunition.").  The point of a permit to acquire is to prevent those who are disqualified from owning a firearm from acquiring it in the first place.  Registration requirements can catch disqualified persons, but only after they have already acquired the weapon, which then requires authorities to seize or confiscate the weapon—a much more dangerous proposition. With a permit to acquire requirement, the disqualified person is denied the ability to purchase the weapon to begin with.

Hawaii's inspection requirement also ensures that guns remain in the hands of law-abiding, responsible citizens.  The ability of law enforcement to trace a firearm ensures that firearms are held by their lawful owners rather than criminals. Without tracing, it would be difficult or impossible to determine where criminals are obtaining their firearms, or even to distinguish one firearm from another. *United States v. Mobley,* 956 F.2d 450, 454 (3d Cir. 1992) ("It is no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes. When a firearm is stolen, determining this chain is difficult and when serial numbers are obliterated, it is virtually impossible.").  Inspection supports the ability to trace a firearm, since inspection helps to confirm the firearm's serial number, which is needed for tracing.  Particularly for "ghost guns," inspection is needed to ensure that the registration or serial number, which is supposed to be

engraved or embedded on unfinished receivers, is placed on the firearm legibly, permanently, and accurately. *See* 2020 Haw. Sess. Laws Act 74, §§ 2, 5, at 480-83; Act 30, Session Laws of Hawai'i 2022, § 1 at 6, https://www.capitol.hawaii.gov/session2022/bills/GM1130_.PDF.[7]

Inspection also serves to ensure that newcomers do not bring firearms from out-of-state that are illegal under Hawai'i law. Act 30, § 1 at 7. Although these newcomers probably do not realize that their weapons have illegal features or modifications, they are nevertheless failing to "abide" by the "law" by trying to bring such firearms into Hawai'i. Parties in private transactions do not have the expertise of licensed dealers and may also transfer weapons that have illegal features or modifications. Act 30, § 1 at 8. Even though they may be doing so inadvertently, they too are failing to "abide" by the "law" in possessing such weapons. Therefore, newcomers and private parties in these situations are, by definition, not "law-abiding," and inspection of their weapons is needed to ensure that only law-abiding, responsible citizens own firearms.[8]

---

[7] Act 30 and other miscellaneous authorities cited herein are compiled in the Addendum, part "C".

[8] In 2020, Act 74 added an inspection requirement for all firearms (except those being registered by licensed dealers) as part of the "ghost guns" amendments to the registration provisions. The District Court, in its initial *Yukutake* decision, invalidated Act 74's inspection requirement and denied a request for a stay pending appeal. In 2022, the Legislature enacted Act 30, which temporarily reinstated a modified inspection requirement for three years so as to provide for inspections while the appeal in *Yukutake* is pending. Act 30, §§ 1, 5 at 5, 15.

Footnote 9 (and Justice Kavanaugh's concurrence) also indicates that if a regulation is designed to ensure that "law-abiding, responsible citizens" can exercise their Second Amendment rights, other secondary procedures meant to implement that regime, such as fingerprinting, background checks, mental health records checks, safety courses, and firearms training, are also valid. *See Bruen*, 142 S. Ct. at 2138 n.9; *id.* at 2162. The Second Amendment is not a "regulatory straightjacket." *Id.* at 2133. As argued above, Hawaii's permit to acquire and inspection requirements are designed to protect "law-abiding, responsible citizens." Because protecting "law-abiding, responsible citizens" is the ultimate

---

Because Act 30 has a "sunset" provision and the original version of the statute will be re-enacted in three years, Act 30 does **not** render the present case moot. *Board of Trustees of Glazing Health and Welfare Trust v. Chambers*, 941 F.3d 1195, 1199 (2019) (a repealed statute is moot "unless there is a reasonable expectation that the legislative body will reenact the challenged provision or one similar to it.").

However, Act 30 and its legislative history also help to clarify the Legislature's intent with respect to the inspection requirement. Under Hawaiʻi law, "subsequent legislative history or amendments" may be used to confirm interpretations of statutory provisions. *Pacific Int'l Servs. Corp. v. Hurip*, 76 Hawaiʻi 209, 217-18, 873 P.2d 88, 96-97 (1994); *Franks v. City and County of Honolulu,* 74 Haw. 328, 340 n.6, 843 P.2d 668, 674 n.6 (1993). In enacting Act 30, the Legislature found that "[r]equiring people to bring the firearm to be registered for physical inspection ensures that the registration information is accurate, ensures that the firearm complies with Hawaiʻi law, and confirms the identity of the firearm so as to facilitate tracing by law enforcement." Act 30, § 1 at 4. The inspection requirement ensures that the engraving or embedding of registration or serial numbers on ghost guns is done "legibly, permanently, and accurately" and it helps avoid the risk of "human error." *Id.* § 1 at 6-7. It also ensures that newcomers to Hawaiʻi and parties in private transactions do not inadvertently possess illegal firearms. *Id.* § 1 at 7-8.

purpose of the regulations, secondary procedures, such as requiring a permit to acquire (with a ten-day expiration date) and requiring inspection at registration, should be valid too, just like fingerprinting and background checks. The D.C. Circuit took a similar approach in *Heller II*, 670 F.3d at 1249 n.*, and *Heller IV*, 801 F.3d at 277, when it upheld registration fees, ballistics testing, fingerprinting, fines, notification requirements, and photographing. Incidental administrative and enforcement provisions are valid as corollaries to otherwise lawful and enforceable underlying regimes.

Just as the Second Amendment is not limited to specific weapons that existed in the Founding Era (e.g., flintlocks and muskets), *see Bruen*, 142 S. Ct. at 2132, it should not be limited to specific enforcement procedures that existed in the Founding Era. Most laws regulating firearms in the Founding Era were enforced by criminal sanctions. *See id.* at 2150 (noting that states, such as Massachusetts and Virginia, had "direct criminal prohibitions on specific weapons and methods of carry[,]" and surety laws were not a substantial restriction). Modern enforcement procedures include permitting/licensing and registration requirements. But just as the Second Amendment can protect modern handguns, it should also permit modern licensing and registration procedures. The historical analysis requires a historical **analogue**, not a historical **twin**. *See id.* at 2133. Therefore, just as modern handguns are a valid analogue to older weapons, modern

34

permitting/licensing and registration procedures (including expiration dates and inspections) should be considered valid analogues to older enforcement methods. Many prominent Second Amendment scholars in fact fully support modern permitting/licensing and registration regimes. *See, e.g.*, Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 148 (Winter 1986); Kates, *Handgun Prohibition*, at 264-66; Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 481 (1995).

Footnote 9 also provides that regulations must "contain only 'narrow, objective, and definite standards[.]'" Hawaii's permit to acquire is not subject to any discretionary standard. The bases for disqualifying an applicant from owning, and therefore acquiring, a firearm are set forth in great detail in Section 134-7. And the ten-day expiration date provision in Section 134-2(e) states only: "Permits issued to acquire any pistol or revolver shall be void unless used within ten days after the date of issue." This is an objective standard with no room for debate. The inspection requirement is similarly objective. The inspection of the serial or registration number on the firearm will be guided by whether the number is legible, permanent, and accurate, which is necessary in order for it to be used for tracing. Act 30, § 1 at 6. Inspection of firearms possessed by newcomers and private parties will be guided by whether the weapon objectively violates Hawaiʻi law. Therefore, the standard will be based on statutes such as Sections 134-8 and

134-8.5.  *See* Haw. Rev. Stat. § 134-8 (2011) (prohibiting, among other things, "assault pistols … ; automatic firearms; rifles with barrel lengths less than sixteen inches; shotguns with barrel lengths less than eighteen inches; cannons; mufflers, silencers, or devices for deadening or muffling the sound of discharged firearms; … ammunition magazines with a capacity in excess of ten rounds which are designed for or capable of use with a pistol"); Haw. Rev. Stat. § 134-8.5 (Supp. 2019) (prohibiting, among other things, bump fire stocks, multiburst trigger activators, and trigger cranks).

Footnote 9 also requires that the regulation not be "put toward abusive ends[.]"  There is no indication that Hawaii's statutes are abusive.  Only 1.4% of applicants were unable to complete their purchases within the ten days and had their permits to acquire voided in 2020.  1-ER-060 n.12; *Firearm Registrations in Hawaii, 2020*, Department of the Attorney General, Crime Prevention & Justice Assistance Division, at 1, https://ag.hawaii.gov/cpja/files/2021/03/Firearm-Registrations-in-Hawaii-2020.pdf.  The figures for prior years were similar.  1-ER-060 n.12.  And Plaintiffs' only harm was having to take time off from work.  1-ER-055; 1-ER-066.

Expiration dates for permits to acquire are also not "abusive" because they are supported by good reasons.  There have been incidents where individuals previously qualified to own firearms have become ineligible due to recent events in

36

their lives. *See Testimony of Chief Paul K. Ferreira*, Hawaii County Police

Department, at pdf 57-58 (Mar. 24, 2022), https://www.capitol.hawaii.gov

/Session2022/Testimony/HB2075_HD1_TESTIMONY_JDC_03-29-22_.PDF.

The time limitations for permits to acquire provide a safeguard by ensuring that

applicants haven't been disqualified after submitting their applications. *Id.*

Consequently, the permit to acquire requirement has a valid purpose and is not

being "put toward abusive ends[.]"

The inspection requirement is also not being "put toward abusive ends[.]"

Due to registrant or firearm dealer errors, there have been incidents where

discrepancies have been discovered regarding firearm serial numbers. *See*

*Testimony of Maj. Joseph A. Trinidad*, Honolulu Police Department, at pdf 5-6

(Mar. 29, 2022), https://www.capitol.hawaii.gov/Session2022/Testimony/

HB2075_HD1_TESTIMONY_JDC_03-29-22_.PDF. And persons purchasing

firearms from non-dealers may not be aware that something about their firearm is

illegal. *Id.* Also, active-duty military personnel who transfer to Hawaiʻi often

unknowingly bring illegal firearms into Hawaii and try to register them. *Id. See*

*also Testimony of the Department of the Attorney General*, at pdf 3-4 (Mar. 29,

2022) (regarding the need to inspect serial numbers, the risk of human error, and

addressing the problem of private transfers and newcomers to Hawaii),

https://www.capitol.hawaii.gov/Session2022/Testimony/HB2075_HD1_TESTIMO

NY_JDC_03-29-22_.PDF.  Consequently, the inspection requirement is serving important needs and is not being imposed simply to be "abusive."

In many ways, Hawaii's permit to acquire and inspection at registration requirements can be regarded as a type of "shall-issue" licensing regime that was upheld in *Bruen*.  A license is defined as:

> A privilege granted by a state or city upon the payment of a fee, the recipient of the privilege then being authorized to do some act or series of acts that would otherwise be impermissible. • A license in this sense is a method of governmental regulation exercised under the police power, as with a license to drive a car, operate a taxi service, keep a dog in the city, or sell crafts as a street vendor. — **Also termed** *permit*.

*License*, Black's Law Dictionary (11th ed. 2019) (emphasis added).  A permit is defined as:  "A certificate evidencing permission; an official written statement that someone has the right to do something; **LICENSE** (1) <a gun permit>."  *Permit*, Black's Law Dictionary (11th ed. 2019) (emphasis added).  Because "license" and "permit" are defined by reference to each other, it is clear that they are essentially interchangeable.

Nothing in the permitting requirements in Section 134-2 or the registration requirements in Section 134-3 indicates that police chiefs have the same kind of discretion in issuing permits to acquire or granting registrations that they previously had with respect to concealed or unconcealed carry licenses under Section 134-9.  Section 134-9(a) contains language requiring "an exceptional case"

38

and "reason to fear injury to the applicant's person or property" and "the urgency or the need[.]"  Sections 134-2 and 134-3 do not have the same discretionary language.  There is also no indication that permits to acquire or registrations are based on any requirement of "special need" or "proper cause."

### 2. Historical Analogues Restricting Guns to Law-Abiding, Responsible Citizens

Footnote 9's protection of regulations "designed to ensure" that "law-abiding, responsible citizens" can exercise their Second Amendment rights has its own historical analogues.  *See Bruen*, 142 S. Ct. at 2138 n.9.

Second Amendment scholars have long argued that that the right to bear arms was historically tied to the concept of "civic virtu" and that the government could disarm citizens deemed to be "unvirtuous," such as felons, children, and the insane.  *See, e.g.*, Kates, *The Second Amendment: A Dialogue*, at 146; Kates, *Handgun Prohibition*, at 266; Cornell & DeDino, *A Well Regulated Right*, at 491–92; Cornell, *"Don't Know Much About History,"* at 679; Reynolds, *A Critical Guide to the Second Amendment*, at 480.  Several courts have adopted this view as well.  *See, e.g., United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010); *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010); *Binderup v. Attorney General*, 836 F.3d 336, 348 (3d Cir. 2016).

Justice Amy Coney Barrett, then a judge of the Seventh Circuit, asserted a slightly different view in her dissent to *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir.

39

2019) (Barrett, J. dissenting). Justice Barrett believed that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety. This is a category simultaneously broader and narrower than 'felons'—it includes dangerous people who have not been convicted of felonies but not felons lacking indicia of dangerousness." *Id.* at 454.

Regardless of whether historical analogues are based on certain persons being "unvirtuous" or being "dangerous," it is clear that some persons traditionally have not been protected by the Second Amendment. *Bruen* appears to refer to them as persons who are not "law-abiding, responsible citizens."[9] In the present case, Hawaii's statutes are designed to prevent those persons from obtaining firearms through a permit to acquire requirement (with a ten-day expiration date) or through an inspection requirement aimed at verifying serial numbers or discovering newcomers or private parties who, perhaps unknowingly, are violating Hawaii law. These implementing procedures are validated by the historical analogues, whether those analogues are considered prohibitions on the "unvirtuous" or the "dangerous."

---

[9] The categorical exception for "longstanding prohibitions on the possession of firearms by felons and the mentally ill" from *Heller I* appears to be referring to this idea as well. *See Bruen*, 142 S. Ct. at 2161-62 (Kavanaugh, J., concurring).

40

**D.    Other Possible Arguments by Plaintiffs**

Plaintiffs are likely to argue that Defendant has waived her historical arguments because she did not address them in her Opening Brief.  However, it is well settled that the Ninth Circuit "may consider new arguments on appeal if the issue arises because of an intervening change in law." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 543 (2013).  Under the prior law, Defendant argued in the first part of the analysis that the challenged laws were "longstanding prohibitions" dating back nearly 100 years to the early 20th century.  *See, e.g.,* Opening Brief, DktEntry 16, at 22-24.  Defendant legitimately took that position based on the case law as it existed at the time.  *See, e.g., Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015); *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 700 F.3d 185, 196 (5th Cir. 2012); *Heller II*, 670 F.3d at 1253-55.  *Bruen* has completely changed the law on this issue and now a Founding Era analogue is required.  *Bruen*, 142 S. Ct. at 2127, 2129-30.  In light of that change, Defendant should be allowed to fully reargue this case.  Defendant should not be held to arguments and strategic choices that were made when the prevailing law was different.  Second Amendment cases should not be reduced to an unfair game of "bait and switch."

## V.    CONCLUSION

41

For all these reasons, Defendant respectfully requests that this Court reverse the District Court's decision and direct the District Court to grant summary judgment in favor of Defendant.  In the alternative, this Court could also remand this case to the District Court, notwithstanding the ruling of the motions panel, if it feels that this case needs further factual or historical development.

DATED:  Honolulu, Hawai'i, September 19, 2022.

s/ Robert T. Nakatsuji
KIMBERLY T. GUIDRY
 Solicitor General
ROBERT T. NAKATSUJI
 First Deputy Solicitor General
CARON M. INAGAKI
KENDALL J. MOSER
 Deputy Attorneys General

Attorneys for Defendant-Appellant HOLLY T. SHIKADA, in her Official Capacity as the Attorney General of the State of Hawai'i

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  No. 21-16756 _____

I am the attorney or self-represented party.

**This brief contains  9,993  words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[X] complies with the length limit designated by court order dated Aug. 18, 2022.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**  s/ Robert T. Nakatsuji _____  **Date** September 19, 2022
*(use "s/[typed name]" to sign electronically-filed documents)*

## **CERTIFICATE OF SERVICE**

I hereby certify that the Supplemental Brief of Defendant-Appellant HOLLY T. SHIKADA was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 19, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED:  Honolulu, Hawai'i, September 19, 2022.

       s/ Robert T. Nakatsuji
KIMBERLY T. GUIDRY
 Solicitor General
ROBERT T. NAKATSUJI
 First Deputy Solicitor General
CARON M. INAGAKI
KENDALL J. MOSER
 Deputy Attorneys General

Attorneys for Defendant-Appellant HOLLY T. SHIKADA, in her Official Capacity as the Attorney General of the State of Hawai'i