# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-22-00328-PRW |
| | ) | |
| JARED MICHAEL HARRISON, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Jared Michael Harrison's Motion to Dismiss the Indictment (Dkt. 17), which argues that the statute he is charged with violating, 18 U.S.C. § 922(g)(3), is unconstitutionally vague, in violation of the Due Process Clause, and unconstitutionally infringes upon his fundamental right to possess a firearm, in violation of the Second Amendment. For the reasons given below, the motion is **GRANTED**.

### Background

I.    *The Facts as Alleged.*

On May 20, 2022, Harrison was pulled over by an officer of the Lawton Police Department for failing to stop at a red light. When Harrison rolled down his window to speak to the officer, the officer smelled marijuana and questioned Harrison about the source of the smell. Harrison told the officer that he was on his way to work at a medical marijuana dispensary, but that he did not have a state-issued medical-marijuana card.

The officer asked Harrison to step out of his car. When he did, the officer noticed that Harrison was wearing an ankle monitor. Harrison told the officer that he was on probation in Texas for an aggravated assault.[1] The officer searched Harrison and found no contraband. The officer did not conduct a field sobriety test, nor did he request a blood draw to determine if Harrison was under the influence of marijuana or some other unlawful substance.

Another officer arrived, and the two officers searched Harrison's car. They found a loaded revolver on the driver's side floorboard; two prescription bottles in the driver's side door, one empty and one containing partially smoked marijuana cigarettes; and a backpack in the passenger seat. The backpack contained marijuana, THC gummies, two THC vape cartridges, and a pre-rolled marijuana cigarette and marijuana stems in a tray.

Harrison was arrested at the scene. The next day, the State of Oklahoma charged Harrison with possession of marijuana, possession of paraphernalia, and failure to obey a traffic signal. Harrison is awaiting trial on those charges. Then, on August 17, 2022, a federal grand jury returned an indictment charging Harrison with possessing a firearm with knowledge that he was an unlawful user of marijuana, in violation of 18 U.S.C. § 922(g)(3).

---

[1] It turns out this wasn't completely accurate; Harrison was actually on bond pending trial in Texas for that aggravated assault. Harrison and another man are alleged to have shot into a crowd at a college party, seriously wounding at least one partygoer. It is not clear from the available records in the Texas case whether any conditions of release were imposed on Harrison other than the location monitoring.

II.    *The Arguments.*

Harrison argues that the indictment should be dismissed for both Due Process Clause and Second Amendment reasons. Because the Court resolves the motion on Second Amendment grounds, the Court won't reach Harrison's Due Process claim or describe Harrison's argument in that regard.

As for the Second Amendment, Harrison argues he has the right to possess a firearm and that § 922(g)(3) infringes upon that right. Relying primarily on *New York State Rifle & Pistol Association v. Bruen*,[2] Harrison argues that the Second Amendment's plain text covers his conduct (possessing a handgun), and that the government cannot affirmatively prove that restrictions like § 922(g)(3) are part of the historical traditions that define the outer bounds of the right to keep and bear arms.

First, says Harrison, neither text nor history and tradition support the notion that only "law-abiding" individuals are part of the people protected by the Second Amendment. Second, Harrison argues that the government cannot point to any historical law on all fours with § 922(g)(3), much less a "tradition" of such laws. And while *Bruen* may not require the government to identify "a historical twin" to § 922(g)(3), where the societal problem addressed by § 922(g)(3)—users of illicit substances possessing guns—is nothing new, the government must identify "distinctly similar" laws in our Nation's history and tradition. And this it cannot do, says Harrison.

---

[2] 142 S. Ct. 2111 (2022).

The United States disagrees. First, it argues, Harrison is not part of "the people" protected by the Second Amendment because he is not "a law-abiding citizen." This being so, the government argues, the burden never shifts to it to affirmatively prove that restrictions like § 922(g)(3) are part of the historical traditions that define the outer bounds of the right to keep and bear arms. And even if it did, there is a historical tradition of preventing "presumptively risky" people like felons and the mentally ill from possessing firearms, and for purposes of the Second Amendment, concludes the government, marijuana users are no different from those because they are similarly "unvirtuous."

### Discussion

### I.    18 U.S.C. § 922(g)(3).

Many people are at least vaguely familiar with the idea that convicted felons can't possess a firearm. 18 U.S.C. § 922(g)(1) is the federal statute making such firearm possession unlawful, and prosecutions under that subsection make up the overwhelming majority of prosecutions brought under § 922 (about 79%).[3] But § 922 contains many lesser-known provisions that prohibit other classes of people from possessing or receiving a firearm. 18 U.S.C. § 922(g)(3), the prohibition at issue here, for example, prohibits possession of firearms by users of substances made unlawful by the federal Controlled Substances Act. It is rarely used by prosecutors, as it accounts for only about 5% of prosecutions brought under § 922.[4]

---

[3] United States Sentencing Commission, *What Do Federal Firearms Offenses Really Look Like?* 24 (July 2022).

[4] *Id.*

Section 922(g)(3) does not have deep roots; it wasn't enacted by Congress until the Gun Control Act of 1968.[5] The statute initially prohibited any individual who was "an unlawful user of or addicted to marihuana or any depressant or stimulant drug . . . or narcotic drug" from receiving a firearm,[6] but it was amended in 1986 to broadly prohibit the receipt *or possession* of a firearm by any person who "is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))."[7] In its modern form, § 922(g)(3) thus strips a person of their fundamental right to possess a firearm the instant the person becomes an "unlawful user" of marijuana. And in the United States' view, all users of marijuana are "unlawful users."

## II. Second Amendment.

A. New York State Rifle & Pistol Association, Inc. v. Bruen.

The Second Amendment to the United States Constitution protects "the right of the people to keep and bear Arms."[8] Because the "central component" of this right is individual self-defense,[9] the Second Amendment guarantees an individual's right to keep and bear

---

[5] Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220–21. The 1968 act originally placed the prohibition in subsection (h)(3). The Firearm Owners' Protection Act, enacted in 1986, reorganized the prohibition to its modern location in subsection (g)(3).

[6] *Id.*

[7] Firearm Owners' Protection Act, Pub. L. No. 99-308, §§ 102(6)(B), (D), 100 Stat. 449, 452 (1986).

[8] U.S. Const. amend. II.

[9] *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008).

arms for self-defense,[10] a conclusion the Supreme Court reached after examining the text and history of the Second Amendment in *District of Columbia v. Heller*.[11] But after *Heller*, federal courts strayed from that textual and historical approach and "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny."[12]

The Supreme Court flatly rejected that approach in *New York State Rifle & Pistol Association, Inc. v. Bruen*, holding that the lower courts' two-step framework was "one step too many."[13] The Court thus explained that

> [w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[14]

This motion is one of a flood of motions that have been filed in this district and nationwide challenging the constitutionality of various subparts of 18 U.S.C. § 922 in light of *Bruen*'s directive that lower courts change their ways. No longer should lower courts evaluating firearm restrictions "defer to the determinations of legislatures," because while

---

[10] *Bruen*, 142 S. Ct. at 2122.

[11] 554 U.S. 570 (2008). *See Bruen*, 142 S. Ct. at 2128–29; *Heller v. District of Columbia*, 670 F.3d 1244, 1273 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller* established that the scope of the Second Amendment right—and thus the constitutionality of gun bans and regulations—is determined by reference to text, history, and tradition.").

[12] *Bruen*, 142 S. Ct. at 2125.

[13] *Id.* at 2127.

[14] *Id.* at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)).

"that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not the deference that the Constitution demands."[15] And while "end-justifies-the-means" rationalizations should generally be understood as antithetical to the rule of law, *Bruen* now leaves no doubt that such rationalizations have no place in our Second Amendment jurisprudence.

The question here is thus whether stripping someone of their right to possess a firearm solely because they use marijuana is consistent with the Nation's historical tradition of firearm regulation. If it is not, then § 922(g)(3) cannot be constitutionally applied to Harrison—no matter the reasonableness of the policy it embodies.

### B. The Second Amendment's plain text covers Harrison's conduct.

The first step is to determine whether the Second Amendment's plain text covers Harrison's conduct of possessing a handgun. It does. To be clear, the United States argues that the relevant conduct is "keeping and bearing arms *as an unlawful drug user or addict*,"[16] but there are problems with that characterization. Though Harrison was found while carrying his firearm, he has been charged under a statute that criminalizes mere possession, so at trial the United States would have to prove only that Harrison possessed the gun—the fact he was carrying or "bearing" the firearm would not matter for purposes of conviction. Accordingly, for purposes of analyzing § 922(g)(3), the relevant conduct is possessing or "keeping" a firearm, rather than carrying or "bearing" a firearm.

---

[15] *Id.* at 2131.

[16] United States' Resp. (Dkt. 25), at 20 (emphasis added).

Moreover, the Supreme Court has held that "'the people' . . . unambiguously refers to all members of the political community, not an unspecified subset," further explaining that the term refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[17] The Court thus concluded that there is a "strong presumption" that the Second Amendment right to keep and carry handguns publicly for self-defense "belongs to all Americans."[18]

No one disputes that Harrison is an American citizen who has resided in the United States his entire life, which under Supreme Court precedent would make him part of the "national community," and thus part of "the people" to whom the Second Amendment guarantees the right to keep arms.[19] The United States argues, however, that marijuana

---

[17] *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)).

[18] *Id.* at 581; *Bruen*, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions."(quoting *Heller*, 554 U.S. at 581)). *See Kanter v. Barr*, 919 F.3d 437, 451–53 (7th Cir. 2019) (Barrett, J., dissenting) ("There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. . . . Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. . . . These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away. In my view, the latter is the better way to approach the problem. . . . In addition to being analytically awkward, the 'scope of the right' approach is at odds with *Heller* itself. There, the Court interpreted the word 'people' as referring to 'all Americans.'").

[19] *Cf. United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) ("This court declines to read 'the people' so narrowly. Instead, it follows

users are lawbreakers, and lawbreakers aren't part of "the people" whose rights are protected by the Constitution.[20] But this is precisely the sort of carving out of a subset from "all Americans" that the *Heller* Court rejected.[21]

---

courts from within the Tenth Circuit, which have observed that 'convicted felons fall within "the people" as contemplated by the First and Fourth Amendments.' Applying the presumption of consistent usage, they have 'decline[d] to carve out felons from the scope of the Second Amendment's protection of "the people,"' and this court does the same." (quoting *United States v. Coombes*, No. 22-CR-00189, --- F. Supp. 3d ----, ----, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022)); *Coombes*, 2022 WL 4367056, at *4 ("[I]t is clear that convicted felons fall within 'the people' as contemplated by the First and Fourth Amendments. Based on existing precedent and well-established canons of construction, the court declines to carve out felons from the scope of the Second Amendment's protection of 'the people.'"); *United States v. Gray*, No. 22-CR-00247-CNS, 2022 WL 16855696, at *2 (D. Colo. Nov. 10, 2022) ("The Court adopts the analysis of its sister district courts within the Tenth Circuit and finds that Defendant is covered by the Second Amendment's plain text.").

[20] On this point, the United States points to *Bruen*'s description of the plaintiffs in that case as "ordinary, law-abiding, and adult citizens." *Bruen*, 142 S. Ct. at 2134. But that description can't be read as breaking new ground with respect to who make up "the people" protected by the Second Amendment. First, *Bruen* noted that it was undisputed that the plaintiffs in that case were part of the people protected by the Second Amendment, so at best, the United States is relying on dicta. But even so, the United States is reading too much into the dicta because immediately after describing the plaintiffs, the *Bruen* Court cited *Heller*'s holding that "the people" includes "all members of the political community," not just "an unspecified subset." *Id.* (citing *Heller*, 554 U.S. at 580). Thus, this reference in dicta to "law-abiding citizens" cannot possibly be read as overturning the very holding upon which it relies. *See Denezpi v. United States*, 142 S. Ct. 1838, 1847–48 (2022) (explaining that stray statements "[r]ead in isolation . . . . cannot overcome the holdings of our cases, not to mention the text of the Clause").

[21] Frankly, it's not even clear this is carving out a "subset," as much as an outright declaration of the federal government's belief that it can deprive practically *anyone* of their Second Amendment right. Who among us, after all, isn't a "lawbreaker"? For sure, there may well exist some adult who has never exceeded the speed limit, changed lanes without signaling, or failed to come to a complete stop at a stop sign, but they are few and far between.

Moreover, the United States' approach shoehorns the government's historical-tradition burden onto *Bruen*'s initial presumption, a presumption based simply on the Second Amendment's plain text. Indeed, as support for excluding marijuana users from "the people," the government relies on a purported historical tradition of regulating firearm use by felons, intoxicated persons, and the mentally ill. But *Bruen* makes clear that the first step is one based solely on the text of the Second Amendment to determine if it presumptively protects an individual's conduct—a presumption that the United States can *then* rebut with history and tradition. Here, because the Second Amendment's plain text covers Harrison's conduct—possessing a handgun for self-defense—"the Constitution presumptively protects that conduct."[22]

C. *Applying § 922(g)(3) to Harrison is inconsistent with the Nation's historical tradition of firearm regulation.*

Given that the Second Amendment presumptively protects Harrison's conduct, the burden shifts to the United States to demonstrate that prohibiting marijuana users from possessing firearms is "consistent with the Nation's historical tradition of firearm regulation."

This inquiry is "fairly straightforward" when the challenged regulation addresses a "general societal problem that has persisted since the 18th century," because there "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."[23] And "if earlier

---

[22] *See Bruen*, 142 S. Ct. at 2129–30.

[23] *Id.* at 2131.

generations addressed the societal problem, but did so through materially different means," that too is evidence that the modern regulation is unconstitutional.[24]

But where the challenged regulation implicates "unprecedented societal concerns or dramatic technological changes," a "more nuanced approach" might be required.[25] Given the novelty of the societal concern, it would be impossible to identify a "historical twin" to the challenged law, so the United States need not do so.[26] But it still must identify a historical tradition of laws that are sufficiently analogous, and that turns on whether the historical laws "impose[d] a comparable burden on the right of armed self-defense" and were "comparably justified."[27] Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," historical analogues in existence near the time the Second Amendment was adopted in 1791 are of primary relevance.[28]

---

[24] *Id.*

[25] *Id.* at 2132.

[26] *Id.* at 2133. While the job of performing these comparisons is necessarily left to the lower courts, *Bruen* provided one instructive example of historical laws that might be sufficiently analogous to a modern restriction, despite not being a "twin." Historical laws restricting the carrying of firearms in "sensitive places" like "legislative assemblies, polling places, and courthouses" were generally accepted as lawful, so modern restrictions restricting carrying in new "sensitive places" (an airport, for example) might well be lawful also. *Id.* Thus, despite not being an *exact* match to the historical law, the modern law would pass muster so long as it imposed a comparable burden and was comparably justified.

[27] *Id.* (internal quotations and citations omitted). Importantly, this analysis "does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 2133 n.7.

[28] *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35) (emphasis in original). *Bruen* explained that "[t]he job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies." *Id.* at 2130 n.6 (emphasis in

Here, the societal problem addressed by § 922(g)(3), possession of firearms by users of substances with the potential for abuse,[29] is not new. The United States' reliance on historical prohibitions on the carrying of firearms by intoxicated persons (more on that later) proves the point. Those historical prohibitions are the product of our Nation's long history of people using substances that might intoxicate and impair judgment. Yet the United States has not identified a single historical law that is "distinctly similar" to § 922(g)(3)—which *Bruen* suggests is dispositive.[30] The United States instead relies solely on laws that are admittedly distinct, but, in its view, close enough for purposes of the analogical reasoning utilized when examining regulations aimed at novel societal problems. But even if the possession of firearms by users of certain substances were a brand-new societal problem, the United States' historical evidence falls short.

### 1. *Categories of Presumptively Risky Persons.*

The United States first argues that § 922(g)(3) is sufficiently analogous to historical regulations on three categories of "presumptively risky persons": the intoxicated, convicted

---

original). This legal inquiry is guided by "evidentiary principles and default rules," including the principle of party presentation. *Id.* (quoting William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019)). The Court will thus decide this legal question based on the arguments and historical record the parties have compiled in their respective briefs and during oral argument. *See id.* ("[I]n our adversarial system of adjudication, we follow the principle of party presentation. Courts are thus entitled to decide a case based on the historical record compiled by the parties.") (internal quotations and citations omitted).

[29] Potential for abuse is the driving factor when it comes to whether a substance is "controlled" under the Controlled Substances Act. *See* 21 U.S.C. § 811.

[30] *See Bruen*, 142 S. Ct. at 2131.

felons, and the mentally ill. But none of these "identify a well-established and representative historical analogue" to § 922(g)(3)'s application to Harrison.[31]

### a. Historical Restrictions on Intoxicated Persons.

To begin, the United States points to seven laws—one 1655 law from colonial Virginia and six state or territorial laws enacted between 1868 and 1899—that it argues "categorically prohibit[ed]" the intoxicated "from possessing firearms."[32] But the government overstates its case. The laws it relies on materially differ from the application of § 922(g)(3) to Harrison in regard to both of *Bruen*'s "central consideration[s]": "the

---

[31] *See id.* at 2133 (emphasis omitted).

[32] United States' Resp. (Dkt. 25), at 30–31. For purposes of the Second Amendment analysis, the Court assumes, without deciding, that these seven historical laws were consistent with the Second Amendment's original meaning. Historical regulations are, of course, only significant for purposes of determining the original meaning of the Second Amendment to the extent that the jurisdictions that enacted the regulations also recognized an individual right to keep and bear arms. The Second Amendment was not in place when the 1655 Virginia law was enacted—the English Bill of Rights wasn't either. Nor was the Second Amendment incorporated against the states at the time the six post-Civil War laws were enacted. *See State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (rejecting a Second Amendment challenge to the Missouri law discussed below on the grounds that "[t]he second amendment to the constitution of the United States is a restriction upon the powers of the national government only, and is not a restriction upon state legislation"); *see also United States v. Cruikshank*, 92 U.S. 542, 553 (1875). The United States has not attempted to demonstrate whether the six states or territories who passed these laws recognized an individual right to keep and bear arms under their respective state constitutions. Having done the work itself, however, the Court found at least one state high court that concluded one of these laws was consistent with the state constitution's individual right to bear arms guarantee. *See Shelby*, 2 S.W. at 468–69. And at least one modern jurist applying a text, history, and tradition test, and relying on some of the laws identified by the United States, found an Ohio law prohibiting a "person, *while under the influence* of alcohol or any drug of abuse," from carrying or using any firearm consistent with the Second Amendment. *See State v. Weber*, 168 N.E.3d 468, 489–96 (Ohio 2020) (DeWine, J., concurring in judgment) (emphasis added).

burden on the right of armed self-defense" imposed by the regulation and the justification for the burden.[33]

Start with comparing the burden each of these laws placed on the right of armed self-defense vis-à-vis the burden imposed by § 922(g)(3). The seven laws the United States identifies imposed a far narrower burden and, as a result, left ample room for the exercise of the core right to armed self-defense. First, the restrictions imposed by each law only applied while an individual was actively intoxicated or actively using intoxicants.[34] Under these laws, no one's right to armed self-defense was restricted based on the mere fact that

---

[33] *Bruen*, 142 S. Ct. at 2133.

[34] 1 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* 401–02, Act XII (1823) (prohibiting "shoot[ing] any gunns *at drinkeing* (marriages and ffuneralls onely [sic] excepted)"); *General Statutes of the State of Kansas* 378, ch. 31, § 282 (John M. Price et al. eds., 1868) ("[A]ny person *under the influence of intoxicating drink* . . . carrying on his person a pistol . . . or other deadly weapon, shall be subject to arrest upon charge of misdemeanor[.]"); *Revised Code of the Statute of Laws of the State of Mississippi* 776, ch. 77, § 2986 (J.A.P. Campbell ed., 1880) ("It shall not be lawful for any person to sell to any . . . *person intoxicated*, knowing him to be . . . *in a state of intoxication*" any concealable, deadly weapon.); *Supplement to the Revised Statutes of Wisconsin* 848, ch. 181, § 4397b(3) (A. L. Sanborn & J. R. Berryman eds., 1883) ("It shall be unlawful for any person *in a state of intoxication* to go armed with any pistol or revolver."); 1 *Revised Statutes of the State of Missouri* 854, ch. 47, § 3502 (Samuel C. Major et al. eds., 1889) ("If any person . . . shall have or carry any [deadly or dangerous weapon] upon or about his person *when intoxicated, or under the influence of intoxicating drinks* . . . shall, upon conviction, be punish by a fine . . . or by imprisonment[.]"); *Statutes of Oklahoma 1890* 495, ch. 25, art. 47, § 4 (Will T. Little et al. eds., 1891) (prohibiting "any public officer" from "carrying" certain specified arms, including a pistol or revolver, "*while under the influence of intoxicating drinks*"); 2 *Code of Laws of South Carolina* 318, ch. 12, § 252 (1902) ("Code of Laws of South Carolina") ("Any person who shall, without just cause or excuse, or *while under the influence, or feigning to be under the influence, of intoxicating liquors*, engaged in any boisterous conduct, or who shall, without just cause or excuse, discharge any gun, pistol or other firearm while upon or within fifty yards of any public road or highway, except upon his own premises, shall be guilty of a misdemeanor[.]") (all emphases added).

he or she was a user of intoxicants.[35] Second, none of the laws appear to have prohibited the mere possession of a firearm.[36] Third, far from being a total prohibition applicable to all intoxicated persons in all places, all the laws appear to have applied to public places or activities (or even a narrow subset of public places),[37] and one only applied to a narrow

---

[35] When asked at argument whether the United Sates was "able to find even a single law that prohibited a person, not [an] intoxicated person, but a person who uses intoxicants, even when sober, from possessing a gun," counsel for the United States responded "No." Tr. of Oral Arg. (Dkt. 35), at 37.

[36] Three of the laws clearly only prohibited carrying a firearm. Little et al., *supra* note 34, at 495 ("carrying"); Sanborn & Berryman, *supra* note 34, at 848 ("to go armed"); Price et al., *supra* note 34, at 378 ("carrying"). Two laws seem to have even permitted carrying but prohibited discharging the firearm. Hening, *supra* note 34, at 401–02 ("shoot[ing] any gunns at drinkeing (marriages and ffuneralls onely [sic] excepted)"); Code of Laws of South Carolina, *supra* note 34, at 318 ("discharge any gun, pistol or other firearm while upon or within fifty yards of any public road or highway, except on his own premises"). And one law prohibited only the sale of firearms to persons intoxicated and did not regulate the intoxicated person's carry, possession, or use. Campbell, *supra* note 34, at 776. The one possible exception is the Missouri law, which made it unlawful for "any person" to "*have or carry* any [deadly or dangerous weapon] upon or about his person when intoxicated, or under the influence of intoxicating drinks." Major et al., *supra* note 34, at 854 (emphasis added). But the broader context of that provision seems to suggest that it only applied to "having" a firearm in a public place, i.e., carrying the firearm, and even then, the law may have provided an exception for self-defense. *Shelby*, 2 S.W. at 469 (describing the law as targeting "[t]he mischief to be apprehended from an intoxicated person going abroad with fire-arms"). In any event, even if the Missouri law did prohibit possession even in the home, one law cannot possibly create a constitutionally significant, "well-established" historical tradition. *See Bruen*, 142 S. Ct. at 2133, 2142. And even if it could, the law would have prohibited possession only while a person was actively intoxicated or actively using intoxicants.

[37] The carry laws would have only applied to public places, and at least one of the laws only applied to certain public places. *See* Code of Laws of South Carolina, *supra* note 34, at 318 (prohibiting the "discharge [of] any gun, pistol or other firearm *while upon or within fifty yards of any public road or highway, except on his own premises*") (emphasis added); *see also* Little et al., *supra* note 34, at 496, ch. 25, art. 47, § 7 (not identified by the United States, but prohibiting carrying a firearm into "any place where intoxicating liquors are sold"). Little is known about the 1655 Virginia law, but it appears that "shoot[ing] any

subset of intoxicated persons.[38] Importantly, none appear to have prohibited the possession of a firearm in the home for purposes of self-defense.

Where the seven laws the United States identifies took a scalpel to the right of armed self-defense—narrowly carving out exceptions but leaving most of the right in place—§ 922(g)(3) takes a sledgehammer to the right. Recall that § 922(g)(3) imposes the most severe burden possible: a total prohibition on possessing any firearm, in any place, for any use, in any circumstance—regardless of whether the person is actually intoxicated or under the influence of a controlled substance.[39] It is a complete deprivation of the core right to possess a firearm for self-defense, turning entirely on the fact that an individual is a user of marijuana. Section 922(g)(3)'s "burden on the right of armed self-defense" is thus not "comparable" to the seven historical intoxication laws.[40]

---

gunns at drinkeing" referred to a social activity, and the law specifically carved out shooting and drinking at weddings and funerals.

[38] The Oklahoma law, for example, only applied to "public officer[s]," leaving the rest of the intoxicated public untouched. Little et al., *supra* note 34, at 495.

[39] *See* 27 C.F.R. § 478.11 ("Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before . . . . A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm.").

[40] *Bruen*, 142 S. Ct. at 2133. The United States suggests that § 922(g)(3) imposes a narrow burden on the right to possess a firearm because it does not permanently deprive the marijuana user of the right. Rather, a person may regain their right to possess a firearm by stopping their use of marijuana. But while theoretically impermanent, the deprivation imposed by § 922(g)(3) is significantly greater than the historical intoxication laws because even if one stops their use of a controlled substance, they could be deprived of their right to armed self-defense for up to a year after their last use. *See* 27 C.F.R. § 478.11 ("An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time, e.g., a conviction for use or possession of a controlled substance within the past year

The justifications for these laws also differ substantially from § 922(g)(3). The only pre-Civil War law the United States points to—the most relevant period under *Bruen*[41]—is the 1655 Virginia law. But as the law itself explained, the justification for the restriction was the fear that the "frequent shooting of gunns [sic] in drinking" would inhibit the ability of the colonists to defend against Indian attacks by (1) drowning out warning shots, which were "the only means for the discovery of [Indian] plots" to attack, and (2) by wasting gun powder "in vaine [sic]" that was essential to the militia's ability to fight off Indian attacks.[42] So, unlike § 922(g)(3), which is justified by concerns that marijuana users are "presumptively risky persons" who accordingly should never possess a gun for any purpose at any time (even when they are sober), the Virginia law's justification had nothing to do with the status of the persons firing the guns or even the fact that they were intoxicated. The six post-Civil War laws were also based on a different justification than § 922(g)(3). Each was concerned with the danger of persons who were actively intoxicated or actively

---

. . . or persons found through a drug test to use a controlled substance unlawfully, provided that the test was administered within the past year."). The deprivation imposed by the historical intoxication laws, on the other hand, ceased the moment the person sobered up.

[41] *See Bruen*, 142 S. Ct. at 2136; *id.* at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution against giving postenactment history more weight than it can rightly bear." (internal quotation marks omitted)).

[42] Hening, *supra* note 34, at 401–02. *See* Ann E. Tweedy, *"Hostile Indian Tribes, Outlaws, Wolves, Bears, Grizzlies and Things Like That?" How the Second Amendment and Supreme Court Precedent Target Tribal Self-Defense*, 13 U. Pa. J. Const. L. 687, 698 (2011).

using intoxicants,[43] and none imposed restrictions on a user of intoxicants when they were sober.

The United States also points to a New York law from the colonial era that was passed "for the prevention" of "great Damages . . . frequently done" around the New Year's holiday "by persons going from House to House, with Guns and other Fire Arms and being often intoxicated with Liquor."[44] The law appears to have prohibited *all persons* from "fir[ing] or discharg[ing] any Gun . . . in any House Barn or other Building or before any

---

[43] Hening, *supra* note 34, at 401–02 (prohibiting "shoot[ing] any gunns *at drinkeing* [sic]"); Price et al., *supra* note 34, at 378 ("[A]ny person *under the influence of intoxicating drink* . . . carrying on his person a pistol . . . or other deadly weapon, shall be subject to arrest upon charge of misdemeanor[.]"); Campbell, *supra* note 34, at 776 ("It shall not be lawful for any person to sell to any . . . *person intoxicated*, knowing him to be . . . *in a state of intoxication*" any concealable, deadly weapon.); Sanborn & Berryman, *supra* note 34, at 848 ("It shall be unlawful for any person *in a state of intoxication* to go armed with any pistol or revolver."); Major et al., *supra* note 34, at 854 ("If any person . . . shall have or carry any [deadly or dangerous weapon] upon or about his person *when intoxicated, or under the influence of intoxicating drinks* . . . shall, upon conviction, be punish by a fine . . . or by imprisonment[.]"); Little et al., *supra* note 34, at 495 (prohibiting "any public officer" from "carrying" certain specified arms, including a pistol or revolver, "*while under the influence of intoxicating drinks*"); Code of Laws of South Carolina, *supra* note 34, at 318 ("Any person who shall, without just cause or excuse, or *while under the influence, or feigning to be under the influence, of intoxicating liquors*, engaged in any boisterous conduct, or who shall, without just cause or excuse, discharge any gun, pistol or other firearm while upon or within fifty yards of any public road or highway, except upon his own premises, shall be guilty of a misdemeanor[.]") (all emphases added). Again, at argument, the United States conceded that it has been unable to identify a single pre-twentieth century law that prohibited the possession of firearms by a person who used intoxicants even when that person was sober. *See* Tr. of Oral Arg. (Dkt. 35), at 37.

[44] 5 *The Colonial Laws of New York from the Year 1664 to the Revolution* 244, ch. 1501, (1894) ("Colonial Laws of New York").

Door or in any Garden, Street, Lane or other Inclosure [sic] on" the "eve of the last Day of December, and on the first and second Days of January."[45]

The United States' reliance on this law is unclear: It includes the law as an example of "state laws [that] have historically prohibited carrying a firearm while under the influence of alcohol."[46] But as explained above, the law applied to *all* persons, not just intoxicated persons or those who use intoxicants.[47] And it is difficult to see how this law could indicate any sort of "well-established,"[48] constitutionally relevant tradition of regulation: The law was in effect for only two years, applied to only certain places in one county and two towns, and restricted the discharge of firearms for only three days a year.

---

[45] *Id*. at 245.

[46] United States' Resp. (Dkt. 25), at 30.

[47] The law purported to apply to "any Person or Persons of any Age or Quality whatsoever." Colonial Laws of New York, *supra* note 44, at 245. It seems doubtful that such a law would even be constitutional today. To the extent the law actually prohibited the entirety of the non-intoxicated public from using firearms for purposes of self-defense, it would almost certainly be unconstitutional under *Heller* and *Bruen*. Although not identified by the United States, it appears that New York passed a somewhat similar law in 1785. *See The Laws of the State of New York Compromising the Constitution, and the Acts of the Legislature, Since the Revolution, From the First to the Fifteenth Session* 188–89, ch. LXXXI (Thomas Greenleaf ed., 1792). That law remarkably makes no reference to alcohol or intoxication at all, stating merely that "great dangers have arisen, and mischief been done by the pernicious practice of firing guns, pistols, rockets, squibs and other fire-works, on the eve of the last day of December, and first and second days of January." *Id.* This latter law seems to confirm that the New Years-related laws had little to do with the intoxicated status of the person firing or discharging a firearm, further weakening any attempt to rely on the laws as analogues to § 922(g)(3).

[48] *Bruen*, 142 S. Ct. at 2133.

b. *Convicted Felons*.

Next, the United States argues that § 922(g)(3) is analogous to the Nation's "deeply rooted" tradition of disarming convicted felons because unlawful users of controlled substances have engaged in felonious conduct (because they must possess the substance in order to use it, and possession is a felony under the Controlled Substances Act), even if never prosecuted and convicted for *that* conduct.[49]

But § 922(g)(3) is quite different from even modern felon-in-possession statutes. For starters, the laws significantly differ in the process by which one is deprived of the right to armed self-defense. Section 922(g)(1), the modern federal felon-in-possession provision, only prohibits possession of a firearm *after* an individual has been convicted of a felony offense.[50] The deprivation of the fundamental right thus occurs only after an individualized, adversarial proceeding that complies with the requirements of due process. Section 922(g)(3), however, is an outlier in our legal tradition in that it deprives persons of a fundamental right with *no* pre-deprivation process. Process is only afforded after the fact, and only to a tiny fraction of those whose rights have been stripped—those that the United States has selected for prosecution and punishment.

But even if after-the-deprivation process is sufficiently analogous to pre-deprivation process, under *Bruen* the question then becomes whether prohibiting a person from possessing a firearm solely on the basis of engaging in felonious conduct—i.e., they use

---

[49] United States' Resp. (Dkt. 25), at 29.

[50] 18 U.S.C. § 922(g)(1).

marijuana—"is consistent with this Nation's historical tradition of firearm regulation."[51] It is to that question the Court now turns.

> *i.* Heller *did not answer the question in this case.*

The United States insists that *Heller* deemed all restrictions on the possession of firearms by those who engage in felonious conduct consistent with the Second Amendment, so there's no need to engage in *Bruen*'s historical-tradition analysis. *Heller*, however, did no such thing; it instead said something more restrained, that "nothing in our opinion should be taken to cast doubt on *longstanding* prohibitions on the possession of firearms by felons"—hardly an endorsement of any and all such prohibitions dreamed up by modern legislatures.[52] And even then, the Court did not place an absolute stamp of approval on such prohibitions: those prohibitions are merely "presumptively lawful,"[53] implying that some could be unconstitutional in some circumstances.[54] Nor did the *Heller*

---

[51] *Bruen*, 142 S. Ct. at 2126.

[52] *Heller*, 554 U.S. at 626 (emphasis added). *See Folajtar v. Att'y Gen. United States of Am.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("*Heller* limited its remark to 'longstanding' bans. Longstanding bans are centuries old, not within living memory.").

[53] *Heller*, 554 U.S. at 627 n.26. *See Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting) ("*Heller*'s aside also described the bans as only presumptively lawful." (cleaned up)).

[54] *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("*Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge."). *Cf. United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011). Even pre-*Bruen* cases that narrowly construed the right recognized by *Heller* implicitly recognized this very point. Take, for example, several pre-*Bruen* as-applied challenges to the federal felon-in-possession law, § 922(g)(1), which, far from merely quoting *Heller*'s "longstanding prohibitions on the possession of firearms by felons" language and moving on, went on to determine whether applying the law was constitutional in the context of the particular underlying felony at issue. *See, e.g., Binderup v. Att'y Gen. United States of Am.*,

Court say anything about prohibitions on those who have engaged in conduct that may be felonious, rather than prohibitions on *felons* (i.e., those previously convicted of a felony).

The first caveat, that the prohibition on possession by a felon be longstanding, makes sense. If not for this limitation, a legislature could circumvent the Second Amendment by deeming every crime, no matter how minor, a felony, so as to deprive as many of its citizens of their right to possess a firearm as possible. Imagine a world where the State of New York, to end-run the adverse judgment it received in *Bruen*, could make mowing one's lawn a felony so that it could then strip all its newly deemed "felons" of their right to possess a firearm.[55] The label "felony" is simply "too easy for legislatures and prosecutors to manipulate."[56]

Remarkably, when presented with this lawn-mowing hypothetical argument, and asked if such an approach would be consistent with the Second Amendment, the United

---

836 F.3d 336, 351 (3d Cir. 2016) (en banc) (holding that the challengers' crimes, which met Congress's definition of a felony for purposes of § 922(g)(1), "were not serious enough [crimes] to strip [the challengers] of their Second Amendment rights"); *id.* at 360 (Hardiman, J., concurring in part & concurring in judgments); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("I agree with the majority that *Heller*'s dictum does not settle the question before us."). The same is true for challenges to other § 922(g) provisions. *See, e.g.*, *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (noting that this language in *Heller* is "not dispositive").

[55] While this hypothetical may seem far-fetched, it captures the broader point that "today, a felony is whatever the legislature says it is. The category is elastic, unbounded, and manipulable by legislatures and prosecutors." *Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting). In Oklahoma, for example, adultery is a felony punishable by up to five years' imprisonment. Okla. Stat. tit. 21, § 872. Examples in other states include opening a bottle of ketchup at the store and placing it back on the shelf or reading someone else's email without permission. *See Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting).

[56] *Folajtar*, 980 F.3d at 920 (Bibas, J., dissenting).

States said "yes."[57] So, in the federal government's view, a state or the federal government *could* deem anything at all a felony and then strip those convicted of that felony—no matter how innocuous the conduct—of their fundamental right to possess a firearm.[58] Why? Because courts must defer to a legislature's judgments about what is and is not a felony, says the United States. It's as if *Bruen*'s command regarding the inappropriateness of such deference to legislative judgments has been lost in translation.[59] In a sense, one must applaud the United States for its steadfast commitment to its legal position. But "giv[ing] legislatures unreviewable power to manipulate the Second Amendment by choosing a label"[60] is inconsistent with the entire point of constitutionalizing a fundamental right in the first place: to restrain a legislature's ability to infringe that right through legislation.[61] What would remain of the Second Amendment if the Court were to accept the United States' view that a legislature could prohibit the exercise of the right it protects simply by

---

[57] Tr. of Oral Arg. (Dkt. 35), at 52–53.

[58] Bear in mind that the United States' theory would likewise allow Congress to add any substances it wishes to Schedule I of the Controlled Substances Act's schedule of drugs, and then disarm citizens of their right to possess a firearm based on their use of that substance. Imagine Congress deeming aspirin a Schedule I controlled substance. Having placed aspirin on Schedule I, any user of that substance would be automatically stripped of their Second Amendment right by operation of § 922(g)(3).

[59] *See* 142 S. Ct. at 2131.

[60] *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting). *See id.* at 920 ("Disarming all felons not only ignores history, but also gives legislatures unfettered power over a fundamental right.").

[61] *Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."). *See id*. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.").

declaring anything or everything a felony? Nothing. Maybe that is what the federal government desires, but it is hardly what the Constitution requires.[62]

ii. *There is no historical tradition of disarming a person solely based on that person having engaged in felonious conduct.*

What common sense suggests, our Nation's history and tradition of firearm regulation confirms: Whether a law burdening the right to keep and bear arms is consistent with the Second Amendment does not turn on legislative labels, but rather on the actual nature of the societal problem the law is designed to address and the actual burdens that the law imposes.

Recall that *Heller* and *Bruen* instructed that the scope of the Second Amendment is defined by the understanding of the right by the people who adopted it.[63] But as far as the Court is aware, no scholar has been able to identify a single colonial or state law in seventeenth, eighteenth, or nineteenth-century America that prohibited a person from possessing any firearm merely because that person engaged in conduct that a legislature has labeled as felonious.[64] Nor has the United States pointed to any such laws here. And

---

[62] *Heller* itself rejected a very similar argument, explaining that an interpretation of the Second Amendment that would give Congress plenary power to exclude large groups of citizens from the scope of the right would be inconsistent with the historical underpinnings of the Second Amendment and the concerns of the founding generation. *See* 554 U.S. at 599–600.

[63] *See Bruen*, 142 S. Ct. at 2136 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." (quoting *Heller*, 554 U.S. at 634–635) (emphasis in original)).

[64] *See* Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1374 (2009); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708

while the laws it does point to don't go nearly that far, the United States nonetheless argues that they establish a history and tradition of stripping people of their Second Amendment right for engaging in any conduct that a legislature says is felonious. The analogy, however, falls apart under scrutiny.

*Thomas Cooley.* The United States first relies on a 1983 article by Robert Dowlut. In a single, three-sentence paragraph, Dowlut argued that "Colonial and English societies of the eighteenth century . . . excluded . . . felons" from the right to keep and bear arms.[65] Dowlut's article, however, does not discuss or cite a single seventeenth, eighteenth, or nineteenth-century law or case demonstrating that point.[66] In fact, he relies on a lone source for this proposition: the 1903 edition of Thomas Cooley's famed treatise on state constitutional law.[67] Elsewhere in its brief, the United States relies on the same Cooley

---

(2009) ("Though recognizing the hazard of trying to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I."); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws."); *Folajtar*, 980 F.3d at 912, 914–15 (Bibas, J., dissenting).

[65] United States' Resp. (Dkt. 25), at 29 (quoting Robert Dowlut, *The Right to Arms: Does the Constitution or Predilection of Judges Rein?*, 36 Okla. L. Rev. 65, 96 (1983)).

[66] The accompanying footnote cites three nineteenth-century southern state constitutions, but those sources are cited merely for the proposition that the right was limited to free white men prior to the enactment of the Fourteenth Amendment. *See* Dowlut, *supra* note 65, at 96 n.147. These sources say nothing about felons.

[67] *Id.* The first edition of Cooley's treatise was initially published in 1868, and as such, has long been considered a helpful source in interpreting the state of American constitutional law at the time of the Fourteenth Amendment's enactment. It is the 1868 edition that the United States relies on elsewhere in its brief. *See* United States' Resp. (Dkt. 25), at 28. The quotations below are taken from the 1868 edition. But to be clear, in the passages relevant

passage, which it claims stands for the proposition that "certain persons—namely, 'the idiot, the lunatic, and the felon, on obvious grounds'—had long been 'almost universally excluded' from exercising certain civic rights in America, including the right to bear arms."[68]

The problem is that the Cooley passage doesn't actually say anything about the right to keep and bear arms.[69] Instead, the passage falls in the middle of Cooley's discussion of who may "participat[e] in the government"—that is, who may hold office or "exercise the elective franchise."[70] Cooley's point in the passage is that "in every State, although all persons are under the protection of the government, and obliged to confirm their action to its laws, there are some who are altogether excluded from participation in the government."[71] His reference to "the idiot, the lunatic, and the felon"—the passage the United States and Dowlut rely on—comes in reference to "[c]ertain classes [that] have been almost universally excluded" from voting because "they lack either the intelligence, the virtue, or the freedom of action *essential to the proper exercise of the elective franchise*."[72] While this passage may suggest a tradition of stripping felons of their right to vote, it does

---

to this case, there are no material distinctions between the 1868 edition and the 1903 edition cited by Dowlut.

[68] United States' Resp. (Dkt. 25), at 29.

[69] Tellingly, Cooley does have a passage exclusively devoted to the right to keep and bear arms; that passage says nothing about the exclusion of felons. *See* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 350 (Lawbook Exch. ed. 2011) (1868).

[70] *Id*. at 28–29. *See* Marshall, *supra* note 64, at 709.

[71] Cooley, *supra* note 69, at 28.

[72] *Id*. at 29 (emphasis added).

nothing to prove a tradition of stripping Second Amendment rights from those who have engaged in felonious conduct.[73]

*Founding-Era Punishments for Felonies and Ratification Convention Proposals.* The United States next relies on a paragraph in a 1983 article by Don Kates, where Kates argued "that the Founders" did not "intend[] to confer" the Second Amendment right upon felons.[74] Kates, however, does not cite a single Founding-era law or case supporting this proposition. Instead, he supports the proposition elsewhere in the paragraph by appealing to two arguments: (1) that because the "law punished felons with automatic forfeiture of all goods, usually accompanied by death[,] [w]e may presume that persons confined in gaols awaiting trial on criminal charges were also debarred from the possession of arms"; and (2) that "[a]ll the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent."[75] Kates's arguments have garnered significant criticism.[76] And for good reason.

---

[73] Nor does depriving felons of the right to vote on the theory that they "lack virtue" support depriving felons of the right to bear arms on the same basis. *See Kanter*, 919 F.3d at 462–64 (Barrett, J., dissenting) (explaining that virtue-based exclusions "are associated with civic rights," like the right to vote, and that "virtue exclusions don't apply to individual rights," like the Second Amendment). Cooley himself distinguished between the right to vote, Cooley, *supra* note 69, at 29–30, 599, and "The Constitutional Protections to Personal Liberty," *id.* at 295–350, which included the "Right to bear arms," *id.* at 350. And rightly so: "The right to vote is historically and textually distinct from the Second Amendment." *Binderup*, 836 F.3d at 369 n.14 (Hardiman, J., concurring in part & concurring in judgments).

[74] Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983).

[75] *Id.*

[76] *See, e.g.*, Marshall, *supra* note 64, at 714; Larson, *supra* note 64, at 1374.

Start with Kates's reliance on the punishment of felons at the Founding. "The premise of this argument—that the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries—is shaky."[77] And "[b]y the time the Constitution was ratified, James Wilson observed that while the term 'felony' was once 'very strongly connected with capital punishment,' that was no longer true."[78] So while death remained a possible punishment for many felonies, death "no longer inevitably followed a felony conviction."[79]

This poses a problem for Kates's theory because there existed felons at the Founding who were not put to death, so any deprivation of those felons' right to armed self-defense would have been effectuated by some means other than their death. In a later article, Kates defended his original position by arguing that felons, even if not actually put to death, were subject to "civil death," which in turn stripped them of personal rights, including the right to bear arms.[80] But the American version of civil death did not deprive felons of all rights.[81] And depriving someone of a right based on civil death also "required explicit statutory authorization."[82] But neither Kates nor any other scholar (at least as this Court is aware)

---

[77] *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).

[78] *Id.* at 459.

[79] *Id. See Folajtar*, 980 F.3d at 920 (Bibas, J., dissenting) (explaining that "[e]ven before the Founding, the link between felonies and capital punishment was frayed" and that "[e]ven crimes that were capital in theory often were not in practice").

[80] *See* Don B. Kates, *A Modern Historiography of the Second Amendment*, 56 UCLA L. Rev. 1211, 1231 n.100 (2009).

[81] *Kanter*, 919 F.3d at 460 (Barrett, J., dissenting).

[82] *Id.*

has identified a single Founding-era law depriving felons of the right to keep and bear arms as a consequence of civil death.

Kates's reliance on three ratification convention proposals—from New Hampshire, Massachusetts, and Pennsylvania—fairs no better. Kates alleged that certain language in these proposals would have excluded felons from the right to armed self-defense, and that as a result, the Second Amendment would have been understood to permit legislatures to deprive persons of the right to armed self-defense solely based on felony status. But for several reasons, these three proposals provide little guidance as to the meaning of the language that was actually adopted by the people in 1791. As then-Judge Barrett explained:

> First, none of the relevant limiting language [in these proposals] made its way into the Second Amendment. Second, only New Hampshire's proposal—the least restrictive of the three—even carried a majority of its convention. Third [and contrary to Kates's allegation], proposals from other states that advocated a constitutional right to arms did not contain similar language of limitation or exclusion. And finally, similar limitations or exclusions do not appear in any of the four parallel state constitutional provisions enacted before ratification of the Second Amendment.[83]

In any event, none of these proposals likely would have been understood to sweep in all felonious conduct. The New Hampshire proposal only applied to those who "are or have been in actual rebellion."[84] The *unsuccessful* proposal at the Massachusetts

---

[83] *Id.* at 455 (cleaned up).

[84] 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891). "Thus, while this proposal reflects support for disarming rebels, it does not say anything about disarming those who have committed other crimes, much less nonviolent ones." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). *See Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting); Larson, *supra* note 64, at 1375 ("Rebellion is only one type of felony, and the explicit limitation to rebellion strongly suggests that extension to any other felony would be inappropriate.").

convention sought to limit the right to "peaceable citizens";[85] but that term "was not a synonym for 'non-felons' or even 'non-criminals.'"[86] So, although it swept more broadly than the New Hampshire proposal, the Massachusetts proposal did not exclude "all criminals, or even all felons."[87] It only "would have disarmed those who caused physical disruption and threatened public safety."[88] And the Pennsylvania Minority's proposal, which the United States relies on elsewhere in its brief, seems to most naturally be read as only excluding "those who pose[d] a danger to public safety, whether or not they have committed a crime."[89] Some have disagreed with this reading of the Pennsylvania proposal, arguing that it did sweep in all felons.[90] But even if that were the case, the Pennsylvania proposal, on its own, cannot support the United States' theory: "[I]t was suggested by a *minority* of the Pennsylvania ratifying convention that failed to persuade its own state, let alone others. A single failed proposal is too dim a candle to illumine the Second Amendment's scope."[91]

---

[85] 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971).

[86] *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

[87] *Id.* at 455.

[88] *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting).

[89] *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

[90] *See, e.g.*, *Range v. Att'y Gen. United States*, 53 F.4th 262, 280 (3d Cir. 2022) (per curiam), *reh'g en banc granted, opinion vacated sub nom. Range v. Att'y Gen. United States of Am.*, No. 21-2835, --- F.4th ----, 2023 WL 118469 (3d Cir. Jan. 6, 2023).

[91] *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting) (emphasis in original). The "Minority" apparently constituted only about one-third of the convention, twenty-three people total. *See The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents*, THE PENNSYLVANIA PACKET, AND DAILY ADVERTISER, Dec. 18, 1787, at 1–3; Marshall, *supra* note 64, at 712. While it's true, as the

These three proposals, therefore, do not establish that a person could be deprived of the right to bear arms at the Founding merely by engaging in felonious conduct. "The concern common to all three is not about felons in particular or even criminals in general."[92] Rather, the common concern was persons who "threatened violence" and posed a risk of causing "public injury."[93] Persons engaging in felonious conduct as a category are both underinclusive and overinclusive of that group. The commission of some felonies indicates no particular risk of future dangerousness. But the past conduct of many non-felons, such as a domestic-violence misdemeanant, can demonstrate that such a person poses a significant risk of causing public injury. Felony status alone, therefore, does not map onto the convention proposals' concerns.

### iii. History and tradition support disarming persons who have demonstrated their dangerousness through past violent, forceful, or threatening conduct.

While our Nation's history and tradition does not support disarming a person merely because they have engaged in felonious conduct, it does support a different proposition: "that the legislature may disarm those who have demonstrated a proclivity for violence"

---

United States points out, that "*Heller* identified this report as 'highly influential' in the run-up to the Second Amendment," *Heller* "did so in the context of concluding that the Amendment codified an individual right not limited to militia service. There is no reference in *Heller* to the 'unless' clause in the Pennsylvania dissenters' proposal, and needless to say, this limiting language did not find its way into the Second Amendment." *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) (internal citation omitted).

[92] *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

[93] *Id.*

through past violent, forceful, or threatening conduct (or past attempts at such conduct).[94]

Or, to put it another way, "the historical record" demonstrates "that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed."[95] A few examples of historical restrictions on firearm possession or use illustrate the point.

Take the laws limiting the right to carry a firearm while actively intoxicated discussed above. The justification for these laws? The danger that could be caused by an intoxicated person carrying a firearm in crowded areas.[96] Or take the surety statutes that were enacted in a few states in the mid-to-late nineteenth century. These laws purported to "require[] certain individuals to post bond before carrying weapons in public."[97] What did these laws target? "[T]hose threatening to do harm."[98] A person was required to post a bond "only when 'attended with circumstances giving just reason to fear that he purpose[d]

---

[94] *Id.* at 454. To be certain, the Nation's history and tradition does support the proposition that some persons that engage in felonious conduct can be deprived of the right to possess firearms. But that is not because those persons engaged in conduct that a legislator had defined as a felony; it is because a person's past conduct demonstrates that there are good reasons to think that such a person poses a risk of causing "public injury." *Id.* at 456. "[T]he historical limits on the Second Amendment" thus "protect us from felons, but only if they are dangerous." *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting).

[95] *Binderup*, 836 F.3d at 369 (Hardiman, J., concurring in part & concurring in judgments).

[96] *See Shelby*, 2 S.W. at 469.

[97] *Bruen*, 142 S. Ct. at 2148.

[98] *Id.*

to make an unlawful use of [firearms.]'"[99] Laws targeting those who engaged in rebellion were also justified on the grounds that such persons posed a danger to public safety. These laws demonstrate that "persons who by their actions . . . betray a likelihood of violence against the state may be disarmed."[100]

These examples and the Nation's broader historical tradition demonstrate that limitations on the right to armed self-defense "were tied to dangerousness."[101] That is not to say that governments are limited to these exact prohibitions.[102] But the justification of modern restrictions still must be analogous to the justifications of Founding-era restrictions: some likelihood of dangerousness demonstrated through past violent, forceful, or threatening conduct.

As previously discussed, *Heller* explained that longstanding prohibitions on possession of firearms by felons are "presumptively lawful."[103] History and tradition's focus on those who have demonstrated a proclivity for violence through past violent, forceful, or threatening conduct is entirely consistent with *Heller*'s statement because the identified *longstanding* restrictions on receipt or possession of firearms applied only to those dangerous felons.

---

[99] *Id.* (quoting William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829)).

[100] Marshall, *supra* note 64, at 727–28.

[101] *Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting).

[102] *See Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) ("[N]o one has suggested that the legislative role ended in 1791[.]").

[103] 554 U.S. at 627 n.26.

Before 1934, Congress largely stayed out of nationwide firearms regulation. In 1932, Congress passed what appears to be its first prohibition on the possession of firearms based on a prior conviction. The law prohibited any person previously convicted of a "crime of violence" from possessing a pistol in the District of Columbia.[104] By limiting the ban on possession to those convicted of a crime of violence—a category including "any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary"[105]—the statute only swept in those who had a history of committing or attempting to commit violent, forceful, or threatening acts.

The first major nationwide prohibition on the basis of a prior conviction was enacted in 1938, when Congress passed the Federal Firearms Act ("FFA").[106] As relevant here, that act made it "unlawful for any person *who has been convicted of a crime of violence* . . . to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."[107] But again, by limiting the statute's reach to crimes of violence, Congress only placed the prohibition on those who had a history of committing violent,

---

[104] Act of July 8, 1932, ch. 465, § 3, 47 Stat. 650, 651 (1932).

[105] *Id.* § 1.

[106] An Act to Regulate Firearms in Commerce, Pub. L. No. 75-785, 52 Stat. 1250 (1938).

[107] *Id.* § 2(f). While the statute only prohibited receipt of a firearm, "the possession of a firearm" was "presumptive evidence" a firearm was received in interstate commerce. *Id.*

forceful, or threatening acts.[108] Thus, felons who did not commit violent or dangerous crimes were permitted to receive (and possess) firearms. The longest-standing felony-related federal firearms prohibition only applied to persons "who ha[d] previously, by due process of law, been shown to be aggressors against society."[109]

It was not until 1961—just fifteen years before the adoption of the ordinances invalidated in *Heller*—that Congress dropped the crime-of-violence requirement from federal law. The 1961 Amendments to the FFA replaced the then-existing category of prohibited persons, those convicted of a "crime of violence," with a prohibition on persons who had previously been convicted of a "crime punishable by imprisonment for a term exceeding one year."[110] Thus, it was not until 1961 that Congress, for the first time, prohibited persons from receiving a firearm solely on the basis of the person having been convicted of a felony, regardless of whether the felony conviction signified that the person exhibited a likelihood of future violence or force.[111]

---

[108] *Id.* § 1(6) (defining "crime of violence" to include "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year"). "Of these, housebreaking is likely the only misdemeanor. The rest of the listed crimes are serious violent felonies." *Skoien*, 614 F.3d at 649 n.8 (Sykes, J., dissenting).

[109] *United States v. Tot*, 131 F.2d 261, 266 (3d Cir. 1942), *rev'd on other grounds*, 319 U.S. 463 (1943).

[110] An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961).

[111] *See Skoien*, 614 F.3d at 640 (majority opinion) (noting that "the [1938] Federal Firearms Act covered only a few violent offenses; the ban on [receipt] by *all* felons was not enacted until 1961").

The history of state prohibitions largely mirrors the federal story. Before World War I, most state-level regulation "remain[ed] faithful to 'the rule in America' of only regulating 'firearms which may be concealed on the person.'"[112] However, the rise in crime brought on by Prohibition led some states to consider expanding restrictions to include prohibitions on possession or ownership of certain firearms. Indiana, Oregon, and Michigan appear to have been the first states with state constitutional arms protections to have passed prohibitions on the possession of firearms on the basis of prior criminal conduct, doing so in 1925.[113] But like the original FFA, those prohibitions only applied to dangerous persons, i.e., those who had been convicted of a "crime of violence."[114] Between 1925 and 1938, several other state and territorial jurisdictions with constitutional arms protections adopted similar provisions.[115]

Because all these longstanding prohibitions focused on dangerousness exhibited by past violent, forceful, or threatening conduct, "[d]ispossession on the basis of a conviction for these sorts of crimes comports with the original public understanding of the scope of the right to keep and bear arms."[116]

---

[112] Marshall, *supra* note 64, at 701.

[113] *Id.* at 701–02.

[114] *Id.*

[115] *Id.* at 705.

[116] *Binderup*, 836 F.3d at 375 (Hardiman, J., concurring in part & concurring in judgments).

iv.  *Total prohibitions on the right to possess a firearm merely on the basis of a person being a user of marijuana do not fall within the tradition of disarming persons who have demonstrated their dangerousness through past violent, forceful, or threatening conduct.*

As explained above, there is little existing historical evidence to support the proposition that a legislature can deprive persons who engage in felonious conduct of the right to possess arms "simply because of their [implicit] status as felons."[117] Rather, the Nation's historical tradition of firearm regulation demonstrates that Congress may disarm those who have demonstrated a proclivity for violence through past violent, forceful, or threatening conduct (or past attempts at such conduct).[118] Harrison may well have such a proclivity, but the mere fact that he uses marijuana does not tell us that.[119]

It bears repeating that all the United States would have to prove at trial to justify depriving Harrison of his right to possess a firearm is that he is a user of marijuana. But the mere use of marijuana carries none of the characteristics that the Nation's history and

---

[117] *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting).

[118] None of this is to suggest that a legislature may not punish an individual's use of a firearm to further some other criminal act. *See, e.g.*, 18 U.S.C. § 924(c). There appears to be a historical tradition of punishing such conduct. *See, e.g.*, *Range*, 53 F.4th at 281 (discussing colonial and early state laws that authorized the seizure or forfeiture of guns used to commit misdemeanor hunting offenses); *Bruen*, 142 S. Ct. at 2141–42, 2146 (discussing the common law crime of going armed to the terror of the people (codified by the English Statute of Northampton), which prohibited carrying firearms "with evil intent or malice" or "for a 'wicked purpose' with a 'mischievous result'"). The key point here is that § 922(g)(3) does not require any proof that a firearm is possessed to facilitate or further the use of marijuana.

[119] That Harrison may have other characteristics that indicate he may fall within the category of persons Congress may disarm is irrelevant in this case. All the United States would have to prove at trial to justify depriving Harrison of his right to possess a firearm is that he is a user of marijuana, so the United States must justify depriving Harrison of his right to armed self-defense on that basis alone.

tradition of firearms regulation supports. The use of marijuana—which can be bought legally (under state law) at more than 2,000 ordinary store fronts in Oklahoma[120]— is not in and of itself a violent, forceful, or threatening act. It is not a "crime of violence." Nor does it involve "the actual use or threatened use of force."[121]

That Congress may have passed § 922(g)(3), as the United States suggests, with some vague relation to public safety or "the public interest" does not change this conclusion.[122] It is not appropriate for a court to "reflexively defer to [a legislative] label when a fundamental right is at stake."[123] And the use of marijuana does not become a violent, forceful, or threatening act merely because a legislature says that it is.

The United States also points to several pre-*Bruen* cases that speculate (under the judicial interest-balancing approach *Bruen* rejected) that users of controlled substances may be more likely than non-users "to engage in illegal and violent gun use" in the future.[124] The statements in these cases, the United States points out, are backed up by social science, statistics, and predictions about future crime. But "stripping a person's fundamental rights based on projected crimes untethered from past dangerous actions is a

---

[120] As of January 2020, the Oklahoma Medical Marijuana Authority reported granting licenses to 2,242 dispensaries. *See* Janice Francis Smith, *'Astonishing': State leads nation in number of cannabis dispensaries*, The Journal Record (Feb. 5, 2020).

[121] *See Binderup*, 836 F.3d at 376 (Hardiman, J., concurring in part & concurring in judgments).

[122] *See id.* ("The Government's unremarkable observation that Maryland's [gun] licensing requirement relates to public safety does not make Suarez's offense a violent crime.").

[123] *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting). *See Bruen*, 141 S. Ct. at 2131.

[124] United States' Resp. (Dkt. 25), at 33 (quoting *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010)).

risky game indeed."[125] That is why *Bruen* rejected the very interest-balancing approach that the United States asks the Court to adopt.[126] True, one opinion in *Bruen* looked to statistics, expert opinions, and predictive judgments, but that opinion was the dissent.[127] The Second Amendment demands more than the United States' interest-balancing approach that is based on speculative assessments of future risk and "back-of-the-envelope math."[128] It requires that § 922(g)(3), as applied to Harrison, be consistent with history and tradition's focus on violent, forceful, or threatening conduct. It is not.

   *c. The Mentally Ill.*

   Next, the United States argues that § 922(g)(3) is analogous to "longstanding prohibitions on the possession of firearms by . . . the mentally ill."[129] According to the United States, the "traditional[] view[]" amongst Americans is that the "mentally ill" are "persons who cannot bear arms without posing real danger to public safety."[130] To support this proposition, the United States points to pre-colonial and colonial practices that severely curbed the liberty of "lunatics," particularly the ability to "lock up 'dangerous lunatics' and

---

[125] *Folajtar*, 980 F.3d at 923 (Bibas, J., dissenting) (emphasis omitted).

[126] *Bruen*, 142 S. Ct. at 2125–31.

[127] *See id*. at 2163–67, 2173–74 (Breyer, J., dissenting).

[128] *Ass'n of New Jersey Rifle and Pistol Clubs Inc. v. Att'y Gen. of New Jersey*, 974 F.3d 237, 260 (3d Cir. 2020) (Matey, J., dissenting), *cert. granted, judgment vacated sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (2022).

[129] United States' Resp. (Dkt. 25), at 29 (quoting *Heller*, 554 U.S. at 626).

[130] *Id.*

seize their property."[131] And if governments could lock up dangerous lunatics, the United States argues, then it certainly would have been permissible to disarm such persons.

But the United States' own conception of the historical tradition demonstrates why § 922(g)(3) as applied to Harrison is not analogous to these traditions. Under the United States' own theory, history and tradition would limit disarmament to *dangerous* lunatics. And as explained above, the mere use of marijuana does not indicate that someone is in fact dangerous, let alone analogous to a "dangerous lunatic." There are likely nearly 400,000 Oklahomans who use marijuana under state-law authorization. Lumping all those persons into a category with "dangerous lunatics," as the United States' theory requires, is a bridge too far.

The United States responds by advancing a somewhat different argument: that drug users, like the mentally ill, "have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."[132] But that argument appears to have no limit. The Diagnostic and Statistical Manual of Mental Disorders, for example, lists autism, attention deficit disorder, and nicotine dependence as mental disorders.[133] All those groups "have difficulty exercising self-control," and yet, it is hard to see how any of those groups could be categorically prohibited from the right to armed self-defense on that basis.[134]

---

[131] *Id.*

[132] *Id.* at 33 (quoting *Yancey*, 621 F.3d at 685).

[133] *See* American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 56, 68, 645 (5th ed., text revision, 2022).

[134] This is yet another attempt by the United States to transform distinct historical examples into roving warrants applicable to whatever conduct it desires. The trick goes something

*2. Restrictions on "Unvirtuous" Persons.*

The United States also argues that "ample historical scholarship has established that the Second Amendment right to bear arms was closely tied to the concept of a virtuous citizenry and to the notion that the government could disarm lawbreaking or otherwise unvirtuous citizens who posed a risk to public safety."[135] And since Congress could view marijuana users as "unvirtuous," § 922(g)(3) falls within that historical tradition. But there are two problems with this argument.

First, under the United States' own conception of the historical tradition, such restrictions would only apply to those who are both unvirtuous and dangerous. And as explained above, because the mere use of marijuana does not involve violent, forceful, or threatening conduct, a user of marijuana does not automatically fall within that group.

Second, the idea that the Second Amendment incorporates some "vague 'virtue' requirement" is "belied by the historical record"[136] and inconsistent with *Heller* itself:

> Although courts, scholars, and litigants have cited this supposed limitation, this virtuous-citizens-only conception of the right to keep and bear

---

like this: Take a historical example that applied to a distinct class of persons (e.g., dangerous lunatics), extract from it a broad principle (e.g., concerns about people "lacking self-control"), and then fit into that broad category whole new classes of people (e.g., marijuana users), even if they aren't remotely the sort of persons that were historically regulated.

[135] United States' Resp. (Dkt. 25), at 32.

[136] *Binderup*, 836 F.3d at 358 (Hardiman, J., concurring in part & concurring in judgments); *id.* at 372 ("We have found no historical evidence on the public meaning of the right to keep and bear arms indicating that 'virtuousness' was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*."); *Folajtar*, 980 F.3d at 919 (Bibas, J., dissenting) ("The focus on virtue rests on strained readings of colonial laws and ratifying conventions perpetuated by scholars and courts' citing one another's faulty analyses.").

41

arms is closely associated with pre-*Heller* interpretations of the Second Amendment by proponents of the 'sophisticated collective rights model' who *rejected* the view that the Amendment confers an individual right and instead characterized the right as a 'civic right exercised by citizens, not individuals who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia.[137]

But *Heller* "expressly rejects the argument that the Second Amendment protects a purely civic right. It squarely holds that 'the Second Amendment confer[s] *an individual right* to keep and bear arms[.]"[138] And because "virtue exclusions don't apply to individual rights, they don't apply to the Second Amendment."[139] Therefore, the limits on the right protected by the Second Amendment "are not defined" by a person's "lack of virtue or good character."[140] "The right historical test is not virtue, but dangerousness" as exhibited by past violent, forceful, or threatening conduct.[141]

### 3. Restrictions on Slaves, Indians, Catholics, and Loyalists.

In its defense of § 922(g)(3), the United States retreats even further. At argument, the United States pointed to a variety of rather ignominious historical restrictions that it argues demonstrates a historical tradition permitting legislatures to disarm those whom the

---

[137] *Binderup*, 836 F.3d at 371 (Hardiman, J., concurring in part & concurring in judgments) (cleaned up). *See id.* at 372 n.18; *Kanter*, 919 F.3d at 462–64 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting).

[138] *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting) (quoting *Heller*, 554 U.S. at 595) (internal citation omitted).

[139] *Id.*

[140] *Id.* at 464.

[141] *Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting).

legislature views as "untrustworthy": namely, slaves, Indians, Catholics, and loyalists.[142] Since Congress could equally view drug users as "untrustworthy," so the argument goes, then these historical regulations provide constitutional cover for § 922(g)(3). The United States' reliance on these laws is concerning, but in any event, they do not support the constitutionality of § 922(g)(3).

*a. Slaves and Indians.*

To start, historical restrictions on slaves and Indians provide no insight into the constitutionality of § 922(g)(3). That is because neither slaves nor Indians were understood to be a part of the "political community" of persons protected by the Second Amendment.[143] Slaves, of course, were not made a part of the political community until the post-Civil War amendments and thus did not hold any Second Amendment rights—a point infamously, yet explicitly, made by *Dred Scott v. Sanford* itself.[144] Indians, likewise,

---

[142] *See Range*, 53 F.4th at 274 ("[T]he pertinent historical periods were replete with laws 'relevantly similar' to the modern prohibition on felon firearm possession because they categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact.").

[143] *Heller*, 554 U.S. at 580. *Cf. United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("[W]e would also have to recognize that groups like women, Native Americans, and blacks may not have been part of the political community at the time of the founding.").

[144] 60 U.S. (9 How.) 393, 416–17 (1857) (explaining that "at the time the Constitution was adopted, and long afterwards . . . it cannot be believed that the large slaveholding States regarded [African Americans, whether free or enslaved] as included in the word citizens, or would have consented to a Constitution which might compel them to receive them in that character from another State. For if they were so received, and entitled to the privileges and immunities of citizens . . . [i]t would give to persons of the negro race . . . the full liberty . . . to keep and carry arms wherever they went"). *See McDonald v. City of Chicago*, 561 U.S. 742, 822–23, 844–50 (2010) (Thomas, J., concurring in part & concurring in judgment); *Bruen*, 142 S. Ct. at 2150.

were also generally not considered to be a part of the political community protected by the Second Amendment;[145] in fact, all Indians did not become citizens until long after African Americans. The Fourteenth Amendment's Citizenship Clause, which granted citizenship to newly freed slaves, was initially interpreted not to sweep in all Indians.[146] It was not until the adoption of the Indian Citizenship Act of 1924 that "all non-citizen Indians born within the territorial limits of the United States" were granted citizenship and brought within the political community protected by the Second Amendment.[147] Thus, historical restrictions on these groups provide little insight into the meaning of the Second Amendment because the ratifying public would not have understood those group to be protected by the Second Amendment.

   b. *Catholics, Loyalists, and Others Deemed Untrustworthy.*

   The United States' reliance on laws restricting the rights of Catholics, loyalists, and others deemed untrustworthy similarly misses the mark. And its reliance on these various pre-constitutional practices requires the Court to address a broader conceptual point. According to the United States' theory, all pre-1789 practice is entitled to equal weight. That is, if colonial or pre-1789 state governments imposed a restriction on firearms, the Second Amendment must be understood to have incorporated those restrictions.

---

[145] *See Dred Scott*, 60 U.S. (9 How.) at 404.

[146] *See* U.S. Const. amend. XIV, § 1; *see also Elk v. Wilkins*, 112 U.S. 94 (1884).

[147] Pub. L. No. 68-175, 43 Stat. 253 (1924).

The problem with this argument is that, as *Bruen* explained, "when it comes to interpreting the Constitution, not all history is created equal."[148] And while the Second Amendment and other provisions of the Bill of Rights were intended to codify pre-existing rights,[149] the Constitution and Bill of Rights did not incorporate all pre-1789 practice. That is because the liberty-protecting provisions of the Constitution were responding to both ancient *and* recent abuses. The Framers themselves recognized that colonial and early state governments repeatedly violated the liberty-protecting provisions of the English and state bills of rights.[150] Writing just nine years after the adoption of the Bill of Rights, Justice Samuel Chase explained that "[t]here is . . . a material difference between laws passed by the individual states, during the revolution, and laws passed subsequent to the organization of the federal constitution. Few of the revolutionary acts would stand the rigorous test now applied" under the federal Constitution.[151] A few examples from other constitutional provisions demonstrate this point in relation to both colonial and pre-1789 state practice.

---

[148] *Bruen*, 142 S. Ct. at 2136; *id.* at 2133 ("[C]ourts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

[149] *Heller*, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." (emphasis in original)).

[150] *See, e.g.*, Michael Kent Curtis, *Free Speech*, *"The People's Darling Privilege": Struggles for Freedom of Expression in American History* 47 (2000) ("[I]t was after acts like the suppression of the Tory press, loyalty oaths, the searches of Quakers, and a Massachusetts legislative declaration finding certain persons guilty of treason, that Madison noted that one objection to a bill of rights was that state bills of rights had been repeatedly violated.").

[151] *Cooper v. Telfair*, 4 U.S. (4 Dall.) 14, 19 (1800).

Like the Second Amendment, the Fourth Amendment also "codified a *pre-existing* right."[152] But in many ways, the Fourth Amendment was ratified, in part, to respond to very recent abuses that occurred in the colonial era. As the Supreme Court has explained, "the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity."[153] Thus, even though the Fourth Amendment "codified a *pre-existing* right,"[154] no one would suggest that the colonial-era practices of writs of assistance and general warrants were incorporated into the Fourth Amendment.

The same is true for pre-1789 state practice. After independence, many of the newly independent states adopted constitutions containing provisions analogous to those found in the subsequent federal Constitution. But those states repeatedly violated the clear import of many of those provisions, including the freedom of the press, the right against unreasonable searches, and protections against bills of attainder.[155] Some aspects of the federal Constitution were even specifically designed to respond to recent state abuses. Take the Contracts Clause, which was adopted to respond to "an ignoble array of legislative schemes for the defeat of creditors and the invasion of contractual obligations" that

---

[152] *Heller*, 554 U.S. at 592 (emphasis in original).

[153] *Riley v. California*, 573 U.S. 373, 403 (2014).

[154] *Heller*, 554 U.S. at 592 (emphasis in original).

[155] *See* Curtis, *supra* note 150, at 7.

persisted throughout the states following the Revolutionary War.[156] It would make little sense to understand any of these clauses as incorporating—rather than repudiating—such pre-1789 state practice.

It is difficult to think that the public who adopted the Second Amendment intended to incorporate the Catholic and loyalist type of pre-constitutional restrictions—and the United States' broader theory of legislatively determined "untrustworthiness"—into the federal Constitution. First, key framers were critical of analogous trustworthiness approaches. For example, in Federalist 46, James Madison himself criticized the European monarchical practice of being "afraid to trust the people with arms."[157]

Second, it would be odd indeed for the Framers to have incorporated such a trojan horse into the Second Amendment. The purpose of enshrining a right into the Constitution is to limit the discretion of a legislature.[158] But if the United States' theory is correct and

---

[156] *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 427 (1934).

[157] *The Federalist No. 46*, at 299 (James Madison) (Clinton Rossiter ed., 1961).

[158] *See Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."); *id.* at 634–35. This aspect of our Nation's Constitution is an important departure from English practice—a point that is lost on the United States and the *Range* panel it relies on. Relying on seventeenth-and eighteenth-century Parliamentary practice, *Range* says that this practice "reveals the 'historical understanding,' that the legislature—Parliament—had the power and discretion to determine who was sufficiently loyal and law-abiding to exercise the right to bear arms," and then concludes that American legislatures therefore must also have such discretion under the Second Amendment. 53 F.4th at 275 (internal citation omitted). But *Range*'s analysis ignores the fact that in the British system, Parliament is supreme. Accordingly, the Second Amendment's predecessor in the English Bill of Rights, which declared that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law," "like all written English rights," "was held only against the Crown, not Parliament." *Heller*, 554 U.S. at 593. Our system is much different.

47

all a legislature must do to prohibit a group of persons from possessing arms is to declare that group "untrustworthy," then the Second Amendment would provide virtually no limit on Congress's discretion. The Framers weren't perfect, but they also weren't fools.

Third, the disarmament of Catholics and loyalists "involved wholesale deprivation" of other civil liberties as well.[159] So, if these laws "justified an exception to the Second Amendment" based on a legislature's decision that a group of persons is "untrustworthy," the laws would "also justify exceptions to other basic rights" on that basis, including "basic First, Fourth, and Fifth Amendment rights."[160] Today, we would not allow the government to shut down news outlets because the persons running the outlet could not be trusted, even though Revolutionary War-era Virginia did just that to Loyalists and Pennsylvania the same to Quakers.[161] If such laws cannot create a historical tradition of regulation in the

---

Here, the Constitution is supreme. Not Congress. Not state legislatures. Thus, *Range*'s absolute legislative-discretion principle is based on a faulty conflation of two entirely different constitutional systems and is inconsistent with the very foundations of our Nation's constitutional structure.

[159] Marshall, *supra* note 64, at 726.

[160] *Id*. at 725.

[161] *Id*. at 725 n.158. The United States points out that the 1776 Pennsylvania Constitution had a right-to-bear-arms provision. And so, according to the United States, Pennsylvania's Revolutionary War-era acts to disarm certain groups should be particularly insightful as to the meaning of the Second Amendment. But the same 1776 Constitution had a provision that emphatically declared, in the immediately preceding provision, "[t]hat the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained." Pa. Const. of 1776, ch. I, § XII. It is difficult to think of a more empathic protection of the freedom of the press, and yet, Pennsylvania suppressed Tory and Quaker speech and presses. If these revolutionary-era speech-suppressing laws cannot create a historical tradition of regulation in the First Amendment context, how could they do so in the Second?

First Amendment context, how could they do so in the Second?[162] In America, these laws were largely passed either during the Seven Years War or "in the darkest days of an existential domestic war," the Revolutionary War.[163] Times of war tend to bring out the worst in governments, at least when it comes to civil liberties. Many governmental acts that violate core constitutional protections are approved of at that time and justified based on military necessity. Because of this harsh reality, today, we do not look to *Korematsu* to determine when the government may discriminate based on race. Nor do we rely on World War I-era laws that criminalized political dissent to determine the scope of the First Amendment.[164] We should be mindful of these realities in the Second Amendment context as well.

In any event, the laws restricting the rights of Catholics and loyalists from keeping and bearing arms cannot provide the basis for a historical analogue to § 922(g)(3). At the outset, it seems doubtful that the colonial restrictions on Catholics provide any insight into the meaning of the Second Amendment.[165] First, it appears that only two American

---

[162] *Cf. Bruen*, 142 S. Ct. at 2130 (comparing *Bruen*'s history-and-tradition test with the Supreme Court's use of historical evidence to determine the reach of the First Amendment's protections).

[163] *See* Marshall, *supra* note 64, at 721–25.

[164] *See, e.g.*, *Gilbert v. Minnesota*, 254 U.S. 325 (1920); *Debs v. United States*, 249 U.S. 211 (1919).

[165] To the extent the United States seeks to rely on laws of Parliament relating to Catholics from the seventeenth and eighteenth century, those sources are particularly dubious in interpreting the scope of the Second Amendment. *Cf. Bruen*, 142 S. Ct. at 2136 (explaining that English practices that were "never . . . 'acted upon or accepted in the colonies'" are to be given little weight (quoting *Dimick v. Schiedt*, 293 U.S. 474, 477 (1935)). There is little to no evidence that many of these laws, including the infamous 1688 parliamentary act

colonies—Virginia in 1756 and Pennsylvania in 1759—ever acted to disarm Catholics.[166]
Two laws in place during time of war hardly demonstrate a course of consistent practice
sufficient to establish a constitutionally significant tradition.[167] Second, at the time these
provisions were enacted, the operative rights-protecting document was the English Bill of
Rights, which limited the right "to have arms" to Protestants.[168] Catholics were thus
excluded from the protections of the right. Laws applying to a group that was not protected
by the right to armed self-defense cannot provide any insight into that right's scope.

But even if they could, the colonial laws targeting Catholics and loyalists cannot
possibly serve as constitutionally relevant analogues to § 922(g)(3) because the
justifications for these laws—one of the two central considerations under *Bruen*—are
dissimilar. These colonial laws were justified on the fear that the covered groups were

---

disarming Catholics, were ever understood to be in force in the colonies. *See* Robert H.
Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early
America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 n.47
(2007).

[166] *See* 5 *The Statutes at Large of Pennsylvania from 1682 to 1801* 627 (W. Stanley Ray
ed., 1898); Churchill, *supra* note 165, at 157 & n.47. There is some disagreement over
whether Maryland may have also disarmed Catholics during this period. *Compare Range*,
53 F.4th at 276–77, *and* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting
Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020), *with*
Churchill, *supra* note 165, at 157 n.47. But the difference between two and three isn't large
enough to be of constitutional significance. *See infra* note 167.

[167] *See Bruen*, 142 S. Ct. at 2142 ("For starters, we doubt that *three* colonial regulations
could suffice to show a tradition of public-carry regulation." (emphasis in original)). *Cf.
NLRB v. Noel Canning*, 573 U.S. 513, 524–26 (2014); *id.* at 572–74 (Scalia, J., concurring
in judgment); William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 16–18
(2019).

[168] *See Heller*, 554 U.S. at 592–93.

likely to wage active war against the colonies or interfere with the colonists' war efforts.[169] This is a radically different justification than the justification for § 922(g)(3).

### 4. Restrictions in Modern Shall-Issue Regimes.

Finally, the United States points to restrictions in some modern "shall-issue" regimes that it argues are analogous to § 922(g)(3). According to the United States, *Bruen* placed a constitutional stamp of approval on all aspects of every modern shall-issue regime. And since some modern shall-issue regimes have prohibitions analogous to § 922(g)(3), the United States argues, *Bruen* also necessarily approves of § 922(g)(3).

The United States points to two specific restrictions. The first is an Arkansas statute that prohibits those who "chronically or habitually abuse a controlled substance to the extent that his or her normal faculties are impaired" from receiving a permit to carry a concealed handgun.[170] Arkansas, however, does not prohibit such persons from possessing a firearm.[171] Nor does there appear to be any restriction on such a person openly carrying a firearm. The second law is a Texas statute that prohibits "chemically dependent

---

[169] *See Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting).

[170] Ark. Code Ann. § 5-73-309(7).

[171] *See* Ark. Code Ann. § 5-73-103(a).

person[s]" from receiving a permit to carry a handgun.[172] But like Arkansas, Texas does not prohibit such persons from possessing a firearm.[173]

The United States' reliance on these laws is misguided for at least two reasons. First, it is not clear that *Bruen* placed a constitutional stamp of approval on all aspects of every modern shall-issue regime, particularly given that no such regulation was at issue in the case. Nor is it at all clear that these particular aspects of shall-issue regimes garnered any serious attention. And the majority explicitly noted the possibility that some aspects of shall-issue regimes could in fact be unconstitutional in some circumstances.[174] Given the wide variety of provisions in some forty-three shall-issue states, it would seem imprudent to suggest that the Court meant to ratify all aspects of every shall-issue regime. Thus, this Court is "reluctant to place more weight on these passing references than the [Supreme] Court itself did."[175]

---

[172] Tex. Gov't Code Ann. § 411.172(a)(6). A "chemically dependent person" is defined as "a person who frequently or repeatedly becomes intoxicated by excessive indulgence in alcohol or uses controlled substances or dangerous drugs so as to acquire a fixed habit and an involuntary tendency to become intoxicated or use those substances as often as the opportunity is presented." *Id.* § 411.171(2).

[173] *See* Tex. Penal Code Ann. § 46.04.

[174] *See Bruen*, 142 S. Ct. at 2138 n.9.

[175] *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) (discussing *Heller*'s similar passage regarding certain restrictions).

Second, putting aside issues of timing[176] and whether these two laws demonstrate a well-established tradition,[177] and assuming these laws are consistent with the Second Amendment, the restrictions in the two shall-issue regimes the United States points to are not sufficiently analogous to § 922(g)(3). That is because—like the historical intoxication restrictions discussed above—the Arkansas and Texas laws impose a much narrower burden on the right of armed self-defense than the burden imposed by § 922(g)(3).[178] Both of these laws impact only the right to *carry* a *handgun*, and the Arkansas law prohibits only a certain type of carry. These laws thus preserve the right to defend oneself with other types of firearms. And importantly, neither law prohibits possession of a firearm, preserving the right to use a firearm in the home for purposes of self-defense. These laws, therefore, unlike § 922(g)(3)—which, again, totally deprives the covered person of the right to armed self-defense using any type of gun, under all circumstances, and in all places—leave ample room for the exercise of the core right to armed self-defense.

---

[176] It appears that the first shall-issue regime was enacted in Washington State in 1961. *See* David B. Kopel, *Restoring the Right to Bear Arms:* New York State Rifle & Pistol Association v. Bruen, 2022 Cato Supreme Ct. Rev. 305, 325–26. Although the United States has made no attempt to establish when the drug-related restrictions were included within such laws, it appears that Washington's 1961 shall-issue law prohibited persons with a "record of . . . drug addiction" from carrying a pistol. *See* R.C.W. 9.41.070 (Supp. 1961). It is worth noting that such persons were permitted to *possess* a pistol under the same law. *See* R.C.W. 9.41.040 (Supp. 1961). In any event, it is difficult to understand how laws passed 170 years after the Second Amendment could provide any insight into "the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137.

[177] *Cf. Bruen*, 142 S. Ct. at 2133, 2142; *Noel Canning*, 573 U.S. at 524–26; *id.* at 572–74 (Scalia, J., concurring in judgment); Baude, *supra* note 167, at 16–18. The United States has not attempted to demonstrate how many shall-issue regimes have similar restrictions.

[178] *See Bruen*, 142 S. Ct. at 2133.

### *Conclusion*

None of this is to say that the government cannot play a role in protecting the public from dangerous persons possessing firearms. It can, and it should. For example, if the State of Texas thought that Harrison's alleged involvement in a shooting demonstrated that Harrison was a danger to the public, it could have demonstrated to a Texas judge—in an individualized proceeding of which Harrison would have been given notice and the opportunity to be heard—that Harrison ought to be jailed while awaiting trial for that shooting. The Constitution, after all, permits pre-trial detention, and such detention would be a highly effective means of furthering the government's interest in protecting the public from a gun-toting Harrison. But that didn't happen; Harrison was released pending trial in Texas. And so here we are, with the federal government now arguing that Harrison's mere status as a user of marijuana justifies stripping him of his fundamental right to possess a firearm. For all the reasons given above, this is not a constitutionally permissible means of disarming Harrison.

Because the Court concludes that 18 U.S.C. § 922(g)(3) violates Harrison's Second Amendment right to possess a firearm, the Court declines to reach Harrison's vagueness claim. The Motion to Dismiss the Indictment is **GRANTED.** Accordingly, the Indictment is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** this 3rd day of February 2023.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE