No *Shepard's* Signal™
As of: January 11, 2024 6:33 PM Z

# *Arnold v. Kotek*

Circuit Court of Oregon, Harney County, Twenty-Fourth Judicial District

November 24, 2023, Decided

Harney County Circuit Court case #22CV41008

**Reporter**

2023 Ore. Cir. LEXIS 3887 *

Joseph Arnold and Cliff Asmussen, Plaintiffs v. Tina Kotek, Governor of the State of Oregon, Ellen Rosenblum, Attorney General of the State of Oregon, Casey Codding, Superintendent of the Oregon State Police, Defendants

## Core Terms

firearm, magazines, rounds, weapons, ban, self-defense, technology, permit-to-purchase, shooting, right to bear arms, ammunition, gun, rifles, unduly, permanently, reload, voters, public safety, background check, multi-shot, loading, scientific, revolvers, Sheriff, repeating, handgun, firing, arms, cartridges, concealed

**Judges:** [*1] Robert S. Raschio, Presiding Judge.

**Opinion by:** Robert S. Raschio

## Opinion

*Opinion Letter Granting a Permanent Injunction Pursuant to ORS 28.020 Superseding the Letter of November 21, 2023.*

Parties:

The Harney County Circuit Court is issuing a Permanent Injunction under *Oregon Revised Statute 28.020* declaring 2022 **Ballot Measure 114** unconstitutional thereby permanently enjoining its implementation.

The court finds the plaintiffs have shown their right to bear arms under *Article I, § 27 of the Oregon Constitution* would be unconstitutionally impaired if **Ballot Measure 114** is allowed to be implemented. *Doyle v. City of Medford, 356 Or. 336 (2014)*. Based upon a facial constitutional evaluation of **Ballot Measure 114**, the **measure** unduly burdens the plaintiffs' right to bear arms. *State v. Christian, 354 Or.*

*22 (2013)*.

**I. Standard of Review**

The Oregon Constitution "has content independent of that of the federal constitution." *State v. Soriano, 68 Or. App. 642, 645 (1984).*[1] Therefore, any irreparable harm of **Ballot Measure 114** must be analyzed separately under Oregon law and is not dependent on a federal constitutional determination. The pleading before this court focused solely on the Oregon Constitution and the state constitutional analysis is dispositive.

According to Hon. Jack L. Landau, retired Oregon Supreme Court Justice, the Oregon Supreme Court's analysis under Article I, § 27 developed from a historical analysis:

"In some cases, [*2] the court adopted a historical or originalist approach, as in State v. Kessler. That case involved the meaning of Article I, § 27, which guarantees the right to bear arms. The court observed that federal court decisions construing the Second Amendment guarantee of a right to bear arms 'are not particularly helpful.' Turning to the meaning of the state constitutional guarantee, the court declared that its task was 'to respect the principles given the status of constitutional guarantees and limitations by the drafters ....' The court set out a history of the provision, from its roots in the English Bill of Rights of 1689 to colonial American fears of standing armies and concerns for personal safety to the state constitution of Indiana, from which the Oregon guarantee was borrowed. In the end, the court concluded that the 'arms' that the state constitution guarantees a right to possess

---

[1] This court will not reach the second amendment analysis since there has been a clear and convincing showing that **Ballot Measure 114** is unconstitutional under *Oregon Constitution Article I, § 27* under Oregon jurisprudence.

2023 Ore. Cir. LEXIS 3887, *2

consist of those that would have been used by nineteenth-century settlers for personal defense and military purposes."

JACK LANDAU, An Introduction to Oregon Constitutional Interpretation, 55 Willamette L. Rev. 261, 265-66, Spring 2019.

State v. Hirsch similarly cited a range of modern treatises and articles on the historical origins of the constitutional right to bear arms, including writings [*3] of the framers of the Second Amendment of which Article I, § 27 of the Oregon Constitution is a descendant. See, e.g., State v. Hirsch, 338 Or. 622 ("[W]e must discern the intent of the drafters of Article I, § 27, and the people who adopted it.").

The Oregon Supreme Court has held total bans on types of weapons and firearms used for self and state defense violate Article I, § 27. Hirsch at 40-41 quoting State v. Delgado, 298 Or. 395 at 403-404 ("The problem here is that ORS 166.510(1) absolutely proscribes the mere possession or carrying of such arms [switchblades]. This the constitution does not permit.").

Building off and clarifying of past precedence, the Supreme Court created the current constitutional interpretation of Article I, § 27 found in State v. Christian, 354 Or. 22 (2013). The court laid out a five-part test for any statute that would restrain a firearm activity. First, the Oregon Constitution prevents the legislature from infringing on citizen rights to bear arms in self-defense. Id. at 30. Second, the term "arms" includes firearms and certain hand carried weapons used for self-defense at the founding of Oregon. Id. [2] Third, the legislative restraint is valid and reasonable if it is addressing dangerous practices which allows for regulating the carrying and use of a firearm. Id. at 32 citing State v. Robinson, 217 Or. 612, 618.[3] Fourth,

restrictions must be reasonable in scope and for the purpose of promoting public safety. Id. at 33-34. Fifth, the reasonable restrictions [*4] cannot unduly frustrate the right to bear arms. Christian at 38 ("...the legislature may specifically regulate the manner of possession and the use of protected weapons to promote public safety as long as the exercise of that authority does not unduly frustrate the right to bear arms guaranteed by Article I, § 27.").

The Supreme Court limited the judicial inquiry to a facial challenge of the constitutionality of a statute in all applications. Christian at 40.

Considering of the above factors, the Oregon Supreme Court held the legislature has "wide latitude to enact specific regulations restricting the possession and use of weapons to promote public safety." Christian, 354 Or. at 33. The court upheld the City of Portland ordinance disallowing loaded firearms within the city limits, unless under the control of a concealed handgun licensee, because the restrained "conduct" of having a loaded firearm "creates an unreasonable and unjustified risk or harm to members of the public." Id. at 35.

## II. Historical Context for Oregon's Right to Bear Arms

"The people shall have the right to bear arms for the defence [sic] of themselves, and the State, but the Military shall be kept in strict subordination to the civil power[.]" Oregon Constitution Article I, § 27.

At the time of adoption of the Oregon [*5] Constitution in 1857, the Oregon territory had legally existed since 1848. The first European settlement was Fort George established in 1812, later named Astoria after being secured by the Astor party from the United States. The first American colony was established in 1834. The "great migration" from United States to the Oregon country along the Oregon Trail began in 1843. The period was marked by western emigration and persistent violent conflicts with the Indian Tribes. As described by Professor Brian DeLay of University of California, Berkley, in his testimony, the emigrants were in a state of war with the Indian population and used whatever firearms were available to them in defense of themselves and their burgeoning community while pushing the native tribes of their ancestral lands.

---

[2] The Oregon Supreme Court, in its early interpretations of the Oregon Constitution ask the lower courts to consider "what did those conservative pioneer citizens have in mind." Jones v. Hoss, 132 Or. 175, 178-179 (1930).

[3] A list of such legal restrictions is contained in Board of County Commissioners of Columbia County v. Rosenblum, 324 Or. App. 221, footnote 11, which supports the use, possession, dangerous group delineation on firearms restraints.

Further, dangerous groups contain individuals who "demonstrated an identifiable threat to public safety" or are

---

"serious lawbreakers" can be prevented from bearing arms. Christian, 354 Or. at 32-33 citing State v. Hirsch/Friend, 338 Or. 622, 679 and 675-76 (2005).

2023 Ore. Cir. LEXIS 3887, *5

Professor Mark Axel Tveskov of Southern Oregon University testified that during the Oregon territorial era, firearms were restrained by the supply chain to the region, which was very distant from the supply sources on the east coast of the United States, but in no other way were firearms regulated by government.

Professor Delay described the technological improvements over the muskets of the revolution **[*6]** to the firearms of 1857 as consisting of five general developments: fulminates; percussion cap ignitions; breach loading; multi-shot technology; and metallic cartridges. The development of fulminates allowed quick ignition of gun powder and improved propulsion of projectiles leading to percussion caps which dramatically increased reloading speeds. Multi-shot technology will be described below. Breach loading allowed cartridges to be inserted into the barrel through the buttstock which increased reloading speed. Metallic cartridges are the modern bullet with the projectile and powder inside a single device which allowed for breach loading from the stock. The user of the firearm no longer needed to set the firearm on its stock, load the barrel with black powder, place a ball down the barrel, tamp it in place, pick up the firearm, place an ignition cap with fulminate and then shoot the weapon. The court finds each of these developments were focused on improving efficiency in firing speeds and ability to deploy more rounds when using the weapons with a higher rate of firing speed. As Dr. Delay stated in his testimony, there was an "allure toward multi-shot technology."

The court finds the **[*7]** best firearm technology of 1857 and before was in the Oregon territory pre-statehood. There is evidence in the historical and archeological record of Colt revolvers and "buck and ball" technology in Oregon. Buck and ball were a paper cartridge consisting of a single ball and two buck shots fired simultaneously like modern shotgun ammunition.

There were pepperboxes in the region, then the most popular multi-shot firearm. Pepperboxes are multi-barrel handguns on a coaxially revolving mechanism making them multi-shot firearms. The loading of the firearms was difficult, the barrels had to be waxed or grease to hold the gun on one's person while avoiding self-injury. The gun typically had no more than six barrels as more barrels proved too heavy for practical use. However, there were some models with over ten barrels with smaller caliber ammunition.

As described by Professor DeLay, multi-shot firearms had made significant advancements from the 1830s with the development of the Colt revolver until statehood. Gunmakers had been pursuing multi-shot technology for centuries prior to the revolver, but Colt achieved an outcome that laid the foundation for all further multi-shot advancements. Additionally, **[*8]** the development of the metallic cartridges in the 1850s was a large advancement in multi-shot rifle technology leading to the Henry rifle of 1860 that could hold ten rounds. In 1857, there were tubular magazines that could hold ten rounds. According to Dr. Delay, the citizen population in the 1860s was the best armed in the world.

Colt revolvers looked very similar to the revolvers of today. Loading would require a loading of black powder, ball being seated on the powder, percussion caps placed on the back of each chamber. First-generation revolvers had to be partially disassembled, each bore greased or waxed, percussion caps placed on the back nipples, powder being poured, and a ball tamped into the chambers. Each chamber of the magazine would need to be loaded with each of those five steps. Reloading a six-shot revolver in the 1830's would take 30 steps and take a minute and half to complete for an experienced owner. The first weapons need the shooter to move the chamber to the next round. As it was developed, a hinged loading lever and capping window were added around 1839, improving reloading speeds significantly.

Firearms development happened quickly from 1830 until 1857. Shotguns **[*9]** were in high use for personal protection. The militia generally had single shot rifles and muskets. The most highly sought-after rifles were breach-loaded Sharps rifles in the 1850s, which were the "first solution" to multi-shot rifles because of reduced reloading times and capacity to hold more than one round at a time according to Professor Delay.

Ashley Hlebinsky, who was a museum curator integral in the development of the Buffalo Bill Center of the West which contains 7000 unique historical firearms dating back to the 1500s and who has extensive training on firearms development at the Smithsonian American History Museum, testified multi-shot technology had been researched and tested since at least the 1500s. The multi-shot technology was really revolutionized by Colt in the 1830s with the onset of the industrial revolution. The court finds, generally, gun makers were striving for repeater technology and there was a proliferation of the technology in 1857 when Colt's patent ended. Her testimony was consistent with that of the professors.

2023 Ore. Cir. LEXIS 3887, *9

The court finds, and all the experts agree, there was no clear distinction between private and military use at the time of statehood. See also *State v. Kessler, 289 Or. 359, 368 (1980)*. **[*10]** Professor DeLay did testify most private gun manufacturers were angling for military contracts but would sell any firearm to private citizens who could afford one. Private citizens used those firearms for self-defense and defense of the state in the form of militia activities. As early as 1803, Meriwether Lewis bought his large capacity magazine weapon on the Lewis and Clark expedition to impress upon the Indian tribes of American firearm superiority. As Professor Delay explained there were examples of ten-round firearm magazines prior to 1857, but issues with the technology that were not solved by statehood. The Henry rifle, which was developed and completed by the Winchester Repeating Arms company in 1860, was a breakthrough in firearms technology allowing for over ten-round capacity in a tubular magazine with a lever action repeating technology. See also State v. Delgado, 298 Or. at 403 (Oregon's Constitutional Delegates "must have been aware that technological changes were occurring in weaponry as in tools generally. The format and efficiency of weaponry was proceeding apace. This was the period of development of the Gatling gun, breach loading rifles, metallic cartridges, and repeating rifles."). Black powder, **[*11]** with the repeating firing, would foul barrels requiring regular cleaning for the weapon to allow the arm used, and produced significant smoke from repeating firing of cartridges, made the rapid-fire technology impracticable in most utilizations.

The court finds the metal cartridge, percussion cap ignition and repeating technology, along with development of detachable magazines in 1870s, firearm automation and smokeless powder in the 1880s, were the foundation for the semi-automatic firearm. See Also Kessler at 369.

Further, the court finds, and each expert on firearm historical development agreed, almost all emigrants to the Oregon Territory had firearms. Firearms were a necessity of life for self-defense, service in the militia and subsistence through hunting. Most had muskets, but many had rifles, pistols, including revolvers and pepperboxes, and shotguns.

Along with firearm development, government developed in Oregon. There were multiple attempts to have a constitutional convention in Oregon prior to 1857. Ultimately, Territorial Governor George L. Curry encouraged the creation of a state because it would likely mean drawing in more settlers by creating protected routes of travel from the "Indian difficulties **[*12]** upon our frontiers". CHARLES HENRY CAREY, editor, The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857, 1926, pg. 20-21. After three prior electoral defeats, Curry's speech turned the tide on the concept of a constitutional convention leading to the electorate passing the initiative 7,617 for to 1,679 against, a "sweeping victory...more remarkable in view of the previous repeated rejections". Id. at 21-22.

Professor Tveskov testified that at the time of the constitutional convention, the Rogue Valley Indian War was concluding to which at least two delegates had a collateral relationship. Jesse Applegate had military assistance to strike a road in that region during the fighting and LaFayette Grover had engaged in diplomatic talks to end the conflict. The professor testified the delegates, and citizens generally of Oregon, wanted the best firearms they could have for defense of themselves and their communities. Further, most emigrants could take a half day ride to town and purchase any firearm that might be available for sale at the local mercantile, though supplies were unpredictable since Oregon was so remote.

The convention opened at the courthouse **[*13]** in Salem, Oregon on August 17, 1857, concluding on September 18, 1857.

During the convention, a committee on the bill of rights was added to the list of standing committees and framed the bill of rights "very closely [to] the phraseology of similar provision in the Indiana constitution of 1851". Id at 28. Article I, § 27 was adopted without any noted debate by the delegates. CLAUDIA BROWN and ANDREW GRADE, A Legislative History of Oregon, *37 Willamette L. Rev. 469 (2001)*. The court infers from that silent record that no concerns were raised over the types of firearms allowed for self or state defense.

The voters of Oregon, in a special election on November 9, 1857, adopted the constitution by a vote of 7,195 for and 3,217 against. CAREY at 27.

Each historical expert agreed, and the court finds, that delegates to the Oregon constitutional convention, and those voting for the constitution, would have been generally aware of firearms development and multi-shot technology. Professor Tveskov described textual evidence of Oregonians knowing and thinking about all the technological advancements to firearms and wanting the finest firearms technology available. Additionally, the

2023 Ore. Cir. LEXIS 3887, *13

court finds the highest level of firearm development then existing had **[\*14]** been introduced in Oregon at the statehood.

The best evidence for a constitutional provision's intended meaning is to examine the wording of the provision. *State v. Mills, 354 Or. 350, 356 (2013)*. Oregonians, through Article I, § 27, protected their right to defend themselves with firearms.

The court finds the historical record produced in this case well developed providing clear and convincing evidence of the intent of the framers and people adopting the Oregon Constitution in the election of 1857. See Hirsch, 338 Or. at 643.

"A constitution is dependent upon ratification by the people. Its language should therefore be considered in the sense most obvious to the common understanding of the people at the time of its adoption." LANDUA at 266.

Our constitution was derived from the voters in November of 1857 and requires the same deference as anything derived from the voters now.

A constitutional provision must be considered under that lens.

> "In construing the organic law, the presumption and legal intendment are that every word, clause and sentence therein have been inserted for some useful purpose. *School District No. 1, Multnomah County v. Bingham*, 204 Or. 601, 611 (1955).
>
> When so engaged, the object is to give effect to the intent of the people adopting it. But this intent is to be found in the instrument itself. It is to be presumed that the language **[\*15]** which has been employed is sufficiently precise to convey the intent of the framers of the instrument."

*Monaghan v. Sch. Dist. No. 1, Clackamas County, 211 Or. 360, 366-67 (1957)*.

The question for the court to answer is what did the voters of 1857 understand Article I, § 27 to mean? The answer lies with voters heavily reliant on firearms for their basic subsistence and protection; voters engaged in forceable removal of the indigenous tribes of Oregon, which the settlers described as war and which they engaged in militia-type service; voters who wanted the very best weapons they could procure for those purposes; and a clear lack of governmental restraint on

the types of weapons available to the public of both private and military grades. The court finds the voter of 1857 did not seek to restrain access to the best firearms with the highest functionality possible they could procure.

That answer is bolstered the first case on self-defense with a firearm landing in the Oregon Supreme Court in 1861. The opinion was written under the pen of Justice Rueben Boise[4] , establishing the legal rule, with a foundation in English common law, for the use of deadly force in self-defense. The rule continues in similar form in the law today. Justice Boise wrote:

> "If [the defendant] ... believing **[\*16]** he was in actual and imminent danger of death, or great bodily harm, should kill [the decedent], I think he would be justified. By the common law, one acting from appearances in such a case, and believing the apparent danger imminent, would be justified, though it afterwards turned out that there was no real danger, and the gun of assailant was only loaded with powder...the court should have

---

[4] Rueben Boise is an important figure in early Oregon history. Territorial prosecutor starting in 1852, his first case as a prosecutor was to advocate for a formerly enslaved petitioner against the former enslaver to achieve freedom for the petitioner's children being held in bondage by the enslaver. His work was a significant contribution towards Oregon's character as a free state. See R. GREGORY NOKES, Breaking Chains: Slavery on the Trail, 2013, pg. 72-93. The litigation ending slavery in Oregon.

As a territorial judge, he presented the preamble for an unanimously passed bill to resubmit the question of state government to a popular vote in 1856. CAREY at pg. 17. Many attacks were laid at the proposal by the editor of Oregonian, Thomas J. Dryer, who later was a delegate to the Constitutional Convention of 1857. Among those attacks that immigration was being stunted by the Indian Wars and the federal government was unlikely to pay the Indian war claims accruing from the wars, leading to a large war debt for the newly created state. CAREY at pg. 18. Boise was undeterred and ultimately his faction was successful in achieving an initiative for a constitutional convention.

Boise was a delegate to the constitutional convention and appointed as head of the committees on "the legislative department" and "the seat of government and public buildings". CASEY at pg. 29. He was among the "leaders of the policies of the convention." Id.

He was elected as one of the first four Justices of the Oregon Supreme Court in 1859, serving in the role of Chief Justice three times (1864-1866, 1870-1872 and 1876-1880).

instructed the jury, that, if they believed, from the evidence in the case, that there was reasonable ground for [the defendant] to believe his life in danger, or that was in danger of great bodily harm from the deceased, and that such danger was imminent, and he did so believe, and acted on such a belief killed the deceased, he was excusable; and there it was not necessary that he should wait until an assault was actually committed."

*Goodall v. State, 1 Or. 333, 336-337 (1861)*.

Parenthetically, in Goodall, the defendant shot twice from a pistol with repeater technology after the decedent drew his pistol and threated violence.

The historical record supports the court finding that self-defense using a firearm was justified when threatened with an imminent threat of deadly force and the firearms available were **[*17]** pistols, shotguns, rifles and muskets. The pistols were multi-shot capable, and the pistols and rifles had repeating technology. See Christian, 354 Or. at 30.

### III. *Ballot Measure 114* Severability Clause

As stated on the record, the court finds Sections 1 through 10 are severable from Section 11 of *Ballot Measure 114*. Sections 1 through 10 relate to a permit-to-purchase scheme and its application to multiple statutory sections of current Oregon law. While some sections further tweak current statutes to add additional restraints on the purchase of firearms, the overall emphasis is on the permit-to-purchase application to those statutes. Section 11 relates to a large capacity magazine ban and has limited reference to the permit-to-purchase scheme. The court believes it appropriate to analyze those two statutory schemes separately pursuant to Section 12 of *Ballot Measure 114*.

This court does not hold a line-item veto allowing it to redline the language of *Ballot Measure 114* to make it read in a constitutional way. Such an act of judicial power would be a true arrogation of authority reserved for the legislative branch. Sections 1-10 each and all contain the language "permit-to-purchase" or "permit" both in titling of the sections and the language within the body of **[*18]** the text. The court cannot practicably rewrite those statutory changes to make them constitutional.

For example, Section 4 outlines the permit-to-purchase process, section 5, the appeal process, and the

remaining sections apply the permitting process to various sale of firearm provisions. As this court noted in its opinion letter of January 3, 2023, the "language the defendants urge the court to use to sever is inexorably linked with the permit-to-purchase program. To find otherwise requires the court to ignore the operative language linking each provision on background checks to the permit-to-purchase program. The court would be separating sentences at commas and considering the phrase 'permit holder' surplusage. It is not surplusage." The court does not have the authority to strike language word by word, comma by comma. Clear to the court, each section is so essentially and inseparably connected with and dependent upon the unconstitutional permit-to-purchase scheme, the court finds it is apparent the remaining parts would not have been enacted without the unconstitutional part. *ORS 174.040(2)*. Further, removing the permit-to-purchase or permit language would leave the remaining parts, standing alone, incomplete **[*19]** and incapable of being executed in accordance with the legislative intent, except as to Section 11. *ORS 174.040(3)*.

As to Section 11, the court will not strike or add language to remedy the clear typographical errors or bring the language of the section in conformance with the language of other states' statutes to create an application for the adoptive statute doctrine. In fact, to do so is inapposite to that legal doctrine. In fact, the legislature has given clear direction on this type of issue. *ORS 174.010* limits the court in "the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all." *Ballot Measure 114* would have the court exercise authority in clear violation of the separation of powers doctrine as described in *ORS 174.010*. The court will determine whether the section, on its face, is constitutional.

### IV. *Ballot Measure 114* Permit-to-Purchase Scheme is Facially Unconstitutional

Oregon citizens have a right to self-defense against an imminent threat of **[*20]** harm, which is unduly burdened by *Ballot Measure 114*' permit to purchase scheme.

Three salient facts were agreed upon by the parties at trial: A) *Ballot Measure 114* delays the purchase of

firearms for a minimum of 30 days; B) the permit-to-purchase program derives its language source in the concealed handgun license statutes (*ORS 166.291, et. al*); and C) the Federal Bureau of Investigations (FBI) refuses to conduct criminal background checks though has now granted a "grace period". The court finds these agreed to facts are fatal to the constitutionality of the permit-to-purchase scheme.

A. The right under Article I, § 27 is the ability to respond to the imminent threat of harm which is unduly burdened by the 30-day delay.

"As a general proposition, individuals in Oregon have a right to possess firearms for the defense of self and property under *Article I, § 27, of the Oregon Constitution*." *Willis v. Winters, 350 Or. 299, footnote 1 (2011)*.

"It is axiomatic that we should construe and interpret statutes 'in such a manner as to avoid any serious constitutional problems.'" *Easton v. Hurita, 290 Or. 689, 694 (1981)* cited by *Bernstein Bros. v. Dep't of Revenue, 294 Or. 614, 621 (1983)*. This court has attempted to follow the axiom, but simply cannot avoid the serious constitutional problems with ***Ballot Measure 114***. This court finds the permit-to-purchase facially unconstitutional creating an inability for it to be **[*21]** applied in a constitutional way under any factual circumstances.

Oregon has an array of statutes allowing and limiting self-defense and the types of use of force available to citizens in response to a threat of harm from another.[5]

---

[5] ***ORS 161.209*** **Use of physical force in defense of a person**. Except as provided in *ORS 161.215* and *161.219*, a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose.

***ORS 161.215*** **Limitations on use of physical force in defense of a person**.

(1) Notwithstanding *ORS 161.209*, a person is not justified in using physical force upon another person if:

(a) With intent to cause physical injury or death to another person, the person provokes the use of unlawful physical force by that person.

(b) The person is the initial aggressor, except that the use of

physical force upon another person under such circumstances is justifiable if the person withdraws from the encounter and effectively communicates to the other person the intent to do so, but the latter nevertheless continues or threatens to continue the use of unlawful physical force.

(c) The physical force involved is the product of a combat by agreement not specifically authorized by law.

(d) The person would not have used physical force but for the discovery of the other person's actual or perceived gender, gender identity, gender expression or sexual orientation.

(2) As used in this section, "gender identity" has the meaning given that term in *ORS 166.155*.

***ORS 161.219*** **Limitations on use of deadly physical force in defense of a person**. Notwithstanding the provisions of *ORS 161.209*, a person is not justified in using deadly physical force upon another person unless the person reasonably believes that the other person is:

(1) Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person; or

(2) Committing or attempting to commit a burglary in a dwelling; or

(3) Using or about to use unlawful deadly physical force against a person.

***ORS 161.225*** **Use of physical force in defense of premises**.

(1) A person in lawful possession or control of premises is justified in using physical force upon another person when and to the extent that the person reasonably believes it necessary to prevent or terminate what the person reasonably believes to be the commission or attempted commission of a criminal trespass by the other person in or upon the premises.

(2) A person may use deadly physical force under the circumstances set forth in subsection (1) of this section only:

(a) In defense of a person as provided in *ORS 161.219*; or

(b) When the person reasonably believes it necessary to prevent the commission of arson or a felony by force and violence by the trespasser.

(3) As used in subsection (1) and subsection (2)(a) of this section, "premises" includes any building as defined in *ORS 164.205* and any real property. As used in subsection (2)(b) of this section, "premises" includes any building.

***ORS 161.229*** **Use of physical force in defense of property**. A person is justified in using physical force, other than deadly physical force, upon another person when and to the extent that the person reasonably believes it to be necessary to

2023 Ore. Cir. LEXIS 3887, *21

Imminent use or use of unlawful physical force is required to trigger the statutory defense. For use of deadly force, a citizen is only allowed to use such force if there is use or threatened use of physical force against the citizen while the perpetrator is committing a felony or if being threatened with deadly physical force. See *ORS 161.219* and *ORS 161.225*. The legislature recognizes citizens who are placed in imminent threat of violence inside their homes have the right to use deadly force to protect themselves from that threat. The court must give deference to the controlling statutes on self-defense. State v. Sandoval, 324 Or. 506, 511-12 (2007).

The Oregon Supreme Court, in Sandoval, held:

"[T]he statute...sets out a specific set of circumstances that justify a person's [*22] use of deadly force (that the person reasonably believes that another person is using or about to use deadly force against him or her) and does not interpose any additional requirement (including a requirement that there be no means of escape). That impression is not altered by the requirement in *ORS 161.209* that the use of deadly force be present or 'imminent,' or by the same statute's reference to 'the degree of force which the person reasonably believes to be necessary.' We conclude, in short, that the legislature's intent is clear on the face of *ORS 161.219*: the legislature did *not* intend to require a person to retreat before using deadly force to defend against the imminent use of deadly physical force by another."

Id. at 513-14.

Oregonians have no duty to retreat from their homes when under imminent threat of harm prior to using deadly physical force. Id. at 514. The court finds often individuals face potential deadly situations from domestic partners who are restrained from contact after acts of abuse, or threats of violence from stalkers, that create a need for immediate self-protection. Given Oregonians statutory and constitutional rights use of deadly physical force under the appropriate circumstances, **Ballot** [*23] **Measure 114**'s permit-to-purchase scheme is an unconstitutional restraint as it prevents ready access to firearms in emergent situations outside the control of those seeking the firearm.

**Ballot Measure 114** has a negative impact on public

---

prevent or terminate the commission or attempted commission by the other person of theft or criminal mischief of property.

safety, particularly in rural communities. The court finds the testimony of Harney County Sheriff Dan Jenkins, who leads five deputies, and Union County Sheriff Cody Bowen, who leads fifteen deputies, demonstrated definitively citizens cannot rely on law enforcement to respond quickly to their needs if they are subject to a break in or a threat of deadly physical harm. Victims can be left without a law enforcement response for hours, with only their own resources to protect themselves from harm. A law abiding citizen's need to protect themselves, their loved ones and their property can be immediate as there is no law enforcement officer who will be there to do it for them.[6]

The court further finds the 30-day absolute prohibition on the initial purchase of a firearm is not permitted under the Oregon Constitution. The Oregon Supreme Court held as much in Christian when it found the Portland ordinance was "not a total ban on possessing or carrying a firearm [*24] for self-defense in public like those bans that this court held violated Article I, § 27 in previous cases." Christian at 40. The court finds there are no reasonably likely circumstances in which the application of [**Ballot Measure 114** sections 1 through 11] would pass constitutional muster." Id. at 42 quoting *State v. Sutherland, 329 Or. 359, 365 (1999)*.

B. **Ballot Measure 114** mimics the concealed handgun license scheme reducing the right to bear arms to an unduly burdensome administrative due process right.

Possessing a concealed weapon is a privilege in Oregon. Without a concealed handgun license ("CHL"), a weapon must be openly carried to alert other citizens said citizen is carrying a firearm. Open carry of a firearm is right of all citizens who are not otherwise precluded from possessing a firearm. As the Oregon Supreme

---

[6] As the Oregon Court of Appeals wrote: "the [Oregon] Supreme Court traced the historical context of *Article I, § 27, of the Oregon Constitution* and in doing so, examined the adoption of the Second Amendment. The court noted that the framers of the United States Constitution considered those who committed crimes to be outside of the right to bear arms: '"[T]he general view of the framers of the Second Amendment that a certain criminal element—notably, 'outlaws' using weapons or otherwise committing injurious crimes against person and property—occupied a lesser status in the community than the responsible, law-abiding citizenry, particularly respecting the bearing of arms.'" *State v. Parras, 326 Or. App. 246, 255, 531 P.3d 711, 716 (2023)*. **Ballot Measure 114** imposes that large burden on law-abiding citizens on their ability to readily access a firearm when they need one.

2023 Ore. Cir. LEXIS 3887, *24

Court describes:

> "The Court of Appeals stated: 'As a logical matter, if the general prohibition against possessing a concealed firearm without a license is constitutional, then it follows that *ORS 166.250(2)(b)*, which allows greater freedom to possess firearms, cannot be unconstitutional.' We agree."

*State v. Perry, 336 Or. 49, 58 (2003)*.

The court agrees with defendants' argument that the permit-to-purchase statutory framework is an analog of the CHL statutory framework. The legal interpretation of the **[\*25]** CHL framework is likely to be applied to **Ballot Measure 114**. The language of each is *ejusdem generis*, requiring that the language of **Ballot Measure 114** be given the same legal meaning as the CHL statute. "Words that are legal terms of art are exceptions to that rule [of plain, ordinary meaning are ascribed to a word]; we give those words their established legal meaning, often beginning our analysis with *Black's Law Dictionary. Muliro, 359 Or. at 746, 380 P.3d 270*; *State v. Dickerson, 356 Or. 822, 829, 345 P.3d 447 (2015)* (interpreting statutes by giving "legal terms * * * their established legal meanings')." *Gordon v. Rosenblum, 361 Or. 352, 361 (2017)*. The language similarities are clear and described below.

The courts when conducting a legal review of administrative decisions to deny a concealed firearms license have done so under a rational basis test. Perry at 59 (2003) ("Our discussion of *ORS 166.250* demonstrates that the legislature intended to create licensing requirements, with exceptions, for the possession of concealed weapons. Drawing a distinction between business owners and employees for purposes of one of the exceptions to the license requirement is not irrational.").[7]

---

[7] Other types of cases allowing the low bar of rational basis analysis on constitutional issues include, but are not limited to, searches of probationers without the need for a warrant based upon probable cause. *State v. Gulley, 324 Or. 57 (1996)*, revocations of the privilege of probation *State v. Martin, 370 Or. 653 (2022)*, reviewing convictions in *Post-Conviction Relief Watkins v. Ackley, 370 Or. 604 (2022), Revocation of professional licensure Sachdev v. Oregon Medical Board, 312 Or. App. 392, Denial of entry into government buildings State v. Koenig, 238 Or. App. 297 (2010)*, Placement in segregated housing in a prison *Barrett v. Belleque, 344 Or. 91*, Rights after conviction for a parole hearing *Rivas v. Board of Parole*

The standard of judicial review for regulations under Article I, § 27 is intermediate scrutiny. See Christian. This court recognizes the intermediate scrutiny standard was applied by **[\*26]** Oregon Supreme Court in weighing the ordinance against the Second Amendment right to possess a firearm under the United States Constitution. However, the use of intermediate scrutiny by the supreme court highlights the importance of the right to bear arms under Oregon law. This court finds that the use of a rational basis structure to deny a primary right does not meet the Supreme Court's requirements of intermediate scrutiny. The court, also, finds that the use of the same language in both **Ballot Measure 114** and the concealed handgun license statutes undermines the importance of the Article I, § 27 right to bear arms by directing courts to reduce the standard of review to a rational basis test for a primary constitutional right.

For example, *ORS 166.291* outlines an extensive list of requirements to receive a CHL. *ORS 166.293* allows an officer to deny a CHL if:

> "...Notwithstanding *ORS 166.291 (1)*, and subject to review as provided in subsection (5) of this section, a sheriff may deny a concealed handgun license if the sheriff has reasonable grounds to believe that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern **[\*27]** of behavior involving unlawful violence or threats of unlawful violence."

Compare that language to **Ballot Measure 114** Section 4(1)(b)(C) where a person may obtain a permit-to-purchase so long as the person "does not present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of violence." The conduct described would have to be separate from objective standards such as convictions from crimes, mental health or domestic violence court-ordered or any prohibitions based upon release agreements restraining firearm possession. See **Ballot Measure 114** Section 4(1)(b) (A-B) and Section 4(2)

---

*and Post-Prison Supervision, 272 Or. App.248 (2015)*.

None of these types of matters, or the others operating with a rational basis standard, are restraints, in the first instance, on a constitutional right.

2023 Ore. Cir. LEXIS 3887, *27

see also *Concealed Handgun License for Stanley v. Myers, 276 Or. App. 321, 331 (2016)*.

*ORS 166.293(5)* is a judicial review process nearly identical to the **Ballot Measure 114**(5)(5) judicial review process. The judicial review standard for a denial of a CHL under the "reasonable grounds" is characterized by the court as:

"It is not clear that the proceeding under *ORS 166.293* appropriately can be characterized as an 'equitable action or proceeding'. Rather, it is a special statutory proceeding **[*28]** to review a decision by an elected county official, more in the nature of an administrative review proceeding under the Administrative Procedures Act...the issue for the reviewing court is the correctness of that determination..."

*Concealed Handgun License for Stanley v. Myers, 276 Or. App. 321, 328 (2016)*.[8]

The court finds a due process administrative review hearing undermines the right to bear arms by allowing the consideration of all types of information that would not be allowed in court proceeding were the rules of evidence to apply. *Stanley at 331*. This process meets the rational basis rule allowing a review of a decision by an elected official under the principles of due process, a very low bar of review with hardly any procedural protection for an applicant. *Id. at 339*. Such a review process does not meet an intermediate scrutiny standard, where the burden falls on the government:

"[T]o prove that the regulation at issue survives a 'heightened' level of scrutiny. See, e.g., *Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 347, 356 (3d Cir. 2016)*, cert. den., *137 S. Ct. 2323, 198 L.Ed.2d 752 (2017)* (once the challengers have carried their burden to show that their offenses were not serious and have distinguished their circumstances from persons historically excluded from the right to bear arms, the government must 'meet some form of heightened scrutiny'—in *Binderup*, intermediate scrutiny); accord **[*29]** *Kanter v. Barr, 919 F.3d 437, 442 (7th Cir. 2019)* ('We have consistently described step two as 'akin to intermediate scrutiny' and have required the

government to show that the challenged statute is substantially related to an important governmental objective.'"

*State v. Shelnutt, 309 Or. App. 474, 477-78,* review denied, *368 Or. 206 (2021)*.

The court finds much like concealed handgun hearings, there is no evidence competency rule in **Ballot Measure 114** Section 5(5). While a citizen denied a permit-to-purchase has the due process right to be heard and present evidence, the core determination of the court would remain "did the permitting agent have reasonable grounds to deny the permit?" Reducing the right to bear arms by a lawful citizen with unsubstantiated, uncharged, hearsay-based alleged conduct, for example, because the uncharged conduct was written in a police report or testified to by scorned lover that the lover had earlier denied occurred, is unduly burdensome to the primary right to bear arms. See *Stanley at 331*.

Rational basis reviews of government actions do not meet the heightened standards required under Intermediate Scrutiny.

Intermediate Scrutiny is a recognition that the right to bear arms is a protected right. The state must have an important government objective and competent evidence to allow **[*30]** a restrain on the right. The court finds the "reasonable grounds" review under **Ballot Measure 114** using a rational basis test to deny a permit-to-purchase, does not meet the constitutional standard required under Christian.[9] The court further finds that **Ballot Measure 114** is unduly burdensome by flipping the burden of proof, requiring citizens to prove they are not dangerous, rather than the state meeting the intermediate scrutiny standard proving a citizen is too dangerous to own a firearm. In essence, law abiding citizen must prove to the state that they can safely possess firearms rather than the current model that requires to the state to prove that a citizen, through their conduct, has lost the right to possess a firearm.

C. The lack of Federal Bureau of Investigations

---

[8] The opinion was penned by now Chief Judge of Court of Appeals Erin Lagesen on a panel with now Oregon Supreme Court Chief Justice Meagan Flynn and Justice Rebecca Duncan.

[9] The first description of intermediate scrutiny by the Oregon Supreme Court was "[t]he Supreme Court when faced with gender discrimination challenges imposes what has come to be known as an "intermediate tier" scrutiny somewhere between a "rational basis" equal protection test and a "strict scrutiny" test." *Matter of Comp. of Williams, 294 Or. 33, 40 (1982)*.

2023 Ore. Cir. LEXIS 3887, *30

background checks means permits cannot be issued without full judicial review unduly burdening the right to bear arms.

The parties have stipulated at trial that the Federal Bureau of Investigations ("FBI") will not conduct background checks on applicants who apply for a permit-to-purchase a firearm. The defendants invited the court to assume that the permits will be issued anyhow. The defendants provided no evidence **[\*31]** on why that the assumption would be true.

A plain reading of *Ballot Measure 114* Section 4(1)(e) clearly contradicts that assumption:

> "The Federal Bureau of Investigation shall return the fingerprint cards used to conduct the criminal background check and may not keep any record of the fingerprints. Upon completion of the criminal background check and determination of whether the permit applicant is qualified or disqualified from purchasing or otherwise acquiring a firearm the department shall report the results, including the outcome of the fingerprint-based criminal background check, to the permit agent."

*Ballot Measure 114* further directs that during the FBI background check, state police must investigate the applicant further, but they must rely on the FBI to complete the check prior to issuing a permit. The parties stipulate the state cannot order the FBI to conduct a background check. Further, there is no opt out language in *Ballot Measure 114* to allow for the non-completion these background checks. The FBI has stated the language of 'the permitting agent or their designee' prohibits the FBI from assisting Oregon because Public Law 92-544 is clear only law enforcement can receive the FBI background **[\*32]** check, not designees.[10]

---

[10] On November 10, 2023, each of the defendants filed an amended admission including a set of emails between defendants' attorneys and the United States Department of Justice. The salient paragraph of those emails for this court's findings is from Joshua K. Handell, Senior Counsel Office of the Deputy Attorney General, U.S. Department of Justice on October 26, 2023:

> "As discussed on our call, FBI is willing to extend a grace period during which the State of Oregon will be permitted access to FBI criminal history record information (CHRI) while the Department of Justice continues to review whether Oregon's law complies with federal requirements.

> That allowance is contingent on Oregon's assurance that it will not designate any private party to act as a Permit

The court finds if in fact that background checks cannot be completed is fatal to the permit-to-purchase provisions. *ORS 174.040(3)*. The court agrees with the plaintiff that the FBI background check is required by the *Ballot Measure 114* and "no Oregonian will be able to be issued a permit-to-purchase by any permit **[\*33]** agent in the state and will be forced to seek relief under Section 5 of the *Measure* at the 30-day mark." Plaintiff's trial memorandum, pg. 29.[11] Requiring every applicant

---

Agent or otherwise receive CHRI during the grace period. Cf. *Measure 114*, sec. 3(4) ("'Permit Agent' means a county sheriff or police chief with jurisdiction over the residence of the person making an application for a permit-to-purchase, or *their designees*." (Emphasis added)). In the event a county sheriff or police chief opts to designate another person to serve as Permit Agent, such a designee must be a subordinate officer to the county sheriff or police chief who is employed in the same office."

Even if the grace period could be executed with each of the state's 36 sheriffs under the terms outlined by the FBI, the rights of Oregonians would hang on the determination of the FBI as to whether to continue conducting background checks for the state under *Ballot Measure 114*. At any moment, the FBI could declare, and Oregonians would be without legal recourse, that the FBI can no longer provide background checks.

Even having the background checks does not save the constitutionality of the *Ballot Measure 114* and this new wrinkle does not change the court's analysis. The defendants negotiated the above paragraph with the federal government starting November 23, 2022, until November 3, 2023. A right of Oregonians under their Oregon Constitution should not be subject to an administrative determination of a federal agency which took a year to grant a grace period and could, in a moment, take the grace period away.

No further hearing is necessary on this late-filed wrinkle, as the outcome of a hearing does not change the analysis of the court that the required thirty-day delay of *Ballot Measure 114* does not meet the imminency requirement of Article I, § 27. The delay of 30 days is unconstitutional. If the FBI eliminates background checks, there would be a further delay protracting the unconstitutionality the *measure*, but allowing a grace period does not solve the constitutional problems of the *measure*.

---

[11] Further, the Eastern Oregon Counties Association has misread *Ballot Measure 114*. They stated in their Amicus brief that many counties are unable to fund and/or staff the permit-to-purchase program so citizens will have to travel great distance to other counties to get a permit. The citizen would not be allowed to do so, as they must apply with a permit agent in the "jurisdiction over the residence of the person".

2023 Ore. Cir. LEXIS 3887, *33

to go through judicial review, without any other reason than the state cannot meet the requirements of the law, is unduly burdensome on the right to bear arms as it requires all Oregonians to prove they are safe to possess a firearm, flipping the current protections of the right to bear to arms on its head. *Supra.* It is worth noting that getting a permit-to-purchase does not create "any right of the permit holder to receive a firearm." ***Ballot Measure 114***, section 4(6)(a).

During the 30-day delay, along with a subsequent required judicial review if the FBI decides it will not conduct a background check effectively eliminating the grace period, the permit-to-purchase scheme facially prevents the applicant from defending themselves or "for the defense of community as a whole", the guaranteed right under Article I, § 27. Hirsch, 338 Or. at 633.

D. Permit-to-purchase policy is unreasonable and unduly burdensome on the right to bear arms.

The court finds Sections 1 through 11 of ***Ballot Measure 114*** are facially unconstitutional under Christian analysis as follows:

First, the Oregon Constitution prevents the **[*34]** legislature from infringing on citizens' rights to bear arms in self-defense and the 30-day delay in obtaining a firearm through the permitting process does infringe on citizens ability to protect themselves from an imminent threat of harm.

Second, the term "arms" includes firearms and certain hand carried weapons used for self-defense in 1857. Sections 1 through 11 effect all firearm purchases by imposing restraints on the ability to precure nearly all legal arms used for self-defense.

Third, the legislative restraint is valid and reasonable if it restrains dangerous practices by regulating the carrying and use of a firearm. ***Ballot Measure 114*** creates a barrier to all firearm purchases by assuming the very act of owning firearm is a dangerous practice. The defendants failed to provide any convincing evidence of a threat to public safety requiring a permitting process. The defendants did not link the harms of suicide and homicide to the immediate sale of firearms failing to demonstrate that a 30-day delay would change those tragic outcomes. Even if they had, they did not provide sufficient evidence to find these harms require a complete restraint on firearm purchases for at least

30 **[*35]** days.

Fourth, the "carry or use" exercise of policing powers is only allowed for reasonable restriction on ownership of weapons that promote public safety. The court finds no evidence in the record that public safety is promoted by the permit-to-purchase policy. The defendant showed there is a harm from gun violence in terms of injuries and deaths but provided no evidence the program would help reduce those harms. The court finds the number of deaths from homicides and suicides weighed against the right to self-defense with a firearm weigh against the permit-to-purchase policy. The court finds from the evidence that Oregon has a relatively low rate of firearms deaths compared to gun ownership. 38.3% of citizens in Oregon own firearms. The defendants want the court to assume there must be value in the program based upon a preamble and voters' guide. The court finds the preamble and voters' guide were designed to persuade the voter to approve the ***measure***. The defendants endeavored to prove the preamble and voters' guide statements factually true, and to prove, if true, those statements justified the burden placed on firearm possession by the ***measure***. The court finds that the defendants **[*36]** did not meet that burden. As a result, the court will not give weight to either the preamble or the voters' guide as a result. *ORS 174.020(1)(b)* ("A court may limit its consideration of legislative history to the information that the parties provide to the court. A court shall give the weight to the legislative history that the court considers to be appropriate").

Fifth, the reasonable restrictions cannot unduly frustrate the right to bear arms. The court reiterates its finding that the significant delay imposed by ***Ballot Measure 114***, the enactment of a "rational basis" policy on a right that requires the deference of intermediate scrutiny, the inability of the defendants to institute the policy as written with no guaranteed FBI background checks and failing to demonstrate the ***Ballot Measure 114*** permit-to-purchase policy promotes public safety, show an unduly frustration ot the right to bear arms.

## V. ***Ballot Measure 114*** Large Capacity Magazine Ban is Facially Unconstitutional

"Our purpose is not to freeze the meaning of the state constitution to the time of its adoption, but is 'to instead to identify, in light of the meaning understood by the framers, relevant underlying principles that may inform our **[*37]** application of the constitutional text to modern

---

***Ballot Measure 114*** Section 4(1)(a).

circumstance'" *Couey v. Atkins, 357 Or. 460, 490 (2015)* quoting *State v. Davis, 350 Or. 440, 446 (2011)*. In terms of firearms, the courts are directed to seek to "'apply faithfully the principles embodied in the Oregon Constitution to modern circumstances as those circumstances arise." *State v. Hirsch, 338 Or. 622, 631* overruled on separate grounds by *State v. Christian, ibid.*

Magazines, along with the rest of a firearm's components, are protected arms under Article I, § 27. There is no historical basis for limiting the size and capacity of firearms, including magazines.

The court finds that a magazine is a necessary component of a firearm under Oregon law. *ORS 166.210(4)* defines "Firearm" to mean "a weapon, by whatever name known, which is designed to expel a projectile by the action of powder". The projectile and the powder are contained within the magazine in the form of ammunition. *ORS 166.210(5)* defines "Handgun" to mean "any pistol or revolver using a fixed cartridge containing a propellant charge, primer and projectile, and designed to be aimed or fired otherwise than from the shoulder." The definition is a classification of a firearm and defines a pistol or a "revolver using a fixed cartridge", which assumes the pistol has a detachable cartridge, or magazine, to function as a firearm. **[*38]** The firearm, as testified to during trial by Mr. Springer, consists of the firing mechanism and magazine containing the projectile and powder. The statutes support that functional reality through the codification of the above definitions. Without a magazine, the remaining components of a gun are not a firearm. *State v. Boyce, 61 Or. App. 662, 665 (1983)* ("In a public place, [a citizen] may possess both a firearm and ammunition, so long as the ammunition is not in the chamber, cylinder, clip or magazine."). The court in *Boyce* found that the ammunition is separate from the magazine, not that the magazine is separate from the firearm. See Defendant's Trial Memorandum, pg. 9.

As stated above, the conservative pioneers who voted for the Oregon Constitution in 1857 wanted the best shotguns, rifles, handguns, including revolvers and pepperboxes, and muskets they could afford. There was a deep desire to have repeating features. *Supra.* Arms consisted of those weapons used by settlers for both personal and military defense excepting cannons and other heavy ordnances not kept by militiamen or private citizens. Hirsch at 641 citing *State v. Kessler, 289 Or. 359, 368 (1980)*. The Constitutional delegates and voters of 1857 would be impressed by the advancement

in today's firearms technology, but **[*39]** they would understand our current stock of firearms as direct descendants of those they possessed, including multi-shot and repeater technologies.

As the Oregon Supreme Court concluded regarding weapons development at the founding of the state:

"The only difference is the presence of the spring-operated mechanism that opens the knife. We are unconvinced by the state's argument that the switchblade is so 'substantially different from its historical antecedent' (the jackknife) that it could not have been within the contemplation of the constitutional drafters. They must have been aware that technological changes were occurring in weaponry as in tools generally. The format and efficiency of weaponry was proceeding apace. This was the period of development of the Gatling gun, breach loading rifles, metallic cartridges and repeating rifles. The addition of a spring to open the blade of a jackknife is hardly a more astonishing innovation than those just mentioned."

*State v. Delgado, 298 Or. 395, 403 (1984)*.

As described above, the court finds that firearm technology at the founding of the state is the foundation for the current firearm technology[12] Large capacity

---

[12] "In State v. Kessler, 289 Or. at 369, the court held: 'Firearms and other hand-carried weapons remained the weapons of personal defense, but the arrival of steam power, mechanization, and chemical discoveries completely changed the weapons of military warfare. The development of powerful explosives in the mid-nineteenth century, combined with the development of mass-produced metal parts, made possible the automatic weapons, explosive, and chemicals of modern warfare. P. Cleator, *Weapons of War* 153-177 (1967).'" *Oregon State Shooting Ass'n v. Multnomah Cnty., 122 Or. App. 540, 545-46 (1993)*. This same evidence was evinced during the trial. Smokeless powder development in the 1880s was the key to well-functioning semiautomatic weapons, but the drive for larger capacity magazines was well under way at statehood. The record in this case shows that the Volcanic was one of, but certainly not the only, repeating rifles of the 1850s. *Id. at 550* (The parties presented a battle of the experts to prove that the weapons were or were not of the "sort" used in mid-nineteenth century). The Oregon State Shooting Association case had a very different record of the historical facts than in this case. The court of appeals relied on the historical record made in that case to make its determination on twenty-five firearms listed. The record in this case leads the court to very different factual conclusions. For example, the finding by the court of appeals was that the "first commercially

2023 Ore. Cir. LEXIS 3887, *39

magazines predated the automation and mass production of metals of the **[\*40]** industrial revolution, well under way at statehood, though they were substantially advanced with the onset of the industrial revolution. Large capacity magazines existed in the early 1800s. The technology was sought as early as the 1500s. Breach-loaded rifles were prized. Colt revolvers and pepperboxes were types of firearms with large magazines used for self-defense at statehood and would have been understood to be firearms for militia usage and self-defense. See Christian, 354 Or. at 30 quoting State v. Kessler, 289 Or. at 368 (1980).[13],[14]

A. Statutory Analysis of Section 11, the Large Capacity Magazine Ban

---

available successful lever action repeating rifle" appeared in 1862. *Id. at 549*. On this record, Professor Delay testified it appeared in 1860. Ms. Hlebinsky testified to several other models of multi-shot firearms pre-statehood including, but not limited to, the Lorenzoni and Girandoni rifles, not found in that record. All of the historians testified to pepperboxes and Colt revolvers had multi-shot technology. The patent for Colt ended in 1857 leading to a proliferation of multi-shot firearms. The historical record showed the proliferation of multi-shot firearms at the time of statehood, and that the technology was not new to the voters in 1857. As Professor Delay stated there was a significant "allure of multi-shot technology". Further, the notion of "wide use" is extremely hard for the court weigh, because as the experts in this case testified sales records were not kept or archived in a way at the time of statehood. The historical and archeological record does confirm that multi-shot and repeating technology was available and commonly used in 1859, not in rifles per se, but certainly in handguns. The parsing between handguns, shotguns, rifles, and muskets does not seem to serve any legal purpose on the question of firearm development. The gunsmiths at the time were actively trying to apply the multi-shot, repeating technology to all forms of firearms of that era, and succeeding before the advent of the Civil War two years after statehood.

[13] Kessler found that the term "arms" in Article I, § 27 are weapons used by militia and for self-defense maintained by the individual. Kessler at 370. Kessler also announced that "regulation is valid if the aim of public safety does not frustrate the guarantees of the state constitution." Id.

[14] The Defendants have not shown that large capacity magazines are "advanced weapons of modern warfare", Kessler at 369. The historical record diverges from that conclusion as the technology existed prior to statehood. While the technology for a specific number of ten-round magazines was very limited at statehood, that is not the legal analysis. The legal analysis is was the technology for multi-shot magazines in existence and a focus of technology advancement at statehood.

The court will highlight areas causing the facial unconstitutionality of the statute. The statutory issues are not based upon overbreadth, but on the only clear application of the law if allowed to go into effect.

Defendants argue that ***Ballot Measure 114***, Section 11 has language borrowed from other states pointing to the language from the federal assault rifle ban of 1994 to 2004, New York, Massachusetts, and Rhode Island.[15]

"When one state borrows a statute from another state, the interpretation of the borrowed statute by the courts of the earlier enacting state ordinarily is persuasive." *State ex rel. W. Seed Prod. Corp. v. Campbell, 250 Or.*

---

[15] Former *18 U.S.C. § 921(31)* (emphasis added): "The term 'large capacity ammunition feeding device' (A) means a magazine, belt, drum, feed strip, or similar device manufactured after the date of enactment of the Violent Crime Control and Law Enforcement Act of 1994 that has a capacity of, or that can be **readily restored or converted to accept, more than 10 rounds of ammunition**; but (B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

*N.Y. Penal Law § 265.00(23)* (emphasis added): "'Large capacity ammunition feeding device' means a magazine, belt, drum, feed strip, or similar device, that has a capacity of, or that can be **readily restored or converted to accept, more than ten rounds of ammunition**; provided, however, that such term does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition or a feeding device that is a curio or relic..."

*Mass. Gen. Laws Ann. Ch. 140, § 121* (emphasis added): "'Large capacity feeding device,' (i) a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be **readily converted [\*41] to accept, more than ten rounds of ammunition or more than five shotgun shells**; or (ii) a large capacity ammunition feeding device as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(31) as appearing in such section on September 13, 1994. The term "large capacity feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber ammunition."

*R.I. Gen. Laws § 11-47.1-2*, (emphasis added): "'Large capacity feeding device' means a magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device which is capable of holding, or can **readily be extended to hold, more than ten (10) rounds of ammunition** to be fed continuously and directly therefrom into a semi-automatic firearm. The term shall not include an attached tubular device which is capable of holding only .22 caliber rimfire ammunition."

*262, 270-71 (1968)*. The defendants argue the court should find that the same implementation strategies in those states would occur under **_Ballot Measure 114_**. The main gist of the testimony of defense witness James Yurgealitis was that in each of the states listed, there were magazines purporting to limit the magazines to ten rounds that could be purchased that did not have fixed plates or that could be easily modifiable with tools to hold more than ten rounds. Defendants want to court to draw the inference that the plaintiff's testimony from Scott Springer demonstrating that in manner of seconds those types of magazines can be modified to carry significantly more rounds with a $15.00 bit from Home Depot was not relevant because it took a tool to modify the magazine to defeat the manufacture limitations.[16]

However, the court finds the language of **_Ballot Measure 114_** Section 11 deviates substantially **[*42]** from the language of the statutes cited in footnote 15. The pertinent definitions are:

> **_Ballot Measure 114_**, SECTION 11 (1) As used in this section:
> (b) "Detachable magazine" means an ammunition feeding device that can be loaded or unloaded while detached from a firearm and readily inserted in a firearm;
> (c) "Fixed magazine" means an ammunition feeding device contained in or permanently attached to a firearm in such a manner that the device cannot be removed without disassembly of the firearm action;
> (d) "Large-capacity magazine" means a fixed or detachable magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any

manner, or a kit with such parts, that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload, but does not include any of the following:
(A) An ammunition feeding device that has been permanently altered so that it is not capable, now or in the future, of accepting more than 10 rounds of ammunition;

(B) An attached tubular device designed to accept, and capable **[*43]** of operating only with 0.22 caliber rimfire ammunition; or
(C) A tubular ammunition feeding device that is contained in a lever-action firearm.

The distinctions are clear. The modifications restrictions of **_Ballot Measure 114_** of the "overall capacity of, or that can be readily restored, changed, or converted" is not the same as "readily converted to accept", "capable of holding, or can readily be extended to hold", "readily restored or converted to accept" nor "readily restored or converted to accept" in the other statutes. The word "changed" does not exist in any of the other states' statutory definitions and, pursuant to statutory construction, changed must have a different meaning than converted. The court finds Mr. Springer showed demonstrably that the ten-round limited magazines on the market can be readily changed in under a minute to hold substantially more ammunition.

Further the court finds that the term "readily capable" has been defined by the caselaw in Oregon when applied to the Felon in Possession of a Firearm statute under *ORS 166.250(1)(c)(C)*. See Gordan at 361. The legal standard is that a pistol which lacks a firing mechanism that could be replaced in three to four minutes by a gunsmith at a cost of **[*44]** $6 as "readily capable of use as a weapon". *State v. Gortmaker, 60 Or. App. 723 (2008)* cited by *State v. Briney, 345 Or. 505 (2008)*. This same concept analytically links with the idea of changing a magazines capacity to be readily capable of holding ammunition making Mr. Springer's testimony particularly relevant. Prior holdings by Oregon courts are more persuasive than an adopted language analysis in determining what a phrase means.

The court finds that these two cases define "readily capable", and Mr. Springer's testimony demonstrated that almost all detachable and most fixed magazines are readily capable of holding more than ten rounds of ammunition, thus meaning nearly all firearms are

---

[16] Mr. Springer in Ex. 19 modified a ten-round limited magazine to carry 17 rounds in seconds. In Ex. 20, he demonstrated a quick removal of a retaining plate and spacer designed to limit capacity on a magazine, modifying the magazine to hold substantially more rounds. In Ex. 21, he removed a ten-round limitation dimple in a magazine in 35 seconds allowing for a 17-round capacity. All with those alterations were done $15.00 drill bit.

He also testified that the plastic ten-round limitation in Glock magazines can be removed by boiling the magazine in water for 30 seconds which allows for the removal of the plastic limiter thus increasing capacity to 17 rounds. His testimony was creditable as it provides the court necessary evidence to conclude as it does regarding the ready changeability of most, if not all, magazines with purported limitations on magazine capacities.

banned under ***Ballot Measure 114***.

Additionally, none of the other statutes contain the language "including any such device joined or coupled with another in any manner". This language was demonstrated to be important in Mr. Springer's testimony because most semi-automatic pistols can be joined together at the magazines to increase the rounds capable of being fired from ten to twenty. The court finds the restraint on coupling is a far more restrictive concept than the other statutes proffered since any detachable baseplate would allow for two ten-round magazines to be put together **[\*45]** or coupled. Since nearly all magazines have removable baseplates, they and the firearms they can be used with are banned under ***Ballot Measure 114***.

Section 11 contains language that possessors of large capacity magazines are required to permanently alter an ammunition feeding device to be not capable, now or in the future, of accepting more than ten rounds of ammunition. Also, firearms dealers must dispose of their stock of large capacity magazines unless they can "permanently alters any large-capacity magazine in the gun dealer's inventory or custody so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds of ammunition or permanently alter the magazine so it is no longer a (sic)"[17] ***Ballot Measure 114*** Section 11(2)(a)(C). This language is not contained in any offered statutory language from other states. The court finds the concept of permanently altering large capacity magazines was demonstrated to be impossible based upon the testimonies of Mr. Springer and other plaintiffs' witnesses and Mr. Yurgealitis, the defendants' witness. There is no practical way to permanently alter large capacity magazines. All alterations can be quickly reversed well within six minutes. See Gortmaker **[\*46]** , id.

The proffered statutes are not red apples to red apples comparisons to ***Ballot Measure 114***, section 11. Since they are not identical copies, the court does not interpret

them as having the same legislative effect. *State v. Eggers, 326 Or. App. 337, 348-349 (2023)*. The court is directed that "when the Oregon version of a statute contains different wording from the uniform act, we presume that the difference is significant. *State ex rel Juv. Dept. v. Ashley, 312 Or. 169, 179 (1991)* ('We generally give meaning to the difference between an Oregon statute and the statute or model code from which it was borrowed.')". *State v. Hubbell, 371 Or. 340, 355 (2023)*.

The court finds most firearms, except those specifically excluded by the definition in ***Ballot Measure 114***, are banned under by ***Ballot Measure 114***, because there is no effective way of limiting magazines to ten rounds or less by permanently alter them and the magazines are readily capable of alteration or changed to carry more than ten rounds within seconds.

These findings include fixed magazines on shotguns, a clear weapon of choice during the pre-statehood period for self-defense. The vast majority, if not all, standard shotguns sold on the market today have bolts that are removeable and replaceable with tubular magazine extensions. This capacity cannot be permanently altered because the bolts are **[\*47]** necessary to disassemble the weapon for cleaning. Additionally, the evidence through Mr. Springer's testimony showed the advent of mini shells allows fixed magazines of shotguns to hold more than ten rounds when they would have held less than ten rounds with regular sized shells. The language of Section 11 is an equivalent ban of shotguns because there is no practical way to permanently alter the fixed magazine to not accept ten rounds of mini shells. The language does not adjust for modifications in ammunition allowing a firearm to hold more ammunition.

The court finds almost all rifles with fixed magazines can, like shotguns, have magazine extensions added readily to increase the capacity of the rifle well over ten rounds, because of the same cleaning necessity and easy adaptability as the shotgun.

The court finds that all semi-automatic handguns and rifles, the most popular forms of firearms for self-defense in country today, are banned under ***Ballot Measure 114***, Section 11. The action, skeleton of the firearm, needs a magazine to be a gun. See *State v. Goltz, 169 Or. App. 619 (2000)*. Each gun has a fixed magazine under the definition section because the gun has ammunition feeding device that lifts one bullet into the chamber **[\*48]** at a time. There is no way to permanently alter that function to not accept magazines

---

[17] The defendants want the court to ignore this typographical error or add language to correct. This the court cannot do. "If the legislature has chosen language that creates unexpected and unintended results, the legislature can amend the statute to express its actual intent. It is not the function of a court to insert language that should have been added and ignore language that should have been omitted. *ORS 174.010*." *Cole v. Farmers Ins. Co., 108 Or. App. 277, 280 (1991)* cited by *Wright v. State Farm Mut. Auto. Ins. Co., 223 Or. App. 357, 367 (2008)*.

containing over ten rounds, and they are readily capable of accepting magazines of over ten rounds. According to the testimony, each of magazines adapted by manufactures currently to hold only ten rounds are actually 10 + 1 rounds under the definitions of **Ballot Measure 114**, meaning they would be banned. This is because the semi-automatic firearms can take detachable magazines holds ten rounds and the fixed magazine holds one round. The court finds that if the firearm has a functionality to allow a detachable magazine to be attached to the fixed magazine, it is illegal under **Ballot Measure 114**, Section 11 (1).

The court finds most detachable magazines sold on the market have removable baseplates primarily for the ability to clean the magazines to extend their useability. The other state statutes do not prevent those magazines from being sold on the market. **Ballot Measure 114** does. Ben Callaway, Mr. Springer and Mr. Yurgealitis testified that removeable baseplate magazines on the market are all modifiable to hold more than ten rounds because of the baseplates allows for extensions to added, other magazines to be coupled, and can readily **[*49]** be changed to accept more than ten rounds. There is no functional application that will permanently alter those magazines which cannot be readily changed as described, in part, in footnote 16.

Under *Oregon State Shooting Ass'n v. Multnomah Cnty., 122 Or. App. 540, 548-49 (1993)*, the Court of Appeals rejected the notion of modification to firearms to make them legal after the fact:

"While it is argued by the defendants the firearms can be modified to meet the requirements of...the law does not support the proposition. The dissent concludes that, because the 'semi-automatic firearms may be illegally modified to become automatic weapons * * * is not a reason to deprive them of section 27 protection under the tests adopted by the Supreme Court.' *122 Or. App. at 556, 858 P.2d at 1325*. That is backwards. The weapons have been modified, ostensibly so that they will not be classified as military weapons, which, under the Supreme Court's tests are not entitled to the constitutional protection. Those 'modifications' cannot be used to bootstrap these weapons into personal defense weapons so that they come within the constitutional protection."

The court finds the statutorily distinct language of **Ballot Measure 114**, Section 11 regarding "change" and "permanently alter" unduly burdens the right to bear arms under Article I, § 27. The court **[*50]** concludes the definition of "large capacity magazine" with the definitions of "fixed" and "detachable" magazines effectively bans most of firearms currently within the possession of Oregon citizens and limits the market to only those firearms excepted from the ban under Section 11.[18] The court finds that the large capacity

---

[18] The allowed magazines are contained in **Ballot Measure 114** Section 11(1)(d)

(A) An ammunition feeding device that has been permanently altered so that it is not capable, now or in the future, of accepting more than 10 rounds of ammunition;

(B) An attached tubular device designed to accept, and capable of operating only with 0.22 caliber rimfire ammunition; or

(C) A tubular ammunition feeding device that is contained in a lever-action firearm.

As shown above, the language "permanently altered so that it not capable, now or in the future" is not factually possible under any circumstance. Subsection (C) deviates from the magazine language of detached or fixed creating legal uncertainty as to what can be possessed, but seemingly to freeze firearms at the Winchester Henry Rifle stage of 1860.

The defendants argued, and presented evidence, suggesting that semi-automatic technology is not constitutionally protected based upon the smokeless powder, detachable magazines, and automation occurring after statehood. They argue, in essence, that the state could seize the most popular and effective weapons of self-defense based upon a historical record coupled with the law as they read it as excluding firearm automation. Section 11(1)(d) supports the finding by attempting to freeze out automation through exceptions as to what is allowed under **Ballot Measure 114**. Applying the logic of the defendants, any firearm that uses smokeless powder, detachable magazines or automation within a firearm loading mechanism would not be protected under the Oregon Constitution. The defendants would freeze the constitutionally protected firearms to the time of statehood, or put another way, allowing only for black powder antiques or replicas thereof.

However, the court finds that firearms development has continued in linear way since 1830 and semi-automation is another phase of repeater technology, smokeless powder the next phase of black powder, and detachable magazines as the next phase of fixed magazines. Each are successor technologies built on their ancestor technologies. "The appropriate inquiry...is whether a kind of weapon, as modified by its modern design and function, is of the sort commonly used by individuals for personal defense during either the revolutionary and post-revolutionary era, or in 1859 when Oregon's constitution was adopted." State v. Delgado, 298 Or.

2023 Ore. Cir. LEXIS 3887, *50

magazine ban effectively bans all firearm magazines fixed or attached which is unconstitutional under any application of said law. Christian at 35-36.

B. The court finds the large capacity magazine ban does not enhance public safety to a degree necessary to burden the right to bear arms.

Limitations on the types of weapons usable for self-defense are normally an undue burden on the Oregon citizens. Christian at 40.

The court heard from two sworn officers who were elected Sheriffs in their counties. Both Harney County Sheriff Dan Jenkins and Union County Sheriff Cody Bowen testified that for their own protection and that of their deputies, they issue large capacity magazines. Sheriff Bowen issues Smith and Wesson 9MM firearms with a magazine capacity of 17 + 1. Seventeen rounds in the detachable magazine and one round in the fixed magazine. Additionally, the deputies are issued two additional 17-round magazines. **[*51]** Sheriff Jenkins, who provides law enforcement protection for 10,000 square miles with six sworn officers, where it can take an hour and half to respond to an emergency, issues Glock model 22, 40-caliber pistols with 15 + 1 and two additional detachable magazines of 15 rounds. He also issued AR 15, 223' caliber with 25 to 30 capacity magazines with a couple of ten + 1 magazines.

Defendant Cody Codding, superintendent of the Oregon State Police, testified that the Oregon State Police Troopers are issued Smith and Wesson 9MM firearms with a magazine capacity of 17 + 1. Additionally, OSP issues two additional 17 round magazines and duty weapons consisting of shotguns and Smith and Wesson AR 15 rifles with multiple 20 and 30 round magazines.

Most of the deputies and troopers have their weapons with them when they are off-duty and have their vehicles and weapons with them at their home to improve response time to emergencies. Those weapon possessions are illegal under **_Ballot Measure 114_** when the officers are off-duty.

Section 11(4)(c) states there is an exemption from enforcement of the large capacity magazine restriction for "[a]ny government officer, agent or employee, member of the Armed Forces of the United **[*52]** States or peace officer, as that term is defined in _ORS 133.005_, that is authorized to acquire, possess or use a large-capacity magazine provided that any acquisition,

possession or use is related directly to activities within the scope of that person's official duties."

The court finds police officers would not be able to possess their duty weapons when at home because they would not be acting within the scope of their official duties. Sheriffs Bowen and Jenkins testified that they maintain the same magazines they issue to their deputies for their own personal protection when they are not on duty, because they face threats to their safety at home. Further, deputies are not always on call and within the scope of their official duties due to labor laws requiring that they be released from work obligations at the end of shifts. However, if called out to an emergent situation, they need to leave from their home to the scene. Stopping at the Sheriff's office to obtain their weapons creates substantial delays in response times threatening to the safety of caller requesting help. Both were very clear they are providing law enforcement protections for vast geographic spaces and such a delay only compounds **[*53]** the significant response delay the residents already face in being protected by law enforcement when threatened with harm.

The court agrees with the National Police Association Amicus Curiae filed on January 31, 2023, at page 8:

> "Because police officers are defending themselves against the same criminals as citizens, their experience is highly relevant to the appropriate scope of self-defense. Over the years, police departments across the nation have abandoned service revolvers in favor of modern semi-automatic weapons with larger magazines. This is true even though police are often working together as a group, with even less need for higher capacity magazines than individual citizens attempting to defend themselves."

The testimony of Defendant Codding, Sheriffs Jenkins and Bowen convince the court to find **_Ballot Measure 114_**, Section 11 has a negative public safety consequence on policing by increasing a safety risk to the public and the polices' own ability to protect themselves from emergent harm.

Further, citizens use large capacity magazine firearms to defend themselves.

Defense witness, James Yurgealitis, maintains a high caliber handgun with a nine-round magazine for his self-defense **[*54]** because he does not have others sleeping in other rooms in the house, so use of a high caliber round is not a concern if a high caliber bullet pierce walls because there is no risk of killing an

2023 Ore. Cir. LEXIS 3887, *54

innocent on the other side of that wall. He has decades of training that allow him to use those weapons effectively. Nine rounds for a highly trained former law enforcement officer, with a heavy and dangerous caliber of round, only enhances the argument that less trained citizens need more rounds to make up for the deficits in stopping power of an aggressor with a lower caliber round firearm reducing the risk to innocents.

Both plaintiffs, Joseph Arnold, 52, and Cliff Asmussen, 76, own large capacity magazines for their own self-defense. Mr. Arnold is an Oregon state employee managing the Harney County state highway department. Mr. Asmussen is a retired logger and car dealer. They are each concealed handgun licensees with appropriate training as required by ORS 166.291, they own many firearms, have had guns in their lives since their early childhood, have been trained at a young age to properly handle and safely use firearms, and have purchased hundreds of firearms apiece. Each enjoy the use and possession **[*55]** of large capacity magazines for personal protection. The notion of being charged with a crime of possessing a large capacity magazine offends Mr. Asmussen since he does not think he has done something wrong that separates him from other "normal citizens". Mr. Arnold takes his large capacity magazine firearms with him when he is in public for personal protection. Neither have fired the firearms in self-defense, but they feel protected and are prepared to protect themselves and their community if necessary.

Sheriff Bowen described an incident when citizens brought their weapons to back up deputies in a high intensity situation with a criminal. Their backup was essential to the safety of the community. As he put it: "I depend on an armed citizenry" for community protection.

These witnesses each demonstrate the idea that self-defense is first about having the ability to defend oneself and being able to burnish a weapon when necessary. The defendants' evidence from Mr. Jorge Baez, the statistician, who reviewed a very limited sample size within the National Rifle Association ("NRA") data base, supported this conclusion when he testified that most acts of self-defense with a firearm involve **[*56]** no shooting at all. The display of force terminates the aggressor's behavior. Mr. Baez also concluded that the average number of 2.2 rounds are fired in acts of self-defense. He found that over ten rounds fired in acts of self-defense occurred in the database for .3% of all incidents. He testified there is no way to gauge how many shootings were prevented by the show of force, included shows of force with large capacity magazine firearms.

The number of .3% of all acts of self-defense using ten rounds or more is significant statistically when weighed against the statistical significance of the actual impact of mass shootings in the United States.In terms of overall types of events occurring in society causing death and causalities, mass shootings rank very low in frequency. However, as Mr. Joe Paterno's testimony highlighted, these terrible mass shooting events create extremely emotional moments in our society that are highly sensationalized by the media. As Mr. Paterno pointed out, after the Uvalde School Shooting horror, the number of people who signed up to help with the _**Ballot Measure 114**_ campaign spiked. The mass shooting events have a significant impact on the psyche of **[*57]** America when they happen. People, also, tend to believe these events are prolific and happening all the time with massive levels of death and injury. The court finds this belief is not validated by the evidence. Mass shooting events are very rare.

The advocates for _**Ballot Measure 114**_ argue in the preamble and in the voters' guide that a restraint on the amount of ammunition as the key to preventing mass shootings. Nothing in the preamble, the voters' guide nor the defendants' evidence provide a rationale for why the rounds should be limited to ten as opposed to any other arbitrary number that could have been picked nor did they show the limitation of ten rounds has any demonstrable effect on negative outcomes to mass shooting events.

The proponents claim the delay in reloading can help with individuals getting away from the shooter. Ignoring that the larger the magazine, the higher chance of it jamming according to the testimony, the court finds the time to reload a ten-round magazine into a semi-automatic firearm is negligible at best.

Derik LaBlanc, the first witness for the plaintiffs and a firearms instructor, stated he could reload his firearm in 2.10 seconds and an elderly individual **[*58]** with proper training can reload in four to five seconds. Shane Otley, a Harney County Rancher, relies more heavily on large capacity magazines as he gets older and his reaction time and proficiency declines for reloading.

Mr. Springer, a competitive shooter, can reload in .7 of a second.

Sheriff Bowen and Sheriff Jenkins can reload in two

seconds. Mr. Yurgealitis can reload in one to two seconds. He testified that an untrained individual could reload in five to six seconds.

Exhibits 174 through 184 where different examples of ten-round magazines purchased by Mr. Yurgealitis. The court could easily carry every one of those exhibits, at the same time, in a single jacket pocket for easy retrieval. Many more of those magazines could be carried in other pockets and storage items attached to a normally sized adult.

Mr. Baez testified that there was an increase in casualties when large capacity magazines were used. The increase was ten deaths versus six deaths without large capacity magazine use and 16 injuries versus three. However, out of the 179 incidents he reviewed, he could not describe how many shooters used large capacity magazines or not, leading him to make approximate guesses as to [*59] how often they were used. Fundamentally, there is no clarity in the literature about how often large capacity magazines were used because it was not a point of data entry until a policy maker decided it should be point of data in 2004. The court cannot find that the restriction on large capacity magazines would affect the mass shooting event outcomes with any scientific certainty as differentiated from an individual forced by statute to carry more magazines for reloading.

The court finds that ten-round magazine bans are no panacea to prevent a mass shooter based upon the evidence in this case. A motivated mass shooter could carry 100 rounds in ten separate magazines and readily release a detachable magazine from a firearm and reload in two seconds offering none of the supposed protection promoted in the preamble or voter's guide for **Ballot Measure 114** in banning large capacity magazines. The court can find no scientific or analytical reasoning on this record that a ten-round limitation will increase public safety in any meaningful way.

C. The Large Capacity Magazine ban is unduly burdensome

The court finds no proof offered demonstrated Large Capacity Magazine bans would reduce the number [*60] of casualities in the future. Any such conclusion would be mere speculation by the court.

The defendants attempted to assert that the Section 11 ban would have a significant impact on mass shootings, but they failed to lay a proper scientific foundation, as the Oregon Supreme Court requires:

"The function of the court is to ensure that the persuasive appeal [of scientific evidence] is legitimate. The value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert...[S]cientific assertions...should be supported by the appropriate scientific validation. This approach 'ensure[s] that expert testimony does not enjoy the persuasive appeal of science without subjecting its propositions to the verification processes of science.'"

*Jennings v. Baxter Healthcare Corporation, 331 Or. 285, 304-305 (2000)* quoting *State v. O'Key, 321 Or. 285 (1995)*.

The defendants called Dr. Michael Seigel, an epidemiologist from Tufts University, to testify to his policy conclusions. His testimony was based upon four academic studies of 179 events he considered mass shootings without any consideration of the many variables that could impact those conclusions. Defendants failed to lay a scientific process for the court to be able to follow the analysis [*61] that led to the doctor's conclusions. As a result, the testimony was not allowed. For example, there was not even an agreed upon definition in those four studies for a definition of a mass shooting. If the science cannot agree on a definition on what it is addressing, how can a court derive any conclusions from the data. The data conclusions were also derived against the backdrop of eight types of gun laws.[19] There was no attempt to extract a single policy option from the eight to identify its effect on mass shootings. The remaining concerns of the court were explained on the record.

Essentially, the defendants wanted to come to court, say this person is an expert, and have the expert assert their legal conclusions as scientific evidence without the

---

[19] In addition to Large Capacity Magazine bans, the articles considered assault weapons bans, permit-to-purchase laws, Mental health and domestic violence protections, universal background checks, may issue permits, and other violent misdemeanor laws. The conclusions in the studies only had validity when comparing the result of these statutes' sans all these statutes. Oregon has mental health and domestic violence protections, universal background checks, and other violent misdemeanor laws that restrict firearm possession and the defendants did not provide the court a delineation of how to evaluate the evidence without those laws being considered generally. In other words, the conclusions offered where not discretely on large capacity magazine bans but on an array of firearm restraints.

proper showing to the court of the scientific validation for the process or the way the process was used to come to these conclusions. The defendants failed to establish a factual, scientifically reliable record allowing Dr. Seigel's conclusions under OEC 702. See *State v. Romero, 191 Or. App. 164 (2003)* review denied *337 Or. 248 (2004)* (litigant's claim of that a scientific theory is valid is a hypothesis that requires empirical proof).

Additionally, the court did not find Dr. Seigel's testimony credible. **[*62]** The doctor, in his initial testimony, was using statistics to further the agenda of the defendants, hyper-charging the impact of firearms in Oregon. For example, comparing 2001 to 2021, firearm related homicide deaths were 47 in 2001 as compared to 146 in 2021. Dr. Seigel describes that as a 310% increase in mortality. The use of a comparison between 99 more deaths and 310% increase appears the court to be policy advocacy, not scientifically useful conclusions. While technically true, the statistical trick turning 99 into 310% was designed to enflame rather than educate. The court finds Dr. Seigel is an advocate for gun control ***measures***, who used data in a partisan manner to drive home his personal point of view rather than provide this court with a scientific way to evaluate policy decisions for their effectiveness in solving gun-related deaths. Such an analysis would have allowed the court to evaluate the policy's effectiveness on public safety against its burden on the right to bear arms, but none was offered.

Dr. Seigel's testimony offered one area of concurrence between the parties. There have been 155 mass shooting events from 1976 to 2018 The definition of mass shooting agreed **[*63]** upon academically and on the record is a shooting consisting of over four deaths and the incident was not attributable to another crime or domestic violence. The total physical harm from those mass shootings was 1078 deaths and 1694 non-fatal casualties or 25.6 deaths and 40.3 injuries on average per year from mass shootings since 1976. Only two of those mass shooting events occurred in Oregon.

The court finds the total fatal and non-fatal casualties from those 155 mass shootings occurring over the last 42 years is 2,772 casualties. The historic number of causalities from mass shooting events is staggeringly low in comparison the media's sensationalized coverage of the events.

By comparison, Harney County has a current population of 7,495 people and Oregon's population is 4,240,137 as of 2022.

Mass shooting events are tragic and often involved the most vulnerable sections of the population. However, the court finds that number of people killed and injured is statistically insignificant compared to the number of lawful gun owners. As noted, Oregon has 38.3% of citizens who own firearms and of those, 49.8% of whom are estimated to own magazines that hold over ten rounds. This means Oregon **[*64]** has 1.6 million lawful gun owners, 808,000 of whom have large capacity magazines in their possession. The court finds the large capacity magazine ban directed at 155 criminals who used firearms, sometimes with large capacity magazines, to commit heinous crimes in the last 42 years that results in 808,000 lawful citizens becoming presumed criminals with an affirmative defense, not reasonable and unduly burdensome to those citizens' Article I, § 27 right.

An affirmative defense places the burden on the accused to prove their right to possess the large capacity magazine by a preponderance of the evidence. See *Oregon State Bar Books*, Criminal Law in Oregon, section 19.1-2. Proof may consist of testimony subject to creditability determination by the fact finder. However, generally, proof is better bolstered by documentation. Mr. Springer noted in his testimony that none of the current large capacity magazine manufacturers place numbers on the magazines that can be associated with any type of registry meaning the magazines are not serialized. The court finds, presumptively, that fact alone will require a defendant, currently a lawful citizen, to give up their right against self-incrimination and testify against their interest that they had a large capacity magazine **[*65]** in their possession, but they owned it before ***Ballot Measure 114*** went into effect. If they are not believed by a fact finder, they could go to jail for up to 364 days and be fined $6,250.00.

In other words, the possession of a large capacity is presumed illegal until the accused owner of the large capacity magazine proves otherwise in a court of law after the state had established a prima facia case of guilty which survived a motion for judgment of acquittal.[20]

_____

[20] The court expressed significant concerns with the racial and socio-economic realities of this portion of the law including large impact this could have on the current indigent defense crisis and the current insufficient availability of lawyers, along with the significant personal costs to the citizen of being arrested and tried.

There are significant constitutional problems unexplored with

2023 Ore. Cir. LEXIS 3887, *65

For those, and the other reasons outlined, the large capacity magazine ban is unduly burdensome on gun rights when compared to the actual harm caused by those items as demonstrated at trial.

D. The Large Capacity Magazine ban is not authorized under Christian.

The court is mindful the impact of mass shootings. The court finds comparing that impact to the potential loss of liberty to currently lawful gun owners, this ban is unduly burdensome under Article I, § 27. The limited number of mass shootings in the country weighed against the massive criminalization of lawful firearm possession in Oregon does not allow for the burden caused the imposition of the large capacity magazine ban contained in **Ballot Measure 114**, Section 11.

The statutorily distinct **[*66]** language of **Ballot Measure 114**, Section 11 regarding "change" and "permanently alter" clearly unduly burdens the right to bear arms under Article I, § 27.

The conclusion the court made after the temporary injunction remains just as true after a full evidentiary hearing. The court cannot sustain a restraint on a constitutional right based upon a mere speculation the restriction could promote public safety. Certainly, a court cannot use a mere speculation in determining guilt in a criminal case, damages in a negligence case, future harm in a parole matter, or the many other legal matters disallowing that outcome. See _State v. Hedgpeth, 365 Or. 724, 733 (2019)_; _Smith v. Providence Health & Servs — Oregon, 361 Or. 456, 475-76 (2017)_; _Smith v. Bd. of Parole & Post-Prison Supervision, 343 Or. 410, 419 (2007)_; _Lea v. Gino's Pizza Inn, Inc., 271 Or. 682, 688 (1975)_ ("Prosser on Torts (2nd ed), s 42, p. 200 expresses ... what is required is evidence from which

---

**Ballot Measure 114** that were not properly plead.

There is real legal concern about the police being the initiators of prosecutions, a power generally left to a duly elected district attorney. Also, the police are allowed to make that prosecutorial decision based upon unchecked discretion during roadside stop related to Section 11(5)(d) where an individual can avoid prosecution if they "permanently and voluntarily relinquished the large-capacity magazine to law enforcement or to a buyback or turn-in program approved by law enforcement, prior to commencement of prosecution by arrest, citation or a formal charge". The police will decide who will be prosecuted without any restraint and for how long the citizen can have to handover the magazine before the officer initiate the prosecution by arrest or citation. The level of police authority is unprecedent under Oregon law.

reasonable men may conclude that, upon the whole, it is more likely that there was negligence than that there was not. Where the conclusion is a matter of mere speculation or conjecture, or where the probabilities are at best evenly balanced between negligence and its absence, it becomes the duty of the court to direct the jury that the burden of proof has not been sustained.").

The court finds the defendants did not present evidence demonstrating a positive public safety result for the **[*67]** large capacity ban beyond a speculative, de minimis impact on mass shooting fatalities which occur very rarely. The court further finds that the conduct of owning a large capacity magazine does not create an unreasonable and unjustified risk or harm to members of the public. Christian at 35.

Nearly all the people who own large capacity magazines are reasonable gunowners who are not identifiable risks to their community nor cast an unjustifiable risk or threat of harm to other citizens. Id.

**Ballot Measure 114**, Section 11 is facially unconstitutional which the court finds of clear and convincing evidence as demonstrated above. The court's legal and factual conclusion is that **Ballot Measure 114** does not increase public safety but diminishes it while creating nearly a million presumed misdemeanants. A result not reasonable under Article I, § 27 as defined by Oregon Supreme Court pursuant Christian.

## VI. CONCLUSION

Any finding by the court that **Ballot Measure 114**'s permit-to-purchase program or large capacity magazine ban increases public safety would be merely speculative and was unsupported by the facts at trial.

A declaratory judgment is preventive justice, designed to relieve parties of uncertainty by adjudicating their **[*68]** rights and duties before wrongs have actually been committed. _Hale v. State, 259 Or. App. 379_, review denied 354 Or. 840 (2013). This court is preventing the undue burden of **Ballot Measure 114** from being imposed on current, and prospective, gun owners who have a right to lawfully possess firearms for the purposes of defending themselves and the state against imminent threats of harm.

Pursuant to _ORS 28.010_, et. al., the court, using its equitable power, DECLARES and ADJUDGES **Ballot Measure 114** facially unconstitutional in all of its

2023 Ore. Cir. LEXIS 3887, *68

applications under *Oregon Constitution, Article I, § 27*. The court makes this declaration to settle and to afford relief from uncertainty and insecurity with respect to the right to bear arms in Oregon. *ORS 28.120. 2022* **_Ballot Measure 114_** is permanently enjoined from implementation.

The court orders costs upon a filing under *ORCP 69* that are just and equitable for the plaintiffs. *ORS 28.100*.

Plaintiffs shall prepare the judgment in conformance with this letter, the statutes and the caselaw and submit the judgment to the defendants no later than December 1, 2023 for review. Defendants shall review the judgment as to form and file any objections by December 8, 2023, at noon.

Without any objection as to form, the court will enter the judgment on December 8, 2023.

So Declared and Adjudged, **[*69]**

/s/ Robert S. Raschio

Robert S. Raschio

24th Judicial District (Grant/Harney)

Presiding Circuit Court Judge

---

**End of Document**