No. 21-16756

IN THE

# United States Court of Appeals
# for the Ninth Circuit

TODD YUKUTAKE and DAVID KIKUKAWA,

Plaintiffs-Appellees,

v.

ANNE E. LOPEZ, in her Official Capacity as the Attorney General of the State of Hawaiʻi,

Defendant-Appellant,

and

CITY AND COUNTY OF HONOLULU,

Defendant.

On Appeal from the United States District Court for the District of Hawaiʻi
Honorable J. Michael Seabright, United States District Judge
(Civil No. 1:19-cv-00578-JMS-RT)

**BRIEF OF GUN VIOLENCE PREVENTION GROUPS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT**

IAN SIMMONS
DAVID K. ROBERTS
ARJUN A. SHENOY
CATHERINE A. WARD
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
isimmons@omm.com

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Brady Center to Prevent Gun Violence, Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund), and Giffords Law Center to Prevent Gun Violence each has no parent corporation. They have no stock; hence, no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ......................................................................1

INTRODUCTION .............................................................................................2

ARGUMENT .....................................................................................................3

I.    The En Banc Court Should Resolve This Case Consistent with the Well-Established Law That Regulations on the Acquisition of Firearms Do Not Automatically Trigger Full Second Amendment Review. ..........................................................................3

II.    A Holding That Hawaiʻi's Regulations Here Are "Abusive" Would Contradict *Bruen* and Invite Baseless Challenges to Shall-Issue Licensing Regimes. ............................................7

III.    Hawaiʻi's Regulations Here Reflect Common-Sense Notions of Gun Safety and Prevent Evasion of Hawaiʻi's Other, Clearly Constitutional Firearms Regulations. .................................13

    A.    Hawaiʻi's License-Expiration Period Supports the State's Background-Check System. ...................................13

    B.    The Inspection Requirement Supports Regulations on Ghost Guns, Machine Guns, and Uniquely Dangerous Devices. .................................................................16

CONCLUSION .................................................................................24

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. James*,
   120 F.4th 941 (2d Cir. 2024) ................................................................4

*B&L Prods., Inc. v. Newsom*,
   104 F.4th 108 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1958 (2025) ........... 4, 5, 6

*Bevis v. City of Naperville*,
   85 F.4th 1175 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2491 (2024) .................23

*Bondi v. VanDerStok*,
   145 S. Ct. 857 (2025) ......................................................................... 17, 18

*Capen v. Campbell*,
   134 F.4th 660 (1st Cir. 2025) ...............................................................22

*Cocking v. State*,
   567 P.3d 348 (Nev. 2025) ....................................................................19

*Def. Distributed v. Bonta*,
   2022 WL 15524977 (C.D. Cal. 2022), *adopted*, 2022 WL 15524983 ...............19

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ......................................................................... 15, 22

*Doe v. Bonta*,
   650 F. Supp. 3d 1062 (S.D. Cal. 2023), *aff'd*, 101 F.4th 633 (9th Cir.
   2024) ..............................................................................................8, 9

*Duncan v. Bonta*,
   133 F.4th 852 (9th Cir. 2025) ........................................................ 3, 4, 12, 22

*Garland v. Cargill*,
   602 U.S. 406 (2024) ......................................................................... 16, 22

*Gazzola v. Hochul*,
   88 F.4th 186 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2659 (2024)......................5

*McRorey v. Garland*,
   99 F.4th 831 (5th Cir. 2024) ................................................................ passim

*Md. Shall Issue, Inc. v. Moore*,
   116 F.4th 211 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1049
   (2025) ................................................................................... 3, 8, 9, 10

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Montgomery v. Rosenblum*,
  2024 WL 3887248 (D. Or. 2024)..........................................................19

*Nat'l Ass'n for Gun Rts. v. Polis*,
  2024 WL 3085865 (D. Colo. 2024) ...................................................19

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  597 U.S. 1 (2022) ...................................................................... passim

*New York v. Arm or Ally, LLC*,
  718 F. Supp. 3d 310 (S.D.N.Y. 2024)...............................................19

*Oakland Tactical Supply, LLC v. Howell Twp.*,
  103 F.4th 1186 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 603 (2024) ...................5

*Palmer v. Sisolak*,
  2024 WL 4432818 (D. Nev. 2024) ...................................................19

*Rhode v. Bonta*,
  — F.4th —, 2025 WL 2080445, No. 24-542 (9th Cir. 2025)..............................7

*Rocky Mountain Gun Owners v. Polis*,
  121 F.4th 96 (10th Cir. 2024) .......................................................8, 11

*Teixeira v. County of Alameda*,
  873 F.3d 670 (9th Cir. 2017)........................................................5, 7

*United States v. Avila*,
  672 F. Supp. 3d 1137 (D. Colo. 2023)...............................................19

*United States v. Berger*,
  715 F. Supp. 3d 676 (E.D. Penn. 2024) .............................................23

*United States v. Bridges*,
  — F.4th —, 2025 WL 2250109 (6th Cir. 2025)................................................22

*United States v. Chan*,
  2024 WL 4028019 (D. Haw. 2024) ...................................................23

*United States v. Henry*,
  688 F.3d 637 (9th Cir. 2012)........................................................22

*United States v. Manney*,
  114 F.4th 1048 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1151 (2025) .................6

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Mitchell*,
    734 F. Supp. 3d 702 (N.D. Ohio 2024) .................................................................23

*United States v. Oxley*,
    2025 WL 2306238 (D. Md. 2025) .......................................................................23

*United States v. Price*,
    111 F.4th 392 (4th Cir. 2024) .............................................................................19

*United States v. Rahimi*,
    602 U.S. 680 (2024) .......................................................................... 4, 11, 12, 15

*United States v. Rare Breed Triggers, LLC*,
    690 F. Supp. 3d 51 (E.D.N.Y. 2023) .......................................................... 20, 21

*United States v. Serrano*,
    651 F. Supp. 3d 1192 (S.D. Cal. 2023) ..............................................................19

*United States v. Simien*,
    655 F. Supp. 3d 540 (W.D. Tex. 2023) ..............................................................23

*United States v. Vlha*,
    142 F.4th 1194 (9th Cir. 2025) .............................................................................3

*Yukutake v. Lopez*,
    130 F.4th 1077 (9th Cir. 2025) ................................................................... passim

**Statutes**

18 U.S.C. § 922(o) ...................................................................................................16

18 U.S.C. § 922(t) ....................................................................................................13

Haw. Rev. Stat. § 134-1 ...........................................................................................20

Haw. Rev. Stat. § 134-2 ...........................................................................................13

Haw. Rev. Stat. § 134-3 ..................................................................................... 18, 23

Haw. Rev. Stat. § 134-8 ..................................................................................... 16, 20

Haw. Rev. Stat. § 134-8.5 ............................................................................. 16, 20, 22

Mich. Comp. Laws  § 28.422 ...................................................................................13

Mich. Comp. Laws  § 28.422a ..................................................................................13

v

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

N.J. Rev. Stat. § 2C:58-3 .........................................................................14

**Rules**

27 C.F.R. § 478.102 ........................................................................... 12, 13

**Other Authorities**

Dan Hardoon, *Print and Shoot: How 3D-Printed Guns Are Spreading Online*, BBC (June 18, 2025)................................................................18

Dave Collins, *Are Forced-Reset Triggers Machine Guns? ATF and Gun Rights Advocates at Odds in Court Fights*, AP (Aug. 24, 2023).......................21

Everytown for Gun Safety, *Untraceable – The Rising Specter of Ghost Guns* (May 14, 2020)...................................................................17

Firearm Registrations in Hawaii, 2020, Department of the Attorney General, Crime Prevention & Justice Assistance Division. ...............................10

John Gramlich, *What the Data Says About Gun Deaths in the U.S.*, Pew Rsch. Ctr. (Mar. 5, 2025). ....................................................................12

Jonathan Bernstein & Mark Gray, *Five Years Since the Route 91 Massacre No One Knows a Damn Thing*, Rolling Stone (Sept. 21, 2022) ...................22

*Powerful US Gun Lobby Group Backs New Curbs on Rapid-fire Accessories*, Straits Times (Oct. 6, 2017) .............................................21

Thomas Gibbons-Neff & Aric Toler, *When a Glock Isn't a Glock: The History of the Pistol Found With Luigi Mangione*, N.Y. Times (Dec. 12, 2024).................................................................18

Tim Balk, *Trump Administration Abandons Fight to Ban Powerful Gun Accessory*, N.Y. Times (May 17, 2025)..............................................21

TK Logan & Robert Walker, *Civil Protective Order Outcomes: Violations and Perceptions of Effectiveness*, 24 J. of Interpersonal Violence 675 (2008) ...................................................................15

vi

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are three non-profit organizations dedicated to ending gun violence through education, research, and advocacy. *Amici* have a substantial interest in ensuring that the Constitution is construed properly to allow democratically elected officials to address the nation's gun violence crisis, and to safeguard the interests of everyone—whether they are gun owners or not—in living safe and secure lives in their communities. Numerous courts, including the Supreme Court, have cited the briefs of *amici* on issues involving firearms regulations and constitutional principles concerning the ownership and use of firearms.

Brady Center to Prevent Gun Violence is the nation's most longstanding non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action. Everytown for Gun Safety is the nation's largest gun violence prevention organization, with millions of supporters across all fifty states. Giffords Law Center to Prevent Gun Violence is

---

[1] *Amici curiae* submit this brief under Federal Rule of Appellate Procedure 29(b) and Circuit Rule 29-2(a). All parties consent to the filing of this brief. Undersigned counsel for *amici curiae* certify that this brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amici curiae* has contributed money for this brief.

1

a national organization, founded more than 30 years ago, dedicated to promoting and defending the laws and policies proven to reduce gun violence.

## INTRODUCTION

As part of Hawaiʻi's shall-issue licensing system for obtaining firearms, lawmakers have sensibly concluded that, if a person who clears a background check and obtains a license to buy a handgun does not complete that purchase within 30 days, the person must obtain a fresh background check and license before buying the handgun. This measure stops those who have become ineligible to possess a firearm—such as a domestic abuser against whom a restraining order has recently been issued—from buying a handgun based on a stale background check. State lawmakers have also reasonably determined that, for a firearm that is not purchased from an authorized dealer in Hawaiʻi, a person must present the firearm for inspection to law-enforcement authorities. This requirement ensures that firearms in Hawaiʻi comply with the state's regulations—including restrictions on machine guns and unserialized "ghost guns," as well as bump stocks and other devices that enable a shooter to inflict mass carnage with rapid fire.

Although neither of these objective, nondiscretionary requirements prevents a law-abiding person from acquiring a handgun, Plaintiffs insist that both measures are inconsistent with the Second Amendment. They are wrong: each regulation lies well within constitutional bounds, as confirmed by both Supreme Court and

2

Circuit precedent. A ruling for Plaintiffs risks upending well-established regulations on firearms and who may possess them, encouraging challengers to mislabel a host of reasonable and modest regulations as "abusive." Equally troubling, striking down these two regulations could impair the working of other longstanding and clearly constitutional regulations—such as limits on ghost guns and machine guns.

The en banc Court should reverse the district court ruling and uphold Hawai'i's lifesaving and constitutional regulations.

## ARGUMENT

**I. The En Banc Court Should Resolve This Case Consistent with the Well-Established Law That Regulations on the Acquisition of Firearms Do Not Automatically Trigger Full Second Amendment Review.**

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court established a two-step framework for evaluating Second Amendment challenges. At step one, courts determine "whether 'the Second Amendment's plain text' covers the regulated conduct at issue." *United States v. Vlha*, 142 F.4th 1194, 1197 (9th Cir. 2025) (quoting *Bruen*, 597 U.S. at 24). If not, "that conduct falls outside the ambit of the Second Amendment, and the government may regulate it." *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 218 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1049 (2025) (quotations omitted); *see also Duncan v. Bonta*, 133 F.4th 852, 868 (9th Cir. 2025) (en banc)

3

(upholding California's large-capacity magazine ban because "the Second Amendment's plain text does not encompass a right to possess large-capacity magazines"). Only if the "plain text" step is satisfied does the analysis proceed to step two, where the government must demonstrate that "the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024); *see Antonyuk v. James*, 120 F.4th 941, 981 (2d Cir. 2024) ("*Bruen* instructs that history is relevant only if 'the Second Amendment's plain text covers an individual's conduct[.]'" (quoting *Bruen*, 597 U.S. at 17)), *cert. denied*, 145 S. Ct. 1900 (2025).

Courts perform the first step because "the plain text of the Second Amendment directly protects one thing—the right to 'keep and bear' firearms." *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024) (quoting U.S. Const. amend. II), *cert. denied*, 145 S. Ct. 1958 (2025). Not all firearm regulations implicate that right. *See id.* at 118 (emphasizing that the "Supreme Court has made clear that the Second Amendment does not speak to all restrictions that impact firearms in any way" (quoting *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring))); *see also Duncan*, 133 F.4th at 868–69 ("The Founders limited the Second Amendment's protection to the right to bear arms, not the broader right to bear arms and accoutrements. We must respect that limitation ….").

Indeed, in *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc), this Court acknowledged the distinction between the Second Amendment's "core right to possess a firearm for self-defense" and "ancillary rights necessary to the realization of that right." *Id.* at 677. In *B&L*, this Court confirmed the continued validity of that distinction post-*Bruen* and explained that "[a]ncillary rights," such as "the right to acquire firearms," are only "protected to the extent necessary to serve [Second Amendment purposes such as lawful self-defense]; otherwise, the Second Amendment is not implicated by restraints on such rights." 104 F.4th at 118.

That reasoning makes sense: When regulations concern "implied corollary rights ... [the Second Amendment] analysis begins one step removed from the plain text." *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1196 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 603 (2024). As a result, those regulations are "presumptively lawful" and subject to *Bruen* step-two scrutiny only if they "meaningfully constrain" the "core right" to "keep and bear" arms. *See B&L*, 104 F.4th at 118–19; *Teixeira*, 873 F.3d at 677; *see also Oakland Tactical Supply*, 103 F.4th at 1196 (considering whether a zoning regulation "restrict[ed] conduct necessary to effectuate" the core Second Amendment right); *Gazzola v. Hochul*, 88 F.4th 186, 197 (2d Cir. 2023) (applying *Teixeira*'s "meaningfully constrained"

5

standard where plaintiffs challenged a law that regulated the purchase of firearms), *cert. denied*, 144 S. Ct. 2659 (2024).

Accordingly, in challenges asserting the right to acquire firearms, only after the challenger overcomes the presumptive lawfulness of the government's regulation—i.e., by sufficiently demonstrating a "meaningful constraint" on the right to keep and bear arms—does the burden shift to the government to justify the law as consistent with our historical tradition of firearm regulation. *B&L*, 104 F.4th at 118–19; *see also United States v. Manney*, 114 F.4th 1048, 1052 (9th Cir. 2024) ("Nor has the Court held that every requirement making it slightly more difficult to possess a firearm demands a full historical inquiry into its origin."), *cert. denied*, 145 S. Ct. 1151 (2025).

Here, neither the 30-day license period nor the inspection requirement regulates conduct protected by the plain text of the Second Amendment. As the panel dissent aptly noted, "[s]uch regulations place no restrictions whatsoever on the permit holder's ability to keep and possess the acquired arm in his home or elsewhere, nor [do they] preclude him from carrying the weapon in public or otherwise 'bearing' it." *Yukutake v. Lopez*, 130 F.4th 1077, 1118 (9th Cir. 2025) (Bea, J., dissenting). Therefore, before this Court proceeds to any historical inquiry under *Bruen* step two, Plaintiffs must show that the challenged regulations meaningfully constrain their core Second Amendment rights. As explained below,

because the regulations are part of Hawai'i's shall-issue regime, Plaintiffs must prove that "in practice" the regulations are "put toward abusive ends" such that they effectively "deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9. For the reasons in Part II, Plaintiffs cannot satisfy this burden.[2]

## II. A Holding That Hawai'i's Regulations Here Are "Abusive" Would Contradict *Bruen* and Invite Baseless Challenges to Shall-Issue Licensing Regimes.

In *Bruen*, the Supreme Court assured that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of" the shall-issue licensing regimes employed by the large majority of states. 597 U.S. at 38 n.9. At the same time, it declined to "rule out constitutional challenges to shall-issue regimes" if those laws were "be[ing] put toward abusive ends." *Id.* Here, the two judges in the majority of the now-vacated panel decision concluded (though on different reasoning) that Hawai'i's 30-day license period and inspection requirement were "abusive" and thus impermissible. That is incorrect. These regulations are objective, clear, and definite. They are neither abusive on their face nor abused in practice.

Hawai'i's regulations bear all the indicia of a shall-issue regime, and thus are presumptively lawful. The 30-day license period and inspection requirement

---

[2] In *Rhode v. Bonta*, — F.4th —, 2025 WL 2080445, No. 24-542 (9th Cir. 2025), the panel majority committed similar analytical missteps applying *Bruen*, *B&L*, and *Teixeira* as the now-vacated panel decision in this case. *See id.* at *19–30 (Bybee, J., dissenting). The State of California has timely sought rehearing or rehearing en banc, and the panel has directed the plaintiff to respond.

are "objective" and "definite" standards. *Bruen*, 597 U.S. at 38 n.9 (quotations omitted). A person seeking to purchase a handgun must obtain the weapon within the statutory period and, if the gun is subject to the inspection requirement, present it for inspection. *See id.*; *see also Md. Shall Issue*, 116 F.4th at 225 (licensing regime presumptively constitutional where challenged regulation "allows any law-abiding person who seeks to obtain a handgun qualification license to do so by completing the objective criteria outlined in the statute"); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 122–23 (10th Cir. 2024) (Colorado's minimum-age requirement for firearm purchases is presumptively constitutional because it "is a nondiscretionary condition or qualification on the commercial sale of arms aimed at ensuring guns are held by law-abiding, responsible persons").

As other federal appellate courts have confirmed, *Bruen*'s footnote 9 simply clarified that *Bruen* did not foreclose the possibility of constitutional challenges to shall-issue regimes that were being used abusively. *See Md. Shall Issue*, 116 F.4th at 222–23 (interpreting *Bruen*'s footnote 9 to confirm that "non-discretionary 'shall-issue' licensing laws are presumptively constitutional" unless a challenger can show the regime is being put toward "abusive" ends); *accord McRorey v. Garland*, 99 F.4th 831, 836–37 (5th Cir. 2024); *Rocky Mountain Gun Owners*, 121 F.4th at 122; *Doe v. Bonta*, 650 F. Supp. 3d 1062, 1070 (S.D. Cal. 2023), *aff'd*, 101 F.4th 633 (9th Cir. 2024).

Footnote 9 itself provided the basic test for assessing whether a shall-issue regime is "being put toward abusive ends": whether its application effectively "den[ies] ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9; *see also Md. Shall Issue*, 116 F.4th at 223 (challenger can rebut presumptive constitutionality of shall-issue regime only if the regulation "effectively den[ies] the right to keep and bear arms" (quotations omitted)); *accord McRorey*, 99 F.4th at 839; *Rocky Mountain Gun Owners*, 121 F.4th at 122; *see also Doe*, 650 F. Supp. 3d at 1069–70 ("there is a difference between prohibiting a right and regulating the right; so long as the regulation of the right to keep and bear arms doesn't amount to a prohibition of the right, the regulation is permissible").

Hawaiʻi's 30-day license period and inspection requirement do not effectively "deny ordinary citizens" their Second Amendment right to keep and bear arms. Far from it. These regulations do not create barriers anything like the examples called out in *Bruen*'s footnote: "lengthy wait times in processing license applications" or "exorbitant fees." 597 U.S. at 38 n.9. As to the license period, 30 days is plenty of time to complete a handgun purchase. *Cf. Yukutake*, 130 F.4th at 1118 n.10 (Bea, J., dissenting) (criticizing panel majority's conclusion that 30-day period is "very short" as "an unexplained and subjective, values-based

9

assessment").[3]  And an ordinary, law-abiding person who somehow does not

complete the purchase in the 30-day window can simply seek a new license—and

will get it, as long as no disqualifying event has happened in the interim.  Further,

even if an applicant must reapply, delay alone—particularly delay occasioned by

the applicant's own inaction—does not constitute a deprivation of the Second

Amendment right.  *Md. Shall Issue*, 116 F.4th at 226–27 (rejecting challengers'

argument that "any delay resulting from compliance" with a shall-issue regime

qualifies as "infringement"); *McRorey*, 99 F.4th at 839–40 (rejecting challengers'

argument that the Second Amendment confers a right to "immediate access to

firearms").

    The same result holds for the inspection requirement.  Because the actual

inspection is brief and not onerous—and because the inspection requirement

applies only to the subset of firearms not bought from a licensed dealer in

---

[3] As the dissent emphasized, Plaintiffs have not shown (or even argued) that "citizens in Hawaiʻi are not ordinarily able to acquire a handgun within thirty days." *Yukutake*, 130 F.4th at 1118 n.10 (Bea, J., dissenting).  Plaintiffs likewise failed to show that they personally "will not be able to acquire, possess, and carry the handguns they seek as a result of the thirty-day permit expiration period." *Id.* at 1118.  To the contrary, Plaintiffs showed only that, when the expiration period was merely 10 days, only 1.4% of applicants could not complete their purchases in that time window in 2020, with previous years showing similar figures.  1-ER-060 n.12; 2-ER-329; 2-ER-348; 2-ER-357; Firearm Registrations in Hawaii, 2020, Department of the Attorney General, Crime Prevention & Justice Assistance Division, at 1, https://ag.hawaii.gov/cpja/files/2021/03/Firearm-Registrations-in-Hawaii-2020.pdf.

Hawai'i—it too in no way effectively denies an individual the right to carry a firearm.

A holding that Hawai'i's regulations are "abusive" would encourage baseless challenges to other presumptively lawful regulations and amount to improper judicial micromanagement of legislatures. Legislatures must choose somewhere to draw a line when regulating firearms to ensure that only "law-abiding, responsible citizens" have access to weapons. *See McRorey*, 99 F.4th at 837 ("[r]ead against the backdrop provided by *Heller*, *Bruen*'s footnote 9 plainly" permits shall-issue regimes to impose restrictions that are "'designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens'" (quoting *Bruen*, 597 U.S. at 38 n.9)).

Here, there is nothing abusive about the 30-day line drawn by Hawai'i's legislature for handguns. *Cf. Rocky Mountain Gun Owners*, 121 F.4th at 123 ("It seems evident that the necessity of *some* minimum age requirement is widely accepted—after all, no one is reasonably arguing that 8-year-olds should be allowed to purchase guns." (emphasis original)). And contrary to the panel majority's view, the legislature's choice of a longer license expiration period for rifles and shotguns does not foreclose it from setting a shorter period for handguns. *See Rahimi*, 602 U.S. at 691 (admonishing lower courts for interpreting *Bruen* and

*Heller* to needlessly constrain modern legislatures, emphasizing that "[t]hese precedents were not meant to suggest a law trapped in amber").

A different view would fly in the face of the warning Justice Barrett issued in her *Rahimi* concurrence, in which she cautioned against drawing too many inferences from the absence of historical regulations. As she explained, "assum[ing] that founding-era legislatures maximally exercised their power to regulate" is "flawed" because it "adopt[s] a 'use it or lose it' view of legislative authority." 602 U.S. at 739–40. So, too, it is illogical to conclude that legislators somehow lose the ability to regulate some weapons more stringently just because they have regulated other weapons less stringently. *See Duncan*, 133 F.4th at 881.[4]

As the Supreme Court has made clear, longstanding, common-sense firearm regulations like those at issue here are presumptively constitutional. The federal government has understood the same to be true, having similarly decided that 30 days is an acceptable period for a background check to remain valid. *See* 27 C.F.R. § 478.102(c) (NICS background check to acquire any firearm type is valid for 30 days; if the person returns after 30 days to obtain the firearm, the dealer

---

[4] Hawai'i could reasonably choose a shorter timeframe for the validity of a license to purchase a handgun than for other firearms for any number of reasons, including that they are more concealable and are more frequently used in firearm-related violent crimes. *See* John Gramlich, *What the Data Says About Gun Deaths in the U.S.*, Pew Rsch. Ctr. (Mar. 5, 2025), https://www.pewresearch.org/short-reads/2025/03/05/what-the-data-says-about-gun-deaths-in-the-us/.

must initiate a new check). A holding that the statutes at issue here are "abusive" could improperly call into question other aspects of shall-issue licensing regimes that the Supreme Court has already blessed as presumptively constitutional, wrongly subjecting legislatures to judicial micromanagement. This Court should not encourage these meritless claims.

## III. Hawaiʻi's Regulations Here Reflect Common-Sense Notions of Gun Safety and Prevent Evasion of Hawaiʻi's Other, Clearly Constitutional Firearms Regulations.

The license-expiration period and the inspection requirement each reflects a common-sense effort by the Hawaiʻi legislature to curb gun violence. Further, these regulations ensure the effectiveness of other—and clearly constitutional—regulations, such as background checks and restrictions on ghost guns, machine guns, and devices that enable rapid fire.

### A. Hawaiʻi's License-Expiration Period Supports the State's Background-Check System.

Like many states, Hawaiʻi requires a background check for certain firearms purchases. *See* Haw. Rev. Stat. § 134-2(a). So, too, federal law requires background checks for many firearms transactions. *See* 18 U.S.C. § 922(t); 27 C.F.R. § 478.102. Hawaiʻi's 30-day license period is part of the state's background-check system and is codified as part of that statutory scheme. *See* Haw. Rev. Stat. § 134-2(e). Other states have also imposed similar time limits. *See* Mich. Comp. Laws §§ 28.422, 28.422a (30-day expiration period for permit to

13

purchase firearms); N.J. Rev. Stat. § 2C:58-3 (90-day expiration period for permit to purchase handgun). And the federal government has likewise set a 30-day limit on the validity of a background check. *Supra* at 12.

Temporal limitations like these promote the effective working of background-check systems. Without a meaningful time limit, purchases could be based on outdated information; an individual who initially cleared a background check may well later engage in crimes or other conduct rendering him ineligible to possess a gun. As the now-vacated panel majority conceded, Hawai'i "has a valid interest in ensuring that the background-check results are not stale." *Yukutake*, 130 F.4th at 1099. And on the other side of the ledger, this licensing period does not hinder individuals' ability to acquire a handgun. *Supra* at 9–10.

Indeed, Hawai'i had ample basis to set a 30-day period for the validity of handgun licenses. Over the course of a month, all manner of things can occur that might disqualify someone from possessing a firearm: a domestic-violence restraining order (as in *Rahimi*) or a felony charge, to name just two. And it is precisely in the immediate aftermath of disqualifying events like these—when, for example, an abuser might retaliate against an intimate partner who has just obtained a protective order, or a person indicted for a violent felony may threaten witnesses or flee—that a state may be particularly keen to preclude someone from acquiring a handgun. *See, e.g.*, TK Logan & Robert Walker, *Civil Protective*

*Order Outcomes: Violations and Perceptions of Effectiveness*, 24 J. of Interpersonal Violence 675, 675–76 (2008) (30 percent of domestic-violence survivors report being stalked in immediate aftermath of the issuance of a protective order). Neither the Second Amendment's text nor the Supreme Court's precedents deprives lawmakers of discretion in choosing how long a background check or purchase license remains valid, unless a challenger shows the regulation is "be[ing] put toward abusive ends" that "deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9. As explained, Plaintiffs cannot do so.

There can be no serious dispute that background-check systems are constitutionally permissible. As the Fifth Circuit has explained, "*Bruen* and *Heller* make clear that background checks preceding firearm sales are presumptively constitutional." *McRorey*, 99 F.4th at 836; *see Bruen*, 597 U.S. at 38 n.9 (observing that states with shall-issue regimes "often require applicants to undergo a background check or pass a firearms safety course … to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" (quotations omitted)); *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008). More recently, *Rahimi* recognized that the Second Amendment does not bar the government from keeping deadly arms out of the hands of people determined to be dangerous. *See* 602 U.S. at 698–700. That is precisely what background checks are designed to do. Yet without a meaningful time limit on the

15

validity of background checks (or on purchase licenses), background checks would be less effective. This Court should make clear that the Constitution does not forbid lawmakers from adopting regulations, like Hawai'i's license period, that do not meaningfully constrain the right to keep and bear arms.

**B.     The Inspection Requirement Supports Regulations on Ghost Guns, Machine Guns, and Uniquely Dangerous Devices.**

As the panel dissent recognized, Hawai'i's inspection requirement applies to only three categories of firearms: "(1) guns which lack serial numbers (so-called 'ghost guns'); (2) guns brought into Hawai'i from out of state; and (3) guns transferred between private persons." *Yukutake*, 130 F.4th at 1118 (Bea, J., dissenting). Inspection of these narrow categories of firearms enables the effective enforcement of Hawai'i's regulations on uniquely dangerous firearms.

Some of these regulations (like the state's prohibition on "automatic firearms," *see* Haw. Rev. Stat. § 134-8) cover weapons that are generally illegal under federal law or in other states. *See* 18 U.S.C. § 922(o) (prohibiting possession of unregistered "machineguns"). Other Hawai'i regulations apply to weapons that are not altogether prohibited federally or by some other states. *See* Haw. Rev. Stat. § 134-8, 134-8.5.[5] As the below examples attest, Hawai'i's

---

[5] For example, federal law does not ban possession of all "machineguns," *see* 18 U.S.C. § 922(o)(2), and the Supreme Court has concluded that "nonmechanical" bump stocks are not "machineguns" under federal law, *see* *Garland v. Cargill*, 602 U.S. 406 (2024).

16

regulations on these devices have in common two key attributes: first, they are well within constitutional bounds; and second, officials would be hampered in enforcing them absent the inspection requirement.

*Ghost guns*. So-called ghost guns bear no serial numbers and thus are uniquely suited to crime because they can be nearly impossible for law enforcement officials to trace to their original purchaser even if they are recovered at a crime scene. The Hawaiʻi legislature has described "a 'ghost gun' [a]s a firearm that is assembled without serial numbers or other identification markings," emphasizing that "[a] person may assemble a ghost gun from a prepackaged kit requiring only minimal expertise" and thus "bypass background checks, registration, and other legal requirements." Act 74, § 2, 2020 Haw. Sess. Laws 479, 480–81. Ghost guns can even be made relatively easily at home using a 3D printer. For these reasons, they have posed significant challenges to gun safety in the United States.[6]

Importantly, ghost guns are often made to resemble commercially popular guns, so absent physical inspection they appear virtually indistinguishable. *See Bondi v. VanDerStok*, 145 S. Ct. 857, 866–67, 872 (2025) (side-by-side photos of

---

[6] *See* Everytown for Gun Safety, *Untraceable – The Rising Specter of Ghost Guns* (May 14, 2020), https://everytownresearch.org/report/the-rising-specter-of-ghost-guns/ (describing ghost guns as a "rising specter" that is "the fastest-growing gun safety problem facing our country").

frame from Glock-variant firearm and partially complete frame from self-assembly

kit). Indeed, the gun allegedly used to kill a health insurance executive in a recent

high-profile shooting in New York City was made with a 3D printer by using a

popular design, available online, patterned after a Glock model.[7] While earlier 3D-

printed components had durability problems, material quality has improved even as

costs have decreased, and access to 3D printing and digital blueprints has

proliferated.[8]

Left unchecked, ghost guns circumvent reasonable firearm-purchase

regulations intended to keep guns out of the hands of those barred from having

them. *See VanDerStok*, 145 S. Ct. at 876 (Sotomayor, J., concurring). Thus, to

address concerns stemming from "[t]he ease with which ghost guns may be

obtained," 2020 Haw. Sess. Laws at 481, Hawaiʻi now requires anyone who builds

a ghost gun to engrave a unique registration number on the firearm and have

officials physically inspect it. Haw. Rev. Stat. § 134-3(b). Inspecting the firearm

in this manner allows law enforcement to confirm that the registration number is

---

[7] *See* Thomas Gibbons-Neff & Aric Toler, *When a Glock Isn't a Glock: The History of the Pistol Found With Luigi Mangione*, N.Y. Times (Dec. 12, 2024), https://www.nytimes.com/2024/12/12/us/unitedhealthcare-luigi-mangione-gun.html.

[8] Dan Hardoon, *Print and Shoot: How 3D-Printed Guns Are Spreading Online*, BBC (June 18, 2025), https://www.bbc.com/news/articles/cvg84rke4ejo.

permanent, legible, and consistent with all paperwork—a necessary step because offenders may use counterfeit or duplicate markings.

Courts have roundly rejected Second Amendment challenges to regulations on ghost guns, self-assembled guns, and serialization. *See, e.g.*, *New York v. Arm or Ally, LLC*, 718 F. Supp. 3d 310, 334–36 (S.D.N.Y. 2024); *Montgomery v. Rosenblum*, 2024 WL 3887248, at *4–6 (D. Or. 2024) (denying motion for temporary restraining order); *Nat'l Ass'n for Gun Rts. v. Polis*, 2024 WL 3085865 (D. Colo. 2024) (denying motion for temporary injunction); *Def. Distributed v. Bonta*, 2022 WL 15524977, at *4–5 (C.D. Cal. 2022) (tentative order denying motion for preliminary injunction), *adopted*, 2022 WL 15524983; *Cocking v. State*, 567 P.3d 348, 353–54 (Nev. 2025); *see also, e.g.*, *United States v. Price*, 111 F.4th 392, 402–08 (4th Cir. 2024) (en banc) (upholding federal prohibition on possessing firearm with obliterated serial number); *United States v. Avila*, 672 F. Supp. 3d 1137, 1143–44 (D. Colo. 2023) (same); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1210–12 (S.D. Cal. 2023) (same).[9]  But because many ghost guns are

---

[9] Litigation over a Nevada regulation on ghost guns is pending before this Court. *See Palmer v. Sisolak*, No. 22-15645.  On a limited remand "solely to develop the historical and factual record" in the wake of *Bruen*, the district court found that "[t]he regulation of ghost guns fits squarely within this rich historical tradition" of firearms regulation. *Palmer v. Sisolak*, 2024 WL 4432818, at *1, *7 (D. Nev. 2024).  The court further found that "early American lawmakers had no reason to regulate amateur firearms making because amateurs simply could not and did not make firearms."  *Id.* at *8.

virtually indistinguishable from popular commercially manufactured guns, physical inspections are an important measure to prevent unfettered proliferation of these untraceable weapons.

***Machine guns, forced reset triggers, and bump stocks***.  Hawaiʻi laws limit machine guns (or automatic weapons), along with forced reset triggers and bump stocks (both of which modify semiautomatic weapons to enable rapid fire).  *See* Haw. Rev. Stat. §§ 134-1, -8, -8.5.  Absent a physical inspection, firearms with these prohibited features can be difficult to tell apart from those without them.

Take forced reset triggers, which are replacement trigger assemblies that enable AR-15-style weapons to fire at the same rate as a military M16 rifle in full-automatic mode.  *See United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51, 65 (E.D.N.Y. 2023).  They are "drop-in" devices, meaning they replace the original trigger assembly within the weapon and are installed without visibly modifying it.  *See id.* at 64–65.  Without a physical inspection, these illegal features could easily escape detection.  And the danger of these machine-gun conversion tools is extreme.  As Professor Robert Spitzer, a gun policy and politics expert, has explained, these devices are designed "to find civilian workarounds that give you weapons that fire like a military weapon," which individuals would want only "if you want to do a whole lot of damage out in society," or if you "find this

20

loads of fun."[10]  As of 2023, around 100,000 forced reset triggers had been sold.

*Rare Breed Triggers*, 690 F. Supp. 3d at 58.  Further aggravating the public safety

threats of these devices, earlier this year the federal government abandoned—with

scant explanation—litigation over the legality of the device under federal law, and

is taking steps to return previously confiscated devices to the manufacturer,

distributors, and some purchasers.[11]

Similarly, bump stocks replace a rifle's original stock with one that

harnesses the recoil of the weapon to enable a shooter to fire continuously merely

by pulling the trigger once, keeping his trigger finger stationary, and applying

forward pressure to the barrel with his other hand.[12]  The perpetrator of the

deadliest mass shooting in U.S. history—who opened fire on thousands of

concertgoers from a hotel window above the Las Vegas strip, killing 60—used

---

[10] Dave Collins, *Are Forced-Reset Triggers Machine Guns? ATF and Gun Rights Advocates at Odds in Court Fights*, AP (Aug. 24, 2023), https://apnews.com/article/forced-resettriggers-rifles-machine-guns-atf-a17b5aaeda285a780286e209683955b6.

[11] See Tim Balk, *Trump Administration Abandons Fight to Ban Powerful Gun Accessory*, N.Y. Times (May 17, 2025), https://www.nytimes.com/2025/05/17/us/politics/trump-guns-rifles.html; Notice of Compliance, ECF 126, *Nat'l Ass'n for Gun Rights, Inc. v. Bondi*, No. 4:23-cv-830 (N.D. Tex. Feb. 19, 2025).

[12] *Powerful US Gun Lobby Group Backs New Curbs on Rapid-fire Accessories*, Straits Times (Oct. 6, 2017), https://www.straitstimes.com/world/united-states/after-las-vegas-shooting-momentum-builds-for-ban-of-rapid-fire-devices.

several rifles outfitted with bump stocks.[13]  Although the Supreme Court recently held that "nonmechanical" bump stocks did not fall within the federal "machinegun" definition, *see Cargill*, 602 U.S. 406, the devices are nevertheless validly restricted under Hawai'i law.  *See* Haw. Rev. Stat. § 134-8.5.  For good reason: because "a semiautomatic rifle with a bump stock can have the same lethal effect as a machinegun," there is "little doubt" that lawmakers "would not [see] any material difference between a machinegun and a semiautomatic rifle equipped with a bump stock."  *Cargill*, 602 U.S. at 429 (Alito, J., concurring).

The Second Amendment does not forbid lawmakers from restricting machine guns and other devices that achieve comparable rates of fire.  As this Court has emphasized, *Heller* itself recognized "that it would be 'startling' to read the Second Amendment as prohibiting a ban on machine guns, and the Court clearly signaled that one machine gun—the M-16—could be banned."  *Duncan*, 133 F.4th at 882–83 (quoting *Heller*, 554 U.S. at 624); *see United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (holding that "machine guns are 'dangerous and unusual weapons' that are not protected by the Second Amendment").  Other courts agree.  *See, e.g.*, *United States v. Bridges*, — F.4th —, 2025 WL 2250109, at *4–9 (6th Cir. 2025); *Capen v. Campbell*, 134 F.4th 660, 670 (1st Cir. 2025);

---

[13] *See* Jonathan Bernstein & Mark Gray, *Five Years Since the Route 91 Massacre No One Knows a Damn Thing*, Rolling Stone (Sept. 21, 2022).

*Bevis v. City of Naperville*, 85 F.4th 1175, 1193 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2491 (2024); *United States v. Oxley*, 2025 WL 2306238, at *2–12 (D. Md. 2025); *United States v. Chan*, 2024 WL 4028019, at *5–6 (D. Haw. 2024).[14]

The inspection requirement undergirds Hawaiʻi's regulations on machine guns, forced reset triggers, and bump stocks. Without a physical inspection, these and other illegal features could well escape detection—particularly for firearms brought into Hawaiʻi from jurisdictions with looser restrictions on these uniquely dangerous features. Hawaiʻi's lawmakers sensibly determined that physical inspection is a practical and efficient way to detect these outlawed features *before* they circulate on Hawaiʻi's streets. Further, lawmakers sensibly limited this requirement so that inspection is not required for firearms registered by authorized dealers (as those weapons can be expected to comply with state regulations). *See* Haw. Rev. Stat. § 134-3(c).

If the Court were to invalidate the inspection requirement, it would erroneously deprive Hawaiʻi of a valuable means to effectuate the state's manifestly constitutional regulations on uniquely dangerous firearms. This Court should confirm that, as with background checks, the Constitution permits

---

[14] *See also, e.g.*, *United States v. Mitchell*, 734 F. Supp. 3d 702, 704–09 (N.D. Ohio 2024); *United States v. Simien*, 655 F. Supp. 3d 540, 554 (W.D. Tex. 2023); *United States v. Berger*, 715 F. Supp. 3d 676, 687–88 (E.D. Penn. 2024).

lawmakers to stop criminals from so easily evading valid regulations on these weapons.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

August 18, 2025

*/s/ Ian Simmons*

IAN SIMMONS
DAVID K. ROBERTS
ARJUN A. SHENOY
CATHERINE A. WARD
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
isimmons@omm.com

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify the following:

1. This brief complies with the type-volume limitation of Circuit Rule 29-2(c)(3), because it contains 5,440 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the format, typeface, and type-style requirements of Fed. R. App. P. 32(a)(4)-(6).

*/s/ Ian Simmons*
Ian Simmons

## CERTIFICATE OF SERVICE

I certify that on August 18, 2025, I filed the foregoing Amicus Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system

*/s/ Ian Simmons*
Ian Simmons