No. 21-16756

In the
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

TODD YUKUTAKE; DAVID KIKUKAWA,

Plaintiffs-Appellees,

v.

ANNE E. LOPEZ, In her Official Capacity as the Attorney General of the State of Hawaiʻi ,

Defendant-Appellant,

and

CITY AND COUNTY OF HONOLULU,

Defendant.

Appeal from the United States District Court
District of Hawaiʻi, Honolulu
Honorable J. Michael Seabright, Chief United States District Judge
Civil No. 1:19-cv-00578 JMS-RT

**BRIEF OF AMICUS CURIAE THE STATES OF MICHIGAN, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF DEFENDANT-APPELLANT**

Dana Nessel
Michigan Attorney General

Ann M. Sherman
Solicitor General

Christopher M. Allen
Assistant Solicitor General

Donald S. McGehee
Division Chief

Mark G. Sands
Assistant Attorney General
*Counsel of Record*
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway, 2nd Floor
East Lansing, MI  48823
(517) 241-0210
SandsM1@michigan.gov

Attorneys for Amicus State of
Michigan

Dated: October 20, 2025

## CORPORATE DISCLOSURE

State government and state agencies are excepted from filing a corporate affiliate/financial interest disclosure statement.

# TABLE OF CONTENTS

Page

Corporate Disclosure ...................................................................i

Table of Contents.......................................................................ii

Table of Authorities .................................................................. iii

Statement of Interest of Amicus Curiae....................................1

Argument ...................................................................................3

I.   States have broad authority to experiment with reasonable
     regulations within the scope of their police powers.........................3

     A.   States retain broad authority to innovate and
          experiment to protect citizens from firearms-related
          violence. ..................................................................4

     B.   *Bruen* reflects ample latitude for state "shall-issue"
          regimes. ..................................................................6

II.  Hawaiʻi's licensing and registration regulatory regimes are
     constitutional under *Bruen*..............................................8

     A.   The Supreme Court recognizes "shall-issue" licensing
          regimes as presumptively constitutional. ...............................8

     B.   Hawaiʻi's 30-day validity for handgun purchase permits
          is constitutional. ...................................................11

     C.   The limited inspection of particular firearms is
          constitutional.......................................................16

Conclusion and Relief Requested.............................................20

Certificate of Compliance ......................................................24

Certificate of Service .............................................................25

## TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Bond v. United States,*
    564 U.S. 211 (2011) ................................................................... 3

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ........................................................... passim

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ................................................................... 3

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ........................................................... passim

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ................................................................... 4

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) .............................................................. passim

*Oregon v. Ice,*
    555 U.S. 160 (2009) ................................................................... 3

*Sgro v. United States,*
    287 U.S. 206 (1932) ................................................................. 14

*United States v. Greany,*
    929 F.2d 523 (9th Cir. 1991) ................................................. 14

*United States v. Peterson,*
    __ F.4th __; 2025 WL 2462665(5th Cir. Aug. 27, 2025) ...................... 16

*Yukutake v. Lopez,*
    130 F.4th 1077 (2025)................................................... 9, 10, 11

**Statutes**

430 Ill. Comp. Stat. 65/7........................................................ 15

iii

Cal. Penal Code §§ 31655(c), 26840(a) ................................................... 15

Conn. Gen. Stat. §§ 29-33, 29-36h(b) .................................................. 15

Del. Code Ann. tit. 11, § 1448(j)(1) ..................................................... 15

Hawaii Rev. Stat. § 134-2(e) ................................................... 12, 13, 15

Hawaii Rev. Stat. §§ 134-2(i) .................................................. 10, 15

Hawaii Rev. Stat. § 134-3 ........................................................ 17

Hawaii Rev. Stat. § 134-3(a) ..................................................... 18

Hawaii Rev. Stat. § 134-3(b) .............................................. 17, 18

Hawaii Rev. Stat. § 134-3(c) ..................................................... 17

Hawaii Rev. Stat. § 134-3(f) ..................................................... 20

Hawaii Rev. Stat. § 134-8 ........................................................ 19

Hawaii Rev. Stat. § 134-31 ....................................................... 18

Hawaii Rev. Stat. § 846-2.7 ...................................................... 15

Md. Code Ann., Pub. Safety § 5-117.1(i) ................................. 15

Mich. Comp. Laws § 28.422(3)(c) ........................................... 10

Mich. Comp. Laws § 28.422(h)(4) ..................................... 15, 16

Minn. Stat. §§ 624.7131(6), 624.7134(2) ............................... 15

N.J. Stat. Ann. § 2C:58-3(f) ................................................ 15, 16

N.Y. Penal Law § 400.00(1)(b) ............................................... 15

Neb. Rev. Stat. §§ 69-2403, -2407 ........................................ 15

Or. Rev. Stat. § 166.292(4) ..................................................... 15

Wash. Rev. Code § 9.41.090(1)(a) .......................................... 15

**Rules**

Fed. R. App. P. 29(a)(2) ........................................................... 1

Fed. R. App. P. 32(a)(5) .......................................................... 24

Fed. R. App. P. 32(a)(6) .......................................................... 24

Fed. R. App. P. 32(f) .............................................................. 24

## STATEMENT OF INTEREST OF
## AMICUS CURIAE

Amici the States of Michigan California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia ("Amici States") submit this brief in support of the State of Hawaiʻi. *See* Fed. R. App. P. 29(a)(2).

As independent sovereigns, Amici States have primary responsibility to protect the health, safety, and welfare of their citizens, including protecting those citizens from the harmful effects of gun violence and promoting the safe and responsible use of firearms. The Second Amendment permits the States to enact a variety of regulations to combat the misuse of firearms and enables "solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010). Amici States have fulfilled this responsibility by exercising their police powers to regulate firearms in order to protect the public, including through measures—such as background checks and purchase permits—that ensure that those with access to guns are "law-abiding, responsible citizens." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022).

Amici States have taken different approaches to ensuring that only "law-abiding, responsible citizens" are allowed to purchase, possess, and carry a firearm in their borders, but all wish to maintain their authority to address firearm related issues through legislation that is responsive to the unique circumstances in their communities. Within the confines of its "shall-issue" permitting regime, Hawai'i has imposed a temporal limitation on the outcome of its background check for the purchase of handguns. In addition, Hawai'i imposes a limited inspection requirement for firearms that are imported from out-of-state, are sold by a non-licensed individual, or are unserialized "ghost guns." The purpose of the inspection regulation is to obtain and verify the serial numbers of those firearms—information it routinely obtains for firearm purchases from in-state, licensed dealers.

Both regulations are among the panoply of potential options available to the Amici States as part of a presumptively lawful "shall-issue" permitting and registration regimes. This Court should reverse the district court's erroneous decision enjoining Hawai'i's reasonable, public-safety focused licensing and registration regulatory regime.

## ARGUMENT

I. **States have broad authority to experiment with reasonable regulations within the scope of their police powers.**

It may be a familiar phrase that the sovereign States operate as "laboratories of democracy," but it is well-worn because it is true—local flexibility is a critical part of our federalist system. *Oregon v. Ice*, 555 U.S. 160, 171 (2009) ("We have long recognized the role of the States as laboratories for devising solutions to difficult legal problems."). Our federalism envisions states as essential to a "decentralized government that will be more sensitive to the diverse needs of a heterogenous society[.]" *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). This decentralization encourages "innovation and experimentation" and "makes government 'more responsive by putting the States in competition for a mobile citizenry.'" *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,* 576 U.S. 787, 817 (2015) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)).

The need for "innovation and experimentation" is particularly salient in the protection of the health and safety of the citizenry, which involves," primarily[ ] and historically, matters of local concern." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (cleaned up).

Accordingly, the States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."  *Id.* (cleaned up).

> **A.**    **States retain broad authority to innovate and experiment to protect citizens from firearms-related violence.**

This "great latitude" encompasses the vital role States play in setting their own local policies to minimize the risk of gun violence.  As explained by the U.S. Supreme Court, the Second Amendment "by no means eliminates" the "ability to devise solutions to social problems that suit local needs and values."  *McDonald*, 561 U.S. at 785.  Rather, as explained by Justice Kavanaugh, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."  *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring (quoting *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008)).

Indeed, since the Founding, States have enacted restrictions on who may bear arms, where arms may be brought, and the manner in which arms may be carried.  *See Heller*, 554 U.S. at 626–27.  The Court has repeatedly affirmed the States' authority in this area, even as it has defined the scope and import of the rights conferred by the Second

4

Amendment. In several of its major Second Amendment opinions—
*Heller*, 554 U.S. 570, *McDonald*, 561 U.S. 742, and *Bruen*, 597 U.S. 1—
the Court expressly acknowledged the role States play in reducing the
risk of gun violence.

In *Heller*, the Court made clear that the right to keep and bear
arms is "not unlimited." 554 U.S. at 626. Although States may not ban
the possession of all handguns, they still possess "a variety of tools" to
combat the problem of gun violence in a way that is responsive to the
needs of their communities. *Id.* at 636. States may, for example,
implement measures prohibiting "felons and the mentally ill" from
possessing firearms. *Id.* at 626.

The Court then reiterated in *McDonald* that the Second
Amendment "by no means eliminates" a state's "ability to devise
solutions to social problems that suit local needs and values." 561 U.S.
at 785. Recognizing that "conditions and problems differ from locality
to locality," *id.* at 783, the Court made clear that "state and local
experimentation with reasonable firearms regulations" should continue
"under the Second Amendment," *id.* at 785 (cleaned up).

## B. *Bruen* reflects ample latitude for state "shall-issue" regimes.

*Bruen* reaffirmed the principles set forth in *Heller* and *McDonald* and effectively sanctioned "shall-issue" licensing regimes. The Court affirmatively stated that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." 597 U.S. at 38 n.9. These state laws are "designed to ensure only that those bearing arms . . . are, in fact, 'law-abiding, responsible citizens.' " *Id.* (citing *Heller*, 554 U.S. at 635); *see also Heller*, 554 U.S. at 626–27 & n.25 (describing "conditions and qualifications on the commercial sale of arms" as "presumptively lawful").

A "shall-issue" licensing regime is one where an applicant's "general desire for self-defense is sufficient to obtain a [permit]." *Bruen,* 597 U.S. at 38 n.9 (citation omitted). Such a regime may include requirements that an applicant "undergo a background check or pass a firearms safety course," because such guardrails "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). Some of the permissible requirements of a "shall-issue" regime include, but are not limited to, "fingerprinting, a background check, a mental

6

health records check, and training in firearms handling and in laws regarding the use of force[.]" *Id.* at 80 (Kavanaugh, J., concurring). As long as these measures permit ordinary citizens to exercise their second Amendment rights, they are presumptively constitutional. *Id.* at 38 n.9.

This deference to state "shall-issue" regimes does not mean, of course, that they are per se consistent with the Second Amendment. Challenges may be available where a "shall-issue" regime is "put toward abusive ends . . . where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.*

At bottom, the Supreme Court has contemplated that principles of federalism allow States leeway to design regulations to ensure "that those bearing arms . . . are, in fact, 'law-abiding, responsible citizens.'" *id*. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). Like other States in their own way, Hawaiʻi has done just that.

7

## II.   Hawaiʻi's licensing and registration regulatory regimes are constitutional under *Bruen*.

At issue in this case are two components of Hawaiʻi's "shall-issue" regime: the firearm purchase permit and firearm registration regulations.  Critically, Appellees Yukutake and Kikukawa agree that these regulations as a whole are permissible exercises of Hawaiʻi's police powers, presumably acknowledging that those regulations permissively determine whether the individual applicant is a "law-abiding, responsible citizen." *Bruen*, 597 U.S. at 38 n.9.  But they nevertheless challenge two aspects of those regulatory regimes: (1) that a purchase permit is only valid for 30 days; and (2) that a firearm not registered by a state- or federally-licensed firearms dealer must be inspected by the State to obtain and verify information—including serial numbers.  Each claim should fail.

### A.   The Supreme Court recognizes "shall-issue" licensing regimes as presumptively constitutional.

In analyzing the constitutionality of these two challenged components, this Court must begin with the proposition that they are part of a regulatory regime that our Supreme Court identified as presumptively constitutional.  *Id.*  As long as the "shall-issue"

8

regulatory regime does not "grant open-ended discretion to licensing officials and do[es] not require a showing of some special need apart from self-defense," *id.* at 80 (Kavanaugh, J., concurring), those components should remain clothed in the presumption of constitutionality*, id.* at 38 n.9. Thus, this Court's review of those individual components is constrained to whether those components are being put toward "abusive ends" that have the functional effect of "deny[ing] ordinary citizens their right to public carry." *Id.*

Applying another analytic rubric to constituent parts of a "shall-issue" regime would thus fail to follow *Heller* and *Bruen*. For its part, the panel concurrence suggests that *Bruen*'s footnote 9 "require[s] the government to provide a historical analogue to justify the temporal limit on firearm permits." *Yukutake v. Lopez*, 130 F.4th 1077, 1108 (2025) (Lee, J., concurring). But subjecting each minute detail of a "shall-issue" regime to a full-blown historical analogue inquiry not only disregards the Supreme Court's plain and repeated signals about the presumptive validity of "shall-issue" regimes. It would also impractically place the judiciary at the center of firearms licensing. As the panel dissent emphasized, invasive judicial scrutiny for each detail

9

of a "shall-issue" regime would transform "the Second Amendment into a kind of regulatory code for firearm licensing requirements," 130 F.4th at 1124 (Bea, J., dissenting), displacing the States' considered judgment and replacing it with intrusive judicial scrutiny.

There are a variety of lawful, objective requirements that States impose as part of their "shall-issue" regimes. States largely require firearm-safety training courses to ensure individuals have the knowledge to operate firearms safely and background checks to determine whether a citizen is law-abiding. *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) (favorably describing 43 States' "shall-issue" regimes with comparable characteristics "among other possible requirements"). For other examples, some states may require proof of citizenship or residence, *see, e.g.*, Mich. Comp. Laws § 28.422(3)(c); some ask for a modest processing fee, *see* Hawaii Rev. Stat. §§ 134-2(i).

Engaging in the historical-analogue inquiry to scrutinize these provisions, courts would be asked to scour and weigh the historical record to micromanage the constitutionality of these kinds of "narrow, objective, and definite standards." *Bruen*, 597 U.S. at 38 n.9. Such an in-depth dissection threatens to lose sight of the constitutional forest for

the trees: Does requiring a state-issued driver's license or identification card have a direct Founding-era antecedent? Does a $42 fee violate the Second Amendment? Must a state demonstrate historical support for a four-hour "training in firearms handling"?

Tasking the federal courts with this kind of hair-splitting would turn "federal judges [into] the inspectors general of state firearm regulations." 130 F.4th at 1125 (Bea, J., dissenting). Instead, managing the fine details of "shall-issue" regimes should remain with the States, so that they may continue to prepare "solutions to social problems that suit local needs and values." *McDonald*, 561 U.S. at 785.

This Court should follow the Supreme Court's guidance that "shall-issue" regimes are presumptively constitutional, and subparts of a regime may be challenged only where they are "put toward abusive ends." *Bruen*, 597 U.S. at 38 n.9.

## B. Hawaiʻi's 30-day validity for handgun purchase permits is constitutional.

Upon receipt of an application for a purchase permit, Hawaiʻi authorities conduct a background check to determine whether the applicant has a disqualifying criminal history or poses a danger of

causing a self-inflicted bodily injury or unlawful injury to another person based on specific criteria. Hawaii Rev. Stat. § 134-2(e). Once that check is complete, Hawai'i will issue the permit. *Id.* Yukutake and Kikukawa challenge a constituent provision of the regime that the purchase permit remains valid for 30 days. *Id.* After that, Hawai'i deems its determination that the individual is a "'law-abiding, responsible citizen" to be stale and requires the individual to re-apply.

The 30-day provision is a valid piece of Hawai'i's "shall-issue" scheme. It does not require an individual re-applying for a purchase permit on the 31st day to show an "atypical need for armed self-defense." *Bruen*, 597 U.S. at 38 n.9. Nor does it allow Hawai'i to exercise "open-ended" discretion upon re-application or otherwise deny qualified individuals the right to acquire or carry firearms for self-defense. *Id.* at 79 (Kavanaugh, J., concurring).

And should a permit holder be unable or unwilling to obtain a handgun within 30 days of the permit's issuance, a new permit can be sought. Just as with the original application, Hawai'i "shall issue" a purchase permit on reapplication if the applicant does not have a disqualifying criminal history or poses a danger of causing a self-

inflicted bodily injury or unlawful injury to another person based on specific criteria. Hawaii Rev. Stat. § 134-2(e).

The 30-day validity regulation simply puts a temporal limit on the State's determination that the applicant is a "'law-abiding, responsible citizen." *Bruen*, 597 U.S. at 79 (quotation omitted). The time limit is a recognition that a license is not a permanent guarantee. Rather, circumstances can change, and an individual whom a state has found to qualify may no longer meet that definition as time passes due to a subsequent disqualifying event.

This is not a novel concept. In the context of the Fourth Amendment, for example, in order to obtain a search warrant, there must be facts "sufficient to justify a conclusion that the property which is the object of the search is probably on the premises to be searched at the time the warrant is issued." *United States v. Greany*, 929 F.2d 523, 524–25 (9th Cir. 1991). But probable cause does not exist where it is based on stale information. That is because the staleness doctrine is based on the notion that probable cause dissipates with the passage of time. *See Sgro v. United States*, 287 U.S. 206, 210 (1932) ("[I]t is manifest that the proof must be of facts so closely related to the time of

13

the issue of the warrant as to justify a finding of probable cause at that time."). The staleness doctrine ensures that a search warrant is based on current, reliable facts rather than outdated guesses.

Hawaiʻi's permit regulation performs this same reliability function. Hawaiʻi has decided that its determination that an individual is a "law-abiding, responsible citizen" dissipates with time. As a policy matter, the State decided that, after 30 days, it requires additional facts to determine whether the circumstances have changed. The number of days the permit remains valid is not a question of constitutional dimension. It is simply a "condition[ ] and qualification[ ] on the commercial sale of arms" that *Heller* found to be presumptively lawful. 554 U.S. at 626-27 & n.26. Since the 30-day limitation period does not change the nature of Hawaiʻi's "shall-issue" permitting regime, it remains presumptively constitutional. *See Bruen*, 597 U.S. at 38 n.9.

Thus, the proper constitutional test is whether Yukutake and Kikukawa can prove that the ancillary provision at issue has been "put toward abusive ends" as, for example, through "exorbitant fees" or "lengthy wait times in processing license applications" after the 30th day. *See id*. Hawaiʻi's 30-day validity provision passes that test.

14

There are no "exorbitant fees" related to the re-application—the fee for a background check is limited to $42.00. *See* Hawaii Rev. Stat. §§ 134-2(i), 846-2.7.[1] And the 30-day expiration period actually encourages permit holders to obtain their firearm sooner than later, as opposed to something akin to a "lengthy wait time" that *Bruen* suggested could compromise the constitutionality of a provision.

Temporal limits on the validity of a permit to purchase a firearm are not unusual.[2] Hawaiʻi's validity period is comparable to other temporal limits among the States,[3] it cannot be said that the 30-day staleness-related expiration of a permit to purchase is an "abusive" policy implicating the Second Amendment's protection. Any delay in

---

[1] Honolulu Police Department, Application for a Firearm Permit, available at https://www.honolulupd.org/police-services/firearms/ (accessed October 20, 2025).

[2] *See* Cal. Penal Code §§ 31655(c), 26840(a); Conn. Gen. Stat. §§ 29-33, 29-36h(b); Del. Code Ann. tit. 11, § 1448(j)(1); Hawaii Rev. Stat. § 134-2(e); 430 Ill. Comp. Stat. 65/7; Md. Code Ann., Pub. Safety § 5-117.1(i); Mich. Comp. Laws § 28.422(h)(4); Minn. Stat. §§ 624.7131(6), 624.7134(2); Neb. Rev. Stat. §§ 69-2403, -2407; N.J. Stat. Ann. § 2C:58-3(f); N.Y. Penal Law § 400.00(1)(b); Or. Rev. Stat. § 166.292(4); Wash. Rev. Code § 9.41.090(1)(a).

[3] Three states have a validity period under one year—Hawaiʻi, Michigan (30 days under Mich. Comp. Laws § 28.422(h)(4)), and New Jersey (90 days with an additional 90 days with good cause shown, under N.J. Stat. Ann. § 2C:58-3(f)).

the permittee's ability to purchase, possess, and carry a firearm is attributable to their own procrastination[4] and not to Hawaiʻi's "shall issue" licensing regime.  Likewise, the additional time to conduct the second background check would not be sufficiently "lengthy" to overcome *Bruen*'s presumption of lawfulness.  *See United States v. Peterson*, __ F.4th __; 2025 WL 2462665, at *7 (5th Cir. Aug. 27, 2025) (holding that an eight-month delay to obtain a suppressor "is insufficient to overcome *Bruen*'s presumption").  The District Court's decision enjoining this "narrow, objective, and definite standard" should be reversed.

## C.   The limited inspection of particular firearms is constitutional.

The second challenged regulation is part of Hawaiʻi's firearms registration regime.  All firearms in Hawaiʻi must be registered with the State.  Hawaii Rev. Stat. § 134-3.  Generally, when an individual purchases a firearm in Hawaiʻi from a Federal Firearms License holder, or a state-licensed firearm dealer, the seller will register that firearm

---

[4] As noted in Hawaiʻi's supplemental brief, even when the validity period of a permit was only 10 days, 98.6% of applicants were able to complete their purchases.  *See* ECF No. 52-1, App. Supp. Br., p. 46.

with the Chief of Police of the county where that individual's business or residence is located. Hawaii Rev. Stat. § 134-3(c). That registration includes the name of the manufacturer and importer; model; type of action; caliber or gauge; serial number; and source from which receipt was obtained, including the name and address of the prior registrant. Hawaii Rev. Stat. § 134-3(b). This regulation does not require the purchaser to submit to inspection, since the required information is provided to Hawaiʻi by the licensed dealer. Hawaii Rev. Stat. § 134-3(c).

Yukutake and Kikukawa specifically challenge an ancillary provision requiring individuals in three limited circumstances to present a firearm for inspection to obtain and verify the information Hawaiʻi lawfully obtains for every other firearm:

(1) When an individual brings a firearm of any kind into Hawaiʻi from out of state, Hawaii Rev. Stat. § 134-3(a);

(2) When an individual acquires a firearm from any individual who is not a dealer licensed under Hawaii Rev. Stat. § 134-31 or a Federal Firearms license holder, Hawaii Rev. Stat. § 134-3(b);

(3) When the firearm has been assembled from separate parts and an unfinished receiver, or parts created using a three-dimensional printer, *id.*

17

For out-of-state weapons, this requirement serves the additional purpose of requiring the importing individual to undergo the same fingerprinting and background check requirements as an individual who obtained a purchase permit. Hawaii Rev. Stat. § 134-3(a). These background check and fingerprinting requirements were specifically recognized by the Supreme Court as presumptively constitutional. *Bruen*, 597 U.S. at 38 n.9.

For all three limited purposes, the inspection requirement allows the state to obtain and verify basic registration information, like the serial number. Hawaii Rev. Stat. § 134-3(b). This is the same information the State is able to obtain from State- and federally-licensed firearms dealers. And just like the presumptively constitutional purchase permit regulatory regime, Hawaiʻi "shall register" a firearm unless (1) the background check indicates that the individual has a disqualifying criminal history or poses a danger of causing a self-inflicted bodily injury or unlawful injury to another person based on specific criteria, *id.*, or (2) the firearm is prohibited under Hawaiʻi law. *See* Hawaii Rev. Stat. § 134-8.

In other words, the inspection requirement contains only "narrow, objective, and definite standards" guiding registration officials. *Bruen*, 597 U.S. at 38 n.9. The inspection requirement does not ban citizens from possessing and carrying "ghost guns" that are assembled from separate parts and an unfinished receiver, or parts created using a three-dimensional printer. Rather, it brings those "ghost guns" into compliance with Hawaiʻi's lawful registration regime by imprinting a registration number and having authorities verify the accuracy of that information. Likewise, the regulation does not ban individuals from lawfully purchasing a firearm from a non-licensed seller. Rather, it simply allows Hawaiʻi to obtain and confirm the basic registration information as it does for all other firearms. Since the limited inspection regulation does not change the nature of Hawaiʻi's registration regime, it remains presumptively constitutional. *Bruen*, 597 U.S. at 38 n.9.

Therefore, just as with the provision of the purchase permit regime, the proper constitutional test is whether Yukutake and Kikukawa can establish that this provision has been "put toward abusive ends" through "exorbitant fees" or "lengthy wait times in

19

processing license applications." *See id*. Again, they can establish neither.

The fee to inspect and register an out-of-state firearm is $84.00. Hawaii Rev. Stat. § 134-3(f).[5] This amount cannot be considered so "excessive" as to overcome the presumption of constitutionality. Likewise, Yukutake and Kikukawa have not demonstrated any significant delay in or constraint on their ability to acquire a firearm, let alone a "lengthy wait time" of constitutional dimension.

The district court's decision enjoining this "narrow, objective, and definite standard" should be reversed.

## CONCLUSION AND RELIEF REQUESTED

This Court should reverse the decision of the district court and hold that the challenged ancillary provisions to Hawai'i's unquestionably valid purchase permit and its limited inspection regulation regimes are both "presumptively constitutional" and,

---

[5] Kaua'i Police Department, Firearms Section, Out of State Acquired Firearm Registration, available at https://www.kauai.gov/Government/Departments-Agencies/Police-Department/Firearms-Section#section-6 (accessed October 20, 2025).

therefore, are a valid exercise of Hawai'i's police powers to protect the

health, safety, and welfare of its citizens.

Dated:  October 20, 2025                    Respectfully submitted,

                                            */s/ Mark G. Sands*

                                            Dana Nessel
                                            Michigan Attorney General

                                            Ann M. Sherman
                                            Solicitor General

                                            Mark G. Sands
                                            Assistant Attorney General
                                                  *Counsel of Record*
                                            Alcohol & Gambling Enf. Div.
                                            2860 Eyde Parkway, 2nd Floor
                                            East Lansing, MI  48823
                                            (517) 241-0210
                                            SandsM1@michigan.gov

                                            Christopher M. Allen
                                            Assistant Solicitor General

                                            Donald S. McGehee
                                            Division Chief

                                            Attorneys for Amicus State of
                                            Michigan

ROB BONTA
Attorney General
State of California
1300 I Street
Sacramento, CA  95814

WILLIAM TONG
Attorney General
State of Connecticut
165 Capitol Avenue
Hartford, CT  06106

KWAME RAOUL
Attorney General
State of Illinois
115 South LaSalle Street
Chicago, IL  60603

ANTHONY G. BROWN
Attorney General
State of Maryland
200 Saint Paul Place
Baltimore, Maryland 21202

KEITH ELLISON
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN  55155

PHILIP J. WEISER
Attorney General
State of Colorado
1300 Broadway, 10th Floor
Denver, CO  80203

KATHLEEN JENNINGS
Attorney General
State of Delaware
820 N. French Street
Wilmington, DE  19801

AARON M. FREY
Attorney General
State of Maine
6 State House Station
Augusta, Maine  04333

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA  02108

MATTHEW J. PLATKIN
Attorney General
State of New Jersey
Richard J. Hughes Justice
Complex
25 Market Street
Trenton, NJ  08625

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

PETER F. NERONHA
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

NICHOLAS W. BROWN
Attorney General
State of Washington
P.O. Box 40100
Olympia, WA 98504

DAN RAYFIELD
Attorney General
State of Oregon
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
Attorney General
State of Vermont
109 State Street
Montpelier, VT 05609

BRIAN L. SCHWALB
Attorney General
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.     This amicus brief complies with the alternative length

limitation set forth in this Court's August 29, 2025 order, ECF No. 141,

because, exclusive of the parts of the document exempted by Fed. R.

App. P. 32(f), this amicus brief contains no more than 4,200 words.  This

document contains 3,954 words.

2.     This document complies with the typeface requirements of

Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App.

P. 32(a)(6) because this document has been prepared in a proportionally

spaced typeface using Word 2013 in 14-point Century Schoolbook.

<div style="margin-left:50%">

/s/ Mark G. Sands
Assistant Attorney General
        *Counsel of Record*
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway, 2nd Floor
East Lansing, MI  48823
(517) 241-0210
SandsM1@michigan.gov

Attorney for Amicus State of
Michigan

</div>

Dated:  October 20, 2025

## CERTIFICATE OF SERVICE

I certify that on October 20, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Mark G. Sands
Assistant Attorney General
*Counsel of Record*
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway, 2nd Floor
East Lansing, MI  48823
(517) 241-0210
SandsM1@michigan.gov

Attorney for Amicus State of Michigan