**No. 21-16756**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

ANN E. LOPEZ, in her Official Capacity as the Attorney General
of the State of Hawaii; CITY AND COUNTY OF HONOLULU,

*Appellant*,

v.

TODD YUKUTAKE; DAVID KIKUKAWA,

*Appellees*.

————————

On Appeal from the United States District Court for the District of Hawaii,
No. 1:19-cv-00578

————————

## BRIEF FOR *AMICUS CURIAE* NATIONAL SHOOTING SPORTS
## FOUNDATION, INC. IN SUPPORT OF APPELLEES

————————

LAWRENCE G. KEANE
SHELBY BAIRD SMITH
NATIONAL SHOOTING
  SPORTS FOUNDATION, INC.
400 N. Capitol St., NW
Washington, DC 20001
 (202) 220-1340

PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
MATTHEW D. ROWEN
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Amicus Curiae*

November 20, 2025

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* National Shooting Sports Foundation, Inc. ("NSSF") is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut. Pursuant to Federal Rule of Appellate Procedure 26.1(a), NSSF certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.................................................................................... iii

STATEMENT OF INTEREST................................................................................ 1

SUMMARY OF ARGUMENT................................................................................ 2

ARGUMENT .......................................................................................................... 3

I.     Laws That Restrict The Ability Of Law-Abiding Citizens To Obtain
And Retain Handguns Plainly Implicate The Second Amendment .............. 3

II.    *Bruen* Did Not Create A Special Category Of Firearm Regulations
That Are Exempt From Its Burden-Shifting Framework .............................. 9

III.   Hawaii Has Failed To Proffer Any Historical Analogue To Justify
Either Law As Consistent With This Nation's Historical Tradition ............ 15

IV.   Hawaii's Remedial Arguments Do Not Require Reversal .......................... 17

CONCLUSION ..................................................................................................... 18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*B&L Prods., Inc. v. Newsom,*
    104 F.4th 108 (9th Cir. 2024)................................................................11

*Citizens United v. FEC,*
    558 U.S. 310 (2010)..........................................................................17

*District of Columbia v. Heller,*
    554 U.S. 570 (2008).......................................................... 3, 5, 8, 12

*Jackson v. City & Cnty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014)..............................................................17

*McRorey v. Garland,*
    99 F.4th 831 (5th Cir. 2024).................................................................8

*N.Y. State Rifle & Pistol Ass'n. v. Bruen,*
    597 U.S. 1 (2022)........................................................2, 3, 5-7, 10-16

*Nguyen v. Bonta,*
    140 F.4th 1237 (9th Cir. 2025)................................................. 3, 7, 8

*Ortega v. Grisham,*
    148 F.4th 1134 (10th Cir. 2025)......................................................8, 9

*Reese v. ATF,*
    127 F.4th 583 (5th Cir. 2025)................................................................8

*Sekhar v. United States,*
    570 U.S. 729 (2013)..........................................................................11

*Teixeira v. Cnty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017)................................................................8

*United States v. Daniels,*
    101 F.4th 770 (10th Cir. 2024)..........................................................14

*United States v. Knipp,*
    138 F.4th 429 (6th Cir. 2025)................................................................8

*United States v. Perez-Garcia*,
　96 F.4th 1166 (9th Cir. 2024) ...................................................................4

*United States v. Rahimi*,
　602 U.S. 680 (2024) ........................................................... 2, 3, 12-14

*Yukutake v. Lopez*,
　130 F.4th 1077 (9th Cir. 2025) ......................................... 6, 9, 15, 16

**Constitutional Provision**

U.S. Const. amend. II ................................................................................3

**Statutes**

Haw. Rev. Stat. §134-2(e) .....................................................................2, 5

Haw. Rev. Stat. §134-3 ...................................................................... 2, 4, 5

Haw. Rev. Stat. §134-3(a) .....................................................................4, 8

Haw. Rev. Stat. §134-17(b)(3) .................................................................4

Haw. Rev. Stat. §706-640(1)(e) ...............................................................4

Haw. Rev. Stat. §706-663 .........................................................................4

**Other Authorities**

An Act for forming, regulating, and conducting the military Force of this
　State, *in Acts and Laws of the State of Connecticut, in America* (1784) ............16

David B. Kopel, *Background Checks for Firearms Sales and Loans: Law,
　History, and Policy*, 53 Harv. J. on Legis. 303 (2016) .......................................16

## STATEMENT OF INTEREST[1]

The National Shooting Sports Foundation, Inc. ("NSSF"), is the firearm industry's trade association. Founded in 1961, NSSF's mission is to promote, protect, and preserve America's traditional hunting and shooting heritage and firearm freedoms. NSSF has over 10,000 members, including manufacturers, distributors, and sellers of firearms, ammunition, and related products, public and private shooting ranges, and endemic media. To promote, protect, and preserve America's tradition of firearms use and ownership, NSSF often submits amicus briefs in cases that implicate Second Amendment freedoms. NSSF and its members have a vested interest in protecting the Second Amendment rights of law-abiding citizens more generally, and in ensuring sound development of the historical approach to the Second Amendment described in *Heller*, *Bruen* and *Rahimi*. Ahistorical restrictions on the acquisition and retention of firearms, like Hawaii's permit-expiration and inspection requirement, threaten the businesses of NSSF members and fundamental constitutional rights. NSSF accordingly submits this brief in support of Plaintiffs-Appellees.

---

[1] No party's counsel authored any part of this brief, and no one other than amicus contributed to its preparation or submission. All parties have consented to this filing.

## SUMMARY OF ARGUMENT

Hawaii gives law-abiding individuals only a narrow window (originally 10 days, now 30) to acquire a handgun after obtaining the requisite permit to purchase one. Haw. Rev. Stat. §134-2(e). An individual must then present the firearm to police for inspection within five days. *Id.* §134-3. Those restrictions plainly regulate conduct covered by the plain text of the Second Amendment. Indeed, *all* those restrictions do is add hoops through which a citizen seeking to exercise her right to keep and bear arms must jump. Hawaii therefore bears the burden to prove that the challenged restrictions are consistent with this Nation's historical tradition of firearms regulation. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024); *N.Y. State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1, 17 (2022). It cannot sidestep that burden, or shift it to Plaintiffs, by likening its newfangled restrictions to the shall-issue carry-permit regimes *Bruen* discussed in a footnote. *Bruen* did not declare such laws—let alone Hawaii's novel add-ons to its outlier permit-to-*purchase* regime—presumptively constitutional. The panel was right to reject Hawaii's view, which makes nonsense of Supreme Court precedent, defies logic, and is itself ahistorical. And Hawaii cannot come close to shouldering its burden of proving that its novel regime is consistent with historical tradition. The Court should affirm.

## ARGUMENT

I.  **Laws That Restrict The Ability Of Law-Abiding Citizens To Obtain And Retain Handguns Plainly Implicate The Second Amendment.**

The threshold question in a Second Amendment case is "whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct." *Bruen*, 597 U.S. at 32.  If the answer is yes—i.e., if the state has "regulate[d] arms-bearing conduct," *Rahimi*, 602 U.S. at 691—then "the Constitution presumptively protects that conduct," *Bruen*, 597 U.S. at 24, and the state "bears the burden to 'justify its regulation'" by reference to historical tradition, *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 24).  Here, the answer is plainly yes:  The challenged restrictions, which do nothing other than make it more difficult to obtain and retain possession of handguns, "regulate[] conduct" "the plain text of the Second Amendment protects."  *Nguyen v. Bonta*, 140 F.4th 1237, 1241 (9th Cir. 2025).

The Second Amendment secures "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  As *Heller* explained, "the most natural reading of 'keep Arms' … is to 'have weapons,'" and "the natural meaning of 'bear arms[]' … implies [] the carrying of [a] weapon [] for the purpose of 'offensive or defensive action.'"  *District of Columbia v. Heller*, 554 U.S. 570, 582-83 (2008).  Hawaii's permit-to-purchase expiration rule and inspection-to-possess requirement impose obstacles on a law-abiding individual's ability to keep and carry weapons for self-defense.  Indeed, that is their only purpose.  These are not generally applicable laws

3

that happen to have an ancillary effect on citizens' ability to keep and bear arms. Making it more difficult to keep and bear arms is their whole point. They therefore regulate arms-bearing conduct covered by the Second Amendment's plain text.

Start with §134-2(e), which places a temporal restriction on when individuals may take possession of handguns. Plaintiffs ("the people") would like to take possession of handguns ("Arms") to have ("keep") and carry ("bear"). Section 134-2(e) prohibits them from doing so after the 10-day (now 30-day) period following the issuance of a permit to purchase. That suffices to satisfy the threshold inquiry. A law that "restricts [the] ability to bear or keep [a] firearm … unquestionably implicates … Second Amendment rights"—especially when, as here, it does nothing else. *United States v. Perez-Garcia*, 96 F.4th 1166, 1181 (9th Cir. 2024).

The threshold analysis is equally straightforward as to §134-3. Under that provision, anyone who acquires, transfers into the state, or otherwise takes possession of a firearm within Hawaii must "register and submit to physical inspection the firearm within five days" of the purchase or acquisition, or upon arrival in Hawaii, to "the chief of police of the [relevant] county." Haw. Rev. Stat. §134-3(a). Failure to "submit to physical inspection," *id.*, can result in penalties and/or jail time. *See* Haw. Rev. Stat. §134-17(b)(3); *id.* §§706-640(1)(e), 706-663. In that way, §134-3 plainly implicates the right to "Keep arms," which *Heller*

described as "a common way of referring to possessing arms" at the Founding. 554 U.S. at 583.

Hawaii's contrary submission before the panel "border[s] on the frivolous." *Id.* at 582. According to Hawaii, the Second Amendment's plain text does not cover the purchase or acquisition of firearms because it does not say the magic words "purchase" or "acquire" alongside "keep" and "bear." There are too many problems with that (il)logic to count. For present purposes, it suffices to say that it fundamentally misunderstands *Bruen*'s threshold inquiry and would not even save the challenged regulations, which on their face restrict a citizen's ability to *possess* (i.e., keep) a handgun.

The conduct in which Plaintiffs seek to engage is keeping and bearing handguns. Sections 134-2(e) and 134-3 restrict them from doing so outside a narrow time frame, and unless the government is provided an opportunity to inspect their firearms. That Hawaii accomplishes those ends by restricting the ability to purchase, *see* §134-2(e), and by placing a post-purchase demand on law-abiding citizens, *see* §134-3, makes no difference. The threshold inquiry focuses on a plaintiff's "proposed course of conduct," *Bruen*, 597 U.S. at 32, not the means by which the state has frustrated it. If Hawaii passed a law that said "Hawaiians cannot keep or bear a firearm unless the firearm is purchased within 30 days of an individual's obtaining a permit and submitted to the police for inspection within 5 days of

purchase," no one would seriously dispute that it restricted conduct covered by the plain text. From the perspective of the citizen whose ability to keep and bear arms is restricted, there is no difference between that law and Hawaii's. The threshold question is not whether the Second Amendment explicitly confers a right to purchase a firearm however an individual wants to. It is whether the challenged restriction frustrates the ability to keep or bear arms *at all*.

Adopting Hawaii's contrary view would leave the threshold-textual inquiry covering virtually nothing, as nearly all laws restricting arms-bearing conduct (save a blanket prohibition on keeping or bearing arms) will regulate something more specific than keeping or bearing arms simpliciter. Indeed, that is what Judge Bea seemed to envision in his panel dissent, as he insisted that §§134-2(e) and 134-3 should escape scrutiny so long as they are not so burdensome that they "effectively or in practice 'den[y] ordinary citizens their' rights to keep and carry." *Yukutake v. Lopez*, 130 F.4th 1077, 1110 (9th Cir. 2025) (Bea, J., dissenting) (quoting *Bruen*, 597 U.S. at 38 n.9). But not one word in *Heller*, *Bruen*, or *Rahimi* even hints of some secret sliding scale under which the degree of burden is relevant to the challenger's threshold showing, let alone suggests that laws do not even implicate the right to keep and bear arms unless they effectively foreclosure the exercise of the right entirely.

To be sure, this Court has held "that the plain text of the Second Amendment only prohibits *meaningful constraints* on the right to acquire firearms." *Nguyen*, 140 F.4th at 1241. But while the Second Amendment no doubt restricts the government's ability to pass overly burdensome restrictions on the acquisition of firearms, to interpret the Second Amendment to protect *only* that much would flout *Bruen*'s commands that the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," and that it is not for courts to decide which burdens they think are or are not sufficiently meaningful. 597 U.S. at 70. Indeed, the whole point of interring interest-balancing in this context was to get courts out of the business of making those kinds of subjective assessments, and instead focus them on comparing burdens to those that our Nation has historically tolerated.

Finally, Hawaii contended before the panel that its requirements are mere conditions of purchase and acquisition. That is wrong and irrelevant (and Hawaii abandons the argument en banc). As explained, Hawaii's laws plainly inhibit citizens' ability to *retain possession* of a handgun. Once a citizen secures a permit to purchase and takes possession of her handgun within the 30-day window (or moves into Hawaii with a long-possessed handgun), the only way she can *continue to possess* that firearm without penalty or imprisonment is by handing it over to the police for "physical inspection" within five days of taking possession or moving into

the state. Haw. Rev. Stat. §134-3(a). It blinks reality to suggest that such a restriction does not implicate the explicit textual right to "keep" arms.

In all events, this Court has consistently recognized that the right to keep and bear arms includes the right to purchase or otherwise acquire them. *See, e.g.*, *Nguyen*, 140 F.4th at 1241; *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc). That is unsurprising, as *Heller* itself invoked Founding-era sources demonstrating that the right to "keep arms" was always understood to embrace *taking* possession (and, of course, keeping it). 554 U.S. at 583 n.7. It is little wonder, then, that courts have coalesced around the conclusion that "the Second Amendment's text presumptively protects the act of selling," "transferring," and "obtain[ing]" "a firearm." *United States v. Knipp*, 138 F.4th 429, 434-35, 590 & n.2 (6th Cir. 2025). While Judge Bea took the opposite view, relying on dictum in *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), the Fifth Circuit has since squarely held the opposite, concluding that "the Second Amendment 'covers' the conduct [of] []commercial purchases[]," *Reese v. ATF*, 127 F.4th 583, 590 & n.2 (5th Cir. 2025). Exactly so. "[A]lthough the Second Amendment's text does not spell out the right to obtain firearms, it nonetheless 'covers' that right." *Knipp*, 138 F.4th at 434; *accord Ortega v. Grisham*, 148 F.4th 1134, 1143-44 & n.3 (10th Cir. 2025).[2]

---

[2] Far from "overstat[ing] the Tenth Circuit's position," Dkt.139 at 1, Plaintiffs' supplemental letter, *see* Dkt.134, gets *Ortega* exactly right. The Tenth Circuit was crystal clear: "As paper or a computer is a necessary predicate to the right to print,

## II. *Bruen* Did Not Create A Special Category Of Firearm Regulations That Are Exempt From Its Burden-Shifting Framework.

With no serious textual argument, Hawaii spends nearly all its supplemental response arguing that a footnote in *Bruen* abrogates the Supreme Court's entire burden-shifting framework, that anything connected to a shall-issue regime is presumptively constitutional, and that "[t]o rebut or overcome that presumption of constitutionality, a plaintiff challenging a state licensing regulation [must] bear the burden of alleging and proving that the regulation at issue is 'put toward abusive ends,' such that the regulation effectively or in practice" eviscerates the "rights to keep and carry." *Yukutake*, 130 F.4th at 1110 (Bea, J., dissenting); HI.Supp.Br.6-8. Judge Collins adopted a different position on *Bruen* footnote 9, but his is not correct either. In fact, both views get *Bruen*, and the Second Amendment more generally, exactly backwards.

**A.** To start with common ground, *Bruen* clarified that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to

---

or the ability to own property is a necessary predicate of the right to just compensation for a taking—acquiring, purchasing, and possessing firearms is a necessary predicate to keeping and bearing them." 148 F.4th at 1143. In reality, it is Hawaii that misreads *Ortega* as treating "acquisition" as a lesser-protected right. *See* Dkt.139 at 1. *Ortega* rejected that approach because it "provides no limiting principle," and "inevitably leads to case-by-case judicial interest balancing" regarding what parts of the right enshrined in the Second Amendment are most worth protecting. 148 F.4th at 1144.

obtain a [permit].'" 597 U.S. at 38 n.9. The state and Judge Bea effectively read footnote 9 to say that—and only that. But that is not all footnote 9 said; not by a longshot. It also emphasized that while shall-issue carry-permit regimes are likely permissible because they "do not require applicants to show an atypical need for armed self-defense," any "permitting scheme can be put toward abusive ends," in which case the regime would be inconsistent with this Nation's history of firearms regulation and therefore unconstitutional under the Second Amendment. *Id.  Bruen* thus refused to "rule out constitutional challenges to shall-issue regimes" under the test it established only a few paragraphs earlier. *Id.*

That itself refutes Hawaii's view that *Bruen*'s footnoted dictum means that courts evaluating shall-issue regimes in particular—or any provisions therein—can completely ignore *Bruen*'s threshold-textual inquiry, as well as the historical-tradition analysis that *Bruen* demands, in exchange for an amorphous judicial consideration of "abusiveness." *See* HI.Supp.Br.6-8. After all, if shall-issue licensing regimes did not implicate the Second Amendment at all, then there would have been no need for the Supreme Court to discuss them in *Bruen*, let alone to go out of its way to explain that such regimes can *violate* the Second Amendment if "put toward abusive ends." *Bruen*, 597 U.S. at 38 n.9. The state's contrary view also makes nonsense of constitutional law more generally. Whether laws implicate a constitutional right turns on *whether* they restrict conduct the right covers, not on

10

*how much* they restrict it. To say that a particular type of law does not implicate a constitutional right unless it violates that right is incoherent.[3]

In any event, the notion that footnote 9 places the burden of persuasion on challengers rather than the state is contradicted by the whole thrust of *Bruen*. Hawaii would have one believe that the Court in *Bruen* intended for the footnote to swallow the holding clearly set forth in the body of the decision. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). *Bruen* was emphatic that "a court [may] conclude that" a restriction on arms-bearing conduct "falls outside the Second Amendment's 'unqualified command'" "[o]*nly* if" the government proves that it 'is consistent with this Nation's historical tradition." 597 U.S. at 17 (emphasis added). So too was *Rahimi*, which reiterated that "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation'" by showing that it "is consistent with the principles that underpin our regulatory tradition." 602

---

[3] Far from supporting Hawaii's position, *B&L Productions, Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024), confirmed that "unless the right to *acquire* firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless." *Id.* at 118. In any event, *B&L*'s application of *Bruen*'s Second Amendment analysis to the "commercial sale of arms" on "state property" is distinct from plaintiffs' more basic desire to simply purchase and possess arms— especially considering that *B&L* provided no analysis on *Bruen*'s footnote 9, and the plaintiff there (unlike here) "concede[d] that the Challenged Statutes d[id] not 'meaningfully constrain' the right to keep and bear arms" in that case. *Id.* at 119.

U.S. at 691-92.  And to state what should be obvious, shall-issue licensing regimes "regulate[] arms-bearing conduct."  *Id.*  Indeed, that is all they do.

Against that backdrop, the only sensible reading of footnote 9 is as an application of the historical-tradition inquiry to laws that restrict arms-bearing conduct, but generally do so in ways that are consistent with historical tradition.  Put differently, *Bruen*'s footnoted reference to shall-issue regimes was intended simply to convey that non-abusive shall-issue licensing regimes are, as a general matter, likely to be relevantly similar to the types of restrictions on arms-bearing conduct that have been imposed throughout our Nation's history.  Specifically, the Court was giving voice to the fact that the "why" of those regimes will be historically justified in most cases because they are designed, like other longstanding laws in this Nation's historical tradition, to ensure that only "law-abiding, responsible citizens" carry arms.  *See Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635).  But the question remains whether the "how" of any particular law that a state *claims* to be a shall-issue regime is in fact consistent with what our Nation's historical tradition allows—i.e., whether the state has confined itself to (among other things) "narrow, objective, and definite standards," rather than "requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion'"—"features that typif[ied]" the ahistorical and unconstitutional scheme that New York had in place at the time. *Id.  Bruen*'s recognition that shall-issue regimes "can be put toward abusive ends,"

and thus be unconstitutional, *id.*, was, accordingly, a recognition that *not all* shall-issue regimes are necessarily consistent with our Nation's historical tradition of firearm regulation.

Hawaii's position that footnote 9 resolves this case also rests on a logical fallacy: The mere fact that *Bruen* cautioned that it should not be read to "suggest the unconstitutionality" of every "'shall-issue' licensing regime[]," *id.*, does not mean that it declared *every* shall-issue licensing regime presumptively constitutional. *Contra* HI.Supp.Br.7-8. Even if each state's regime worked the same (they do not), a court would still have to look at *both* the "how" *and* the "[w]hy" of a challenged law. *Rahimi*, 602 U.S. at 692. Moreover, footnote 9 affirmatively refutes any claim that *all* shall-issue regimes are constitutional, as it explains that shall-issue regimes are likely (but not definitively) constitutional because (again) they are normally "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens." *Bruen*, 597 U.S. at 38 n.9. The Court then went on to explain that such regimes may *not* pass muster if they entail, *e.g.*, "lengthy wait times in processing license applications or exorbitant fees." *Id.* And rightly so. Because burdens untethered from the time or cost of ensuring that citizens are in fact law-abiding cannot be justified on that "why," regimes (like Hawaii's) that impose them are instead likely being "put toward abusive ends." *Id.*

All of that suffices to defeat Hawaii's reliance on footnote 9. But there is more. Section 134-3 is not in any meaningful way part of a background-check or shall-issue regime. After all, every citizen who submits a firearm for inspection has *already* obtained a permit and completed a background check. Section 134-3 could not, then, be presumptively justified by the shall-issue regimes of footnote 9 even under Hawaii and Judge Bea's (mis)interpretation. Furthermore, §§134-2(e) and 134-3 are not "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens." *See Bruen*, 597 U.S. at 38 n.9. Both restrictions instead "broadly restrict arms use by the public generally." *Rahimi*, 602 U.S. at 698. Again, §134-3 subjects to inspection firearms purchased by individuals *that the state has already deemed to be law-abiding*. And the only way §134-2(e) could be understood as playing a role in sussing out who "pose[s] a credible threat to the physical safety of others," *id.* at 700, is if the state presumes that everyone who passes a background check and obtains a permit to purchase is at risk of turning from law-abiding and responsible to felonious every 30 days. A law that can be justified only based on "suspicion o[f] citizens presumably exercising their Second Amendment rights in a lawful way," *United States v. Daniels,* 101 F.4th 770, 778 (10th Cir. 2024), is a quintessential law "put toward abusive ends," *Bruen*, 597 U.S. at 38 n.9. *Bruen*'s footnote about shall-issue licensing regimes governing who can

14

carry a firearm in public—which §§134-2(e) and 134-3 are obviously not—is thus no help to the state.

**B.** Judge Collins' reading of footnote 9 as requiring limited means-ends scrutiny divorced from historical tradition to decide whether some part of a shall-issue regime is "abusive," fares little better. *Bruen* resoundingly rejected any and all use of "means-end scrutiny in the Second Amendment context." 597 U.S. at 19. That emphatic statement alone overcomes any contrary inference from footnote 9's supposedly "opaque dicta." *Yukutake*, 130 F.4th at 1104 (Lee, J., concurring). Properly interpreted, footnote 9 stands for the proposition that non-abusive shall-issue regimes will generally find support in historical tradition. As noted above, the "why" of those regimes will be historically justified in most cases because they are designed to ensure that only "law-abiding, responsible citizens" carry arms. *See Bruen*, 597 U.S. at 38 n.9. There is no need for means-end scrutiny divorced from historical tradition in that analysis.

### III. Hawaii Has Failed To Proffer Any Historical Analogue To Justify Either Law As Consistent With This Nation's Historical Tradition.

Even assuming *Bruen*'s footnote 9 created some presumption of constitutionality for shall-issue regimes, it mentioned shall-issue regimes only for *carry permits*, not (as relevant here) permit-to-purchase regimes—much less temporal permit-to-purchase restrictions like §134-2(e). That was likely for good reason. While shall-issue *carry*-permit regimes have some historical pedigree,

15

permits-to-purchase regimes are a modern novelty, remain exceedingly rare, and burden the right to keep and bear arms much differently than carry-permit regimes (as they restrict possession too). *See* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 343-46, 352-55, 358, 360-61 (2016). Even today, such regimes remain quite rare. That is no "enduring American tradition." *Bruen*, 597 U.S. at 69-70.

As to the history, Hawaii's proffered analogue underscores the novelty of §134-3. Before the panel, Hawaii pointed to militia laws that required in-person weapons inspections to ensure military readiness. *Yukutake*, 130 F.4th at 1101-02. But such inspections were not five-day deadlines for lawful gun ownership; as Hawaii itself attests, they were either part of a *mandate* to purchase, or freestanding obligations for persons already required to own weapons. And they were meant to ensure military readiness, not to ferret out firearms deemed especially dangerous. *See, e.g.*, An Act for forming, regulating, and conducting the military Force of this State, *in* Acts and Laws of the State of Connecticut, in America at 150-51 (1784) (requiring all "Housholders under fifty-five Years of Age" to be "furnished at their own Expence" with certain weapons, and requiring periodic inspections to look for any "deficiency of Arms and Ammunition," punishable by fine). Perhaps Hawaii could mandate gun ownership and periodically inspect all weapons to ensure adequate upkeep and operation, but §134-3 is practically the opposite of such a law.

It is no surprise, then, that Hawaii is the *only* state to require in-person inspection and registration of weapons. These novel restrictions are far afield from those our Nation's historical tradition tolerates.

## IV. Hawaii's Remedial Arguments Do Not Require Reversal.

Last and least, Hawaii urges this Court to reverse and instruct the district court to enter summary judgment in the state's favor on plaintiffs' facial challenge. HI.Supp.Br.15-16. But in arguing that plaintiffs have failed to meet the standard for a facial challenge, Hawaii ignores that "[t]he distinction" between a facial and as-applied challenge "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). To be sure, "[f]acial challenges are disfavored" because they "often rest on speculation" (and thus "raise the risk of premature interpretations of statutes") and can put courts in the position of having to "resolve questions of constitutionality with respect to each potential situation that might develop." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 962 (9th Cir. 2014). But there is nothing speculative about the harms the challenged law has caused plaintiffs. Nor is this a challenge to "complex and comprehensive legislation" requiring a robust analysis of a host of "potential situation[s] that might develop." *Id.* Plaintiffs challenge two narrow provisions of §§134-2(e) and 134-3, each of which applies the same to everyone in Hawaii. In any event, short of procuring a declaration from every layperson in the

17

state, it is a mystery how Hawaii would propose that plaintiffs satisfy its impossible standard for a facial challenge in this case.

## CONCLUSION

The Court should affirm.

Respectfully submitted,

LAWRENCE G. KEANE
SHELBY BAIRD SMITH
NATIONAL SHOOTING
  SPORTS FOUNDATION, INC.
400 N. Capitol St., NW
Washington, DC 20001
(202) 220-1340

s/ Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Amicus Curie*

November 20, 2025

18

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Circuit R. 32-1 because this brief contains 4,197 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.


November 20, 2025

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy