No. 21-16756

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TODD YUKUTAKE; DAVID KIKUKAWA,

*Plaintiffs-Appellees,*

v.

ANNE E. LOPEZ, in her Official Capacity as
Attorney General of the State of Hawaii,

*Defendant-Appellant,*

and

CITY AND COUNTY OF HONOLULU,

*Defendant.*

On Appeal from the United States District Court
for the District of Hawaii
Case No. 1:19-CV-00578-JMS-RT

**BRIEF OF IDAHO, ALABAMA, ALASKA, ARKANSAS, FLORIDA, GEORGIA, INDIANA, IOWA, KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, NORTH DAKOTA, OHIO, SOUTH CAROLINA, SOUTH DAKOTA, TEXAS, UTAH, WEST VIRGINIA, WYOMING, AND THE ARIZONA LEGISLATURE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

RAÚL R. LABRADOR
Attorney General

OFFICE OF THE IDAHO
ATTORNEY GENERAL
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
jack.corkery@ag.idaho.gov

ALAN M. HURST
Solicitor General

SEAN M. CORKERY
Assistant Solicitor General

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTEREST OF THE *AMICI* STATES ............................................................................ 1

SUMMARY OF THE ARGUMENT ................................................................................. 2

ARGUMENT ........................................................................................................................ 4

   I.   The Provisions Implicate the Plain Text of the Second Amendment. ................. 4

       A.   The Acquisition of Firearms is Protected by the Second Amendment ..... 5

       B.   Dicta from *Bruen* Does Not Override the Two-Step Inquiry. .................. 10

       C.   The Provisions Fail the Atextual "Meaningfully Constrain" Test. .......... 12

   II.   The Provisions Are Not Consistent with This Nation's Historical Tradition. ... 15

       A.   There Is No Historical Analog to Hawaii's Permit to Acquire Law ........ 15

       B.   There Is No Historical Analog to Hawaii's Inspection Requirement. .... 18

CONCLUSION ................................................................................................................... 19

## TABLE OF AUTHORITIES

### CASES

*B&L Prods. Inc. v. Newsom,*
104 F.4th 108 (9th Cir. 2024) ................................................................. 7, 13, 14

*Brown v. Davenport,*
596 U.S. 118 (2022) ...................................................................................... 12

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .................................................................................. 3, 13

*Free Speech Coal., Inc. v. Paxton,*
606 U.S. 461 (2025) ........................................................................................ 7

*Luis v. United States,*
578 U.S. 5 (2016) ............................................................................................ 6

*Maryland Shall Issue, Inc. v. Moore,*
116 F.4th 211 (4th Cir. 2024) .................................................................. 6, 11

*McCoy v. ATF,*
140 F.4th 568 (4th Cir. 2025) ....................................................................... 8

*McDonald v. City of Chi.,*
561 U.S. 742 (2010) ..................................................................................... 10

*National Rifle Association v. Bondi,*
133 F.4th 1108 (11th Cir. 2025) .................................................................... 8

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
597 U.S. 1 (2022) ...................................................................................passim

*Nunn v. State,*
1 Ga. 243 (1846) .......................................................................................... 13

*Reese v. ATF,*
127 F.4th 583 (5th Cir. 2025) ....................................................................... 8

*Rhode v. Bonta,*
145 F.4th 1090 (9th Cir. 2025) .................................................................... 14

*Snope v. Brown,*
  145 S. Ct. 1534 (2025) ............................................................................. 10

*State v. Wilson,*
  543 P.3d 440 (Haw. 2024) ........................................................................... 1

*Teixeira v. County of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ............................................................ 7, 8, 15

*United States v. Gore,*
  118 F.4th 808 (6th Cir. 2024) ...................................................................... 8

*United States v. Rahimi,*
  602 U.S. 680 (2024) ......................................................................... 8, 17, 18

*Wolford v. Lopez,*
  125 F.4th 1230 (9th Cir. 2025) .................................................................... 1

*Yukutake v. Connors,*
  554 F. Supp. 3d 1074 (D. Haw. 2021) ...................................................... 2, 3

*Yukutake v. Lopez,*
  130 F.4th 1077 (9th Cir. 2025) ............................................................ *passim*

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II .............................................................................. *passim*

## STATUTES

The Federal Militia Act of 1792 § 1, 1 Stat. 271 (May 8, 1792) ...................... 16

Haw. Rev. Stat. § 134-2 ........................................................................... *passim*

Haw. Rev. Stat. § 134-3 ........................................................................... *passim*

Haw. Rev. Stat. § 134-9.5 ........................................................................ 1, 11

Haw. Rev. Stat. § 134-17 .............................................................................. 3, 5

Idaho Code, Title 18, Chapter 33 .................................................................... 4

## OTHER AUTHORITIES

2 George Tucker, *Blackstone's Commentaries* (1803) ................................................13

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts (2012) ...........6

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983) ...............................................................17

*FBI Releases 2024 Reported Crimes in the Nation Statistics*, FBI (Aug. 5, 2025) ....................1

James Wilson's Lectures on Law, Part 3, Chapter IV, Of Crimes Against the Right of Individuals to Personal Safety, *in* 2 Collected Works of James Wilson (K. Hall & M. Hall eds., 2007) ..............................................................................3

The Federalist No. 44, (C. Rossiter ed. 1961) (J. Madison) ................................7

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* (1868) ....................................7

United States Selective Service System, Backgrounds of Selective Service: Military Obligation: The American Tradition, Vol. II, (reprinting An Act for Forming, Regulating, and Conducting the Military Force of this State (Conn. 1784) ...............16

### INTEREST OF THE *AMICI* STATES

The States of Idaho, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Texas, Utah, West Virginia, Wyoming, and the Arizona Legislature respectfully submit this brief as amici curiae in support of Plaintiffs-Appellees. Amici States respect the right of the people to keep and bear arms. The Constitution expressly guarantees this right because it is "necessary to the security of a free State." U.S. Const. amend. II. And particularly today, where a new violent crime is perpetrated in the U.S. every 25.9 seconds, law-abiding citizens need the ability to arm and defend themselves. *See FBI Releases 2024 Reported Crimes in the Nation Statistics*, FBI (Aug. 5, 2025), https://tinyurl.com/2s3w4kc3. For that reason, Amici States have taken unapologetic stands to defend the Second Amendment.

Hawaii holds a quite different view of the right's importance. *See State v. Wilson*, 543 P.3d 440, 442, 459 (Haw. 2024) (claiming that "*Bruen* snubs federalism principles" and holding "the spirit of Aloha clashes with a federally-mandated lifestyle that lets citizens walk around with deadly weapons during day-to-day activities"). Again and again, it has passed laws which fly in the face of the Second Amendment. *See Wolford v. Lopez*, 125 F.4th 1230, 1233 (9th Cir. 2025) (Mem. Op.) (Van Dyke, J., dissenting from denial of reh'g en banc) (analyzing Hawaii law criminalizing the possession of a firearm on 96.4% of publicly accessible land in Maui County); Haw. Rev. Stat. § 134-9.5 (criminalizing the possession of a firearm on private land without express

1

authorization). Here is no different. The State has passed laws which intentionally attack the core of the Second Amendment: the keeping of arms. And those laws are completely inconsistent "with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).

In many ways, States are laboratories of democracy. But when it comes to the Bill of Rights, States cannot experiment. All States must respect and defend all Americans' rights. Unless enjoined, these laws' eroding impact will not be confined to Hawaii.

Accordingly, Amici States file this brief in support of Plaintiffs-Appellees under Federal Rule of Appellate Procedure 29(a)(2).

## SUMMARY OF THE ARGUMENT

When taken together, two of Hawaii's laws put arbitrary and stringent hurdles upon the act of lawfully acquiring and keeping a firearm. The first provision, Hawaii Revised Statutes § 134-2(e), provides the process for a citizen to initially acquire a firearm. A law-abiding Hawaiian attempting to acquire a firearm for self-defense begins the process by entering a gun store. While there, the resident must identify the make, model, and serial number of the firearm he wishes to purchase. *Yukutake v. Connors*, 554 F. Supp. 3d 1074, 1078 (D. Haw. 2021). Next, the applicant must appear at the police department to apply for the permit to acquire the handgun. *Id.* After a 14-day waiting period, the applicant has only 30 (previously 10) days to return to the police department during business hours to pick up the permit. *Id.*; *Yukutake v. Lopez*, 130 F.4th 1077, 1083

(9th Cir. 2025), *vacated, reh'g en banc granted*, 144 F.4th 1119 (9th Cir. 2025). If he fails this, he must begin the process anew. *See Yukutake*, 554 F. Supp. 3d at 1078. Then, after retrieving the permit, he may go to the gun store to pick up the weapon within 30 (previously 10) days. *Yukutake*, 130 F.4th at 1081 & n.3. Again, if he fails to do so within the required time limit he must start over from the beginning. *See id.*

But the process doesn't end there. After fulfilling those burdensome requirements, § 134-3 requires a handgun purchaser to return to the police department within five days so the chief of police may inspect the firearm.[1] *Yukutake*, 554 F. Supp. 3d at 1078. If he fails to do so, he is subject to criminal penalties—including confiscation of his arms. § 134-17(b)(3).

Together, § 134-2(e)'s timing requirements and § 134-3's inspection requirement create an elaborate series of hurdles that must be cleared before someone can "keep" a handgun. This regime strays from the Second Amendment's basic tenets. The Amendment stands as a reminder to both state and federal governments that the people have a "*pre-existing*" right to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Hawaii's job is to recognize and defend that right, not create arbitrary hurdles to exercise it. *See* James Wilson's Lectures on Law, Part 3, Chapter IV, Of Crimes Against the Right of Individuals to Personal Safety, *in* 2 Collected Works of

---

[1] Following the district court's injunction, the statute was amended to exempt handguns purchased from licensed dealers from the inspection requirement. *Yukutake*, 130 F.4th at 1083.

James Wilson (K. Hall & M. Hall eds., 2007), https://tinyurl.com/2p8244t4 (The right "cannot be repealed, or superseded, or suspended by any human institution.").

The *Bruen* analysis here is straightforward. At step one, the Court should have "little difficulty concluding" that the "plain text of the Second Amendment" protects the right to keep—and, by necessity, acquire—firearms. *Bruen*, 597 U.S. at 32. At step two, Hawaii has not come close to meeting its burden to identify "well-established and representative historical analogue[s]" justifying the relevant provisions. *Id.* at 30.

Amici States recognize the gravity of gun violence. *See, e.g.*, Idaho Code, Title 18, Chapter 33 (firearm related offenses). But such violence is not new, and, at ratification in 1789, the Framers responded to this unfortunate reality by ensuring that Americans would always be able to arm themselves with effective and useful weapons. Hawaii can act to prevent gun violence, too, and it should—by investigating crime and holding criminals fully responsible for their unlawful conduct. Hawaii, however, cannot obstruct its law-abiding citizens from exercising their rights. The Court should strike down Hawaii's § 134-2(e) and § 134-3 to vindicate the people's rights under the Second Amendment.

**ARGUMENT**

## I. The Provisions Implicate the Plain Text of the Second Amendment.

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In determining if this command is violated, courts must ask whether "the Second Amendment's plain text covers an

individual's conduct." *N.Y. State Rifle & Pistol Ass. v. Bruen*, 597 U.S. 1, 17 (2022). If it does, that conduct is "presumptively protect[ed]." *Id.*

Both provisions regulate what the Second Amendment plainly protects. Hawaii Revised Statutes § 134-2(e)'s temporal restrictions on handgun acquisition regulate conduct covered by the Second Amendment's plain text because restrictions on arms acquisition "infringe[]" on an individual's ability "to keep and bear Arms." U.S. Const. amend. II. Similarly, § 134-3's inspection requirement is part of Hawaii's regime in regulating the acquisition of arms—it therefore implicates the Second Amendments' plain text for the same reasons § 134-2(e) does.[2]

## A.  The Acquisition of Firearms is Protected by the Second Amendment.

A straightforward textual analysis of the Second Amendment shows that its "plain text covers" arms acquisition in two independent ways. *Bruen*, 597 U.S. at 17. First, "shall not be infringed" extends the Second Amendment's protection to acts beyond "keep[ing]" and "bear[ing]" arms. Second, because acquisition is a necessary predicate of "keep[ing]" and "bear[ing]" arms, it is also protected by the Second Amendment under longstanding principles of textual interpretation.

The Second Amendment has a broad sweep. Rather than proclaim that "the right to keep and bear Arms" should not be denied, the Second Amendment insists that the

---

[2] Section 134-3 implicates the Second Amendment for another reason: it directly regulates the keeping of arms. *See* Haw. Rev. Stat. § 134-17(b)(3).

right "shall not be infringed." U.S. Const. amend. II. Through the phrase "shall not be infringed," the Second Amendment's plain text secures the "keep[ing]" and "bear[ing]" arms. *Id.* But it also covers related acts as well. As originally understood, "infringe" includes "burdens that [fall] short of total deprivations," like those that hinder the exercise of the right. *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 244 (4th Cir. 2024) (Richardson, J., dissenting); *see Infringe*, Johnson's Dictionary of the English Language (4th ed. 1773) ("violate"; "destroy" or "hinder"). "Hinder" means "[t]o stop; to interrupt; to obstruct; to impede or prevent from moving forward by any means." *Hinder*, Webster's Am. Dictionary of the English Language (1st ed. 1828).

Hawaii's laws, like all restrictions on arms acquisition, plainly "infringe" on "the right to keep and bear Arms." U.S. Const. amend II. The elaborate series of obstacles Hawaii has erected against handgun acquisition "hinder[s]" and "impede[s] . . . [one] from moving forward" with keeping an arm, and thus regulates conduct covered by the "Second Amendment's plain text." *Hinder,* Webster's Am. Dictionary (first two quotes); *Bruen*, 597 U.S. at 17 (third quote).

Even without the Second Amendment's sweeping "infringe[]" language, its plain text would still cover arms acquisition. That's because, as "[t]he law has long recognized," "the '[a]uthorization of an act also authorizes a necessary predicate act.'" *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 192 (2012)). "Constitutional rights thus implicitly protect those closely related acts necessary

6

to their exercise." *Id.*; *accord Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 478 (2025) (quoting The Federalist No. 44, p. 285 (C. Rossiter ed. 1961) (J. Madison)) ("No axiom is more clearly established in law, or in reason, than that . . . wherever a general power to do a thing is given, every particular power necessary for doing it is included."). Under this canon—termed the "predicate-act canon"—"[W]here a general power is conferred or duty enjoined, every particular power necessary for the exercise of the one, or the performance of the other, is also conferred." Scalia & Garner at 192 (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 63 (1868)).

The need for this canon in other constitutional contexts is obvious. Without this canon, governments could nullify rights by burdening the avenues of constitutional rights. Free exercise would mean little if governments could freely ban constructing churches, temples, or mosques—for many faiths, a predicate act necessary to worship. Freedom of the press would mean little if governments could freely prohibit acquiring printers and ink.

And, as this Court has recognized, the right to keep and bear arms would similarly mean little if governments could freely prohibit acquiring arms. *B&L Prods. Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) (en banc); *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc), abrogated in part by *Bruen*, 597 U.S. at 17 ("[T]he core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (cleaned up).

7

Multiple courts of appeal have recognized that the basic linguistic intuition encapsulated by the predicate-act canon compels the conclusion that the Second Amendment's plain text covers arms acquisition. In *Reese*, the Fifth Circuit held that federal laws prohibiting young adults from purchasing handguns regulated conduct covered by the Second Amendment's plain text because "the right to 'keep and bear arms' surely implies the right to purchase them." *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025) (citing, *inter alia*, *Teixeira*, 873 F.3d at 677). "Because constitutional rights impliedly protect corollary acts necessary to their exercise," the court continued, the Second Amendment "covers" commercial purchases. *Id.* ("The baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether.").

Similarly, in *United States v. Gore*, the Sixth Circuit held that "[r]eceiving a firearm, of course, is protected because it is a logical antecedent to 'keeping' a firearm." 118 F.4th 808, 813 (6th Cir. 2024) (quoting U.S. Const. amend. II) (cleaned up). The Eleventh Circuit implicitly reached the same conclusion in *National Rifle Association v. Bondi* when considering a challenge to Florida's prohibition on young adults purchasing firearms. 133 F.4th 1108 (11th Cir. 2025) (en banc). The court treated the challenged law as "regulating arms-bearing conduct," and proceeded to "examine the [nation's] 'historical tradition of firearm regulation'" under *Bruen*'s second step. *Id.* at 1114 (quoting *United States v. Rahimi*, 602 U.S. 680, 691 (2024)); *see also McCoy v. ATF*, 140

F.4th 568, 575 (4th Cir. 2025) (noting it was undisputed that "purchasing a handgun for lawful purposes" "is part of the 'conduct' protected by the [Second] Amendment") (citing *Bruen*, 597 U.S. at 31–32).

Despite the Second Amendment's clear mandate, the panel dissent made two serious errors in claiming that because the Second Amendment does not contain the word "acquire," "[t]he acquisition of arms . . . is protected by the Second Amendment, [] *only to the extent necessary to preserve* the explicitly granted rights to keep and bear arms." *Yukutake*, 130 F.4th at 1111 (Bea, J. dissenting) (emphasis added). First, it ignored the phrase "shall not be infringed," which forecloses a narrow "necessary-to-preserve" test. Because restrictions on acquisition necessarily "infringe[]" upon the right to "keep" arms, acquisition falls within the Second Amendment's plain text just as clearly as if the right to "acquire" arms were listed explicitly. U.S. Const. amend. II.

Second, although the dissent acknowledged that that acquisition is a "predicate act necessary to actual possession," *Yukutake*, 130 F.4th at 1111 & n.2, it misapplied the predicate-act canon. In the dissent's view, rights "implied" by the canon "receiv[e] protection only to the extent necessary to preserve" the right to keep and bear arms. *Id.* (emphasis omitted). Under that logic, a government could in fact forbid the construction of churches—after all, the faithful can always worship at home.

But the predicate-act canon does not take that tack. It is a textual canon, reflecting a text's ordinary semantic meaning. Whatever acts the Second Amendment protects when the predicate-act canon is applied are therefore protected by its plain

9

text, and the right to engage in those actions cannot be treated as a "second-class right." *McDonald v. City of Chi.*, 561 U.S. 742, 780 (2010). This Court should reject the panel dissent's atextual analysis as inconsistent with *Bruen*'s command to look to "the Second Amendment's plain text." *Bruen*, 597 U.S. at 17.

## B. Dicta from *Bruen* Does Not Override the Two-Step Inquiry.

*Bruen* embodies a careful analysis of the Second Amendment's text and the history of firearm regulation. *Bruen*'s holding, in light of this considered analysis, is crystal clear. When a challenge is brought to a firearm regulation, a challenger must show that "the Second Amendment's plain text covers [his] conduct." *Bruen*, 597 U.S. at 17. If a challenger shows this, the conduct is "presumptively protect[ed]" and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

Hawaii "appear[s] bent on distorting th[e] [Supreme] Court's Second Amendment precedents." *Snope v. Brown*, 145 S. Ct. 1534, 1538 (2025) (Thomas, J., dissenting from denial of certiorari). Cherry-picking the Supreme Court's "opaque dicta," it argues that § 134-2(e) is not subject to *Bruen*'s holding because, like the "shall-issue" permitting regimes passingly mentioned in *Bruen*'s ninth footnote, it aims to prevent gun ownership by those who are not "law abiding, responsible citizens." *Yukutake*, 130 F.4th 1104 (Lee, J., concurring) (first quote); *Bruen*, 597 U.S. at 38 n.9 (cleaned up) (second and third quotes); *see* Supplemental Brief of Defendant-Appellant at 30.

By Hawaii's lights, the Supreme Court hid an elephant in a mousehole—provided that a State attempts to limit firearms to law-abiding citizens, it may altogether ignore the carefully laid out two-step inquiry. Hawaii's reliance on footnote nine is misplaced. Footnote nine merely clarifies that, because may-issue and shall-issue regimes impose different burdens on the Second Amendment right, a holding that may-issue regimes are unconstitutional does not imply that shall-issue regimes are unconstitutional. *See Maryland Shall Issue*, 116 F.4th at 242–43 (dissenting).

More importantly, even if the footnote constituted precedent on the constitutionality of shall-issue regimes, it would not help Hawaii in circumventing the rest of *Bruen*. Footnote nine contemplates laws that "require applicants to undergo a background check or pass a firearms safety course." *Bruen*, 597 U.S. at 38 n.9. Hawaii does have such a law. § 134-9.[3] But the respondents are challenging §§ 134-2(e) and 134-3, which together forbid U.S. citizens from exercising their constitutional rights— and potentially subject them to criminal penalties—unless they visit a police station three times and a gun store twice in the correct sequence and under an intentionally condensed timetable. *Bruen*'s footnote nine says nothing at all about this kind of arbitrary roadblock-laden regime.

---

[3] Before *Bruen*, Hawaii imposed the unconstitutional requirement that applicants show an "exceptional case" before it would issue a carry permit. § 134-9 (2007); *see Bruen*, 597 U.S. at 15.

Further, if shall-issue regimes are constitutional, it is not because they get a different test from other burdens on Second Amendment rights. *Bruen* was emphatic in establishing one, and only one, test for the constitutionality of firearms regulations: "We reiterate that *the* standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24 (emphasis supplied). Thus, "the Court's dicta in footnote 9 must be understood as having effectively concluded that attaching modern-day background checks to the acquisition of firearms satisfies both the 'how' and the 'why' of *Bruen*'s historically based test." *Yukutake*, 130 F.4th at 1096. This Court should decline Hawaii's baseless invitation to craft an additional test for a subset of firearm regulations, stretching footnote nine "beyond [its] context—all to justify an outcome inconsistent with th[e] [Supreme] Court's reasoning" *Brown v. Davenport*, 596 U.S. 118, 141 (2022).

### C. The Provisions Fail the Atextual "Meaningfully Constrain" Test.

Again, under the first step of *Bruen*, the *only* thing respondents need to show at the outset is that "the Second Amendment's plain text covers" arms acquisition. *Bruen*, 597 U.S. at 17. It does. *See* Part I.A.

To alleviate Hawaii's burden, the State and the panel dissent rely on *B&L Products*. In that case, this Court—drawing from the well of outdated pre-Bruen

caselaw—put a qualifier on an "unqualified command": laws must "*meaningfully constrain the right to keep and bear arms*" to fail the first step of *Bruen*. *Bruen*, 597 U.S. at 24 (cleaned up) (first quote); *B&L Prods.*, 104 F.4th at 118–19 (cleaned up) (emphasis added) (second quote).

As an initial matter, this judicially-created modifier is inconsistent with the text of the Second Amendment. *See Infringe*, Webster's Am. Dictionary (defining "infringe" as "[t]o destroy or *hinder*") (emphasis supplied). It is inconsistent with the Supreme Court's holding in *Bruen*. And it exists only to allow judges to engage in the same "interest-balancing inquiry" that *Bruen* explicitly rejected. *Bruen*, 597 U.S. at 22 (quoting *Heller*, 554 U.S. at 634).

Instead, under *Bruen*, when a regulation hinders conduct covered by the plain text of the Second Amendment *to any extent*, "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24; *see* 2 George Tucker, *Blackstone's Commentaries* 143 n.40 (1803) ("The right of the people to keep and bear arms shall not be infringed, *and this without any qualification as to their condition or degree*, as is the case in the British government.") (emphasis added)); *Nunn v. State*, 1 Ga. 243, 251 (1846) ("The right of the whole people . . . to keep and bear *arms* . . . shall not be *infringed*, curtailed, or broken in upon, *in the smallest degree*." (third emphasis added)). This en banc Court should take the opportunity to abrogate *B&L Products'* rewriting of the Second Amendment.

But truthfully, Hawaii's laws can't even survive *B&L Products*' lenient test. The burdens of § 134-2(e)'s temporal requirements for handgun acquisition are clearly far from de minimis. Starting with the economic costs, the provision forces citizens to make direct payments to the State in connection with permit applications as well as bear the inevitable costs of traveling at least twice to a police station during working hours. § 134-2(e); § 134-2(i). Although these costs alone would be enough to "meaningfully constrain" the right to keep and bear arms, the provision intentionally delays citizens from exercising their constitutional rights—a manifest "meaningful constraint" on those rights. *B&L Prods.*, 104 F.4th at 118–19; *see Rhode v. Bonta*, 145 F.4th 1090, 1099–107 (9th Cir. 2025) (holding the inherent costs and delays of California's ammunition check law "meaningfully constrain[ed]" the right to keep and bear arms). Beyond the 14-day waiting period, the provision's scattered timeline inherently causes additional delays. And these delays mount if an applicant's permit lapses due to Hawaii's exacting deadlines—forcing the applicant to begin anew. In some cases, the efforts required to meet these deadlines will inevitably lead citizens to forfeit their constitutional rights altogether.

And § 134-3's inspection requirement directly regulates the "keep[ing]" of arms, by controlling gun owners' conduct after arms are acquired, so the *B&L Products* test does not apply. The *B&L Products* test is used to determine "the extent to which the Second Amendment's plain text protects ancillary rights," not to evaluate regulations covered by the Second Amendment "[o]n it's face." *B&L Prods.*, 104 F.4th at 117, 118.

14

Even if this Court were to extend *B&L Products'* atextual requirement to "the core right to possess a firearm for self-defense," Hawaii's rule forcing gun owners to bring handguns to the police chief within five days of acquisition does not survive it. *Id.* at 118 (quoting *Teixeira*, 873 F.3d at 677). This demanding timeline, enforced with criminal penalties, "meaningfully constrains" the right to keep arms under any reasonable definition of the term.

## II. The Provisions Are Not Consistent with This Nation's Historical Tradition.

Because § 134-2(e)'s temporal requirements for handgun acquisition and § 134-3's inspection requirement regulate conduct that "the Second Amendment's plain text covers," the burden shifts to Hawaii to "demonstrate that the regulation[s] [are] consistent with this Nation's historical tradition of firearm regulation" to withstand constitutional scrutiny. *Bruen*, 597 U.S. at 17. To do so, Hawaii must show that its laws are "relevantly similar" to historical regulations, an inquiry guided by examining "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. Hawaii has not come close.

### A. There Is No Historical Analog to Hawaii's Permit to Acquire Law.

Hawaii identifies no "relevantly similar" law to § 134-2(e)'s temporal requirements for handgun acquisition. Hawaii first attempts to rely on founding-era laws requiring militia members to "provide [themselves] with a good musket."

15

Supplemental Brief of Defendant-Appellant at 9–19; *see, e.g.*, The Federal Militia Act of 1792 § 1, 1 Stat. 271 (May 8, 1792).

These laws obviously fail *Bruen*'s "how" prong, because they *in no way* burden the right to keep or bear arms. Hawaii argues that an official mandate to own arms implies official approval that the firearm may be acquired, but the militia laws give no indication that government approval was a *prerequisite* for acquisition as in § 134-2(e). Supplemental Brief of Defendant-Appellant at 18. The militia laws also did not require government approval to acquire firearms in general. For example, a Connecticut statute required militia members to acquire a "well fixed Musket, the Barrel not less than three Feet and a Half long." United States Selective Service System, Backgrounds of Selective Service: Military Obligation: The American Tradition, Vol. II, Pt. 2, at 256 (reprinting An Act for Forming, Regulating, and Conducting the Military Force of this State (Conn. 1784)). But a militiaman could purchase a musket with a barrel three feet long without government approval, implicit or otherwise. The statute would only require him to acquire another musket with a longer barrel.

The militia statutes also fail *Bruen*'s "why" prong. Section 134-2(e)'s temporal requirements for handgun acquisition serve "to ensure that law-abiding, responsible citizens own firearms rather than criminals" and "to prevent those who are disqualified from owning a firearm from acquiring it in the first place." Supplemental Brief of Defendant-Appellant at 4. Militia laws, in contrast, were directed towards "the repelling of foreign enemies" and perhaps "prevention of crime and apprehension of criminals."

16

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 215 n.47 (1983). Hawaii urges this Court to look at the historical and modern regulations at an absurdly high level of generality, arguing *Bruen*'s "why" prong is met because § 134-2(e)'s temporal requirements for handgun acquisition and militia laws "both ultimately protect the security of the community." Supplemental Brief of Defendant Appellant at 19. But this is not the proper way to look for "relevantly similar" historical analogs. Courts look for "laws at the founding regulat[ing] firearm use to address [the] *particular* problems" addressed by the modern statute, and courts "must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 602 U.S. at 692 (emphasis supplied) (first quote); *id.* at 740 (Barrett, J., concurring) (second quote). The "particular problems" of community defense and criminal apprehension are in no way similar to preventing disqualified citizens from acquiring firearms.

Hawaii's reliance on loyalty oaths and pardons do no more than militia laws to justify § 134-2(e). Even if these statutes satisfy *Bruen*'s "why" requirement, they miss the mark on the "how." As the panel majority noted: "A system of individualized applications that governs *only* persons who have *already* been determined to lack the ability to possess firearms (such as the loyalty oath and pardon systems invoked by Hawaii here) is not 'relevantly similar' to a system that requires *all* persons, the great majority of whom *cannot* constitutionally be disarmed, to submit individualized applications before they may exercise their constitutional rights." *Yukutake*, 130 F.4th

1098 n.10 (emphasis original) (quoting *Rahimi*, 602 U.S. at 692). The subset of persons at which the laws are aimed are different—loyalty oaths and pardons were aimed at people who had already been disarmed, such as British loyalists, while § 134-2(e)'s temporal requirements for handgun acquisition are aimed at all Hawaiians. *See id.*; *cf. Rahimi*, 602 U.S. at 698–99 (holding *Bruen*'s "how" requirement was satisfied where the modern law and historical analog were both aimed at individuals judicially determined to threaten the safety of others).

Even if *Rahimi* is (mis)read to allow the "mixing and matching [of] historical laws—relying on one law's burden and another law's justification," § 134-2(e)'s temporal requirements for handgun acquisition still cannot be justified because Hawaii has pointed to no statute that satisfies *Bruen*'s "how" prong. *Rahimi*, 602 U.S. at 772 (Thomas, J., dissenting). Because none of the statutes Hawaii offered are "relevantly similar" to § 134-2(e) based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense," it has not shown that it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24, 29.

**B. There Is No Historical Analog to Hawaii's Inspection Requirement.**

To justify § 134-3's inspection requirement, Hawaii argues that founding-era statutes requiring militiamen to submit their arms to superiors for inspection are "relevantly similar." *See Yukutake*, 130 F.4th at 1101–02 (collecting statutes requiring militiamen to submit their arms and ammunition to inspection by superiors). As the panel majority held, this comparison fails both *Bruen*'s "why" and "how" prongs. *Id.* at

1102–03. This comparison fails the "why" prong because § 134-3's inspection requirement addresses the "particular problem" of identifying guns that cannot be owned under Hawaii law or lacking serial numbers, while militia inspection statutes aimed to ensure that firearms were operable. *Id.* It also fails the "how" prong because a militiaman did not have to submit all recently acquired arms to inspection. Because Hawaii has not shown that § 134-3's inspection requirement is "relevantly similar" to the militia inspection statutes, it has not demonstrated § 134-3's inspection requirement "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24, 29.

## CONCLUSION

For all these reasons, this Court should affirm.

Dated: November 20, 2025       Respectfully submitted,

RAÚL R. LABRADOR
ATTORNEY GENERAL

*/s/ Sean M. Corkery*

SEAN. M. CORKERY
ASSISTANT SOLICITOR GENERAL

### ADDITIONAL SIGNATORIES

STEVE MARSHALL
Attorney General
State of Alabama

STEPHEN J. COX
Attorney General
State of Alaska

STEVE MONTENEGRO
Speaker of the Arizona
House of Representatives

WARREN PETERSON
President of the
Arizona Senate

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
State of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

KEITH G. KAUTZ
Attorney General
State of Wyoming

**CERTIFICATE OF COMPLIANCE**

9th Circuit Case No.:          21-16756

**This brief contains 4,736 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

Dated: November 20, 2025

/s/ *Sean M. Corkery*
Sean M. Corkery

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/ *Sean M. Corkery*
Sean M. Corkery