**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| TODD YUKUTAKE; DAVID KIKUKAWA,<br><br>*Plaintiffs-Appellees*,<br><br>v.<br><br>ANNE E. LOPEZ, In her Official Capacity as the Attorney General of the State of Hawaii,<br><br>*Defendant-Appellant*,<br><br>and<br><br>CITY AND COUNTY OF HONOLULU,<br><br>*Defendant*. | No. 21-16756<br><br>D.C. No. 1:19-cv-00578-JMS-RT<br><br>OPINION |

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, District Judge, Presiding

Argued and Submitted March 24, 2026
Pasadena, California

Filed September 22, 2026

Before: Mary H. Murguia, Chief Judge, and Kim McLane Wardlaw, Jacqueline H. Nguyen, John B. Owens, Ryan D. Nelson, Bridget S. Bade, Daniel A. Bress, Danielle J. Forrest, Lawrence VanDyke, Gabriel P. Sanchez and Holly A. Thomas, Circuit Judges.

Opinion by Judge Owens;
Dissent by Judge R. Nelson;
Dissent by Judge Forrest;
Dissent by Judge VanDyke

## SUMMARY*


### Second Amendment

The en banc court reversed the district court's injunction that blocked the implementation of the State of Hawaii's firearm licensing regime on Second Amendment grounds, and remanded for further proceedings.

Hawaii is a "shall-issue" jurisdiction for firearm permits, meaning that as long as an applicant satisfies certain requirements, they may obtain a firearm. This differs from a "may-issue" regime, where the State retains some discretion in deciding whether to issue a firearm license to an applicant.


* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 3 of 84



Plaintiffs Todd Yukutake and David Kikukawa challenged the constitutionality of two requirements of Hawaii's shall-issue regime: 1) Hawaii Revised Statutes § 134-2(e), which provides a narrow time window within which to acquire a handgun after obtaining the requisite permit; and 2) Hawaii Revised Statutes § 134-3, which provides that once the applicant has obtained the firearm, a form with information about the firearm must be completed, and one must bring the firearm to a police station for inspection in certain circumstances. The district court granted summary judgment to Plaintiffs, concluding that the challenged aspects of both provisions were facially unconstitutional under the Second Amendment and permanently enjoined their enforcement.

After the injunction was entered, the Supreme Court issued *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), which outlined how courts should analyze shall-issue regimes like Hawaii's. While *Bruen* instructs courts to engage in a two-step inquiry when evaluating Second Amendment claims, the en banc court wrote that *Bruen* distinguished shall-issue from may-issue regimes and, in footnote 9, included an apparent carve-out to the two-step test, providing that objective, non-abusive "shall-issue" licensing regimes are presumptively constitutional. The en banc court further wrote that despite a wide range of methodological approaches to assessing shall-issue regulations after *Bruen*, the circuit courts have converged on one unifying principle: non-abusive, shall-issue laws comport with the Second Amendment.

With the guidance of *Bruen*, the en banc court held that Hawaii's shall-issue regime comports with the Second Amendment because Plaintiffs failed to show that the two challenged provisions, which are presumptively lawful, have

been put toward abusive ends that would effectively deny ordinary citizens their Second Amendment rights. Rather, at most, the provisions impose only modest, procedural burdens, and do not materially impede Plaintiffs from acquiring firearms.

Dissenting, Judge R. Nelson, joined by Judges Bress and VanDyke, and joined except as to Part I–C by Judges Bade and Forrest, wrote that the majority incorrectly holds that footnote 9 of *Bruen* creates a "carve-out" or "safe harbor" from Second Amendment scrutiny, and is thus analytically distinct from *Bruen*'s framework. He wrote that the correct application of *Bruen* to Hawaii's regulations makes this case straightforward. First, the Second Amendment's plain text covers the acquisition of arms, and Hawaii's statewide restrictions govern the process by which ordinary citizens take possession of handguns. Second, Hawaii has not identified a representative historical analogue for either its short permit use period or its acquisition-linked inspection mandate. Accordingly, because Hawaii has not carried the burden *Bruen* places on the government, the en banc court should have affirmed the district court's judgment.

Dissenting, Judge Forrest joined all but Part I–C of Judge Nelson's opinion explaining the problems with the majority's approach and wrote separately to address the scope of the injunction issued. Judge Forrest would have affirmed the district court on the merits and remanded with instructions for the district court to narrow its permanent injunction in light of *Trump v. CASA, Inc.*, 606 U.S 831 (2025), because there is no need to enjoin enforcement of Hawaii's challenged laws against anyone other than Plaintiffs to afford Plaintiffs complete relief.

Dissenting, Judge VanDyke proposed two "bright-line" rules that he believes could resolve a large part of this court's Second Amendment cases and accord with Supreme Court precedent: (1) if a firearm product or usage that a state seeks to ban is currently prevalent throughout our nation, then it should simply be unconstitutional to ban it; and (2) if a state has a firearm regulation that most other states don't have, then the regulation should be unconstitutional. Applying these bright-line rules, Judge VanDyke would hold that because the challenged regulations here are outliers, they are unconstitutional.

## COUNSEL

Alan A. Beck (argued), Law Offices of Alan Beck, San Diego, California; Stephen D. Stamboulieh, Stamboulieh Law PLLC, Olive Branch, Mississippi; for Plaintiffs-Appellees.

Jo-Ann T. Sagar (argued), Kristen Love I, Reedy C. Swanson, Natalie J. Salmanowitz, Eric S. Roytman-Cash, and Ryan M. Campbell, Hogan Lovells Cadwalader US LLP, Washington, D.C.; Robert T. Nakatsuji First Deputy Solicitor General; Caron M. Inagaki and Kendall J. Moser, Deputy Attorneys General; Kaliko'onālani D. Fernandes and Kimberly T. Guidry, Solicitors General; Anne E. Lopez and Holly T. Shikada, Hawaii Attorneys General; Office of the Hawai'i Attorney General, Honolulu, Hawai'i; for Defendants-Appellants.

Kevin O'Grady, Law Office of Kevin O'Grady LLC, Honolulu, Hawai'i, for Amicus Curiae Hawai'i Rifle Association.

Donald E.J. Kilmer Jr., Law Offices of Donald Kilmer, Caldwell, Idaho, for Amici Curiae The Second Amendment Foundation and The Madison Society Foundation, Inc..

Erin M. Erhardt and Michael T. Jean, National Rifle Association of America, Institute for Legislative Action, Fairfax, Virginia, for Amicus Curiae National Rifle Association of America, Inc..

Jeremiah L. Morgan, William J. Olson, and Robert J. Olson, William J. Olson PC, Vienna, Virginia; Rick Boyer, Integrity Law Firm PLLC, Lynchburg, Virginia; John I. Harris, Schulman Leroy & Bennett PC, Nashville, Tennessee; Joseph W. Miller, Law Offices of Joseph Miller LLC, Fairbanks, Alaska; for Amici Curiae Gun Owners of America, Gun Owners Foundation, Gun Owners of California, Tennessee Firearms Association, Tennessee Firearms Foundation, Virginia Citizens Defense League, Virginia Citizens Defense Foundation, Coalition of New Jersey Firearm Owners, Connecticut Citizens Defense League, Heller Foundation, Oregon Firearms Federation, Grass Roots North Carolina, America's Future Inc., U.S. Constitutional Rights Legal Defense Fund, Conservative Legal Defense and Education Fund, and Restoring Liberty Action Committee.

Ian Simmons, David K. Roberts, Catherine A. Ward, Arjun A. Shenoy, and Danielle N. Siegel, O'Melveny & Myers LLP, Washington D.C., for Amici Curiae Brady Center to Prevent Gun Violence, Everytown for Gun Safety, and Giffords Law Center to Prevent Gun Violence.

Konstadinos T. Moros, Second Amendment Foundation, Bellevue, Washington, for Amici Curiae Second Amendment Foundation, California Rifle & Pistol Association Inc., and Second Amendment Law Center Inc..

Barry K. Arrington, Arrington Law Firm, Wheat Ridge, Colorado, for Amicus Curiae National Association for Gun Rights.

Mark G. Sands, Assistant Attorney General; Donald S. McGehee, Division Chief; Christopher M. Allen, Assistant Solicitor General; Ann M. Sherman, Solicitor General; Dana Nessel, Michigan Attorney General; Office of the Michigan Attorney General, East Lansing, Michigan; Rob Bonta, California Attorney General, Office of the California Attorney General, Sacramento, California; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; Brian L. Schwalb, District of Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Andrea J. Campbell, Massachusetts Attorney General, Office of the Massachusetts Attorney General, Boston, Massachusetts; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Dan Rayfield, Oregon Attorney General, Office of the Oregon Attorney General, Salem,

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 8 of 84



Oregon; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Nicholas W. Brown, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; for Amici Curiae States of Michigan, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia.

Erin E. Murphy, Paul D. Clement, Matthew D. Rowen, and Nicholas A. Aquart, Clement & Murphy PLLC, Alexandria, Virginia; Lawrence G. Keane and Shelby B. Smith, National Shooting Sports Foundation Inc., Washington, D.C.; for Amicus Curiae National Shooting Sports Foundation, Inc..

Michael T. Jean, U.S. Sportsmen's Alliance Foundation, Columbus, Ohio, for Amicus Curiae U.S. Sportsmen's Alliance Foundation.

Sean Corkery, Assistant Solicitor General; Alan M. Hurst, Solicitor General; Raúl R. Labrador, Idaho Attorney General; Office of the Idaho Attorney General, Boise, Idaho; Steve Marshall, Alabama Attorney General, Office of the Alabama Attorney General, Montgomery, Alabama; Stephen J. Cox, Alaska Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; Tim Griffin, Arkansas Attorney General, Office of the Arkansas Attorney General, Little Rock, Arkansas; James Uthmeier, Florida Attorney General, Office of the Florida Attorney General, Tampa, Florida; Christopher M. Carr, Georgia Attorney General, Office of the Georgia Attorney General, Atlanta, Georgia; Theodore E. Rokita, Indiana Attorney General,

Office of the Indiana Attorney General, Indianapolis, Indiana; Brenna Bird, Iowa Attorney General; Office of the Iowa Attorney General, Des Moines, Iowa; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Kris W. Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Liz Murrill, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Keith G. Kautz, Wyoming Attorney General, Office of the Wyoming Attorney General, Cheyenne, Wyoming; Catherine L. Hanaway, Missouri Attorney General, Office of the Missouri Attorney General, Jefferson City, Missouri; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Russell Coleman, Kentucky Attorney General, Office of Kentucky Attorney General, Frankfort, Kentucky; Dave Yost, Ohio Attorney General, Office of the Ohio Attorney General, Columbus, Ohio; Drew H. Wrigley, North Dakota Attorney General, Office of the North Dakota Attorney General, Bismarck, North Dakota; Alan Wilson, South Carolina Attorney General, Office of the South Carolina Attorney General, Columbia, South Carolina; Marty Jackley, South Dakota Attorney General, Office of the South Dakota Attorney General, Pierre, South Dakota; Ken Paxton, Texas Attorney General, Office of the Texas Attorney General, Austin, Texas; Derek Brown, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; John B. McCuskey, West Virginia Attorney General, Office of the West Virginia Attorney General, Charleston, West Virginia; Steve Montenegro, Speaker of the Arizona House of Representatives, Phoenix,

Arizona; Warren Peterson, President of the Arizona Senate, Phoenix, Arizona; for Amicus Curiae Idaho, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Texas, Utah, West Virginia, Wyoming, and the Arizona Legislature.

---

## OPINION

OWENS, Circuit Judge:

The State of Hawaii appeals from a 2021 injunction that blocked the implementation of its firearm licensing regime on Second Amendment grounds. After the injunction was entered, the Supreme Court issued *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), which outlined how courts should analyze "shall-issue" regimes like Hawaii's. With the benefit of *Bruen*'s guidance, we hold that Hawaii's shall-issue regime comports with the Second Amendment, and we reverse the district court and remand for further proceedings.

### I. BACKGROUND

#### A. Hawaii's Shall-Issue Firearm Regulation Regime

Like most States, Hawaii is a so-called "shall-issue" jurisdiction for firearm permits. *See* Haw. Rev. Stat. Ann. § 134-2(a)–(e) (mandating that authorities "shall issue" firearm permits to applicants who satisfy specified criteria). As long as an applicant satisfies certain requirements, they may obtain a firearm—Hawaii does not retain any discretion to block their efforts. *See id*. § 134-2. These requirements are "narrow, objective, and definite." *Bruen*, 597 U.S. at 38

n.9 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)). This differs from a "may-issue" regime, where the State "retains some discretion in deciding whether to issue a firearm license to an applicant." *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 216 (4th Cir. 2024) (en banc), *cert. denied,* 145 S. Ct. 1049 (2025) (comparing "may-issue" with "shall-issue" licensing schemes).

As part of its shall-issue regime, Hawaii requires an applicant to provide, among other things, their fingerprints, social security number, and mental health history to the police before obtaining a firearms permit. Haw. Rev. Stat. Ann. § 134-2(b). These requirements, which are commonplace in shall-issue jurisdictions, are not challenged here.

However, as part of its shall-issue regime, Hawaii has two unique requirements that are at issue. The first requirement provides: "Permits issued to acquire any pistol or revolver shall be void unless used within thirty days after the date of issue." *Id*. § 134-2(e). And if the permit becomes void, the applicant must restart the permitting process. *See id*.

The second requirement comes into play once the applicant has obtained the firearm. After completing a form with information about the firearm (such as its caliber, serial number, and manufacturer), one must bring the firearm to a police station for inspection in certain circumstances. *Id*. § 134-3(b)–(c).

**B. This Litigation**

Todd Yukutake and David Kikukawa ("Plaintiffs"), residents of Honolulu County, challenged these laws in

federal court.[1] As for § 134-2(e), they alleged that although Yukutake received the necessary permit for a handgun, he was unable to obtain the firearm within the governing time limit and thus had to initiate a new application. As for § 134-3, Plaintiffs contended that requiring them to bring their firearms to a police station for inspection forces them to take time off from work and wastes the time of both the registrant and the police. Accordingly, Plaintiffs alleged that § 134-2(e) and § 134-3 violated their Second Amendment rights.

The parties filed cross-motions for summary judgment. In August 2021, the district court granted summary judgment to Plaintiffs. *See Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1090 (D. Haw. 2021). The court, applying intermediate scrutiny under then-applicable circuit precedent, facially

[1] Plaintiffs challenged the prior versions of § 134-2(e) and § 134-3(c), but the controversy remains live. Under the prior version of § 134-2(e), the validity period for a handgun acquisition permit was ten rather than thirty days. And under the prior version of § 134-3, virtually all firearms acquired pursuant to § 134-2 were subject to an in-person inspection requirement at registration. Now, that requirement is limited to firearms acquired through private party transfers, certain self-manufactured or three-dimensional-printed firearms, and firearms brought into Hawaii from another jurisdiction. *See id.* § 134-3(a)–(c).

During this litigation, the State contended that these amendments mooted the case, and the three-judge panel disagreed. *See Yukutake v. Lopez*, 130 F.4th 1077, 1082–84 (9th Cir. 2025), *vacated*, 144 F.4th 1119 (9th Cir. 2025). We continue to hold that the controversy remains live, as the amended provisions remain sufficiently similar to the prior versions that the alleged constitutional defects have not been eliminated. *See Teter v. Lopez*, 125 F.4th 1301, 1307 (9th Cir. 2025) (en banc) (holding that an amendment to a statutory provision does not moot a challenge to that provision if the amended provision is "substantially similar" to the original provision regarding the alleged constitutional defect (quoting *Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1197 (9th Cir. 2019) (en banc))).

invalidated both requirements. *Id.* at 1080 & n.6. The court concluded that there was no reasonable fit between the law's stated objective of promoting public safety and the ten-day permit use period imposed by § 134-2(e). *Id.* at 1086. The court similarly held that § 134-3's in-person inspection and registration requirements did not survive intermediate scrutiny. The court permanently enjoined the enforcement of both provisions. *Id.* at 1090–91.[2]

Nine months later, in *Bruen*, the U.S. Supreme Court rejected the then-existing framework for evaluating Second Amendment claims in favor of a history and tradition test. *See* 597 U.S. at 17–24. As detailed *infra*, *Bruen* instructs courts to engage in a two-step inquiry: First, does the Second Amendment's plain text cover the plaintiff's conduct? And second, if so, is the legislation at issue consistent with the Nation's historical tradition of firearm regulation? *Id.* at 24. Yet in a footnote, the *Bruen* Court included an apparent carve-out to this test: objective, non-abusive "shall-issue" licensing regimes are presumptively constitutional. *Id.* at 38 n.9.

At odds with every other circuit court to analyze shall-issue laws after *Bruen*, a divided three-judge panel of this court held that Hawaii's shall-issue regime is unconstitutional. *See Yukutake*, 130 F.4th at 1104. The majority concluded that the acquisition of firearms is conduct protected by the Second Amendment's plain text because the right to keep and bear arms necessarily includes

---

[2] In a subsequent September 2021 order, the district court clarified that the permit-use period requirement and the in-person inspection and registration requirement were severable from the rest of the provisions, and that the court had invalidated neither § 134-2 nor § 134-3 entirely. *Yukutake v. Connors*, 2021 WL 4342320, at *1 (D. Haw. 2021).

the right to acquire them. *See id*. at 1092. In the majority's view, Hawaii's laws did not pass constitutional muster under *Bruen* footnote 9. *Id*. at 1096–98. The panel therefore affirmed the district court's judgment and remanded for revision of the injunction in light of Hawaii's intervening statutory amendments. *Id*. at 1104.

Drawing parallels to permitting systems in the First Amendment context, Judge Collins, writing only for himself, reasoned that the challenged Hawaii laws were insufficiently tailored and therefore abusive. *Id*. at 1095–99.

Judge Lee concurred in full except for Judge Collins's discussion of *Bruen* footnote 9. *Id*. at 1104–08 (Lee, J., concurring). In his view, the case could be resolved solely through *Bruen*'s text-and-history methodology, as Hawaii failed to identify a sufficient historical analogue for the challenged restrictions. *Id*. at 1108 (Lee. J., concurring). He cautioned against reading *Bruen* footnote 9 to authorize any form of means-end scrutiny. *Id*.

Judge Bea dissented. *Id*. at 1108 (Bea, J., dissenting). He maintained that the acquisition of a firearm is not itself conduct that the plain text of the Second Amendment protects. *Id*. at 1109 (Bea, J., dissenting). In his view, the challenged provisions were merely ancillary regulations governing the manner of obtaining firearms. *Id*. at 1109, 1116 (Bea, J., dissenting). He would have reversed the district court's judgment and vacated the injunction. *Id*. at 1110 (Bea, J., dissenting).

Our court granted rehearing en banc. *See Yukutake*, 144 F.4th at 1119.

## II. DISCUSSION

When considering a Second Amendment challenge to firearm laws, courts generally begin with three modern Supreme Court decisions: *District of Columbia v. Heller*, 554 U.S. 570 (2008), *Bruen*, 597 U.S. 1; and *United States v. Rahimi*, 602 U.S. 680 (2024). In *Heller*, the Court held that the Second Amendment protects an individual right to keep and bear arms for self-defense, regardless of militia service.[3] *See* 554 U.S. at 595. Fourteen years later, *Bruen* established the two-step framework—focused on text, history, and tradition—for evaluating firearm regulations under the Second Amendment. *See* 597 U.S. at 24. And in *Rahimi*, the Court clarified that *Bruen* does not require a rigid search for historical twins and instead permits a more nuanced analogical inquiry, which "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 602 U.S. at 692.

So what does *Bruen*'s two-step inquiry require? At step one, a court asks whether the Second Amendment's plain text covers an individual's conduct. *See Bruen*, 597 U.S. at 24. If so, the Constitution presumptively protects that conduct, and the government bears the burden at step two of demonstrating that its regulation is consistent with the Nation's historical tradition of firearm regulation.[4] *Id.* If the

---

[3] *McDonald v. City of Chicago* held that the Second Amendment right recognized in *Heller* applies to the states through the Fourteenth Amendment. 561 U.S. 742, 791 (2010).

[4] The proper time frame at which to consider the Nation's history and tradition remains unclear, as the Court has repeatedly declined to decide "whether courts should primarily rely on the prevailing understanding of an individual right" at the time of the ratification of the Bill of Rights, in

government cannot make that showing at step two, the challenged law is unconstitutional. *Id*. In *Bruen*, the Court struck down New York's public carry licensing requirement because the State had failed at step two to demonstrate that its discretionary licensing regime was consistent with the Nation's history and tradition. 597 U.S. at 70–71. In *Rahimi*, the Court upheld a federal provision, 18 U.S.C. § 922(g)(8), which prohibits individuals subject to domestic violence restraining orders from possessing a firearm after a judicial finding that they pose a credible threat. 602 U.S. at 698–700. The Court concluded at step two that the law was sufficiently analogous to historical provisions that permitted the disarmament of dangerous individuals. *Id*.

Yet the Court in *Bruen* took care to distinguish shall-issue from may-issue regimes. May-issue regimes, like the handgun permit regulation at issue in *Bruen*, are constitutionally suspect because they grant authorities the discretion to deny licenses and permits even after applicants satisfy objective criteria. *See Bruen*, 597 U.S. at 13–14. Shall-issue laws, by contrast, generally require applicants to satisfy only objective criteria, like background checks and firearm safety training, and are designed to ensure that those bearing arms are "law-abiding, responsible citizens." *Id*. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). Unless a shall-issue law is "put toward abusive ends," such as through "lengthy" processing delays or "exorbitant fees" that effectively deny

1791, or at the time of the Fourteenth Amendment's ratification, in 1868. *Bruen*, 597 U.S. at 37–38 (declining to address the issue because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry"); *accord United States v. Hemani*, 146 S. Ct. 1677, 1687 n.3 (2026).

ordinary citizens their Second Amendment rights, it is presumptively constitutional. *Id.*

Justice Kavanaugh, joined by Chief Justice Roberts, underscored this point in his concurrence. *See id.* at 79–80 (Kavanaugh, J., concurring). He emphasized that *Bruen* addressed only discretionary, may-issue licensing systems and did not call into question the constitutionality of objective, shall-issue regimes that employ background checks, fingerprinting, mental-health record checks, and firearm training requirements. *Id.* In his view, those systems remain constitutionally permissible so long as they operate as "objective licensing requirements" without granting "open-ended discretion to licensing officials." *Id.* at 80. In its subsequent jurisprudence featuring shall-issue regimes, the Court has not altered its "abusive ends" test. *See Wolford v. Lopez*, 146 S. Ct. 2032 (2026).

Nor has the Court further clarified how to approach shall-issue laws. Two years after *Bruen*, *Rahimi* demonstrated that substantial disagreement remains about what, precisely, *Bruen* requires courts to do. *See Rahimi*, 602 U.S. at 691 ("[S]ome courts have misunderstood the methodology of our recent Second Amendment cases."); *see id.* at 743 (Jackson, J., concurring) (noting that after *Bruen*, "confusion plagu[es] the lower courts" (bracketing in original)). The Court produced seven separate opinions, which reflected different views concerning the proper level of generality for historical analogues, the role of historical evidence, and the extent to which courts may reason by analogy. *See, e.g.*, *id.* at 703–04 (Sotomayor, J., concurring) (urging that courts consider whether "the challenged regulation is consistent with the *principles* that underpin our regulatory tradition") (emphasis added); *id.* at 709 (Gorsuch, J., concurring) (arguing for a more precise analogue). And

*Rahimi* offered no guidance on how lower courts should relate *Bruen* footnote 9 to the two-step analysis.

This Second Amendment confusion, as detailed in *Rahimi*, has spread to circuit courts that have analyzed similar shall-issue laws. As the Tenth Circuit put it, "it is difficult to forecast how the Supreme Court would decide the issue, given the apparent tension between the *Bruen* two-step framework and the safe harbor list of presumptively lawful regulations." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 120 (10th Cir. 2024). Yet despite a wide range of methodological approaches to assessing shall-issue regulations, the circuit courts have converged on one unifying principle: non-abusive, shall-issue laws comport with the Second Amendment.

The First, Fourth, and Tenth Circuits have resolved *Bruen* footnote 9's indeterminacy largely at step one. The First Circuit, when reviewing Maine's seventy-two-hour cooling-off period, held that under *Bruen*, shall-issue regulations "do[] not regulate conduct protected by the plain text of the Second Amendment" and are "presumptively constitutional unless a challenger could show that they were abusive toward Second Amendment rights." *Beckwith v. Frey*, 171 F.4th 560, 570–71 (1st Cir. 2026). When reviewing Maryland's firearm laws, the Fourth Circuit held that "non-discretionary 'shall-issue' licensing laws are presumptively constitutional and generally do not 'infringe' the Second Amendment right to keep and bear arms under step one of the *Bruen* framework." *Md. Shall Issue*, 116 F.4th at 222; *see id*. at 224 (noting that to skip to *Bruen* step two when analyzing shall-issue laws would "improperly treat[] the plain text inquiry as a meaningless check-the-box exercise"); *see also United States v. Speed*, 175 F.4th 272, 286–87 (4th Cir. 2026) (upholding a federal regulation on

silencers as a presumptively constitutional shall-issue licensing law). Similarly, the Tenth Circuit upheld Colorado's shall-issue scheme because "laws imposing conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment." *Rocky Mountain Gun Owners*, 121 F.4th at 120.

By contrast, the Second Circuit proceeded through the history and tradition inquiry at *Bruen* step two when evaluating New York's post-*Bruen*, shall-issue licensing provisions. *See Antonyuk v. James*, 120 F.4th 941, 998 (2d Cir. 2024). The court concluded that the provisions were constitutionally permissible by drawing an analogy to pre-modern surety laws. *Id*.

The Fifth Circuit, in rejecting a challenge to federal background check procedures for dealer transfers, did not focus on a particular step in the *Bruen* framework. *See McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024). It instead emphasized that *Bruen*'s footnote 9 preserves the constitutionality of objective conditions on commercial firearm sales and background checks that are designed to ensure that firearms are acquired by law-abiding citizens, and did not engage in a full analysis of steps one and two. *Id.*; *see also United States v. Peterson*, 161 F.4th 331, 338–39 (5th Cir. 2025) (upholding the suppressor licensing regime of the National Firearms Act ("NFA") as a shall-issue law under *Bruen* footnote 9). *But see United States v. Comeaux*, 179 F.4th 297, 302 (5th Cir. 2026) (holding that the plaintiff's challenge to the NFA's silencer regime failed at *Bruen*'s first step, as the challenged provision is a presumptively constitutional, non-abusive, shall-issue law under footnote 9, so no step two historical analysis was required). Similarly, we have upheld the NFA's regulation

of silencers as presumptively constitutional under *Bruen* footnote 9. *See United States v. DeBorba*, 177 F.4th 1005, 1012 (9th Cir. 2026). In *DeBorba*, we analyzed the *Bruen* footnote 9 presumption of constitutionality as analytically distinct from the step one and step two inquiry. *Id*.

Despite these cases' different paths, they share a common destination: non-discretionary, objective, and non-abusive shall-issue laws, especially those involving background checks, firearm training, fingerprinting, or other ordinary eligibility requirements, pass constitutional muster under *Bruen* footnote 9.

Today, we follow the lead of the *McRorey*, *Petersen*, and *DeBorba* courts. When analyzing a ten-day background check, the Fifth Circuit in *McRorey* did not undertake an extensive discussion of historical analogues and the like. *McRorey*, 99 F.4th at 837. This approach is prudent, as *Bruen* footnote 9 never asked the lower courts to subject shall-issue regulations to history-and-tradition analyses. Indeed, the Fifth Circuit took the Supreme Court at its word that a shall-issue regime with background checks is presumptively lawful. *Id.* at 836–39. The court then addressed whether the plaintiffs had rebutted that presumption of lawfulness by showing that the regulations had been "put towards abusive ends." *Id*. at 839–40. And because the plaintiffs could not make that showing, the Fifth Circuit rejected the challenge. *Id*.

Ultimately, we need not decide the bedeviling question of whether this is a step one or step two case under *Bruen*. We also need not—and should not—chart the entire constellation of possible shall-issue laws that one could draft or challenge. As the Fifth Circuit did in *McRorey*, we instead ask whether Plaintiffs have shown that the two

presumptively lawful requirements in question—the thirty-day purchase provision and the police station inspection requirement—have been put toward "abusive ends" that would effectively "deny ordinary citizens" their Second Amendment rights. *Bruen*, 597 U.S. at 38 n.9.

Plaintiffs in this case have failed to make that showing. *Cf. Md. Shall Issue, Inc.*, 116 F.4th at 227–29 (holding that Maryland's comprehensive background check regime is permissible under *Bruen* and not abusive); *McRorey*, 99 F.4th at 836, 839–40 (noting that standard requirements such as background checks, "especially when not at all lengthy," are not abusive for purposes of *Bruen* footnote 9); *Peterson*, 161 F.4th at 340–42 (holding that no evidence indicated that the challenged NFA provision was abusive as applied to the plaintiff). And while certain background checks, firearms safety courses, lengthy wait times, exorbitant fees, or other components of a shall-issue regime could trigger the Second Amendment's protections, nothing in Plaintiffs' Complaint suggests that either the thirty-day restriction or the police station inspection requirement crosses that line. At most, the provisions impose only modest, procedural burdens. They require compliance with a reasonable deadline and, for firearms that fall into the categories set out in § 134-3(a)–(c), *see supra* note 1, a brief administrative visit to verify basic information. They do not materially impede Plaintiffs from acquiring firearms. Even in light of Hawaii's distinctive tradition of heightened firearm regulation, which the Supreme Court has viewed with skepticism, *see Wolford*, 146 S. Ct. at 2040, 2046, the requirements at issue here are not abusive.

Cases like this one threaten to unleash countless, consequential questions about our Second Amendment jurisprudence. For example: What does "infringe" mean for

Second Amendment purposes? Or "meaningfully constrain"? *See, e.g.*, *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118–19 (9th Cir. 2024). Those important inquiries will await another day. Judge R. Nelson's dissent—which acknowledges that our holding is consistent with other courts applying *Bruen*—thoughtfully presents a different take on footnote 9. And Judge VanDyke shares, as only he can, his Second Amendment worldview. Like the vast majority of courts reviewing footnote 9, we respectfully disagree with both of them. Hopefully, the Supreme Court will make clear which analysis it thinks is correct.

**REVERSED AND REMANDED.**

---

R. NELSON, Circuit Judge, with whom BRESS and VANDYKE, Circuit Judges, join, and with whom BADE and FORREST, Circuit Judges, join except as to Part I–C, dissenting:

The majority offers a narrow analysis of the Second Amendment precedent on shall-issue licensing regimes. It correctly acknowledges that "certain background checks, firearms safety courses, lengthy wait times, exorbitant fees, or other components of a shall-issue regime could trigger the Second Amendment's protections." Maj. Op. 21.

But the majority incorrectly holds that footnote 9 of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), creates a "carve-out" or "safe harbor" from Second Amendment scrutiny, and is thus analytically distinct from *Bruen*'s framework. Maj. Op. 13, 18. Footnote 9 does not say that all objective regulations placed within a "shall-issue" licensing regime are "presumptively constitutional."

*Id.* at 13. It only addresses "public carry" regulations not at issue here. *Bruen*, 597 U.S. at 38 n.9. And it does not shift to the citizen the burden to prove that a law governing protected conduct has been "put toward abusive ends." Maj. Op. 17 (cleaned up). That interpretation violates *Bruen*'s clear command that it is the government's burden to show that restrictions on the right to keep and bear arms are "consistent with the Nation's historical tradition." 597 U.S. at 24.

Instead, footnote 9 described non-abusive regulations to ensure that only "law-abiding, responsible citizens" were carrying handguns outside the home, preserved challenges when a permitting system denies citizens their right to carry, and concerned only longstanding licensing regimes. *Id.* at 38 n.9 (citation omitted).

Hawaii's challenged provisions are something else. Hawaii requires purchasers of handguns to obtain a handgun-acquisition permit that is void unless the permittee completes the purchase within 30 days, and it requires persons acquiring certain firearms to bring them to a police station for physical inspection within five days of acquisition. Haw. Rev. Stat. §§ 134-2(e), 134-3(c). Neither regulation has anything to do with determining whether applicants are "'law-abiding, responsible citizens'" eligible for licenses to "exercis[e] their Second Amendment right to public carry." *Bruen*, 597 U.S. at 38 n.9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). Indeed, the challenged laws operate *after* the applicant has completed a background check, firearms training course, and myriad other requirements—i.e., after he has proven himself a "law-abiding, responsible citizen"—and has been issued a permit to purchase (not carry) a handgun. And neither regulation was "longstanding" in 2022 when *Bruen* issued.

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 24 of 84



Footnote 9 did not create a gaping Second Amendment exemption for states to exploit with new creative restrictions that would otherwise fail *Bruen*'s test. The majority—like most lower courts—fails to grasp (or even acknowledge) these differences. Never has a single footnote in a Supreme Court opinion been so misread by so many lower courts to deny so many Americans their constitutional rights. The statements in footnote 9 are not the genesis of a different constitutional framework; they show merely how the framework the Court has established *might* be applied in particular circumstances.

This case is all the worse since the challenged laws appear to be part of Hawaii's consistent and not-so-subtle attempts to end run around the Second Amendment, which suggests that these laws are abusive under footnote 9. *See, e.g.*, *Young v. Hawaii*, 45 F.4th 1087, 1090–94 (9th Cir. 2022) (en banc) (O'Scannlain, J., dissenting); *Teter v. Lopez*, 76 F.4th 938, 942–43, 947–49 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024), *vacated as moot on reh'g en banc*, 125 F.4th 1301 (9th Cir. 2025); *State v. Wilson*, 543 P.3d 440, 442 (Haw. 2024), *abrogated by Wolford v. Lopez*, 146 S. Ct. 2032, 2050 (2026). Hawaii has only grown more intransigent in its "blatant defiance" of the Supreme Court's clear commands on the Second Amendment. *Wilson v. Hawaii*, 145 S. Ct. 18, 21 (2024) (Statement of Thomas, J., respecting the denial of certiorari) (citation omitted); *cf. Granillo v. State*, 593 P.3d 1, 28 (Haw. 2026) (accusing the U.S. Supreme Court of "[m]aking the country more dangerous with a Second Amendment unmoored from text or history and unrecognizable to the framers who wrote it"); *id.* (*Bruen* was "deadly jurisprudence," and *Wolford* "show[ed] disdain for Hawai'i's constitutional traditions."). But Hawaii's

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 25 of 84



"[m]erely local attitudes can neither shrink nor inflate the meaning of fundamental Bill of Rights guarantees that apply to the States through the Fourteenth Amendment." *Wolford*, 146 S. Ct. at 2050.

A correct application of *Bruen* to Hawaii's regulations makes this case straightforward. First, the Second Amendment's plain text covers the acquisition of arms. A person ordinarily cannot "keep" an arm without first acquiring it, and the law has long recognized that authorization of an act includes authorization of necessary predicate acts. *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). Hawaii's statewide restrictions govern the process by which ordinary citizens take possession of handguns; possession is the core conduct protected by the "right of the people to *keep* . . . Arms." U.S. Const. amend. II (emphasis added). Second, Hawaii has not identified "a well-established and representative historical *analogue*" for either its short permit-use period or its acquisition-linked inspection mandate. *Bruen*, 597 U.S. at 30. Because Hawaii has not carried the burden *Bruen* places on the government, we should have affirmed the district court's judgment. I respectfully dissent.[1]

I

The majority improperly side-steps the governing rule. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. The government must then "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

[1] I agree that this appeal is not moot. *See* Maj. Op. 12 n. 1.

*Id.* The order matters. So does the allocation of burdens. The Second Amendment's text determines whether the presumption of protection attaches; history and tradition determine whether the government has rebutted it. *Id.* at 17, 19, 24. Courts may not insert a freestanding means-end inquiry before or between those questions. *Id.* at 19–24. It strains credulity to interpret footnote 9 as creating a separate "carve-out" or "safe harbor" from *Bruen*'s overarching approach. Maj. Op. 13, 18.

*Bruen* guides our analysis. And we err when we cast aside *Bruen*'s holdings for a few clarifying statements in one of its thirty-two footnotes. Footnote 9 does not address—let alone control—this case.

A

Situated in the Supreme Court's step two discussion, footnote 9 provides in full:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake v. Filko*, 724 F.3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). Rather, it appears that these

> shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." *Ibid.* And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969), rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Bruen*, 597 U.S. at 38 n.9. At the outset, footnote 9 addresses public-carry licensing, not every objective regulation touching firearms. The circuit courts that have read it as the latter have overread and misapplied the Supreme Court's guidance. *See, e.g.*, *Beckwith v. Frey*, 171 F.4th 560, 570–71 (1st Cir. 2026); *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 216 (4th Cir. 2024) (en banc); *McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024); *United States v. DeBorba*, 177 F.4th 1005, 1012 (9th Cir. 2026); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 120 (10th Cir. 2024). In other

words, the inferior courts are missing *Bruen*'s forest for a footnote's trees.

The term "shall-issue" traditionally referred only to concealed-carry permitting schemes. *See, e.g.*, Jack Hagler Self Defense Act, ch. 87-24, 1987 Fla. Laws (codified as amended at Fla. Stat. § 790.06 (2025)) (establishing the shall-issue concealed-carry licensing regime widely credited as the model for subsequent state right-to-carry laws); Tyler R. Smotherman, *More Rights, More Responsibilities: A Post-*Bruen *Proposal for Concealed Carry Compromise*, 2024 Wis. L. Rev. 343, 357–63 (2024) (describing the evolution of public-carry laws in the United States and juxtaposing "may-issue" permitting regimes with "shall-issue" and "constitutional-carry" regimes).

Likewise, "shall-issue" was used in *Bruen* to distinguish objective public-carry licensing regimes from New York's discretionary carry regime. *See* 597 U.S. at 13 & n.1, 38 & n.9. The question before the Court was whether New York could require an applicant to demonstrate a special need for self-defense before carrying a concealed handgun in public. *Id.* at 10–15; *see also id.* at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."). The Court contrasted New York's "may-issue" system with 43 states' shall-issue regimes, in which a general desire for self-defense was sufficient to obtain a license to carry. *Id.* at 13, 38 n.9.

Lower courts have misunderstood footnote 9 and expanded the term "shall-issue" to encompass all objective regulations on the purchase, possession, carry, or transfer of firearms. *See, e.g.*, *Md. Shall Issue*, 116 F.4th at 222; *McRorey*, 99 F.4th at 837. But the footnote expressly and

repeatedly refers to "public carry," "bearing arms," and licensing officials' discretion over concealed-carry permit applications. *Bruen*, 597 U.S. at 38 n.9. Those features are not present in the laws Plaintiffs challenge.

This case concerns acquisition of handguns for simple possession, including possession in the home, "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628–29. Plaintiffs do not challenge any aspect of Hawaii's highly restrictive public-carry laws or permitting scheme. *See Wolford*, 146 S. Ct. at 2046 & n.9 (Hawaii has "a tight web of laws that severely restricts the carrying of firearms for self-defense."). Nor do Plaintiffs challenge Hawaii's myriad requirements (i.e., fingerprinting, mental-health disclosures, training courses, fees, and background checks) simply to purchase a firearm in the first place.

Plaintiffs' claims target two additional rules: what happens if an already qualified permittee does not complete a handgun purchase within 30 days, and what must occur after certain firearms have been acquired. Haw. Rev. Stat. §§ 134-2(e), 134-3(c). Those rules are not carry-license criteria. They have nothing to do with "guiding licensing officials" in the issuance of public-carry permits via "narrow, objective, and definite standards." *Bruen*, 597 U.S. at 38 n.9 (cleaned up). Therefore, Hawaii's regulations—which apply *after* an applicant has obtained a permit merely to possess a handgun in the home—are wholly outside the ambit of footnote 9.

The distinction is not formalism. Public carry and home possession have different historical traditions. *See id.* at 45–70. For example, surety laws and laws banning carrying weapons while intoxicated may illuminate regulation of

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 30 of 84



public carry, but they would not automatically justify a restriction on possessing a handgun in the home. *See United States v. Connelly*, 117 F.4th 269, 280 (5th Cir. 2024); *cf. United States v. Hemani*, 146 S. Ct. 1677, 1685, 1693 (2026) (focusing on mere possession of a gun inside the home). Analogical reasoning requires courts to identify the conduct, burden, and justification at the correct level of specificity. *Bruen*, 597 U.S. at 30; *United States v. Rahimi*, 602 U.S. 680, 739–40 (2024) (Barrett, J., concurring) (discussing the importance of analogizing at the proper level of generality). Redefining "shall-issue" as a universal catch-all for all objective firearms licensing provisions—rather than a specific type of public-carry-permit issuance regime—collapses those distinctions. Footnote 9's discussion of "shall-issue" public-carry regimes does not speak to this case.

B

1

Regardless, reflexively invoking footnote 9 to bypass *Bruen*'s framework is error. Footnote 9 is not a standard; it is a statement about the potential application of a standard. It neither creates any presumption of constitutionality for firearms regulations nor reverses the burden of proof *Bruen* places squarely on the government. *Contra* Maj. Op. 21. Footnote 9 speaks only to the non-discretionary issuance of public-carry permits, and it is not a blanket blessing even of those. The Supreme Court simply clarified that "nothing in [the Court's] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 597 U.S. at 38 n.9. And why should it? The Court in *Bruen* invalidated New York's "may-issue" law precisely because it gave authorities "discretion to deny

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 31 of 84



concealed-carry licenses even when the applicant satisfies the statutory criteria." *Id.* at 14–15, 71. So footnote 9 is just the Supreme Court explaining that *Bruen* should not be read to have held that shall-issue concealed-carry permitting regimes are per se unconstitutional. It should not be understood as having created a distinct ahistorical test outside the *Bruen* framework.

The majority converts footnote 9's cautious explanation into a categorical presumption: once a provision is couched in terms of an objective "shall-issue regime," the citizen must show that the provision is abusive enough to deny the right before *Bruen*'s ordinary text-and-history analysis applies. Maj. Op. 19–21. That reading does not follow from the footnote's language. Footnote 9 never says "presumptively constitutional" or "presumptively lawful." It does not identify a new, or different, standard of review. It does not say who bears the burden. And it does not instruct courts to bypass the historical inquiry when protected conduct is regulated. Its repeated qualifications—"do not necessarily," "often," "appear," and "do not rule out"—are the language of a limiting clarification, not a new doctrinal test. *Bruen*, 597 U.S. at 38 n.9.

Much of the confusion in the lower courts stems from the assumption that footnote 9 provides an alternative mode of analysis to *Bruen*. It does not. Of course, some objective licensing requirements may be upheld under the proper *Bruen* analysis. Background checks and training requirements may be supported by historical traditions permitting the government to ensure that those bearing arms are "law-abiding, responsible citizens," *id.* at 70, and "well regulated" (i.e., trained and proficient) in the use of their firearms. U.S. Const. amend. II; *see Heller*, 554 U.S. at 597 ("[T]he adjective 'well-regulated' implies nothing more than

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 32 of 84



the imposition of proper discipline and training."); *cf. Jones v. Bonta*, 34 F.4th 704, 728 (9th Cir. 2022) (approving "sensible" firearms regulations like "proper training" requirements), *reh'g granted, opinion vacated*, 47 F.4th 1124 (9th Cir. 2022). If a challenged regulation falls within such a tradition, it is constitutional at *Bruen* step two. That result does not require relocating history into a virtually irrebuttable presumption at step one. Nor does it require a separate carve-out test that treats a statute's "shall-issue" label as a substitute for examining the burden being challenged.

At bottom, footnote 9 simply clarifies the limits of *Bruen*'s holding in terms of how the Court's established framework may apply in particular circumstances. At most, it predicts how *Bruen*'s historical analysis would likely shake out if ever applied to "narrow, objective, and definite standards" geared toward ensuring that those carrying handguns are "law-abiding, responsible citizens." 597 U.S. at 38 n.9 (citation omitted). It does not create a new test, analytical prong, or safe harbor from *Bruen*.

2

The majority reaches a different conclusion—finding support largely in nonbinding judicial opinions. None persuade.

i

The majority acknowledges the division among the circuits and follows the Fifth Circuit's approach in treating footnote 9 as an independent safe harbor. Maj. Op. 17–20; *see McRorey*, 99 F.4th at 836–37. *But see Antonyuk v. James*, 120 F.4th 941, 998 (2d Cir. 2024) (proceeding through *Bruen* step two when evaluating "shall-issue"

regulation). The division among lower courts makes the majority's position understandable, but it does not make it correct. Start with the Fifth Circuit's decision in *McRorey*, which concerned enhanced background checks for certain purchasers aged 18–20 years old and a limited period in which the government completed those checks. 99 F.4th at 834–36. As we explained in *Nguyen v. Bonta* when distinguishing *McRorey*, the delay in *McRorey* served a likely valid background-check purpose; in *Nguyen*, delay itself was the point of the purchase restriction. 140 F.4th 1237, 1243 (9th Cir. 2025).

Hawaii's laws are triggered after the background check is complete, the permit has issued, and the permittee has been approved. Hawaii's post-approval deadline is more like the law we invalidated in *Nguyen*, where we held that a California law "categorically prohibiting citizens from purchasing more than one firearm of any kind in a 30-day period" violated the Second Amendment. *Id.* Such a law, like Hawaii's, "temporally meter[s] the exercise" of the right to keep arms because it controls the timing by which a vetted, law-abiding citizen can legally obtain a firearm. *Id.* Both laws do nothing to ensure that gun owners are law-abiding and responsible; they merely force or prevent the acquisition of the gun within a set time period.

The Fourth Circuit's decision in *Maryland Shall Issue*, 116 F.4th 211, is similarly distinguishable. Maryland's law required a background investigation and safety training before a license issued. *Id.* at 216–18. Whether or not that court correctly placed footnote 9 at step one of the *Bruen* test, it reviewed eligibility-related requirements of the kind the footnote identifies. *Id.* at 216–17, 222–23 (discussing *Bruen*, 597 U.S. at 38 n.9). It did not hold that every

objective post-approval burden added to a firearms statute inherits a presumption of constitutionality. *Id.* at 222–23.

The majority also invokes decisions involving silencers and the National Firearms Act. Maj. Op. 18–20. Those cases raise distinct questions about the status of the regulated item, taxation and registration traditions, and the operation of the federal making-and-transfer regime. *See United States v. Speed*, 175 F.4th 272, 286–87 (4th Cir. 2026); *United States v. Peterson*, 161 F.4th 331, 338–39 (5th Cir. 2025). They do not establish that an acquisition deadline or police inspection of ordinary firearms are valid merely because the surrounding statutory scheme is nondiscretionary.

As these decisions illustrate, courts cannot resolve supposed ambiguity in a footnote by adopting a methodology the opinion's overall holding forecloses. The Supreme Court instructed that once the Second Amendment's text covers conduct, "the government must affirmatively prove" the relevant historical tradition. *Bruen*, 597 U.S. at 19. We cannot reverse *Bruen*'s burden merely because a challenged provision appears in the same statutory chapter as an unchallenged background check or training requirement.

ii

Contrary to today's majority opinion, Justice Kavanaugh's *Bruen* concurrence did not extend footnote 9. To be sure, Justice Kavanaugh stated that "shall-issue licensing regimes are constitutionally permissible." *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring). But like footnote 9, Justice Kavanaugh was referring only to "licensing requirements for carrying a handgun for self-defense," not to all manner of firearms regulations if they are

"objective" in nature. *Id.* at 79. Justice Kavanaugh emphasized that the Court did not prohibit states from requiring licenses for public carry, and he described as constitutionally permissible "existing" shall-issue licensing systems that required fingerprinting, background checks, mental-health-record checks, and firearms training. *Id.* at 79–80. Those are the same eligibility-focused features the Court identified in footnote 9, none of which are at issue in this appeal.

Justice Kavanaugh took pains to distinguish the standard vetting practices of "existing" shall-issue regimes from the features of "unusual" and "constitutionally problematic" may-issue regimes. *Id.* The concurrence homes in on the fact that New York's may-issue licensing regime was an "outlier"—distinct from "the existing licensing regimes . . . employed in 43 States." *Id.* at 79. Hawaii's laws are even more of an outlier and did not exist in their current form when *Bruen* was published.

Justice Kavanaugh quotes *Heller*'s language describing certain "longstanding" laws as "presumptively lawful regulatory measures." *Id.* at 81 (quoting *Heller*, 554 U.S. at 626–27 & n.26). Yet Hawaii adopted its one-of-a-kind physical-inspection mandate in 2020 and its current 30-day permit period in 2023 after *Bruen*. Act of Sept. 15, 2020, No. 74, 2020 Haw. Sess. Laws 479–83 (codified at Haw. Rev. Stat. § 134-3); Act of June 2, 2023, No. 52, 2023 Haw. Sess. Laws 113–36 (codified at Haw. Rev. Stat. § 134-2). A concurrence defending "existing" and "longstanding" public-carry regulations cannot prospectively bless every novel acquisition burden a state might later add.

In short—as with the *Bruen* majority's footnote 9—Justice Kavanaugh did not say that any new firearms

restriction becomes permissible when attached to a shall-issue system, and he did not purport to replace *Bruen*'s text-and-history analysis with a burden-shifting presumption.

iii

Finally, the majority invokes out-of-circuit precedent that relies on *Heller*'s dicta that "nothing in our opinion should be taken to cast doubt on longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms," which are "presumptively lawful regulatory measures." 554 U.S. at 626–27 & n.26; Maj. Op. 19–20 ("follow[ing] the lead" of the *McRorey* court, which "emphasized that *Bruen*'s footnote 9 preserves the constitutionality of objective conditions on commercial firearm sales"). That language in *Heller* should not be overread. *Heller* referred to "longstanding" regulatory measures. 554 U.S. at 626. It did not hold that any burden on a buyer is constitutional if it can be characterized as a sales condition. Nor did it undermine the historical methodology that *Bruen* later made explicit. *See id.* at 635 ("[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").

Two features matter here. First, commercial-sale conditions traditionally regulated sellers, not buyers, for instance by requiring sellers to maintain lawful premises, keep sales records, and comply with transfer rules. *See Teixeira v. County of Alameda*, 873 F.3d 670, 682–90 (9th Cir. 2017) (en banc) (seller-side regulation is rooted in text and history, but the rights of buyers and sellers are not coextensive), *abrogated in part by Bruen*, 597 U.S. at 17; *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms &*

*Explosives*, 5 F.4th 407, 416 (4th Cir. 2021) ("A condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records."), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021). Hawaii's 30-day provision voids permits held by *buyers*.

Second, the laws before us are not "longstanding" regulations carried forward from the Founding. Hawaii added the across-the-board in-person inspection requirement in 2020. Act of Sept. 15, 2020, No. 74, 2020 Haw. Sess. Laws 479–83 (codified at Haw. Rev. Stat. § 134-3). The legislature narrowed it in 2022. Act of June 3, 2022, No. 30, 2022 Haw. Sess. Laws 50–54 (codified at Haw. Rev. Stat. § 134-3). As it stands, no other state has adopted such an inspection rule. Hawaii replaced the former 10-day permit period with the current 30-day period effective in January 2024. Act of June 2, 2023, No. 52, 2023 Haw. Sess. Laws 113–36 (codified at Haw. Rev. Stat. § 134-2). That recent enactment prevents Hawaii from invoking *Heller*'s assurance about "longstanding" commercial qualifications being "presumptively lawful." *See Hirschfeld*, 5 F.4th at 418 ("requiring the law to be both a commercial condition *and* longstanding to be presumptively valid" under *Heller*). Hawaii still must identify the historical principles that support its new burden. Thus, even assuming *Heller*'s dicta is a carve-out from *Bruen*, that carve-out cannot apply here.

In sum, footnote 9 clarified *Bruen*'s holding and cautioned that the Court striking down "may-issue" carry regimes should not be read to also endorse striking down "shall-issue" carry regimes, which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." 597 U.S. at 38 n.9 (citation omitted). Footnote 9 did not create a new

constitutional test or categorical presumption out of whole cloth.

C

Let us assume that the majority is correct: "non-discretionary, objective, and non-abusive shall-issue laws" like "background checks, firearm training, fingerprinting, or other ordinary eligibility requirements" all bypass *Bruen*'s traditional two-step analysis and automatically "pass constitutional muster under *Bruen* footnote 9." Maj. Op. 20. Even if correct, this conclusion does not save the two Hawaii laws at issue. Contrary to the majority's conclusory analysis, Hawaii's laws (1) are not "ordinary" or "longstanding"; (2) are not "eligibility requirements" aimed at ensuring gun owners are "law-abiding, responsible citizens"; and (3) have been "put toward abusive ends."

1

To start, these time-limit and inspection-requirement laws are not "*ordinary* eligibility requirements." *Id.* (emphasis added).

First, they are "outliers," *Bruen*, 597 U.S. at 30, 70, 79, that apply after an applicant has been deemed eligible to possess a firearm. No other state has an equivalent restriction. It appears that only two other states have a permit validity period of under one year. And as the district court found, Hawaii is "the *only* state in the country to require in-person inspection and registration of firearms." *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1090 (D. Haw. 2021). The *Bruen* Court focused on a law's "outlier" status at several points. 597 U.S. at 30, 65, 70. As did Justices Alito and Kavanaugh in their separate concurrences. *Id.* at 78 (Alito, J., concurring) ("The District of Columbia law was

an extreme outlier; only a few other jurisdictions in the entire country had similar laws."); *id.* at 79 (Kavanaugh, J., concurring) ("New York's outlier may-issue regime is constitutionally problematic."). The Supreme Court closely scrutinizes firearms laws that are extreme outliers. So should we.

Second, these laws—enacted only in the last few years—are not ordinary because they are not "longstanding," as previously noted. Not only do these laws lack any historical pedigree from the Founding or Reconstruction Eras, they do not even date back to the expansion of "shall-issue" carry regimes in this country. *See* Smotherman, *supra*, at 360–62 ("In 1987, Florida passed a shall-issue concealed carry statute that would serve as the paradigm for similar statutes adopted by thirty-three states over the next three decades."). Because these laws are not longstanding, they draw no support from any Supreme Court precedent endorsing certain "longstanding" firearms regulations. *See Heller*, 554 U.S. at 626; *McDonald v. Chicago*, 561 U.S. 742, 786 (2010); *Bruen*, 597 U.S. at 30; *Wolford*, 146 S. Ct. at 2042. Hawaii's arbitrary time-limit and inspection laws are "late-in-time outliers" that deserve no deference. *Bruen*, 597 U.S. at 70.

2

Next, these laws are not "eligibility requirements." Maj. Op. 20. Even broadly interpreted, footnote 9 speaks only to laws "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9 (citation omitted). The Hawaii laws here do nothing of the sort. They take effect after the State has determined that the applicant satisfies its objective criteria. A deadline requiring that person to complete a

handgun purchase within 30 days does not ensure the applicant's character, lack of criminal history, mental health, or firearms competence. And an inspection of an already acquired firearm does not reveal whether its owner was disqualified when the permit was issued.

These laws apply only to Hawaiians who have run the gauntlet in successfully navigating Hawaii's strict process to acquire a handgun. These individuals have completed forms collecting identifying information and mental-health history, submitted to fingerprinting and photographing, granted police access to their mental-health records, completed a training course, paid a fee, passed a background check, and been determined to have "the essential character or temperament necessary to be entrusted with a firearm." Haw. Rev. Stat. § 134-2(b)(1)(E). In other words, these post-permit requirements are not "eligibility requirements," Maj. Op. 20, because they apply only after the individuals have proven themselves eligible as "law-abiding, responsible citizens," *Bruen*, 597 U.S. at 38 n.9 (citation omitted).

3

Finally, the challenged regulations have been "put toward abusive ends" by Hawaii. *Id.* They only inconvenience Hawaiian gun owners and aspiring gun owners—who have been trained and vetted—by hindering their ability to lawfully purchase handguns, without adequate justification.

Hawaii asserts that the "permit's 30-day validity window helps ensure that permittees do not obtain disqualifying conditions between receiving a permit and acquiring the firearm." But Hawaii did not show that its "legislature considered *any* evidence—let alone substantial evidence—

prior to enacting the law" (and the district court found none). *Yukutake*, 554 F. Supp. 3d at 1084. Before the district court, Hawaii did not provide any "empirical evidence or case law suggesting that a 10-day permit use period would enhance public safety." *Id*. The same is true of the new 30-day period. The district court's reasoning remains valid: if the goal is to prevent a licensee from making use of the permit to purchase after he has become disqualified from owning a firearm, a 30-day time limit does nothing to accomplish that objective. *Id.* at 1085. "In fact, the opposite could be true." *Id*. "By shortening the permit use period to reduce the likelihood that disqualifying changes occur before the applicant obtains the handgun, the law arguably increases the likelihood that individuals will *already* be in possession of a gun should a disqualifying change occur." *Id*.

Unlike an "ordinary eligibility requirement" such as a background check, the challenged 30-day time limit is an expiration rule that forces a still-qualified citizen to restart the entire application process if a transaction cannot be completed quickly enough. Maj. Op. 20; Haw. Rev. Stat. § 134-2. Hawaii already conditions every permit on the continuing disqualifications in Hawaii Revised Statutes § 134-7. Hawaii law also provides for impoundment of permits upon specified arrests, and Hawaii subjects firearm owners to continuous criminal-record monitoring through the FBI's "Rap Back" program. *See* Haw. Rev. Stat. § 846-2.7.

Those features confirm that the State knows how to respond to an actual change in eligibility. The 30-day rule instead presumes that a permit becomes unreliable with the passage of a short, arbitrary period even when no disqualifying event occurs. As the three-judge panel majority explained, while Hawaii likely has some "valid

interest in ensuring that the background-check results are not stale," it has pointed to no evidence to support its "extravagant view that anything over . . . 30 days counts as stale." *Yukutake v. Lopez*, 130 F.4th 1077, 1099 (9th Cir.), *reh'g en banc granted, opinion vacated*, 144 F.4th 1119 (9th Cir. 2025).

Hawaii law's treatment of long guns exposes the mismatch. A permit to acquire rifles and shotguns remains valid for one year and may be used for multiple acquisitions, subject to the same continuing disqualifications. Haw. Rev. Stat. § 134-2(e). If the risk of a newly arising disqualification justifies voiding a handgun permit after 30 days, the State has not explained why the same risk permits repeated rifle and shotgun acquisitions for 12 months. That inconsistency is evidence that the challenged handgun deadline is not a legitimate eligibility-screening function discussed in footnote 9. *See Yukutake*, 130 F.4th at 1099.

Hawaii's explanation for the inspection requirement makes even less sense. Hawaii has justified it as a response to unserialized "ghost guns," a means of identifying firearms unlawful to possess, and an aid to tracing firearms used in crimes. Those may be public-safety objectives, but they are not applicant eligibility determinations. The current law applies to firearms acquired through nondealer transfers, specified self-manufactured or 3D-printed firearms, and firearms brought into Hawaii. Haw. Rev. Stat. § 134-3(b)–(c). It requires the firearm—not the applicant's criminal or mental-health record—to be presented. Its "why" concerns the weapon's markings and traceability, not whether a licensing official has properly classified the applicant as law-abiding and responsible.

Hawaii asserts that "the inspection requirement addresses the problem of 'ghost guns,' which are assembled without identification markings and enable persons who would normally be prohibited from owning or possessing firearms to do so." But the inspection requirement applies not just to unserialized firearms; it also applies to all standard handguns brought to Hawaii from other states (even if purchased from a federally licensed dealer) or legally sold by private parties in Hawaii. Haw. Rev. Stat. § 134-3(a)–(b). And the physical inspection requirement applies after an individual has either already obtained the firearm or already been vetted and approved to do so. Thus, the inspection requirement is either an over-inclusive add-on regulating already illegal possession or a superfluous burden on an already vetted, law-abiding person. And again, "Hawaii is the *only* state in the country to require in-person inspection and registration of firearms" and "provided no evidence whatsoever in support of its position" that its inspection requirement was necessary to public safety. *Yukutake*, 554 F. Supp. 3d at 1089–90.

The point is this: background checks, fingerprinting, firearms education and training courses, and similar eligibility criteria are not challenged here. But footnote 9's examples do not operate as a talisman for rules that neither screen the applicant nor guide the issuance decision. *See Bruen*, 597 U.S. at 38 n.9. Even if footnote 9 created a separate safe harbor, Hawaii's 30-day deadline and physical-inspection mandate fall outside it.

* * *

Footnote 9 does not control this case. The challenged regulations have nothing to do with public carry, are not longstanding, and do nothing to ensure that those possessing

arms are law-abiding, responsible citizens. They have been put toward abusive ends and are not entitled to a presumption of constitutionality under *Heller* or *Bruen*, to the extent such a presumption exists. Hawaii's firearm regulations should have been assessed under *Bruen*'s framework.

II

The proper analysis begins with *Bruen* step one. There is no dispute that Plaintiffs are "law-abiding, responsible citizens" who seek to acquire handguns for lawful possession in their homes. *Heller*, 554 U.S. at 635. Handguns are "Arms" protected by the Second Amendment, *id.* at 581–82, 628–29, and Plaintiffs are among "the people," *see id.* at 581; *Bruen*, 597 U.S. at 31–32. The only questions are: (1) whether the Second Amendment's plain text—protecting "the right of the people to keep . . . Arms"—includes the necessary predicate act of acquiring arms, and (2) if so, whether the Hawaii laws here "infringe" that right. U.S. Const. amend. II. Text, ordinary usage, precedent, and the canons of construction all point to the same answer for both questions. Yes.

A

The "right to keep and bear arms includes the right to purchase them. And thus laws that burden the ability to purchase arms burden Second Amendment rights." *Jones*, 34 F.4th at 716. *Heller* explained that the most natural reading of "keep Arms" is to "have weapons." 554 U.S. at 582. At the Founding, "keep" meant to have in custody, hold, or retain. *Id.* at 582–83. *Bruen* likewise described the Second Amendment's operative clause as guaranteeing the individual right to possess and carry weapons. 597 U.S. at 20. A person cannot ordinarily have, hold, retain, or possess a handgun without first taking possession of it. Acquisition

is the transition by which an arm comes into the person's custody. It is therefore embedded in the ordinary exercise of the right to keep.

1

As several of our sister circuits have held, the Second Amendment protects the acquisition of arms. *See, e.g.*, *Ortega v. Grisham*, 148 F.4th 1134, 1143–44 (10th Cir. 2025); *Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 127 F.4th 583, 590 & n.2 (5th Cir. 2025). Our en banc decision in *Teixeira* recognized this relationship even before *Bruen*. 873 F.3d at 670. The right to keep and bear arms "wouldn't mean much" without the ability to acquire them, and the right to keep arms "necessarily involves the right to purchase them," obtain ammunition, and keep them in repair. *Id.* at 677–78 (citations omitted).

Like the three-judge panel majority, I express no "view as to whether any other aspects of our opinion in *Teixeira* have been abrogated by *Bruen*." *Yukutake*, 130 F.4th at 1090. But at least one of *Teixeira*'s textual insights remains sound: the right to keep an arm must include the act by which the individual obtains it. *See Teixeira*, 873 F.3d at 678 ("The right to keep and bear arms for self-defense under the Second Amendment must also include the right to acquire a firearm." (cleaned up)). The three-judge panel majority agreed and was correct to reaffirm, post-*Bruen*, "our prior holding in *Teixeira* that the purchase and acquisition of firearms is conduct that is protected by the plain text of the Second Amendment." *Yukutake*, 130 F.4th at 1090.

Our decision in *Nguyen* applied the same principle to a direct restriction on buyers' ability to acquire and keep multiple arms. 140 F.4th at 1242–43. "[I]f the Second Amendment's plain text protects the ability to possess

multiple arms, which we conclude[d] it does, then it also protects the ability to acquire multiple arms." *Id.* at 1243. Thus, because California's "one-gun-a-month law" constrained acquisition, it triggered the Second Amendment. *Id.* at 1242–43. Because Hawaii's laws likewise constrain acquisition, they too trigger *Bruen*'s test.

2

The three-judge panel dissent agreed that acquisition is a predicate act necessary to possession. *Yukutake*, 130 F.4th at 1111 (Bea, J., dissenting). But the dissent would protect acquisition "only to the extent necessary" to prevent the government from effectively denying possession or carry. *Id.* at 1111–13. That limitation does not come from the Amendment's text. Once acquisition is recognized as necessary to "keep" an arm, it is conduct through which the textual right is exercised. It thus becomes conduct covered and presumptively protected by the Second Amendment's plain text. *See Bruen*, 597 U.S. at 24.

The predicate-act canon supports the textual answer. "The law has long recognized that the '[a]uthorization of an act also authorizes a necessary predicate act.'" *Luis*, 578 U.S. at 26 (Thomas, J., concurring in the judgment) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 192 (2012)). The principle applies to constitutional rights: "Constitutional rights thus implicitly protect those closely related acts necessary to their exercise." *Id.* Justice Thomas has given the Second Amendment as an example, explaining that the right to keep and bear arms implies a corresponding right to obtain ammunition and acquire and maintain proficiency with weapons. *Id.*

"There comes a point at which the regulation of action intimately and unavoidably connected with a right is a regulation of the right itself." *Jones*, 34 F.4th at 716 (cleaned up) (quoting *Luis*, 578 U.S. at 26 (Thomas, J., concurring in the judgment)). Acquiring an arm is not merely helpful to keeping it. It is logically necessary. The "core Second Amendment right wouldn't mean much without the ability to acquire arms." *Nguyen*, 140 F.4th at 1241 (cleaned up). After all, the government could nullify the right to possess newly made arms if it could prohibit every purchase, gift, inheritance, or transfer while insisting that possession itself remained lawful. Even short of total prohibition, the government could make it so inconvenient and expensive to acquire arms, that it effectively discourages most citizens from doing so. The Second Amendment's text does not guarantee citizens the right to keep only whatever weapons happen to be in their hands before the government closes all lawful channels of acquisition. Without protection for "closely related rights" like the acquisition of firearms and ammunition, "the Second Amendment would be toothless." *Luis*, 578 U.S. at 27 (Thomas, J., concurring in the judgment).

Other constitutional provisions illustrate the flaw. The freedom of the press would offer little protection if the government could forbid publishers from obtaining paper, ink, cameras, computers, or distribution services. *See Ortega*, 148 F.4th at 1143 ("As paper or a computer is a necessary predicate to the right to print, . . . acquiring, purchasing, and possessing firearms is a necessary predicate to keeping and bearing them."). The free exercise of religion would be hollow if the government could prohibit congregations from acquiring Bibles or leasing church buildings while claiming that worship itself remained

untouched. *See id.* ("Common sense dictates that the right to bear arms requires a right to acquire arms, just as the right to free press necessarily includes the right to acquire a printing press, or the right to freely practice religion necessarily rests on a right to acquire a sacred text."). And the right to counsel necessarily protects reasonable steps to retain counsel. *See Luis*, 578 U.S. at 25 (Thomas, J., concurring in the judgment). In each setting, the predicate act is protected to an equal degree—were it otherwise, the express right could be extinguished indirectly. *Cf. Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866) ("The legal result must be the same, for what cannot be done directly cannot be done indirectly.").

The three-judge panel dissenting view that "[t]he plain text of the Second Amendment does not wholly protect the purchase or the acquisition of firearms," *Yukutake*, 130 F.4th at 1109 (Bea, J., dissenting), "makes no more sense than saying that the First Amendment's text does not protect the right to acquire copies of books, audio files, or movies," *id.* at 1092 (Maj. Op.). The panel majority said it right: the dissent's "view would still allow all manner of harassing limitations on the acquisition of firearms, *without any constitutional scrutiny whatsoever*, so long as those limitations fall short of ultimately preventing a citizen from possessing firearms for self-defense." *Id.* Ignoring the predicate-act canon and excluding the acquisition of arms from the umbrella of the Second Amendment's full protection reduces it to "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780). That we may not do.

B

Hawaii argues, and the majority agrees, that Plaintiffs have not shown a practical denial of the ability to acquire and possess firearms. *See* Maj. Op. 21. But *Bruen* step one asks whether the text covers the conduct, not whether the law destroys the right altogether. Laws that "infringe" the right to keep and bear arms implicate the Second Amendment. Because the majority resolves this case based solely on footnote 9, it does not reach the question of what "infringe" means under the Second Amendment. Maj. Op. 22. But applying *Bruen* correctly, we should have addressed this question and held that "infringe" encompasses burdens short of destruction of the right.

The Second Amendment's text says, "shall not be infringed," not "shall not be denied." U.S. Const. amend. II. At the Founding, to infringe included to violate, destroy, impede, or hinder; to hinder included obstructing for a time or interposing obstacles. *See Md. Shall Issue*, 116 F.4th at 244 (Richardson, J., dissenting) (collecting Founding-era definitions and concluding that they "defined 'infringe' to include burdens that fell short of total deprivations").

"Shall not be infring[ed]" forbids destruction of the right, such as a ban on all gun ownership. *Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022). "But it also forbids lesser violations that hinder a person's ability" to keep and bear arms. *Id.* (cleaned up). The Supreme Court approvingly quoted this understanding in *Heller*, stating that the right shall not be "infringed, curtailed, or broken in upon, in the smallest degree." 554 U.S. at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)). Similarly, we defined infringement in *Nguyen* as "[a]n encroachment or trespass on (a right, privilege, etc.)." 140 F.4th at 1243 (quoting *Infringement*,

Black's Law Dictionary (12th ed. 2024)). In short, a constitutional infringement need not eliminate every means of exercising the right.

The challenged Hawaii laws impose direct legal obstacles on the exercise of the Second Amendment right. Section 134-2(e) makes a handgun permit void unless used within 30 days. If the permittee cannot complete the acquisition in that window—for instance, because the chosen handgun is unavailable, a seller is delayed, work or family obligations intervene, or a transaction otherwise falls through—the permittee must begin again. Yukutake experienced that consequence under the former 10-day rule. *Yukutake*, 130 F.4th at 1081. Section 134-3 requires covered persons to transport an acquired firearm to a police department for inspection. Each regulation controls a mandatory step in taking and retaining lawful possession. That is enough to bring the conduct within the Second Amendment's plain text.

By failing at the start, the majority misses an opportunity to clarify our prior misguided precedent suggesting that some other test—i.e., means-end scrutiny or "meaningful constraint"—can precede or replace *Bruen* step one. *See, e.g.*, *B & L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1958 (2025). A "meaningful constraint" screen becomes especially impermissible if it asks courts to weigh the severity of the burden before taking the text seriously. *See id.* at 118–19. *Bruen* rejected as "one step too many" any test that turned constitutional scrutiny on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." 597 U.S. at 18–19. A rule that demands near-total denial before history matters recreates the rejected interest-balancing threshold under a new name. And even if

the meaningful-constraint test is viewed as applying at step one rather than before step one, it would still be deficient because whether the challenged law permissibly burdens the right to bear arms is "out of place" at step one. *Wolford*, 146 S. Ct. at 2049.

We should have overruled our mistaken "meaningful constraint" test in *B & L Productions*, 104 F.4th at 118–19. But even *B & L Productions* does not support a practical-denial threshold in this case. *B & L Productions* addressed contracts for firearm sales on state property. 104 F.4th at 111. Individuals remained free to examine firearms at a show, leave the property, and immediately order the desired item elsewhere. *Id.* at 117–20. The decision expressly distinguished a limited restriction on the purchase of firearms and a ban covering all sales of a type of arm in a region. *Id.* at 117 n.17, 119. Hawaii's rules, in contrast, apply statewide to the covered acquisitions; there is no lawful location within Hawaii where a handgun permittee may avoid the deadline, and federal law sharply limits Hawaii residents' ability to obtain a handgun elsewhere. Haw. Rev. Stat. § 134-2(e); 18 U.S.C. § 922(b)(3) (prohibiting licensed dealers from selling handguns to out-of-state residents). The universal acquisition rules here do not resemble the location-specific contracting restrictions in *B & L Productions*.

* * *

Under *Bruen*, once protected conduct is covered, the government bears the burden to establish a historical tradition. 597 U.S. at 24. If the burden is genuinely ordinary and longstanding, that history should not be difficult to identify. Shifting the burden to the citizen when the state argues that the regulation is modest is exactly the kind of

judicial interest balancing *Bruen* removed from the analysis. *Id.* at 23–24. That brings us to *Bruen* step two.

III

*Bruen* step two ends the inquiry—Hawaii's regulations infringe on the right to keep arms and are not "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. Hawaii need not produce a "historical twin." *Id.* at 30. Modern laws may address unprecedented societal concerns or dramatic technological changes through a more nuanced analogical inquiry. *Id.* at 27. But nuance does not dispense with comparison. The State still must identify a "well-established and representative historical analogue" whose operation and justification are relevantly similar to the challenged law. *Id.* at 29–30. The primary considerations are the regulation's "how" and "why." *Rahimi*, 602 U.S. at 692. "The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld"; the more it diverges, the less likely it is to survive. *Hemani*, 146 S. Ct. at 1686.

And while the Supreme Court has never engaged in "an exhaustive historical analysis . . . of the full scope of the Second Amendment," *Rahimi*, 602 U.S. at 702 (quoting *Bruen*, 597 U.S. at 31), it has illustrated how to conduct a historically grounded inquiry into our history of firearm regulation. That inquiry should neither devolve into a reflexive prohibition on firearms nor a reflexive prohibition on firearm regulation. It should prompt courts to evaluate whether the burden placed on the Second Amendment right is analogous with our tradition of firearm regulation.

In its en banc supplemental brief, Hawaii ignores its burden under *Bruen* to present any historical analogues,

choosing instead to focus on footnote 9. That alone is telling. But in its supplemental brief to the three-judge panel, Hawaii presented three categories of historical analogues to support its laws: loyalty oaths, pardons, and militia laws. When applied to the two regulations at issue, each historical analogue fails in both the "how" and "why."

A

There is no historical analogue to Hawaii's 30-day deadline for handgun purchases. Hawaii invokes Revolutionary-era loyalty oaths and the longstanding power to pardon convicted persons. These analogues are offered to justify permitting in general, not the 30-day expiration rule, and thus are framed at too high a level of generality. *Cf. Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) ("A court must be careful not to read a principle at such a high level of generality that it waters down the right."). That already leaves a gap: neither an oath nor a pardon became void because the restored person failed to purchase an arm within a few weeks. But the proposed analogies fail even at the broader level Hawaii advances them.

The "how" of these laws was very different. The loyalty-oath laws disarmed persons regarded as disloyal to the new governments during the Revolution. Under Hawaii's examples, refusing an oath could produce a broad loss of civic rights, while taking the oath could remove that disability. Hawaii characterizes the oath as a "request" for official permission to own a firearm. That is not how the law operated. The oath addressed a defined wartime ground for disarmament—refusal to pledge allegiance—not the ordinary citizen's acquisition of an arm. The laws thus disabled persons treated as disloyal and restored their general civic status if they supplied the assurance. The laws

did not require all citizens, including those never suspected of disloyalty, to seek transaction-by-transaction approval before acquiring arms.

Their "why" was also particular. Revolutionary governments feared allegiance to an enemy sovereign, refusal to support the new polity, and the resulting risk of aid to hostile forces. Hawaii's deadline does not address allegiance, wartime sabotage, or an identified reason to doubt any applicant. Haw. Rev. Stat. § 134-2(e). Instead, it seeks freshness in administrative information by making every approval expire automatically. Framing both purposes as "dispel[ling] potential dangerousness" abstracts away the very distinctions *Bruen* and its progeny require courts to examine.

Pardons are further afield. A pardon is an act of sovereign clemency after conviction. *United States v. Wilson*, 32 U.S. (7 Pet.) 150, 160 (1833) (opinion of Marshall, C.J.). It can forgive an offense and restore legal rights lost because the recipient committed it. *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380 (1866). Hawaii calls a pardon application a request for official approval to own a firearm and says both pardons and permits protect community safety.

But the "how" is not comparable. A person subject to a conviction-based disability receives clemency from the consequences of an adjudicated offense. An ordinary Hawaii resident who has committed no disqualifying act must obtain routine preacquisition approval and, for each handgun transaction, use it within 30 days. Haw. Rev. Stat. § 134-2(e). Extraordinary relief for a person already lawfully disabled is not analogous to a universal precondition imposed on law-abiding, responsible citizens.

Additionally, the pardon tradition was based on the exercise of discretion. *See Wilson*, 32 U.S. at 160 ("A pardon is an act of grace . . . ."). Proffering this as a historical analogue suggests that Hawaii may still conceptualize its permitting requirement as a may-issue scheme.

The "why" also differs. The pardon power historically served mercy, correction of harsh judgments, restoration, reconciliation, and executive control over punishment. *See Herrera v. Collins*, 506 U.S. 390, 411–15 (1993) (clemency's historic role in correcting judgments); *Biddle v. Perovich*, 274 U.S. 480, 486 (1927) (pardons as instruments of public welfare); *Knote v. United States*, 95 U.S. 149, 152–54 (1877) (amnesty and reconciliation); *Garland*, 71 U.S. at 380 (restoration). Clemency was not a device for keeping every ordinary citizen's background information current before an arms transaction. Nor does the pardon tradition establish that government may repeatedly suspend a qualified citizen's acquisition authority without any new reason to doubt that citizen.

*Rahimi* and *Hemani* reinforce the distinction. *Rahimi*, 602 U.S. at 698–700; *Hemani*, 146 S. Ct. at 1694. Focused historical laws may support focused modern restrictions on persons shown or reasonably thought to present a particular danger. *Rahimi*, 602 U.S. at 698; *Hemani*, 146 S. Ct. at 1692 n.6. But a tradition directed at a discrete class does not automatically justify a broad rule imposed on the public generally. *See Rahimi*, 602 U.S. at 698–99. Hawaii's oath and pardon analogies therefore prove, at most, that the government historically could impose or remove disabilities for persons based on national allegiance or criminal convictions. They do not support automatic expiration of every loyal, law-abiding, and responsible citizen's handgun permit.

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 56 of 84



Hawaii accordingly loses on § 134-2(e). It has no analogue from the relevant historical periods, and its status-based examples operate for different reasons and against different persons. The 30-day rule fails at *Bruen* step two.

B

Hawaii mounts a slightly better historical defense of its physical inspection law. The State points to colonial and early state militia laws. These laws commonly required able-bodied men of military age to enroll in the militia, furnish specified arms and ammunition at their own expense, maintain that equipment in serviceable condition, appear at musters, and submit the equipment to review. Connecticut required persons obliged to keep arms to bring them to a designated place so an officer could identify deficiencies. South Carolina fined militiamen whose arms or equipment were deficient at muster. Massachusetts required periodic examinations of company arms and equipment. The Militia Act of 1792 directed brigade inspectors to inspect arms and report on the condition of militia equipment.

Those enactments establish a genuine tradition: the government could inspect militia equipment to enforce an affirmative public duty of military readiness. *See Jones*, 34 F.4th at 718–19 ("Militia membership also included some of what we might now call regulation: members of the militia were required to meet regularly for weapons inspection and registration." (cleaned up)). But that tradition differs from Hawaii's compulsory police inspection of newly acquired private handguns in both the "how" and the "why."

Begin with the "how." Militia inspection attached to enrollment and the public obligation to appear equipped for service. It did not affect the acquisition of arms because the covered person already possessed the weapon. Review

occurred at a muster, training day, or other militia proceeding and tested whether the arms required for service were present and fit. Deficiency of arms could produce a fine or other consequence tied to failure to perform that public duty. Unlike § 134-3, the inspection was not triggered by a purchase, gift, inheritance, importation, or private transfer. It did not condition an ordinary citizen's acquisition of an arm for self-defense or other private purposes on transporting the arm to civilian police within a few days.

Hawaii argues that the affirmative duty to "provide" oneself with a musket necessarily implied official approval to acquire one. That argument reverses the historical law's operation. A command to obtain and maintain an arm presupposes that the citizen may acquire it; it is not a licensing decision. The government did not first investigate every militiaman, issue transaction-specific permission, and then cancel that permission if unused. The laws compelled arms possession for a public function. Hawaii's laws restrict the process of private acquisition. Opposite commands cannot be made analogous by broadly describing both as governmental involvement with guns.

The State also emphasizes militia "returns"—reports listing companies, equipment, and in sometimes each man's equipment—and describes them as early registration requirements analogous to § 134-3. Even accepting that label, the operative difference remains. The returns documented compliance with a military unit's equipment requirements and the readiness of its subordinate units. They were generated through the chain of command because officials needed to know whether the militia could field properly armed men. Hawaii's inspection is part of a civil registry keyed to new private acquisitions, the firearms'

serial numbers and features, and future law-enforcement use. *See* Haw. Rev. Stat. § 134-3. Recording military readiness is not the same historical practice as compelling physical presentation of privately acquired arms for identification and tracking.

Hawaii contends that militia service was pervasive among those who possessed full civil rights, so the distinction between militiamen and civilians should not matter. But the prevalence of militia service does not eliminate the distinction between the public duties of militiamen and the private rights of citizens. The same individual may have kept a private arm for self-defense and owed a public duty to appear with suitable equipment. The inspection authority followed from the latter duty. *Heller* rejected the proposition that the right to keep arms depended on militia service; the "*central component* of the right" was self-defense. 554 U.S. at 599. A widespread obligation imposed on citizens when acting as militiamen does not become a general power over those citizens whenever they privately acquire arms for "self-defense and hunting." *Id.*

The modern law's "why" is further removed. Militia inspection ensured that the body charged with collective defense had enough serviceable, standardized equipment to perform that role. It enforced a duty to be armed and ready. Hawaii contends that its inspection requirement protects against "internal threats (e.g., criminals)." And its filings identify a series of aims: verifying serial numbers, detecting unserialized "ghost guns," discovering prohibited weapons or accessories, correcting transcription errors, and the ability to trace a firearm recovered in a later criminal investigation. Those are concerns about contraband, identification, record accuracy, and law enforcement. They are not concerns about whether a citizen's arms are fit for public military service.

Hawaii says the difference between external defense and internal law enforcement is immaterial because militias also pursued criminals, and both systems served "the security of the community." Again, that argument proceeds at a level of generality *Bruen* forbids. 597 U.S. at 30. Almost every firearms law could be argued to promote community security in some way. *Rahimi* asked whether Founding-era laws regulated arms to address the relevant "particular problem." 602 U.S. at 692. *Hemani* likewise examined the analogue's purpose and operation, not a universal aspiration such as safety. 146 S. Ct. at 1686–87. The militia's occasional law-enforcement function still depended on armed citizens being equipped to perform a public duty. Hawaii's inspection instead examines private arms as potential contraband or future evidence. *See* Haw. Rev. Stat. § 134-3. The policy concerns, and the ways to address them, remain different.

Whether the historical tradition supports inspection of militia equipment for militia readiness, *see Jones*, 34 F.4th at 717–19, it does not support Hawaii's acquisition-linked inspection for serial-number enforcement and tracing.

* * *

The result at *Bruen* step two is straightforward. Hawaii bears the historical burden, and Hawaii has not carried it. Section 134-2(e)'s automatic 30-day permit expiration and § 134-3's acquisition-linked physical-inspection requirement are inconsistent with the Nation's historical tradition of firearm regulation.

IV

The majority's opinion tracks other courts' interpretations of footnote 9. But footnote 9 cannot bear the doctrinal weight the majority places on it. Read in context,

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 60 of 84



the footnote states that objective public-carry licensing criteria—to ensure that those carrying handguns outside the home are "law-abiding, responsible citizens"—are not necessarily unconstitutional. The footnote does not create a freewheeling presumption of constitutionality for every objective feature of every firearms-licensing statute. And it does not endorse burden-shifting by label. A state may not take a likely constitutional background-check requirement, append a novel post-approval restriction, call the combined statute "shall-issue," and require citizens to prove practical denial without identifying any historical basis. Such an approach runs afoul of *Bruen* and reduces the Second Amendment to "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780).

*Bruen*'s ordinary framework resolves this case. Acquisition is covered by the Second Amendment's plain text because it is a necessary predicate to keeping an arm. *Jones*, 34 F.4th at 716. Hawaii's statewide purchase deadline and physical-inspection mandate burden that protected conduct. Hawaii therefore must demonstrate that those laws are consistent with the Nation's historical tradition. Hawaii has not done so. No representative historical analogue supports voiding an approved handgun permit after 30 days. And colonial militia inspection laws ensured that enrolled militiamen possessed functional arms for public defense; they did not condition private acquisition on presenting a firearm to police.

We should have affirmed the district court's grant of summary judgment to Plaintiffs. I respectfully dissent.

FORREST, Circuit Judge, dissenting:

Since *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Supreme Court has applied a two-step text-history-tradition framework for Second Amendment analysis. *See id.* at 24; *United States v. Rahimi*, 602 U.S. 680, 692 (2024); *United States v. Hemani*, 146 S. Ct. 1677, 1685 (2026); *Wolford v. Lopez*, 146 S. Ct. 2032, 2043 (2026). Reasonable minds may disagree on the efficacy of that framework or how to apply it. But we cannot sidestep it. In my view, that is what the majority does by following in the footsteps of others who have adopted a safe-harbor for shall-issue licensing regimes based on *Bruen*'s footnote nine. I join all but Part I–C of Judge Nelson's opinion explaining the serious problems with the majority's approach.[1] I write separately only to address the scope of the injunction that the district court issued because, while I would have affirmed the district court on the merits, I also would have remanded with instructions for the district court to narrow its permanent injunction in light of *Trump v. CASA, Inc.*, 606 U.S 831 (2025).

Courts generally only have the authority to "administer complete relief *between the parties*." *Id.* at 851 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928) (emphasis in original)). Injunctions that afford relief beyond the parties typically exceed the scope of federal equitable powers. *See id.* at 842–43; *see also* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 425 (2017). Here, the district court permanently enjoined Hawaii from enforcing Hawaii Revised Statutes §§ 134-2(e) and 134-3 against any person. Obviously, this

[1] I do not join Part I–C because it is an unnecessary application of an incorrect standard.

injunction bars Hawaii from enforcing its challenged regulations against individuals other than the Plaintiffs. As such, I would reject Plaintiffs' request that we summarily affirm the district court's decision because the injunction that it issued is overbroad. *See CASA*, 606 U.S. at 843–44.

Plaintiffs misunderstand the relationship between complete relief in a facial challenge and universal relief. These concepts are "not synonymous." *CASA*, 606 U.S. at 851. Complete relief in this case is preventing enforcement of the challenged statutes in all circumstances *against the Plaintiffs*. That might "advantage nonparties," but it does so "only incidentally." *Id.* (quoting *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)). By contrast, universal relief—enjoining enforcement of the regulations against any person subject to them—would grant nonparties direct relief, which *CASA* disfavors. *Id.* at 851–54.

While there may be rare cases where issuance of universal relief is appropriate, this is not one of them. Universal relief is not necessary to remedy Plaintiffs' alleged harm. And properly understood, a facial challenge does not and cannot erase the challenged provisions from the Hawaii Revised Statutes. *See Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring) (citing Jonathan Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1016–17 (2018)).

To the extent that *Vasquez Perdomo v. Noem* suggests a different result, it is distinguishable. 148 F.4th 656, 686–87 (9th Cir. 2025) (per curiam), *cast into doubt by Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025). *Vasquez Perdomo* concerned a district-wide temporary restraining order sought by a broad putative *class*. *Id.* at 664. And the nature of the traffic-stop practice being enjoined apparently thwarted the

court's ability to afford complete relief to the class while limiting the scope of relief to just class members. *Id.* at 686–87. Assuming *Vasquez Perdomo* was decided correctly, *see Noem*, 146 S. Ct. at 1 (staying the district court's TRO without opinion), it may be an example of a case that warrants broad relief, *see CASA*, 606 U.S. at 853–54. But here, there is no need to enjoin enforcement of Hawaii's challenged laws against anyone other than the Plaintiffs to afford the Plaintiffs complete relief. As such, while the district court correctly concluded that Hawaii's challenged statutes violate the Second Amendment, the permanent injunction that it entered universally preventing enforcement of those statutes should have been narrowed.

---

VANDYKE, Circuit Judge, dissenting:

By my count, the Supreme Court has decided seven Second Amendment cases since 2008.[1] Each of those cases, save one, was decided the same way: the Court invalidated the government's challenged firearm regulation. Along the way, the Court and its Justices have repeatedly instructed lower courts that the Second Amendment really is a part of our Constitution, that it really means what it says, and that it really prohibits the government from abridging the people's

---

[1] *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *United States v. Rahimi*, 602 U.S. 680 (2024); *United States v. Hemani*, 608 U.S. ----, 146 S. Ct. 1677 (2026); *Wolford v. Lopez*, 609 U.S. ----, 146 S. Ct. 2032 (2026).

right to own, obtain, carry, and make use of "all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582; *Rahimi*, 602 U.S. at 712–13 (Gorsuch, J., concurring) ("Perhaps judges' jobs would be easier if they could simply strike the policy balance they prefer. And a principle that the government always wins surely would be simple for judges to implement. But either approach would let judges stray far from the Constitution's promise."); *Wolford*, 146 S. Ct. at 2060–61 (Barrett, J., concurring) ("This case … is not hard. While most Hawaiians might prefer that no one carry firearms in public places, a majority's opposition to a constitutional right is not a permissible basis for restricting it.").

But in spite of the Court's obvious efforts to instruct lower courts to enforce the Second Amendment, the Ninth Circuit has done precisely the opposite. That's not a rhetorical statement: in this circuit, the Second Amendment safeguards *less* liberty now than it did in the wake of *Heller*.[2]

For Exhibit A on how things have changed in the wrong direction, look no further than the majority's opening paragraph. The majority recalls that the district court "blocked the implementation of [Hawaii's] firearm licensing regime on Second Amendment grounds" the year before *Bruen* was decided. Maj. Op. at 10. The legal basis for reversing that injunction, according to the majority, is the "guidance" that *Bruen* provided on "how courts should

[2] Of course, the difference is slight: not because our court is necessarily more anti-Second Amendment than it used to be, but rather because this court has always consistently resisted enforcement of the Second Amendment. *See Knife Rights, Inc. v. Bonta*, 182 F.4th 797, 802–3 (9th Cir. 2026) (VanDyke, J., dissenting from the denial of rehearing en banc). It's hard to get much worse when you're already touching the bottom.

analyze 'shall-issue' regimes like Hawaii's." *Id.* I agree that *Bruen* changed the law. But if our court's takeaway from *Bruen* is that *Bruen* changed the law to make it *harder* to mount a successful Second Amendment challenge, then somebody has seriously lost the plot.

The Supreme Court's efforts to enforce the Second Amendment, while laudable, have failed—in this circuit, at least.[3] Elsewhere, I've floated some ideas for practical

[3] For Exhibit B, take a look at what happened after the Supreme Court reversed one of our Second Amendment decisions just this past Term. In *Wolford*, the Supreme Court struck down a Hawaii law that "generally prohibit[ed] licensed individuals from carrying a firearm, even if unloaded or inoperable, 'on private property of another.'" 146 S. Ct. at 2046 (quoting HAW. REV. STAT. § 134–9.5(a)). The Supreme Court granted certiorari on the constitutionality of only one of Hawaii's provisions, but it noted that the provision was part of a more comprehensive regime that Hawaii had adopted in the wake of *Bruen* to make it "almost impossible … to carry a firearm." *Id.* at 2040. Indeed, the Court observed that Hawaii "flatly prohibited" firearm possession "[o]n a large portion of the land within [Hawaii]'s boundaries," including in any library, hospital, college, beach, amusement park, and a host of other places. *Id.* at 2040, 2046. Our court, of course, had blessed the lion's share of this regime. *See Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024). But the Supreme Court did not look kindly on that blessing, observing that Hawaii's regime "hobble[d] what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives." *Wolford*, 146 S. Ct. at 2041.

After it was done explaining how badly our court had botched our Second Amendment analysis, the Supreme Court remanded the case back to our court to clean up the mess that we had made. *Id.* at 2053. What did we do? Order supplemental briefing? Hear another round of oral argument? Acknowledge the need to rethink our approach? Nope. The same panel that got reversed entered a one-and-a-half page opinion stating—with zero analysis—that the Supreme Court's decision had *no effect* on any of its prior analysis except with respect to the single provision that the Supreme Court explicitly struck down. *See Wolford v.*

*tactics* the Court might use to get our court to start faithfully applying the Second Amendment. *See Knife Rights*, 182 F.4th at 813–16 (VanDyke, J., dissenting from the denial of rehearing en banc). But a few *doctrinal* tweaks wouldn't hurt, either. Our court always conveniently seems to conjure up exceptions or loopholes for cases like *Heller* and *Bruen*—and the Supreme Court's other Second Amendment instruction that so many of my colleagues dislike.[4] There's

*Lopez*, No. 23-16164, 2026 WL 2291925, at *2 (9th Cir. Aug. 10, 2026) ("Our analysis as to all other aspects of Hawaii's law is unaffected."). You might be thinking "unbelievable," but I think the word you're looking for is "predictable." *See Knife Rights*, 182 F.4th at 816 (VanDyke, J., dissenting from the denial of rehearing en banc) ("*Wolford*'s nice, but it literally affects nothing on my court.").

[4] The obvious upshot of our court's obstinate refusal to sustain any Second Amendment challenge is that governments within this circuit can implement pretty much any firearm regulation they want and get away with it. A less obvious (but not less important) ramification is that our jurisprudence has a chilling effect on bringing Second Amendment challenges in the first place. Litigation is expensive—especially when a case lasts for several years and involves multiple levels of proceedings before a district court, a three-judge panel, and an en banc panel. These costs stretch "the already-limited resources of nonprofit advocacy groups that must go up against taxpayer-funded state governments with seemingly unlimited litigation resources." Brief of Amici Curiae Second Amendment Foundation, California Rifle & Pistol Association, Incorporated, & Second Amendment Law Center, Inc. in Support of Plaintiffs-Appellees at 2.

Congress recognized this imbalance. That's why it "authoriz[ed] the district courts to award a reasonable attorney's fee to prevailing parties in civil rights litigation … to ensure effective access to the judicial process for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks and citation omitted); *see* 42 U.S.C. § 1988(b). But a party who does not ultimately "prevail[]" cannot recover fees. 42 U.S.C. § 1988(b). And since it's basically impossible for Second Amendment challengers to ultimately "prevail[]"

nothing wrong with those decisions, and, if our court routinely applied them correctly, our caselaw would be in a respectable place. But, to give effect to the Second Amendment and to prevent our court from perpetually shifting the goalposts toward my colleagues' preferred outcomes, the Supreme Court needs to start enforcing more strict rules to supplement the *Bruen* framework. Some firearm regulations ought to be completely off the table.

Half a decade ago, I proposed two "bright-line" rules that could resolve a sizable chunk of our Second Amendment cases and make it much harder for recalcitrant judges to ignore the law. *See Duncan v. Bonta*, 19 F.4th 1087, 1161 (9th Cir. 2021) (VanDyke, J. dissenting), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022). First, if a "firearm product or usage that a state seeks to ban is currently prevalent throughout our nation," then it should simply be unconstitutional to ban it.[5] *Id.* Second, if a state has a firearm regulation that "most other states don't" have, then the regulation should be unconstitutional.[6] *Id.* I continue to believe that incorporating these bright-line rules into our Second Amendment jurisprudence would accord with Supreme Court precedent, leave minimal room for judicial manipulation, and (perhaps something that my colleagues

in this circuit, the price tag for bringing a Second Amendment challenge here is egregiously hefty. That threatens "effective access to the judicial process" for persons interested in asserting their Second Amendment rights. *Hensley*, 461 U.S. at 429 (internal quotation marks and citation omitted).

[5] I will refer to this principle as the "common-use rule."

[6] I will refer to this principle as the "outlier rule."

could get behind, even if they dislike the substance of the rules) make our jobs as judges easier.

Applying these rules would make this an easy case. Hawaii's byzantine firearm-registration requirements are outliers. Ergo, Hawaii shouldn't be allowed to enforce them. The majority's conclusion otherwise distorts the Second Amendment, so I respectfully dissent.

**I.**

It's hard to imagine how the same court of appeals that gave the government an "undefeated, 50–0 record" in Second Amendment challenges *before Bruen* could—with the Supreme Court's subsequent direction in *Bruen*, *Hemani*, and *Wolford*—develop a body of law *less* sympathetic to firearm-regulation challengers. *Rahimi*, 602 U.S. at 712 (Gorsuch, J., concurring). But we've managed to do so. Where there's a will, there's a way, I guess. And—when it comes to blessing firearms regulations enacted by the governments of this circuit—our court has never been wanting in will.

I need not retell the story of "our court's long campaign against the Second Amendment." *Knife Rights*, 182 F.4th at 806 (VanDyke, J., dissenting from the denial of rehearing en banc). But to see how our caselaw is getting worse, not better, consider our post-*Heller*, pre-*Bruen* jurisprudence.

Before *Bruen*, we evaluated Second Amendment challenges under "a two-step framework." *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *abrogated by Bruen*, 597 U.S. 1 (2022). First, we would "ask if the challenged law affect[ed] conduct that is protected by the Second Amendment" based on the "historical understanding

of the scope of the right." *Id.* (internal quotation marks and citation omitted). "If the challenged restriction burden[ed] conduct protected by the Second Amendment," then "we [would] move to the second step of the analysis and determine the appropriate level of [means-ends] scrutiny." *Id.* at 784. "If a regulation amount[ed] to a destruction of the Second Amendment right, it [was] unconstitutional under any level of scrutiny." *Id.* (internal quotation marks and citation omitted). If a regulation "implicate[d] the core of the Second Amendment right and severely burden[ed] that right," it would "receiv[e] strict scrutiny." *Id.* (internal quotation marks and citation omitted). And if a regulation affected Second Amendment rights "in some lesser way, we [would] apply intermediate scrutiny." *Id.* (citation omitted).

This "exceptionally malleable" approach had no shortage of flaws. *McDougall v. Cnty. of Ventura*, 23 F.4th 1095, 1119 (9th Cir.) (VanDyke, J., concurring), *reh'g en banc granted, opinion vacated*, 26 F.4th 1016 (9th Cir. 2022), and *on reh'g en banc*, 38 F.4th 1162 (9th Cir. 2022). At step one, we would typically just "assum[e], rather than decid[e], that the regulation at hand burden[ed] conduct protected by the Second Amendment." *Id.* at 1121. And at step two, we would invariably select intermediate scrutiny, apply a level of scrutiny that "essentially equate[d] to rational basis review," and bless the regulation. *Id.* at 1119.

But our paper-tiger Second Amendment regime, at least in theory, had two teeth: (1) we would recognize that a regulation implicated a constitutional right, even when the regulation imposed a less-than-absolute burden on citizens' ability to acquire firearms, and (2) we would require at least *some* justification for the regulation. Consider *Silvester v. Harris*, where, before *Bruen*, a panel of our court assessed the constitutionality of a California law that imposed a

ten-day waiting period "for all lawful purchases of guns" by purchasers who cleared a background check in less than ten days and who had "previously purchased a firearm or ha[d] a permit to carry a concealed weapon." 843 F.3d 816, 818 (9th Cir. 2016), *abrogated by Bruen*, 597 U.S. 1. The panel (spoiler alert) upheld the regulation, but the panel still required the regulation to satisfy intermediate scrutiny—even though the panel opined that the regulation "[did] not place a substantial burden on Second Amendment rights." *Id.* at 827.

The paper tiger served its purpose well: preserving the optics of a well-defined regime to protect a constitutional right but *never* requiring our court to apply this approach in a way that would invalidate any firearm regulation. In *Silvester*, for instance, the panel stated that the regulation "had the objective of promoting safety and reducing gun violence" and that the government had "met its burden" of passing intermediate scrutiny. *Id.* at 827, 829. This conclusion was par for the course. Governments *always* attempt to justify their gun grabbing by appealing to public safety, and—with the wide latitude that we gave to governments in fashioning their regulations—it's not surprising that our court *always* found any firearm regulation sufficiently tailored to that end. *See McDougall*, 23 F.4th at 1122 n.9 (VanDyke, J., concurring).

But, by at least *saying* that we were applying heightened scrutiny to firearm regulations, we left the door open for district courts within our circuit to invalidate irrational firearm regulations that did no more than impose red tape on prospective and current gun owners. This case provides a good example of that. The district court applied our pre-*Bruen* caselaw and subjected the challenged provisions

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 71 of 84



to intermediate scrutiny.[7] *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1077 (D. Haw. 2021). But the court found that the state government "entirely failed to demonstrate how each law effectuate[d] its asserted interest in public safety, [so] neither law [could] pass constitutional muster." *Id.*

Mystifyingly, even *that* conclusion is too much Second Amendment protection post-*Bruen*, and our court's paper tiger has become a paper kitten. The majority invents a "carve-out" to *Bruen* and declares that "non-discretionary, objective, and non-abusive shall-issue laws … pass constitutional muster" without any ifs, ands, or buts.[8] Maj. Op. at 13, 20. In other words, as long as a law meets the

[7] I agree with the majority that the intervening amendments to the challenged provisions have no constitutional import. *See* Maj. Op. at 12 n.1.

[8] Our pre-*Bruen* caselaw similarly provided for a category of "presumptively lawful regulatory measures." *Young*, 992 F.3d at 783 (quoting *Silvester*, 843 F.3d at 821). But, to qualify for this presumptive constitutionality, a regulation had to be "sufficiently longstanding"—novel or outlier regulations did not qualify. *Silvester*, 843 F.3d at 819. Today, the majority incredibly reads *Bruen* to require *no historical pedigree at all* to support its presumption. As the district court observed, neither of the challenged regulations here are "longstanding" in any sense. *Yukutake*, 554 F. Supp. 3d at 1082. The permit-use-period regulation existed in only "a handful of similar [state] laws from the 1930s," all except one of which has since been repealed. *Id.* at 1082–83. And the in-person inspection and registration requirement—which was enacted in 2020—has no historical analogue. *Id.* at 1086–87.

But under the majority's approach, unprecedented firearm regulations like the ones here easily pass constitutional muster with no questions asked. This conclusion is out of step not only with *Bruen*'s emphasis on "historical tradition" but also with our previous ahistorical, always-sympathetic-to-the-government, pre-*Bruen* Second Amendment caselaw. *Bruen*, 597 U.S. at 19. Things really have gotten (a little) worse out here on the Left Coast.

conveniently undefined standards of "non-discretionary," "objective," "non-abusive," and "shall-issue," the Second Amendment doesn't apply at all. No constitutional analysis is required, and no justification for the regulation is too stupid to jeopardize the law's constitutionality.

What exactly *is* a "non-abusive shall-issue law[]"? Maj. Op. at 20. The majority leaves us in the dark. The majority faults Plaintiffs for failing to allege in their complaint that either of the challenged provisions "crosses [the] line" between an always-constitutional shall-issue regime and an abusive shall-issue regime.[9] *Id.* at 21. But the majority draws no line. It merely speculates, in wishy-washy language, that "*certain* background checks, firearms safety courses, lengthy wait times, exorbitant fees, or other

[9] Why the majority throws Plaintiffs' *complaint* under the bus is puzzling. If Plaintiffs *could have* pleaded that the challenged provisions are sufficiently abusive, then the question of abusiveness would be one of fact, not of law. After all, "the tenet that a court must accept as true all of the allegations contained in a complaint" at the motion-to-dismiss stage "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). So if "abusiveness" is a question of law, then there was *nothing* Plaintiffs could have alleged in their complaint that would have made a difference.

But if the question of abusiveness *is* a question of fact, then the majority's blanket declaration that the challenged provisions "comport[] with the Second Amendment" is premature on this record, and the majority's remedy of reversal is improper. Maj. Op. at 10. As the majority itself observes, the district court entered its judgment a year before *Bruen* was decided. *Id.* Plaintiffs had no reasonable opportunity to plead that the challenged provisions violated the "footnote 9" doctrine that the majority has just now conjured up. Nor did the parties conduct discovery on whether the challenged provisions are "abusive." So to the extent that abusiveness is a question of fact, the proper remedy would be to vacate the district court's judgment and remand to allow Plaintiffs to amend their complaint.

components of a shall-issue regime *could* trigger the Second Amendment's protections." *Id.* (emphasis added). Anyone who has ever tried to purchase a firearm or obtain a concealed-carry permit would likely be pulling his or her hair out upon reading this speculation. Purchasing a firearm and obtaining a permit to carry it publicly *always* involves "background checks" and "firearms safety courses." Depending on how at-risk, impatient, or wealthy you are, it also involves "lengthy wait times" and "exorbitant fees." The majority's silence as to which parts of the process trigger Second Amendment protection—and which don't—is deafening.

Whether a regulation is part of a "shall issue" regime under the majority's approach is far from obvious. When describing these regimes, the Supreme Court emphasized that they "often require applicants to undergo a background check or pass a firearms safety course" so that governments can ensure "only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Bruen*, 597 U.S. at 38 n.9 (internal quotation marks and citation omitted). Even if footnote 9 *did* create a carveout to the *Bruen* framework (which it did not), it did not hold that *any and all* "narrow," "objective," or "definite" requirements for purchasing a firearm or obtaining a permit are automatically part of a "shall issue" regime. *See id.* At most, it observed that states that *already had* "shall issue" regimes at the time *Bruen* was decided imposed some such requirements on applicants.[10]

[10] Ironically, as both the majority and the dissent recognized in *Bruen*, Hawaii did *not* have a "shall issue" regime at the time *Bruen* was decided. *See Bruen*, 597 U.S. at 15; *id.* at 99–100 (Breyer, J., dissenting).

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 74 of 84



Whether a regulation is "abusive" isn't obvious, either. The only clue that the majority leaves us is that it would be abusive to "effectively deny ordinary citizens their Second Amendment rights." Maj. Op. at 21 (internal quotation marks and citation omitted). This is circular reasoning. To the majority, a shall-issue regime violates the Second Amendment only if it is abusive, and a shall-issue regime is abusive only if it violates the Second Amendment.

And when is the Second Amendment "effectively" violated? Here in the Ninth Circuit, "effectively" never. In a different line of post-*Bruen* cases, to avoid applying *Bruen* itself, we've begun to avail ourselves of another convenient, Ninth Circuit-made rule that "the plain text of the Second Amendment only prohibits meaningful constraints on the right to acquire firearms." *See, e.g.*, *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024). Like the elusive standards the majority invokes today, the definition of "meaningful constraint" has largely been left as an exercise for the reader. But "given our track record with the Second Amendment, you might correctly expect that we'd find all sorts of weapons-related restrictions not really all that 'meaningful.'" *Knife Rights*, 182 F.4th at 808 (VanDyke, J., dissenting from the denial of rehearing en banc). Through its circular reasoning and tacit reference to the atextual "meaningful constraint" test, the majority continues the predictable strategy of *Bruen* avoidance in its path to upholding the regulations challenged here.

One can only guess why the majority has chosen to leave district courts and future panels with more questions than answers. But I suspect that the majority is motivated more by fear than by humility. Had the majority provided more explanation, the flaws in its approach would be even more apparent. For example, suppose that the majority had

defined "abusive" to mean "a regulation that has no legitimate purpose other than to frustrate an ordinary, law-abiding citizen's ability to obtain or carry a firearm," or something like that. Such a definition would require courts to weigh a challenged regulation's burden on the plaintiff (to assess the extent to which the regulation frustrates his ability to obtain a firearm) against the government's interest in enforcing the regulation (to determine whether the regulation has a legitimate purpose). And *that* would too blatantly turn the core holding of *Bruen*—that courts must not "apply[] means-end scrutiny" of any kind "in the Second Amendment context"—on its head. 597 U.S. at 19.

At best, the majority resurrects the very same interest-balancing approach that *Bruen* rejected. But really, it's worse than that—it invites judges in this circuit to rubber-stamp any regulation they like, no matter how unreasonable, so long as it can be plausibly labeled as part of a "non-abusive," "shall-issue" regime. Even our pre-*Bruen* caselaw didn't provide such an easy shortcut for opportunistic governments to bar their residents from exercising their Second Amendment rights. We used to have to work a little harder to reject Second Amendment claims.

## II.

So where do we go from here? Not much has changed with regard to my proposed solution. The Supreme Court needs to constrain the discretion of the lower courts if it wants to induce judges—who often don't personally care much for or know much about guns—to protect the Second Amendment. The Court need not overrule any of its prior doctrine, but it should enforce the common-use and outlier principles as stricter Second Amendment *rules*. Whenever the government "restricts" the keeping or bearing of arms,

*see Wolford*, 146 S. Ct. at 2055 (Barrett, J., concurring), the first question should be whether the regulation passes muster under the common-use and outlier rules. If not, then the regulation should be invalidated. If it does pass muster, then the analysis should proceed through the usual *Bruen* framework, and the regulation should be upheld only if it is "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. In other words, the common-use and outlier rules should function as "unsafe harbors" such that failing to satisfy either test renders a regulation per se unconstitutional.

I won't rehash my entire apologia for these two rules. *See Duncan*, 19 F.4th at 1170–72 (VanDyke, J., dissenting). But, since it's been some time since I've discussed them, I'll explain how they comport with recent Supreme Court precedent.

**A.**

Though the Supreme Court hasn't yet applied the common-use and outlier rules as strictly as I'm envisioning, these rules are derived from Supreme Court precedent, and they fit nicely into the *Bruen* framework: every firearm regulation that would fail the common-use or outlier test would also fail to satisfy *Bruen*'s demands, properly applied. And if that's true, then the Court can develop the *Bruen* framework while also enforcing strict rules that minimize the wiggle room that policy-minded lower courts have weaponized to achieve their desired policy ends. Standards are good, but rules work better when you're dealing with less-than-enthusiastic enforcers.

**1.**

Take the common-use rule first: "any regulation that prohibits a firearm product or usage that is 'in common use' nationally" is unconstitutional. *Id.* at 1170. Such regulations, by definition "regulate[] arms-bearing conduct," which means that they are "presumptively unconstitutional." *Rahimi*, 602 U.S. at 691; *Wolford*, 146 S. Ct. at 2044. After all, the "sorts of weapons" that were historically protected by "the right to keep and carry arms … were those in common use at the time." *Heller*, 554 U.S. at 627 (internal quotation marks and citation omitted). And today, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. Under *Bruen*, then, such a regulation is constitutional only if the government can "affirmatively prove" that it is part of the "historical tradition that delimits the outer bounds of the right to keep and bear arms." 597 U.S. at 19.

At step two of *Bruen*, the government must "identify a well-established and representative historical analogue" to save the challenged regulation from invalidation. 597 U.S. at 30, 32 (emphasis omitted). To save the regulation, the proposed analogue must "impose a comparable burden on the right of armed self-defense" and be "comparably justified" to the challenged regulation. *Id.* at 29; *see also Hemani*, 146 S. Ct. at 1686 ("The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld. Conversely, the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review.").

There will never be an appropriate historical analogue for a regulation that fails the common-use test. Banning common-use firearms or usages is something that "the Founders themselves" obviously could have done to address the "perceived societal problem" of "firearm violence." *Bruen*, 597 U.S. at 26–27. And, by definition, such a ban would "prohibit[] … an entire class of 'arms'" or practices "overwhelmingly chosen by American society" for the "lawful purpose" of "defense of self, family, and property." *Heller*, 554 U.S. at 628. The founding generation, which recognized "the inherent right of self-defense … central to the Second Amendment right," would not have tolerated such regulation. *Id.*

As *Bruen* observed, even laws that superficially *look like* historical analogues banning firearms or uses that are in common use today don't satisfy step two. When searching for a historical analogue to the challenged New York law in *Bruen*, the Court analyzed colonial statutes that "authorized justices of the peace to arrest 'all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively … by Night or by Day, in Fear or Affray of Their Majesties Liege People.'" 597 U.S. at 46. The government argued that these statutes prohibited the bearing of "any offensive weapons, including firearms." *Id.* Even if so, the Court explained, the statutes were not historical analogues:

> Regardless, even if [the government's] reading of these colonial statutes were correct, it would do little to support restrictions on the public carry of handguns *today*. At most, respondents can show that colonial legislatures sometimes prohibited

> the carrying of "dangerous and unusual weapons"—a fact we already acknowledged in *Heller*. Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Thus, *even if these colonial laws prohibited the carrying of handguns* because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Id.* at 47 (final emphasis added) (citations omitted).

This analysis demonstrates that identifying a historical analogue for a ban on a common-use firearm or firearm usage is effectively impossible. The government in *Bruen* came as close as one could. To save its modern restrictions on the public carry of handguns, the government identified a historical regulation that—assuming the government's interpretation was correct—*also* prohibited the public carry of handguns. *Id.* That wasn't enough because, even if the laws were nearly identical in operation (i.e., even if the "how" was similar), they were completely disparate in purpose (i.e., the "why" was different). *See id.* The drafters

of the historical statutes sought to "prohibit[] the carrying of dangerous and unusual weapons." *Id.* (internal quotation marks and citation omitted).

In contrast, if a modern government tried to ban a practice that is "unquestionably in common use today," it *couldn't* have the objective of prohibiting "dangerous and unusual" activities or instrumentalities because, by definition, things in common use are not unusual. *Id.*; *see also Caetano*, 577 U.S. at 417 (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual."). The only way to find a historical regulation with a similar "why" to a ban on a common-use practice would be to identify a historical regulation that banned firearms or firearm usages *that were also in common use during the relevant historical period*. And those historical regulations, of course, didn't exist. *See Heller*, 554 U.S. at 627 (noting that "the sorts of weapons" historically protected by the Second Amendment were "those in common use at the time") (internal quotation marks and citation omitted).

The common-use rule is consistent with *Bruen*. And because imposing it as a bright-line rule would strip our court of much of the wide discretion that we've inappropriately manufactured for ourselves in Second Amendment cases, it would significantly improve our court's approach to those cases. *See Duncan*, 19 F.4th at 1170–71 (VanDyke, J., dissenting).

**2.**

The second rule I propose—the outlier rule—arises from the unremarkable proposition that "the Second Amendment has the same meaning in all parts of the United States." *Wolford*, 146 S. Ct. at 2050. "Merely local attitudes can neither shrink nor inflate the meaning of fundamental Bill of

Rights guarantees that apply to the States through the Fourteenth Amendment." *Id.* But when states like Hawaii enact novel rules that have few or no counterparts in other jurisdictions, they subject the Second Amendment right to "a widely varying patchwork quilt of state and local restrictions and bans that would be an embarrassment for any other constitutional right." *Duncan*, 19 F.4th at 1172 (VanDyke, J., dissenting).

Each of the state and local gun regulations that the Supreme Court has invalidated on Second Amendment grounds have been outliers. The laws prohibiting citizens from keeping a handgun in the home—which were the subject of both *Heller* and *McDonald*—were "extreme outlier[s]; only a few other jurisdictions in the entire country had similar laws." *Bruen*, 597 U.S. at 78 (Alito, J., concurring). So too was the law struck down in *Bruen*, which gave state authorities "discretion to deny concealed-carry licenses even when the applicant satisfie[d] the [relevant] statutory criteria." *Bruen*, 597 U.S. at 13–14. In stark contrast to New York, "the vast majority of States" provided that "authorities must issue concealed-carry licenses whenever applicants satisf[ied]" the relevant statutory criteria. *Id.* at 13. The laws at issue in *Caetano* and *Wolford* were outliers, too. *See Caetano*, 577 U.S. at 420 (Alito, J., concurring) (noting that "hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States" (citation modified)); *Wolford*, 146 S. Ct. at 2045–46 (noting that, after *Bruen*, "Hawaii and four other States" enacted "new laws" providing that "*no one* carrying a firearm may enter [private property open to the public] without express authorization").

Although the Supreme Court didn't directly strike down these laws *because* they were outliers, it's easy to see why it's not a coincidence that all of them were outliers. Under *Bruen*, a challenged regulation must be "consistent with this Nation's historical *tradition* of firearm regulation" to survive judicial review. 597 U.S. at 17 (emphasis added). Just identifying *one* historical analogue—let alone one modern regulatory innovation—won't suffice to show a tradition. In fact, *Bruen* itself expressed doubt that "*three* colonial regulations could suffice to show a tradition" justifying the New York law challenged there. *Id.* at 46. And, applying *Bruen*, the Court has rejected the proposition that proposed historical analogues that were outliers *during the relevant historical period* could save a modern regulation from invalidation. *See Wolford*, 146 S. Ct. at 2050 ("An outlier legal rule adopted in a few locales is not enough. And as we have explained, 'overwhelming evidence' shows an 'enduring American tradition permitting public carry.' Hawaii's prohibitions on public carry represent a distinct outlier." (citations omitted) (quoting *Bruen*, 597 U.S. at 67)).

So, in theory, the only way to justify a regulation that is an outlier *today* at *Bruen*'s second step would be to identify a historical analogue that *wasn't* an outlier during the relevant historical period. The fact that there are so many entirely unprecedented firearm regulations today (like Hawaii's) makes it extremely unlikely that such an analogue would ever exist.[11] But even if there *were* such an analogue,

---

[11] In both its petition for rehearing en banc and its supplemental brief, Hawaii devotes *zero* space to analyzing any potential historical analogue to the provisions challenged here. The majority follows suit. The fact that nobody contends that a historical analogue even exists for the challenged provisions shows that, if we had subjected those provisions

Case: 21-16756, 09/22/2026, ID: 12958474, DktEntry: 207, Page 83 of 84



that analogue almost certainly would fail to satisfy *Bruen*'s requirements. If governments of the past uniformly found it necessary to enforce a regulation—but if most of those governments have since determined that the same regulation is now *unnecessary*—then the modern regulation and the purported historical analogue would not be "comparably justified." *Bruen*, 597 U.S. at 29. The "why" would be different, and the analogue would not be able to save the modern outlier from invalidation. *See id.* at 47.

States that enact firearm regulations that other states have felt no need to enact are usually just trying to "us[e] their 'laboratory of democracy' to conduct ongoing experiments on how to subject a fundamental right to death by a thousand cuts." *Duncan*, 19 F.4th at 1172 (VanDyke, J., dissenting) (citation omitted). Strictly applying the outlier rule would foreclose this strategy—a strategy that today's majority pursues enthusiastically.

* * *

To be clear, the common-use and outlier rules cannot solve every Second Amendment problem, because the rules are not bidirectional. It's not constitutional to ban unusual weapons just because they're unusual any more than it's constitutional to ban unusual speech just because it's unusual. And enacting a firearm restriction that a majority of other states have enacted isn't constitutional just because other states have done it, any more than banning all political speech would be constitutional just because a majority of states decided to do so. If all of law could be reduced to mechanical rules, we wouldn't need lawyers or judges.

---

to *Bruen*'s second step, we could not have reversed the district court's conclusion of a Second Amendment violation.

That's why we still need the unliquidated history-and-tradition framework provided by *Bruen* and subsequent Supreme Court precedent—for the *truly* difficult cases.

This, however, is *not* a difficult case. As Judge Nelson correctly observes, the regulations that are challenged here are outliers, *see* Dissent of R. Nelson, J., at 19, so they are unconstitutional. We should have affirmed the district court on this basis.

## III.

Frankly, our court's scorched-earth approach to the Second Amendment is getting exhausting. I haven't even been on the bench for that long, and I've lost count of the number of dissents that I've written in cases like this one, which is just another verse of the same boring song. I highly suspect that, before too long, the name of this case will have a red flag next to it on Westlaw, just like so many of our court's other Second Amendment cases do. But hopefully next time, when the Supreme Court plants that flag, it will do so with a little more bite than it has before. Until then, I will assiduously but wearily dissent.